# U.S. District Court
## District of New Hampshire (Concord)
## CIVIL DOCKET FOR CASE #: 1:20−cv−00362−JL

McCoy v. Pittsfield, NH, Town of
Assigned to: Judge Joseph N. Laplante
Cause: 42:1983 Civil Rights Act

Date Filed: 03/20/2020
Date Terminated: 10/06/2021
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Joe McCoy**

represented by **Robert M. Fojo**
Fojo Law, P.L.L.C.
264 South River Road
460
Bedford, NH 03110
603−473−4694
Fax: 603−473−4694
Email: rfojo@fojolaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Pittsfield, NH, Town of**

represented by **Robert Joseph Dietel**
Gallagher Callahan & Gartrell PC
214 N Main St
Concord, NH 03301
603 228−1181
Email: dietel@gcglaw.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|------------|---|------|-------------|
| 03/20/2020 | 1 | | NEW CASE/ COMPLAINT with Jury Demand Filing fee $ 400, receipt number ANHDC−1954111 filed by Joe McCoy. (Attachments: # 1 Civil Cover Sheet, # 2 Summons − Waiver)(Fojo, Robert) (Entered: 03/20/2020) |
| 03/20/2020 | | | Case assigned to Judge Joseph N. Laplante. The case designation is: 1:20−cv−362−JL. Please show this number with the judge designation on all future pleadings. (ed) (Entered: 03/20/2020) |
| 03/20/2020 | | | NOTICE. This case has been designated for Electronic Case Filing. All further submissions shall be filed in compliance with the Administrative Procedures for Electronic Case Filing. Pro se litigants are not required to file electronically and may continue to file documents in paper format. Persons filing electronically are strongly encouraged to complete the interactive training modules available on the courts website. To access these modules, click HERE. (ed) (Entered: |

| | | 03/20/2020) |
|---|---|---|
| 03/20/2020 | 2 | Notice of Lawsuit/Waiver issued electronically as to Pittsfield, NH, Town of. **NOTICE: Counsel shall print and serve the notice/waiver <u>and</u> all attachments in accordance with Fed. R. Civ. P. 4.** (Attachments: # <u>1</u> Notice ECF) (ed) (Entered: 03/20/2020) |
| 04/29/2020 | 3 | NOTICE of Attorney Appearance by Robert Joseph Dietel on behalf of Pittsfield, NH, Town of Attorney Robert Joseph Dietel added to party Pittsfield, NH, Town of(pty:dft).(Dietel, Robert) (Entered: 04/29/2020) |
| 05/21/2020 | 4 | WAIVER OF SERVICE Returned Executed as to Pittsfield, NH, Town of by Joe McCoy. Served/Mailed on 4/7/2020. Answer Follow Up on 6/9/2020. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Fojo, Robert) (Entered: 05/21/2020) |
| 06/08/2020 | 5 | ANSWER to <u>1</u> Complaint − New Case with jury demand filed by Pittsfield, NH, Town of.(Dietel, Robert) (Entered: 06/08/2020) |
| 06/10/2020 | | NOTICE OF PRETRIAL CONFERENCE. **The preliminary pretrial conference will not be canceled and at least one counsel for each party will be required to attend. While not mandatory, the court prefers that the Joint Discovery Plan filed in accordance with Fed. R. Civ. P. 26(f) specify a summary judgment deadline which falls after the close of discovery, but at least 120 days before trial.** Pretrial Conference set for 6/26/2020 10:00 AM before Judge Joseph N. Laplante. Joint Discovery Plan due by 6/19/2020. Please note pursuant to Title 28 USC 636(c) and Local Rule 73.1, the parties may consent to have the case reassigned to the Magistrate Judge, but are free to withhold consent without adverse consequences.(cmp) (Entered: 06/10/2020) |
| 06/19/2020 | 6 | Joint Assented to MOTION for Discovery *Parties' Proposed Discovery Plan* filed by Pittsfield, NH, Town of.(Dietel, Robert) (Entered: 06/19/2020) |
| 06/22/2020 | | NOTICE of ECF Filing Error re: <u>6</u> Joint Assented to MOTION for Discovery *Parties' Proposed Discovery Plan* filed by Pittsfield, NH, Town of. Filer used wrong event. Filer shall refile using the *Discovery Plan* event and enter in docket text: *Replaces document no. 6*. If the filing party has any questions concerning this notice, please contact the judge's case manager at 603−369−5374.Compliance Deadline set for 6/23/2020.(jb) (Entered: 06/22/2020) |
| 06/22/2020 | 7 | Proposed Discovery Plan filed by Pittsfield, NH, Town of. (Dietel, Robert) (Entered: 06/22/2020) |
| 06/23/2020 | | **RESCHEDULING NOTICE of Hearing** (time change only). Pretrial Conference reset for 6/26/2020 at 11:00 AM (from 10:00 AM) before Judge Joseph N. Laplante.(jb) (Entered: 06/23/2020) |
| 06/24/2020 | 8 | **PROCEDURAL ORDER re Preliminary Pretrial Video Conference scheduled for June 26, 2020 at 11:00 AM before Judge Joseph N. Laplante. So Ordered by Judge Joseph N. Laplante.**(jb) (Entered: 06/24/2020) |
| 06/26/2020 | | Minute Entry for proceedings held before Judge Joseph N. Laplante. PRETRIAL CONFERENCE held on 6/26/2020. Order to issue. (Pltfs Atty: Robert M. Fojo) (Defts Atty: Robert Joseph Dietel)(Total Hearing Time: 23 minutes) (jb) (Entered: 06/26/2020) |

| 07/10/2020 | 9 | | **ORDER approving (with changes) 7 Proposed Discovery Plan. Length of Trial 2 days. Case Track: Standard. So Ordered by Judge Joseph N. Laplante. Amendment of Pleadings Deadline set for 9/2/2020. Dispositive Motion Filing Deadline 9/24/2020. Discovery Status Conference set for 1/15/2021 at 03:30 PM before Judge Joseph N. Laplante. Joint Statement regarding the status of discovery due by 1/13/2021. Discovery deadline 1/29/2021. Summary Judgment Motions due by 1/30/2021. (jb)** (Entered: 07/10/2020) |
|---|---|---|---|
| 07/10/2020 | | | **TRIAL NOTICE:** Pretrial Statements due 5/11/2021. LR 16.2(d) Objections due 5/25/2021. Final Pretrial Conference set for 6/1/2021 at 02:00 PM before Judge Joseph N. Laplante. Jury Selection/Trial set for two week period beginning 6/8/2021 at 09:30 AM before Judge Joseph N. Laplante. (jb) (Entered: 07/10/2020) |
| 09/24/2020 | 10 | | MOTION for Judgment on the Pleadings filed by Pittsfield, NH, Town of.Follow up on Objection on 10/8/2020. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Memorandum of Law Memorandum of Law in Support of Motion for Summary Judgment on the Pleadings)(Dietel, Robert) (Entered: 09/24/2020) |
| 10/08/2020 | 11 | | Assented to MOTION to Extend Time to Object/Respond to 10 MOTION for Judgment on the Pleadings to 10/13/2020 filed by Joe McCoy.(Fojo, Robert) (Entered: 10/08/2020) |
| 10/12/2020 | | | **ENDORSED ORDER granting 11 Motion to Extend Time to Object/Respond re 10 Motion for Judgment on the Pleadings,. *Text of Order: Granted.* So Ordered by Judge Joseph N. Laplante.Follow up on Objection on 10/13/2020. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(cmp)** (Entered: 10/13/2020) |
| 10/13/2020 | 12 | | OBJECTION to 10 MOTION for Judgment on the Pleadings filed by Joe McCoy. Follow up on Reply on 10/20/2020. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Fojo, Robert) (Entered: 10/13/2020) |
| 11/04/2020 | | | HEARING NOTICE re: 10 MOTION for Judgment on the Pleadings VIDEO−CONFERENCE Motion Hearing set for 12/4/2020 at 10:00 AM before Judge Joseph N. Laplante.(cmp) (Entered: 11/04/2020) |
| 12/04/2020 | | | Minute Entry for proceedings held before Judge Joseph N. Laplante. MOTION HEARING held on 12/4/2020 re 10 MOTION for Judgment on the Pleadings .Order to issue. (Court Reporter: Susan Bateman) (Pltfs Atty: Robert Fojo, Esq.) (Defts Atty: Robert Dietal, Esq.)(Total Hearing Time: 50 minutes) (cmp) (Entered: 12/04/2020) |
| 12/10/2020 | 13 | | **///ORDER granting in part and denying in part 10 Motion for Judgment on the Pleadings. Town of Pittsfield's motion for judgment on the pleadings is GRANTED as to Counts 3, 4, and the overbreadth portion of Count 1, and DENIED as to the remainder of Count 1 and all of Count 2. Counts 3 and 4 and the overbreadth portion of Count 1 are dismissed with prejudice. So Ordered by Judge Joseph N. Laplante.(jb)** (Entered: 12/10/2020) |

| 01/04/2021 | 14 | | Assented to MOTION to Continue Trial *and Extend Deadlines* filed by Pittsfield, NH, Town of. (Attachments: # 1 Exhibit Exhibit A − Civil Form 3)(Dietel, Robert) (Entered: 01/04/2021) |
|---|---|---|---|
| 01/06/2021 | | | ACTION REQUIRED − NOTICE Nonconforming Document re 14 Assented to MOTION to Continue Trial *and Extend Deadlines* filed by Pittsfield, NH, Town of. The document fails to comply with LR 7.2−Motion to continue shall contain a certification that the client has been notified of the request. File certification as addendum using the Other Documents/Addendum event and link filing(s) to document no. 14. The document will remain on file. Please note that unless a document curing the defect is filed by the Notice of Compliance Deadline the matter may be referred to a judicial officer for appropriate action. If the filing party has any questions concerning this notice, please contact the judge's case manager at 603−369−5374.Compliance Deadline set for 1/8/2021.(jb) (Entered: 01/06/2021) |
| 01/07/2021 | 15 | | Addendum/ 14 Assented−To Motion To Continue Trial and Extend Deadlines Established in the Court's July 10, 2020 by Pittsfield, NH, Town of. (Dietel, Robert) Modified on 1/7/2021 to add association to 14 Motion (jb). (Entered: 01/07/2021) |
| 01/08/2021 | | | **ENDORSED ORDER granting 14 Motion to Continue and Extend Deadlines. *Text of Order: Granted. Counsel should not anticipate further delays without a showing of exceedingly good cause.* So Ordered by Judge Joseph N. Laplante. Discovery deadline 6/1/2021. Summary Judgment Motions due by 6/1/2021. Final Pretrial Statements 10/5/2021. LR 16.2(d) Objections due 10/19/2021. Final Pretrial Conference reset for 10/26/2021 at 03:00 PM before Judge Joseph N. Laplante. Jury Selection/Trial set for two week period beginning 11/2/2021 09:30 AM before Judge Joseph N. Laplante. (jb)** (Entered: 01/11/2021) |
| 01/08/2021 | | | **Reset Pretrial Order Deadlines:** Mid−Litigation Discovery Status Conference reset for 5/14/2021 at 03:30 PM before Judge Joseph N. Laplante. Joint Statement regarding the status of discovery due by 5/12/2021. (jb) (Entered: 01/11/2021) |
| 05/12/2021 | 16 | | STATUS REPORT by Joe McCoy : Joint Statement Regarding Status of Discovery(Fojo, Robert) (Entered: 05/12/2021) |
| 05/12/2021 | | | **ENDORSED ORDER reviewing 16 Status Report. *Text of Order: Reviewed.* So Ordered by Judge Joseph N. Laplante.(jb)** (Entered: 05/13/2021) |
| 05/14/2021 | | | Minute Entry for proceedings held before Judge Joseph N. Laplante. MID−LITIGATION DISCOVERY STATUS VIDEO−CONFERENCE held on 5/14/2021. (Pltfs Atty: Robert M. Fojo) (Defts Atty: Robert Joseph Dietel)(Total Hearing Time: 7 minutes) (jb) (Entered: 05/17/2021) |
| 06/01/2021 | 17 | | MOTION for Summary Judgment *with Memorandum of Law and Exhibits* filed by Pittsfield, NH, Town of.Follow up on Objection on 7/1/2021. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Memorandum of Law Memorandum of Law in Support of Motion for Summary Judgment, # 2 Exhibit Ex A Depo −McCoy with Exhibits, # 3 Exhibit (Affidavit) Ex B Affidavit−Marston with Exhibits, # 4 Exhibit (Affidavit) Ex C Affidavit−Anderson with Exhibits, # 5 Exhibit Ex D Request for Admission with Exhibitss, # 6 Exhibit Ex E Initial |

| | | | Disclosures, # 7 Exhibit (Affidavit) Ex F Affidavit−Dietel)(Dietel, Robert) (Additional attachment(s) added on 6/8/2021: # 8 Corrected Affidavit re Doc. 17−3) (ko). (Entered: 06/01/2021) |
|---|---|---|---|
| 06/07/2021 | 18 | | Assented to MOTION to Correct Affidavit of Cara Marston [Doc. 17−3] filed by Pittsfield, NH, Town of. (Attachments: # 1 Exhibit (Affidavit) Ex B − Affidavit of Cara Marston)(Dietel, Robert) (Entered: 06/07/2021) |
| 06/07/2021 | | | **ENDORSED ORDER granting 18 Assented to Motion to Correct Affidavit of Cara Marston [Doc. 17−3].** *Text of Order: Granted.* **So Ordered by Judge Joseph N. Laplante.(ko)** (Entered: 06/08/2021) |
| 06/30/2021 | 19 | | Assented to MOTION to Extend Time to Object/Respond to July 8, 2021 filed by Joe McCoy.(Fojo, Robert) (Entered: 06/30/2021) |
| 07/02/2021 | | | **ENDORSED ORDER granting 19 Assented to Motion to Extend Time to Object/Respond re 17 Motion for Summary Judgment.** *Text of Order: Granted.* **So Ordered by Judge Joseph N. Laplante. Follow up on Objection on 7/8/2021. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(ko)** (Entered: 07/02/2021) |
| 07/08/2021 | 20 | | MOTION to Extend Time to Object/Respond to 17 MOTION for Summary Judgment *with Memorandum of Law and Exhibits* to 7/12/2021 filed by Joe McCoy.Follow up on Objection on 7/22/2021. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Fojo, Robert) (Entered: 07/08/2021) |
| 07/09/2021 | | | **ENDORSED ORDER granting 20 Motion to Extend Time to Object/Respond re 17 Motion for Summary Judgment to 7/12/2021.** *Text of Order: Granted.* **So Ordered by Judge Joseph N. Laplante.Follow up on Objection on 7/12/2021. (jb)** (Entered: 07/09/2021) |
| 07/12/2021 | 21 | | OBJECTION to 17 MOTION for Summary Judgment *with Memorandum of Law and Exhibits* filed by Joe McCoy. Follow up on Reply on 7/19/2021. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Exhibit (Affidavit) Exhibit A − Declaration of Joseph McCoy, # 2 Exhibit Exhibit 1 − Photographs (part 1), # 3 Exhibit Exhibit 1 − Photographs (part 2), # 4 Exhibit Exhibit 2 − Photographs (part 1), # 5 Exhibit Exhibit 2 − Photographs (part 2), # 6 Exhibit Exhibit B − Meeting Minutes, # 7 Exhibit Exhibit C − Carl Anderson Letter)(Fojo, Robert) (Entered: 07/12/2021) |
| 07/15/2021 | | | NOTICE re: 17 MOTION for Summary Judgment *with Memorandum of Law and Exhibits* Motion Hearing set for 9/17/2021 at 11:00 AM before Judge Joseph N. Laplante.(ko) (Entered: 07/15/2021) |
| 07/19/2021 | 22 | | REPLY to Objection to Motion re 17 MOTION for Summary Judgment *with Memorandum of Law and Exhibits* filed by Pittsfield, NH, Town of. Surreply due by 7/26/2021. (Dietel, Robert) (Entered: 07/19/2021) |
| 07/23/2021 | 23 | | MOTION to Strike 21 Objection to Motion,, *Declaration of Joseph McCoy* filed by Pittsfield, NH, Town of.Follow up on Objection on 8/6/2021. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Exhibit Exhibit A−Declaration of |

| | | | |
|---|---|---|---|
| | | | Robert Dietel)(Dietel, Robert) (Entered: 07/23/2021) |
| 08/06/2021 | 24 | | MOTION to Extend Time to Object/Respond to 23 MOTION to Strike 21 Objection to Motion,, *Declaration of Joseph McCoy* to August 9, 2021 filed by Joe McCoy.Follow up on Objection on 8/20/2021. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Fojo, Robert) (Entered: 08/06/2021) |
| 08/09/2021 | 25 | | OBJECTION to 23 MOTION to Strike 21 Objection to Motion,, *Declaration of Joseph McCoy* filed by Joe McCoy. Follow up on Reply on 8/16/2021. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Exhibit (Affidavit) Declaration of Robert M. Fojo)(Fojo, Robert) (Entered: 08/09/2021) |
| 09/13/2021 | | | RESCHEDULING NOTICE of Motion Hearing re: 17 MOTION for Summary Judgment *with Memorandum of Law and Exhibits* Motion Hearing reset for 9/17/2021 at 10:00 AM (from 11:00 AM) before Judge Joseph N. Laplante.(ko) (Entered: 09/13/2021) |
| 09/17/2021 | | | Minute Entry for proceedings held before Judge Joseph N. Laplante. MOTION HEARING held on 9/17/2021 re 17 MOTION for Summary Judgment. Order to issue. (Court Reporter: Susan Bateman) (Pltfs Atty: Robert Fojo) (Defts Atty: Robert Joseph Dietel)(Total Hearing Time: 1:10) (vln) (Entered: 09/17/2021) |
| 10/06/2021 | 26 | | **///ORDER granting 17 Motion for Summary Judgment; denying 23 Motion to Strike 21 Objection to Motion. The clerk shall enter judgment accordingly and close the case. So Ordered by Judge Joseph N. Laplante.(jb)** (Entered: 10/06/2021) |
| 10/06/2021 | 27 | | **JUDGMENT is hereby entered in accordance with 13 Order on Motion for Judgment on the Pleadings, 26 Order on Motion for Summary Judgment, Order on Motion to Strike. Signed by Daniel J. Lynch, Clerk of Court. *(Case Closed)* (ko)** (Entered: 10/06/2021) |
| 11/04/2021 | 28 | | NOTICE OF APPEAL by Joe McCoy.( Filing fee $ 505, receipt number ANHDC−2180276.) [NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the Forms & Notices section of the First Circuit website at www.ca1.uscourts.gov, MUST be completed and submitted to the U.S. Court of Appeals for the First Circuit.]<br><br>**NOTICE TO COUNSEL: Counsel should register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf/. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf** (Fojo, Robert) (Entered: 11/04/2021) |
| 11/04/2021 | 29 | | NOTICE OF APPEAL as to 27 Judgment by Joe McCoy. File−stamped copy to be sent to parties/USCA by Clerk's Office.<br><br>**NOTICE TO COUNSEL: Counsel should register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf/. Counsel and pro se parties should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf**(ko) (Entered: 11/05/2021) |

| 11/04/2021 | 30 | | FINANCIAL AFFIDAVIT re: 29 Notice of Appeal by Joe McCoy.(ko) (Entered: 11/05/2021) |
|---|---|---|---|
| 11/05/2021 | 31 | | Appeal Cover Sheet as to 28 Notice of Appeal filed by Joe McCoy. (Attachments: # 1 Transcript Order)(ko) (Entered: 11/05/2021) |
| 11/05/2021 | 32 | | Clerk's Certificate transmitting Record on Appeal to US Court of Appeals, documents numbered 13, 17, 21, 23, 26, 27, 28, and 29 re 28 Notice of Appeal. (ko) (Entered: 11/05/2021) |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

APPEAL COVER SHEET

1.  USDC/NH Case No. 20-cv-362-JL

2.  TITLE OF CASE: Joe McCoy v. Town of Pittsfield, NH.

3.  TYPE OF CASE: Civil

4.  NAME OF APPELLANT(S) & COUNSEL FOR APPELLANT(S):
    See certified copy of docket (ECF registered users not provided with a copy of docket)

5.  NAME OF APPELLEE(S) & COUNSEL FOR APPELLEE(S):
    See certified copy of docket (ECF registered users not provided with a copy of docket)

6.  NAME OF JUDGE: Judge Joseph N. Laplante

7.  DATE OF JUDGMENT OR ORDER ON APPEAL: **October 6, 2021**

8.  DATE OF NOTICE OF APPEAL: **November 4, 2021**

9.  FEE PAID or IFP: YES

10. COURT APPOINTED COUNSEL: Not Applicable

11. COURT REPORTER(S):  and DATES: Susan Bateman, 12/4/2020, Motion Hearing, Susan Bateman, 9/17/2021, Motion Hearing

12. TRANSCRIPTS ORDERED/ON FILE: NO

13. HEARING/TRIAL EXHIBITS: NO

14. MOTIONS PENDING: NO

15. GUIDELINES CASE: Not Applicable

16. RELATED CASES or CROSS APPEAL: Not Applicable

17. SPECIAL COMMENTS: NO

# UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

Case name _____

District Court Case No. _____ District of PLEASE SELECT

Date Notice of Appeal filed _____ Court of Appeals Case No. _____

Form filed on behalf of _____

## TRANSCRIPT REPORT

Transcript Not Necessary for this Appeal _____

Transcript Already Filed in District Court.  List each transcript by docket entry number and date and type of proceeding (attach separate page if necessary) _____

## TRANSCRIPT ORDER

Name of Court Reporter_____

Phone Number of Reporter_____

A. _____ **This constitutes an order of the transcript of the following proceedings [check appropriate box(es) and indicate dates of hearing(s)]:**

PROCEEDING(S)                                          HEARING DATE(S)

☐  Jury Voir Dire                          _____
☐  Opening Statement (plaintiff)           _____
☐  Opening Statement (defendant)           _____
☐  Trial                                   _____
☐  Closing Argument (plaintiff)            _____
☐  Closing Argument (defendant)            _____
☐  Findings of Fact/Conclusions of Law     _____
☐  Jury Instructions                       _____
☐  Change of Plea                          _____
☐  Sentencing                              _____
☐  Bail hearing                            _____
☐  Pretrial proceedings (specify) _____ _____
☐  Testimony (specify ) _____  _____
☐  Other (specify) _____  _____

NOTE:  Any form that fails to specify in adequate detail those proceedings to be transcribed will be considered deficient.

B. _____ **I certify that I have contacted the court reporter and the following financial arrangements for payment of the transcript have been made:**

☐  Private funds.
☐  Government expense (civil case).  IFP status has been granted and a motion for transcript at government expense has been allowed.  (Attach a copy of the order to each copy of this order form.)
☐  Criminal Justice Act.  A CJA Form 24  has been approved by the district court judge.
☐  Criminal Justice Act.  A CJA Form 24 is attached for authorization by the court of appeals.
☐  Federal Public Defender/Government Counsel - no CJA Form 24 necessary.

Filer's name _____  Filer's Signature _____

Firm/Address _____   Filer's Email address _____

Telephone number _____   Date mailed to court reporter _____

(Court Reporter Use ONLY) Date received _____

Form CA1-10 (6/09/09)                                          **SEE INSTRUCTIONS ON REVERSE**

**UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT**

**TRANSCRIPT REPORT/ORDER FORM**

This form must be completed by any party that files a notice of appeal to the First Circuit and by any party that wishes to order a transcript for an appeal. **A Transcript Report/Order Form that fails to comply with these instructions will be deemed non-compliant. In addition, the appeal will be subject to dismissal pursuant to 1st Cir. R. 3.0(b) and 10.0(a) if appellant fails to timely file a Transcript Report/Order Form.**

<h3 style="text-align:center;color:red;">TRANSCRIPT REPORT INSTRUCTIONS</h3>

If a transcript is not necessary for the appeal, or the transcript is already completed and filed with the district court, only the Transcript Report section needs to be completed. Appellant must file the completed Transcript Report Form with the Court of Appeals Clerk's Office, accompanied by proof of service on opposing parties, within 14 days after the case is docketed in the Court of Appeals.

<h3 style="text-align:center;color:red;">TRANSCRIPT ORDER INSTRUCTIONS</h3>

If a transcript is being ordered, the Transcript Order section of the form must be completed. The completed Transcript Order Form must be filed with the court reporter in the district court within 14 days after filing the notice of appeal. Fed. R. App. P. 10(b). Do not submit this form until financial arrangements have been made with the court reporter. Appellant must file the completed Transcript Order Form with the Court of Appeals Clerk's Office and one copy with the district court clerk's office, accompanied by proof of service on opposing parties, within 14 days after the case is docketed in the Court of Appeals.

<h3 style="text-align:center;color:red;">CRIMINAL JUSTICE ACT INSTRUCTIONS</h3>

Any party ordering transcripts at government expense under the Criminal Justice Act must also complete a CJA Form 24, Authorization and Voucher for Payment of Transcripts. The voucher must be authorized by either the district court judge or the circuit court judge prior to the order being placed with the court reporter. Both the Transcript Order Form and CJA Form 24 must indicate with specificity those proceedings to be transcribed. The transcript order will be considered timely for purposes of Fed. R. App. P. 10(b) and 1st Cir. R. 3.0(b) and 10.0(a) if a completed Transcript Order Form and a CJA Form 24 in need of authorization are received by the Court of Appeals Clerk's Office within 14 days of the docketing of the appeal. The Clerk's Office will forward the Transcript Order Form and authorized CJA Form 24 to the court reporter.

**NOTE**: A separate Transcript Order Form (and if necessary, a CJA Form 24) must be completed for each court reporter from whom a transcript is requested.

<h3 style="text-align:center;color:red;">COURT REPORTER'S DUTIES</h3>

The court reporter should indicate on the Transcript Order Form the date of receipt of the form. Once the Transcript Order Form is filed in the Court of Appeals, the Clerk's Office will send a Transcript Order Acknowledgment to the court reporter noting the deadline for production of the transcript. If the court reporter *promptly* returns the Acknowledgment indicating that the transcript order is incomplete for any reason, the deadline may be suspended until the party ordering the transcript cures the deficiency. If the court reporter cannot complete the transcript by the deadline, he or she must file a motion for extension in the Court of Appeals. Fed. R. App. P. 11(b). An extension of time does not waive the mandatory fee reductions, which shall take effect after 60 days if the transcript order is not completed and a waiver has not been granted. Once the transcript is complete, the court reporter must file a copy with the district court and provide the ordering party with a copy.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Joe McCoy

    v.                                          No. 20-cv-362-JL

Town of Pittsfield, NH


CLERK'S CERTIFICATE TO
CIRCUIT COURT OF APPEALS

    I, Kellie Otis, Deputy Clerk of the United States District Court for the District of New Hampshire, do hereby certify that the following documents constitute the record on appeal to the First Circuit Court of Appeals:

    DOCUMENTS NUMBERED: 13, 17, 21, 23, 26, 27, 28, and 29

    The Clerk's Office hereby certifies the record and docket sheet available through ECF to be the certified record and the certified copy of the docket entries.


    IN TESTIMONY WHEREOF, I hereunto set my hand and affix the seal of said Court, at Concord, in said District, on this day, November 5, 2021

**DANIEL J. LYNCH**, Clerk

**By: /s/ Kellie Otis, Deputy Clerk**

**Nov 05, 2021**

cc:   Counsel of Record

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

## Case No.: 1:20-cv-362-JL

JOSEPH McCOY,

> Plaintiff,

vs.

TOWN OF PITTSFIELD

> Defendant.

---

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that Joseph McCoy, the Plaintiff in the above-named case, appeals to the United States Court of Appeals for the First Circuit from the Judgment entered in this action on October 6, 2021.

Respectfully submitted,

JOSEPH McCOY,

By His Attorneys,

FOJO LAW, P.L.L.C.

Dated:  November 4, 2021

_____*/s/ Robert M. Fojo*_____
Robert M. Fojo (#19792)
264 South River Road, Suite 464
Bedford, NH 03110
Direct: (603) 473-4694
rfojo@fojolaw.com

### CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was electronically filed with the Clerk of Court using CM/ECF on November 4, 2021.  I also certify that this document is being served this day on Robert J. Dietel, Esq., of Gallagher, Callahan & Gartrell, P.C., 214 North Main Street, Concord, NH 03301, counsel for the Town of Pittsfield, via transmission of Electronic Filing generated by CM/ECF and by email.

<div align="right">

_____*/s/ Robert M. Fojo*_____
Robert M. Fojo

</div>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Joe McCoy

    v.

                            Case No. 20-cv-362-JL

Town of Pittsfield, NH


JUDGMENT


    In accordance with the following Orders by District Judge Joseph
N. Laplante, dated December 10, 2020 and October 6, 2021, judgment is
hereby entered.

    The prevailing party may recover costs consistent with Fed. R.
Civ. P. 54(d) and 28 U.S.C. § 1920.


                           By the Court:


                           /s/ Daniel J. Lynch
                           Daniel J. Lynch
                           Clerk of Court


Date: October 6, 2021

cc:  Counsel of Record

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Joseph McCoy

   v.         Civil No. 1:20-cv-362-JL
                 Opinion No. 2020 DNH 217
Town of Pittsfield

## MEMORANDUM ORDER

  In this action, which pits a property owner against his town over the enforcement of a zoning ordinance, resolution of the Town's motion for judgment on the pleadings hinges on the sufficiency of the factual allegations in the plaintiff's complaint.  Plaintiff Joseph McCoy sued the Town of Pittsfield, alleging that the Town's order to remove a 52-foot trailer depicting the word "TRUMP" from his property violated his rights under the United States Constitution and caused him emotional distress.  He brought two claims under 42 U.S.C. § 1983 (Count 1 for violation of free speech rights and Count 2 for violation of equal protection rights) and two claims under New Hampshire law for intentional and negligent infliction of emotional distress (Counts 3 and 4).  This court has jurisdiction over McCoy's federal claims under 28 U.S.C. §§ 1331 and 1343 because the claims present federal questions and arise from federal civil rights statutes, and supplemental jurisdiction over his state law claims under 28 U.S.C. § 1367(a).

  Pittsfield moves for judgment on the pleadings, arguing that McCoy relies solely on unsubstantiated legal conclusions to support his free speech and equal protection claims under § 1983, and that his state claims are also insufficiently supported by facts and barred by statutory immunity doctrines.  After reviewing the parties' submissions and hearing oral argument, the court grants the motion in part and denies it in part.  As for McCoy's free speech claim, his

complaint contains enough facts that, when construed in his favor, support the inference that the Town of Pittsfield applied the ordinance against him in a way that discriminates against either the content or viewpoint of his speech, and that the Town's application of the ordinance was unconstitutionally vague.  The court further finds that McCoy has plead sufficient facts to satisfy the "similarly situated" element of his "class of one" equal protection claim.  The court, however, grants Pittsfield's motion as to the overbreadth portion of McCoy's free speech claim and Counts 3 and 4 in full, as McCoy has conceded that he is no longer pursuing those claims.

## I.      **Applicable legal standard**

A motion for judgment on the pleadings under Rule 12(c) is evaluated under essentially the same standard as a Rule 12(b)(6) motion to dismiss for failure to state a claim.  See Simmons v. Galvin, 575 F.3d 24, 30 (1st Cir. 2009).  Under this standard, McCoy must plead "factual content that allows the court to draw the reasonable inference that the [Town] is liable for the misconduct alleged."  Martinez v. Petrenko, 792 F.3d 173, 179 (1st Cir. 2015).  McCoy must also "do more than suggest in conclusory terms the existence of questions of fact about the elements of a claim."  A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 81 (1st Cir. 2013).  Dismissal is warranted when a complaint's factual averments are "too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture."  In re Montreal, Maine & Atl. Ry., Ltd., 888 F.3d 1, 6 (1st Cir. 2018) (quoting SEC v. Tambone, 597 F.3d 436, 442 (1st Cir. 2010) (en banc)).

## II.     **Background**

Because a motion for judgment on the pleadings "calls for an assessment of the merits of the case at an embryonic stage," the court construes all well-pleaded facts from the complaint in

the light most favorable to McCoy and draws all reasonable inferences in his favor.  Perez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008).  The following background conforms to this requirement.

McCoy and his wife moved to Pittsfield in early 2014.[1]  Their property sits along state Route 107.[2]  Along with their belongings, the McCoys brought a 52-foot trailer to their property and placed it in the front yard.[3]  In July 2016, McCoy's son painted the word "TRUMP" in large white letters on the trailer.[4]  The newly-painted trailer caught the attention of the local media and led to a story that was published in the *Concord Monitor* on August 11, 2016.[5]  According to McCoy, statements from the *Monitor* article show that he used the trailer primarily as a sign to express political speech, and secondarily (if at all) for storage.[6]

The trailer also caught the attention of Pittsfield residents and its Board of Selectmen.  After the *Monitor* article was published, the Town allegedly received several complaints about McCoy's trailer, but McCoy believes this is untrue.[7]  Nevertheless, at some point after the article's publication, the Town's Board of Selectmen issued an order directing McCoy to remove the trailer by July 2018 pursuant to a Town ordinance, purportedly because the trailer was an

---

[1] Complaint (doc. no. 1), at ¶ 8.

[2] Id.

[3] Id. at ¶ 9.

[4] Id. at ¶ 10.

[5] Id. at ¶ 11.

[6] Id. at ¶¶ 12-14.

[7] Id. at ¶¶ 19, 24.

unpermitted storage container.[8]  According to McCoy, however, the removal order was based

solely on the fact that the trailer depicted the word "TRUMP" in large letters. [9]

Pittsfield first adopted regulations for storage containers as part of its zoning ordinance in

1997.[10]  From 1997 to 2015, the ordinance defined "storage container" as "any truck trailer, box

trailer, school bus, mobile home or other similar facility used for storage or other purposes."[11]

After the Town amended its ordinance in March 2016, the definition of storage container

changed to "a truck trailer, box trailer, school bus, MANUFACTURED HOUSING unit, or

similar mobile container parked continuously for 31 days or more and used principally for

storage and not used for any person's residential occupancy or transient lodging."[12]  McCoy

contends that his trailer did not meet the definition of storage container in the post-2016

ordinance because he was not using the trailer "principally for storage" but was instead using the

trailer principally as a sign to express political speech, and the trailer met the conditions in the

ordinance for outdoor signs.[13]

McCoy alleges generally that "during this time and afterward," Pittsfield has allowed

other residents to keep similar, unpermitted storage containers on their properties.[14]  He further

---

[8] Id. at ¶¶ 20-21.  McCoy does not provide the date of the Town's order.

[9] Id. at ¶ 20.

[10] Id. at ¶ 15.

[11] Id. at ¶ 16.

[12] Id. at ¶ 17.

[13] Id. at ¶ 21.

[14] Id. at ¶ 22.  McCoy alleges that a member of the Board of Selectmen – Carl Anderson – wrote him a letter dated January 11, 2020 that references the Town's decision to order McCoy to remove the trailer and the fact that other "illegal storage containers" existed in the Town.  Id. at

asserts that three members of the Board of Selectmen – Carl Anderson, Larry Konopka, and Jim Allard – repeatedly harassed him about his trailer, but did not apply similar pressure to other residents with unpermitted storage containers.[15]

## III.   **Analysis**

Counts 1 and 2 of McCoy's complaint arise from 42 U.S.C. § 1983.  To state a claim under § 1983, McCoy must plausibly plead two essential elements, "(i) that the conduct complained of has been committed under color of state law, and (ii) that this conduct worked a denial of rights secured by the Constitution or laws of the United States." Rodríguez-Reyes v. Molina-Rodríguez, 711 F.3d 49, 55 (1st Cir. 2013).  Pittsfield challenges only the second element of McCoy's § 1983 claims, namely, whether its conduct encroached on McCoy's constitutional rights.  The court addresses each count in turn.

### A.   **Count 1 (Free Speech)**

Through Count 1, McCoy alleges that the ordinance, as applied by Pittsfield, is an "unconstitutional abridgement" of his right to freedom of speech under the First and Fourteenth Amendments of the Constitution and unconstitutionally vague and overbroad.[16]  Pittsfield contends that McCoy's challenge to the ordinance fails because it is based only on undeveloped,

---

¶¶ 22, 24.  McCoy does not provide a copy of this letter as an exhibit to his complaint or objection to Pittsfield's motion for judgment on the pleadings.

[15] Id. at ¶ 23.  McCoy does not specify when this alleged harassment occurred, or whether it occurred before the Town issued its order to remove the trailer, after the order, or both before and after.

[16] Complaint (doc. no. 1), at ¶ 26.

bald legal conclusions, and lacks the required factual predicate to state a plausible claim for relief.[17]  For the following reasons, the court finds that Count 1 states a cause of action.

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'"  Reed v. Town of Gilbert, 135 S. Ct. 2218, 2226 (2015) (quoting U.S. Const. amend. I).  "As a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  United States v. Stevens, 559 U.S. 460, 468 (2010) (citing Ashcroft v. American Civil Liberties Union, 535 U.S. 564, 573 (2002)); see also Iancu v. Brunetti, 139 S.Ct. 2294, 2299 (2019) ("The government may not discriminate against speech based on the ideas or opinions it conveys.").

The government may restrict speech in nonpublic fora "as long as the restrictions are 'reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.'"  Cornelius v. NAACP Legal Defense and Education Fund, Inc., 473 U.S. 788, 800 (1985) (quoting Perry Educational Assn. v. Perry Local Educators' Assn., 460 U.S. 37, 46 (1983)).  "The existence of reasonable grounds for limiting access to a nonpublic forum, however, will not save a regulation that is in reality a facade for viewpoint-based discrimination."  Id. at 811.

There are varying levels of discrimination under First Amendment jurisprudence. Content discrimination occurs whenever a government regulates "particular speech because of the topic discussed or the idea or message expressed."  Reed, 135 S.Ct. at 2226-27.  Content-based restrictions "are subject to strict scrutiny, which requires the government to demonstrate

---

[17] Doc. no. 10-1, at 5.

that the restriction advances a 'compelling interest' and is 'narrowly tailored to achieve that interest.'" Signs for Jesus v. Town of Pembroke, NH, 977 F.3d 93, 101 (1st Cir. 2020) (quoting Reed, 135 S.Ct. at 2218). Viewpoint discrimination is "an egregious form of content discrimination" in which "the government targets not subject matter, but particular views taken by speakers on a subject." Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819, 829 (1995). In cases like this one involving political speech, the "First Amendment's guarantee of free speech applies with special vigor" and "affords the broadest protection to such political expression in order to ensure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people." See Nat'l Org. for Marriage v. McKee, 649 F.3d 34, 51 (1st Cir. 2011) (quotations omitted).

Pittsfield labels McCoy's as-applied challenge as lacking factual support. It further argues that McCoy concedes, through his allegation that the trailer was a sign and not a storage container, that he had no right to keep the trailer on his property as a storage container and thus suffered no constitutional injury. Neither argument supports dismissal of Count 1.

In challenging the sufficiency of the factual support for Count 1, Pittsfield focuses on the portion of the complaint in which McCoy recites this claim (paragraphs 27-33) and not the remainder of the complaint. The court must, however, read the complaint "as a whole" when ruling on a motion for judgment on the pleadings. See Garcia-Catalan v. United States, 734 F.3d 100, 103 (1st Cir. 2013) (noting that "there need not be a one-to-one relationship between any single allegation and a necessary element of the cause of action"); Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 14 (1st Cir. 2011) ("The question confronting a court on a motion to dismiss is whether all the facts alleged, when viewed in the light most favorable to the plaintiffs, render the plaintiff's entitlement to relief plausible.") (emphasis added).

Viewed as a whole and in the light most favorable to McCoy, the complaint contains just enough factual allegations to survive a motion for judgment on the pleadings.  Specifically, in paragraph 20, McCoy alleges that the Town ordered him to remove the trailer for violating the "storage container" section of the ordinance because the trailer depicted the word "TRUMP" in large letters, yet allowed other unpermitted trailers (that did not depict political speech or support for Mr. Trump) to remain.  These allegations, taken as true for purposes of this motion, support a claim for unconstitutional content (banning unpermitted storage containers with political messages) or viewpoint (banning unpermitted storage containers expressing support for then-political candidate Donald J. Trump) discrimination.  See Rosenberger, 515 U.S. at 828-29 ("Discrimination against speech because of its message is presumed to be unconstitutional . . . [and] [w]hen the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant.") (citing Turner Broadcasting System, Inc. v. FCC, 512 U. S. 622, 641-43 (1994) and R.A.V. v. St. Paul, 505 U. S. 377, 391 (1992)).

As for McCoy's assertion that the trailer was a sign and not a storage container, the court disagrees that this amounts to a concession that McCoy has not suffered any constitutional injury from Pittsfield's application of the ordinance.  The court can draw the reasonable inference from this allegation that by applying the storage container rule to him when he was using the trailer as a sign, the Town applied the ordinance in a way that repressed his First Amendment rights.  In other words, Count 1 can be read to allege that Pittsfield should have applied the sign rules to him all along, but its real intent was to use the storage container rule as a cover for unconstitutionally restricting his speech rights.

McCoy also challenges the Town's application of the ordinance on overbreadth and vagueness grounds.[18]  Pittsfield seeks dismissal of these aspects of Count 1 because they are based solely on bare conclusions of law.[19]

**Overbreadth**.  Pittsfield is correct that McCoy only supports his overbreadth claim with pure conclusions of law,[20] which the court cannot accept as true for purposes of deciding this motion.  See Maldonado v. Fontanes, 568 F.3d 263, 268 (1st Cir. 2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Without pointing to any specific factual allegation in the complaint, McCoy argues that he "adequately" alleges that Pittsfield's order to remove the trailer pursuant to the ordinance broadens the ordinance beyond its text to encompass unpermitted storage containers that express political speech.[21]  Even if the court were to accept this conclusory statement as true, it is insufficient to satisfy the rigorous standard for challenging a law or rule on overbreadth grounds.

Neither the United States Supreme Court nor the First Circuit Court of Appeals have determined "whether there is such a creature as an as-applied overbreadth challenge."  McCullen v. Coakley, 708 F.3d 1, 11 (1st Cir. 2013), rev'd and remanded on other grounds, 573 U.S. 464 (2014).  Neither party addresses this argument in their motion papers, and other Circuit Courts of Appeal appear to be split on this question.  Compare, Farrell v. Burke, 449 F.3d 470, 498 (2d

---

[18] Doc. no. 12, at 4.  McCoy's counsel conceded at oral argument that he is not making facial overbreadth or vagueness challenges to the ordinance.

[19] Doc. no. 10-1, at 5.

[20] See Complaint (doc. no. 1), at ¶ 27 and ¶ 28.

[21] Doc. no. 12, at 4.

Cir. 2006) ("All overbreadth challenges are facial challenges, because an overbreadth challenge

by its nature assumes that the measure is constitutional as applied to the party before the court."),

with Turchick v. United States, 561 F.2d 719, 721 n.3 (8th Cir. 1977) ("The 'as applied' method

vindicates a claimant whose conduct is within the First Amendment but invalidates the

challenged statute only to the extent of the impermissible application").

      It is clear, however, that an overbreadth challenge always contains a facial component.

See Hill v. Colorado, 530 U.S. 703, 731–32 (2000) (noting that "the overbreadth doctrine

enables litigants 'to challenge a statute, not because their own rights of free expression are

violated, but because of a judicial prediction or assumption that the statute's very existence may

cause others not before the court to refrain from constitutionally protected speech or

expression'") (quoting Broadrick v. Oklahoma, 413 U.S. 601, 615 (1973)).  The court will

therefore evaluate McCoy's overbreadth claim under the facial challenge rubric.

      To show that the ordinance is overbroad, McCoy must prove that it "punishes a

'substantial' amount of protected free speech, 'judged in relation to the [rule's] plainly legitimate

sweep.'" Virginia v. Hicks, 539 U.S. 113, 118-19 (2003) (quoting Broadrick, 413 U.S. at 615)).

An overbreadth finding "suffices to invalidate all enforcement of that law, 'until and unless a

limiting construction or partial invalidation so narrows it as to remove the seeming threat or

deterrence to constitutionally protected expression.'" Id. at 119 (quoting Broadrick, 413 U.S. at

613).  This court must "vigorously enforce[ ] the requirement that a [law's] overbreadth be

substantial, not only in an absolute sense, but also relative to the [law's] plainly legitimate

sweep." United States v. Williams, 553 U.S. 285, 292 (2008)).  "Invalidation for overbreadth is

'strong medicine' that is not to be 'casually employed.'" Id. (quoting Los Angeles Police Dept.

v. United Reporting Publishing Corp., 528 U.S. 32, 39 (1999)).

McCoy has not shown, either through the factual allegations in his complaint or in his objection to Pittsfield's motion, how the ordinance punishes a "substantial" amount of protected speech in an absolute sense or in relation to the ordinance's plainly legitimate sweep.  In fact, McCoy does not even address the ordinance's "perfectly constitutional" applications or attempt to argue why its application to him is substantially punitive relative to its legitimate applications. Because McCoy's threadbare conclusions of law do not suffice to meet this vigorous standard at the pleadings stage, Pittsfield is entitled to judgment on the pleadings on the overbreadth portion of Count 1.

**Vagueness**.  McCoy's as-applied vagueness challenge fares slightly better.[22]  The vagueness doctrine implicates the Due Process Clause of the Fourteenth Amendment, not purely the First Amendment.  See Williams, 553 U.S. at 304; Kolender v. Lawson, 461 U.S. 352, 353-54 (1983).  A law is unconstitutionally vague when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  Id.  "The degree of vagueness that the Constitution tolerates – as well as the relative importance of fair notice and fair enforcement – depends in part on the nature of the enactment."  Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498 (1982).  "If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply."  Id. at 499.

---

[22] Unlike overbreadth claims, the First Circuit Court of Appeals has recognized as-applied vagueness claims.  See United States v. Zhen Zhou Wu, 711 F.3d 1, 15 (1st Cir. 2013) ("Outside the First Amendment context, we consider whether a statute is vague as applied to the particular facts at issue . . . .") (emphasis in original) (internal quotation marks omitted).

After reviewing the complaint and hearing oral argument, it is unclear to the court whether this vagueness challenge involves a lack of fair notice, risk of discriminatory enforcement, both, or neither.  Although the text of the ordinance does not reference speech, McCoy alleges that Pittsfield used the ordinance to regulate his speech when it ordered him to remove his trailer based on the ordinance and the fact that the trailer depicted "TRUMP" in large letters.[23]  McCoy argues that this application of the ordinance was unconstitutionally vague because the Town failed to make clear whether all political speech may be prohibited, or only some types of speech or expression.[24]  Accepting McCoy's factual allegation about the Town's basis for its removal order as true, which the court must for purposes of this motion, the court can reasonably infer from this allegation that a person of ordinary intelligence would not have fair notice of what is prohibited under the ordinance or what a trailer must look like in order to pass muster under the storage container section of the ordinance.

Because McCoy alleges that the order interferes with his free speech rights, a "greater degree of specificity" is required, and under this more-stringent vagueness test, the Town's application of the ordinance to McCoy could also be viewed as "so standardless that it authorizes" some form of discriminatory enforcement.  Buckley v. Valeo, 424 U.S. 1, 77 (1976). McCoy's complaint therefore contains minimally sufficient factual allegations to support a claim that the Town applied the ordinance against him (and interfered with his free speech rights) in a vague manner.  Pittsfield's motion for judgment on the pleadings on this portion of his claim accordingly must be denied.

---

[23] Complaint (doc. no. 1), at ¶ 20.

[24] Doc. no. 12, at 4.

In sum, McCoy's complaint alleges enough facts to state a plausible claim of constitutional injury stemming from the Town's application of the ordinance against him; namely, that the Town applied the ordinance in a manner that discriminated against the content or viewpoint of his speech, and in a vague manner. McCoy has not alleged sufficient facts to support a claim that the ordinance is unconstitutionally overbroad. Pittsfield's motion for judgment on the pleadings on Count 1 is therefore denied in part and granted in part.

### B.     Count 2 (Equal Protection – disparate treatment)

Pittsfield similarly argues that it is entitled to judgment on the pleadings on Count 2 of McCoy's complaint because that claim is not supported by sufficient factual allegations. Instead, Pittsfield asserts that McCoy has plead only "[g]eneral and conclusory allegations" that the Town treated other similarly situated landowners differently,[25] which are insufficient to carry his burden of proving an equal protection claim at the pleadings stage. McCoy counters that he has both sufficiently alleged the existence of other similarly situated landowners, and that the Town treated these landowners differently than him. In this procedural posture – a Rule 12 challenge to the pleadings – McCoy has the better of the arguments.

McCoy asserts that the ordinance, as applied by Pittsfield, impermissibly creates two classes of residents – persons with unpermitted storage containers expressing political speech and persons with unpermitted storage containers not expressing political speech – and argues that the Town treats these classes differently in violation of the Constitution.[26] Liberally construed,

---

[25] Doc. no. 10-1, at 7.

[26] Compl. (doc. no. 1) at ¶ 36.

13

this is a "class of one" theory of equal protection liability and, under such a theory, McCoy must allege that he has "been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  Donovan v. City of Haverhill, 311 F.3d 74, 77 (1st Cir. 2002) (quoting Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam)).

Pittsfield's motion challenges the level of factual detail supporting the "similarly situated" element of McCoy's equal protection claim.  For the following reasons, the court is not persuaded by Pittsfield's arguments.

"An individual is 'similarly situated' to others for equal protection purposes when 'a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated.'" Davis v. Coakley, 802 F.3d 128, 133 (1st Cir. 2015) (quoting Barrington Cove Ltd. P'ship v. Rhode Island Hous. & Mortgage Fin. Corp., 246 F.3d 1, 8 (1st Cir.2001)).  Although "[e]xact correlation [between comparators] is neither likely nor necessary, id., "a class-of-one plaintiff bears the burden of showing that his comparators are similarly situated in all respects relevant to the challenged government action." Gianfrancesco v. Town of Wrentham, 712 F.3d 634, 640 (1st Cir. 2013).

Here, the relevant comparison points are property owners in Pittsfield with unpermitted storage containers on their properties, including trailers.  McCoy sufficiently alleges that these similarly situated comparators exist (or existed at the time of the Town's action against him) and did not receive similar treatment as he did from the Town.

14

Gianfrancesco v. Town of Wrentham does not compel a different result, as Pittsfield

argues in its motion.[27]  There, the plaintiff simply alleged "that the regulatory and enforcement

measures taken against Tom's Tavern were not also taken against 'similarly situated

establishments'" but did not specify what made these other establishments similarly situated.

712 F.3d at 640.  This assertion was "so general and conclusory" that it could not survive a

motion to dismiss.  Id.; see also Bel-Air Nursing & Rehab Ctr., Inc. v. Town of Goffstown, No.

16-CV-259-JL, 2018 WL 264091, at *7 (D.N.H. Jan. 2, 2018) (holding that plaintiff's "vague

and conclusory reference to 'other business in analogous matters'" fell "far short" of showing of

similarly situated comparators necessary to survive a motion to dismiss).  Here, McCoy's

allegations, while generalized, provide further detail about the relevant comparators.  It also

appears that McCoy based his allegations of other similarly situated property owners on

whatever public information he had access to at the time.  And members of the Pittsfield Board

of Selectmen acknowledged that other unpermitted storage containers or trailers existed, and that

these property owners were not punished for violating the ordinance.[28]  McCoy has therefore

sufficiently alleged the existence of similarly situated comparators for purposes of his equal

protection claim.[29]

---

[27] Doc. no. 10-1, at 7.

[28] Doc. no 1, at ¶ 22.

[29] Under questioning at oral argument, McCoy's counsel acknowledged that his client obtained
additional information about the alleged comparators, both through his own research and through
public records requests to the Town.  Yet McCoy chose not to include that information in the
complaint or his objection to Pittsfield's motion for judgment on the pleadings because he did
not feel it was necessary under the case law.  Counsel for Pittsfield similarly relied on public
records and other documents during oral argument that were not attached to its answer or motion
for judgment on the pleadings.  The court's review of the instant motion would have been aided
by this additional information and documentation, and had the court considered it, the motion

While McCoy must show "an extremely high degree of similarity between" himself and the persons to whom he compares himself to meet his burden of proving substantial similarity, here, he has done "more than 'point to nearby parcels in a vacuum and leav[e] it to the municipality to disprove conclusory allegations that the owners of those parcels are similarly situated,'" albeit by the slimmest of margins.  Freeman v. Town of Hudson, 714 F.3d 29, 38 (1st Cir. 2013) (quoting Cordi-Allen v. Conlon, 494 F.3d 245, 251 (1st Cir. 2007)).  For example, McCoy alleges that the Town allowed other landowners in Pittsfield to maintain unpermitted storage containers (without political speech written on them) on their properties, and admitted this to him on several occasions.  These property owners were similarly situated because they had unpermitted storage containers, including trailers, on their properties.  This is the most relevant, if not the only relevant, factor in the present comparator analysis.  And Pittsfield does not state in its motion what other information about these alleged comparators McCoy should have provided at this stage of the case to show that they were truly similarly situated to him.

McCoy has also plead enough facts to support the allegation that the Town treated these other similarly situated landowners differently than him.  Specifically, he alleges that the Town took no enforcement action against these other unpermitted trailers or storage containers and did not apply similar pressure or harassment to these other property owners.[30]  This is adequate

would not have converted to a motion for summary judgment.  See Giragosian v. Ryan, 547 F.3d 59, 65 (1st Cir. 2008) (When ruling on a Rule 12 motion, "[a] district court may also consider documents incorporated by reference in [the complaint], matters of public record, and other matters susceptible to judicial notice.") (quotations omitted).  Instead, the task of deciding this motion was frustratingly limited to drawing inferences from the few factual allegations actually plead in McCoy's complaint.

[30] Doc. no. 1, at ¶ 23.

factual content at the pleadings stage to "allow the court to draw the reasonable inference that

[Pittsfield]" violated McCoy's equal protection rights by intentionally treating other similarly

situated landowners differently.  Martinez, 792 F.3d at 179; see also Testa v. Salvatore Mancini

Res. & Activity Ctr., Inc., No. CV 18-00566-WES, 2019 WL 2929333, at *3 (D.R.I. July 8,

2019), report and recommendation adopted, No. 1:18-CV-566-MSM-LDA, 2020 WL 91554

(D.R.I. Jan. 8, 2020) (finding sufficient plaintiff's allegation that she, as an executive director

subject to an employment contract, was similarly situated to other "rank and file" employees

subject to a collective bargaining agreement).  The court accordingly cannot grant judgment on

the pleadings for Pittsfield on this basis alone.  Pittsfield may challenge the sufficiency of the

evidence of similarly situated comparators or other elements of McCoy's equal protection claim

through a properly supported motion under Rule 56 or Rule 50 later in the litigation.

### C.    Counts 3 and 4 (negligent and intentional infliction of emotional distress)

McCoy also asserts claims under New Hampshire law for negligent and intentional

infliction of emotional distress arising from the Town's order to remove his trailer.  Pittsfield

moves to dismiss these claims on various grounds,[31] but McCoy has not opposed that part of

Pittsfield's motion.  At oral argument, McCoy's counsel conceded that he is no longer pursuing

these claims and the court accordingly grants Pittsfield's motion and awards it judgment on the

pleadings on Counts 3 and 4.

---

[31] Doc. no. 10-1, at 7-10.

**IV.**     **Conclusion**

For the reasons set forth above, Pittsfield's motion for judgment on the pleadings[32] is

GRANTED as to Counts 3, 4, and the overbreadth portion of Count 1, and DENIED as to the

remainder of Count 1 and all of Count 2.  Counts 3 and 4 and the overbreadth portion of Count 1

are dismissed with prejudice.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  December 10, 2020

cc:     Robert M. Fojo, Esq.
        Robert Joseph Dietel, Esq.

---

[32] Doc. no. 10.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| JOSEPH McCOY | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No.:1:20-cv-00362-JL |
| | ) | Jury Trial Demanded |
| TOWN OF PITTSFIELD | ) | |
| | ) | |
| Defendant | ) | |

## <u>MOTION FOR SUMMARY JUDGMENT</u>

Defendant Town of Pittsfield moves for summary judgment pursuant to Fed. R. Civ. P. 56(c) and says:

1.      Plaintiff's Complaint, as narrowed by the Court's prior order (doc. 13), contains two claims. Count I alleges an as-applied vagueness challenge to the Town's zoning ordinance, and Count II alleges a "class of one" equal protection claim.

2.      The Town moves for summary judgment with respect to both counts because there are no genuine issues of material fact in dispute and the Town is entitled to judgment as a matter of law.

3.      The Town submits and incorporates, by reference, a memorandum of law and accompanying affidavits and exhibits in support of its motion for summary judgment. *See* Local Rule 7.1(a)(2).

4.      The Town did not seek Plaintiff's concurrence with respect to the relief requested herein due to the dispositive nature of this motion. *See* Local Rule 7.1(c).

WHEREFORE, the Town of Pittsfield respectfully requests that the Court:

A.  Grant this Motion for Summary Judgment; and

B.  Grant such other relief as the Court deems just and proper.

Respectfully submitted,

**TOWN OF PITTSFIELD**

By Its Attorneys,
GALLAGHER, CALLAHAN & GARTRELL, P.C.

Dated:  June 1, 2021               By:____/s/ Robert J. Dietel_____
Robert J. Dietel (#19540)
214 North Main Street
Concord, NH  03301
603-228-1181
dietel@gcglaw.com

## CERTIFICATE OF SERVICE

I, Robert J. Dietel, hereby certify that a copy of the foregoing was sent to all counsel of record via ECF.

Dated:  June 1, 2021               By:____/s/ Robert J. Dietel_____
Robert J. Dietel (#19540)

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

JOSEPH McCOY )
                                                    )
Plaintiff )
                                                    )
v. )          Civil Action No.:1:20-cv-00362-JL
                                                    )     Jury Trial Demanded
TOWN OF PITTSFIELD )
                                                    )
Defendant )

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION AND PROCEDURAL HISTORY

This past December, the Court ruled that Plaintiff Joseph McCoy's Complaint (doc. 1) contains "just enough factual allegations" to survive dismissal because, taken as true, it describes unconstitutional content or viewpoint discrimination by Defendant Town of Pittsfield. *See* Memorandum Order (doc. 13) ("Order") at 8.

With respect to Count I, the Court ruled that McCoy alleged "minimally sufficient facts to support a claim that the Town applied [its] ordinance against him…in a vague manner." *See* Order at 12. The Court accepted as true the allegation that the Town required him to remove his storage container because it "depicted 'TRUMP' in large letters" and that "a person of ordinary intelligence would not have fair notice of what was prohibited under the ordinance or what a trailer must look like in order to pass muster under the storage container section of the ordinance." *Id*.

With respect to Count II, the Court ruled that "liberally construed," McCoy alleges sufficient facts to state a "class of one" theory of equal protection liability; i.e., that he was harassed and singled out for enforcement of the ordinance, and required to remove his storage

container because of his support for Donald Trump, but "that the Town allowed other property owners to maintain unpermitted storage containers (without political speech written on them) on their property, and admitted this to him on several occasions." Order at 16.

McCoy's other allegations - an overbreadth challenge to the application of the ordinance, and allegations of intentional and negligent infliction of emotional distress - were dismissed with prejudice.

Since December, the Town has propounded Requests for Admission, Interrogatories and Requests for Production, and taken McCoy's deposition. The resulting record reveals that McCoy's claims are without foundation, and he knew or should have known that his allegations could not be substantiated prior to bringing suit. There is no evidence of discrimination. There is no evidence of selective enforcement. He cannot make out a "class of one" equal protection claim. And McCoy plainly knew the requirements of the ordinance and reasons for the Town's decisions. Despite his prior representations that he possesses evidence of discrimination, no such evidence has been produced. *See* Order at 15, FN 29 (noting assertion that supporting evidence exists). Summary judgment should enter for the Town.

## STATEMENT OF FACTS[1]

In early 2014, McCoy moved to 322 Catamount Road, Pittsfield, NH. Complaint (doc. 1), ¶¶ 1, 8. Approximately two weeks later, McCoy purchased a 52-foot trailer and had it delivered to his property empty (the "Storage Container"). Deposition of Joseph McCoy ("McCoy Dep."), attached hereto as Exhibit A, at 25:16-23. McCoy used the Storage Container to keep "tools and stuff" in it so that he could do maintenance to his property. *Id*. at 25:2-9.

---

[1] The following facts are undisputed for the purposes of this motion only.

In August 2015, the Town's then building inspector, Jesse Pacheco (the "Building Inspector"), visited McCoy's property to conduct an inspection relative to a building permit McCoy had obtained for work to his home. *See* McCoy Dep. at 26:8-23.

While visiting the McCoy property, the Building Inspector noticed the Storage Container and informed McCoy that it needed a permit. McCoy Dep. at 26:10-11 and 26:20-23. At that point (August 2015 ) the Storage Container had been on the property for a little over a year. *Id*. at 27:3-6. McCoy subsequently applied for and obtained a storage container permit effective September 1, 2015 (the "2015 Permit"). *Id*. at 26:20; Affidavit of Cara Marston ("Marston Aff."),  attached hereto as Exhibit B, at ¶ 6; *see also* Marston Aff., Exhibit 2.

The 2015 Permit was specific to the Storage Container, and informed McCoy of the Town's zoning ordinance requirements. *See* Martson Aff., Exhibit 2. In particular, the 2015 Permit recites that the Storage Container could be used for storage purposes only for a period of one year. *Id*. These requirements are plainly stated on the face of the permit, as shown by the following excerpt:

Storage Containers, whether registered or not, whether mobile or stationery, are not allowed on a permanent basis in any zoning district within the Town of Pittsfield. A storage container is permitted for storage purposes only, for a period of one year, with the approval of a parking permit issued by the Board of Selectmen or their designee, provided said storage container meets all setback requirements, and as limited by the following; a) maximum of one storage container per lot in the Urban, Suburban or Rural Districts, b) maximum of two storage containers per lot in the Light Industrial/Commercial Districts.

APPLICANTS NAME:    Joseph McCoy

*See* Martson Aff., Exhibit 2.

In 2015, sometime after securing the 2015 Permit, McCoy needed additional storage space, and rented a storage container (the "Rental Container"), which he placed between the Storage Container and his home. *See* McCoy Dep. at 21:16-19, 24:12-14.

3

In January 2016, during the run-up to the New Hampshire presidential primary, McCoy allowed his son to paint the side of the Storage Container with an image that reads "TRUMP! USA" with the date "2016" in smaller letters contained in the exclamation point. McCoy Dep. at 43:12-15. The image below shows the Storage Container as of January 29, 2016 and the Rental Container extending from behind it.



McCoy Dep. at Exhibit D.

The Storage Container continued to be used for storage during 2016 and after, but McCoy also considered it to be a sign. *See* McCoy Dep. at 46:9-10 ("It was somewhat a storage trailer, but then it was also my Trump trailer.").

In August 2016 (three weeks before the 2015 Permit was set to expire), the Storage Container caught the attention of the local press and was the subject of an article in the *Concord Monitor*, published August 11, 2016. *See* McCoy Dep. at 44:9-17; Complaint ¶ 11. The Storage Container became widely known on social media and garnered a mix of praise and complaints from the public. *Id*. at 51:1-22 (acknowledging "[t]here was complaints and there was 'We love it.'").

On September 1, 2016, McCoy's 2015 Permit expired. As previously noted, under Article 14 of the zoning ordinance, such permits are for one year only, after which the storage container needs to be removed. *See* Marston Aff., Exhibit 1 at *32. When the Town is aware of zoning violations, it has taken action to enforce the zoning ordinance's terms. *See id*. at ¶ 25. Accordingly, the Town's Building Inspector wrote to McCoy sometime in September or October 2016, and informed McCoy that the 2015 Permit had expired, that the Storage Container needed to be removed, and specifically cited the authority for the directives (Article 14, Section 3 of the zoning ordinance). *See* Martson Aff., Exhibit 3 ("2016 Notice of Violation"). He also informed McCoy of his right to bring an appeal of the decision to the Town's zoning board of adjustment. *Id*. McCoy acknowledges having received the 2016 Notice of Violation. McCoy Dep. at 72:4-8.

Around this same time, McCoy alleges that he was also visited by the Building Inspector and told he would need to remove the Storage Container. McCoy Dep. at 72:8-11. He also required McCoy to remove the Rental Container, which did not feature any expressive content, and which had never been permitted by the Town. McCoy Dep. at 21:16-20, 40:5-8, 72:8-11.

5

McCoy further alleges that the Board of Selectman caused the Building Inspector "to remove it due to complaints." *Id*. 50:19-23. The Town, in fact, had received at least one anonymous complaint regarding McCoy's Storage Container in 2016, the specific content and source of which was not recorded. *See* Marston Aff. at ¶ 24. It is not unusual for the Town to receive anonymous complaints regarding alleged zoning violations. *See* Marston Aff. at ¶ 24. However, regardless of complaints, there is no question that the 2015 Permit had expired, and that the Town was aware of the expiration of the permit. *Id*. at ¶ 27. Prior to the publication of the *Concord Monitor* article, the Town was aware of McCoy's Storage Container due to McCoy's permit application and prior observation by the Building Inspector, and therefore, had specific knowledge that it was unlawfully on McCoy's property as of September 1, 2016. *See id*.

Following receipt of the 2016 Notice of Violation, McCoy wrote to the Board of Selectmen on November 3, 2016 and requested a six-month permit extension. Marston Aff., Exhibit 4 (the "Nov. 2016 Letter"). In his letter, he explained that he was having difficulty emptying the storage containers and needed additional time. *See id*. The Nov. 2016 Letter makes no mention of any need or desire by McCoy to use the Storage Container as a sign, and it is devoid of any mention of President Trump, or any alleged harassment by the Town, selectmen, or others.

On November 15, 2016, one week after the 2016 Presidential election, the Board of Selectmen met and considered McCoy's request for a six-month extension for the Storage Container. *See* Affidavit of Carl Anderson ("Anderson Aff."), attached hereto as Exhibit C, at ¶ 2. Based on the representations described in McCoy's letter - specifically, that McCoy was disabled and needed additional time to empty the Storage Container - the Board granted the extension. *Id*. The motion was made by Selectman Carl Anderson and passed by unanimous

vote. *Id*. At the time, the use of the Storage Container to express support for President Trump

was publically well-known, and Anderson was specifically aware of such use, but it did not

factor in deliberations. *Id*. at ¶ 3.

The Board's decision to grant a six-month extension was made despite the Town being

aware of at least one complaint. *See* Marston Aff., at ¶ 24.  It was also made notwithstanding the

plain language of the zoning ordinance, which provides, in pertinent part, that storage containers

"shall be used for and only for storage" and may not be on a lot for more than 12 months in any

one 15 month period. *See* Marston Aff, Exhibit 1 at 54.

As of November 2016, the Storage Container had been on the McCoy property for

approximately two years, and was being used for both storage and expressive purposes. *See*

McCoy Dep. at 46:9-10. Nevertheless, the only enforcement action that the Town took in 2016

with respect to McCoy, was notifying him of complaints, notifying him of the expiration of the

2016 Permit and his right to appeal, and requiring him to remove the Rental Container, which did

not feature any expressive content. *See* McCoy Dep. at 21:16-20, 40:5-8.

In May 2017, the Building Inspector visited McCoy's property, and McCoy subsequently

requested a meeting with the Board. *See* Marston Aff., Exhibit 5.

The Board met with McCoy on June 13, 2017 (McCoy's request had been tabled over

from a prior May 23, 2017 meeting). *See* Marston Aff., Exhibit 6. As recited in the minutes of

that meeting, McCoy represented to the Board that he was using the Storage Container for

storing tools needed for repairs to his property, which was taking him longer than planned due to

a disability. *Id*. at *10. There was no mention of the Storage Container being used for a sign or to

express political content, or any allegation of harassment or discrimination.

During deliberations, the Board Chairman, Jim Allard, questioned if "there was an issue with extending the permit." *See* Martson Aff., Exhibit 5 at *10. The Town's administrator, Cara Marston, noted the 12 month limit in the zoning ordinance, and discussion followed as to whether the Town's zoning board of adjustment needed to be involved. *Id*. In apparent reference to the 12 month limit, the Building Inspector informed the Board that it had "no choice and must get rid of the trailer" but also noted that there are other trailers in Town "that have been there for a long time." *Id*. Selectwoman Carole Richardson inquired if the Storage Container would be removed after the year. *Id.* McCoy responded by confirming that "he just needed more time to do the work needed on their home." *Id.* The Board voted unanimously to grant the year extension. The Town then issued a new permit, which once again, informed McCoy of the zoning ordinance's requirements. *See* Martson Aff., Exhibit 7.

In granting another year extension, the Board allowed McCoy to keep the Storage Container on his property for a total of approximately four years (early 2014 through June 2018), when the ordinance allows only 12 months. It also did so, notwithstanding the fact that (1) the Storage Container continued to be used as a sign in support of President Trump, (2) the zoning ordinance provides storage containers may be used for storage only, and (3) despite the fact that McCoy has never applied for a sign permit. *See* Requests for Admission ("RFAs"), attached hereto as Exhibit D, at ¶¶ 38-40.[2] As in November 2016, there was no mention during the June 2017 meeting from McCoy or others of the Storage Container being used as a sign or any mention of any expressive content on it. *See* Martson Aff., Exhibit 5 at *10.

---

[2] The RFAs attached to the memorandum were admitted in full per Fed. R. Civ. P. 36(a)(3) because McCoy did not provide answers within 30 days of service, nor within a subsequent extension that was granted. *See* Affidavit of Robert J. Dietel ("Dietel Aff."), attached hereto as Exhibit F. McCoy's responses were not provided until 97 days after service of the RFAs. *Id.* Plaintiff has not moved to withdraw or set aside the admissions.

In the following month (July 2017), McCoy allowed the portion of the Storage Container that is the subject of the Complaint (the side facing the road) to be repainted with a scene of hot air balloons and a waving American flag. McCoy Dep., 83:19-84:6.[3] The following images depict the Storage Container prior to July 2017 and after its repainting in July 2017.



McCoy Dep., Exhibit A (depicting Storage Container pre-July 2017).



McCoy Dep., Exhibit H. (depicting Storage Container post-July 2017).

---

[3] McCoy contends in his deposition, and in responses to the Town's RFAs, that the rear doors of the Storage Container indicated some support for President Trump after July 2017. Whether they did or not, is not known to the Town, but also not material given that they are not the subject of the Complaint, as is plainly shown by the above images. *See also* Complaint ¶ 10 (describing sign as the image on the side of the Storage Container). There is also no allegation of discrimination or harassment in the Complaint with respect to the rear doors, nor any assertion or evidence that the Town knew what the rear doors looked like, or that they factored into any decision of the Town.

Over the course of the next year (June 2017-June 2018), the Storage Container displayed the balloon scene depicted at McCoy Dep., Exhibit H.

On May 22, 2018, the Board wrote to McCoy and reminded him that his 2017 Permit was set to expire in the following month and that the Storage Container would need to be removed. The Board noted that McCoy could apply for another permit provided the Storage Container was removed for three months. Marston Aff., at ¶ 17. McCoy responded to the Board's letter by requesting yet another extension. *Id*. at 18. This was his third request.

In a May 29, 2018 letter to the Board, McCoy once again requested an extension so that he could store personal belongings, as he had on two prior occasions in 2016 and 2017. He made no mention of any desire to maintain the Storage Container as a sign or to express support for President Trump. *See* Martson Aff., Exhibit 9.

The Board met on June 12, 2018 and considered McCoy's third request for an extension. *See* Martson Aff., ¶ 19. The Board discussed McCoy's prior permit history and his prior representations to the Board. *Id.* There was no discussion regarding the use of the Storage Container for any expressive purposes, nor its prior use to support President Trump. The Board voted unanimously to deny the request given the requirements of the zoning ordinance and prior extensions. The next day, on June 13, 2018, the Town Administrator wrote to McCoy and informed him of the Board's decision. *See* Martson Aff., ¶ 19, Exhibit 10. The letter contains a summary of the Board's reasoning, a portion of which follows:

> The Board of Selectmen considered your permit extension request dated May 29, 2018. While they note the personal circumstances that have caused delay, the Board has to balance the terms of the zoning ordinance with your request, and as you have already been granted a year's extension beyond the 12 months permitted, they voted to not grant this second extension.

*Id*. at Exhibit 10.

After receiving the Board's letter, McCoy sold the Storage Container to a local business. McCoy Dep., at 41:17. He has since decided that he does not want a Storage Container on his property. McCoy Dep., at 66:9-20 (stating "I wouldn't have a storage trailer in this town for nothing in the world…."). McCoy did not appeal the Board's decision. *See* Marston Aff., at ¶ 23.

The Board's June 2018 decision, denying a third extension, was not unique. In fact, on the very same night that it denied McCoy's request, it also voted to initiate enforcement action with respect to three unpermitted storage containers located on a different property at 140 Tilton Hill Road (the "Tilton Hill Trailers"). *See* Marston Aff., at ¶ 20. To the best of the Town's knowledge, the Tilton Hill Trailers did not display any expressive content.

On June 13, 2018, the same day the Board notified McCoy of its denial, it also sent a notice of violation to the owners of the Tilton Hill Trailers. *See* Marston Aff., Exhibit 11. The owners of the Tilton Hill Trailers subsequently applied for permits. *Id.* The owners were granted one storage container permit and required to remove the other two storage containers on their property. *Id.* This is similar to the treatment of McCoy in 2016, when McCoy was granted an extension for the Storage Container, but required to remove the Rental Container, which did not have any expressive content on its side.

In addition, the Board has since taken other enforcement measures with respect to Storage Containers in Town. It has required property owners to seek permits when the Town becomes specifically aware of unpermitted storage containers, and it has even taken a property owner to Court when compliance was not obtained. *See* Marston Aff., at ¶ 28. Because the Town has limited resources to dedicate to enforcement of the zoning ordinance, it has focused its enforcement efforts on instances where it is specifically aware of potential violations, as may

11

occur when it knows a permit has expired, receives complaints, or otherwise. *See id*. at ¶¶ 24-25, 28.

Despite the above history and factors, McCoy has alleged that his treatment by the Town was discriminatory and that he did not know of the reasons for the Board's decisions. In particular, he alleges that three individuals (Jim Allard, Larry Konopka, and Carl Anderson), "repeatedly harassed" him about his Storage Container. Complaint at ¶ 23. McCoy's Complaint does not describe what specific actions those individuals took with respect to him or his Storage Container. However, during Deposition, McCoy clarified the allegations.

In deposition, McCoy was asked:

> Q:    …I asked you what the Town did, what evidence you had that the town selectmen, the three individuals [Allard, Konopka, and Anderson], were trying to get this [Storage Container] off because it said "Trump." You said that you were informed that there were some complaints from some of the selectmen.
> A.    Complaints -- complaints by the building inspector and in the town minutes.
> Q.    Okay. What else?
> A.    Complaints.

McCoy Dep. at 98:2-99:6.

When pressed for further detail of the alleged discrimination, McCoy responded that he was told to get the Storage Container off his property and was told of "Complaints, complaints, complaints, complaints." McCoy Dep., at 99:19-20. In follow up, he was asked a final time to identify what specifically Allard, Konopka, and Anderson allegedly did to discriminate against him, and he responded as follows:

> Q:    I asked you a question. I said the only evidence you had that you were discriminated against because this was a Trump sign was because you said you were told about complaints.
> A.    Complaints.
> Q.    And I am asking you, there was nothing else?

A.    Just the complaints. And they would mention a permit, and that permit was illegal.

McCoy Dep. at 100:20-101:5.

McCoy was in fact informed of complaints. That point is not disputed. There is no question that the Building Inspector communicated with McCoy, and McCoy was informed he needed to obtain a permit, and remove the Rental Trailer, as detailed above.

Additionally, in 2017, Selectman Anderson was aware of complaints received by the Town regarding unpermitted storage containers, which he conveyed to McCoy. *See* Anderson Aff., at ¶ 7. The complaints did not relate to McCoy's use of the Storage Container to express support for President Trump, but rather, pertained to its permit status and that of other storage containers in Town. *Id*. Anderson shared this information with McCoy. *Id*., at ¶ 7; McCoy Dep. at 62:7-11.

Anderson - a life-long Republican and supporter of President Trump - was on friendly terms with McCoy at the time he shared the information regarding complaints. Anderson Aff., 12. In fact, McCoy has previously displayed a sign publically supporting Anderson in local Town elections. *See* McCoy Dep. at 62:4-12.

Later, in January 2020 (approximately a year and half after the June 2018 permitting decision), Anderson became aware that McCoy was spreading falsehoods regarding the Board's actions. *See* Anderson Aff., at ¶ 8. Accordingly, Anderson wrote to McCoy and explained his reasons for voting to deny McCoy's third permit request. *Id.*, Exhibit 1. In his letter, Anderson noted that he personally liked McCoy's support for Trump, but that Anderson believed he was required to enforce the ordinance on an even basis, stating "[t]he truth is you've been treated just like everyone else that has brought in a storage container or a permit has expired since we took

office!" Approximately two months after receiving Anderson's letter, McCoy filed the present suit against the Town.

## STANDARD OF REVIEW

When ruling on a motion for summary judgment, the Court must "constru[e] the record in the light most favorable to the nonmoving party and resolv[e] all reasonable inferences in that party's favor." *Pierce v. Cotuit Fire Dist.*, 741 F.3d 295, 301 (1st Cir. 2014). Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a). In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." *Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr.*, 103 F. 3d 196, 199–200 (1st Cir. 1996) (citations omitted). *See also Nolan v. CN8*, 656 F.3d 71, 76 (1st Cir. 2011). Nevertheless, if the non-moving party's "evidence is merely colorable, or is not significantly probative," no genuine dispute as to the material fact has been proved, and "summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (citations omitted).

## LEGAL ANALYSIS

I.  <u>The Town is entitled to summary judgment on McCoy's equal protection claim because the undisputed facts establish that there was no discrimination in the enforcement of the Town's zoning ordinance, the town had a rational basis for its decision, and he was not treated differently from other similarly situated individuals.</u>

In order to prevail on a "class of one" equal protection claim, McCoy must be able to present evidence upon which a reasonable jury could conclude that he was intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). The undisputed facts, however, make clear that there was no discrimination, the Town had a rational basis for its

treatment of McCoy, and McCoy fails to identify sufficient comparators to make out a "class of one" claim.

A. *The Town did not discriminate against McCoy*

No reasonable jury could examine the undisputed facts at issue in this case and conclude that McCoy was discriminated against based on his support for President Trump or his use of his Storage Container to express that support, or any other factor. To the contrary, the undisputed facts reveal that the Board exercised considerable discretion with respect to McCoy, and applied the zoning ordinance in an extremely light-handed manner with respect to his Storage Container.

The undisputed evidence is overwhelming:

- At the time the Board denied McCoy's 2018 permit request, the Storage Container no longer displayed the image "TRUMP! USA," and instead, depicted a balloon scene. McCoy admits this fact. Therefore, the central allegation in his suit - i.e., that "[t]he Board's order was based solely on the fact that the trailer depicted "TRUMP" in large letters" (Complaint, ¶ 20) - cannot be sustained.

- As of the June 2018 denial, the Storage Container had been on the property for approximately four years despite the ordinance's 12 month limitation.

- During the period of time in which McCoy's trailer was painted with the words "TRUMP! USA" he received two permits extensions (one on November 15, 2016 right after the presidential election, and another in June 2017), when in fact, the zoning ordinance does not provide for any extensions.

- The Board granted McCoy extensions despite the fact that it was aware of complaints regarding the trailers in both 2016 and 2017.

- The Board granted extensions in 2016 and 2017 despite the fact that McCoy was plainly in violation of the terms of the zoning ordinance.
  - Under the zoning ordinance, storage containers may be on a property for no more than 12 months in a 15 month period.
  - Under the zoning ordinance storage containers may be used for storage only, but McCoy admits he was using the Storage Container for dual purposes.

- Carl Anderson was on friendly terms with McCoy during the period when McCoy applied for permits, was a supporter of President Trump, and made the motion to approve McCoy's permit extension request in November 2016 when the Storage Container said "TRUMP! USA."

- During deposition, the only evidence McCoy was able to muster in support of discrimination was that he was informed - allegedly on multiple occasions - that the Town had received complaints and he needed to remove the trailer. These points are not in any way discriminatory or harassing on their own, and when pressed to provide more factual detail, McCoy could not muster a shred of any other evidence.[4]

In light of the above, McCoy cannot credibly allege that he was discriminated against. If anything, the Board allowed McCoy far more leeway in maintaining the Storage Container than the express terms of the ordinance provide. In deciding this motion for summary judgment, the Court need not go beyond this point. McCoy's equal protection claim should not be allowed to proceed to a jury given the overwhelming evidence in the record.

Nevertheless, even if there were some credible evidence of discrimination, McCoy's evidence of similarly situated comparators also fails. The undisputed facts demonstrate that McCoy was not treated differently from others. And the generic class of comparators relied on by McCoy - property owners with storage containers without expressive content - is woefully inadequate at this stage.

B. *McCoy's "class of one" claim fails because he does not identify <u>specific instances</u> where persons similarly situated <u>in all relevant aspects</u> were treated differently without any rational basis.*

To sustain a "class of one" equal protection claim, a plaintiff must identify <u>specific instances</u> where persons similarly situated <u>in all relevant</u> respects were treated differently without a rational basis. *See Buchanan v. Maine,* 469 F.3d 158, 178 (1st Cir.2006) ("Plaintiffs claiming an equal protection violation must first identify and relate *specific instances* where persons *situated similarly in all relevant aspects* were treated differently.") (*quoting Rubinovitz*

---

[4] On April 12, 2021, the Town propounded Interrogatories and Requests for Production, calling for McCoy to produce evidence of his claims. Per the agreed upon discovery plan, his responses were due on May 27, 2021. To date, no responses have been provided. *See* Dietel Aff. at ¶ 7. Additionally, McCoy's initial disclosures provide no evidence of any discrimination, harassment, or disparate treatment. *See* Initial Disclosures, attached hereto as Exhibit E. The exhibits referenced therein have not been provided by McCoy.

*v. Rogato*, 60 F.3d 906, 910 (1st Cir.1995). This requirement "is meant to be 'a very significant burden.'" *See Cordi-Allen*, 494 F.3d at 251 (internal citations omitted). In fact, "only in extreme circumstances will a land-use dispute give rise to an equal protection claim." *Torromeo v. Town of Fremont*, 438 F.3d 113, 118 (1st Cir.2006) (citation omitted). "Were the law otherwise, the federal court would be transmogrified into a supercharged version of a local zoning board—a zoning board on steroids, as it were." *Cordi-Allen*, 494 F.3d at 252.

Contrary to the above requirements,  McCoy's "class of one" claim does not identify a single specific comparator. Instead, it is premised on a threadbare allegation that the Town singled him out for discrimination because of his support for President Trump, but allowed other unidentified storage containers in Town to evade regulation. Were this enough to sustain his claims, it would turn First Amendment precedent on its head. *See Cordi-Allen*, 494 F.3d at 251 (holding "[i]t is inadequate merely to point to nearby parcels in a vacuum and leave it to the municipality to disprove conclusory allegations that the owners of those parcels are similarly situated.")

Because McCoy does not identify any specific properties or individuals who were treated differently, he has not provided sufficient information to sustain his claims. *See id*. The burden is on McCoy to present this evidence, and not the Town. To do so, McCoy would need to identify specific properties that were in fact similarly situated in all relevant respects. Generic descriptions of other comparators are insufficient because "[v]arious factual traits, circumstantial nuances, and peculiarities can set entities apart, rendering them, by virtue of their differences, amenable to disparate treatment." *See Cordi-Allen*, 494 F.3d at 252 (quoting *Racine Charter One, Inc. v. Racine Unified Sch. Dist.*, 424 F.3d 677, 681 (7th Cir.2005).

In order to identify a storage container that is relevant in all respects to his own, McCoy

would need to identify a storage container with the following shared characteristics:

1. It must not be grandfathered under the zoning ordinance;
2. It must have been well known to the Town as needing a permit;
3. It must have received multiple permit extensions (for a total of several years at least) beyond what the ordinance allows;
4. It must have been the subject of complaints and public awareness and press;
5. It must have been used for a dual purposes (storage and something else);
6. The owner must have previously applied for permits and represented that he would remove the storage container but not follow through;
7. It must have been on a lot that had a history of other storage container violations, such as the unpermitted Rental Container on McCoy's property);
8. It must have been visible from a public road;
9. It must have had the above characteristics during the same time that McCoy sought a permit and was denied; and
10. It must have been in the same zoning district as McCoy (among other possible factors).

Absent such shared similarities, a reasonable  jury could not conclude that McCoy has

identified an adequate comparator. *See Cordi-Allen*, 494 F.3d at 251 (holding in a class of one

equal protection claim, a plaintiff must show that they "engaged in the same activity ... without

such distinguishing or mitigating circumstances as would render the comparison inutile.").

In addition, McCoy also fails to identify any difference in treatment without rational

basis. While McCoy contends that the Town has allowed other unpermitted storage containers to

escape review because they did not contain political speech, this is plainly not true. For

example[5]:

- In June 2018, on the same day that the Board denied McCoy's third request for an extension, the Board initiated enforcement action with respect to the Tilton Hill Trailers as noted previously. As a result, one of those storage containers received a permit and the other two were removed. *See* Marston Aff., ¶ 28.

- In 2019, the Town brought suit to enforce Article 14 in *Town of Pittsfield v. James Hetu, et al*, Case No. 217-2019-cv-00663, Merrimack Superior Court. This action

---

[5] The examples recited in this motion are not comprehensive of all of the enforcement actions by the Town. They are intended as representative examples for the purpose of this motion.

arose following lengthy efforts to obtain compliance. *See* Marston Aff., ¶ 28, Exhibit 13.

- In the summer of 2019, the Town became aware of an unpermitted storage container at 11 Cram Avenue, issued a notice of violation, and subsequently received and approved a permit application. *See* Marston Aff., Exhibit 14. The Town's treatment with respect to the storage container at 11 Cram Avenue is consistent with the manner in which Mr. McCoy's 2015 Permit application was received and approved.

- With respect to McCoy, the Town allowed him to keep the Storage Container on his property in 2016 and 2017, but required the Rental Container, which did not display any expressive content, to be removed.

As the above demonstrates, there is ample history of the Town taking enforcement with respect to storage containers in Town, and not just with regard to McCoy. McCoy cannot identify any difference in treatment between him and other storage container, nor can he genuinely contend that the Town lacked a rational basis for denying his permit request in 2018.

Additionally, even if the Town was previously lax in enforcement, or inconsistent in application, that would not save McCoy's claims. *See Gray v. Town of Easton*, 115 F. Supp. 3d 312, 320 (D. Conn. 2015) ("the Equal Protection Clause does not require perfectly uniform enforcement efforts.") (*aff'd sub nom. Gray v. Maquat*, 669 F. App'x 4 (2d Cir. 2016)).

In the land-use context, the application and enforcement of regulations and ordinances may change over time, without it giving rise to a constitutional injury. As the First Circuit explained in *Cordi-Allen*, "[s]ince zoning bylaws, environmental standards, and licensing criteria may change over time, courts must be sensitive to the possibility that differential treatment—especially differential treatment following a time lag—may indicate a change in policy rather than an intent to discriminate." 494 F.3d 245, 253 (1st Cir. 2007) (quoting *Purze v. Vill. of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir.2002).

In light of the above, this Court should grant summary judgment for the Town with respect to Count II. *See Olech,* 528 U.S. at 565 (Breyer, J., concurring) (The "similarly situated"

requirement must be enforced with particular rigor in the land-use context because zoning

decisions "will often, perhaps almost always, treat one landowner differently from another.").

II.  <u>The Town is entitled to summary judgment with respect to Count I (presenting an as-
     applied vagueness challenge) because no reasonable jury could find that the Town's
     ordinance,  as applied to McCoy, was unconstitutionally vague.</u>

In Count I, McCoy alleges that a "person of reasonable intelligence would not have fair

notice of what is prohibited under the ordinance or what a trailer must look like in order to pass

muster under the storage container section of the ordinance" and that its application to McCoy

could "be viewed as 'so standardless that it authorizes' some form of discriminatory

enforcement." *See* Order, at 12 (clarifying Count I's factual allegations). The undisputed facts

prove otherwise:

- McCoy had multiple conversations with the Building Inspector regarding the
  requirement that he obtain a permit for his Storage Container;

- McCoy received a Notice of Violation that informed him of the ordinance and the
  right to appeal decisions;

- McCoy met with the Board and discussed his Storage Container at length and was
  present while the Board debated the 12 month requirement and the status of other
  storage containers in Town;

- McCoy successfully applied for three permits (2015, 2016, and 2017);

- The Board gave McCoy advance notice of the expiration of his June 2017 permit
  and informed him of his right to seek a new permit after three months had passed;

- McCoy received written notice following the Board's June 2018 decision
  informing him of the basis for the Board's decision (*see* Marston Aff., Exhibit 12
  (stating "the Board has to balance the terms of the zoning ordinance with your
  request, and as you have already been granted a year's extension beyond the 12
  months permitted, they voted not to grant this second extenson"));

- McCoy knew he needed to remove his unpermitted Rental Container in 2016 and
  did so;

- McCoy knew that the zoning ordinance was available for review and where to find it (*see* McCoy Dep., at 80:16-17 (acknowledging "you could go on the town website and read them")); and

- The ordinance, on its face, is plain, content neutral, and easily understood by a person of reasonable intelligence.

Given the above record, there can be no reasonable doubt that McCoy "in fact knew—or was chargeable with knowledge—that his conduct fell within the [ordinance's] proscriptions" and the reasons why he needed to remove the Storage Container in 2018. *See United States v. Cintolo,* 818 F.2d 980, 997 (1st Cir.).

III.   The Town is entitled to summary judgment because McCoy's claims of constitutional injury are not ripe because he did not pursue an appeal to the Town's zoning board of adjustment.

The Town zoning ordinance provides that the Board of Selectmen is the "zoning administrator" and, as such, is generally responsible for "administering and enforcing the zoning ordinance" including issuing storage container permits. *See* Marston Aff., Exhibit 1 at *7 (Article 1, Sec. 6); *see also* Marston Aff., Exhibit 1 at *54 (Article 14, Sec. 3(f)) ("The zoning ordinance administrator shall issue a permit for the STORAGE CONTAINER…"). However, when an individual is aggrieved by a decision of the Board with respect to a storage container permit, it is required to bring an appeal to the Town's zoning board of adjustment, or it loses its ability to challenge such decision. *See* Marston Aff., Exhibit 1 at *40 (Appeals to Board of Adjustment). Accordingly, despite the fact that the Board is the zoning administrator, it is the zoning board of adjustment that has final say over storage container permitting decisions if an appeal is pursued.

Given the above requirements, McCoy's allegations of unconstitutional enforcement - both his vagueness and class-of-one challenge - are not ripe. Specifically, he cannot claim that the Town subjected him to unequal protection of its laws, or applied the ordinance in a vague manner, if he did not avail himself of the procedures for resolving his claims at the municipal

level. If he had, it is possible the zoning board of adjustment could have overturned the Board's decision, or provided further reasoning regarding why the 2018 permit was denied, but this did not happen. Other federal circuits have reached the same conclusion regarding ripeness.

In *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342 (2d Cir.2005), the plaintiffs asserted First Amendment and RLUIPA claims based on allegations of discriminatory enforcement of a local zoning ordinance. On review, the Second Circuit Court of appeals extended the "final decision" requirements articulated in W*illiamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), to the  plaintiffs' First Amendment and RLUIPA claims, and held they were not ripe because the plaintiffs had failed to appeal a cease-and-desist order and apply for a variance. In reaching its holding, the *Murphy* Court explained that in land-use contexts, "the *Williamson County* final decision requirement serves the essential goal of ripeness jurisprudence: it helps federal courts avoid entanglement in abstract disputes which would be better defined and more easily resolved with a more complete and concrete factual record." *See Guatay Christian Fellowship v. Cty. of San Diego*, 670 F.3d 957, 977 (9th Cir. 2011) (analyzing *Murphy*, 402 F.3d 342 (2d Cir.2005)). The *Murphy* Court noted, however, that in the First Amendment context, the final decision requirement should be "cautiously applied." *Id*. "Accordingly, it added a preliminary inquiry to its determination of whether the Murphys would be required to show that a final decision had been reached: (1) whether the Murphys experienced any immediate injury as a result of the government's actions, and (2) whether requiring them to pursue additional remedies would further define their alleged injuries." *Id*.

Applying the *Murphy* Court's analysis here, it is apparent McCoy's claims are not ripe. McCoy did not experience any immediate injury as a result of the Board's denial because, while

an appeal to the zoning board of adjustment was pending, he would have been able to maintain

his Storage Container on his property, and further, the Storage Container did not say "TRUMP!

USA" at the time. And, if McCoy had appealed, it would have further defined McCoy's alleged

injuries because if it had resulted in the grant of a permit, it would have negated any injury, and

regardless, it would have required each side (McCoy and the Board) to advance arguments to the

zoning board of adjustment as to why the Board's decision was lawful and reasonable or not.

The First Circuit, admittedly, has not directly addressed this issue. *See Roman Cath.*

*Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 90 (1st Cir. 2013) ("…we do not

resolve today the question of whether relaxed First Amendment ripeness standards apply

generally to claims predicated on alleged Free Exercise violations, nor do we resolve the

question of whether (and to what extent) *Williamson County* may apply to such claims.") (citing

*Murphy*, 402 F.3d 342 (2d Cir.2005)). But it has not precluded such a result, and the First Circuit

has recognized such claims can be dismissed " under general principles of prudential ripeness."

*Id*.

In light of the above, this Court should conclude that McCoy's claims are not ripe, lest it

invite property owners to short circuit state law procedures and create constitutional claims out

of any routine permit denial. "If disgruntled permit applicants could create constitutional claims

merely by alleging that they were treated differently from a similarly situated applicant, the

correctness of virtually any state permit denial would become subject to litigaton in federal

court." *Vill of Belle Terre v. Boraas*, 416 U.S. 1, 12 (1974) (Marshall, J, dissenting). Under the

facts in this case, there is no constitutional harm until the local board with final authority has had

the opportunity to weigh in and correct any perceived errors to the extent they exist. Until such

time, courts should issue restrain before wading into land-use disputes. *See Macone v. Wakefield*,

277 F.3d 1, 10 (1st Cir. 2002) (noting "extreme reluctance to entertain equal protection challenges to local planning decisions"); *Mangual v. Rotger–Sabat,* 317 F.3d 45, 59 (1st Cir.2003)("Determining ripeness requires evaluation of 'both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'")(quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)); *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.").

## CONCLUSION

The Town is entitled to summary judgment for the reasons set forth above.

Respectfully submitted,

**TOWN OF PITTSFIELD**

By Its Attorneys,
GALLAGHER, CALLAHAN & GARTRELL, P.C.

Dated:  June 1, 2021                    By:___/s/ Robert J. Dietel_____
Robert J. Dietel (#19540)
214 North Main Street
Concord, NH  03301
603-228-1181
dietel@gcglaw.com

## CERTIFICATE OF SERVICE

I, Robert J. Dietel, hereby certify that a copy of the foregoing was sent to all counsel of record via ECF.

Dated:  June 1, 2021                    By:___/s/ Robert J. Dietel_____
Robert J. Dietel



EXHIBIT
**A**
[MCCOY DEP.]

*In the Matter Of:*

MCCOY

vs

TOWN OF PITTSFIELD

---

JOSEPH MCCOY

May 07, 2021

---



**Certified**
**Videographers & Court Reporters**
**VIDEOCONFERENCING**

**603-666-4100**
**Toll Free: 1-888-212-2072**

814 Elm Street * Suite 400 * Manchester, NH  03101
Fax: 603-666-4145 * Email: info@avicorereporting.com
Website: www.avicorereporting.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Civil Action No.:
1:20-CV-00362-JL

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                        \*
JOSEPH McCOY,                           \*
                                        \*
          Plaintiff,                    \*
                                        \*
vs.                                     \*
                                        \*
TOWN OF PITTSFIELD, NH,                 \*
                                        \*
          Defendant.                    \*
                                        \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


DEPOSITION OF JOSEPH McCOY

Deposition taken by agreement of counsel via

Zoom on Friday, May 7, 2021, commencing at 1:00 P.M.


Court Reporter:
Tina L. Hayes, RPR, NH LCR #80
(RSA 310-A:161-181)

```
 1                 A P P E A R A N C E S

 2   Representing the Plaintiff:

 3             FOJO LAW, PLLC
               121 Bay Street
 4             Manchester, NH  03104
               By:  Robert M. Fojo, Esquire
 5             (603)473-4694
               rfojo@fojolaw.com
 6
     Representing the Defendant:
 7
               GALLAGHER, CALLAHAN & GARTRELL, PC
 8             214 North Main Street
               Concord, NH  03301
 9             By:  Robert J. Dietel, Esquire
               (603)545-3613
10             dietel@gcglaw.com

11   Also present:

12             Cassandra Sferazo


13                 S T I P U L A T I O N S

14
          It is agreed that the deposition shall be taken
15   in the first instance in stenotype and when
     transcribed may be used for all purposes for which
16   depositions are competent under the Federal Rules of
     Civil Procedure.
17
          Notice, filing, caption and all other
18   formalities are waived.  All objections except as to
     form are reserved and may be taken in court at time
19   of trial.

20        It is further agreed that if the deposition is
     not signed within 30 days, the signature of the
21   deponent is waived.


22


23
```

1                          I N D E X

2    WITNESS:

3      Joseph McCoy

4    EXAMINATION:                                    PAGE

5      By Mr. Dietel                                    4

6    ERRATA SHEET                                     102

7    CERTIFICATE OF REPORTER                          103

8    EXHIBITS FOR IDENTIFICATION:

9    MARKED           DESCRIPTION                    PAGE

10   Exhibit A        Photograph                       22

11   Exhibit B        Article 14, Storage Containers   31

12   Exhibit C        Town of Pittsfield Permit        38
                      for Storage Containers
13
     Exhibit D        Facebook Post dated              45
14                    January 29, 2016

15   Exhibit E        Notice of Violation Letter       70

16   Exhibit F        Handwritten Letter dated         76
                      November 3, 2016
17
     Exhibit G        Town of Pittsfield Permit        81
18                    for Storage Containers

19   Exhibit H        Facebook Post of Balloon         87
                      Picture dated July 30, 2017
20
     Exhibit I        Letter dated May 22, 2018        92
21
     Exhibit J        Letter dated May 29, 2018        93
22
        (Digital exhibits were provided to all counsel.)
23

4

```
 1                    P R O C E E D I N G S

 2            MR. DIETEL:  We agree to the usual

 3       stipulations?

 4            MR. FOJO:  Yes.

 5                      JOSEPH McCOY,

 6  having been first duly sworn, was deposed and

 7  testified as follows:

 8                      EXAMINATION

 9  BY MR. DIETEL:

10       Q.   Mr. McCoy, I am Robert Dietel.  As I think

11  you know, I am counsel for the Town of Pittsfield.

12  And the purpose of today's meeting is obviously to

13  take your deposition and to go over some questions

14  with you about the facts of the case.

15            Before we get started and delve into those

16  details, I want to go over some ground rules with

17  you.  And I will start by saying that, you know,

18  since you said you can't -- you have got difficulty

19  hearing, I am going to need you to let me know --

20  you can raise a hand or something, but I am going to

21  need you to let me know if you are not hearing

22  anything that I am saying.

23       A.   Okay.
```

1    Q.   Similarly, if you are not understanding

2  any of the questions that I ask, I need you to let

3  me know that as well.

4    A.   Okay.

5    Q.   If you don't let me know, I am going to

6  assume that you understood and that you heard the

7  question and we're going to keep moving on.

8         The other thing that's important is, so

9  that the stenographer, the court reporter can get a

10  clear record, we're going to have to be careful that

11  we don't talk over each other, particularly given

12  that we're doing this by Zoom.  So you are going to

13  have to let me ask the questions, and then I will

14  stop, and you answer them -- I will let you answer

15  them, and then we can go back and forth from there.

16  I will do my best not to interrupt you.  You do your

17  best not to interrupt me.

18         If you give responses where you are

19  nodding your head or, you know, holding up a hand or

20  something like that, that doesn't get recorded.  So

21  I always need you to say your responses audibly so I

22  can hear them.

23         And if you need a break, you can let us

1   know.  As long as there's not a question that's open

2   and pending, we can take reasonable breaks from time

3   to time.

4            If your attorney, Robert, objects to

5   something that I say, you are going to need to

6   answer the question anyway unless he specifically

7   instructs you not to.

8            And, finally, and perhaps most

9   importantly, Mr. McCoy, I know you just took your

10  oath, but I want to make sure you understand that

11  the testimony you are giving today is under oath and

12  that you have sworn to tell the truth.  Do you

13  understand that?

14       A.   Yes, sir, I do.

15       Q.   And do you understand all the instructions

16  I just explained to you?

17       A.   Basically, yes, I do.

18       Q.   Is there any specifically that you don't

19  understand?

20       A.   No.  I pretty much understand that -- with

21  my hearing, I am good.

22       Q.   Like I said, let me know if you are not

23  hearing anything.  You will see my lips moving,

1   so...

2       A.   Okay.

3       Q.   So, Mr. McCoy, for the record, can you

4   state your full name and tell us where you live?

5       A.   Joseph Edward McCoy.  And I live at

6   322 Catamount Road in Pittsfield, New Hampshire.

7       Q.   Any relation to the Hatfield McCoys?

8       A.   Yes.  They posted me on the front page of

9   the "Concord Monitor."

10      Q.   So where are you originally from?  I

11  understand you are not a lifelong resident of

12  Pittsfield; is that right?

13      A.   No.  I am originally from Ayer,

14  Massachusetts.

15      Q.   Okay.  And what brought you to

16  New Hampshire?

17      A.   Well, I have lived in New Hampshire and I

18  was working and -- working for myself and working

19  for local unions.  And I moved out of Manchester in

20  2014.  I had a lot of medical problems.  And I

21  bought my home out in the country to have a little

22  bit of quiet life.

23      Q.   Okay.  What was your profession?  What did

1  you do for a living?

2      A.   Carpenter.

3      Q.   A carpenter?

4      A.   Yes, sir.

5      Q.   Okay.  Residential construction or

6  commercial?  A little bit of everything?

7      A.   Everything.

8      Q.   Yeah.  Yeah.  Where did you learn that

9  trade?

10     A.   From my father when I was 14.  18 I

11 started working for Century 21, and I worked for

12 myself.  Then I got into local unions, and I was

13 running jobs all over New England.

14     Q.   Do you do that still?  Do you have -- are

15 you employed now?

16     A.   No.  I had an accident in 2010 and

17 multiple surgeries 2014.  I ended up with a metal

18 rod in my leg, gangrene, pseudomonas infection,

19 shock treatment, heart attack.  So I have been going

20 through some stuff over the years.

21     Q.   I am sorry to hear that, Mr. McCoy.  It

22 doesn't sound fun.  How are you doing now?

23     A.   I am okay.  I just don't get along like --

1  move around like I used to.

2       Q.   Yeah.  Yeah.  So what year did you move to

3  Pittsfield?

4       A.   About June or July 2014.

5       Q.   Okay.  How did you settle on the property

6  where you are now?

7       A.   Excuse me?

8       Q.   How did you choose the property where you

9  are now?

10       A.   Me and my wife was riding around looking

11  at properties.  And when I seen this place, we liked

12  it; so we bought it.

13       Q.   Okay.  Mr. McCoy, I meant to ask you at

14  the outset.  Have you ever been deposed before?

15       A.   In a lawsuit I had concerning my

16  construction.

17       Q.   Okay.  When was that?

18       A.   That was in possibly -- I am not really

19  sure of the date, but sometime in 2013.  They

20  settled out of court 2014.  So between there is when

21  I was deposed.

22       Q.   Okay.  Is that the only lawsuit -- that

23  and this one the only lawsuits you have ever been a

1 | party to?

2 |     A.   As far as I know, yes.

3 |     Q.   As far as you know?

4 |     A.   Yeah.

5 |     Q.   So, to your knowledge, you have never been

6 | a party to another lawsuit?

7 |     A.   Well, before, there was one that didn't

8 | make it concerning the doctor and the dirty needle

9 | which ended up giving me pseudomonas and gangrene.

10 | And my lawyer, they just didn't do good; so they

11 | dropped my lawsuit.

12 |     Q.   Okay.  Have you ever been arrested or

13 | convicted of a crime before?

14 |     A.   I would like to keep that to myself, if

15 | possible, because I do not think it would concern my

16 | case here.

17 |     Q.   I understand that, Mr. McCoy.  But I am

18 | allowed to ask and you do have to tell me.

19 |         MR. FOJO:  Joe, it's okay for you to

20 |     answer it.  We can -- that's all I will say.

21 |         MR. DIETEL:  Robert, what's the basis for

22 |     your objection?

23 |         MR. FOJO:  I am not objecting.  I just

1          told him it's okay for him to answer.

2                MR. DIETEL:  I thought you said for him

3          not to.

4                MR. FOJO:  No, no.  I am not objecting.

5          It's appropriate.  It's fine.

6                Joe, we can always move to exclude

7          information on various evidentiary grounds

8          later.  But for now, there's no objection that

9          I can lobby against the question; so you have

10         to answer it.  It's okay to answer it.

11               THE WITNESS:  Okay.

12         Q.   (By Mr. Dietel) So, Mr. McCoy, the

13    question was have you ever been arrested or

14    convicted of a crime before?

15         A.   Yes.

16         Q.   And what was -- how many times?

17         A.   I have no idea.  Three, four, five.  And I

18    had one major one.  I ended up accidentally shooting

19    a police officer, and I ended up doing 20 years in

20    prison for that.

21         Q.   Where was that, Mr. McCoy?

22         A.   That was in Georgia.

23         Q.   Georgia?

1       A.    Yeah.

2       Q.    What brought you down to Georgia?

3       A.    After Elvis Presley died, I just decided

4   to go south.  And I had worked down there with some

5   of my friends; so I went down there and stayed down

6   there to 2004, from '78 to 2004.  Then I came back

7   to Massachusetts, stayed 10 years, and moved to

8   New Hampshire.

9       Q.    So where were you incarcerated?

10      A.    Many prisons in Georgia.  My longest stint

11  was in Reidsville State Prison.  And I spent three

12  years -- a little over three years in lockdown.  It

13  was -- it was a difficult time.

14      Q.    And so what year was that that you had the

15  shooting?

16      A.    1984.

17      Q.    Okay.  You said, though, that you were

18  incarcerated from 1978 to 2004.  Was there something

19  prior to that?

20      A.    No.  You had asked me -- my -- my response

21  to that question, you asked me when I had moved to

22  Georgia and I said in 1978.  And I came back up

23  north 2004.  I wasn't -- I didn't say I was

```
 1    incarcerated then.

 2         Q.    Okay.  So what years -- so you were

 3    incarcerated from 1984 to 2004?

 4         A.    Yes.

 5         Q.    Okay.  What other crimes have you been

 6    arrested or charged with previously?

 7         A.    When I was a kid, stolen vehicle.

 8         Q.    What else?

 9         A.    A burglary.  And that's about as far as I

10    want to go because I really don't remember all that

11    way back.  I am in a short of mind right now.

12         Q.    Well, Mr. McCoy, I am going to ask you, if

13    there's any others that you remember, you need to

14    tell me.

15         A.    If it's on my record and -- right now, I

16    don't remember.  That's the only thing I can tell

17    you.  My record is public knowledge if you want to

18    look at it.

19         Q.    Have you ever been charged or accused of

20    committing perjury?

21         A.    No.

22         Q.    Ever been charged with any crimes that

23    relate to your truthfulness?
```

1      A.    No.  Not that I am aware of, no.

2      Q.    Okay.  Since 2004, when you were released

3 from prison, have you been charged or arrested --

4 arrested or charged with a crime?

5      A.    I was arrested in -- July 31, 2015, I was

6 coming out of Walmart in Concord.  And a

7 motorcyclist hit me, hit my truck from behind, and

8 he was a retired Hampton police officer.  And they

9 wanted to charge me with vehicular homicide.  And it

10 ended up when I had a lawyer.  The officer was found

11 to be 67, 66 years old, retired.  He was on

12 methamphetamine, Viagra, driving erratically.  And I

13 ended up -- plea bargained to a misdemeanor of

14 failure of right-of-way or some misdemeanor like

15 that.  I don't really remember.

16      Q.    Okay.  That was back in 2015, you said?

17      A.    2015.  And then in 2017, I been buying

18 storage units at auction since I can't work no more.

19 I posted on Craigslist I had a book of world coins.

20 And the same Concord Police Department detectives

21 and all of them, they answered my ad on Craigslist.

22 They wanted to buy them.  They came up here and they

23 had told me that my coins, which I have owned for

1 over 10 years, were stolen in a burglary.  They

2 arrested me for receiving stolen property.  And they

3 did a lot of lying; the cops did.

4          And my case went to trial, I am thinking,

5 March of 2018, right around there.  And the jury was

6 out 12 minutes and I was found not guilty.  They

7 were my coins, my property.  And the same cops who

8 was involved in the motorcycle accident tried to get

9 me for this.

10     Q.   Why did they believe you had stolen

11 property?

12     A.   Well, Detective Croft, who was in charge

13 of it, made some statement that -- the elderly lady,

14 her husband passed.  And he showed -- he showed her

15 them coins.  She immediately identified them as

16 hers.  When she was placed on the witness stand,

17 looked at the coins, she had never seen the coins.

18          Detective Croft, instead of -- they

19 charged me for a felony, said the coins were valued

20 at $4,000.  They were not.  Once my lawyer, Alex

21 Vitale, went and had them checked, they were valued

22 at $300.  But the detective, instead of

23 investigating the cause, went to a justice of the

1  peace, raised his right hand, and said, "We need to

2  arrest him for felony receiving stolen property."

3  And that's what they did.

4           And after the court case, there was -- a

5  lot of evidence come out that -- basically, there

6  was a lot of lies involved with the police who was

7  trying to target me for the motorcycle accident

8  and -- the motorcycle accident because of my

9  involvement in the shooting in '84.  So it was

10  target, target, target.  And they got -- they got

11  proved to be very misleading in that case.  Like I

12  said, the jury was out 12 minutes:  "Not guilty."

13      Q.   Okay.  So you had the car accident.  You

14  were charged with the stolen property.  Any other

15  charges or arrests since 2004?

16      A.   No.  None since I was been out.

17      Q.   Okay.  How did you choose this property in

18  Pittsfield?

19      A.   Well, like I said, me and my wife went

20  driving around looking at properties to buy because

21  we wanted to move.  And I had contacted the owner

22  here; so we stopped by and looked at the place.

23  Nice place, 3 acres.  It was out in the country.  I

1  have got my own pond.  I had a humongous garage,

2  three-bedroom home.  So I liked it, and we

3  decided -- when we left here, my wife had told me,

4  "We gonna buy that?  I want to."  And I said, "Yes."

5  So immediately, when we was leaving, spit on the

6  hand and shook on the deal and we bought this place.

7       Q.   Sounds pretty nice, Mr. McCoy.  Pittsfield

8  is a nice town, isn't it?

9       A.   Yes, it is.  It is.  I like it.  Some

10  things I don't like.  But it is a nice, quiet town.

11       Q.   Yeah.  Yeah.  How much did you pay for the

12  property?

13       A.   $124,000.

14       Q.   All right.  Who owned it previously?  Who

15  did you buy it from?

16       A.   A person named Bobby Brown.  He lived

17  across the street, an old farmhouse.  He was born

18  there and he owned, like, 70, 80 acres.  And he had

19  sold that and set up on this place across the street

20  from where he was born.

21       Q.   Okay.  Is he still kicking around?

22       A.   No.  He -- the reason I -- we did it real

23  quick, the transaction, he was -- had three heart

1   attacks.  His wife was on oxygen and he wanted to

2   get her placed in an elderly home before he passed.

3   So we hurried up and did the transaction.  And he

4   would come up and sit with me.  And about six months

5   later, he had passed.  He was a good guy.

6        Q.   Did he have any trailers on the property

7   when you bought it?

8        A.   No.  There was no trailers on the property

9   when I bought the property.

10       Q.   What about on any of your neighbors'

11   properties that you can see from yours?

12       A.   From -- see from my house?  I have only

13   got two neighbors, one across the street and one

14   down at the end of my driveway.  They don't have

15   trailers.  But if you ride around Pittsfield, you

16   are going to see trailers, trailers, trailers,

17   trailers all over the place.

18       Q.   Okay.  Did you say -- I thought I heard

19   you say earlier that you buy trailers at auction?

20       A.   No.  I buy storage units at auction.

21       Q.   Storage units at auction.  Tell me the

22   difference.

23       A.   What would -- the difference?  I don't

1  understand.

2      Q.    Well, when I think of a trailer, I am

3  thinking of, like, the trailer on the back, a

4  tractor-trailer?

5      A.    No.  This would be just like your TV show

6  "Storage Wars."

7      Q.    Oh, okay.  All right.

8      A.    That's what I did.

9      Q.    So you are talking about, like, storage

10  containers that are fixed, at a facility --

11      A.    Yeah, facility.

12      Q.    -- people put stuff in, and you buy and

13  you don't know what's inside?

14      A.    Correct.

15      Q.    So let's -- I am going to try and share my

16  screen with you, Mr. McCoy, and we'll see how this

17  works.  I am not the best at Zoom; so bear with me

18  for one minute here.

19      A.    Okay.  You don't mind if I smoke a

20  cigarette while we're doing this?

21      Q.    I do not mind, Mr. McCoy.

22      A.    All right.  Thank you.

23      Q.    So can you tell me what you are seeing on

1    the -- can you see my screen now?

2         A.    I see my Trump trailer.

3         Q.    All right.  So tell me:  What is this a

4    picture of?

5         A.    That is my Trump trailer that I brought up

6    here when I moved here in 2014.  But at that time,

7    it did not have the "Trump" symbol on it.  But that

8    is -- that is my President right there.  That's who

9    I was voting for; very, very strong about Mr. Trump.

10        Q.    I suspect we can agree democracy is an

11   important thing; right, Mr. McCoy?

12        A.    Excuse me?

13        Q.    I said democracy is an important thing;

14   right?

15        A.    I think what you believe in is the

16   important thing.

17        Q.    Yeah.  And, Mr. McCoy, can you see in this

18   picture -- can you describe to me what's underneath

19   where it says "Trump"?  There's two vehicles there?

20        A.    Yes.  There's two four-wheelers that I

21   purchased when I moved here and just some other

22   stuff up under it.

23        Q.    And what am I looking at behind the

1    trailer there?

2         A.    That is a building on the -- you are

3    talking about on the left side?

4         Q.    Well, it looks like you can see underneath

5    the trailer another trailer behind it?

6         A.    Oh, yes.  That was a trailer that I had

7    rented from Tommy Trailer [sic].  He owns a trailer

8    place in town, and he has over -- he's in the

9    commercial district and he has over 30, 40 trailers,

10   school buses, everything on his property in the --

11   in the commercial district downtown.  And at the

12   time -- do you see that building to the left?

13        Q.    Yes.

14        A.    I had bought a storage unit.  And that

15   entire building, from window, door, shingle, siding

16   wood, everything, was in that storage unit.  And I

17   had rented that trailer there to place all that

18   stuff in while I was building it and making repairs

19   on my property.  And that trailer I was told also

20   had to go.  I did not have a permit for that

21   trailer.  I did not need a permit, just like I don't

22   think I needed a permit for my other trailer.  But

23   the select board told me both of them have to go.

1      Q.   So, Mr. McCoy, when we talk about the

2  trailer, can we agree we're talking about the

3  trailer that's in this picture that we're looking

4  at?

5      A.   I don't understand.  Could you explain?

6      Q.   Sure.  We're going to be talking about the

7  trailer throughout this deposition.  And I just want

8  to have an agreement with you that when we talk

9  about the trailer, this is the thing we're talking

10  about?

11      A.   Yes, my Trump trailer.

12      Q.   Yeah.  Okay.

13      A.   I understand.

14          MR. DIETEL:  All right.  So, Robert, I

15      will mark this as Exhibit A.  And since we're

16      doing this by Zoom -- I know it's a little

17      different, but my plan will be to send you all

18      of the exhibits afterwards, if that works for

19      you.

20          MR. FOJO:  Fine.

21          (J. McCoy Deposition Exhibit A was marked

22      for identification.)

23      Q.   (By Mr. Dietel) All right.  So my screen

1   should be off now.

2          So the Trump trailer, Mr. McCoy, where did

3   you get that from?

4       A.   I had bought that when I moved up here

5   from a person in Londonderry named Dollar Bill.

6       Q.   When you say when you moved up here, do

7   you mean when you moved to Pittsfield?

8       A.   Yes, when I moved to Pittsfield.

9       Q.   Okay.  Had you researched before you

10  bought it if you could have it on your property?

11  Had you done anything to look at the zoning

12  ordinance?

13      A.   Well, I did not because there were so many

14  trailers around town.  And it sat there until I

15  painted "Trump" on it with no problem, no

16  complaints, no nothing.  And nobody ever approached

17  me.  I didn't understand.  Plus I was in and out of

18  hospitals, physicals, and I was more concerned about

19  myself.

20      Q.   How much did you pay for the Trump

21  trailer?

22      A.   Before it was Trump?

23      Q.   Yeah.

1      A.    $1,200.

2      Q.    Okay.  And how did you get it to the

3  property?

4      A.    Dollar Bill's transporter.  I paid him to

5  drive it from Londonderry up to my property.

6      Q.    Okay.  Can you describe the trailer to me?

7  I mean, physically, what's it like?

8      A.    I don't understand the question.

9      Q.    Well, I will rephrase it.  Is it the same

10  size as the trailer you had behind it, the one that

11  you rented?

12      A.    No.  The one I rented was a 20-foot sit-

13  on-the-ground storage container that Tommy Trailer

14  delivered up here when I needed it.

15      Q.    Okay.  And the Trump trailer was about

16  52 feet long you alleged in your complaint?

17      A.    I believe it was that.  I have never

18  measured it, but I believe that was the size.

19      Q.    Okay.  Was $1,200 a good price for it?

20      A.    To me, it was, yes.

21      Q.    What's the -- if you know, what's, like,

22  the going rate for a 52-foot tractor-trailer?

23      A.    I have no idea.

1        Q.    Okay.   What were you using it for?

2        A.    At that time, the process of moving.   I

3    moved from Manchester up here.   I had a lot of

4    belongings.   I had also bought a lot of storage

5    units, and I placed some of that in there.   And I

6    was also using it because I had to redo my -- keep

7    my tools and stuff in and I had to redo my deck,

8    redo my garage.   There was maintenance that needed

9    to be done on my property.   And I was not physically

10   able just to get out there and do it.   It had to

11   take years.   And there's still work that needs to be

12   done, but physically I am not really capable of

13   doing a lot.

14       Q.    Yeah.   Yeah.   So you had it before you

15   moved to Pittsfield?

16       A.    No.   I bought it about two weeks -- I

17   don't exactly know the date -- just a couple weeks

18   after I had moved here.   I still had to empty my

19   place out in Manchester.

20       Q.    I see.   And then you loaded it up with

21   stuff on the property?

22       A.    No.   It was placed here empty.

23       Q.    Okay.

1     A.    And as I moved up, I put some of it in

2     there.

3     Q.    Okay.  So you got a permit for the Trump

4     trailer back in 2015; right?

5     A.    Correct.

6     Q.    Okay.  How did you know to go apply for a

7     permit?

8     A.    The building inspector, Jesse Pacheco, he

9     had came up.  I got a permit for my building that I

10    built.  And he had told me that I also needed a

11    permit for that trailer.  I had -- did not know,

12    never talked to anybody, never seen anybody.  So I

13    ended up getting a permit from him.  He was the

14    building inspector in charge of permits for storage

15    trailers, and he gave me a permit.

16    Q.    Yeah.  About when would you say you had

17    that conversation with him?  When did he come out to

18    look at your property?

19    A.    Oh, it had to be end of August 2015,

20    because he gave me the permit September 2015.  So

21    when he came up to inspect my building, make sure it

22    was -- the permit and everything was good, he

23    noticed the trailer.  So it was end of August 2015,

1  because I got a permit September the 1st, I believe,

2  2016 [sic].  So it was in a couple weeks.

3      Q.   Okay.  So you had had it on your property

4  for about year before you got the permit?

5      A.   July -- July -- yeah, a little over a

6  year.

7      Q.   Okay.  Did you check the zoning ordinance

8  before you went and got the permit?

9      A.   No.  I had no idea about zoning ordinance.

10  I never owned my own property, had no idea what was

11  needed.  Then I just moved it up here, because they

12  was all over the place.  That's why I moved it

13  there.

14     Q.   Okay.  You have since reviewed the town

15  zoning ordinance; right?

16     A.   Some of them.

17     Q.   Some of them?  Have you reviewed

18  Article 14 dealing with the storage containers?

19     A.   I don't know what Article 14 is.

20     Q.   Okay.  Have you reviewed the sections of

21  the zoning ordinance dealing with storage

22  containers?

23     A.   Some of them.  But I couldn't tell you

1  which is which because I am not into ordinances and

2  all that stuff.  I have been given some over the

3  years, ordinances, and I was given my permit.

4      Q.   All right.  I am going to show you

5  another.  Let's see if I can do this again.  I am

6  going to show you my screen again.

7      A.   Yeah.

8      Q.   All right.  Do you see a document,

9  Mr. McCoy, that says "Article 14, Storage

10 Containers"?

11     A.   I see it, yes.

12     Q.   Okay.  And do you know what this is?

13     A.   It's an ordinance, as far as I know.  I

14 don't know if the ordinance -- if the ordinance is

15 correct, if it was -- I don't know much about

16 ordinances, but I see your ordinance -- the

17 ordinance here.

18     Q.   Okay.  Well, I will tell you this is a

19 copy of the town's zoning ordinance that I pulled

20 off their website today.  Do you have any reason to

21 doubt that?

22     A.   Well --

23     Q.   I will give you a second to take a look at

1   it.

2       A.   Would this be the same ordinance that was

3   in compliance when I moved here, or is this the one

4   that has been redone?

5       Q.   This is the current zoning ordinance.

6       A.   Yeah.  Then I -- I have no understanding

7   with that.  I have no connection to any ordinances

8   as of today.

9       Q.   Okay.  Let me ask you:  Do you see my

10  mouse?  It's the little hand moving around on the

11  screen?

12      A.   Yeah.

13      Q.   Okay.  It's next to this.  It's

14  Section 3(a).

15      A.   I see that.

16      Q.   Can you read to me what it says on this

17  line?

18      A.   That says (as read) "The storage container

19  shall be used for and only storage."

20      Q.   Okay.  And what does that mean to you?

21      A.   Well, on my permit, it completely says

22  something else.  It says a storage container can be

23  used for storage or other purposes.  So at the time

1   I got my permit, I was going by what was on my

2   permit:  could be used for storage or other

3   purposes.  And at the time, I wasn't into

4   ordinances.  But I don't -- I did not see this back

5   when I was involved with ordinances.

6        Q.   Okay.  Well, that's not the question I

7   asked you, Mr. McCoy.  What I asked you was what

8   does this line that you are reading here today mean

9   to you today?

10       A.   Well, today it wouldn't mean anything to

11  me because I don't have a storage container.

12       Q.   All right.  Well, I am not asking you if

13  you had a storage container.

14       A.   You asked me what it means today.  And it

15  doesn't mean anything to me today because this is --

16  I don't see these things.  And I have no use for

17  this today; so it doesn't mean anything to me.

18       Q.   Okay.  Well, let me ask this a different

19  way because you strike me as somebody, Mr. McCoy,

20  who, you know, words are important to you.

21       A.   Excuse me.  Can you say that again?

22       Q.   I said you strike me as somebody where

23  words are important to you.

1      A.     Words are --

2      Q.     So I will ask you.  This says "The storage

3   container shall be used for and only for storage."

4   So under the town's ordinance, could I use a storage

5   container as a bowling alley?

6           MR. FOJO:  Object to form.

7      A.     You would have to ask the town.

8      Q.     (By Mr. Dietel) Okay.  So you have no

9   opinion?  You don't know what that means?

10     A.     I just know that what you saying today,

11  that doesn't concern me.

12     Q.     Doesn't concern you?  Okay.

13          MR. DIETEL:  I am going to mark this as

14      Exhibit B.  This is the Article 14, Storage

15      Containers.

16          (J. McCoy Deposition Exhibit B was marked

17      for identification.)

18     Q.     (By Mr. Dietel) So, Mr. McCoy, you said

19  that you are familiar with your 2015 permit?

20     A.     Yes.  I have it.

21     Q.     All right.  So we're going to pull that up

22  and look at that now.

23          All right.  Mr. McCoy, do you see a

```
 1   document that says "Town of Pittsfield Permit for

 2   Storage Containers"?

 3        A.   I see it.

 4        Q.   So what is this document we're looking at?

 5        A.   That is the document that Jesse gave me

 6   for my container out there when he came up to

 7   inspect my building and noticed my trailer.

 8        Q.   Okay.  So you applied for this; right?

 9        A.   Yes.

10        Q.   That's your signature on the document?

11        A.   That is my signature on that document.

12        Q.   Okay.  And you read this before you signed

13   it?

14        A.   I couldn't testify that I read the whole

15   thing because back in 2015 I was still involved in

16   medical.  So I can't say that I read everything, but

17   I listened to the building inspector and what he

18   told me.  And when I seen up top "used for storage

19   and other purposes," I thought I was okay.  But I

20   did not know that I did not need a permit.

21        Q.   So where does it say on this document "for

22   other purposes," Mr. McCoy?

23        A.   If you read right up under the main term
```

1  "Permit for Storage Containers," it says "Storage

2  containers:  Shall mean any truck trailer, box

3  trailer, school bus, mobile home, or other similar

4  facility used for storage or other purposes."

5      Q.   Okay.  Can we agree, Mr. McCoy, that it

6  then goes on to say "A storage container is

7  permitted for storage purposes only for a period of

8  one year"?

9      A.   That's what it says.

10     Q.   Can you keep it there for more than one

11 year?

12          MR. FOJO:  Object to form.

13     A.   Excuse me?

14     Q.   (By Mr. Dietel) So we just read that.  It

15 says "A storage container is permitted for storage

16 purposes only for a period of one year."  So can you

17 keep a trailer on your property, a storage

18 container, for more than one year?

19          MR. FOJO:  Object to form.

20     A.   Well, I would have to say what I am

21 reading is their ordinance.  But with all the other

22 trailers in town, including board members that have

23 these trailers and they have no permits and they

1  keep theirs -- so my point is, if they can do it,

2  they have had it before I moved here.  They still

3  have them there on their properties today.  I should

4  have been able to have my permit -- keep my trailer.

5  Not permit.  Keep my trailer.

6      Q.   (By Mr. Dietel) I understand the point you

7  are making, Mr. McCoy, but that was not the question

8  that I asked you.  What I asked you is, under the

9  permit's terms, can you keep a trailer for more than

10  one year?

11         MR. FOJO:  Object to form.

12     A.   Excuse me?  If you want me just to say yes

13  as far as what it is there, you take my answer as

14  yes.  But my answer would be everybody has storage

15  trailers, including board members, with no permits.

16  I was doing the right thing.  I was told to get a

17  permit.  And from then on, my permit became the only

18  permit in the town of Pittsfield.

19         So if it says you can't keep it there for

20  no more than one year, it doesn't say that I cannot

21  renew or get another permit, which I was trying to

22  do because of my disability.  And that's what I was

23  doing with the trailer.

1      Q      (By Mr. Dietel) Okay.  And what does it

2   say at the bottom of the document?  What's that last

3   line at the very bottom say?

4      A.   It says "Unit must be removed one year

5   from the approved date above."

6      Q.   So can we agree you got approved on

7   September 1, 2015; so you had to take your trailer

8   off by September 1, 2016?

9      A.   No.

10      Q.   No?  Why not?

11      A.   Because there was no permits for storage

12   trailers back then from what I have found out.  And,

13   again, I was given another permit due to my needs by

14   the select board to extend it from May 2017 through

15   June 2018.  I asked for an extension on the permit.

16   There is nothing that says you can't ask for another

17   extension.  It just says for one year.

18      Q.   I am asking a question, Mr. McCoy.

19      A.   My answer would be, if this only applies

20   to me, not the board members, not the other people

21   in town or anything, it falls under my impression

22   that September, after my trailer ran out, they were

23   targeting me on my Trump trailer.  That's my

1  understanding, my belief.  And when they came to me

2  a year later and said, "You got to get rid of it due

3  to complaints," nobody would tell me complaints.

4  But, yet again, this permit right here is probably

5  the only permit you are going to find in town during

6  that duration, from when I brought my trailer here

7  until my trailer was forced off my property.

8          And if it -- if you want to do the reading

9  as it is, why does everybody else in this town,

10  including board members and defendant, not have this

11  to concern what they have and still have, as of

12  today, on their property?  That's my problem.

13     Q.   So, Mr. McCoy, we agree this document says

14  that a storage container is permitted for storage

15  purposes only; correct?

16     A.   From what the document says, yes.

17     Q.   Yes.  And at the bottom, it says it has to

18  be removed after one year; correct?

19     A.   That's what it says.

20     Q.   And you are capable of reading those

21  sentences; correct?

22     A.   Yes.  And I am also capable of knowing,

23  due to my physical condition, there's no way I could

1  have done it if they come and approached me on

2  September 1, which they did not, because there's

3  others in the town.  I was in the position to take

4  care of my storage but physically unable.  And if

5  you read my letter, I am pretty sure --

6      Q.   Mr. McCoy, let me stop you.  Back in 2015,

7  you were using this for storage; right?

8      A.   Back then, yes.

9      Q.   Yeah.  What you are saying is you think,

10  because other people may have had unpermitted

11  trailers --

12      A.   Not may have, they do.

13      Q.   Okay.  Well, we'll say "may have" because

14  I am asking the questions -- that you should not

15  have to comply with the requirements?  Is that what

16  you are saying?

17      A.   No, I am not saying that.  I am agreeing

18  from what you said it said.  I am not agreeing with

19  your not complying with you -- not complying --

20      Q.   So if there's a law -- no, Mr. McCoy,

21  here's my question.  If there's a law on the books

22  that says you should only have a permit -- a trailer

23  on for one year, you agree you have to comply with

1  it?

2          MR. FOJO:  Object to form.

3      A.    I -- my personal opinion is that everybody

4  has them in Pittsfield.  And because mine was the

5  only one targeted and multiple problems with my

6  disability, I applied for a new permit.  It does not

7  say you cannot apply for a permit.  It says you can

8  have it for one year.  But if a person in my

9  disabled position has things that need to be

10  accomplished, maintenance, everything that I

11  physically cannot do -- the document, I see; agree

12  with you what it says.  But when it was just

13  concerning me, I don't agree with it.  So that's the

14  only answer I can give you for that.

15     Q.    Mr. McCoy, you ultimately took the

16  trailers off your property; right?

17     A.    Excuse me?

18          MR. DIETEL:  Hold on one second, actually.

19     I am going to take down this.  We're going to

20     mark this -- the 2015 permit as Exhibit C.  I

21     am going to stop sharing my screen.

22          (J. McCoy Deposition Exhibit C was marked

23     for identification.)

1      Q.    (By Mr. Dietel) Okay.  Mr. McCoy, the

2  permits [sic] aren't on your property anymore;

3  correct?  I mean -- I am sorry -- not the permits.

4  The trailers are not on your property anymore;

5  correct?

6      A.    Correct.

7      Q.    So when did you take the trailer you were

8  renting off?

9      A.    That had -- I am not sure of the date.  It

10 was 2017.  That was one of the ones that it took me

11 a long -- long physical problem to empty.  And,

12 remember, I had two trailers.

13         So Tommy Trailer, who's in the commercial

14 district, who's only allowed two trailers in the

15 commercial district unless they are grandfathered,

16 which they are not because he rented -- I rented one

17 that come off his property.  It's not grandfathered.

18 And he has over 30; so that violation of that

19 ordinance --

20     Q.    Mr. McCoy, I am going to interrupt you.

21 What I asked you was a simple question.  I asked you

22 when did you take the trailer off that you were

23 renting?

1      A.    Which one?

2      Q.    The trailer you were renting.

3      A.    That I was renting?  Sometime before the

4  winter of 2017.

5      Q.    Okay.  And why did you take it off your

6  property?

7      A.    Jesse Pacheco, Building Inspector, told me

8  I had to remove both of them due to complaint.

9      Q.    When did he tell you that?

10     A.    That, I don't -- I don't have the date.  I

11  don't know.

12     Q.    You recognize you need a permit for

13  trailers on your property; right?

14          MR. FOJO:  Object to form.

15     A.    No, I did not recognize that I needed a

16  permit for trailers until they approached me with

17  the complaints.  Well, no, I did not know that I

18  needed a permit until they showed up.

19     Q     (By Mr. Dietel) So that trailer you were

20  renting went back to Tommy Trailer?

21     A.    Yeah, right down the street among the

22  other 30 or so he's got on his property.

23     Q.    Okay.  And how much were you paying in

1  rent for that trailer?

2       A.    $75 a month.

3       Q.    Okay.  Is that the going rate for

4  trailers?

5       A.    I have no idea.  I agreed to his price.

6       Q.    Okay.  When did you move the Trump

7  trailer?

8       A.    When did I move it?

9       Q.    Yeah.

10      A.    You mean remove it?

11      Q.    Yeah.  When did you take it off your

12  property?

13      A.    That was -- I am pretty sure I got the

14  date, but I don't know facts.  Sometime, I believe,

15  July of 2018.

16      Q.    Okay.  And where did you take it to?

17      A.    I sold it to Tommy Trailer.

18      Q.    To Tommy Trailer in town?

19      A.    Yeah.  And he placed it on his property,

20  then moved it to his other property in Barnstead

21  where it sits today.

22      Q.    How much did you sell it for?

23      A.    A thousand dollars.

1        Q.    And where is it today?

2        A.    One of -- Tommy Trailer's name is Reese

3   Freese [sic].  It's somewhere in Barnstead, I am

4   told.

5        Q.    How long has Tommy Trailer's business been

6   in operation?  Do you know?

7        A.    I have no idea.  From what I understand,

8   20 -- 20-something years.

9        Q.    A long time?

10       A.    Long time.

11       Q.    So I am going to show you another

12   document, Mr. McCoy.  And I appreciate your patience

13   with this process.  These Zoom depos are new for all

14   of us.

15       A.    Yeah.

16       Q.    Bear with me.

17             All right.  Can you describe to me what

18   you can see now?

19       A.    My Trump trailer sitting in the snow.

20       Q.    If I represent to you that this is a post

21   that I got from your Facebook account --

22       A.    Yeah.

23       Q.    -- do you agree?

1      A.   I agree.

2      Q.   Okay.  And the date up here at the top

3  says "January 29, 2016"?

4      A.   Correct.

5      Q.   So by January 2016, the trailer was

6  painted "Trump! USA," "2016" in little red letters

7  at the top of the exclamation point?

8      A.   Correct.

9      Q.   Okay.  When did you paint it?  Because I

10 presume you didn't paint it in the winter, and this

11 is a picture with a bunch of snow.

12     A.   No.  My son painted it sometime in

13 January.  He's a graffiti artist.  And we are all

14 Trump supporters.  And he spent the time out there

15 during that winter at that time painting it.

16     Q.   So he painted it in the winter?

17     A.   Yes, he did.

18     Q.   Okay.  And you think it was January 2016

19 that he did that?

20     A.   Right around there.

21     Q.   So that was before the -- was that before

22 the New Hampshire primary?

23     A.   Yes.

1     Q.   Yeah.  So you were an early Trump guy.

2     A.   Yes, I was.

3     Q.   Before it became popular, huh?

4     A.   Yes, I was.

5     Q.   All right.  So then the "Concord Monitor"

6  does an article about you in August of 2016?

7     A.   Correct.

8     Q.   So when did they first reach out to you?

9     A.   Well, me and my wife was sitting out in

10  the yard, and a car come up the driveway, and we

11  didn't know who they was.  And they explained he was

12  Ray Duckler of the "Concord Monitor" and they want

13  to do -- talk to me about my trailer.  So I had a

14  conversation with him about my trailer, what I

15  believed in my trailer, why it was there, who I was

16  electing.  And then next thing I know, he's got it

17  on the front page of the "Concord Monitor."

18     Q.   All right.  Mr. McCoy, I am going to pause

19  you because I just want to be clear for the record.

20          MR. DIETEL:  We're going to mark this

21       picture that we have been discussing as

22       Exhibit D.  It's the Facebook post dated

23       January 29, 2016.  And I will stop sharing my

1      screen.

2             (J. McCoy Deposition Exhibit D was marked

3      for identification.)

4      Q.   (By Mr. Dietel) All right.  So how did the

5  "Concord Monitor" find out about your trailer?

6      A.   Ray Duckler says him and his photographer

7  was driving by.  If you read the newspaper, it will

8  explain.  They just was driving by and they seen it.

9      Q.   Was it getting attention in town before

10 then?

11     A.   Not really.  Because when you see my

12 trailer, it's on my property.  I have a wooden fence

13 with trees all over the place.  You really couldn't

14 see it.  And if you are coming up from town, it's a

15 good size of a football field from my driveway up

16 into my property where it was at.

17     Q.   Okay.  So when you paint the trailer back

18 in 2016, was it still primarily being used for

19 storage?

20     A.   Some, yes.

21     Q.   But was it still storing things?

22     A.   There were some things in there that I had

23 stored in there.  I was doing maintenance to my

1   place and some household items that we had to get

2   moved in my house.  And my son was doing most of the

3   work.  And he was working; so it took a while.

4        Q.   Okay.  So it was still a storage container

5   at that point?

6        A.   Somewhat, yes.

7        Q.   Okay.  Well, explain to me what you mean

8   by "somewhat."

9        A.   It was somewhat a storage trailer, but

10  then it was also my Trump trailer.

11       Q.   Okay.  What do you mean by that?

12       A.   My Trump trailer, you can look at it and

13  you can understand that was my Trump trailer.  I

14  like Trump.  I wanted him elected.  My son liked

15  him.  He's a graffiti artist.  And he asked, "Can I

16  do it?" and I says, "Yes."

17       Q.   So you intended this to be a sign?

18       A.   I didn't intend anything to be a sign.  My

19  son asked me if he could do it and I said, "Yes."  I

20  was a Trump supporter; so basically it was construed

21  as a sign.

22       Q.   Well, did you consider it to be a sign?

23       A.   After a while, getting close to the

1   election, yes.

2      Q.   At what point did you consider it to be a

3   sign?

4      A.   Mid 2016.

5      Q.   Mid 2016?

6      A.   Yeah, anywhere from -- well, anywhere,

7   basically, from the day that it was painted till the

8   election.

9      Q.   Okay.  And then it stopped being a sign

10  after the election?

11     A.   After the election, my son wanted to paint

12  the Pittsfield Balloon Race on it.  He's a graffiti

13  artist.  And I always have places for him to do his

14  work.  It keeps him out of mischief.  And I said,

15  "Yeah, go ahead and paint the front of it for the

16  balloon rally race."

17     Q.   I am not familiar with the balloon.  So

18  does Pittsfield have a balloon?

19     A.   Every year.  A balloon rally every year.

20     Q.   That's pretty cool.  When did that start?

21  Do you know?

22     A.   It had to be a long time before I was here

23  because you would see Pittsfield Balloon Rally signs

1  all over town, on 28, 107, every road they had in

2  town; balloon rally all over Facebook.

3      Q.   So that -- the post that we talked about,

4  Mr. McCoy, Exhibit D, that January 29, 2016, post --

5      A.   Yeah.

6      Q.   -- it got a lot of comments on Facebook;

7  right?

8      A.   Good ones and bad ones.

9      Q.   Yeah.  So this was pretty well-known in

10  Pittsfield?

11      A.   I can't say it was pretty well-known in

12  Pittsfield because I am on a country road.  And, you

13  know, I didn't have a lot of Facebook friends on

14  Pittsfield who seen it, this or that.  So after --

15  after a while, close to the election it got noticed

16  once the town told me to remove it due to complaints

17  and social media took off on it.

18      Q.   It got noticed before then; right?  The

19  "Concord Monitor" did its article in August of 2016?

20      A.   Yeah.

21      Q.   That was certainly -- it was certainly

22  very well-known at that point; right?

23      A.   It got noticed in mid 2016 in the "Concord

1  Monitor," all over the place.

2       Q.   Basically, everybody in town by that point

3  knew about it?

4       A.   Well, I don't know if I could say,

5  basically, everybody.

6       Q.   Okay.  But what would you say?  How

7  widespread was it known?

8       A.   I can't say that either.

9       Q.   You have no opinion on it?

10      A.   I have got -- I can't answer the question

11  like you are telling me.  You want me to count for

12  how many seen it?  I have no idea.

13      Q.   Okay.  Were there any other trailers in

14  town, Mr. McCoy, that were the subject of a "Concord

15  Monitor" article in 2016, to your knowledge?

16      A.   To my knowledge, no.

17      Q.   Have you ever heard of any other storage

18  containers in the town of Pittsfield getting this

19  much publicity?

20      A.   I haven't heard it.  I can't say one way

21  or the other.

22      Q.   This was probably the most famous storage

23  container in the town of Pittsfield.  Fair enough?

1        A.    Could be.

2        Q.    I see you nodding your head; so I will

3   take that as a yes?

4        A.    It could be.  It could not be.

5        Q.    Anybody ever complain to you about it,

6   Mr. McCoy?

7        A.    Yes.

8        Q.    Who?

9        A.    Select board members, Democrats; people

10   drive by my house shooting me the finger, threaten

11   to come do stuff to me and my trailer.  Yes.  That

12   kept me up at night knowing that I was targeted;

13   even the Democrat down in Georgia:  "Burn the MF

14   down" on comments.  So that created a lot of

15   physical, emotional, and paranoia.  But I was a

16   Trump supporter, and it is what it is.

17        Q.    So lots of people were complaining about

18   it?

19        A.    I didn't know anybody personally

20   complaining, just some comments and people riding

21   by.  But I did know that the select board sent the

22   building inspector up here to remove it due to

23   complaints.

1     Q.   So, Mr. McCoy, though, that's not the

2  question I asked you again.  What I asked you was,

3  from what you are describing to me, a lot of

4  people -- let's set aside the select board.  A lot

5  of other people than the select board were

6  complaining about it, including even somebody as far

7  away as Georgia; correct?

8     A.   And you can add to that a lot of people

9  was liking it.

10     Q.   Okay.  So you agree.  A lot of people --

11     A.   It was different sides.  I can't agree to

12  what you are asking me.  There was complaints and

13  there was "We love it."

14     Q.   Okay.

15     A.   You will have to make your own assertion

16  to that question.  But there was complaints and

17  there was people loving it.  When they came to me as

18  complaints, it wasn't right.

19     Q.   Okay.  But, Mr. McCoy, there was more than

20  one person who complained; right?

21     A.   There was more than one person who loved

22  it.

23     Q.   Okay.  But there was more than one person

1  who complained; correct?

2      A.   There was more than one person who loved

3  it; so I can't say either way.  I am not going to

4  answer that question.  Because if there was 73 here,

5  2,000 there -- I am not going to answer that

6  question.  There was complaints and there was people

7  who loved it.  If you want to --

8      Q.   Mr. McCoy?  Mr. McCoy, I am going to

9  interrupt you.

10          (Reporter admonition.)

11     Q.   (By Mr. Dietel) Mr. McCoy?

12     A.   Yes.

13     Q.   I understand you have a point that you

14  want to make that there were lots of people that

15  liked it, but I am asking you a simple factual

16  question.  And as we discussed at the beginning of

17  this, you have an obligation to answer truthfully.

18  So I am asking you -- you have described to me many

19  complaints, including somebody all the way from

20  Georgia.  So I am asking you a factual question.

21  Did you get more than one complaint?

22     A.   Social media?  Yes.

23     Q.   Okay.  Did you get more than 10

1   complaints?

2        A.   No idea.

3        Q.   You don't remember?

4        A.   That was years ago; five, six years ago.

5        Q.   Is it possible you got more than 10?

6        A.   It's possibly I got less than 10.  I have

7   told you I have no idea.

8        Q.   Okay.  All right.  So I have read through

9   your complaint, Mr. McCoy.  I am going to tell you

10  my understanding of it.  I want you to correct me if

11  I am wrong.  As I understand it, you believe the

12  only reason the town enforced its zoning ordinance

13  against you was because your trailer said "Trump" on

14  it in 2016 and 2017; right?

15       A.   Correct.

16       Q.   Okay.  And you believe the town was

17  discriminating against you; correct?

18       A.   Correct.

19       Q.   Who specifically?  Was it individuals or

20  was it the town?

21       A.   You would have to ask the select board

22  because they claim they got the complaints.  And the

23  select board sent the building inspector up here,

1   who was in charge of storage ordinances, and he got

2   no complaints.  And then when he told me remove it

3   due to complaints, that's when I found out they was

4   coming from the select board.

5        Q.   So it was individuals on the select board

6   that you believe were targeting you?

7        A.   From what I was told.

8        Q.   Okay.  Who told you that?

9        A.   Building inspector.  He said "complaint

10   from the select board members" and I was to go see

11   them.

12        Q.   So it wasn't the town, as a whole?  It was

13   three selectmen?

14        A.   I don't know how many selectmen, but it

15   was from the select board.

16        Q.   Okay.  And not the town itself?

17        A.   Not the town.

18        Q.   Okay.  And you believe the decision to

19   require you to remove the trailer was unfair?

20        A.   Yes.

21        Q.   And you believe it violates your

22   constitutional rights?

23        A.   Yes.

1          Q.    And you believe this because you allege

2     there are other trailers in town that the town has

3     not required to be removed?

4          A.    Not alleged.  That's not an allege.  That

5     is a factual concern of what has taken place in this

6     town before I moved here and today, of May the 7th,

7     2021.

8          Q.    Okay.  So, Mr. McCoy, which trailers in

9     town?

10         A.    Could you be a little bit more specific on

11    that?

12         Q.    Sure.  You are telling me there's a number

13    of trailers in town that you feel are unlawful and

14    that the town is not enforcing its zoning ordinance

15    against; correct?

16         A.    Correct.

17         Q.    Okay.  I want to know what trailers are

18    those?  Who owns them and where are they located?

19         A.    Carl Anderson, 134 Barnstead Road;

20    Trzcinski.  I have a whole list.  I have many photos

21    of trailers in town.  Larry Konopka, select board;

22    Adam Gauthier, planning board.  They have trailers

23    on their properties, and they have been there.

1    Q.   Mr. McCoy, how long have you had that

2    information for?

3    A.   Well, as of today, a while.

4    Q.   Okay.  Well, tell me what that means.  You

5    had it before you brought your lawsuit?

6    A.   Of trailers on the property?  Yes.

7    Q.   Yeah.

8    A.   They are all over town.  You can't go to

9    the Dollar store, Rite Aid, gas station without

10   seeing a storage container.

11   Q.   You said you have a list?

12   A.   Yes, I do.

13   Q.   Okay.  Have you produced that list to me

14   previously?

15   A.   That would be up to my lawyer.

16   Q.   Okay.  Have you given me any of these

17   pictures that you talk about?

18   A.   I do not -- I do not correspond with you,

19   period.  That's between you and my lawyer.

20   Q.   Okay.  But we're clear, though, you have

21   had them since before you brought the lawsuit;

22   right?

23   A.   Before and after.

1          MR. DIETEL:  Okay.  Robert, I would like a

2      copy of that list and all of those pictures

3      when you respond to my discovery requests.

4          MR. FOJO:  Noted.

5      Q.   (By Mr. Dietel) So you said "Carl

6  Anderson."  Who else did you say has trailers on

7  their property that are unlawful?

8      A.   You can connect with my lawyer and he will

9  give you --

10     Q.   No, Mr. McCoy.  You have to answer my

11  questions.

12     A.   I answered "Carl Anderson," and there's

13  many others.

14     Q.   Well, who others?  Which others?

15     A.   Larry Konopka.

16     Q.   Larry Konopka.

17     A.   Adam Gauthier.  Carole Dodge, humongous

18  amount on her property today and has been there.

19  Bob Freese Reese [sic], over 30 in the commercial

20  district.  He's not allowed to have two and they are

21  not grandfathered.  They are all over the place.

22     Q.   What's that last name, Mr. McCoy, the last

23  one?  Bob Freese, is that what you said?

1      A.     Reese Freese, Tommy Trailer.

2      Q.     Tommy Trailer, that's --

3      A.     16 Clark Street.

4      Q.     So Bob Freese is Tommy Trailer.  Okay.

5      A.     Reese Freese.

6      Q.     So we have got Carl Anderson, Larry

7  Konopka, Adam Gauthier, Carole Dodge, Tommy Trailer.

8  Who else?

9      A.     And the others are just on property that I

10 have noticed.  I have no idea who lives there.

11     Q.     Do you know if any of those other ones

12 have permits?

13     A.     As far as I know, no permits.  I would

14 have found out.  I filed a right to know.  But, of

15 course, the town didn't give it to me.  They gave it

16 to you.  So I didn't get my right to know from the

17 town or anybody.

18     Q.     So, Mr. McCoy, you said in your complaint

19 that you were harassed by three individuals.  Do you

20 remember that?

21     A.     Yeah.

22     Q.     Who were they?

23     A.     Carl Anderson, Larry Konopka, Jim Allard.

1   Every time you turn around, "Get rid of the

2   trailer."  I go to their board meeting.  Like Carl

3   said, "You begged us for a permit."  That was a lie.

4   There is recordings of these meetings where I went

5   to these meetings and just let them know what I felt

6   about my trailer.

7       Q.   So at these meetings, you told them what

8   you were using your trailer for?

9       A.   I told them I was -- at that time, I was

10  using it for storage.  It took me a while to get

11  out, but I was also using it for my Trump trailer,

12  which they made complaints.  And I went to the

13  select board, held up the newspaper, and said, "You

14  sent the building inspector to my property,

15  complaints on my Trump trailer."  And the chief of

16  police was sitting right there.  He turned around

17  and he said, "I like that trailer."  Every time you

18  turn around, "Get rid of it.  Get rid of it.  Go to

19  a board meeting."

20      Q.   So when was this board meeting, Mr. McCoy?

21      A.   You will have to -- you will have to get

22  them recordings from Carl Anderson.  He stated in

23  his letter he has the recordings of that meeting

 1  where I begged, and that's because I was in the

 2  midst of hospitals, this and that.  Dates, I am not

 3  sure of.

 4      Q.   Was it in 2017?

 5      A.   2016, the end, and 2017.

 6      Q.   So you said Larry Konopka, Carl Anderson,

 7  Jim Allard, they all harassed you.  Was there

 8  anybody else that harassed you?

 9      A.   There's people that I don't know the name.

10  They didn't like the Trump trailer.

11      Q.   Not selectmen?

12      A.   Not selectmen.

13      Q.   Okay.  So what specifically did Larry

14  Konopka do to harass you?

15      A.   Voted to remove my trailer, notified me to

16  remove my trailer, the whole select board:

17  "Complaints.  Remove it.  Complaints.  Complaints.

18  Remove it.  Complaints."

19           You will have to figure it out from there,

20  because that's all I heard, complaints, complaints.

21      Q.   So, Mr. McCoy, here's what I am hearing

22  you say:  They made you remove your trailer and they

23  told you that they had received complaints multiple

1  times about your trailer.

2       A.   Correct.

3       Q.   Anything else?

4       A.   "Complaints."

5       Q.   Just that they told you there were a lot

6  of complaints, and they kept telling you that?

7       A.   Right.  "There's complaints."

8       Q.   And when were those conversations with

9  Larry Konopka?

10      A.   Well, if you want to get into that, during

11 election time Larry Konopka came up here to my

12 property to place his signs on my property.  I

13 didn't know him.

14      Q.   Let me interrupt you, Mr. McCoy.  When you

15 say "election time," are you talking about the 2016

16 Presidential election?

17      A.   No.  I am talking about the town election

18 of March of 2019.

19      Q.   Okay.  So in March --

20      A.   Then I found out about all the complaints.

21      Q.   So these conversations occurred in March

22 of 2019?

23      A.   During election time, yes.

1      Q.    Okay.  And this is the same for Larry -- I

2   am sorry.  This is the same for Carl Anderson and

3   Jim Allard, when you heard about this?

4      A.    Yes.  Not -- Jim Allard was not on my

5   property, but the other two was wanting to put up

6   their election sign.

7      Q.    Okay.  Were you friendly with these guys?

8      A.    Yes.  I didn't know them.

9      Q.    What was the nature of these

10  conversations?  Were these friendly conversations?

11     A.    Yeah.  They came up to place my [sic]

12  signs up and to vote for them March 2019.  And I did

13  not know who made the complaints then, but I did

14  find out.  And then one of their board members named

15  Carole Dodge sent me messages and explained to me

16  two individuals in town made complaints.  There's a

17  reason for my trailer being removed.  And they was

18  also on the board and running for the same election.

19     Q.    So, Mr. McCoy, you said you did find out

20  who made the complaints; right?

21     A.    Explain.

22         MR. DIETEL:  Tina, can you read back his

23         answer from the prior question?

```
1              (Answer read.)

2         Q.    (By Mr. Dietel) So, Mr. McCoy, you said in

3    your answer "I did find out" about who made the

4    complaints.  Who did you find out made the

5    complaints?

6         A.    Carl Anderson.

7         Q.    Nobody else?

8         A.    Carl Anderson.

9         Q.    You said --

10        A.    He's the select board member that --

11        Q.    You said in the answer -- Mr. McCoy, you

12   said in the answer to your question -- to my

13   question -- you also said that Carole Dodge sent you

14   a message about two individuals.

15        A.    Many.

16        Q.    Sent you many messages.

17        A.    Concerning the removal of my Trump

18   trailer.

19        Q.    What were the content of those messages?

20   What did she tell you in them?

21        A.    She told me that my neighbor Clayton Wood,

22   who was the chairman of the planning board at the

23   time, made complaints to have my Trump trailer
```

1   removed.  She told me Jim Pritchard, who was running

2   for the same position as she was endorsing Carl

3   Anderson for, made the complaint about my trailer.

4   And then I found out she lied.

5        Q.   Why do you say she lied?

6        A.   She lied.

7        Q.   What's that based on, Mr. McCoy?  You said

8   you found out she lied.  What did you find out?

9        A.   She lied.

10       Q.   So you don't have any facts that you can

11  point to as to why she lied?

12       A.   She just lied during election time to help

13  her folks get elected.  Bottom line, that's what she

14  did.  And then when she was confronted on it, "Oh,

15  no."

16            She did.  She made them in black and

17  white.

18       Q.   So, Mr. McCoy, you have identified three

19  selectmen who you believe have individually harassed

20  you about the sign -- the Trump sign:  Larry

21  Konopka, Carl Anderson, Jim Allard.  Am I correct

22  they are all Republicans?

23       A.   I have no idea.

1      Q.   Do you know if they are Trump supporters?

2      A.   I have no idea.  They claim to be, but I

3   have no idea.

4      Q.   They claim to be?

5      A.   They claim to be.

6      Q.   Okay.  When have they claimed that?  Do

7   you recall?  How do you know that?

8      A.   In one of Carl Anderson's letter, which is

9   part of the complaint, "We're all Trump supporters."

10          MR. DIETEL:  So, Robert, I believe I have

11       asked for it in my discovery requests, but I

12       would like a copy of that letter that Carl

13       Anderson sent.  And I would also like a copy of

14       these messages that Mr. McCoy has referenced

15       from Carole Dodge.

16      Q.   (By Mr. Dietel) So, Mr. McCoy, I am going

17   to go over some ground that we have talked about for

18   clarity here.  We have talked about the town zoning

19   ordinance.  And you are aware now that a storage

20   container can only be used for storage purposes;

21   right?

22      A.   I am aware what they say now, but I am --

23      Q.   Okay.  Mr. McCoy, if somebody --

1      A.   Would you let me finish, please?

2      Q.   Yes, of course.

3      A.   I wasn't aware then.  I am aware now.  And

4  also I am aware that, since this has been going on,

5  the ordinance has been redone or whatever they want

6  to call it.  So it's two different -- two different

7  stories when you come to the ordinance, what was and

8  what is now, why it was changed.

9      Q.   So if you want to have a storage container

10  on your property, you can go and get a permit;

11  right?

12      A.   I wouldn't have a storage trailer in this

13  town for nothing in the world, what they did to me

14  to my last one.  I wouldn't even attempt it.

15      Q.   You don't want one on your property now?

16      A.   Don't want one.

17      Q.   Okay.  But if you wanted one, you can go

18  and apply for a permit?

19      A.   If I wanted one.  But that would not

20  happen.

21      Q.   Okay.  And we were talking about this

22  before.  You said that the trailer started to be

23  used primarily as a sign sometime in the middle of

1  2016; right?

2      A.   Correct.

3      Q.   Okay.

4      A.   Not primarily.  I did not say "primarily."

5  You said that.  I said it was part of my -- I am a

6  Trumper; so that -- it was a sign that I was proud

7  of.

8      Q.   So you had multiple uses for it.  You were

9  using it as a trailer for a storage container and

10  you were also using it as a sign?

11      A.   You could say that, yes.

12      Q.   But would you say that?

13      A.   I still had some things in it.  And my

14  Trump -- my Trump sign, that was my freedom of

15  speech.  That was who I was voting for.  And

16  everybody has whoever they want's signs.  I have

17  seen Hillary signs.  I have seen signs downtown;

18  basically, "Screw Trump.  Get rid of him."  And they

19  stayed there on Main Street.

20      Q.   Mr. McCoy, I am not trying to belabor the

21  point here, but I am trying to make sure I

22  understand what you are telling me.

23      A.   Could you repeat that?  I just had some

 1  beep and I didn't hear you.

 2      Q.   Sure.  I am not trying to belabor the

 3  point or beat a dead horse.  I am trying to

 4  understand factually what happened and what you

 5  thought you were using that trailer for.  I have

 6  heard you say to me that it was used as a sign and

 7  for storage, multiple uses; correct?

 8      A.   Not multiple.  Two uses.

 9      Q.   Two uses?

10      A.   When I brought it here, it was storage.

11  When Trump was running for office, it was also a

12  Trump sign.

13      Q.   Okay.  So two uses?

14      A.   (No response.)

15      Q.   Yes?  Two uses?

16      A.   Two, as far as I know, yes.

17      Q.   Okay.  I am going to pull up another

18  exhibit here.  Let's see.

19           Mr. McCoy, how are you right now?  Do you

20  need a break or anything?  We have been going for

21  about an hour and a half.

22      A.   I am good for a little while.  But I will

23  need a break in a while, unless you want to take one

1    now.

2              MR. FOJO:  I can use a brief one too.

3              MR. DIETEL:  All right.  Why don't we do a

4         quick five-minute break, then.

5              (A break was taken.)

6         Q.   (By Mr. Dietel) So we're back on the

7    record, Mr. McCoy.  You understand you are still

8    under oath?

9         A.   I do.

10        Q.   And you can still hear me?

11        A.   I can hear you.

12        Q.   Okay.  Did you speak with anybody while we

13   were on this little break here?

14        A.   Just my wife.  She wanted to know if I

15   wanted another coffee.

16        Q.   Okay.  I am going to show you another

17   exhibit.  Can you see my screen, Mr. McCoy?

18        A.   Yes.  I have a copy of that.

19        Q.   What are we looking at here?

20        A.   Notice of violation with no date.

21        Q.   Okay.  So am I correct in representing to

22   you that this letter says "Your permit for a storage

23   trailer has expired on September 1, 2016"?

1      A.    Yeah.   That's what it says.

2      Q.    And this was sent to you as a notice of

3  violation after that permit expired?

4      A.    I have no idea when it was sent to me.

5  There's no date on it.

6      Q.    You did receive this letter, Mr. McCoy?

7      A.    Yes.   It was years ago.

8      Q.    Okay.   When do you remember receiving it?

9      A.    Excuse me?

10      Q.    I said when do you remember having

11  received it, to the best of your memory?

12      A.    Sometime the end of 2016 or so, right

13  around there.   I am really not sure on the date.

14      Q.    Okay.

15      A.    If it was dated, I would have known,

16  but --

17      Q.    It was after the "Concord Monitor" article

18  sometime in 2016?

19      A.    Yeah.

20          MR. DIETEL:   Okay.   I am going to mark

21      this as -- Exhibit E as the notice of violation

22      letter.

23          (J. McCoy Deposition Exhibit E was marked

1        for identification.)

2        Q.   (By Mr. Dietel) At the point that you got

3   this letter, Exhibit E, Mr. McCoy, your storage

4   container was painted "Trump."  We have already

5   established that; right?

6        A.   Correct.

7        Q.   Okay.  I am going to put another document

8   up.

9             All right.  Mr. McCoy, I just put another

10  document up on my screen.  Do you know what this is?

11  Can you see it?

12       A.   Yes.  It's my letter to the board of -- to

13  Jesse to go to the board of selectmen after he told

14  me to get rid of it due to complaints.

15       Q.   So that's the -- when you say "he told"

16  you, that's the notice of violation, Exhibit E, we

17  were just talking about; right?

18       A.   Could you say that again?

19       Q.   So we just looked at Exhibit E, which was

20  a notice of violation from Jesse Pacheco.  I think I

21  am pronouncing that right.

22       A.   Yeah.

23       Q.   And now we're looking at a letter that you

1  sent dated November 3, 2016, after you had found out

2  that there was -- your permit had expired.

3       A.   Yeah.

4       Q.   Okay.  So Jesse sent you that notice of

5  violation, then, sometime between August 2016, when

6  the "Concord Monitor" article is published, and this

7  date, November 23, 2016?

8       A.   Yeah.  It was right after the "Concord

9  Monitor" that Jesse came up to my place and gave me

10  that and let me know due to complaints I had to

11  remove them both.

12       Q.   Do you remember, Mr. McCoy -- I don't

13  remember.  Do you remember what the date of the

14  Presidential election was in 2016?

15       A.   I am pretty sure.  Wasn't it November 3?

16       Q.   It may have been.  Right abouts then;

17  right?

18       A.   Right about then.

19       Q.   Yeah.  So what are you asking for in this

20  letter?

21       A.   Well, if you notice the month, in

22  November, and if you understand how much disabled I

23  am, I could not remove my trailer within 30 days.

1  With Jesse, the message he had gave me, need to be

2  gone within 30 days or I will get a $500-a-day fine,

3  the fine really decimated me because I am on

4  disability.  So if they was going to charge me a

5  $500-a-day fine, then in a day and a half I would be

6  out of everything.  I could not pay my bills.  I

7  could not do anything.

8          And this letter here, I needed the time

9  because, if you notice the date to when that

10 occurred, winter was coming.  I can hardly walk when

11 it's summer out.  There's no way I can walk through

12 snow and everything.  So I sent this notice to them,

13 and they didn't respond to me.

14     Q.   Did the town ever actually fine you any

15 money, Mr. McCoy?

16     A.   No, they didn't.

17     Q.   So what were you saying you were using the

18 storage container for at this point?  What did you

19 tell the board?

20     A.   At that time, I still had building

21 supplies and stuff that I was redoing maintenance on

22 my house.  And, again, it was wintertime.  I

23 couldn't do none of that.  And I definitely could

1  not get out there and take everything out of my

2  trailer that was there.  There wasn't no place to

3  put it.  Two, I couldn't get it in.  Three, I

4  couldn't walk through the snow.

5           So that's why I wrote that letter, give me

6  an extension.  Not during -- give me an extension

7  during the summertime.  Don't tell me that you are

8  going to force it off in November when you know I am

9  completely disabled, which they understood.  They

10 made notice of that.  "We understand your

11 disability."

12          And this is what I wrote to Jesse to go to

13 the select board because Jesse told me I would have

14 to report to the select board.  They was the one

15 that sent him.

16     Q.   So I am understanding you to say you

17 needed to keep your stuff in there in the winter

18 because you still were going to be doing work on

19 your house, and you were disabled and having a hard

20 time moving things?

21     A.   Yeah.

22     Q.   So you didn't need the extension because

23 it was a Trump sign?

1      A.    Excuse me?

2      Q.    You didn't ask for the extension because

3 it was a Trump sign.  You asked for it so you could

4 store things in there; right?

5      A.    Correct.

6      Q.    Okay.  So you say in this letter,

7 Mr. McCoy, towards the end -- you say -- and correct

8 me if I am wrong.  I am trying to read your

9 handwriting, which is pretty good.  You say "It will

10 be taken care of and I am sorry for the delay."

11          Why did you say "I am sorry"?

12     A.    Because I was being told by the building

13 inspector and the select board that I am violating

14 ordinances, which I had no idea I was even doing.  I

15 was concerned about me, my health, my wife, and my

16 property.

17     Q.    Did you want to comply with the rules of

18 the town?

19     A.    Because that's what they was telling me.

20 When you move to a town, you don't understand what's

21 going on.  And they come up and tell you, "Well,

22 these are the rules."  Of course you want to comply,

23 but then you find out they are not the rules later

1   on.  But you want to comply.  Because I didn't know

2   what was going on, physically beat, could not do it.

3   And I wanted to comply with what the town was

4   forcing on me.  And that's how it went.

5           MR. DIETEL:  Okay.  So we're going to mark

6       this letter as Exhibit F.  This is the

7       November 3, 2016, letter from Mr. McCoy.

8           (J. McCoy Deposition Exhibit F was marked

9       for identification.)

10      Q.   (By Mr. Dietel) So, Mr. McCoy, you send

11  that letter that we just discussed in November.

12  President Trump gets elected.  You asked for a

13  six-month extension; right?  And then am I correct

14  you go before the board of selectmen in June of

15  2017?

16      A.   I did go before them June or -- May or

17  June 2017.  But I wrote them a letter to request to

18  come up there and see them, and they never

19  responded.

20      Q.   Is that the letter we are talking about

21  right now, the November 3 letter?

22      A.   I am not sure.  It was very soon after

23  Jesse came up with the complaint from the select

1  board.  I wanted to talk to the select board and

2  nobody said anything; so I ended up going.

3          MR. DIETEL:  Robert, if there's another

4      letter out there, I would obviously like to see

5      it.

6          THE WITNESS:  Well, Carole says she has

7      the letter, but I haven't seen it.  And you

8      guys didn't give me my right to know; so I have

9      no idea on that.

10          MR. DIETEL:  I will respectfully disagree

11      with you, Mr. McCoy.

12      Q.   (By Mr. Dietel) Okay.  So November 2016

13  through June 2017, does the town do anything to make

14  you get the storage container off your property?

15      A.   Say that again.

16      Q.   Does the town do anything to make you get

17  the storage container off your property between

18  November 3, 2016, and when you met with the board in

19  June of 2017?

20      A.   Well, I don't remember that far back.

21  What I do remember, Jesse coming up here:  "Remove

22  it due to complaints."  I cannot pay their fines.  I

23  could not empty it.  So that's the reason I wrote

```
 1  that letter.
 2       Q.   When you say, Mr. McCoy, that Jesse came
 3  up here, are you talking about when you met with him
 4  back in September of 2016?
 5       A.   Correct.
 6       Q.   Were there any other visits?
 7       A.   Yeah.  I reached out to him.  I wanted to
 8  know about my letter that I sent to town that Carole
 9  mentioned.  But I have no idea if they got it, if
10  they want to show it.  I asked to come up there and
11  speak with the board of selectmen concerning my
12  trailer and the complaint.  Didn't hear nothing.
13       Q.   So you asked for a six-month extension.
14  And, in fact, you kept your trailer on the property
15  for those six months?
16       A.   Of course, I did.
17       Q.   Okay.  All right.  I am going to show you
18  another document, Mr. McCoy.  All right.  Mr. McCoy,
19  I put the document up on my screen.  Do you know
20  what this is?  Can you see it?
21       A.   Yeah.  That's my -- that is a permit that
22  is not -- is not a permit.
23       Q.   Explain to me what you mean by that.
```

1      A.    The select board was not in charge of

2  permit ordinances back then.  The building inspector

3  was.  And I didn't know that at the time, but they

4  couldn't have gave me that permit.

5      Q.    Okay.  But you are aware that the town

6  required permits for storage containers and also

7  required permits for signs?

8      A.    About your storage containers, I found out

9  eventually.  Your signs?  Never heard about any

10  signs, never questioned about any signs, never got a

11  violation concerning any signs.

12      Q.    Mr. McCoy, in your own complaint at

13  paragraph 21, you say "Mr. McCoy's trailer, however,

14  clearly did not meet the definition of a storage

15  container since he did not use the trailer

16  principally for storage but was instead using the

17  trailer principally as a sign to express political

18  speech.  Rather Mr. McCoy's trailer was a sign and

19  clearly met the conditions in town zoning ordinance,

20  Article 9, Section 4, Permitting Conditions for

21  Outdoor Signs."

22            So by the time you filed your lawsuit, you

23  knew that there were permits required for signs;

1  right?

2       A.   Wrong.  I did not know that until I heard

3  you mention it concerning this court case in our

4  Zoom hearing about I had to have a sign permit.

5  Nobody ever contacted me, nothing in black and

6  white, no nothing concerning any sign ordinance.

7  And from what I understand, there is no sign

8  ordinance for political signs on property; so I

9  don't agree with it.

10      Q.   Okay.  You do agree, Mr. McCoy, you have

11  the ability to read the zoning ordinance; right?

12      A.   Excuse me?

13      Q.   You have the ability to read the zoning

14  ordinance; correct?

15           MR. FOJO:  Object to the form.

16      A.   Well, you could read them.  You could go

17  on the town website and read them.  And then you

18  will find out, when you read more, that Carole and

19  who she had posting ordinance and such on the sign

20  did not post them right on the website.  So, I mean,

21  that's right in black and white in part of the

22  information in the minutes.

23      Q    (By Mr. Dietel) Okay.  So, Mr. McCoy, if I

1  am understanding you correctly, you are saying that

2  the document that we're looking at, which is a 2017

3  permit for storage containers, which I am going mark

4  as Exhibit G --

5      A.   Yeah.

6           (J. McCoy Deposition Exhibit G was marked

7      for identification.)

8      Q.   (By Mr. Dietel) So this Exhibit G, you are

9  claiming this permit has no effect or meaning?

10     A.   It's not a legal permit.

11     Q.   Not a legal permit.  So what --

12     A.   The select board was not in charge of

13  storage ordinances, as I have been told and found

14  out.

15     Q.   You didn't have any permit for your

16  storage container, then.

17     A.   Excuse me?

18     Q.   You did not have any permit for your

19  storage container, under your theory; correct?

20     A.   If you understand the zoning and who in

21  charge, no, no permits.

22     Q.   No permits?

23     A.   No permits.  And if you will re- --

1 concerning this June permit, I went up there and

2 made my complaint back to the select board where I

3 was directed to go.  They didn't direct me to find

4 out my rights or anything.  They just direct me to

5 deal with them, the select board.

6            And if you will notice in paperwork I am

7 pretty sure you have, when I went up to that

8 meeting, it was in May.  I complained about them

9 making complaints, and they tabled it.  And when I

10 asked them why they tabled it -- and Carl, in his

11 letter, mentioned he's got these recordings, which

12 my right to know I was not allowed to have.  I would

13 have found them recordings, which he mentions in his

14 letter how I begged him and how I let them know that

15 I was charged for a permit $25.  And when I went to

16 renew, I found out there was no fee for a permit.

17 And I made the accusation at that meeting, "I am

18 going to leave the meeting, go to the police

19 station, and have the building inspector arrest me

20 for charging me for a permit."

21            So during the course of that meeting, they

22 tabled it, went into private session.  I wasn't

23 allowed to hear nothing.  Then they called me back

1   up a month or so later:  "Here.  Here's your permit

2   from the select board."  And I don't recognize that

3   permit as legal because the select board wasn't in

4   charge of permits from what I understand.

5       Q.   Okay, Mr. McCoy.  So I understand your

6   point.  You don't think you had a permit.  But can

7   we agree this Exhibit G, permit for storage

8   containers dated -- June 13, 2017 is the approval

9   date.  It's signed by the then board of selectmen;

10  correct?

11      A.   Signed by the selectmen.

12      Q.   So you testified earlier, Mr. McCoy, that

13  the trailer was repainted with a balloon scene in

14  July of 2017; correct?

15      A.   Pretty close, yes.

16      Q.   Yeah.  I am going to stop sharing my

17  screen, Mr. McCoy, and I am going to put up a

18  different document for you.

19           All right.  So, Mr. McCoy, what do you see

20  on your screen right now?

21      A.   That is my son's painting of the

22  Pittsfield balloon race.

23      Q.   Okay.  And what's the date on the top

1   left-hand corner?

2        A.    July 30, 2017.

3        Q.    All right.  So he paints that in July of

4   2017.  About how long did it take him to paint that?

5        A.    Maybe a week.  I have no idea.  I am not

6   outside much.

7        Q.    Yeah.  Yeah.

8        A.    He did a good job too.

9        Q.    Yeah.  It's nice.  It's nice.

10            So in July of 2017, you are still a Trump

11   supporter; right?

12        A.    Correct.

13        Q.    You are still a Trump supporter today?

14        A.    Correct.

15        Q.    Okay.  So your political views have not

16   changed?

17        A.    They have not changed.

18        Q.    So whose idea was it to paint this as a

19   scene of the Pittsfield balloon festival or race?

20        A.    My son's.

21        Q.    Your son's?

22        A.    Yes.

23        Q.    When do you recall him bringing up the

1  idea?

2       A.   He asked me if he could do it.  Now, if

3  you understand, the back side of the trailer I

4  completely gave him.  He has been a graffiti artist.

5  He's in his mid twenties now.  He's been a graffiti

6  artist since he was 13, 14.  Other places we lived,

7  I built him big walls out of plywood.  I have got a

8  plywood behind my house down in the woods that he

9  also has.  But the back side of the trailer, it was

10  totally his to express his graffiti.  And he's

11  gotten pretty good.  He sells canvasses and stuff

12  now.  He's a good artist.

13       Q.   Okay.

14       A.   But he wanted to do it, and I said,

15  "Sure."

16       Q.   So you didn't hear that it was no longer a

17  Trump sign?

18       A.   Oh, there's "Trump" on it.

19       Q.   Where?

20       A.   Both the back doors from top to bottom,

21  right and left:  "Trump make America great again."

22  It was -- stayed on there, never changed to the day

23  it was removed from my property.

1      Q.    Okay.

2      A.    And you could see that when you come up

3  107, Catamount Road.  That's the only thing you

4  could see coming from town out towards my house:

5  "Trump make America great again."

6      Q.    Going which direction, Mr. McCoy?

7      A.    Excuse me?

8      Q.    Can you see it going from both directions?

9      A.    No.  It's only on the back doors.  And you

10  would see that coming from Catamount going towards

11  Northwood.

12      Q.    Do you have any pictures, Mr. McCoy, from

13  after July 2017 showing that?

14      A.    Yeah.  I have got -- I have got pictures

15  of the day it left.

16      Q.    Okay.  You can send those to me.  That

17  would be appreciated.

18      A.    I will send them to my lawyer.

19          MR. DIETEL:  So I am going to throw up

20      another document.  And just to be clear, I

21      believe we marked that picture we were just

22      discussing as -- if we did not, I would like to

23      mark it as Exhibit H.  This is the July 30,

1    2017, balloon picture.

2              (J. McCoy Deposition Exhibit H was marked

3        for identification.)

4        Q.   (By Mr. Dietel)  Okay.  So, Mr. McCoy, we

5    discussed a permit that you received in June 2017

6    which had a one-year period, which means it expired

7    in June of 2018.  Did the town do anything in that

8    period of time to harass you about the Trump sign,

9    in your opinion?

10       A.   I don't understand the question.

11       Q.   Well, you have said that the town harassed

12   you about the -- sorry.  You said that the three

13   selectmen harassed you about the Trump sign.

14       A.   Correct.

15       Q.   Was there any effort to make you move the

16   trailer in 2017, the storage container?

17       A.   Well, at the end of 2016 November, they

18   said, "Get it off your property."  And that

19   continued until I finally went to the board and they

20   tabled it and gave me this.  So, yes, in 2016, they

21   were still trying to make me get rid of my Trump

22   trailer.

23       Q.   But not in 2017?

1    A.   Oh, yes.  It was during 2017 too.  From

2    October -- from just a little while after the

3    "Concord Monitor," "Get rid of it.  Get rid of it."

4    And all I heard was from, basically, Carl Anderson

5    and the building inspector.  It all started out as

6    complaints.

7          So that still registered, and I was the

8    only one being targeted in this town.  And I still

9    had "Trump" on the trailer.  And my feelings, that

10   was my freedom of speech.  I could have "Trump" on

11   my trailer.  I have got signs all over the place.  I

12   will put them up.  I will keep putting them up.  But

13   when they told me to get rid of it right there, I

14   was tired of messing with the town, tired of them

15   messing with me, trying to live my life.  And I got

16   rid of the trailer because I thought I was doing

17   what I was supposed to be doing, and I find out the

18   select board didn't have the power to remove my

19   trailer.  They didn't have the power till 2018 after

20   this letter.  They took it away from the building

21   inspector.

22   Q.   Who had the power, in your opinion, to

23   remove your trailer?

1       A.    Zoning board.

2       Q.    Zoning board?

3       A.    Zoning board and Jesse Pacheco.

4       Q.    And the zoning board never told you to

5   remove your trailer; right?

6       A.    Never had an issue with the zoning board

7   at all.

8       Q.    Okay.  And you never appealed any of the

9   decisions of the board of selectmen to the zoning

10  board; right?

11      A.    I never knew I had that option until --

12  until after it was gone.  I never knew.

13      Q.    And you never appealed any of the

14  decisions of the board of selectmen to the

15  New Hampshire Superior Court, did you?

16      A.    Excuse me?

17      Q.    You never appealed any of the decisions of

18  the board of selectmen to the New Hampshire Superior

19  Court?

20            MR. FOJO:  Object to form.

21      A.    I don't -- I don't understand that.  I was

22  not even informed of my appeal process from the

23  select board, which was part of the process.  They

1  completely kept me away from the appeal process, did

2  not let me know there was one even involved in the

3  ordinances.  "Just get rid of it."

4          But now if you see the new permits,

5  everything in there, if you have this and that, they

6  give permits.  You've got a year.  And they are on

7  there now.  They have got a year.  And you can apply

8  to the zoning board for appeal process.  They never

9  gave me that option, never let me know about it.  I

10  was just following what they told me I was doing was

11  wrong and I was living in their town.

12      Q    (By Mr. Dietel) Mr. McCoy, we're going to

13  go back here and look at one of our prior exhibits

14  that we talked about.  This was Exhibit E, the

15  notice of violation.

16      A.   Could you scroll to the top?  Is that the

17  undated one?  Yes, that's the undated one.

18      Q.   This is undated notice of violation.

19      A.   Yeah.

20      Q.   Can you read to me what the final

21  paragraph there says?

22      A.   It says, "If you believe the building

23  inspector is in error in the application or

1  interpretation of any provision of the building

2  codes, you have to the right to appeal to the zoning

3  board of appeals in a timely fashion.  This stop

4  work order controls unless and until it is

5  overturned by the zoning board of appeals."

6          That part I don't understand.  But when

7  Jesse Pacheco sent me that, he was directed from the

8  select board down here to give me this from the

9  select board.  And they made sure, through their

10  building inspector, that I go to the select board

11  because that's where they told me to go.  So the

12  zoning board of appeals?  I had no idea.  I was

13  directed to go to the select board.  They kept me in

14  front of the select board from beginning to end.

15      Q.   Mr. McCoy, I just put up a new document.

16  Can you see it?

17      A.   I see it.

18      Q.   Do you know what this is?

19      A.   Could you --

20      Q.   Do you want me to adjust it a little bit?

21      A.   Yeah.  Okay.

22      Q.   Do you know what this is now?

23      A.   Yep.  That's the letter that the select

1  board sent me 2018 that the trailer has got to be

2  gone.

3      Q.   Do you agree with me it says that you can

4  remove it for a three-month period and then apply

5  for another permit to bring it back?

6      A.   I didn't have no way to remove, don't have

7  the funds to remove, was tired with the board

8  messing with me about my trailer; so I got rid of

9  it.

10      Q.   Mr. McCoy, you don't disagree with me that

11  that's what it says; correct?

12      A.   Well, I disagree with you because the

13  select board didn't have the power to do this.

14      Q.   So you received this letter; correct?

15      A.   Correct.  I got it.  And if you notice in

16  there, there's no mention of the appeal process to

17  me like there should have been as there in others

18  nowadays.

19          MR. DIETEL:  So we're going to mark that

20      letter as Exhibit I.  It's the May letter --

21      May 2018 letter from the board of selectmen.

22          (J. McCoy Deposition Exhibit I was marked

23      for identification.)

1      Q.   (By Mr. Dietel) All right.  Mr. McCoy,

2   we're going to look at another document.  Can you

3   see this letter I just put up on the screen,

4   Mr. McCoy?

5      A.   Yeah.  That's my letter.

6      Q.   And what is this?  Can you describe it to

7   me?

8      A.   Yeah.  I was saying I needed time to deal

9   with my trailer.  I was going by what they told me I

10  had to do.  And I had no idea that what they was

11  telling me I had to do they didn't have the power to

12  do it.

13          And at that time, it took me a long time

14  to empty and unload the other trailer they told me

15  to get rid of.  So I was doing -- I was doing way

16  beyond what I was capable of doing.  And my wife was

17  out there with me.  She's disabled with neck

18  problems.  So we had a lot of pressure put on us

19  about these trailer removals.

20          MR. DIETEL:  We're going to mark this as

21      Exhibit J, the May 29, 2018, McCoy letter.

22          (J. McCoy Deposition Exhibit J was marked

23      for identification.)

1       Q.    (By Mr. Dietel) So, Mr. McCoy, by this

2   point in May 2018, you have applied for two permits.

3   Now you are requesting another extension; correct?

4       A.    I applied -- I was told September 2015 to

5   get a permit; so I applied.  And then the next time,

6   it was in May of 2017 and I applied for another

7   permit.  Two permits.  Just two.

8       Q.    Mr. McCoy, you ultimately got told you

9   have got to take the storage container off your

10  property; right?

11      A.    Excuse me?

12      Q.    You ultimately get told that you have to

13  take the storage container off your property?

14      A.    Yeah, remove it.  Correct.

15      Q.    All right.  And what were the reasons you

16  were given?

17      A.    They never really -- they started --

18  first, they mentioned complaints.  That was the main

19  reason.  And I wasn't good with that because that

20  was my right under First Amendment to have "Trump."

21  And "Trump" stayed on that trailer until the day it

22  was gone.

23              So my problem was it was always about

1   Trump and they made it to be about Trump.  They come

2   to me with the so-called complaints about Trump.

3   And from day one till day end, at the end of the

4   day, May, June, "Get rid of" -- I was tired of

5   dealing with the town select board for everything

6   they put me through.

7        Q.   Mr. McCoy, how much money did you make in

8   2018?  Did you have a salary, or was it just the

9   disability?

10       A.   I am on disability.  Me and my wife make a

11  little bit over $7,000 a year.

12       Q.   Okay.  Is that your only source of income?

13       A.   Well, I have garage sales from the things

14  I bought and sold over the years, garage sales.

15       Q.   Tell me about those garage sales.

16       A.   Who wants to come to Pittsfield?  I don't

17  sell much.  Last weekend I might have made 2 bucks.

18  I still got a bunch of stuff.  But I am not selling

19  a bunch.  It just doesn't -- it just doesn't go.

20       Q.   What sort of stuff do you sell?

21       A.   Anything that you can imagine in a storage

22  unit:  dishes, pots and pans, household goods,

23  some artwork I have accumulated.  And I have still

1   got most of everything.  I've got a lot.

2      Q.   And you got that solely from the

3   storage --

4      A.   Yeah.

5      Q.   -- containers that you buy?

6      A.   Storage facilities, yes.

7      Q.   Okay.

8      A.   Since I got disabled, I just started

9   buying storage units.  I accumulated a lot of stuff.

10     Q.   How much money do you think you make in a

11  year from that?

12     A.   Not much.

13     Q.   Okay.  Less than a thousand bucks?

14     A.   No idea.

15     Q.   Okay.  Did you lose any money or wages or

16  salary or anything because the storage container was

17  gone?

18     A.   Yeah.  I lost a pretty good bit that I had

19  in that storage -- both the storage trailers.  And

20  besides the tools and stuff in it, there was stuff

21  in there that I would not sell until come time for

22  property taxes and then I would sell it to help pay

23  my taxes.  Because when you are only making $679 a

1   month -- the wife is only making $314 a month.  My

2   wife buys the food.  We eat dollar food, peaches.

3   We don't eat a lot.  After I pay three, four hundred

4   dollars a month on my building, I am left with a

5   couple hundred dollars a month.  So there's not a

6   lot of finances; so I -- I do that to help make up.

7        Q.   Mr. McCoy, at its core, you are saying the

8   town discriminated against you because you wrote

9   "Trump" on the side of the trailer?

10       A.   Correct.

11       Q.   What evidence do you have of that?

12       A.   Well, the building inspector coming up

13  here telling me specifically "Remove the trailer in

14  30 days due to complaints."  And I didn't find out

15  for a while about the complaints.  And then when I

16  went to a meeting January 29, 2020, I knew about the

17  complaints then, and they was from select board

18  members.

19            So I went to that meeting, and I was

20  endorsing an individual in town.  In my situation, I

21  presented it to the town.  I went around and got

22  signatures.  "Let everybody in town have storage

23  containers.  Give me mine back.  Everybody has them,

1   no permits," this and that.  Of course, the select

2   board did not want that.  The planning board and

3   select board did not want that to happen.

4        Q.   Mr. McCoy, that was a town warrant

5   article, you said?

6        A.   That was a town planning board meeting.

7   And I even -- I informed them.

8        Q.   What else?

9        A.   I informed them that I found out they made

10  the complaints and they are the ones who wanted me

11  to get rid of my Trump sign.  I also told them I

12  don't want to sue the town.  It's in the recordings.

13  Don't go to the minutes.  Go to the recordings.  "I

14  don't want to sue the town.  Let us have our

15  trailers back."

16           "No."

17       Q.   This is after the trailer was already

18  removed; right?

19       A.   A few months after.

20       Q.   Yeah.  So the town -- I asked you what the

21  town did, what evidence you had that the town

22  selectmen, these three individuals, were trying to

23  get this off because it said "Trump."  You said that

1  you were informed that there were some complaints

2  from some of the selectmen.

3      A.   Complaints -- complaints by the building

4  inspector and in the town minutes.

5      Q.   Okay.  What else?

6      A.   Complaints.

7      Q.   What other evidence do you have that this

8  was because of your Trump sign, that you had to

9  remove it?

10     A.   Well, you would have to look at -- we got

11 complaints on the trailer, the trailer.  "You have

12 to remove the trailer."  We got complaints.  Right

13 after it hit the "Concord Monitor," we got

14 complaints.  And when confronted, "Oh, we don't know

15 who sent the complaints.  We don't know where they

16 came from.  We don't know who signed them."

17          But these board members, those three and

18 others, "Get that off your property."

19          "Complaints, complaints, complaints,

20 complaints."  That's all they mentioned to me.

21 That's all they withheld.  And when I questioned

22 them on it, they don't know who signed it, don't

23 know where they came from, don't know anything about

1   it.  There's no complaints on file nowhere, but it

2   was "Complaints."

3           So any ordinary individual, when they tell

4   you from the beginning, "Remove it due to complaints

5   or we're going to fine you" and they keep coming

6   back to complaints, and when you question them on

7   the complaints, they fess up they don't know nothing

8   about the complaints, something went wrong and it

9   was not on me.

10      Q.   Anything else, Mr. McCoy?

11      A.   Complaints.

12      Q.   Just complaints?

13      A.   Complaints.

14      Q.   Okay.  I just want to be clear.  The only

15   evidence you have that this was about the Trump sign

16   is that you were notified there were complaints

17   about the Trump sign?

18      A.   (Audio interference.)

19           (Reporter clarification.)

20      Q.   I asked you a question.  I said the only

21   evidence you had that you were discriminated against

22   because this was a Trump sign was because you said

23   you were told about complaints?

1      A.    Complaints.

2      Q.    And I am asking you, there was nothing

3  else?

4      A.    Just the complaints.  And then they would

5  mention a permit, and that permit was illegal.

6          MR. DIETEL:  Okay.  I am going to -- I

7      don't have any further questions right now,

8      Robert.  I am going to leave open Mr. McCoy's

9      depo in the event anything bubbles up over the

10     next couple of weeks.  But otherwise, I don't

11     have any further questions right now.

12         MR. FOJO:  Okay.

13         MR. DIETEL:  All right.  Mr. McCoy, thank

14     you for your time today.

15         THE WITNESS:  You, too.  I hope you-all

16     have a good weekend.

17         MR. DIETEL:  Enjoy the weekend as well.

18     It should be a nice one.

19         (The deposition was suspended at

20     3:11 P.M.)

21

22

23

1          E R R A T A   P A G E

2          I, JOSEPH MCCOY, the witness herein, have
read the transcript of my testimony and the same is

3   true and correct, to the best of my knowledge, with
the exception of the following changes noted below,

4   if any:

5   Page/Line                    Change/Reason

6   _____       _____

7   _____       _____

8   _____       _____

9   _____       _____

10  _____       _____

11  _____       _____

12  _____       _____

13  _____       _____

14  _____       _____

15  _____       _____

16  _____       _____

17  _____       _____

18  _____       _____

19                        _____

                          JOSEPH MCCOY
20
        Sworn to and subscribed before me,
21  this _____ day of _____, 2021.

22                        _____

                          Notary Public
23                        My commission expires:

```
 1              C E R T I F I C A T E

 2        I, Tina L. Hayes, a Licensed Shorthand Reporter

 3   and Notary Public of the State of New Hampshire, do

 4   hereby certify that the foregoing is a true and

 5   accurate transcript of my stenographic notes of the

 6   deposition of JOSEPH MCCOY, who was duly sworn,

 7   taken on the date hereinbefore set forth.

 8        I further certify that I am neither attorney

 9   nor counsel for, nor related to or employed by any

10   of the parties to the action in which this

11   deposition was taken, and further that I am not a

12   relative or employee of any attorney or counsel

13   employed in this case, nor am I financially

14   interested in this action.

15        THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT

16   DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY

17   ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR

18   DIRECTION OF THE CERTIFYING REPORTER.

19

20

21               Tina L. Hayes, RPR, LCR

22

23
```

**$**

**$1,200** 24:1,19
**$124,000** 17:13
**$25** 82:15
**$300** 15:22
**$314** 97:1
**$4,000** 15:20
**$500-a-day** 73:2,5
**$679** 96:23
**$7,000** 95:11
**$75** 41:2

**1**

**1** 35:7,8 37:2 69:23
**10** 12:7 15:1 52:23
53:5,6
**107** 48:1 86:3
**12** 15:6 16:12
**13** 83:8 85:6
**134** 55:19
**14** 8:10 27:18,19 28:9
31:14 85:6
**16** 58:3
**18** 8:10
**1978** 12:18,22
**1984** 12:16 13:3
**1st** 27:1

**2**

**2** 95:17
**2,000** 52:5
**20** 11:19 42:8
**20-foot** 24:12
**20-something** 42:8
**2004** 12:6,18,23 13:3
14:2 16:15
**2010** 8:16
**2013** 9:19
**2014** 7:20 8:17 9:4,20
20:6
**2015** 14:5,16,17 26:4,
19,20,23 31:19
32:15 35:7 37:6
38:20 94:4
**2016** 27:2 35:8 43:3,
5,6,18 44:6,23 45:18
47:4,5 48:4,19,23
49:15 53:14 60:5
61:15 67:1 69:23
70:12,18 72:1,5,7,14
76:7 77:12,18 78:4
87:17,20
**2017** 14:17 35:14
39:10 40:4 53:14
60:4,5 76:15,17
77:13,19 81:2 83:8,
14 84:2,4,10 86:13
87:1,5,16,23 88:1
94:6

**2018** 15:5 35:15
41:15 87:7 88:19
92:1,21 93:21 94:2
95:8
**2019** 61:18,22 62:12
**2020** 97:16
**2021** 55:7
**21** 8:11 79:13
**23** 72:7
**28** 48:1
**29** 43:3 44:23 48:4
93:21 97:16

**3**

**3** 16:23 72:1,15 76:7,
21 77:18
**3(a)** 29:14
**30** 21:9 39:18 40:22
57:19 72:23 73:2
84:2 86:23 97:14
**31** 14:5
**322** 7:6

**4**

**4** 79:20
**40** 21:9

**5**

**52** 24:16
**52-foot** 24:22

**6**

**66** 14:11
**67** 14:11

**7**

**70** 17:18
**73** 52:4
**78** 12:6
**7th** 55:6

**8**

**80** 17:18
**84** 16:9

**9**

**9** 79:20

**A**

**ability** 80:11,13
**abouts** 72:16
**accident** 8:16 15:8
16:7,8,13
**accidentally** 11:18
**accomplished** 38:10

**account** 42:21
**accumulated** 95:23
96:9
**accusation** 82:17
**accused** 13:19
**acres** 16:23 17:18
**ad** 14:21
**Adam** 55:22 57:17
58:7
**add** 51:8
**adjust** 91:20
**admonition** 52:10
**agree** 4:2 20:10 22:2
33:5 35:6 36:13
37:23 38:11,13
42:23 43:1 51:10,11
80:9,10 83:7 92:3
**agreed** 41:5
**agreeing** 37:17,18
**agreement** 22:8
**ahead** 47:15
**Aid** 56:9
**Alex** 15:20
**Allard** 58:23 60:7
62:3,4 64:21
**allege** 55:1,4
**alleged** 24:16 55:4
**alley** 31:5
**allowed** 10:18 39:14
57:20 82:12,23
**Amendment** 94:20
**America** 85:21 86:5
**amount** 57:18
**Anderson** 55:19
57:6,12 58:6,23
59:22 60:6 62:2
63:6,8 64:3,21 65:13
88:4
**Anderson's** 65:8
**anymore** 39:2,4
**appeal** 89:22 90:1,8
91:2 92:16
**appealed** 89:8,13,17
**appeals** 91:3,5,12
**application** 90:23
**applied** 32:8 38:6
94:2,4,5,6
**applies** 35:19
**apply** 26:6 38:7
66:18 90:7 92:4
**appreciated** 86:17
**approached** 23:16
37:1 40:16
**approval** 83:8
**approved** 35:5,6
**arrest** 16:2 82:19
**arrested** 10:12 11:13
13:6 14:3,4,5 15:2
**arrests** 16:15
**article** 27:18,19 28:9
31:14 44:6 48:19
49:15 70:17 72:6

79:20
**artist** 43:13 46:15
47:13 85:4,6,12
**artwork** 95:23
**assertion** 51:15
**assume** 5:6
**attack** 8:19
**attacks** 18:1
**attempt** 66:14
**attention** 45:9
**attorney** 6:4
**auction** 14:18 18:19,
20,21
**audibly** 5:21
**August** 26:19,23
44:6 48:19 72:5
**aware** 14:1 65:19,22
66:3,4 79:5
**Ayer** 7:13

**B**

**back** 5:15 12:6,22
13:11 14:16 19:3
26:4 30:4 32:15
35:12 37:6,8 40:20
45:17 62:22 69:6
77:20 78:4 79:2
82:2,23 85:3,9,20
86:9 90:13 92:5
97:23
**bad** 48:8
**balloon** 47:12,16,17,
18,19,23 48:2 83:13,
22 84:19 87:1
**bargained** 14:13
**Barnstead** 41:20
42:3 55:19
**based** 64:7
**basically** 6:17 16:5
46:20 47:7 49:2,5
67:18 88:4
**basis** 10:21
**bear** 19:17 42:16
**beat** 68:3 76:2
**beep** 68:1
**begged** 59:3 60:1
82:14
**beginning** 52:16
91:14
**belabor** 67:20 68:2
**belief** 36:1
**believed** 44:15
**belongings** 25:4
**big** 85:7
**Bill** 23:5
**Bill's** 24:4
**bills** 73:6
**bit** 7:22 8:6 55:10
91:20 95:11 96:18
**black** 64:16 80:5,21
**board** 21:23 33:22
34:15 35:14,20

36:10 50:9,21 51:4,5
53:21,23 54:4,5,10,
15 55:21,22 59:2,13,
19,20 60:16 62:14,
18 63:10,22 71:12,
13 73:19 74:13,14
75:13 76:14 77:1,18
78:11 79:1 81:12
82:2,5 83:2,3,9
87:19 88:18 89:1,2,
3,4,6,9,10,14,18,23
90:8 91:3,5,8,9,10,
12,13,14 92:1,7,13,
21 95:5 97:17
**Bob** 57:19,23 58:4
**Bobby** 17:16
**book** 14:19
**books** 37:21
**born** 17:17,20
**bottom** 35:2,3 36:17
64:13 85:20
**bought** 7:21 9:12
17:6 18:7,9 21:14
23:4,10 25:4,16
95:14
**bowling** 31:5
**box** 33:2
**break** 5:23 68:20,23
69:4,5,13
**breaks** 6:2
**bring** 92:5
**bringing** 84:23
**brought** 7:15 12:2
20:5 36:6 56:5,21
68:10
**Brown** 17:16
**bucks** 95:17 96:13
**building** 21:2,12,15,
18 26:8,9,14,21
32:7,17 40:7 50:22
53:23 54:9 59:14
73:20 75:12 79:2
82:19 88:5,20 90:22
91:1,10 97:4,12
**built** 26:10 85:7
**bunch** 43:11 95:18,
19
**burglary** 13:9 15:1
**Burn** 50:13
**bus** 33:3
**buses** 21:10
**business** 42:5
**buy** 14:22 16:20
17:4,15 18:19,20
19:12 96:5
**buying** 14:17 96:9
**buys** 97:2

**C**

**call** 66:6
**called** 82:23
**canvasses** 85:11
**capable** 25:12 36:20,
22 93:16

**car** 16:13 44:10

**care** 37:4 75:10

**careful** 5:10

**Carl** 55:19 57:5,12 58:6,23 59:2,22 60:6 62:2 63:6,8 64:2,21 65:8,12 82:10 88:4

**Carole** 57:17 58:7 62:15 63:13 65:15 77:6 78:8 80:18

**carpenter** 8:2,3

**case** 4:14 10:16 15:4 16:4,11 80:3

**Catamount** 7:6 86:3, 10

**Century** 8:11

**chairman** 63:22

**changed** 66:8 84:16, 17 85:22

**charge** 14:9 15:12 26:14 54:1 73:4 79:1 81:12,21 83:4

**charged** 13:6,19,22 14:3,4 15:19 16:14 82:15

**charges** 16:15

**charging** 82:20

**check** 27:7

**checked** 15:21

**chief** 59:15

**choose** 9:8 16:17

**cigarette** 19:20

**claim** 53:22 65:2,4,5

**claimed** 65:6

**claiming** 81:9

**clarity** 65:18

**Clark** 58:3

**Clayton** 63:21

**clear** 5:10 44:19 56:20 86:20

**close** 46:23 48:15 83:15

**codes** 91:2

**coffee** 69:15

**coins** 14:19,23 15:7, 15,17,19

**comments** 48:6 50:14,20

**commercial** 8:6 21:9, 11 39:13,15 57:19

**committing** 13:20

**complain** 50:5

**complained** 51:20 52:1 82:8

**complaining** 50:17, 20 51:6

**complaint** 24:16 40:8 52:21 53:9 54:9 58:18 64:3 65:9 76:23 78:12 79:12 82:2

**complaints** 23:16 36:3 40:17 48:16

**50:23 51:12,16,18 52:6,19 53:1,22 54:2,3 59:12,15 60:17,18,20,23 61:4, 6,7,20 62:13,16,20 63:4,5,23 71:14 72:10 77:22 82:9 88:6 94:18 95:2 97:14,15,17

**completely** 29:21 74:9 85:4 90:1

**compliance** 29:3

**comply** 37:15,23 75:17,22 76:1,3

**complying** 37:19

**concern** 10:15 31:11, 12 36:11 55:5

**concerned** 23:18 75:15

**Concord** 7:9 14:6,20 44:5,12,17 45:5 48:19,23 49:14 70:17 72:6,8 88:3

**condition** 36:23

**conditions** 79:19,20

**confronted** 64:14

**connect** 57:8

**connection** 29:7

**constitutional** 54:22

**construction** 8:5 9:16

**construed** 46:20

**contacted** 16:21 80:5

**container** 24:13 29:18,22 30:11,13 31:3,5 32:6 33:6,15, 18 36:14 46:4 49:23 56:10 65:20 66:9 67:9 71:4 73:18 77:14,17 79:15 81:16,19 87:16 94:9, 13 96:16

**containers** 19:10 27:18,22 28:10 31:15 32:2 33:1,2 49:18 79:6,8 81:3 83:8 96:5 97:23

**content** 63:19

**continued** 87:19

**controls** 91:4

**conversation** 26:17 44:14

**conversations** 61:8, 21 62:10

**convicted** 10:13 11:14

**cool** 47:20

**cops** 15:3,7

**copy** 28:19 57:2 65:12,13 69:18

**core** 97:7

**corner** 84:1

**correct** 14:14 26:5 28:15 36:15,18,21 39:3,5,6 43:4,8 44:7 51:7 52:1 53:10,15, 17,18 55:15,16 61:2

**64:21 67:2 68:7 69:21 71:6 75:5,7 76:13 78:5 80:14 81:19 83:10,14 84:12,14 87:14 92:11,14,15 94:3,14 97:10

**correctly** 81:1

**correspond** 56:18

**counsel** 4:11

**count** 49:11

**country** 7:21 16:23 48:12

**couple** 25:17 27:2 97:5

**court** 5:9 9:20 16:4 80:3 89:15,19

**Craigslist** 14:19,21

**created** 50:14

**crime** 10:13 11:14 14:4

**crimes** 13:5,22

**Croft** 15:12,18

**current** 29:5

**D**

**date** 9:19 25:17 35:5 39:9 40:10 41:14 43:2 69:20 70:5,13 72:7,13 73:9 83:9,23

**dated** 44:22 70:15 72:1 83:8

**Dates** 60:2

**day** 47:7 73:5 85:22 86:15 94:21 95:3,4

**days** 72:23 73:2 97:14

**dead** 68:3

**deal** 17:6 82:5 93:8

**dealing** 27:18,21 95:5

**decided** 12:3 17:3

**decimated** 73:3

**decision** 54:18

**decisions** 89:9,14,17

**deck** 25:7

**defendant** 36:10

**definition** 79:14

**delay** 75:10

**delivered** 24:14

**delve** 4:15

**democracy** 20:10,13

**Democrat** 50:13

**Democrats** 50:9

**Department** 14:20

**depos** 42:13

**deposed** 4:6 9:14,21

**deposition** 4:13 22:7, 21 31:16 38:22 45:2 70:23 76:8 81:6 87:2 92:22 93:22

**describe** 20:18 24:6 42:17 93:6

**describing** 51:3

**details** 4:16

**detective** 15:12,18, 22

**detectives** 14:20

**died** 12:3

**Dietel** 4:2,9,10 10:21 11:2,12 22:14,23 31:8,13,18 33:14 34:6 35:1 38:18 39:1 40:19 44:20 45:4 52:11 57:1,5 62:22 63:2 65:10,16 69:3,6 70:20 71:2 76:5,10 77:3,10,12 80:23 81:8 86:19 87:4 90:12 92:19 93:1,20 94:1

**difference** 18:22,23

**difficult** 12:13

**difficulty** 4:18

**direct** 82:3,4

**directed** 82:3 91:7,13

**direction** 86:6

**directions** 86:8

**dirty** 10:8

**disability** 34:22 38:6 73:4 74:11 95:9,10

**disabled** 38:9 72:22 74:9,19 93:17 96:8

**disagree** 77:10 92:10,12

**discovery** 57:3 65:11

**discriminated** 97:8

**discriminating** 53:17

**discussed** 52:16 76:11 87:5

**discussing** 44:21 86:22

**dishes** 95:22

**district** 21:9,11 39:14,15 57:20

**doctor** 10:8

**document** 28:8 32:1, 4,5,10,11,21 35:2 36:13,16 38:11 42:12 71:7,10 78:18, 19 81:2 83:18 86:20 91:15 93:2

**Dodge** 57:17 58:7 62:15 63:13 65:15

**dollar** 23:5 24:4 56:9 97:2

**dollars** 41:23 97:4,5

**door** 21:15

**doors** 85:20 86:9

**doubt** 28:21

**downtown** 21:11 67:17

**drive** 24:5 50:10

**driveway** 18:14 44:10 45:15

**driving** 14:12 16:20 45:7,8

**dropped** 10:11

**Duckler** 44:12 45:6

**due** 35:13 36:2,23 40:8 48:16 50:22 54:3 71:14 72:10 77:22 97:14

**duly** 4:6

**duration** 36:6

**E**

**earlier** 18:19 83:12

**early** 44:1

**eat** 97:2,3

**Edward** 7:5

**effect** 81:9

**effort** 87:15

**elderly** 15:13 18:2

**elected** 46:14 64:13 76:12

**electing** 44:16

**election** 47:1,8,10,11 48:15 61:11,15,16, 17,23 62:6,18 64:12 72:14

**Elvis** 12:3

**emotional** 50:15

**employed** 8:15

**empty** 25:18,22 39:11 77:23 93:14

**end** 18:14 26:19,23 60:5 70:12 75:7 87:17 91:14 95:3

**ended** 8:17 10:9 11:18,19 14:10,13 26:13 77:2

**endorsing** 64:2 97:20

**enforced** 53:12

**enforcing** 55:14

**England** 8:13

**entire** 21:15

**erratically** 14:12

**error** 90:23

**established** 71:5

**eventually** 79:9

**evidence** 16:5 97:11

**evidentiary** 11:7

**EXAMINATION** 4:8

**exclamation** 43:7

**exclude** 11:6

**Excuse** 9:7 20:12 30:21 33:13 34:12 38:17 70:9 75:1 80:12 81:17 86:7 89:16 94:11

**exhibit** 22:15,21 31:14,16 38:20,22 44:22 45:2 48:4 68:18 69:17 70:21, 23 71:3,16,19 76:6,8

81:4,6,8 83:7 86:23
87:2 90:14 92:20,22
93:21,22

**exhibits** 22:18 90:13

**expired** 69:23 70:3
72:2 87:6

**explain** 22:5 45:8
46:7 62:21 78:23

**explained** 6:16 44:11
62:15

**express** 79:17 85:10

**extend** 35:14

**extension** 35:15,17
74:6,22 75:2 76:13
78:13 94:3

**F**

**Facebook** 42:21
44:22 48:2,6,13

**facilities** 96:6

**facility** 19:10,11 33:4

**fact** 78:14

**facts** 4:14 41:14
64:10

**factual** 52:15,20 55:5

**factually** 68:4

**failure** 14:14

**Fair** 49:23

**falls** 35:21

**familiar** 31:19 47:17

**famous** 49:22

**farmhouse** 17:17

**fashion** 91:3

**father** 8:10

**fee** 82:16

**feel** 55:13

**feelings** 88:9

**feet** 24:16

**felony** 15:19 16:2

**felt** 59:5

**fence** 45:12

**festival** 84:19

**field** 45:15

**figure** 60:19

**filed** 58:14 79:22

**final** 90:20

**finally** 6:8 87:19

**finances** 97:6

**find** 36:5 45:5 62:14,
19 63:3,4 64:8 75:23
80:18 82:3 88:17
97:14

**fine** 11:5 22:20 73:2,
3,5,14

**fines** 77:22

**finger** 50:10

**finish** 66:1

**five-minute** 69:4

**fixed** 19:10

**FOJO** 4:4 10:19,23
11:4 22:20 31:6
33:12,19 34:11 38:2
40:14 57:4 69:2
80:15 89:20

**folks** 64:13

**food** 97:2

**football** 45:15

**force** 74:8

**forced** 36:7

**forcing** 76:4

**form** 31:6 33:12,19
34:11 38:2 40:14
80:15 89:20

**found** 14:10 15:6
35:12 54:3 58:14
61:20 64:4,8 72:1
79:8 81:13 82:13,16

**four-wheelers** 20:20

**freedom** 67:14 88:10

**Freese** 42:3 57:19,23
58:1,4,5

**friendly** 62:7,10

**friends** 12:5 48:13

**front** 7:8 44:17 47:15
91:14

**full** 7:4

**fun** 8:22

**funds** 92:7

**G**

**gangrene** 8:18 10:9

**garage** 17:1 25:8
95:13,14,15

**gas** 56:9

**Gauthier** 55:22 57:17
58:7

**gave** 26:15,20 32:5
58:15 72:9 73:1 79:4
85:4 87:20 90:9

**Georgia** 11:22,23
12:2,10,22 50:13
51:7 52:20

**get along** 8:23

**give** 5:18 28:23 38:14
57:9 58:15 74:5,6
77:8 90:6 91:8 97:23

**giving** 6:11 10:9

**good** 6:21 10:10 18:5
24:19 26:22 45:15
48:8 68:22 75:9 84:8
85:11,12 94:19
96:18

**goods** 95:22

**graffiti** 43:13 46:15
47:12 85:4,5,10

**grandfathered** 39:15,
17 57:21

**great** 85:21 86:5

**ground** 4:16 65:17

**grounds** 11:7

**guilty** 15:6 16:12

**guy** 18:5 44:1

**guys** 62:7 77:8

**H**

**half** 68:21 73:5

**Hampshire** 7:6,16,17
12:8 43:22 89:15,18

**Hampton** 14:8

**hand** 4:20 5:19 16:1
17:6 29:10

**handwriting** 75:9

**happen** 66:20

**happened** 68:4

**harass** 60:14 87:8

**harassed** 58:19 60:7,
8 64:19 87:11,13

**hard** 74:19

**Hatfield** 7:7

**head** 5:19 50:2

**health** 75:15

**hear** 5:22 8:21 68:1
69:10,11 78:12
82:23 85:16

**heard** 5:6 18:18
49:17,20 60:20 62:3
68:6 79:9 80:22 88:4

**hearing** 4:19,21 6:21,
23 60:21 80:4

**heart** 8:19 17:23

**held** 59:13

**Hillary** 67:17

**hit** 14:7

**Hold** 38:18

**holding** 5:19

**home** 7:21 17:2 18:2
33:3

**homicide** 14:9

**horse** 68:3

**hospitals** 23:18 60:2

**hour** 68:21

**house** 18:12 46:2
50:10 73:22 74:19
85:8 86:4

**household** 46:1
95:22

**humongous** 17:1
57:17

**hundred** 97:3,5

**hurried** 18:3

**husband** 15:14

**I**

**idea** 11:17 24:23
27:9,10 41:5 42:7
49:12 53:2,7 58:10
64:23 65:2,3 70:4
75:14 77:9 78:9
84:5,18 85:1 91:12
93:10 96:14

**identification** 22:22
31:17 38:23 45:3
71:1 76:9 81:7 87:3
92:23 93:23

**identified** 15:15
64:18

**imagine** 95:21

**immediately** 15:15
17:5

**important** 5:8 20:11,
13,16 30:20,23

**importantly** 6:9

**impression** 35:21

**incarcerated** 12:9,18
13:1,3

**including** 33:22
34:15 36:10 51:6
52:19

**income** 95:12

**individual** 97:20

**individually** 64:19

**individuals** 53:19
54:5 58:19 62:16
63:14

**infection** 8:18

**information** 11:7
56:2 80:22

**informed** 89:22

**inside** 19:13

**inspect** 26:21 32:7

**inspector** 26:8,14
32:17 40:7 50:22
53:23 54:9 59:14
75:13 79:2 82:19
88:5,21 90:23 91:10
97:12

**instructions** 6:15

**instructs** 6:7

**intend** 46:18

**intended** 46:17

**interpretation** 91:1

**interrupt** 5:16,17
39:20 52:9 61:14

**investigating** 15:23

**involved** 15:8 16:6
30:5 32:15 90:2

**involvement** 16:9

**issue** 89:6

**items** 46:1

**J**

**J** 22:21 31:16 38:22
45:2 70:23 76:8 81:6
87:2 92:22 93:22

**January** 43:3,5,13,18
44:23 48:4 97:16

**Jesse** 26:8 32:5 40:7
71:13,20 72:4,9 73:1
74:12,13 76:23
77:21 78:2 89:3 91:7

**Jim** 58:23 60:7 62:3,4
64:1,21

**job** 84:8

**jobs** 8:13

**Joe** 10:19 11:6

**Joseph** 4:5 7:5

**identified** 15:15
64:18

**July** 9:4 14:5 27:5
41:15 83:14 84:2,3,
10 86:13,23

**June** 9:4 35:15
76:14,16,17 77:13,
19 82:1 83:8 87:5,7
95:4

**jury** 15:5 16:12

**justice** 15:23

**K**

**kicking** 17:21

**kid** 13:7

**knew** 49:3 79:23
89:11,12 97:16

**knowing** 36:22 50:12

**knowledge** 10:5
13:17 49:15,16

**Konopka** 55:21
57:15,16 58:7,23
60:6,14 61:9,11
64:21

**L**

**lady** 15:13

**Larry** 55:21 57:15,16
58:6,23 60:6,13
61:9,11 62:1 64:20

**law** 37:20,21

**lawsuit** 9:15,22 10:6,
11 56:5,21 79:22

**lawsuits** 9:23

**lawyer** 10:10 14:10
15:20 56:15,19 57:8
86:18

**learn** 8:8

**leave** 82:18

**leaving** 17:5

**left** 17:3 21:3,12
85:21 86:15 97:4

**left-hand** 84:1

**leg** 8:18

**legal** 81:10,11 83:3

**letter** 59:3,23
65:8,12 69:22 70:6,
22 71:3,12,23 72:20
73:8 74:5 75:6 76:6,
7,11,17,20,21 77:4,7
78:1,8 82:11,14
88:20 91:23 92:14,
20,21 93:3,5,21

**letters** 43:6

**lie** 59:3

**lied** 64:4,5,6,8,9,11,
12

**lies** 16:6

**life** 7:22 88:15

**lifelong** 7:11

**liking** 51:9

**lips** 6:23

**list** 55:20 56:11,13
57:2

listened 32:17

live 7:4,5 88:15

lived 7:17 17:16 85:6

lives 58:10

living 8:1 90:11

loaded 25:20

lobby 11:9

local 7:19 8:12

located 55:18

lockdown 12:12

Londonderry 23:5 24:5

long 6:1 24:16 39:11 42:5,9,10 47:22 56:1 84:4 93:13

longer 85:16

longest 12:10

looked 15:17 16:22 71:19

lose 96:15

lost 96:18

lot 7:20 15:3 16:5,6 25:3,4,13 48:6,13 50:14 51:3,4,8,10 61:5 93:18 96:1,9 97:3,6

lots 50:17 52:14

love 51:13

loved 51:21 52:2,7

loving 51:17

lying 15:3

**M**

made 15:13 59:12 60:22 62:13,16,20 63:3,4,23 64:3,16 74:10 82:2,17 91:9 95:1,17

main 32:23 67:19 94:18

maintenance 25:8 38:10 45:23 73:21

major 11:18

make 6:10 10:8 26:21 51:15 52:14 67:21 77:13,16 85:21 86:5 87:15,21 95:7,10 96:10 97:6

making 21:18 34:7 82:9 96:23 97:1

Manchester 7:19 25:3,19

March 15:5 61:18,19, 21 62:12

mark 22:15 31:13 38:20 44:20 70:20 76:5 81:3 86:23 92:19 93:20

marked 22:21 31:16 38:22 45:2 70:23 76:8 81:6 86:21 87:2 92:22 93:22

Massachusetts 7:14 12:7

Mccoy 4:5,10 6:9 7:3, 5 8:21 9:13 10:17 11:12,21 13:12 17:7 19:16,21 20:11,17 22:1,21 23:2 28:9 30:7,19 31:16,18,23 32:22 33:5 34:7 35:18 36:13 37:6,20 38:15,22 39:1,20 42:12 44:18 45:2 48:4 49:14 50:6 51:1,19 52:8,11 53:9 55:8 56:1 57:10,22 58:18 59:20 60:21 61:14 62:19 63:2,11 64:7,18 65:14,16,23 67:20 68:19 69:7,17 70:6,23 71:3,9 72:12 73:15 75:7 76:7,8,10 77:11 78:2,18 79:12 80:10,23 81:6 83:5, 12,17,19 86:6,12 87:2,4 90:12 91:15 92:10,22 93:1,4,21, 22 94:1,8 95:7 97:7

Mccoy's 79:13,18

Mccoys 7:7

meaning 81:9

means 30:14 31:9 56:4 87:6

meant 9:13

measured 24:18

media 48:17 52:22

medical 7:20 32:16

meet 79:14

meeting 4:12 59:2, 19,20,23 82:8,17,18, 21 97:16,19

meetings 59:4,5,7

member 63:10

members 33:22 34:15 35:20 36:10 50:9 54:10 62:14 97:18

memory 70:11

mention 80:3 92:16

mentioned 78:9 82:11 94:18

mentions 82:13

message 63:14 73:1

messages 62:15 63:16,19 65:14

messing 88:14,15 92:8

met 77:18 78:3 79:19

metal 8:17

methamphetamine 14:12

MF 50:13

mid 47:4,5 48:23 85:5

middle 66:23

midst 60:2

mind 13:11 19:19,21

mine 38:4 97:23

minute 19:18

minutes 15:6 16:12 80:22

mischief 47:14

misdemeanor 14:13, 14

misleading 16:11

mobile 33:3

money 73:15 95:7 96:10,15

Monitor 7:9 44:5,12, 17 45:5 48:19 49:1, 15 70:17 72:6,9 88:3

month 41:2 72:21 83:1 97:1,4,5

months 18:4 78:15

motorcycle 15:8 16:7,8

motorcyclist 14:7

mouse 29:10

move 9:1,2 11:6 16:21 41:6,8 75:20 87:15

moved 7:19 12:7,21 20:6,21 23:4,6,7,8 25:3,15,18 26:1 27:11,12 29:3 34:2 41:20 46:2 55:6

moving 5:7 6:23 25:2 29:10 74:20

multiple 8:17 38:5 60:23 67:8 68:7,8

**N**

named 17:16 23:5 62:14

nature 62:9

neck 93:17

needed 21:22 24:14 25:8 26:10 27:11 40:15,18 73:8 74:17 93:8

needle 10:8

neighbor 63:21

neighbors 18:13

neighbors' 18:10

newspaper 45:7 59:13

nice 16:23 17:7,8,10 84:9

night 50:12

nodding 5:19 50:2

north 12:23

Northwood 86:11

Noted 57:4

notice 69:20 70:2,21 71:16,20 72:4,21 73:9,12 74:10 82:6 90:15,18 92:15

noticed 26:23 32:7 48:15,18,23 58:10

notified 60:15

November 72:1,7,15, 22 74:8 76:7,11,21 77:12,18 87:17

nowadays 92:18

number 55:12

**O**

oath 6:10,11 69:8

Object 31:6 33:12,19 34:11 38:2 40:14 80:15 89:20

objecting 10:23 11:4

objection 10:22 11:8

objects 6:4

obligation 52:17

occurred 61:21 73:10

October 88:2

office 68:11

officer 11:19 14:8,10

on-the-ground 24:13

one-year 87:6

open 6:1

operation 42:6

opinion 31:9 38:3 49:9 87:9 88:22

option 89:11 90:9

order 91:4

ordinance 23:12 27:7,9,15,21 28:13, 14,16,17,19 29:2,5 31:4 33:21 39:19 53:12 55:14 65:19 66:5,7 79:19 80:6,8, 11,14,19

ordinances 28:1,3,16 29:7 30:4,5 54:1 75:14 79:2 81:13 90:3

originally 7:10,13

Outdoor 79:21

outset 9:14

overturned 91:5

owned 14:23 17:14, 18 27:10

owner 16:21

owns 21:7 55:18

oxygen 18:1

**P**

Pacheco 26:8 40:7 71:20 89:3 91:7

paid 24:4

paint 43:9,10 45:17 47:11,15 84:4,18

painted 23:15 43:6, 12,16 47:7 71:4

painting 43:15 83:21

paints 84:3

pans 95:22

paperwork 82:6

paragraph 79:13 90:21

paranoia 50:15

part 65:9 67:5 80:21 89:23 91:6

party 10:1,6

passed 15:14 18:2,5

patience 42:12

pause 44:18

pay 17:11 23:20 73:6 77:22 96:22 97:3

paying 40:23

peace 16:1

peaches 97:2

pending 6:2

people 19:12 35:20 37:10 50:9,17,20 51:4,5,8,10,17 52:6, 14 60:9

period 33:7,16 56:19 87:6,8 92:4

perjury 13:20

permit 21:20,21,22 26:3,7,9,11,13,15, 20,22 27:1,4,8 28:3 29:21 30:1,2 31:19 32:1,20 33:1 34:4,5, 17,18,21 35:13,15 36:4,5 37:22 38:6,7, 20 40:12,16,18 59:3 66:10,18 69:22 70:3 72:2 78:21,22 79:2,4 80:4 81:3,9,10,11, 15,18 82:1,15,16,20 83:1,3,6,7 87:5 92:5 94:5,7

permit's 34:9

permits 26:14 33:23 34:15 35:11 39:2,3 58:12,13 79:6,7,23 81:21,22,23 83:4 90:4,6 94:2,7

permitted 33:7,15 36:14

Permitting 79:20

person 17:16 23:5 38:8 51:20,21,23 52:2

personal 38:3

personally 50:19

photographer 45:6

photos 55:20

physical 36:23 39:11 50:15

physically 24:7 25:9, 12 37:4 38:11 76:2

physicals 23:18

picture 20:4,18 22:3 43:11 44:21 86:21 87:1

pictures 56:17 57:2 86:12,14

Pittsfield 4:11 7:6,12 9:3 16:18 17:7 18:15 23:7,8 25:15 32:1 34:18 38:4 47:12,18, 23 48:10,12,14 49:18,23 83:22 84:19 95:16

**place** 9:11 16:22,23
17:6,19 18:17 21:8,
17 25:19 27:12
45:13 46:1 49:1 55:5
57:21 61:12 62:11
72:9 74:2 88:11

**places** 47:13 85:6

**plan** 22:17

**planning** 55:22 63:22

**plea** 14:13

**plywood** 85:7,8

**point** 34:1,6 43:7
46:5 47:2 48:22 49:2
52:13 64:11 67:21
68:3 71:2 73:18 83:6
94:2

**police** 11:19 14:8,20
16:6 59:16 82:18

**political** 79:17 80:8
84:15

**pond** 17:1

**popular** 44:3

**position** 37:3 38:9
64:2

**possibly** 9:18 53:6

**post** 42:20 44:22
48:3,4 80:20

**posted** 7:8 14:19

**posting** 80:19

**pots** 95:22

**power** 88:18,19,22
92:13 93:11

**presented** 97:21

**President** 20:8 76:12

**Presidential** 61:16
72:14

**Presley** 12:3

**pressure** 93:18

**presume** 43:10

**pretty** 6:20 17:7 37:5
41:13 47:20 48:9,11
72:15 75:9 82:7
83:15 85:11 96:18

**previously** 13:6
17:14 56:14

**price** 24:19 41:5

**primarily** 45:18 66:23
67:4

**primary** 43:22

**principally** 79:16,17

**prior** 12:19 62:23
90:13

**prison** 11:20 12:11
14:3

**prisons** 12:10

**Pritchard** 64:1

**private** 82:22

**problem** 23:15 36:12
39:11 94:23

**problems** 7:20 38:5
93:18

**process** 25:2 42:13
89:22,23 90:1,8
92:16

**produced** 56:13

**profession** 7:23

**pronouncing** 71:21

**properties** 9:11
16:20 18:11 34:3
55:23

**property** 9:5,8 15:2,
7,11 16:2,14,17
17:12 18:6,8,9
21:10,19 23:10 24:3,
5 25:9,21 26:18
27:3,10 33:17 36:7,
12 38:16 39:2,4,17
40:6,13,22 41:12,19,
20 45:12,16 56:6
57:7,18 58:9 59:14
61:12 62:5 66:10,15
75:16 77:14,17
78:14 80:8 85:23
87:18 94:10,13
96:22

**proud** 67:6

**proved** 16:11

**provision** 91:1

**pseudomonas** 8:18
10:9

**public** 13:17

**publicity** 49:19

**published** 72:6

**pull** 31:21 68:17

**pulled** 28:19

**purchased** 20:21

**purpose** 4:12

**purposes** 29:23 30:3
32:19,22 33:4,7,16
36:15 65:20

**put** 19:12 26:1 62:5
71:7,9 74:3 78:19
83:17 88:12 91:15
93:3,18 95:6

**putting** 88:12

### Q

**question** 5:7 6:1,6
11:9,13 12:21 24:8
30:6 34:7 35:18
37:21 39:21 49:10
51:2,16 52:4,6,16,20
62:23 63:12,13
87:10

**questioned** 79:10

**questions** 4:13 5:2,
13 37:14 57:11

**quick** 17:23 69:4

**quiet** 7:22 17:10

### R

**race** 47:12,16 83:22
84:19

**raise** 4:20

**raised** 16:1

**rally** 47:16,19,23
48:2

**ran** 35:22

**rate** 24:22 41:3

**Ray** 44:12 45:6

**re-** 81:23

**reach** 44:8

**reached** 78:7

**read** 29:16,18 32:12,
14,16,23 33:14 37:5
45:7 53:8 62:22 63:1
75:8 80:11,13,16,17,
18 90:20

**reading** 30:8 33:21
36:8,20

**real** 17:22

**reason** 17:22 28:20
53:12 62:17 77:23
94:19

**reasonable** 6:2

**reasons** 94:15

**recall** 65:7 84:23

**receive** 70:6

**received** 60:23 70:11
87:5 92:14

**receiving** 15:2 16:2
70:8

**recognize** 40:12,15
83:2

**record** 5:10 7:3
13:15,17 44:19 69:7

**recorded** 5:20

**recordings** 59:4,22,
23 82:11,13

**red** 43:6

**redo** 25:6,7,8

**redoing** 73:21

**redone** 29:4 66:5

**Reese** 42:2 57:19
58:1,5

**referenced** 65:14

**registered** 88:7

**Reidsville** 12:11

**relate** 13:23

**relation** 7:7

**released** 14:2

**remember** 13:10,13,
16 14:15 39:12 53:3
58:20 70:8,10 72:12,
13 77:20,21

**removal** 63:17

**removals** 93:19

**remove** 40:8 41:10
48:16 50:22 54:2,19
60:15,16,17,18,22
72:11,23 77:21
88:18,23 89:5 92:4,
6,7 94:14 97:13

**removed** 35:4 36:18
55:3 62:17 64:1
85:23

**renew** 34:21 82:16

**rent** 41:1

**rented** 21:7,17 24:11,
12 39:16

**renting** 39:8,23 40:2,

3,20

**repainted** 83:13

**repairs** 21:18

**repeat** 67:23

**rephrase** 24:9

**report** 74:14

**reporter** 5:9 52:10

**represent** 42:20

**representing** 69:21

**Republicans** 64:22

**request** 76:17

**requesting** 94:3

**requests** 57:3 65:11

**require** 54:19

**required** 55:3 79:6,7,
23

**requirements** 37:15

**researched** 23:9

**resident** 7:11

**Residential** 8:5

**respectfully** 77:10

**respond** 57:3 73:13

**responded** 76:19

**response** 12:20
68:14

**responses** 5:18,21

**retired** 14:8,11

**reviewed** 27:14,17,
20

**rid** 36:2 59:1,18
67:18 71:14 87:21
88:3,13,16 90:3 92:8
93:15 95:4

**ride** 18:15

**riding** 9:10 50:20

**right-of-way** 14:14

**rights** 54:22 82:4

**Rite** 56:9

**road** 7:6 48:1,12
55:19 86:3

**Robert** 4:10 6:4
10:21 22:14 57:1
65:10 77:3

**rod** 8:18

**rules** 4:16 75:17,22,
23

**running** 8:13 62:18
64:1 68:11

### S

**salary** 95:8 96:16

**sales** 95:13,14,15

**sat** 23:14

**scene** 83:13 84:19

**school** 21:10 33:3

**screen** 19:16 20:1
22:23 28:6 29:11
38:21 45:1 69:17
71:10 78:19 83:17,
20 93:3

3,20

**Screw** 67:18

**scroll** 90:16

**Section** 29:14 79:20

**sections** 27:20

**select** 21:23 35:14
50:9,21 51:4,5
53:21,23 54:4,5,10,
15 55:21 59:13
60:16 63:10 74:13,
14 75:13 76:23 77:1
79:1 81:12 82:2,5
83:2,3 88:18 89:23
91:8,9,10,13,14,23
92:13 95:5 97:17

**selectmen** 54:13,14
60:11,12 64:19
71:13 76:14 78:11
83:9,11 87:13 89:9,
14,18 92:21

**sell** 41:22 95:17,20
96:21,22

**selling** 95:18

**sells** 85:11

**send** 22:17 76:10
86:16,18

**sentences** 36:21

**September** 26:20
27:1 35:7,8,22 37:2
69:23 78:4 94:4

**session** 82:22

**set** 17:19 51:4

**settle** 9:5

**settled** 9:20

**share** 19:15

**sharing** 38:21 44:23
83:16

**shingle** 21:15

**shock** 8:19

**shook** 17:6

**shooting** 11:18 12:15
16:9 50:10

**short** 13:11

**show** 19:5 28:4,6
42:11 69:16 78:10,
17

**showed** 15:14 40:18

**showing** 86:13

**sic** 21:7 27:2 39:2
42:3 57:19 62:11

**side** 21:3 85:3,9 97:9

**sides** 51:11

**siding** 21:15

**sign** 46:17,18,21,22
47:3,9 62:6 64:20
66:23 67:6,10,14
68:6,12 74:23 75:3
79:17,18 80:4,6,7,19
85:17 87:8,13

**signature** 32:10,11

**signatures** 97:22

**signed** 32:12 83:9,11

**signs** 47:23 61:12
62:12 67:16,17 79:7,
9,10,11,21,23 80:8
88:11

**similar** 33:3

**Similarly** 5:1

**simple** 39:21 52:15

**sir** 6:14 8:4

**sit** 18:4

**sit-** 24:12

**sits** 41:21

**sitting** 42:19 44:9 59:16

**situation** 97:20

**six-month** 76:13 78:13

**size** 24:10,18 45:15

**smoke** 19:19

**snow** 42:19 43:11 73:12 74:4

**so-called** 95:2

**social** 48:17 52:22

**sold** 17:19 41:17 95:14

**solely** 96:2

**son** 43:12 46:2,14,19 47:11

**son's** 83:21 84:20,21

**sort** 95:20

**sound** 8:22

**Sounds** 17:7

**source** 95:12

**south** 12:4

**speak** 69:12 78:11

**specific** 55:10

**specifically** 6:6,18 53:19 60:13 97:13

**speech** 67:15 79:18 88:10

**spent** 12:11 43:14

**spit** 17:5

**stand** 15:16

**start** 4:17 47:20

**started** 4:15 8:11 66:22 88:5 94:17 96:8

**state** 7:4 12:11

**stated** 59:22

**statement** 15:13

**station** 56:9 82:19

**stayed** 12:5,7 67:19 85:22 94:21

**stenographer** 5:9

**stint** 12:10

**stipulations** 4:3

**stolen** 13:7 15:1,2,10 16:2,14

**stop** 5:14 37:6 38:21 44:23 83:16 91:3

**stopped** 16:22 47:9

**storage** 14:18 18:20, 21 19:6,9 21:14,16 24:13 25:4 26:14 27:18,21 28:9 29:18, 19,22,23 30:2,11,13

**31**:2,3,4,14 32:2,18 33:1,4,6,7,15,17 34:14 35:11 36:14 37:4,7 45:19 46:4,9 49:17,22 54:1 56:10 59:10 65:19,20 66:9, 12 67:9 68:7,10 69:22 71:3 73:18 77:14,17 79:6,8,14, 16 81:3,13,16,19 83:7 87:16 94:9,13 95:21 96:3,6,9,16,19 97:22

**store** 56:9 75:4

**stored** 45:23

**stories** 66:7

**storing** 45:21

**street** 17:17,19 18:13 40:21 58:3 67:19

**strike** 30:19,22

**strong** 20:9

**stuff** 8:20 19:12 20:22 21:18 25:7,21 28:2 50:11 73:21 74:17 85:11 95:18, 20 96:9,20

**subject** 49:14

**summer** 73:11

**summertime** 74:7

**Superior** 89:15,18

**supplies** 73:21

**supporter** 46:20 50:16 84:11,13

**supporters** 43:14 65:1,9

**supposed** 88:17

**surgeries** 8:17

**suspect** 20:10

**sworn** 4:6 6:12

**symbol** 20:7

**T**

**tabled** 82:9,10,22 87:20

**talk** 5:11 22:1,8 44:13 56:17 77:1

**talked** 26:12 48:3 65:17,18 90:14

**talking** 19:9 21:3 22:2,6,9 61:15,17 66:21 71:17 76:20 78:3

**target** 16:7,10

**targeted** 38:5 50:12 88:8

**targeting** 35:23 54:6

**taxes** 96:22,23

**telling** 49:11 55:12 61:6 67:22 75:19 93:11 97:13

**term** 32:23

**terms** 34:9

**testified** 4:7 83:12

**testify** 32:14

**testimony** 6:11

**theory** 81:19

**thing** 5:8 13:16 20:11,13,16 22:9 32:15 34:16 44:16 86:3

**things** 17:10 30:16 38:9 45:21,22 67:13 74:20 75:4 95:13

**thinking** 15:4 19:3

**thought** 11:2 18:18 32:19 68:5 88:16

**thousand** 41:23 96:13

**threaten** 50:10

**three-bedroom** 17:2

**three-month** 92:4

**throw** 86:19

**till** 47:7 88:19 95:3

**time** 6:2,3 12:13 20:6 21:12 25:2 29:23 30:3 42:9,10 43:14, 15 47:22 59:1,9,17 61:11,15,23 63:23 64:12 73:8,20 74:20 79:3,22 87:8 93:8,13 94:5 96:21

**timely** 91:3

**times** 11:16 61:1

**Tina** 62:22

**tired** 88:14 92:7 95:4

**today** 6:11 28:20 29:8 30:8,9,10,14, 15,17 31:10 34:3 36:12 41:21 42:1 55:6 56:3 57:18 84:13

**today's** 4:12

**told** 11:1 14:23 17:3 21:19,23 26:10 32:18 34:16 40:7 42:4 48:16 53:7 54:2,7,8 59:7,9 60:23 61:5 63:21 64:1 71:13,15 74:13 75:12 81:13 88:13 89:4 90:10 91:11 93:9,14 94:4,8,12

**Tommy** 21:7 24:13 39:13 40:20 41:17, 18 42:2,5 58:1,2,4,7

**tools** 25:7 96:20

**top** 32:18 43:2,7 83:23 85:20 90:16

**totally** 85:10

**town** 4:11 17:8,10 21:8 23:14 27:14 31:7 32:1 33:22 34:18 35:21 36:5,9 37:3 41:18 45:9,14 48:1,2,16 49:2,14, 18,23 53:12,16,20 54:12,16,17 56:8 58:15,17 61:17 62:16 65:18 66:13 73:14 75:18,20 76:3 77:13,16 78:8 79:5, 19 80:17 86:4 87:7,

11 88:8,14 90:11 95:5 97:8,20,21,22

**town's** 28:19 31:4

**tractor-trailer** 19:4 24:22

**trade** 8:9

**trailer** 19:2,3 20:2,5 21:1,5,6,7,17,19,21, 22 22:2,3,7,9,11 23:2,21 24:6,10,13, 15 26:4,11,23 32:7 33:2,3,17 34:4,5,9, 23 35:7,22,23 36:6,7 37:22 39:7,13,22 40:2,19,20 41:1,7, 17,18 42:19 43:5 44:13,14,15 45:5,12, 17 46:9,10,12,13 50:11 53:13 54:19 58:1,2,4,7 59:2,6,8, 11,15,17 60:10,15, 16,22 61:1 62:17 63:18,23 64:3 66:12, 22 67:9 68:5 69:23 72:23 74:2 78:12,14 79:13,15,17,18 83:13 85:3,9 87:16, 22 88:9,11,16,19,23 89:5 92:1,8 93:9,14, 19 94:21 97:9,13

**Trailer's** 42:2,5

**trailers** 18:6,8,15,16, 17,19 21:9 23:14 26:15 33:22,23 34:15 35:12 37:11 38:16 39:4,12,14 40:13,16 41:4 49:13 55:2,8,13,17,21,22 56:6 57:6 96:19

**transaction** 17:23 18:3

**transporter** 24:4

**treatment** 8:19

**trees** 45:13

**trial** 15:4

**truck** 14:7 33:2

**Trump** 20:2,5,7,9,19 22:11 23:2,15,20,22 24:15 26:3 35:23 41:6 42:19 43:6,14 44:1 46:10,12,13,14, 20 50:16 53:13 59:11,15 60:10 63:17,23 64:20 65:1, 9 67:14,18 68:11,12 71:4 74:23 75:3 76:12 84:10,13 85:17,18,21 86:5 87:8,13,21 88:9,10 94:20,21 95:1,2 97:9

**Trumper** 67:6

**truth** 6:12

**truthfully** 52:17

**truthfulness** 13:23

**Trzcinski** 55:20

**turn** 59:1,18

**turned** 59:16

**TV** 19:5

**twenties** 85:5

**U**

**ultimately** 38:15 94:8,12

**unable** 37:4

**undated** 90:17,18

**underneath** 20:18 21:4

**understand** 6:10,13, 15,19,20 7:11 10:17 19:1 22:5,13 23:17 24:8 34:6 42:7 46:13 52:13 53:11 67:22 68:4 69:7 72:22 74:10 75:20 80:7 81:20 83:4,5 85:3 87:10 89:21 91:6

**understanding** 5:1 29:6 36:1 53:10 74:16 81:1

**understood** 5:6 74:9

**unfair** 54:19

**unions** 7:19 8:12

**unit** 21:14,16 35:4 95:22

**units** 14:18 18:20,21 25:5 96:9

**unlawful** 55:13 57:1

**unload** 93:14

**unpermitted** 37:10

**USA** 43:6

**usual** 4:2

**V**

**valued** 15:19,21

**vehicle** 13:7

**vehicles** 20:19

**vehicular** 14:9

**Viagra** 14:12

**views** 84:15

**violates** 54:21

**violating** 75:13

**violation** 39:18 69:20 70:3,21 71:16,20 72:5 79:11 90:15,18

**visits** 78:6

**Vitale** 15:21

**vote** 62:12

**Voted** 60:15

**voting** 20:9 67:15

**W**

**wages** 96:15

**walk** 73:10,11 74:4

**walls** 85:7

**Walmart** 14:6

**want's** 67:16

**wanted** 14:9,22 16:21 18:1 46:14 47:11 66:17,19 69:14,15 76:3 77:1

78:7 85:14

**wanting**  62:5

**Wars**  19:6

**website**  28:20 80:17,
20

**week**  84:5

**weekend**  95:17

**weeks**  25:16,17 27:2

**well-known**  48:9,11,
22

**white**  64:17 80:6,21

**widespread**  49:7

**wife**  9:10 16:19 17:3
18:1 44:9 69:14
75:15 93:16 95:10
97:1,2

**window**  21:15

**winter**  40:4 43:10,15,
16 73:10 74:17

**wintertime**  73:22

**wood**  21:16 63:21

**wooden**  45:12

**woods**  85:8

**words**  30:20,23 31:1

**work**  14:18 25:11
46:3 47:14 74:18
91:4

**worked**  8:11 12:4

**working**  7:18 8:11
46:3

**works**  19:17 22:18

**world**  14:19 66:13

**wrong**  53:11 75:8
80:2 90:11

**wrote**  74:5,12 76:17
77:23 97:8

Y

**yard**  44:10

**year**  9:2 12:14 27:4,6
33:8,11,16,18 34:10,
20 35:4,17 36:2,18
37:23 38:8 47:19
90:6,7 95:11 96:11

**years**  8:20 11:19
12:7,12 13:2 14:11
15:1 25:11 28:3 42:8
53:4 70:7 95:14

Z

**zoning**  23:11 27:7,9,
15,21 28:19 29:5
53:12 55:14 65:18
79:19 80:11,13
81:20 89:1,2,3,4,6,9
90:8 91:2,5,12

**Zoom**  5:12 19:17
22:16 42:13 80:4



**EXHIBIT  A**

J. McCOY
05/07/2021

Tina L. Hayes, RPR, LCR #80
AVICORE Reporting & Video



Joe McCoy raises his arms in praise of the Trump sign his stepson Brian Bales created on his property on Rt. 107 in Pittsfield, N.H, August, 8, 2016  GEOFF FORESTER—Monitor staff

EXHIBIT  B

J. McCOY
05/07/2021

Tina L. Hayes, RPR, LCR #80
AVICORE Reporting & Video

# Article 14.  Storage Containers

## 1.  Authority
RSA 674:16, I, (d); RSA 674:16, V; and RSA 674:17.

## 2.  Purpose
The purpose of these STORAGE CONTAINER regulations is to promote the general welfare by protecting the aesthetics of the town.
(See RSA 674:17, I, (c).)

## 3.  Permitting Conditions for Storage Containers
Except as provided in article 4, section 3, Nonconforming Uses, every STORAGE CONTAINER shall be permitted upon the following conditions and upon all other applicable conditions in the zoning ordinance:

(a) The STORAGE CONTAINER shall be used for and only for storage.

(b) The STORAGE CONTAINER shall have a SETBACK from every STREET boundary or INTERIOR LOT LINE which SETBACK is greater than or equal to the minimum SETBACK specified for the STREET boundary or INTERIOR LOT LINE by article 3, section 4, (h), Table of Dimensional Requirements.

(c) No more than one STORAGE CONTAINER shall be on the LOT if the LOT is in the Urban District, the Suburban District, or the Rural District.

(d) No more than two STORAGE CONTAINERS shall be on the LOT if the LOT is in the Commercial District or the Light Industrial/Commercial District.

(e) The sum of the time during which one or more STORAGE CONTAINERS are on any one LOT during any 15-month period shall be no more than 12 months.

(f) The owner of the LOT where the STORAGE CONTAINER will be put shall tell the zoning ordinance administrator the date when the STORAGE CONTAINER is proposed to be put on the LOT.  The zoning ordinance administrator shall issue a permit for the STORAGE CONTAINER, and the permit shall state the date when the STORAGE CONTAINER is proposed to be put on the LOT.



EXHIBIT C
J. McCOY
05/07/2021
Tina L. Hayes, RPR, LCR #80
AVICORE Reporting & Video

# TOWN OF PITTSFIELD
# NEW HAMPSHIRE

## PERMIT
## FOR STORAGE CONTAINERS

(STORAGE CONTAINERS: Shall mean, any truck trailer, box trailer, school bus, mobile home or other similar facility used for storage or other purposes).

Storage Containers, whether registered or not, whether mobile or stationery, are not allowed on a permanent basis in any zoning district within the Town of Pittsfield. A storage container is permitted for storage purposes only, for a period of one year, with the approval of a parking permit issued by the Board of Selectmen or their designee, provided said storage container meets all setback requirements, and as limited by the following; a) maximum of one storage container per lot in the Urban, Suburban or Rural Districts; b) maximum of two storage containers per lot in the Light Industrial/Commercial Districts.

APPLICANTS NAME: _Joseph McCoy_

APPLICANTS ADDRESS: _322 Catamount Rd._

APPLICANTS TELEPHONE NUMBER: _603-435-5050_

LOCATION OF STORAGE UNIT: TAX MAP & LOT NUMBER: _R23-02-01_

ZONING DISTRICT: _RURAL_

SERIAL NUMBER OF STORAGE CONTAINER: _1H2V04523EB019801_

MAKE AND MANUFACTURER OF CONTAINER: _FP8-F2-45 FRUEHAUF_

SIGNATURE OF APPLICANT: _Joseph E McCoy_

DATE STORAGE USE IS TO BEGIN: _Sept. 1 2015_

APPROVED: DATE: _9-1-15_

_____ Board of Selectmen

Unit must be removed one year from the approved date above.







EXHIBIT E
J. McCOY
05/07/2021
Tina L. Hayes, RPR, LCR #80
AVICORE Reporting & Video



## Office of Code Enforcement

### TOWN OF PITTSFIELD
**Town Hall, 85 Main Street
Pittsfield, New Hampshire**

### NOTICE OF VIOLATION

Dear Mr., Joseph Mc Coy

The property located at 322 Catamount Rd Pittsfield NH 03263, identified in the Town Tax Records as Map R23, Lot 02-01, and owned/occupied by you, your permit for a storage trailer has expired on September 1, 2016 and the trailers need to be removed according to our Zoning Ordinance article 14 section 3.

Your immediate attention to this matter is appreciated.

If you believe the Building Inspector is in error in the application or interpretation of any provision of the Building codes, you have the right to appeal to the Zoning Board of Appeals in a timely fashion. This stop work Order controls unless and until it is overturned by the Zoning Board of Appeals.

Thank you
Jesse Pacheco
Building Inspector

OFFICE 603-435-6774          FAX:603-435-7922          CELL:603-715-6624

Nov. 9, 2016

To: Jesse Pacheco,



EXHIBIT F

J. McCOY
05/07/2021

Tina L. Hayes, RPR, LCR #80
AVICORE Reporting & Video

Hello,

I am writing in regards to seeking a 6 month extension for my trailer on my property located at 322 Catamount Rd.

At the present, i have construction going on, my garage is leaking from the inside and it needs emergency work which will take me several months to fix. I am disabled, with just one working leg, and have to take care of everything myself, and this has already been started. I will remove one trailer by the end of November. The other i will be dealing with over the cold winter months and will have it emptied and removed by the end of April 2017.

I am asking for this 6 month extention inorder to keep my tools and materials inside this trailer while i deal with this emergency construction situation inorder to keep things out of the winter outside elements. It will be taken care of and i am sorry for the delay, but i am physcially handicapped, and will complete this task inorder to remain with good standards for this town and it's rules as a Pittsfield home owner.

Thank you For Your Time.
Sincerely,
Joseph McCoy

EXHIBIT  G

J. McCOY
05/07/2021

Tina L. Hayes, RPR, LCR #80
AVICORE Reporting & Video

# TOWN OF PITTSFIELD
# NEW HAMPSHIRE

## PERMIT
## FOR STORAGE CONTAINERS

(STORAGE CONTAINERS: Shall mean, any truck trailer, box trailer, school bus, mobile home or other similar facility used for storage or other purposes).

Storage Containers, whether registered or not, whether mobile or stationery, are not allowed on a permanent basis in any zoning district within the Town of Pittsfield. A storage container is permitted for storage purposes only, for a period of one year, with the approval of a parking permit issued by the Board of Selectmen or their designee, provided said storage container meets all setback requirements, and as limited by the following; a) maximum of one storage container per lot in the Urban, Suburban or Rural Districts. b) maximum of two storage containers per lot in the Light Industrial/Commercial Districts.

APPLICANTS NAME: Joseph McCoy

APPLICANTS ADDRESS: 322 Catamount Rd.

APPLICANTS TELEPHONE NUMBER: (603) 435-5050

LOCATION OF STORAGE UNIT. TAX MAP & LOT NUMBER: R23-2-1

ZONING DISTRICT: Rural

SERIAL NUMBER OF STORAGE CONTAINER: 1H2V045238B01901

MAKE AND MANUFACTURER OF CONTAINER: FP8-5245 - FRUALHAUF

SIGNATURE OF APPLICANT: Joseph McCoy

DATE STORAGE USE IS TO BEGIN: 6-13-2017

APPROVED DATE: June 13, 2017

Board of Selectmen

Unit must be removed one year from the approved date above







# TOWN OF PITTSFIELD

### Office of Selectmen
85 Main Street, Pittsfield NH 03263
admin@pittsfieldnh.gov ~ telephone (603) 435-6773 ~ fax (603) 435-7922

**EXHIBIT I**

J. McCOY
05/07/2021

Tina L. Hayes, RPR, LCR #80
AVICORE Reporting & Video

May 22, 2018

Joseph E. McCoy
322 Catamount Road
Pittsfield, NH 03263

Re: storage container permit expiration

Dear Mr. McCoy,

As you know, the storage trailer permit that the Board of Selectmen approved two years ago and extended at your request last June is due to expire next month.

Please consider this letter a friendly reminder that the trailer must be removed from the property for at least a three month period before you can apply for another permit to bring it back.

Thank you in advance for your anticipated cooperation.

Sincerely,

Pittsfield Board of Selectmen

RECEIVED
MAY 2018
Town of
Pittsfield, NH

EXHIBIT   J
J. McCOY
05/07/2021
Tina L. Hayes, RPR, LCR #80
AVICORE Reporting & Video

May 29, 2018

Dear Board Members,

This concerns a storage trailer located on my property at 322 Catamount Rd. Pittsfield

Last june, 2017, i came to your meeting, i had 2 trailers to unload and remove, as requested. I've emptied and removed 1 so far and it's not an easy task. I am disabled with 1 working leg to move on and now that the weather has changed i am in the process of unloading the second. This will take more time, when i bought my home in pittsfield i had a huge ammount of belongings which came with me so i am asking for another permit inorder to accomplish this huge task.

I am crippled so it cannot be done easily.

Please let me know, or, set aside a time to discuss this further at your next meeting.

Thank you

Joseph McLy

322 Catamount Rd.
P. O. Box 293
Pittsfield, N.H. 03263



UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

JOSEPH McCOY                              )
                                         )
Plaintiff                                )
                                         )
v.                                       )        Civil Action No.:1-20-cv-00362-JL
                                         )
TOWN OF PITTSFIELD                       )
                                         )
Defendant                                )

### AFFIDAVIT OF CARA MARSTON

     I, Cara Marston, with personal knowledge, on oath depose and say as follows:

1.    I am a resident of the Town of Pittsfield, and I have been employed by the Town for more than twenty years.

2.    I have been the Town Administrator for the Town since December 2015.

3.    Subject to the Board of Selectmen's delegation and direction, my responsibilities as Town Administrator include assisting the Board in the performance of its duties as the Zoning Administrator of the Town's zoning ordinance, and overseeing and communicating with Town staff regarding administration of the zoning ordinance.

4.    A true and accurate copy of excerpts of the Town's zoning ordinance are attached hereto as Exhibit 1. A complete copy of the Town's zoning ordinance is available at:

https://www.pittsfieldnh.gov/sites/g/files/vyhlif3681/f/pages/zoning_ordinance_2021_2.pdf

5.    I am aware of the allegations raised by Joseph McCoy in the above captioned suit, and I have personal knowledge regarding the Town's actions with respect to the granting of storage container permits to Mr. McCoy in 2015, 2016, 2017, and the Board's decision to deny a 2018 permit request from Mr. McCoy. I also have personal knowledge regarding the Town's

permitting and enforcement efforts with respect to other storage containers in the Town during the period between 2015 and the present.

6.      In 2015, Mr. McCoy applied for and received a storage container permit, which was approved effective September 1, 2015 (the "2015 Permit"). A true and accurate copy of the 2015 Permit is attached hereto as Exhibit 2.

7.      Per the Town's zoning ordinance, storage container permits may be granted for a one year period for storage purposes only. *See* Exhibit 1 at Article 14.

8.      The 2015 Permit informed Mr. McCoy that his storage container could be used for storage purposes only and must be removed one year from the approved date (i.e., September 1, 2016).

9.      As of September 1, 2016, Mr. McCoy had not removed his storage container. In addition, he was maintaining an additional unpermitted storage container on his property. Accordingly, the Town's building inspector issued a Notice of Violation to Mr. McCoy. The notice informed Mr. McCoy that his 2015 Permit had expired, that his storage containers needed to be removed, but that he had a right to appeal to the Town's Zoning Board of Adjustment. A true and accurate copy of the Notice of Violation is attached hereto as Exhibit 3.

10.     On November 3, 2016, Mr. McCoy wrote to the building inspector and requested an extension of his 2015 Permit, and he represented that he needed the storage container for storage purposes only. A true and accurate copy of Mr. McCoy's November 3, 2016 letter is attached hereto as Exhibit 4.

11.     On November 15, 2016, the Board unanimously voted to approve the six month extension. The motion to approve was made by Selectman Carl Anderson.

12.     In May 2017, Mr. McCoy requested a meeting with the Town's Board of Selectmen ("Board") regarding his storage container. This request followed a visit to Mr. McCoy's property from the Town's building inspector. A true and accurate copy of an email documenting Mr. McCoy's request is attached hereto as Exhibit 5.

13.     On June 13, 2017, the Board met with Mr. McCoy to consider his request for another extension of his storage container permit. During the meeting, Mr. McCoy represented that he needed the storage container for storage purposes related to work he was performing on his deck and due to a disability. There was no discussion or mention during the meeting of the storage container being used to display any speech or other expressive content. A true and accurate copy of the minutes of the June 13, 2017 meeting with the Board is attached hereto as Exhibit 6.

14.     During the June 13th meeting, I advised the Board that the zoning ordinance states that a storage container permit "shall not [sic] be no more than 12 months." The Board approved Mr. McCoy's request by a unanimous vote despite the 12 month limitation and the fact that the storage container had been on Mr. McCoy's property since sometime in 2014. A true and accurate copy of the 2017 permit is attached hereto as Exhibit 7.

15.     As Zoning Administrator, the Board or its designee(s) are vested with approving or denying permits for storage containers and individuals aggrieved by such decisions may appeal to the Town's Zoning Board of Adjustment. *See* Exhibit 1 at pages 6-7, 39.

16.     Per the Town's zoning ordinance, signs may be permitted under Article 9 upon application by a Town resident. *See* Exhibit 1 at Article 9. Mr. McCoy never requested or otherwise applied for a sign permit from the Town, and never represented or communicated to the Town any desire or intent to use his storage container as a sign.

17.     On May 22, 2018, the Board wrote to Mr. McCoy and reminded him that his 2017 permit was set to expire in the following month and that his storage container would need to be removed. A true and accurate copy of the Board's May 2018 correspondence is attached hereto as Exhibit 8.

18.     On May 29, 2018, Mr. McCoy wrote to the Board and requested a third permit extension. A true and accurate copy of Mr. McCoy's correspondence is attached hereto as Exhibit 9.

19.     On June 12, 2018, the Board considered Mr. McCoy's request for a third extension, and denied it by unanimous vote. The Board discussed Mr. McCoy's permit history and his prior representations to the Board. There was no discussion regarding the use of the storage container for any expressive purposes, nor any mention of use as a Trump sign in 2016 and 2017. A true and accurate copy of the minutes of the June 2018 meeting are attached as Exhibit 10.

20.     During the Board's June 12, 2018, the Board also took up and considered complaints regarding three other unpermitted storage containers in Town, located at 140 Tilton Hill Road, (the "Tilton Hill Trailers") and agreed to send a Notice of Violation to the owners of the storage containers. *See* Exhibit 10 at page 7 ("Notice of Zoning Violation update").

21.     On June 13, 2018, the Board sent a notice of violation to the owners of the Tilton Hill Trailers. A true and accurate copy of the notice of violation is attached as Exhibit 11. In response, the owners of the Tilton Hill Trailers applied for and received a permit for one of their three storage containers. The other two trailers were removed. The Tilton Hill Trailers did not display any expressive content to the Town's knowledge.

22.     On June 13, 2018, I wrote to Mr. McCoy and informed him of the Board's decision, and noted the Board's reasons. A true and accurate copy of my correspondence is attached as Exhibit 12.

23.     Mr. McCoy did not appeal the Board's denial of his third permit request.

24.     The Town, in the ordinary course, sometimes receives anonymous complaints regarding storage containers and other alleged zoning violations. The Town had received an anonymous complaint regarding Mr. McCoy's trailer sometime in 2016, which was not recorded, and received a similar anonymous complaint regarding the Tilton Hill Trailers in 2018.

25.     During my tenure as Town Administrator, the Town has engaged in enforcement with respect to storage containers in instances when it has become aware of potential violations, and without regard to whether a storage container has been used for expressive purposes or not. For example, with respect to Mr. McCoy, the Town learned of an unpermitted trailer on his property in 2015 and subsequently required that he seek and obtain a permit.

26.     Ultimately, the Town did not impose any penalties or take any other enforcement actions against Mr. McCoy other than to confirm that his storage container was removed following the Board's June 2018 decision.

27.     Mr. McCoy's storage containers were known to the Town based on visual inspection of the Town's building inspector, permit applications and correspondence received from Mr. McCoy, and public testimony from Mr. McCoy. Accordingly, the Town was aware that Mr. McCoy had trailers on his property that were not grandfathered and that he needed to comply with Article 14 of the Zoning Ordinance.

28.     The Town has limited resources to dedicate toward enforcement of the storage container provisions of the zoning ordinance. It has, however, taken action against others in Town with respect to unpermitted storage containers, which were not used for expressive purposes. For example:

A. In June 2018, the Town took action with respect to the Tilton Hill Trailers as noted previously.

B. In 2019, the Town brought suit to enforce Article 14 in *Town of Pittsfield v. James Hetu, et al*, Case No. 217-2019-cv-00663, Merrimack Superior Court. This action arose following lengthy efforts to obtain compliance. A true and accurate copy of correspondence with respect to the Town's enforcement efforts is attached as Exhibit 13.

C. In the summer of 2019, the Town became aware of an unpermitted storage container at 11 Cram Avenue, issued a notice of violation, and subsequently received and approved a permit application. A true and accurate copy of the notice of violation is attached as Exhibit 14. The Town's treatment with respect to the storage container at 11 Cram Avenue is consistent with the manner in which Mr. McCoy's 2015 Permit application was received and approved.

29.     Based on my review of Mr. McCoy's permit history, and the Town's enforcement actions with respect to other properties, the following is apparent:

   a. Mr. McCoy's storage container was allowed to remain on his property far beyond the 12 month limit of the zoning ordinance, which is in excess of the time period allowed to other storage containers;

   b. The Town did not require Mr. McCoy to remove the storage container until 2018 (when it was no longer painted "Trump" on the side); and

   c. The Board's actions with respect to Mr. McCoy's storage container were consistent with the treatment of other storage containers in the Town that were

made known to the Board as needing permit approvals, and which did not feature any signs or other expressive content.

Affiant sayeth further not.


May 28, 2021

_____
Date

Cara Marston

_____
Cara Marston


STATE OF NEW HAMPSHIRE
COUNTY OF

      Before me, the undersigned officer, personally appeared the said Cara Marston, known to me or satisfactorily proven to be the person whose name is subscribed to the within instrument, and acknowledged that she executed the same for the purposes therein contained and did state under oath the within facts are true to the beset of her knowledge and belief.


Bernadette C. Theriault
Printed Name:
Notary Public Bernadette C. Theriault
My Commission Expires: 06-29-2021



8



EXHIBIT

MARSTON AFF.
EXHIBIT 1


# TOWN OF PITTSFIELD
# ZONING ORDINANCE

Adopted March 8, 1988

Most recently amended March 9, 2021

# Article 1.  General Provisions

## 1.  Title

This zoning ordinance shall be known as the "Town of Pittsfield Zoning Ordinance" and is herein called the "zoning ordinance" or just the "ordinance" where "ordinance" clearly means the zoning ordinance.

## 2.  Authority

The town meeting's authority to adopt the zoning ordinance is New Hampshire Revised Statutes Annotated RSA 674:16, Grant of Power; other enabling statutes in NH RSA; and enabling case law.

## 3.  Applicability

No person may use or authorize the use of any land or STRUCTURE except according to all applicable regulations of the zoning ordinance.

## 4.  Jurisdiction

The zoning ordinance shall be effective within the corporate boundaries of the town of Pittsfield, New Hampshire.

## 5.  Purpose

Pursuant to RSA 674:17 and RSA 674:21, VI, (a), the zoning ordinance is designed for the following purposes:

(a)   To lessen congestion in the STREETS.

(b)   To secure safety from fires, panic and other dangers.

(c)   To promote health and the general welfare.

(d)   To provide adequate light and air.

(e)   To prevent the overcrowding of land.

(f)   To avoid undue concentration of population.

(g)   To facilitate the adequate provision of transportation, solid waste facilities, water, sewerage, SCHOOLS, parks, child day care.

(h)   To assure proper use of natural resources and other public requirements.

(i)   To encourage the preservation of agricultural lands and BUILDINGS and the agricultural operations described in RSA 21:34-a supporting the agricultural lands and BUILDINGS.

(j)   To encourage the installation and use of solar, wind, or other renewable energy systems and protect access to energy sources by the regulation of orientation of STREETS, LOTS, and BUILDINGS; establishment of maximum BUILDING height, minimum SETBACK requirements, and limitations on type, height, and placement of vegetation; and encouragement of the use of solar skyspace easements under RSA 477.

(k)   To have reasonable consideration for the character of the area involved and its peculiar suitability for particular uses, to conserve the value of BUILDINGS, and to encourage the most appropriate use of land throughout the municipality.  (RSA 674:17, II.)

(l)   To accommodate reasonably amateur radio communications.  (RSA 674:17, III.)

(m)  To encourage the preservation of OPEN SPACE wherever possible.  (See RSA 674:21, VI, (a).)

**6. Administrator**

(a) The board of selectmen shall have charge of administering and enforcing the zoning ordinance except as follows:

    (1) If the zoning ordinance explicitly designates a specific administrator for a specified part of the zoning ordinance, then that administrator shall administer that part of the zoning ordinance.

    (2) The board of selectmen's charge to administer and enforce the zoning ordinance shall not interfere with any state or federal law empowering a specific administrator, for example, RSA 676:13, I, (building inspector); RSA 155-A:4, II, and RSA 155-A:7, I, (fire chief); and RSA 676:5, III, (planning board).

(b) The board of selectmen may authorize an agent to administer and enforce the zoning ordinance on the board's behalf and may revoke that authorization at any time.  Such an authorization or revocation shall be effective if and only if the board's minutes record the board's vote to authorize or revoke.

**7. Conflicting Provisions; Relationship to Other Ordinance or Regulation**

Wherever provisions of the zoning ordinance conflict, or wherever a provision of the zoning ordinance conflicts with a provision of another ordinance or regulation, the provision that imposes the greater restriction or higher standard shall control.  (RSA 676:14.)

**8. Separability**

The invalidity of any provision of the zoning ordinance shall not affect the validity of any other provision.

**9. Penalty Clause**

Any person who violates any of the provisions of this zoning ordinance, or any provision or specification of any application, plat, or plan approved by, or any requirement or condition of a permit or decision issued by, any local administrator or land use board acting under the authority of this zoning ordinance shall be guilty of a misdemeanor if a natural person, or guilty of a felony if any other person; and shall be subject to a civil penalty of $275 for the first offense, and $550 for subsequent offenses, for each day that such violation is found to continue after the conviction date or after the date on which the violator receives written notice from the municipality that the violator is in violation, whichever is earlier. Each day that a violation continues shall be a separate offense. (RSA 676:17, I; also see RSA 676:15 through RSA 676:18, Penalties and Remedies.)

**10. Mobile Home, Mobile Home Park and Trailer Park Ordinance Repealed**

The adoption of the zoning ordinance shall repeal the Mobile Home, Mobile Home Park and Trailer Park Ordinance for the Town of Pittsfield as heretofore amended.

**11. Amendment**

The zoning ordinance may be amended as provided in RSA chapter 675.

**12. Effective Date**

The zoning ordinance shall take effect immediately upon its passage.

# Article 2.  Interpretation Rules and Definitions

## 1.  Word or Phrase Interpretation Rules

(a) All words and phrases of the zoning ordinance shall be interpreted according to this section.

(b) In this section, "headword" means a word or phrase spelled in all capital letters and placed at the beginning of a definition in article 2, section 3, Definitions.

(c) If the zoning ordinance explicitly says that a word or phrase has a specific meaning to be used in a specified part of the zoning ordinance, then the word or phrase has that specific meaning throughout the specified part.

(d) If a word or phrase is a headword in article 2, section 3, Definitions, then the word or phrase has the meaning stated for it as a headword in article 2, section 3, except as provided in paragraph (c) of this section.

(e) If a word or phrase is not a headword in article 2, section 3, Definitions, then the word or phrase has the meaning stated for it in *Webster's Third New International Dictionary of the English Language, Unabridged*, Merriam-Webster, except as provided in paragraph (c) of this section.

## 2.  All-Capital-Letters Spelling of Defined Words and Phrases

All-capital-letters spelling is used to indicate that a word or phrase has the meaning stated for it as a headword in article 2, section 3, Definitions.

In this section, "headword" means a headword as defined in article 2, section 1, (b).

## 3.  Definitions

**ABUTTER:**
(a) In this definition of "ABUTTER," "street" means a street as defined in RSA 672:13.

(b) "ABUTTER" means any person whose property is located in New Hampshire and adjoins or is directly across the street or stream from the land under consideration by the local land use board. For purposes of receiving testimony only, and not for purposes of notification, the term "ABUTTER" shall include any person who is able to demonstrate that his land will be directly affected by the proposal under consideration. For purposes of receipt of notification by a municipality of a local land use board hearing, in the case of an abutting property being under a CONDOMINIUM or other collective form of ownership, the term "ABUTTER" means the officers of the collective or association, as defined in RSA 356-B:3, XXIII. For purposes of receipt of notification by a municipality of a local land use board hearing, in the case of an abutting property being under a MANUFACTURED HOUSING PARK form of ownership as defined in RSA 205-A:1, II, the term "ABUTTER" includes the MANUFACTURED HOUSING PARK owner and the tenants who own MANUFACTURED HOUSING which adjoins or is directly across the street or stream from the land under consideration by the local land use board.  (See RSA 672:3, Abutter.)

**SPECIAL EXCEPTION:** "SPECIAL EXCEPTION" has two meanings as stated in subparagraphs (a) and (b), and the context determines which meaning applies.

(a) "SPECIAL EXCEPTION" means a use permitted upon (1) certain conditions set forth in the zoning ordinance and (2) an approving authority's decision that the use satisfies those conditions.

(b) "SPECIAL EXCEPTION" means the approving authority's decision that the use defined in subparagraph (a) satisfies the conditions set forth in the zoning ordinance.

(c) In subparagraphs (a) and (b), "zoning ordinance" means the zoning ordinance excluding article 5, section 3, I, (b); article 5, section 3, V; article 5, section 4, Equitable Waiver of Dimensional Requirement; article 7, Variances; and article 17, section 12, Appeals and Variances.  These parts of the zoning ordinance state and are limited to New Hampshire state or United States federal requirements for a VARIANCE under RSA 674:33, I, (b); RSA 674:33, V; or article 17, section 12, Appeals and Variances, or for an equitable waiver of a dimensional requirement under RSA 674:33-a.

(RSA 674:33, IV; also see article 6 for SPECIAL EXCEPTION regulations.)

**STABLE:** "STABLE" means a place that houses one or more horses except that "STABLE" excludes any residence that has three or fewer horses as pets.

**STORAGE CONTAINER:** "STORAGE CONTAINER" means a truck trailer, box trailer, school bus, MANUFACTURED HOUSING unit, or similar mobile container parked continuously for 31 days or more and used principally for storage and not used for any person's residential occupancy or transient lodging.  (See article 14 for STORAGE CONTAINER permitting conditions.)

**STORY:**

(a) In this definition of "STORY," the words "attic" and "basement" have the following meanings:

  (1) "Attic" means that part of a BUILDING such that the roof frame meets the floor on opposite sides of the part of the BUILDING.

  (2) "Basement" means that part of a BUILDING such that more than one-half of the part the BUILDING vertically is below the average grade of the ground adjoining the BUILDING.

(b) "STORY" means that part of a BUILDING contained between any floor and the floor or roof next above the part of the BUILDING except that "STORY" excludes attics and basements.

**STREET:** "STREET" means either

(a) a highway as defined in RSA 229:1 or

(b) a road dedicated to the public use but not accepted by the city or town in which the road is located.

**STRUCTURE:** "STRUCTURE" means something constructed or built that has a fixed location on or in the ground or that is permanently attached to something that has a fixed location on or in the ground.

**STRUCTURE, ACCESSORY:**  See ACCESSORY STRUCTURE.

**STRUCTURE, NONCONFORMING:**  See NONCONFORMING STRUCTURE.

**STRUCTURE, PRINCIPAL:**  See PRINCIPAL STRUCTURE.

# Article 4.  Nonconforming Uses and Lots

## 1.  Authority

(a) RSA 674:19, Applicability of Zoning Ordinance:
A zoning ordinance adopted under RSA 674:16 shall not apply to existing structures or to the existing use of any building. It shall apply to any alteration of a building for use for a purpose or in a manner which is substantially different from the use to which it was put before alteration.

(b) RSA 674:39, Five-Year Exemption:
I. Every subdivision plat approved by the planning board and properly recorded in the registry of deeds and every site plan approved by the planning board and properly recorded in the registry of deeds, if recording of site plans is required by the planning board or by local regulation, shall be exempt from all subsequent changes in subdivision regulations, site plan review regulations, impact fee ordinances, and zoning ordinances adopted by any city, town, or county in which there are located unincorporated towns or unorganized places, except those regulations and ordinances which expressly protect public health standards, such as water quality and sewage treatment requirements, for a period of 5 years after the date of approval; provided that:

(a) Active and substantial development or building has begun on the site by the owner or the owner's successor in interest in accordance with the approved subdivision plat within 24 months after the date of approval, or in accordance with the terms of the approval, and, if a bond or other security to cover the costs of roads, drains, or sewers is required in connection with such approval, such bond or other security is posted with the city, town, or county in which there are located unincorporated towns or unorganized places, at the time of commencement of such development;

(b) Development remains in full compliance with the public health regulations and ordinances specified in this section; and

(c) At the time of approval and recording, the subdivision plat or site plan conforms to the subdivision regulations, site plan review regulations, and zoning ordinances then in effect at the location of such subdivision plat or site plan.

II. Once substantial completion of the improvements as shown on the subdivision plat or site plan has occurred in compliance with the approved subdivision plat or site plan or the terms of said approval or unless otherwise stipulated by the planning board, the rights of the owner or the owner's successor in interest shall vest and no subsequent changes in subdivision regulations, site plan regulations, or zoning ordinances, except impact fees adopted pursuant to RSA 674:21 and 675:2-4, shall operate to affect such improvements.

III. The planning board may, as part of its subdivision and site plan regulations or as a condition of subdivision plat or site plan approval, specify the threshold levels of work that shall constitute the following terms, with due regard to the scope and details of a particular project:

(a) "Substantial completion of the improvements as shown on the subdivision plat or site plan," for purposes of fulfilling paragraph II; and

(b) "Active and substantial development or building," for the purposes of fulfilling paragraph I.

IV. Failure of a planning board to specify by regulation or as a condition of subdivision plat or site plan approval what shall constitute "active and substantial development or building" shall entitle the subdivision plat or site plan approved by the planning board to the 5-year exemption described in paragraph I. The planning board may, for good cause, extend the 24-month period set forth in subparagraph I(a).

(c) RSA 676:12, I and VI, Certain Building Permits to Be Withheld prior to Zoning Amendments:
I. The building inspector shall not issue any building permit within the 120 days prior to the annual or special town or village district meeting if:

    (a) Application for such permit is made after the first legal notice of proposed changes in the building code or zoning ordinance has been posted pursuant to the provisions of RSA 675:7; and

    (b) The proposed changes in the building code or the zoning ordinance would, if adopted, justify refusal of such permit.

VI. The provisions of paragraph I shall not apply to any plat or application which has been the subject of notice by the planning board pursuant to RSA 676:4, I(d) prior to the first legal notice of a proposed change in a building code or zoning ordinance or any amendment thereto. No proposed subdivision or site plan review or zoning ordinance or amendment thereto shall affect a plat or application which has been the subject of notice by the planning board pursuant to RSA 676:4, I(d) so long as said plat or application was the subject of notice prior to the first legal notice of said change or amendment. The provisions of this paragraph shall also apply to proposals submitted to a planning board for design review pursuant to RSA 676:4, II(b), provided that a formal application is filed with the planning board within 12 months of the end of the design review process.

(d) RSA 155-B:2, Repair or Removal of Hazardous Building:
The governing body of any city or town may order the owner of any hazardous building within the municipality to correct the hazardous condition of such building or to raze or remove the same.

## 2. Purpose

The purposes of this article are as follows:

(a) To codify the New Hampshire state law of NONCONFORMING USES into the zoning ordinance.

(b) To encourage the discontinuance of NONCONFORMING USES.

(c) To encourage the elimination or reduction of nonconformance of NONCONFORMING LOTS.

(d) To provide for the continuance of lawfully established nonconformance if the transition to conformance is unreasonable.   (See RSA 674:19, which provides for the continuance of NONCONFORMING USES but says nothing about the development of NONCONFORMING LOTS.)

## 3. Nonconforming Uses

(a) Continuance of Nonconforming Activities:  Every NONCONFORMING ACTIVITY may continue to exist upon the following conditions:

    (1) The NONCONFORMING ACTIVITY shall not change to have a purpose, character, or effect on the neighborhood that differs substantially from the purpose, character, or effect on the neighborhood that the NONCONFORMING ACTIVITY had when it was first nonconforming.

    (2) The NONCONFORMING ACTIVITY shall not expand into any indoor or outdoor space that the NONCONFORMING ACTIVITY has not occupied as a NONCONFORMING ACTIVITY.

(3) The NONCONFORMING ACTIVITY shall not expand into any indoor or outdoor space that the NONCONFORMING ACTIVITY vacated and never reoccupied during the following two years.

(4) The NONCONFORMING ACTIVITY shall not expand so as to render premises or property proportionally less adequate.

(5) The NONCONFORMING ACTIVITY shall have no discontinuance of two years or more.

(b) Abandonment of Nonconforming Activities:  Every NONCONFORMING ACTIVITY that satisfies either of the following conditions (1) and (2) shall be deemed abandoned and shall be prohibited:

(1) The NONCONFORMING ACTIVITY shall be deemed abandoned and shall be prohibited if it violates one or more of the conditions in paragraph (a), (1) through (4), and if

(A) within 35 days after the earliest date when the zoning ordinance administrator sends the owner of the NONCONFORMING ACTIVITY a certified-mail notice of the violation, the owner has not submitted a written plan to eliminate the violation or

(B) within 95 days after the earliest date when the zoning ordinance administrator sends the owner of the NONCONFORMING ACTIVITY a certified-mail notice of the violation, the owner has not eliminated the violation.

(2) The NONCONFORMING ACTIVITY shall be deemed abandoned and shall be prohibited if it has a discontinuance of two years or more.  (See article 4, section 3, (a), (5).)

(c) Continuance of Nonconforming Structures:   Every NONCONFORMING STRUCTURE may continue to exist upon the following conditions:

(1) The NONCONFORMING STRUCTURE may be maintained or renovated and may be repaired or rebuilt after any damage if the maintenance, renovations, repairs, and rebuilding satisfy the following conditions (A) and (B):

(A) Maintenance, renovations, repairs, and rebuilding shall not give the NONCONFORMING STRUCTURE a purpose, character, or effect on the neighborhood that differs substantially from the purpose, character, or effect on the neighborhood that the NONCONFORMING STRUCTURE had when it was first nonconforming.

(B) Repairs and rebuilding after the NONCONFORMING STRUCTURE has sustained damage greater than or equal to 75% of the NONCONFORMING STRUCTURE'S PRINCIPAL FLOOR AREA shall be in substantial progress within two years after the date of the NONCONFORMING STRUCTURE'S damage.  (See article 4, section 1, (c), Vesting of Nonconforming Uses.)

(2) The NONCONFORMING STRUCTURE may have additions to its nonconforming parts if the additions satisfy the following conditions (A) through (C):

(A) The additions shall not give the NONCONFORMING STRUCTURE a purpose, character, or effect on the neighborhood that differs substantially from the purpose, character, or

effect on the neighborhood that the NONCONFORMING STRUCTURE had when it was first nonconforming.

(B) The additions in total since the NONCONFORMING STRUCTURE was first nonconforming shall not be substantial.

(C) The additions shall not render the LOT proportionally less adequate.

(3) The NONCONFORMING STRUCTURE may have additions to its conforming parts if the additions satisfy the following conditions (A) and (B):

(A) The additions shall not give the NONCONFORMING STRUCTURE a purpose, character, or effect on the neighborhood that differs substantially from the purpose, character, or effect on the neighborhood that the NONCONFORMING STRUCTURE had when it was first nonconforming.

(B) The additions shall create no nonconformance to the zoning ordinance except that an addition may create a nonconformance if the addition satisfies the conditions in subparagraph (2), for additions to nonconforming parts of the NONCONFORMING STRUCTURE.

(d) Abandonment of Nonconforming Structures: Every NONCONFORMING STRUCTURE that satisfies either of the following conditions (1) and (2) shall be deemed abandoned and shall be prohibited:

(1) The NONCONFORMING STRUCTURE shall be deemed abandoned and shall be prohibited if it violates one or more of the conditions in paragraph (c), (1), (A); paragraph (c), (2); or paragraph (c), (3), and if

(A) within 35 days after the earliest date when the zoning ordinance administrator sends the owner of the NONCONFORMING STRUCTURE a certified-mail notice of the violation, the owner has not submitted a written plan to eliminate the violation or

(B) within 95 days after the earliest date when the zoning ordinance administrator sends the owner of the NONCONFORMING STRUCTURE a certified-mail notice of the violation, the owner has not eliminated the violation.

(2) The NONCONFORMING STRUCTURE shall be deemed abandoned and shall be prohibited if it has sustained damage greater than or equal to 75% of the NONCONFORMING STRUCTURE'S PRINCIPAL FLOOR AREA and if the NONCONFORMING STRUCTURE is not in substantial rebuilding within two years after the date of the NONCONFORMING STRUCTURE'S damage.

(e) Public-Taking Not-Conforming Structures: Every lawfully existing STRUCTURE that becomes a not-conforming STRUCTURE because of an eminent-domain taking or that increases its nonconformance because of an eminent-domain taking shall be treated as a NONCONFORMING STRUCTURE under the zoning ordinance.

(f) Repair or Removal of Hazardous Buildings: Under RSA chapter 155-B, Hazardous and Dilapidated Buildings, the board of selectmen may order the owner of any hazardous building

(d) That due to the degree of past construction or investment made in ignorance of the facts constituting the violation, the cost of correction so far outweighs any public benefit to be gained, that it would be inequitable to require the violation to be corrected.

II. In lieu of the findings required by the board under subparagraphs I(a) and (b), the owner may demonstrate to the satisfaction of the board that the violation has existed for 10 years or more, and that no enforcement action, including written notice of violation, has been commenced against the violation during that time by the municipality or any person directly affected.

III. Application and hearing procedures for equitable waivers under this section shall be governed by RSA 676:5 through 7. Rehearings and appeals shall be governed by RSA 677:2 through 14.

IV. Waivers shall be granted under this section only from physical layout, mathematical or dimensional requirements, and not from use restrictions. An equitable waiver granted under this section shall not be construed as a NONCONFORMING USE, and shall not exempt future use, construction, reconstruction, or additions on the property from full compliance with the ordinance. This section shall not be construed to alter the principle that owners of land are bound by constructive knowledge of all applicable requirements. This section shall not be construed to impose upon municipal officials any duty to guarantee the correctness of plans reviewed by them or property inspected by them.
(RSA 674:33-a.)

## 5. Appeals to Board of Adjustment

I. Appeals to the board of adjustment concerning any matter within the board's powers as set forth in RSA 674:33 may be taken by any person aggrieved or by any officer, department, board, or bureau of the municipality affected by any decision of the administrative officer. Such appeal shall be taken within a reasonable time, as provided by the rules of the board, by filing with the officer from whom the appeal is taken and with the board a notice of appeal specifying the grounds thereof. The officer from whom the appeal is taken shall forthwith transmit to the board all the papers constituting the record upon which the action appealed from was taken.

II. For the purposes of this section:
(a) The "administrative officer" means any official or board who, in the municipality, has responsibility for issuing permits or certificates under the zoning ordinance, or for enforcing the ordinance, and may include a building inspector, board of selectmen, or other official or board with such responsibility.
(b) A "decision of the administrative officer" includes any decision involving construction, interpretation or application of the terms of the zoning ordinance. It does not include a discretionary decision to commence formal or informal enforcement proceedings, but does include any construction, interpretation or application of the terms of the ordinance which is implicated in such enforcement proceedings.

III. If, in the exercise of SUBDIVISION or site plan review, the planning board makes any decision or determination which is based upon the terms of the zoning ordinance, or upon any construction, interpretation, or application of the zoning ordinance, which would be appealable to the board of adjustment if it had been made by the administrative officer, then such decision may be appealed to the board of adjustment under this section; provided, however, that if the zoning ordinance contains an innovative land use control adopted pursuant to RSA 674:21 which delegates administration, including the granting of conditional or special use permits, to the planning board, then the planning

board's decision made pursuant to that delegation cannot be appealed to the board of adjustment, but may be appealed to the superior court as provided by RSA 677:15.

(RSA 676:5, I, II, and III.)

## 6. Materially Similar Applications

If (1) the board of adjustment has disapproved an application, (2) the disapproval was not appealed, (3) a subsequent application is made for a use that does not materially differ in nature and degree from its predecessor, and (4) a material change of circumstances affecting the merits of the subsequent application has not occurred, then the board may not reach the merits of the subsequent application. The applicant bears the burden of proving a material change of circumstances before the board.

## 7. Public Hearing; Notice

I. Prior to exercising its appeals powers, the board of adjustment shall hold a public hearing. Notice of the public hearing shall be given as follows:

(a) The appellant and every ABUTTER and holder of CONSERVATION, preservation, or agricultural preservation RESTRICTIONS shall be notified of the hearing by certified mail stating the time and place of the hearing, and such notice shall be given not less than 5 days before the date fixed for the hearing of the appeal. The board shall hear all ABUTTERS and holders of CONSERVATION, preservation, or agricultural preservation RESTRICTIONS desiring to submit testimony and all nonABUTTERS who can demonstrate that they are affected directly by the proposal under consideration. The board may hear such other persons as it deems appropriate.

(b) A public notice of the hearing shall be placed in a newspaper of general circulation in the area not less than 5 days before the date fixed for the hearing of the appeal.

II. The public hearing shall be held within 30 days of the receipt of the notice of appeal.

III. Any party may appear in person or by the party's agent or attorney at the hearing of an appeal.

IV. The cost of notice, whether mailed, posted, or published, shall be paid in advance by the applicant. Failure to pay such costs shall constitute valid grounds for the board to terminate further consideration and to deny the appeal without public hearing.

(RSA 676:7)

## 8. Review of Developments of Regional Impact

(a) Notice and hearing requirements of RSA 36:54 through RSA 36:58 apply to applications for DEVELOPMENTS OF potential REGIONAL IMPACT.

(b) Review Required: The board of adjustment, upon receipt of an application for development, shall review it promptly and determine whether or not the development, if approved, reasonably could be construed as having the potential for regional impact. Doubt concerning regional impact shall be resolved in a determination that the development has a potential regional impact. (RSA 36:56, I.)

## 9. Burden of Proof

On issues wherein the exercise of the board of adjustment's discretion is sought, the burden of proof is on the applicant.

**10. Issuance of Decision**

(a) The board of adjustment shall issue a final written decision which either approves or disapproves an application for a local permit and make a copy of the decision available to the applicant. If the application is not approved, the board shall provide the applicant with written reasons for the disapproval. If the application is approved with conditions, the board shall include in the written decision a detailed description of all conditions necessary to obtain final approval. (RSA 676:3, I.)

(b) Whenever the board of adjustment votes to approve or disapprove an application, the board shall set forth in its minutes of the meeting at which the vote is taken every finding of fact and every ruling of law that the board made regarding the application. If the board affirms, modifies, or reverses a decision of an administrative officer, then the board shall set forth in the minutes every reason for the affirmation, modification, or reversal. If the board approves an application for a permit, then the board shall set forth in the minutes how the application has satisfied each of the requirements for the permit. If the board disapproves an application for a permit, then the board shall set forth in the minutes every requirement for the permit that the application failed to satisfy. If the board approves an application for a permit but attaches any conditions, then the board shall set forth in the minutes every reason for each condition.

(c) Whenever the board of adjustment votes to approve or disapprove an application or deny a motion for rehearing, the minutes of the meeting at which such vote is taken, including the written decision containing the reasons therefor and all conditions of approval, shall be placed on file in the board's office and shall be made available for public inspection within 5 business days of such vote. (RSA 676:3, II.)

(d) Whenever a plat is recorded to memorialize an approval issued by the board of adjustment, the final written decision, including all conditions of approval, shall be recorded with or on the plat. (RSA 676:3, III.)

**11. Motion for Rehearing, Rehearing, and Appeal to Superior Court**

(a) Whenever a person or a municipality seeks a rehearing on or an appeal of a zoning-related order or decision, the procedures enacted under RSA chapter 677 shall be followed. (RSA 677:1.)

(b) Within 30 days after any order or decision of the zoning board of adjustment, or any decision of the local legislative body or a board of appeals in regard to its zoning, the selectmen, any party to the action or proceedings, or any person directly affected thereby may apply for a rehearing in respect to any matter determined in the action or proceeding, or covered or included in the order, specifying in the motion for rehearing the ground therefor; and the board of adjustment, a board of appeals, or the local legislative body, may grant such rehearing if in its opinion good reason therefor is stated in the motion. This 30-day time period shall be counted in calendar days beginning with the date following the date upon which the board voted to approve or disapprove the application in accordance with RSA 21:35. (RSA 677:2)

(c) A motion for rehearing made under RSA 677:2 shall set forth fully every ground upon which it is claimed that the decision or order complained of is unlawful or unreasonable. (RSA 677:3, I.) A motion for rehearing is a prerequisite for an appeal to the superior court. (RSA 677:3, I.)

(d) Upon the filing of a motion for a rehearing, the board of adjustment, a board of appeals, or the local legislative body shall within 30 days either grant or deny the application, or suspend the order or decision complained of pending further consideration. (RSA 677:3, II.)

(e) If the board grants a rehearing, and if any new basis for aggrievement results from the rehearing, then a subsequent motion for rehearing that raises any new issues that are thrust upon the appealing party is necessary to preserve the new issues for an appeal to the superior court.

(f) Any person aggrieved by any order or decision of the zoning board of adjustment or any decision of the local legislative body may apply, by petition, to the superior court within 30 days after the date upon which the board voted to deny the motion for rehearing. For purposes of this paragraph, "person aggrieved" includes any party entitled to request a rehearing under RSA 677:2.  (RSA 677:4)

# Article 9.  Signs

## 1.  Authority
RSA 674:16, I, (d); RSA 674:16, V; and RSA 674:17.

## 2.  Purpose
The purposes of these sign regulations are as follows:

(a)  To protect the public from distracting and hazardous signs.  (See RSA 674:17, I, (b) ("To secure safety from fires, panic and other dangers") and RSA 674:17, I, (c) ("To promote health and the general welfare").)

(b)  To promote the general welfare by protecting the aesthetics of the town.  (See RSA 674:17, I, (c).)

## 3.  Definitions
In this article, the following terms have the following meanings:

"Animate" means to depict something moving except that "animate" excludes
(a)  depicting moving text and
(b)  sequentially displaying the letters "O," "P," "E," and "N."

"Flash" means to maintain an artificially illuminated display constant for more than .015 seconds and less than 3 minutes except that "flash" excludes
(a)  maintaining a display of text constant for 3 seconds or longer,
(b)  depicting moving text, and
(c)  sequentially displaying the letters "O," "P," "E," and "N."
The purpose of the .015-second constant-display time is to specify a constant-display time at which the human eye sees an illuminated display as not flickering.

## 4.  Permitting Conditions for Outdoor Signs
Except as provided in article 4, section 3, Nonconforming Uses, every outdoor sign shall be permitted upon the following conditions and upon all other applicable conditions in the zoning ordinance:
(a) Prohibited Signs:  The sign shall not animate, flash, or emit sound.
(b) The sign and its illuminator, if any, shall not interfere with pedestrian or vehicular traffic or be confused with or obstruct the view or effectiveness of any official traffic signal or traffic marking.
(c) The source of lighting for every sign artificially illuminated by an external source shall be mounted and shielded so that the lighting is confined to the area of the sign and so that the light source is not visible three feet above grade at the boundary of adjoining property, including adjoining STREETS.
(d) Brightness:  The luminance of the source of lighting for every artificially illuminated sign shall be less than or equal to 230 candelas per square meter as measured at the brightest area on the face of the sign.  (See Freyssinier, J.P., N. Narendran, and J.D. Bullough. 2006. Luminance requirements for lighted signage. *Sixth International Conference on Solid State Lighting, Proceedings of SPIE* 6337, 63371M.)

# Article 14.  Storage Containers

### 1.  Authority
RSA 674:16, I, (d); RSA 674:16, V; and RSA 674:17.

### 2.  Purpose
The purpose of these STORAGE CONTAINER regulations is to promote the general welfare by protecting the aesthetics of the town.
(See RSA 674:17, I, (c).)

### 3.  Permitting Conditions for Storage Containers
Except as provided in article 4, section 3, Nonconforming Uses, every STORAGE CONTAINER shall be permitted upon the following conditions and upon all other applicable conditions in the zoning ordinance:

(a) The STORAGE CONTAINER shall be used for and only for storage.

(b) The STORAGE CONTAINER shall have a SETBACK from every STREET boundary or INTERIOR LOT LINE which SETBACK is greater than or equal to the minimum SETBACK specified for the STREET boundary or INTERIOR LOT LINE by article 3, section 4, (h), Table of Dimensional Requirements.

(c) No more than one STORAGE CONTAINER shall be on the LOT if the LOT is in the Urban District, the Suburban District, or the Rural District.

(d) No more than two STORAGE CONTAINERS shall be on the LOT if the LOT is in the Commercial District or the Light Industrial/Commercial District.

(e) The sum of the time during which one or more STORAGE CONTAINERS are on any one LOT during any 15-month period shall be no more than 12 months.

(f) The owner of the LOT where the STORAGE CONTAINER will be put shall tell the zoning ordinance administrator the date when the STORAGE CONTAINER is proposed to be put on the LOT.  The zoning ordinance administrator shall issue a permit for the STORAGE CONTAINER, and the permit shall state the date when the STORAGE CONTAINER is proposed to be put on the LOT.



**EXHIBIT**

MARSTON AFF.
EXHIBIT 2

# TOWN OF PITTSFIELD
# NEW HAMPSHIRE

## PERMIT
## FOR STORAGE CONTAINERS

(STORAGE CONTAINERS: Shall mean, any truck trailer, box trailer, school bus, mobile home or other similar facility used for storage or other purposes).

Storage Containers, whether registered or not, whether mobile or stationery, are not allowed on a permanent basis in any zoning district within the Town of Pittsfield. A storage container is permitted for storage purposes only, for a period of one year, with the approval of a parking permit issued by the Board of Selectmen or their designee, provided said storage container meets all setback requirements, and as limited by the following; a) maximum of one storage container per lot in the Urban, Suburban or Rural Districts, b) maximum of two storage containers per lot in the Light Industrial/Commercial Districts.

APPLICANTS NAME: ___Joseph McCoy___

APPLICANTS ADDRESS: ___322 Catamount Rd.___

APPLICANTS TELEPHONE NUMBER: ___603-435-5050___

LOCATION OF STORAGE UNIT: TAX MAP & LOT NUMBER: ___R23-02-01___

ZONING DISTRICT: ___RURAL___

SERIAL NUMBER OF STORAGE CONTAINER: ___1H2VO45 23 EB01980 1___

MAKE AND MANUFACTURER OF CONTAINER: ___FP8-F2-45 FRUEHAUF___

SIGNATURE OF APPLICANT: ___Joseph E McCoy___

DATE STORAGE USE IS TO BEGIN: ___Sept. 1, 2015___

APPROVED: DATE: ___9-1-15___

Board of Selectmen

Unit must be removed one year from the approved date above.



**EXHIBIT**

tabbies

MARSTON AFF.
EXHIBIT 3

## Office of Code Enforcement

TOWN OF PITTSFIELD
**Town Hall, 85 Main Street**
**Pittsfield, New Hampshire**

### NOTICE OF VIOLATION

Dear Mr., Joseph Mc Coy

The property located at 322 Catamount Rd Pittsfield NH 03263, identified in the Town Tax Records as Map R23, Lot 02-01, and owned/occupied by you, your permit for a storage trailer has expired on September 1, 2016 and the trailers need to be removed according to our Zoning Ordinance article 14 section 3.

Your immediate attention to this matter is appreciated.

If you believe the Building Inspector is in error in the application or interpretation of any provision of the Building codes, you have the right to appeal to the Zoning Board of Appeals in a timely fashion. This stop work Order controls unless and until it is overturned by the Zoning Board of Appeals.

Thank you
Jesse Pacheco
Building Inspector

OFFICE 603-435-6774          FAX:603-435-7922          CELL:603-715-6624

Nov. 3, 2016

EXHIBIT
MARSTON AFF.
EXHIBIT 4

To: Jesse Pacheco,

Hello,

I am writing in regards to seeking a 6 month extension for my trailer on my Property located at 322 Catamount Rd.

At the present, i have construction going on, my garage is leaking from the inside and it needs emergency work which will take me several months to fix. I am disabled with just one working leg, and have to take care of every thing myself, and this has already been started. I will remove one trailer by the end of November. The other i will be dealing with over the cold winter months and will have it emptied and removed by the end of April 2017.

I am asking for this 6 month extention inorder to keep my tools and materials inside this trailer while i deal with this emergency construction situation inorder to keep things out of the winter outside elements. It will be taken care of and i am sorry for the delay, but i am physcially handicapped, and will complete this task inorder to remain with good standards for this town and it's rules as a Pittsfield home owner.

Thank you For Your Time.
Sincerely,
Joseph McCoy

**Cara Marston**

**EXHIBIT**

MARSTON AFF.
EXHIBIT 5

| | |
|---|---|
| **From:** | Bonnie Theriault |
| **Sent:** | Wednesday, May 17, 2017 5:40 PM |
| **To:** | Cara Marston |
| **Subject:** | RE: Office stuff |

Jesse has left already and I'll let Mr. McCoy know tomorrow.

Bonnie

**From:** Cara Marston
**Sent:** Wednesday, May 17, 2017 5:14 PM
**To:** Bonnie Theriault
**Subject:** Re: Office stuff

McCoy can put his request in writing
Jesse can call my cell if he's still there

Cara M. Marston
Town Administrator
Town of Pittsfield
85 Main Street
Pittsfield, New Hampshire 03263
office 603.435.6773 x20
fax 603.435.7922 (yup, still have one, for nostalgic purposes)

Sent from my iPhone

On May 17, 2017, at 16:51, Bonnie Theriault <btheriault@pittsfieldnh.gov> wrote:

Hi there,

I hope you are having a fun afternoon. Sorry to bug you but Jesse was in and stated that he has to speak to you about the junkyard, and he'd like to talk with you before he calls Chairman Allard. He indicated that it was something he wanted to do as soon as possible. I explained that you would be in tomorrow but it appears that he wanted to speak with you right then. I told him I'd let you know.

Also, Joseph McCoy 435-5050 wants to get on the agenda for Tuesday night. Jesse had gone to his property regarding the storage container and he wants to speak to the Board about it this week. I advised Mr. McCoy that I had to check to see if there were any scheduled appointments first, and we'd get back to him tomorrow about his request. Shortly after that call, Jesse came in and asked if Mr. McCoy had called, and I explained what I told Mr. McCoy.

So, anyway, I hope you continue to have fun if you can, and I'll see you tomorrow.

Bonnie

Bonnie Theriault
Administrative Assistant



**TOWN OF PITTSFIELD**
**BOARD OF SELECTMEN**
**TOWN HALL, 85 MAIN STREET**
**PITTSFIELD, NH  03263**



MEETING MINUTES OF Tuesday June 13, 2017

**CALL TO ORDER**
Call to order at 6:06 p.m. by J.C. Allard, Chairman

**MEMBERS PRESENT**
J.C. Allard, Chairman
Gerard LeDuc, Vice-Chairman
Carole Richardson
Carl Anderson

**MEMBERS ABSENT**
None

**OTHERS PRESENT**
Cara Marston, Town Administrator
Ammy Ramsey, Recording Secretary

**PUBLIC INPUT** – regarding agenda items only

Dan Schroth would like to make an appointment with Cara to talk with her about putting together a petition article about getting rid of the Building Inspector position, Cara and Dan will meet tomorrow at 11 a.m.

**AGENDA REVIEW**
Gerard: None.
Carole: None.
Carl: None.
J.C.: None.

**NEW BUSINESS**

**ACTION ITEMS**
1. Interviews for vacant position on Board of Selectmen – 4 candidates
J.C. informed the public that the first item under new business is to conduct interviews and it may take some time to get through the process. Due to circumstances out of anyone's control this board finds itself with the requirement of standing in for the voters of Pittsfield to choose another member for the selectboard. We are going to do that item of great

8. Storage Container Permit extension concern – 322 Catamount Road (tabled 5/23/17)
Mr. McCoy stated that they originally got the permit in 2015, he went to Jesse to get an extension because they have found out their deck, and porch is rotted. They are requesting an extension because he is doing the work himself and is handicapped and it is taking them more time then expected to do all the repairs needed. So he is asking the board to grant a one year extension. J.C. asked if there was an issue with extending the permit. Cara stated that our Zoning Ordinance states it shall not be no more than 12 months. J.C. asked if this should go to the Zoning Board. Carl asked why this matter is in front of them. Cara explained that the selectboard are the administrators of the ordinance. Cara also expressed to the board that Mr. McCoy is here trying to do the right thing and if you look around town there are storage trailers on properties that may not have a permit. Mr. McCoy stated that Jesse collected $25.00 cash from him for the permit but later found out the there is no permit. Jesse also stated to him that they have no choice and must get rid of the trailer, when there are multiple trailers all over town that have been there for a long time. Carole asked if they have had the trailer for one year and now would like to have it there for another year and after that it will be gone. Mr. McCoy stated that they want to get rid of it but just need more time to do the work needed on their home.

Carole: I make a motion to extend the permit for one year.
Gerard: Second.
Discussion: None.
Motion carries 4-0

Cara will print out another permit and have everyone sign it.

**CHECK MANIFESTS**
1. Accounts Payable
Gerard: I make a motion to approve Accounts Payable.
Carl: Second.
Discussion: None.
Motion carries 4-0

2. Payroll
Gerard: I make a motion to approve Payroll and Direct Deposit.
Carl: Second.
Discussion: None.
Motion carries 4-0

**MINUTES**
1. May 23, 2017 – Public Meeting Minutes
Gerard: I make a motion to approve the May 23, 2017 Public Meeting Minutes.
Carl: Second.
Discussion: Carole has a few grammatical corrections and will give those to Ammy.
Motion carries 4-0

Motion carries 4-0 roll call was done and all approved.

The Board came out of non-public session at 9:09 p.m.

Gerard: I make a motion to seal the non-public minutes as they may affect adversely the reputation of any person other than a member of this board.
Carl: Second.
Discussion: None.
Motion carries 4-0 roll call (2/3 vote) was done and all approved.

Gerard: I make a motion to adjourn.
Carl: Second.
Discussion: None.
Motion carries 4-0

Approved:

_____        _____
J.C. Allard, Chairman                      Date



**EXHIBIT**

MARSTON AFF.
EXHIBIT 7

# TOWN OF PITTSFIELD
# NEW HAMPSHIRE

## PERMIT
## FOR STORAGE CONTAINERS

(STORAGE CONTAINERS: Shall mean, any truck trailer, box trailer, school bus, mobile home or other similar facility used for storage or other purposes).

Storage Containers, whether registered or not, whether mobile or stationery, are not allowed on a permanent basis in any zoning district within the Town of Pittsfield. A storage container is permitted for storage purposes only, for a period of one year, with the approval of a parking permit issued by the Board of Selectmen or their designee, provided said storage container meets all setback requirements, and as limited by the following; a) maximum of one storage container per lot in the Urban, Suburban or Rural Districts. b) maximum of two storage containers per lot in the Light Industrial/Commercial Districts.

APPLICANTS NAME: Joseph McCoy

APPLICANTS ADDRESS: 322 Catamount Rd.

APPLICANTS TELEPHONE NUMBER: (603) 435-5050

LOCATION OF STORAGE UNIT: TAX MAP & LOT NUMBER: R23-2-1

ZONING DISTRICT: Rural

SERIAL NUMBER OF STORAGE CONTAINER: 1H2V045238B01901

MAKE AND MANUFACTURER OF CONTAINER: FP8-5245 - FRUACHAUF

SIGNATURE OF APPLICANT: Joseph McCoy

DATE STORAGE USE IS TO BEGIN: 6-13-2017

APPROVED DATE: June 13, 2017

Board of Selectmen

Unit must be removed one year from the approved date above



# TOWN OF PITTSFIELD

Office of Selectmen
85 Main Street, Pittsfield NH 03263
admin@pittsfieldnh.gov ~ telephone (603) 435-6773 ~ fax (603



May 22, 2018

Joseph E. McCoy
322 Catamount Road
Pittsfield, NH 03263

Re: storage container permit expiration

Dear Mr. McCoy,

As you know, the storage trailer permit that the Board of Selectmen approved two years ago and extended at your request last June is due to expire next month.

Please consider this letter a friendly reminder that the trailer must be removed from the property for at least a three month period before you can apply for another permit to bring it back.

Thank you in advance for your anticipated cooperation.

Sincerely,

Pittsfield Board of Selectmen

RECEIVED
MAY 2018
Town of
Pittsfield, NH

EXHIBIT
MARSTON AFF.
EXHIBIT 9

May 29, 2018

Dear Board Members,

This concerns a storage trailer located on my property at 322 Catamount Rd. Pittsfield

Last june, 2017, i came to your meeting, i had 2 trailors to unload and remove, as requested. I've emptied and removed 1 so far and it's not an easy task. I am disabled with 1 working leg to move on and now that the weather has changed i am in the process of unloading the second. This will take more time, when i bought my home in pittsfield i had a huge ammount of belongings which came with me so i am asking for another permit inorder to accomplish this huge task.

I am crippled so it cannot be done easily.

Please let me know, or, set aside a time to discuss this further at your next meeting.

Thank you

Joseph McCoy

322 Catamount Rd.
P.O. Box 293
Pittsfield. N.H. 03263



**TOWN OF PITTSFIELD**
**BOARD OF SELECTMEN**
**TOWN HALL, 85 MAIN STREET**
**PITTSFIELD, NH 03263**



**EXHIBIT**
MARSTON AFF.
EXHIBIT 10

**MEETING MINUTES OF Tuesday June 12, 2018**

**CALL TO ORDER**
Call to order at 6:02 p.m. by J.C. Allard, Chairman

**MEMBERS PRESENT**
J.C. Allard, Chairman
Gerard LeDuc, Vice-Chairman
Carole Richardson
Carl Anderson
James Adams

**OTHERS PRESENT**
Cara Hayes, Town Administrator
Ammy Ramsey, Recording Secretary

**PUBLIC INPUT** – regarding agenda items only
There was no input.

**AGENDA REVIEW**
Gerard: None.
Jim: None.
Carole: Action item for police
J.C.: Action item for the CDC
Carl: Action items for Zoning Administrator

**APPOINTMENTS**
6:05 p.m. – Central NH Regional Planning Commission – Brownfield's project update
Mike Tardiff from the Central NH Regional Planning commission presented the board with some photos of some properties between Clark Street and Broadway and then described the status of the Brownfield's project and the potential of the program going forward for the town of Pittsfield. Mike explained the history of the program and that it assesses properties that have potential environmental issues and what it would take to get those properties redeveloped. Steve Rickerich, the consulting engineer with Ransom Consulting, was also present. He explained the steps of the environmental work that is involved in this project. The Central NH RPC has funded this project's environmental work through two grants that the RPC received and have designated to Pittsfield. In the next few months as

the project moves forward Tardiff will contact the Community Development Committee to keep them updated, too.

6:15 p.m. – Jay St. Jean Auctioneers – sale of tax deeded land – Map R4 Lots 1-1, 1-6, & 1-7
J.C. announced the appointment and Jay St. Jean presented the board with packets of information regarding their auction services. They believe that the 3 properties could sell for around 8 to 10 thousand dollars each. Carl inquired about the payment for their services if the properties do not sell. St. Jean explained the fee structure and how costs would be split between the purchaser and the seller.

## NEW BUSINESS

## DEPARTMENT UPDATES
1. **Police Department**
Acting Chief Collins updated the board with the hiring process, informed them of paperwork that needed to be filed with the Police Standards & Training regarding his hiring, and confirmed with the board to continue the coverage as it has been.

Carl: I make a motion to continue with having reduced coverage for 20 hours a week until June 26, 2018.
Jim: Second.
Discussion: None.
Motion carries 5-0

Carl inquired about the status of Officer Wood. Acting Chief Collins requested tabling the resignation until he gets a chance to talk with him.  They also discussed some details concerning the membership in the Central NH Special Operations Unit, if there was an annual agreement that needed signing or not.  Both Collins and DiGeorge were of the understanding that the agreement was signed upon joining as a member for coverage, not annually.

## ADDED ITEM – ALL NIGHT PARKING BAN
Carole inquired about the parking ban and would like to remove the ban.

Carole: I make a motion to remove the parking ban.
Carl: Second.
Discussion: The board discussed the issues with the policy and the reasons why it was done and the reasons they should consider removing the ban and also the impact it would have for the winter parking ban. The board inquired with George and Acting Chief Collins concerning their opinions, George feels it is a good idea to have the parking ban and Acting Chief Collins stated he has not had a chance to observe situations and did not feel comfortable giving an opinion either way.  Carl suggested removing the ban and look at the entire ordinance and talk with George and Acting Chief Collins in the fall.  Gerard stated he feels it is important to have because he sees what happens in town at night.
Motion 4-1. Gerard opposes.

ACTION ITEMS

1. CWS Fence & Guardrail quote – 2018 Tilton Hill Road project

J.C. announced item number 1, and inquired with George on the details. George explained the situation and the details on where the guardrail will be placed and the reasons why the rails are needed.

Carl: I make a motion to approve the CWS Fence & Guardrail quote for the 2018 Tilton Hill Road project.
Jim: Second.
Discussion: None.
Motion carries 5-0

ADDED ITEM – TEMPORARY, SEASONAL PART TIME HIRE

George expressed his concern about being shorthanded because of the employee that is out on workman's comp and stated he spoke with Ammy and she is willing to help for the summer months. There was discussion pertaining to hours she is available to work and a wage and how it will be funded from the budget.

Carl: I make a motion to hire Ammy Ramsey temporary and part time as a Light Equipment Operator at $16.00 an hour starting now until August 31, 2018.
Carole: Second.
Discussion: The total hours across town positions was discussed regarding overtime and full time status. This assignment is temporary, just to assist the highway department get the paving projects completed as there is a highway worker out on workers compensation leave.
Motion carries 5-0

2. Summer 2018 F.B. Argue Recreation Area seasonal part time hiring – substitute director

Carl: I make a motion to appoint Donna Keeley as the substitute director of the F.B. Argue Recreation Area.
Gerard: Second.
Discussion: None.
Motion carries 5-0

3. Website Committee appointment request – Ryan Wood

Carole: I make a motion to appoint Ryan Wood to the Website Committee.
Jim: Second.
Discussion: None.
Motion carries 5-0

4. Resignation – Patrol Officer Donald Wood

J.C. announced item number 4.
Gerard: I make a motion to table the resignation of Patrol Officer Donald Wood until the next meeting.
Carl: Second.

Discussion: None.
Motion carries 5-0

### 5. Community Development Committee resignation – Roland Carter

Gerard: I make a motion to accept the resignation of Roland Carter from the Community Development Committee.
Carl: Second.
Discussion: Gerard stated Roland is selling his home and Jim stated we should send out a letter of thanks for all his work.
Motion carries 5-0

### 6. Application for District Nursing Scholarship

J.C. announced item number 6. Carole confirmed that there is just one applicant.

Carole: I make a motion to approve the applicant for the District Nursing Scholarship.
Jim: Second.
Discussion: None.
Motion carries 5-0

### 7. Donation to Conservation Commission Fund – $2,000.00, Chris Hill

J.C. announced item number 7.

Gerard: I make a motion to accept the donation of $2,000.00 for the Conservation Commission fund from Chris Hill.
Jim: Second.
Discussion: Carl stated we should send a letter of thanks.
Motion carries 5-0

### 8. Fee Waiver request for BCEP Solid Waste District – Lyman Park

J.C. announced item number 8. Cara stated they are requesting a waiver because in the past the person that emptied the trash separated it but now with the nature of waste of the trash they are not able to safely separate the trash, which they then have to pay to get rid of the trash.

Carl: I make a motion to approve the Fee Waiver for BCEP for the caretakers of Lyman Park.
Carole: Second.
Discussion:
Motion carries 4-1 Gerard opposes

### 9. Request for Storage Container permit extension – 322 Catamount Road

There was some discussion pertaining to the last extension that was granted and the enforcement process going forward.

Carl: I make a motion to deny the extension request for the Storage Container Permit.
Jim: Second.

Discussion: Gerard stated we need to keep the man at his word.
Motion carries 5-0

The board discussed the terms of the letter and agreed to give them 30 days to remove the trailer.

### 10. Permission for Historical Society to apply to Planning Board
Clayton Wood stated the Historical Society would need a letter of approval from the property owner to speak to the Planning Board regarding their proposal of the relocation of the Society to the Washington House Lot.

Carl: I make a motion to approve the Historical Society to apply to the Planning Board.
Carole: Second.
Discussion: None.
Motion carries 5-0

### 11. Old Home Day application for Parade Permit – July 14, 2018
Carole: I make a motion to approve the Parade Permit for the Old Home Day Parade on July 14, 2018.
Jim: Second
Discussion: None.
Motion carries 5-0

### 12. Balloon Rally Fireworks contract – Atlas Fireworks
Jim: I make a motion to approve the Atlas Fireworks Balloon Rally Fireworks contract.
Carl: Second.
Discussion: Cara noted the recommended change from the insurance company.
Motion carries 5-0

### 13. Eversource BTLA appeals – consideration of legal counsel
Cara stated she sent out the information to Serge and he recommended Attorney Bolt and he would confer with him for contract terms.

Carl: I make a motion to approve Matt Serge to coordinate with Attorney Christopher Boldt from Donahue, Tucker and Ciandella to represent Pittsfield in the BTLA appeal.
Jim: Second.
Discussion:  Carole confirmed that they are voting to have Serge find out the cost and then come to us.
Motion carries 5-0

### 14.  NH E 9-1-1 Data Operations Liaison renewal
Cara stated the liaisons are currently her and Bonnie.
Carl: I make a motion to appoint Cara Hayes and Bernadette Theriault as the 911 Data Operations Liaisons.
Gerard: Second.

Discussion: None.
Motion carries 5-0
## 15. Notice of Intent to Excavate – Map R48 Lot 2
Carl: I make a motion to approve the Intent to Excavate for Map R48 Lot 2.
Carole: Second
Discussion: None.
Motion carries 5-0

## 16. Notice of Intent to Cut Timber – Map R42 Lot 8
Carl: I make a motion to approve the Intent to Cut Timber for Map R42 Lot 8.
Carole: Second.
Discussion: None.
Motion carries 5-0

## 17. Application for Solar Exemption – Map R7 Lot 1-5
Cara explained that this was approved at town meeting in 2016 and it is an exemption for the value of the solar equipment only (to have no property tax impact).

Carl: I make a motion to approve the application for Solar Exemption.
Gerard: Second.
Discussion: None.
Motion carries 5-0

## 18. Funds Transfer – 2018 appropriations to capital reserve and expendable trust funds
J.C. announced item number 18.

Gerard: I make a motion to approve the fund transfer of the 2018 appropriations to the capital reserve and expendable trust funds.
Jim: Second.
Discussion: None.
Motion carries 5-0

## 19. Funds Transfer – perpetual care for lots sold in Floral Park Cemetery
Carole: I make a motion to transfer funds to perpetual care for lots sold in Floral Park Cemetery.
Jim: Second.
Discussion: None.
Motion carries 5-0

## ADDED ITEM – COMMUNITY DEVELOPMENT COMMITTEE – FIRST IMPRESSIONS PROGRAM
J.C. explained that they have come to an agreement with the town of Tilton regarding the First Impressions Program and explained those details. This memorandum states that the town of Pittsfield and the town of Tilton will look at the other community and give some feedback.

Carl: I make a motion to approve J.C., Cara Hayes, and Louie Houle to sign the memorandum.
Carole: Second.
Discussion: None.
Motion carries 5-0

### ADDED ITEM - Zoning Administrator Deputy

Carl explained he will be on vacation and the Zoning Administrator duties should be covered and would suggest appointing a person as the deputy for not just this instance but also when he is not available to give a timely response.

Carl: I make a motion to appoint J.C. Allard as Deputy Zoning Administrator.
Jim: Second.
Discussion: None.
Motion carries 4-1 J.C. abstains

### ADDED ITEM - Donation of building supplies for the barn at the library

Carl stated that in trying to button up the barn at the library with Clayton Wood and Daren Nielsen and he purchased some supplies to get the job accomplished. Carl stated the job can be completed after some more materials are purchased. He would like a motion to accept the materials as a donation. Jim inquired about the dollar amount and Carl stated not more than $50.00.

Jim: I make a motion to accept the donation of materials needed to seal up the barn at the library.
Carole: Second.
Discussion: None.
Motion carries 5-0

### ADDED ITEM - Junkyard license renewals

Carl would like to be proactive with the junkyard licenses around town and suggests sending a letter of notice of the requirements that need to be done before their license expires to get the process started. It was decided to send out those letters and there was some discussion pertaining to some details on what those letters should contain.

### ADDED ITEM - Notice of Zoning Violation update

Carl stated a Notice of Zoning Violation is going to be sent to 140 Tilton Hill Road and gave some details on what the property owners can have for storage trailers.

Carl: I make a motion to send the Notice of Violation to 140 Tilton Hill Road.
Jim: Second.
Discussion: None.
Motion carries 5-0

**ADDED ITEM - Zoning Violation for excessive junk in the yard**

Cara stated that a Notice of Zoning Violation should be sent for a property because she received a complaint concerning excessive debris in the yard. It was decided to put that on the next agenda.

**ADDED ITEM - 33 Main Street purchase and sale agreement extension**

Carl stated that they received a request from Mr. Gamble to extend the purchase and sales agreement for 33 Main Street. There was some discussion pertaining to the details on the reason.

Jim: I make a motion to extend the purchase and sales agreement for 33 Main Street for 30 days.
Carole: Second.
Discussion: None.
Motion carries 5-0

**27. Signing of the Collective Barging Agreement for Teamsters Local #633**

J.C.: I make a motion to approve and sign the Collective Bargaining Agreement with the teamsters union as approved at 2018 town meeting.
Carl: Second.
Discussion: None.
Motion carries 5-0

**COMMITTEE REPORTS**

Gerard stated that BCEP will be changing the rates to 10 cents a pound from 7 cents.

Carl stated that the selectboard will be receiving a letter concerning the septic system at JNR Automotive and gave some details concerning the issue.

**INFORMATION ITEMS**

2. Letter of Commendation – Sergeant DiGeorge

J.C. announced that Sgt. DiGeorge received a letter of commendation and Sgt. DiGeorge explained the story and also informed the board about 2 other circumstances that may receive a letter, as well. Carole read both letters and Sgt. DiGeorge received an applause from all who attended the meeting. The board stated that the town of Pittsfield is honored and proud to have such a heroic member of the police department. Jim stated he will work on finding out where to send these types of letters to the Red Cross to have Sgt. DiGeorge recognized.

**OLD BUSINESS**

2. Josiah Carpenter Library chimney repair (tabled 4/24/2018)

Carl gave an update on the chimney repair, and stated they received a proposal and suggested that we continue to look for someone who will just repoint the chimney.

3. Historical Society public hearing request – relocation of Society headquarters (pending 4/24/2018)
It was decided to schedule the public hearings for the July meetings.

**CHECK MANIFESTS**
1. Accounts Payable
Gerard: I make a motion to approve Accounts Payable.
Carl: Second.
Discussion: None.
Motion carries 5-0

2. Payroll
Gerard: I make a motion to approve Payroll and Direct Deposit.
Carl: Second.
Discussion: None.
Motion carries 5-0

**MINUTES**
1. May 8, 2018 – Non Public Session Minutes (tabled 5/22/2018)

2. May 20, 2018 – Public Session Minutes
Gerard: I make a motion to table the May 20, 2018 Public Meeting Minutes.
Carl: Second.
Discussion:
Motion

3. May 20, 2018 – Non Public Session Minutes
Gerard: I make a motion to table the May 20, 2018 Non-Public Meeting Minutes.
Carl: Second.
Discussion: None.
Motion carries 5-0

4. May 22, 2018 – Public Session Minutes
Gerard: I make a motion to approve the May 22, 2018 Public Meeting Minutes.
Carl: Second.
Discussion: None.
Motion carries 5-0

5. June 2, 2018 – Public Session Minutes
Gerard: I make a motion to approve the June 2, 2018 minutes with corrections of the date and time.
Carl: Second.
Discussion: None.
Motion carries 5-0

**PUBLIC INPUT**

Adam Gauthier would like to remind the board about the meeting tomorrow night concerning school funding and gave some details on what will be discussed. He encourages everyone to come out. Adam also inquired about Atlantic Broadband taking over Metrocast and if that would affect the lines in Pittsfield and Cara explained that the cable franchise is currently on an extended contract agreement until either party requests to open the terms.

**NON-PUBLIC SESSION**

Gerard: I make a motion to go into Non-Public Session under RSA 91-A:3, II (d).
Jim: Second.
Discussion: None - Roll call was done and all approved.

When the Board returned to public session Gerard made a motion to seal the non-public minutes as they may affect adversely the reputation of any person other than a member of this board. Carole seconded the motion.

Motion carries with a 5-0 roll call (2/3 achieved) vote, all approved.

Carl: I make a motion to approve Jay St. Jean Auctioneers to auction the tax deeded properties R4 Lots 1-1, 1-6, & 1-7.
Jim: Second.
Discussion: None.
Motion carries 5-0

Carl: I make a motion to adjourn.
Carole: Second.
Discussion: None.
Motion carries 5-0

Approved:

_James C. Allard, Chairman_     _10 July 2018_
James C. Allard, Chairman        Date



# TOWN OF PITTSFIELD

Office of Selectmen
85 Main Street, Pittsfield NH 03263
admin@pittsfieldnh.gov ~ telephone (603) 435-6773 ~ fax (603) 435-7922



## NOTICE OF ZONING VIOLATION

June 12, 2018

mailed certified mail
and FIRST CLASS MAIL

Diane Dipoto
140 Tilton Hill Road
Pittsfield, NH 03263

notice of violation at:
140 Tilton Hill Road
Map R15 Lot 10

Dear Ms. Dipoto,

It has been brought to the attention of this office that zoning violations exist at your property, 140 Tilton Hill Road.

### VIOLATION

three unpermitted storage trailers on property
Pittsfield Zoning Ordinance – Article# 14. Storage Containers

### CORRECTIVE ACTION NEEDED

remove trailers or submit application for storage container permit(s)

### RIGHT TO APPEAL

This notice is a decision of the Zoning Ordinance Administrator and may be appealed to the Zoning Board of Adjustment in accordance with the provisions of the Pittsfield Zoning Ordinance Article 5, Section 5. Appeals to the Board of Adjustment, provided that such appeal is filed within thirty days of the date of this decision, per NH RSA 676:5 and the Pittsfield Zoning Board of Adjustment's Rules of Procedure.

### PENALTIES & FEES

Please be advised that violations of the provisions of the Pittsfield Zoning Ordinance include civil penalties of $275 for the first offense, and $550 for subsequent offences, for each day such violation is found to continue after the conviction date or after the date on which the violator received written notice, whichever is earlier, with each day that the violation continues being considered as a separate offense, as further described in Article 1, Section 9. Penalty Clause.

This correspondence serves as a formal notice of a zoning violation. You have 30 days notice from the receipt of this notice to cure this violation. In the event that the violations are not cured or remedied as provided for in this notice, the Town will pursue enforcement of the violations as provided for by law.

Should you have any questions please contact the Selectmen's Office at the contact information listed above.

Sincerely,

Pittsfield Board of Selectmen



**OFFICE OF SELECTMEN**
85 Main Street
Pittsfield, NH 03263-0098

NEOPOST
06/13/2018
US POSTAGE $000.47⁰

ZIP 03263
041M11290780

Diane Dipoto
140 Tilton Hill Road
Pittsfield, NH 03263

Dear Ms. Dipoto,



CERTIFIED MAIL

91 7199 9991 7034 2973 3008

91 7199 9991 7034 2973 3008

**OFFICE OF SELECTMEN**
85 Main Street
Pittsfield, NH 03263-0098

NEOPOST
06/13/2018
US POSTAGE $003.92⁰

ZIP 03263
041M11290780

Diane Dipoto
140 Tilton Hill Road
Pittsfield, NH 03263

Dear Ms. Dipoto,



# Town of Pittsfield

Office of Selectmen
85 Main Street, Pittsfield NH 03263
admin@pittsfieldnh.gov ~ telephone (603) 435-6773 ~ fax (60



June 13, 2018

Joseph E. McCoy
322 Catamount Road
Pittsfield, NH 03263

*s/ container removed — no further violation*

Re: storage container permit expiration

Dear Mr. McCoy,

The Board of Selectmen considered your permit extension request dated May 29, 2018.  While they note the personal circumstances that have caused delay, the Board has to balance the terms of the zoning ordinance with your request, and as you have already been granted a year's extension beyond the 12 months permitted, they voted to not grant this second extension.

The Board has granted an additional thirty (30) days from the date of this letter to remove the storage container from your property.

Sincerely,

Cara M. Hayes
Town Administrator

# DrummondWoodsum

### ATTORNEYS AT LAW

**Matthew R. Serge**
Admitted in NH



603.716.2699 Fax

May 24, 2019

James Hetu and Cynthia Hetu
272 Loudon Road
Pittsfield, NH 03263

      RE:   Zoning Violation

Dear Mr. and Mrs. Hetu:

This office serves as general legal counsel to the Town of Pittsfield. The Town has asked us to contact you concerning an ongoing zoning ordinance violation on the property identified above. Specifically, you have been keeping a storage trailer on your property in violation of Article 14 of the Pittsfield Zoning Ordinance.

Article 14 of the Zoning Ordinance (entitled Storage Containers) provides that a storage container is permitted on a property only if the landowner complies with a series of conditions, including that the landowner obtain a permit from the Town. This permit states when the storage container will be placed on the lot, and the Ordinance further provides that the longest a contained can remain on a property is no more than 12 months in a 15-month period. For purposes of Article 14, a "Storage Container" includes a "truck trailer, box trailer, school bus, manufacture housing unit, or similar mobile container parked continuously for 31 days or more and used principally for storage and not used for any person's residential occupancy or transient lodging." A copy of applicable sections of the Zoning Ordinance are attached for reference.

The Town has sent you two Notices of Zoning Violation, dated December 4, 2018 and January 18, 2019 (copies attached). To date, you have not responded to these letters. The Town demands, therefore, that you remove the trailer(s) from your property by May 24, 2019, and that no trailers will be stored on the property until you receive a permit from the Town. If you fail to comply, the Town will initiate legal action to remove the trailer(s). If a lawsuit is filed, you may be required to pay civil fines to the Town of $275 per day, beginning February 17, 2019. In addition, if the Town is successful in its lawsuit, you will be required to pay for the Town's reasonable costs and attorney's fees.

If you have any questions, please contact the Town at (603) 435-6773. Thank you.

Sincerely,

Matthew R. Serge

cc:    Board of Selectmen

## Article 14.  Storage Containers

### 1.  Authority

RSA 674:16, I, (d); RSA 674:16, V; and RSA 674:17.

### 2.  Purpose

The purpose of these STORAGE CONTAINER regulations is to promote the general welfare by protecting the aesthetics of the town.  (See RSA 674:17, I, (c), and Taylor v. Plaistow, 152 N.H. 142, 872 A.2d 769 (2005) ("a municipality may exercise its zoning power solely to advance aesthetic values because the preservation or enhancement of the visual environment may promote the general welfare.").)

### 3.  Permitting Conditions for Storage Containers

Except as provided in article 4, section 3, Nonconforming Uses, every STORAGE CONTAINER shall be permitted upon the following conditions and upon all other applicable conditions in the zoning ordinance:

(a)  The STORAGE CONTAINER shall be used for and only for storage.

(b)  The STORAGE CONTAINER shall have a SETBACK from every STREET boundary or INTERIOR LOT LINE which SETBACK is greater than or equal to the minimum SETBACK specified for the STREET boundary or INTERIOR LOT LINE by article 3, section 4, (h), Table of Dimensional Requirements.

(c)  No more than one STORAGE CONTAINER shall be on the LOT if the LOT is in the Urban District, the Suburban District, or the Rural District.

(d)  No more than two STORAGE CONTAINERS shall be on the LOT if the LOT is in the Commercial District or the Light Industrial/Commercial District.

(e)  The sum of the time during which one or more STORAGE CONTAINERS are on any one LOT during any 15-month period shall be no more than 12 months.

(f)  The owner of the LOT where the STORAGE CONTAINER will be put shall tell the zoning ordinance administrator the date when the STORAGE CONTAINER is proposed to be put on the LOT.  The zoning ordinance administrator shall issue a permit for the STORAGE CONTAINER, and the permit shall state the date when the STORAGE CONTAINER is proposed to be put on the LOT.



# TOWN OF PITTSFIELD

Office of Selectmen
85 Main Street, Pittsfield NH 03263
admin@pittsfieldnh.gov ~ telephone (603) 435-6773 ~ fax (603) 435-7922

## NOTICE OF ZONING VIOLATION

December 4, 2018

mailed certified mail
and FIRST CLASS MAIL

James B. Hetu
Cynthia A. Hetu
272 Loudon Road
Pittsfield, NH 03263

notice of violation at:
272 Loudon Road
Map R35 Lot 10

Dear James & Cynthia,

It has been brought to the attention of this office that zoning violations exist at your property, 272 Loudon Road.

### VIOLATION
unpermitted storage trailer on property
Pittsfield Zoning Ordinance – Article# 14. Storage Containers

### CORRECTIVE ACTION NEEDED
remove trailer or submit application for storage container permit

### RIGHT TO APPEAL
This notice is a decision of the Zoning Ordinance Administrator and may be appealed to the Zoning Board of Adjustment in accordance with the provisions of the Pittsfield Zoning Ordinance Article 5, Section 5. Appeals to the Board of Adjustment, provided that such appeal is filed within thirty days of the date of this decision, per NH RSA 676:5 and the Pittsfield Zoning Board of Adjustment's Rules of Procedure.

### PENALTIES & FEES
Please be advised that violations of the provisions of the Pittsfield Zoning Ordinance include civil penalties of $275 for the first offense, and $550 for subsequent offences, for each day such violation is found to continue after the conviction date or after the date on which the violator received written notice, whichever is earlier, with each day that the violation continues being considered as a separate offense, as further described in Article 1, Section 9. Penalty Clause.

This correspondence serves as a formal notice of a zoning violation. You have 30 days notice from the receipt of this notice to cure this violation. In the event that the violations are not cured or remedied as provided for in this notice, the Town will pursue enforcement of the violations as provided for by law.

Should you have any questions please contact the Selectmen's Office at the contact information listed above.

Sincerely,

Pittsfield Board of Selectmen



# TOWN OF PITTSFIELD

**Office of Selectmen**
85 Main Street, Pittsfield NH 03263
admin@pittsfieldnh.gov ~ telephone (603) 435-6773 ~ fax (603) 435-7922

## SECOND - NOTICE OF ZONING VIOLATION

January 18, 2019

mailed certified mail
and FIRST CLASS MAIL

James B. Hetu
Cynthia A. Hetu
272 Loudon Road
Pittsfield, NH 03263

notice of violation at:
272 Loudon Road
Map R35 Lot 10

Dear James & Cynthia,

It has been brought to the attention of this office that zoning violations exist at your property, 272 Loudon Road.

### VIOLATION
unpermitted storage trailer on property
Pittsfield Zoning Ordinance – Article# 14. Storage Containers

### CORRECTIVE ACTION NEEDED
remove trailer or submit application for storage container permit

### RIGHT TO APPEAL
This notice is a decision of the Zoning Ordinance Administrator and may be appealed to the Zoning Board of Adjustment in accordance with the provisions of the Pittsfield Zoning Ordinance Article 5, Section 5. Appeals to the Board of Adjustment, provided that such appeal is filed within thirty days of the date of this decision, per NH RSA 676:5 and the Pittsfield Zoning Board of Adjustment's Rules of Procedure.

### PENALTIES & FEES
Please be advised that violations of the provisions of the Pittsfield Zoning Ordinance include civil penalties of $275 for the first offense, and $550 for subsequent offences, for each day such violation is found to continue after the conviction date or after the date on which the violator received written notice, whichever is earlier, with each day that the violation continues being considered as a separate offense, as further described in Article 1, Section 9. Penalty Clause.

This correspondence serves as a formal notice of a zoning violation. **You have 30 days notice from the receipt of this notice to cure this violation.** In the event that the violations are not cured or remedied as provided for in this notice, the Town will pursue enforcement of the violations as provided for by law.

Should you have any questions please contact the Selectmen's Office at the contact information listed above.

Sincerely,

Pittsfield Board of Selectmen



# TOWN OF PITTSFIELD

Office of Selectmen
85 Main Street, Pittsfield NH 03263
admin@pittsfieldnh.gov ~ telephone (603) 435-6773 ~ fax (603) 435-7922



## NOTICE OF ZONING VIOLATION

August 13, 2019

mailed certified mail
and FIRST CLASS MAIL

Sanel Realty Co. Inc.
11 Cram Avenue
Pittsfield, NH 03263

notice of violation at:
11 Cram Avenue
Map U3 Lot 11

Dear Sanel Realty Co. representative(s),

It has been brought to the attention of our office that zoning violations exist at your property, 11 Cram Avenue.

### VIOLATION
unpermitted storage trailer on property
Pittsfield Zoning Ordinance – Article# 14. Storage Containers

### CORRECTIVE ACTION NEEDED
remove trailer or submit application for storage container permit

### RIGHT TO APPEAL
This notice is a decision of the Zoning Ordinance Administrator and may be appealed to the Zoning Board of Adjustment in accordance with the provisions of the Pittsfield Zoning Ordinance Article 5, Section 5. Appeals to the Board of Adjustment, provided that such appeal is filed within thirty days of the date of this decision, per NH RSA 676:5 and the Pittsfield Zoning Board of Adjustment's Rules of Procedure.

### PENALTIES & FEES
Please be advised that violations of the provisions of the Pittsfield Zoning Ordinance include civil penalties of $275 for the first offense, and $550 for subsequent offences, for each day such violation is found to continue after the conviction date or after the date on which the violator received written notice, whichever is earlier, with each day that the violation continues being considered as a separate offense, as further described in Article 1, Section 9. Penalty Clause.

This correspondence serves as a formal notice of a zoning violation. **You have 30 days notice from the receipt of this notice to cure this violation.** In the event that the violations are not cured or remedied as provided for in this notice, the Town will pursue enforcement of the violations as provided for by law.

Should you have any questions please contact the Selectmen's Office at the contact information listed above.

Sincerely,

Pittsfield Board of Selectmen

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

> **EXHIBIT**
> **C**
> tabbies
> [ANDERSON AFF.]

| | | |
|---|---|---|
| JOSEPH McCOY | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No.:1:20-cv-00362-JL |
| | ) | |
| TOWN OF PITTSFIELD | ) | |
| | ) | |
| Defendant | ) | |

**AFFIDAVIT OF CARL ANDERSON**

I, Carl Anderson, with personal knowledge, on oath depose and say as follows:

1.  I am a resident of the Town of Pittsfield, New Hampshire, and I have served on the Town's Board of Selectmen ("Board") since 2016.

2.  On November 15, 2016, the Board received a request from Joseph McCoy to grant a six-month extension of his 2015 storage container permit. In his correspondence to the Board, Mr. McCoy represented that he needed the extension because he was disabled and needed additional time to move items out of the storage container. I made a motion to approve his request, which passed by unanimous vote.

3.  As of November 15, 2016, I was aware that Mr. McCoy had painted the side of his storage container in support of Donald Trump, which did not factor into my deliberations.

4.  In June 2017, Mr. McCoy requested another year extension of his 2015 storage container permit.

5.  On June 13, 2017 the Board meet and considered his request. I voted to approve the extension based on Mr. McCoy's representations that he was disabled and needed to use the storage container for reasons related to his disability.

6.      Mr. McCoy was present during the June 2017 meeting. During the meeting, he made no mention of any desire or intent to use the trailer as a sign and there was no discussion of any such use. The depiction of the word "Trump" on the storage container was not considered by the Board in its deliberations in anyway.

7.      Following the June 2017 approval, I became aware of complaints regarding unpermitted storage containers, including Mr. McCoy's, and I informed Mr. McCoy of this fact. The complaints did not relate to Mr. McCoy's use of his storage container to communicate support for President Trump.  In fact, I later learned that in the summer of 2017, Mr. McCoy had the "Trump" image on the side of his storage container repainted to depict a balloon scene.

8.      On June 12, 2018, the Board reviewed a third request for a permit extension from Mr. McCoy, which was denied. During this meeting, the Board voted to pursue enforcement measures against another set of unpermitted storage containers located on Tilton Hill Road.

9.      Following the denial of Mr. McCoy's 2018 permit request, I became aware that Mr. McCoy was spreading false information regarding the reasons for the denial. I subsequently wrote a letter to him in January 2020 to correct this misinformation. My letter to Mr. McCoy contains an accurate description of my reasons for voting for his application in 2016 and 2017, and against his application in 2018. A true and accurate copy of my letter is attached hereto as Exhibit 1.

10.     In the letter, I note that there are "illegal trailers all over the place…" This sentiment was intended to express my personal sense that there are likely unpermitted storage containers in Town that have evaded review by the Board. However, I also believe many such storage containers in Town are in fact grandfathered and preexist the Zoning Ordinance or are otherwise lawful.

11.     Absent a significant expenditure of resources by the Town, it would be impractical and wasteful to attempt to document the status of each storage container in Town. As described in the letter, the Town has limited resources for enforcement of the Town's storage container ordinance and must be prudent in the allocation of its resources. Therefore, I have supported enforcement actions when the Town has had specific knowledge that a storage container is not grandfathered and not permitted. My decisions have been based on the requirements of the zoning ordinance only.

12.     At no time did I harass or otherwise discriminate against Mr. McCoy. The notion that I would discriminate against Mr. McCoy based on his support for President Trump is not credible. I am a life-long Republican, have been a public supporter of President Trump, and was on friendly terms with Mr. McCoy prior to the initiation of his suit against the Town.

Affiant sayeth further not.

_____5/28/2021_____
Date

Carl Anderson

STATE OF NEW HAMPSHIRE
COUNTY OF

Before me, the undersigned officer, personally appeared the said Carl Anderson, known to me or satisfactorily proven to be the person whose name is subscribed to the within instrument, and acknowledged that he executed the same for the purposes therein contained and did state under oath the within facts are true to the beset of his knowledge and belief.

Printed Name: Cara M. Marston
Notary Public
My Commission Expires: 5/15/2

4

EXHIBIT

tabbies

ANDERSON AFF.
EXHIBIT 1

Hello Joe,

I'm writing to try to correct some incorrect information that is being spread verbally and through social media by you.

Before becoming a selectman in 2016, I frankly knew zero about the storage container article in the zoning ordinance.  My *first* exposure to it was when you came to the board with your expired permit and literally begged the board to give you a one-year extension due to your disability and how long it would take to empty the trailer out.  I'm sure you remember it, as does everyone else in the room at the time.  Hopefully you remember that I was the one that made the motion to give you a *yearlong extension*.  I remember you thanking us profusely and *swearing you'd have the trailer empty and gone by the end of the year!*

Over the course of that next year, in addition to a workload you can't even imagine, that the select board has to find a way to deal with, we received several complaints about storage containers.  One of those complaints was about your trailer, and in addition, that you were operating a second hand store in the rural district without a variance (which as you know, we never pursued).  We were never given a name***. Nothing was said about Trump being on the trailer***- not then, not ever- not from the - complainant and not from any member of the board.  Let me assure you that none of this is related to Trump's name on the trailer (and which if you recall was no longer even on the trailer when you got a notice that your extension was nearly up).  We happen to all be Republicans, and not one of us has ever bad-mouthed Trump at all that I know of.  Personally, I liked Trump on your trailer better than I liked the balloons, but at the end of the day none of us gave a damn what you painted on it.  Most of the time I still wear a Make America Great Again hat.

Anyway, what was obvious was that there were illegal storage containers all over the place (that's about the only *truth* I can find in your rants).  So, what should we do about it?  None of us had any idea when they were put in- before or after the zoning article.  Many select boards had apparently just ignored the ordinance, thus creating a nearly impossible situation for *this* board.  Most of us actually work-full time and it is hard to work 70 hours a week, keep up with everything else a select board has to do ***AND*** start going house by house figuring out what the story is with every existing storage container would be an almost impossible task.  However, the rule is on the books and the select board is elected to enforce the rules whether we agree with them or not.  So, as a board, we decided the best we could do is enforce the rule as storage trailers were added and that we knew about coming in during our term in office.  We didn't make the rule.  We weren't the ones that ignored the rule.  We decided to not make the situation worse by ignoring it on our watch.

Fast forward to 11 months into your year long extension.  It was obvious you had made zero progress emptying your trailer and we didn't want you to get to the end of year and have us on your ass about an expired permit.  You keep claiming we demanded you get rid of the trailer a month early.  ***That was simply a courtesy to remind you that time was approaching when we would have to deal with it again!***

You say I was in your yard leaving a sign and told you I didn't know "what happened to your trailer".  That is not what I said.  I told you I didn't know who ***complained*** about your trailer.  I didn't know then, and I don't know now.  We were never given a name.  But I do know that we gave you a year-long extension to keep it, you used up the year and we reminded you that you'd have to remove it.  You

know what happened and I know what happened.  Did I make the motion to send you the letter?  Yes, I did.  And I would have done the same thing no matter who it was and no matter what they had painted on their trailer- I couldn't care less what the trailer looked like.  You made us a promise and we were not prepared to let that promise be broken.  Those are the rules and the only ones we are capable of enforcing are the ones that come in under our tenure.  You're being told by your neighbors and people who you think are friends that ***you*** have been picked on.  ***The truth is you've been treated just like everyone else that has brought in a storage container or a permit has expired since we took office!***

These people who are advising you are convincing you that the board of selectmen is only interested in taking care of their friends, that we treat newcomers differently.  ***THAT IS THE BIGGEST UNTRUTH THAT IS BEING TOLD!***

You are claiming I voted not to recommend Pritchard's article because "we need it to make the town pretty".  ***Once again, absolutely NOT what I said, and I have the audio to prove it!***  Frankly, I don't give a damn whether we have the storage container rule or not.  The voters decided to pass it long ago ***"to promote the general welfare by protecting the aesthetics of the town".***  That's verbatim from the zoning ordinance.  My comment was that if that's what the voters want, so be it.  My biggest problem with the proposed change is that it is not town wide.  Separating the rules by district will just add one more layer of confusion for the public.

In closing I wanted to send you this letter to set the record straight and remind you of what you agreed to.  This letter contains the truth and as with anyone who makes claims that are untrue in my presence, I will correct them with the truth.  I think that you should stick to what actually happened and not get personal because you are being instigated by others.  Being a selectman means a heavy work load for literally no compensation and at times includes tirades from people who, if they are honest with themselves, have no real justification.

Carl Anderson



**From:**        Robert Fojo <rfojo@fojolaw.com>
**Sent:**        Wednesday, March 31, 2021 6:10 PM
**To:**          Robert J. Dietel
**Subject:**     McCoy/Pittsfield
**Attachments:** 2021-03-31 Responses to RFA.pdf

Rob:

See attached.  Thanks.

Robert M. Fojo
Principal



264 South River Road
Suite 464
Bedford, NH 03110
Direct/Fax: (603) 473-4694
Email: rfojo@fojolaw.com
facebook.com/FojoLawFirm
@RobertFojo

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

### Case No.: 1:20-cv-362-JL

JOSEPH McCOY,

      Plaintiff,

vs.

TOWN OF PITTSFIELD

      Defendant.

---

### PLAINTIFF JOSEPH McCOY's RESPONSES TO TOWN OF PITTSFIELD'S FIRST SET OF REQUESTS FOR ADMISSIONS

Plaintiff Joseph McCoy responds to the Town of Pittsfield's Request for Admissions:

1. On September 1, 2015 you were granted a storage container permit by the Town for the trailer described at paragraph 9 and 10 of your Complaint, which is the trailer that is subject of this litigation (the "Trailer").

   **RESPONSE:** Admitted.

2. The 2015 Storage Container Permit states that "[a] storage container is permitted for storage purposes only, for a period of one year."

   **RESPONSE:** Admitted.

3. **Exhibit A** to these Requests for Admissions is a genuine copy of the September 1, 2015 storage container permit approval that you received from the Town (the "2015 Permit").

   **RESPONSE:** Admitted.

4.    Between September 1, 2015 and January 29, 2016, the Trailer was painted with the words "TRUMP! USA".

**RESPONSE:** Admitted.


5.    As of January 29, 2016, the Trailer was painted with the words "TRUMP! USA".

**RESPONSE:** Admitted.


6.    **Exhibit B** to these Requests for Admissions is a genuine copy of a Facebook post that depicts the trailer as of January 29, 2016.

**RESPONSE:** Admitted.


7.    The 2015 Permit expired on September 1, 2016.

**RESPONSE:** Admitted.


8.    **Exhibit C** to these Requests for Admissions is a genuine copy of a Notice of Violation that you received following expiration of the 2015 Permit.

**RESPONSE:** Admitted.


9.    **Exhibit D** to these Requests for Admissions is a genuine copy of a Facebook post that depicts the trailer as of September 11, 2016.

**RESPONSE:** Admitted


10.   On November 3, 2016, you wrote to the Town and requested a 6 month extension of the 2015 Permit.

**RESPONSE:** Admitted.


11.   **Exhibit E** to these Requests for Admissions is a genuine copy of a November 3, 2016 letter that you wrote requesting a six month extension of the 2015 Permit.

**RESPONSE:** Admitted.

12.    In support of your November 2016 request for an extension, you represented that "I am asking for this 6 month extension in order to keep my tools and materials inside this trailer while I deal with this emergency construction situation in order to keep things out of the winter outside elements."

       **RESPONSE:** Admitted.

13.    Your November 3, 2016 request for an extension to allow the Trailer on your property was granted.

       **RESPONSE:** Denied. Under the revised ordinance, the 2015 permit could not have been extended; rather, it could only have been a zoning variance. The Board of Selectmen did not have the authority, however, to grant a zoning variance.

14.    At the time your November 3, 2016 request was granted, the trailer was painted with the words "TRUMP! USA".

       **RESPONSE:** Denied. Please see response to Request No. 13.

15.    In May 2017, you requested approval to maintain the Trailer on your property for an additional year.

       **RESPONSE:** Admitted.

16.    On June 13, 2017, you met with the Town's selectmen to discuss your request for an extension of the storage container permit.

       **RESPONSE:** Admitted.

17.    During the June 13, 2017 meeting with the Selectmen, you represented that the permit was needed so you could complete work to your home.

       **RESPONSE:** Admitted.

18.    During the June 13, 2017, were asked "if they have had the trailer for one year and now would like to have it there for another year and after that it will be gone?"

       **RESPONSE:** Admitted.

19.    In response to the above question, you represented that you "want to get rid of it but just need more time to the work needed on their home."

**RESPONSE:**  Admitted.


20.    The Town granted your request by unanimous vote of the selectmen (4-0).

**RESPONSE:**  Denied. See response to Request No. 13. Thus, any "permit" issued would be void because the Board of Selectmen did not have authority to issue a storage container permit on behalf of the Town of Pittsfield.


21.    **Exhibit F** to these Requests for Admissions is a genuine copy the portion of the June 13, 2017 minutes of the Town's Board of Selectmen meeting addressing your request for an extension of the storage container permit.

**RESPONSE:**  Admitted.


22.    **Exhibit G** to these Requests for Admissions is a genuine copy of your June 2017 storage container permit (the "2017 Permit").

**RESPONSE:**  Denied. See response to Request No. 20.


23.    The 2017 Permit was granted "for storage purposes only, for a period of one year"

**RESPONSE:**  Denied. See response to Request No. 20.


24.    As of June 13, 2017, the Trailer was painted with the words "TRUMP! USA".

**RESPONSE:**  Admitted.


25.    As of July 9, 2017, the Trailer no longer depicted, showed, or otherwise displayed the words "TRUMP! USA".

**RESPONSE:**  Admitted in part; denied in part. The Trailer no longer depicted, showed, or otherwise displayed the character string "! USA." But it is not accurate that the Trailer no longer depicted, showed, or otherwise displayed the word "TRUMP." The back of the trailer showed the word "TRUMP" as shown in Exhibit D (of September 11, 2016). In addition, although the trailer did not show the *word* "USA," the trailer showed the USA flag occupying one-third of the 52-foot-long side of the trailer.

4

26.   As of July 9, 2017, the Trailer was being painted with a scene depicting hot air balloons.

**RESPONSE:** Admitted.

27.   **Exhibit H** to these Requests for Admissions is a genuine copy of a Facebook post that depicts the Trailer as of July 9, 2017.

**RESPONSE:** Admitted.

28.   **Exhibit I** to these Requests for Admissions is a genuine copy of a Facebook post that depicts the Trailer as of July 30, 2017.

**RESPONSE:** Admitted.

29.   On May 22, 2018 the Town notified you that your 2017 Permit was set to expire in June 2018 and that to maintain the Trailer on your property you would need to remove it for a period of three months and then reapply.

**RESPONSE:** Denied.

30.   As of May 22, 2018, the Trailer did not depict the words "TRUMP! USA"

**RESPONSE:** Admitted in part; denied in part. See response to Request No. 25.

31.   **Exhibit J** to these Requests for Admissions is a genuine copy of a May 22, 2018 letter from the Town to you regarding the Trailer.

**RESPONSE:** Admitted.

32.   On May 29, 2018 you requested an extension of your storage container permit.

**RESPONSE:** Admitted.

33.   As of May 29, 2018, the Trailer had been on your property for more than two years and eight months.

**RESPONSE:** Admitted.

34.    **Exhibit K** to these Requests for Admissions is a genuine copy of a May 29, 2018 letter
       you wrote to the Town.

       **RESPONSE:** Admitted.

35.    In support of your request for an extension in May 2018, you represented that you needed
       additional time to unload property you were storing in the Trailer.

       **RESPONSE:** Admitted.

36.    By letter dated June 13, 2018 you were notified by the Town's board of selectmen that
       your permit request was denied and that the Trailer had to be removed within 30 days.

       **RESPONSE:** Admitted.

37.    **Exhibit L** to these Requests for Admissions is a genuine copy of a June 13, 2018 letter
       from the Town informing you of the Town's decision with respect to your May 2018
       request for a storage container permit.

       **RESPONSE:** Admitted.

38.    You never applied for a sign permit for the Trailer.

       **RESPONSE:** Admitted.

39.    You have never requested approval from the Town to maintain a sign on your property at
       322 Catamount Road, Pittsfield, NH.

       **RESPONSE:** Admitted.

40.    You never applied for any form of approval or permit for the Trailer other than as a
       storage container.

       **RESPONSE:** Admitted.

41.     You did not appeal the Town's June 13, 2018 decision denying you a storage container permit.

        **RESPONSE:** Denied.


42.     Between June 13, 2018 and the present, you have not applied for any permit to maintain the Trailer on your property.

        **RESPONSE:** Admitted.


43.     You were in possession of the document provided at Exhibit A, and/or aware of its contents, prior to filing the Complaint in this action.

        **RESPONSE:** Admitted.


44.     You made or were aware of the Facebook post provided at Exhibit B prior to filing the Complaint in this action.

        **RESPONSE:** Admitted.


45.     You were in possession of the document provided at Exhibit C, and/or aware of its contents, prior to filing the Complaint in this action.

        **RESPONSE:** Admitted.


46.     You made or were aware of the Facebook post provided at Exhibit D prior to filing the Complaint in this action.

        **RESPONSE:** Admitted.


47.     You were in possession of the document provided at Exhibit E, and/or aware of its contents, prior to filing the Complaint in this action.

        **RESPONSE:** Admitted.


48.     You were in possession of the document provided at Exhibit F, and/or aware of its contents, prior to filing the Complaint in this action.

        **RESPONSE:** Admitted.

49.    You were in possession of the document provided at Exhibit G, and/or aware of its contents, prior to filing the Complaint in this action.

**RESPONSE:**  Admitted.

50.    You were aware of the Facebook post provided at Exhibit H, and/or aware of its contents, prior to filing the Complaint in this action.

**RESPONSE:**  Admitted.

51.    You made or were aware of the Facebook post provided at Exhibit I, prior to filing the Complaint in this action.

**RESPONSE:**  Admitted.

52.    You were in possession of the document provided at Exhibit J, and/or aware of its contents, prior to filing the Complaint in this action.

**RESPONSE:**  Admitted.

53.    You were in possession of the document provided at Exhibit K, and/or aware of its contents, prior to filing the Complaint in this action.

**RESPONSE:**  Admitted.

54.    You were in possession of the document provided at Exhibit L, and/or aware of its contents, prior to filing the Complaint in this action.

**RESPONSE:**  Admitted.

8

Respectfully submitted,

JOSEPH McCOY,

By His Attorneys,

FOJO LAW, P.L.L.C.

Dated: March 31, 2021                    _____*/s/ Robert M. Fojo*_____
                                         Robert M. Fojo (#19792)
                                         264 South River Road, Suite 464
                                         Bedford, NH 03110
                                         Direct: (603) 473-4694
                                         rfojo@fojolaw.com

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was emailed to Defendant's counsel

on March 31, 2020.

                                         _____*/s/ Robert M. Fojo*_____
                                         Robert M. Fojo

The above answers and information supplied herein are full, complete and accurate to the best of my knowledge, information and belief.

Dated: 3-12-2021

Joseph McCoy
Joseph McCoy

STATE OF New Hampshire

County of Merrimack

Signed and sworn to (or affirmed) before me on this 12ᵗʰ day of March, 2021 by Joseph McCoy, whose identity was determined by (check box that applies and complete blank line, if any):

☐     My personal knowledge of the identity of said person OR

☐     The oath or affirmation of a credible witness, _____ (name of witness), the witness being personally known to me OR

☑     The following identification documents: DL  NHLI 3345 901 _____ (driver's license, passport, other).

Notary Public/Justice of the Peace  Lorien Chateauneuf

My Commission Expires:

STATE OF
MY
COMMISSION
EXPIRES
October 17, 2023
2013
NEW HAMPSHIRE
NOTARY PUBLIC

10



EXHIBIT

A

[TOWN RFA]

# TOWN OF PITTSFIELD
# NEW HAMPSHIRE

## PERMIT
## FOR STORAGE CONTAINERS

(STORAGE CONTAINERS: Shall mean, any truck trailer, box trailer, school bus, mobile home or other similar facility used for storage or other purposes).

Storage Containers, whether registered or not, whether mobile or stationery, are not allowed on a permanent basis in any zoning district within the Town of Pittsfield. A storage container is permitted for storage purposes only, for a period of one year, with the approval of a parking permit issued by the Board of Selectmen or their designee, provided said storage container meets all setback requirements, and as limited by the following; a) maximum of one storage container per lot in the Urban, Suburban or Rural Districts, b) maximum of two storage containers per lot in the Light Industrial/Commercial Districts.

APPLICANTS NAME: _Joseph McCoy_

APPLICANTS ADDRESS: _322 Catamount Rd._

APPLICANTS TELEPHONE NUMBER: _603-435-5050_

LOCATION OF STORAGE UNIT: TAX MAP & LOT NUMBER: _R23-02-01_

ZONING DISTRICT: _RURAL_

SERIAL NUMBER OF STORAGE CONTAINER: _1H2VO45 23EBO1980 1_

MAKE AND MANUFACTURER OF CONTAINER: _FP8-F2-45 FRUEHAUF_

SIGNATURE OF APPLICANT: _Joseph E McCoy_

DATE STORAGE USE IS TO BEGIN: _Sept. 1, 2015_

APPROVED: DATE: _9-1-15_

_Board of Selectmen_

Unit must be removed one year from the approved date above.



**EXHIBIT**

*B*

[TOWN RFA]



**Joseph Mccoy**
January 29, 2016 · 🌐

52 FEET OF TRUMP!!!   GET THE POINT!



👍 9                                    7 Comments  5 Shares

👍 Like              💬 Comment              ➤ Share



**EXHIBIT**

C

[TOWN RFA]



## Office of Code Enforcement

### TOWN OF PITTSFIELD
**Town Hall, 85 Main Street**
**Pittsfield, New Hampshire**

### NOTICE OF VIOLATION

Dear Mr., Joseph Mc Coy

The property located at 322 Catamount Rd Pittsfield NH 03263, identified in the Town Tax Records as Map R23, Lot 02-01, and owned/occupied by you, your permit for a storage trailer has expired on September 1, 2016 and the trailers need to be removed according to our Zoning Ordinance article 14 section 3.

Your immediate attention to this matter is appreciated.

If you believe the Building Inspector is in error in the application or interpretation of any provision of the Building codes, you have the right to appeal to the Zoning Board of Appeals in a timely fashion. This stop work Order controls unless and until it is overturned by the Zoning Board of Appeals.

Thank you
Jesse Pacheco
Building Inspector

OFFICE 603-435-6774          FAX:603-435-7922          CELL:603-715-6624



EXHIBIT

D

[TOWN RFA]



**Joseph Mccoy**
September 11, 2016 · 🌐

Let's get the vote started!



👍 8                                                    3 Comments

👍 Like              💬 Comment              ↗ Share

**Elaine Smith-page**
Go trump
Like · Reply · 4y

**Paula A Miller**
Hi. Do you have electric heaters? I need a lil one for my dragons room.
Like · Reply · 2y

> **Joseph Mccoy**
> sorry no, i slod all last month, but will keep an eye out...
> Like · Reply · 2y                                    👍 1
>
> Write a reply...                          🙂 📷 GIF 🎭

Write a comment...                          🙂 📷 GIF 🎭

Nov. 3, 2016

To: Jesse Pacheco,

Hello,

I am writing in regards to seeking a 6 month extension for my trailer on my property located at 322 Catamount Rd.

At the present, i have construction going on, my garage is leaking from the inside and it needs emergency work which will take me several months to fix. I am disabled with just one working leg, and have to take care of every thing my self, and this has already been started. I will remove one trailer by the end of November. The other i will be dealing with over the cold winter months and will have it emptied and removed by the end of April 2017.

I am asking for this 6 month extention inorder to keep my tools and materials inside this trailer while i deal with this emergency construction situation inorder to keep things out of the winter outside elements. It will be taken care of and i am sorry for the delay, but i am physcially handicapped, and will complete this task inorder to remain with good standards for this town and it's rules as a Pittsfield home owner.

Thank you For Your Time.
Sincerely,
Joseph McCoy

EXHIBIT
E
[TOWN RFA]



EXHIBIT
F
[TOWN RFA]



**TOWN OF PITTSFIELD**
**BOARD OF SELECTMEN**
**TOWN HALL, 85 MAIN STREET**
**PITTSFIELD, NH  03263**

MEETING MINUTES OF Tuesday June 13, 2017

**CALL TO ORDER**
Call to order at 6:06 p.m. by J.C. Allard, Chairman

**MEMBERS PRESENT**
J.C. Allard, Chairman
Gerard LeDuc, Vice-Chairman
Carole Richardson
Carl Anderson

**MEMBERS ABSENT**
None

**OTHERS PRESENT**
Cara Marston, Town Administrator
Ammy Ramsey, Recording Secretary

**PUBLIC INPUT** – regarding agenda items only

Dan Schroth would like to make an appointment with Cara to talk with her about putting together a petition article about getting rid of the Building Inspector position, Cara and Dan will meet tomorrow at 11 a.m.

**AGENDA REVIEW**
Gerard: None.
Carole: None.
Carl: None.
J.C.: None.

**NEW BUSINESS**

**ACTION ITEMS**
1. Interviews for vacant position on Board of Selectmen – 4 candidates
J.C. informed the public that the first item under new business is to conduct interviews and it may take some time to get through the process. Due to circumstances out of anyone's control this board finds itself with the requirement of standing in for the voters of Pittsfield to choose another member for the selectboard. We are going to do that item of great

8. Storage Container Permit extension concern – 322 Catamount Road (tabled 5/23/17)
Mr. McCoy stated that they originally got the permit in 2015, he went to Jesse to get an extension because they have found out their deck, and porch is rotted. They are requesting an extension because he is doing the work himself and is handicapped and it is taking them more time then expected to do all the repairs needed. So he is asking the board to grant a one year extension. J.C. asked if there was an issue with extending the permit. Cara stated that our Zoning Ordinance states it shall not be no more than 12 months. J.C. asked if this should go to the Zoning Board. Carl asked why this matter is in front of them. Cara explained that the selectboard are the administrators of the ordinance. Cara also expressed to the board that Mr. McCoy is here trying to do the right thing and if you look around town there are storage trailers on properties that may not have a permit. Mr. McCoy stated that Jesse collected $25.00 cash from him for the permit but later found out the there is no permit. Jesse also stated to him that they have no choice and must get rid of the trailer, when there are multiple trailers all over town that have been there for a long time. Carole asked if they have had the trailer for one year and now would like to have it there for another year and after that it will be gone. Mr. McCoy stated that they want to get rid of it but just need more time to do the work needed on their home.

Carole: I make a motion to extend the permit for one year.
Gerard: Second.
Discussion: None.
Motion carries 4-0

Cara will print out another permit and have everyone sign it.

**CHECK MANIFESTS**
1. Accounts Payable
Gerard: I make a motion to approve Accounts Payable.
Carl: Second.
Discussion: None.
Motion carries 4-0

2. Payroll
Gerard: I make a motion to approve Payroll and Direct Deposit.
Carl: Second.
Discussion: None.
Motion carries 4-0

**MINUTES**
1. May 23, 2017 – Public Meeting Minutes
Gerard: I make a motion to approve the May 23, 2017 Public Meeting Minutes.
Carl: Second.
Discussion: Carole has a few grammatical corrections and will give those to Ammy.
Motion carries 4-0

Motion carries 4-0 roll call was done and all approved.

The Board came out of non-public session at 9:09 p.m.

Gerard: I make a motion to seal the non-public minutes as they may affect adversely the reputation of any person other than a member of this board.
Carl: Second.
Discussion: None.
Motion carries 4-0 roll call (2/3 vote) was done and all approved.

Gerard: I make a motion to adjourn.
Carl: Second.
Discussion: None.
Motion carries 4-0

Approved:

_____          _____
J.C. Allard, Chairman                              Date

*copy - for your records*



**EXHIBIT**

G

[TOWN RFA]

# TOWN OF PITTSFIELD
## NEW HAMPSHIRE

## PERMIT
## FOR STORAGE CONTAINERS

(STORAGE CONTAINERS: Shall mean, any truck trailer, box trailer, school bus, mobile home or other similar facility used for storage or other purposes).

Storage Containers, whether registered or not, whether mobile or stationery, are not allowed on a permanent basis in any zoning district within the Town of Pittsfield. A storage container is permitted for storage purposes only, for a period of one year, with the approval of a parking permit issued by the Board of Selectmen or their designee, provided said storage container meets all setback requirements, and as limited by the following: a) maximum of one storage container per lot in the Urban, Suburban or Rural Districts, b) maximum of two storage containers per lot in the Light Industrial/Commercial Districts.

APPLICANTS NAME: Joseph McCoy

APPLICANTS ADDRESS: 322 Catamount Rd.

APPLICANTS TELEPHONE NUMBER: (603) 435-5050

LOCATION OF STORAGE UNIT: TAX MAP & LOT NUMBER: R23-2-1

ZONING DISTRICT: Rural

SERIAL NUMBER OF STORAGE CONTAINER: 1H2V045238B01901

MAKE AND MANUFACTURER OF CONTAINER: FPS-5245 - FRVALHAVT

SIGNATURE OF APPLICANT: Joseph McCoy

DATE STORAGE USE IS TO BEGIN: 6-13-2017

APPROVED DATE: June 13, 2017

Board of Selectmen

Unit must be removed one year from the approved date above



EXHIBIT

H

[TOWN RFA]



**Brian Bales**
July 9, 2017 · 🌐

Not done yet but progress ain't always pretty



👍❤️ 23                                          6 Comments  2 Shares

👍 Like              💬 Comment              ↪ Share

View 5 more comments

Erin Russell
Great job **Brian Bales** 💎 1
Like · Reply · 3y · Edited



Write a comment...              



**EXHIBIT**

I

[TOWN RFA]



**Joseph Mccoy**
July 30, 2017 · 🌐

•••



**Brian Bales**
July 30, 2017 · 🌐

👍 2

 Like          💬 Comment          ↗ Share

 Write a comment...          



# TOWN OF PITTSFIELD

Office of Selectmen
85 Main Street, Pittsfield NH 03263
admin@pittsfieldnh.gov ~ telephone (603) 435-6773 ~ fax (603) 435-7922



May 22, 2018

Joseph E. McCoy
322 Catamount Road
Pittsfield, NH 03263

Re: storage container permit expiration

Dear Mr. McCoy,

As you know, the storage trailer permit that the Board of Selectmen approved two years ago and extended at your request last June is due to expire next month.

Please consider this letter a friendly reminder that the trailer must be removed from the property for at least a three month period before you can apply for another permit to bring it back.

Thank you in advance for your anticipated cooperation.

Sincerely,

Pittsfield Board of Selectmen





May 29, 2018

Dear Board Members,

This concerns a storage trailer located on my property at 322 Catamount Rd. Pittsfield

Last june, 2017, i came to your meeting, i had 2 trailors to unload and remove, as requested. I've emptied and removed 1 so far and it's not an easy task! I am disabled with 1 working leg to move on and now that the weather has changed i am in the process of unloading the second.

This will take more time, when i bought my home in pittsfield i had a huge ammount of belongings which came with me so i am asking for another permit inorder to accomplish this huge task.

I am crippled so it cannot be done easily.

Please let me know, or, set aside a time to discuss this further at your next meeting.

Thank you

Joseph M'Coy

322 Catamount Rd.
P. O. Box 293
Pittsfield. N.N. 03263



# TOWN OF PITTSFIELD





Office of Selectmen
85 Main Street, Pittsfield NH 03263
admin@pittsfieldnh.gov ~ telephone (603) 435-6773 ~ fax (603) 435-7922

June 13, 2018

Joseph E. McCoy
322 Catamount Road
Pittsfield, NH 03263

Re: storage container permit expiration

*S/Container
removed
no further violation*

Dear Mr. McCoy,

The Board of Selectmen considered your permit extension request dated May 29, 2018. While they note the personal circumstances that have caused delay, the Board has to balance the terms of the zoning ordinance with your request, and as you have already been granted a year's extension beyond the 12 months permitted, they voted to not grant this second extension.

The Board has granted an additional thirty (30) days from the date of this letter to remove the storage container from your property.

Sincerely,

Cara M. Hayes
Cara M. Hayes
Town Administrator



**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

**Case No.: 1:20-cv-00362-JL**

JOSEPH McCOY,

      Plaintiff,

vs.

TOWN OF PITTSFIELD

      Defendant.

_____

**PLAINTIFF'S INITIAL DISCLOSURE**

      Plaintiff Joseph McCoy provides the following initial disclosure pursuant to Federal Rule of Civil Procedure 26(a).

**1.      Individuals Likely to Have Discoverable Information (Fed. R. Civ. P. 26(a)(1)(A)(i))**

      The following individuals likely have discoverable information Mr. McCoy may use to support his claims:

      **James C. Allard**
      c/o Town of Pittsfield
      85 Main Street
      Pittsfield, New Hampshire 03263

      Mr. Allard likely has information concerning the trailer at issue in the Complaint, and the Town's actions and decisions concerning it.

      **Carl Anderson**
      c/o Town of Pittsfield
      85 Main Street
      Pittsfield, New Hampshire 03263

      Mr. Anderson likely has information concerning the trailer at issue in the Complaint, and the Town's actions and decisions concerning it.

**Brian Bales**
222 Catamount Road
Pittsfield, New Hampshire 03263

Mr. Bales likely has information concerning the trailer at issue in the Complaint.

**Carole Dodge**
c/o Town of Pittsfield
85 Main Street
Pittsfield, New Hampshire 03263

Ms. Dodge likely has information concerning the trailer at issue in the Complaint, and the

Town's actions and decisions concerning it.

**Adam Gauthier**
c/o Town of Pittsfield
85 Main Street
Pittsfield, New Hampshire 03263

Ms. Gauthier likely has information concerning the trailer at issue in the Complaint, and

the Town's actions and decisions concerning it.

**Cara Marston**
c/o Town of Pittsfield
85 Main Street
Pittsfield, New Hampshire 03263

Ms. Marston likely has information concerning the trailer at issue in the Complaint, and

the Town's actions and decisions concerning it.

**Larry Konopka**
c/o Town of Pittsfield
85 Main Street
Pittsfield, New Hampshire 03263

Mr. Konopka likely has information concerning the trailer at issue in the Complaint, and

the Town's actions and decisions concerning it.

**Joseph McCoy**
322 Catamount Road
Pittsfield, New Hampshire 03263

Mr. McCoy likely has information concerning the trailer at issue in the Complaint, the

Town's actions and decisions concerning it, and damages resulting from the Town's decisions

and the trailer's removal.

**Linda McCoy**
322 Catamount Road
Pittsfield, New Hampshire 03263

Ms. McCoy likely has information concerning the trailer at issue in the Complaint, the

Town's actions and decisions concerning it, and damages resulting from the Town's decisions

and the trailer's removal.

**Paul Nickerson**
12 Norris Road
Pittsfield, New Hampshire 03263

Mr. Nickerson likely has information concerning the trailer at issue in the Complaint, and

the Town's actions and decisions concerning it.

**Jesse Pacheco**
c/o Town of Pittsfield
85 Main Street
Pittsfield, New Hampshire 03263

Mr. Pacheco likely has information concerning the trailer at issue in the Complaint, and

the Town's actions and decisions concerning it.

**James Pritchard**
c/o Town of Pittsfield
85 Main Street
Pittsfield, New Hampshire 03263

Mr. Pritchard likely has information concerning the trailer at issue in the Complaint, and

the Town's actions and decisions concerning it.

**Matt St. George**
c/o Town of Pittsfield
85 Main Street
Pittsfield, New Hampshire 03263

Mr. St. George likely has information concerning the trailer at issue in the Complaint,

and the Town's actions and decisions concerning it.

**Bonnie Theriault**
c/o Town of Pittsfield
85 Main Street
Pittsfield, New Hampshire 03263

Ms. Theriault likely has information concerning the trailer at issue in the Complaint, and

the Town's actions and decisions concerning it.

**Clayton Woods**
c/o Town of Pittsfield
85 Main Street
Pittsfield, New Hampshire 03263

Mr. Woods likely has information concerning the trailer at issue in the Complaint, and

the Town's actions and decisions concerning it.

**2.    Documents (Fed. R. Civ. P. 26(a)(1)(A)(ii)**

Mr. McCoy has the following documents in his possession, custody, or control and may

use them to support his claims:

- September 1, 2015 Permit for Storage Containers;

- Notice of Violation (no date, approx. late 2016);

- October 31, 2016 Email from Jesse Pacheco to Cara Marston;

- November 15, 2016 Town Board of Selectmen Meeting Agenda;

- May 23, 2017 Town Board of Selectmen Meeting Agenda;

- May 23, 2017 Town Board of Selectmen Meeting Minutes;

- June 13, 2017 Permit for Storage Containers;

- May 8, 2018 Town Board of Selectmen Meeting Minutes;

- May 22, 2018 Letter from Town;

- June 12, 2018 Town Board of Selectmen Meeting Agenda;

- June 12, 2018 Town Board of Selectmen Meeting Minutes;

- January 11, 2020 letter from Mr. Anderson to Mr. McCoy;

- Photographs of the trailer.

**3.      Computation of Damages (Fed. R. Civ. P. 26(a)(1)(A)(iii))**

Mr. McCoy has suffered $16,600 in damages in connection with the acquisition and removal of his trailer (and its contents), an amount still to be determined in connection with his emotional distress, and an amount to be determined later in connection with the violation of his Constitutional rights.

**4.      Insurance (Fed. R. Civ. P. 26(a)(1)(A)(iv))**

Not applicable.


Mr. McCoy reserves the right to revise and/or supplement this Initial Disclosure as the case progresses and more information becomes available.

Respectfully submitted,

JOSEPH McCOY,

By Their Attorneys,

FOJO LAW, P.L.L.C.

Dated:  August 11, 2020                         _____/s/Robert M. Fojo_____

Robert M. Fojo, Esq. (#19792)
264 South River Road, Suite 464
Bedford, NH 03110
(603) 473-4694
rfojo@FojoLaw.com

## CERTIFICATE OF SERVICE

I certify that the foregoing was transmitted on this date, via email, to Defendant's counsel.

Dated:  August 11, 2020                         _____/s/Robert M. Fojo_____

Robert M. Fojo



UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| JOSEPH McCOY | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No.:1-20-cv-00362-JL |
| | ) | |
| TOWN OF PITTSFIELD | ) | |
| | ) | |
| Defendant | ) | |

## AFFIDAVIT OF ROBERT J. DIETEL

I, Robert J. Dietel, with personal knowledge, on oath depose and say as follows:

1.      I am counsel for the Town of Pittsfield, New Hampshire in the above captioned matter.

2.      On December 24, 2020, I served Requests for Admission on Plaintiff's counsel.

3.      Per Fed. R. Civ. P. 36(a)(3) responses to the Requests were due on January 23, 2021.

4.      On January 25, 2021, I emailed Plaintiff's counsel and inquired as to the status of Plaintiff's responses, which had not been provided. In response, Plaintiff's counsel requested an extension to Friday, January 29, 2021, which was granted. However, no responses or objections were provided within the extended time period.

5.      Ultimately, responses to the Town's Requests for Admission were provided on March 31, 2021 (97 days after service). The responses include denials to several of the requests. However, Plaintiffs has filed no motion to amend or withdraw the admission of those requests, which occurred by operation of Fed. R. Civ. P. 36(a)(3) on January 29, 2021.

6.      Additionally, on April 12, 2021, Defendant propounded Interrogatories and Requests for Production on Plaintiff. Per the discovery plan, response were due on May 27, 2021. No responses have been received.

7.      On May 29, 2021, I inquired of Plaintiff's counsel regarding the status of his client's responses to Defendant's discovery requests. A reply was received on the afternoon of June 1, 2021 indicating that some production will be forthcoming, but has not yet been produced.

Affiant sayeth further not.

_____6/1/21_____
Date

_____
Robert J. Dietel

STATE OF NEW HAMPSHIRE
COUNTY OF

Before me, the undersigned officer, personally appeared the said Robert Dietel, known to me or satisfactorily proven to be the person whose name is subscribed to the within instrument, and acknowledged that he executed the same for the purposes therein contained and did state under oath the within facts are true to the beset of his knowledge and belief.

_____Elizabeth A. LaClair_____
Printed Name: Elizabeth A LaClair
Notary Public
My Commission Expires: 8/23/22

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

EXHIBIT
B
[MARSTON AFF.]

| | |
|---|---|
| JOSEPH McCOY | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | )    Civil Action No.:1:20-cv-00362-JL |
| | ) |
| TOWN OF PITTSFIELD | ) |
| | ) |
| Defendant | ) |

### AFFIDAVIT OF CARA MARSTON

I, Cara Marston, with personal knowledge, on oath depose and say as follows:

1.     I am a resident of the Town of Pittsfield, and I have been employed by the Town for more than twenty years.

2.     I have been the Town Administrator for the Town since December 2015.

3.     Subject to the Board of Selectmen's delegation and direction, my responsibilities as Town Administrator include assisting the Board in the performance of its duties as the Zoning Administrator of the Town's zoning ordinance, and overseeing and communicating with Town staff regarding administration of the zoning ordinance.

4.     A true and accurate copy of excerpts of the Town's zoning ordinance are attached hereto as Exhibit 1. A complete copy of the Town's zoning ordinance is available at:

https://www.pittsfieldnh.gov/sites/g/files/vyhlif3681/f/pages/zoning_ordinance_2021_2.pdf

5.     I am aware of the allegations raised by Joseph McCoy in the above captioned suit, and I have personal knowledge regarding the Town's actions with respect to the granting of storage container permits to Mr. McCoy in 2015, 2016, 2017, and the Board's decision to deny a 2018 permit request from Mr. McCoy. I also have personal knowledge regarding the Town's

permitting and enforcement efforts with respect to other storage containers in the Town during the period between 2015 and the present.

6.      In 2015, Mr. McCoy applied for and received a storage container permit, which was approved effective September 1, 2015 (the "2015 Permit"). A true and accurate copy of the 2015 Permit is attached hereto as Exhibit 2.

7.      Per the Town's zoning ordinance, storage container permits may be granted for a one year period for storage purposes only. *See* Exhibit 1 at Article 14.

8.      The 2015 Permit informed Mr. McCoy that his storage container could be used for storage purposes only and must be removed one year from the approved date (i.e., September 1, 2016).

9.      As of September 1, 2016, Mr. McCoy had not removed his storage container. In addition, he was maintaining an additional unpermitted storage container on his property. Accordingly, the Town's building inspector issued a Notice of Violation to Mr. McCoy. The notice informed Mr. McCoy that his 2015 Permit had expired, that his storage containers needed to be removed, but that he had a right to appeal to the Town's Zoning Board of Adjustment. A true and accurate copy of the Notice of Violation is attached hereto as Exhibit 3.

10.     On November 3, 2016, Mr. McCoy wrote to the building inspector and requested an extension of his 2015 Permit, and he represented that he needed the storage container for storage purposes only. A true and accurate copy of Mr. McCoy's November 3, 2016 letter is attached hereto as Exhibit 4.

11.     On November 15, 2016, the Board unanimously voted to approve the six month extension. The motion to approve was made by Selectman Carl Anderson.

12.     In May 2017, Mr. McCoy requested a meeting with the Town's Board of Selectmen ("Board") regarding his storage container. This request followed a visit to Mr. McCoy's property from the Town's building inspector. A true and accurate copy of an email documenting Mr. McCoy's request is attached hereto as Exhibit 5.

13.     On May 23, 2017, the Board began deliberations regarding Mr. McCoy's extension request and discussed enforcement of the storage container ordinance generally. The Board's deliberations were tabled so that the Board could meet with Mr. McCoy. A true and accurate copy of the minutes of the May 23, 2017 meeting with the Board are attached hereto as Exhibit 15.

14.     On June 13, 2017, the Board met with Mr. McCoy to consider his request for another extension of his storage container permit. During the meeting, Mr. McCoy represented that he needed the storage container for storage purposes related to work he was performing on his deck and due to a disability. There was no discussion or mention during the meeting of the storage container being used to display any speech or other expressive content. A true and accurate copy of the minutes of the June 13, 2017 meeting with the Board is attached hereto as Exhibit 6.

15.     During the June 13th meeting, I advised the Board that the zoning ordinance states that a storage container permit "shall not [sic] be no more than 12 months." The Board approved Mr. McCoy's request by a unanimous vote despite the 12 month limitation and the fact that the storage container had been on Mr. McCoy's property since sometime in 2014. A true and accurate copy of the 2017 permit is attached hereto as Exhibit 7.

16.     As Zoning Administrator, the Board or its designee(s) are vested with approving or denying permits for storage containers and individuals aggrieved by such decisions may appeal to the Town's Zoning Board of Adjustment. *See* Exhibit 1 at pages 6-7, 39.

3

17.     Per the Town's zoning ordinance, signs may be permitted under Article 9 upon application by a Town resident. *See* Exhibit 1 at Article 9. Mr. McCoy never requested or otherwise applied for a sign permit from the Town, and never represented or communicated to the Town any desire or intent to use his storage container as a sign.

18.     On May 22, 2018, the Board wrote to Mr. McCoy and reminded him that his 2017 permit was set to expire in the following month and that his storage container would need to be removed. A true and accurate copy of the Board's May 2018 correspondence is attached hereto as Exhibit 8.

19.     On May 29, 2018, Mr. McCoy wrote to the Board and requested a third permit extension. A true and accurate copy of Mr. McCoy's correspondence is attached hereto as Exhibit 9.

20.     On June 12, 2018, the Board considered Mr. McCoy's request for a third extension, and denied it by unanimous vote. The Board discussed Mr. McCoy's permit history and his prior representations to the Board. There was no discussion regarding the use of the storage container for any expressive purposes, nor any mention of use as a Trump sign in 2016 and 2017. A true and accurate copy of the minutes of the June 2018 meeting are attached as Exhibit 10.

21.     During the Board's June 12, 2018, the Board also took up and considered complaints regarding three other unpermitted storage containers in Town, located at 140 Tilton Hill Road, (the "Tilton Hill Trailers") and agreed to send a Notice of Violation to the owners of the storage containers. *See* Exhibit 10 at page 7 ("Notice of Zoning Violation update").

22.     On June 13, 2018, the Board sent a notice of violation to the owners of the Tilton Hill Trailers. A true and accurate copy of the notice of violation is attached as Exhibit 11. In response, the owners of the Tilton Hill Trailers applied for and received a permit for one of their

three storage containers. The other two trailers were removed. The Tilton Hill Trailers did not display any expressive content to the Town's knowledge.

23.     On June 13, 2018, I wrote to Mr. McCoy and informed him of the Board's decision, and noted the Board's reasons. A true and accurate copy of my correspondence is attached as Exhibit 12.

24.     Mr. McCoy did not appeal the Board's denial of his third permit request.

25.     The Town, in the ordinary course, sometimes receives anonymous complaints regarding storage containers and other alleged zoning violations. The Town had received an anonymous complaint regarding Mr. McCoy's trailer sometime in 2016, which was not recorded, and received a similar anonymous complaint regarding the Tilton Hill Trailers in 2018.

26.     During my tenure as Town Administrator, the Town has engaged in enforcement with respect to storage containers in instances when it has become aware of potential violations, and without regard to whether a storage container has been used for expressive purposes or not. For example, with respect to Mr. McCoy, the Town learned of an unpermitted trailer on his property in 2015 and subsequently required that he seek and obtain a permit.

27.     Ultimately, the Town did not impose any penalties or take any other enforcement actions against Mr. McCoy other than to confirm that his storage container was removed following the Board's June 2018 decision.

28.     Mr. McCoy's storage containers were known to the Town based on visual inspection of the Town's building inspector, permit applications and correspondence received from Mr. McCoy, and public testimony from Mr. McCoy. Accordingly, the Town was aware that Mr. McCoy had trailers on his property that were not grandfathered and that he needed to comply with Article 14 of the Zoning Ordinance.

29.     The Town has limited resources to dedicate toward enforcement of the storage container

provisions of the zoning ordinance. It has, however, taken action against others in Town with

respect to unpermitted storage containers, which were not used for expressive purposes. For

example:

    A.  In June 2018, the Town took action with respect to the Tilton Hill Trailers as noted

        previously.

    B.  In 2019, the Town brought suit to enforce Article 14 in *Town of Pittsfield v. James*

        *Hetu, et al*, Case No. 217-2019-cv-00663, Merrimack Superior Court. This action

        arose following lengthy efforts to obtain compliance. A true and accurate copy of

        correspondence with respect to the Town's enforcement efforts is attached as Exhibit

        13.

    C.  In the summer of 2019, the Town became aware of an unpermitted storage container

        at 11 Cram Avenue, issued a notice of violation, and subsequently received and

        approved a permit application. A true and accurate copy of the notice of violation is

        attached as Exhibit 14. The Town's treatment with respect to the storage container at

        11 Cram Avenue is consistent with the manner in which Mr. McCoy's 2015 Permit

        application was received and approved.

30.     Based on my review of Mr. McCoy's permit history, and the Town's enforcement actions

with respect to other properties, the following is apparent:

    a.  Mr. McCoy's storage container was allowed to remain on his property far beyond

        the 12 month limit of the zoning ordinance, which is in excess of the time period

        allowed to other storage containers;

b.  The Town did not require Mr. McCoy to remove the storage container until 2018
    (when it was no longer painted "Trump" on the side); and

c.  The Board's actions with respect to Mr. McCoy's storage container were
    consistent with the treatment of other storage containers in the Town that were
    made known to the Board as needing permit approvals, and which did not feature
    any signs or other expressive content.

Affiant sayeth further not.


6/4/2021

Date

_Cara Marston_

Cara Marston


STATE OF NEW HAMPSHIRE
COUNTY OF

Before me, the undersigned officer, personally appeared the said Cara Marston, known to me or satisfactorily proven to be the person whose name is subscribed to the within instrument, and acknowledged that she executed the same for the purposes therein contained and did state under oath the within facts are true to the beset of her knowledge and belief.


_Rhonda E. Davignon_

Printed Name: Rhonda E. Davignon
Notary Public
My Commission Expires: 12/2/25

RHONDA E. DAVIGNON
MY COMMISSION EXPIRES
DEC. 2, 2025
NOTARY PUBLIC
NEW HAMPSHIRE





EXHIBIT

MARSTON AFF.
EXHIBIT 1

# TOWN OF PITTSFIELD ZONING ORDINANCE

Adopted March 8, 1988

Most recently amended March 9, 2021

# Article 1.  General Provisions

## 1.  Title

This zoning ordinance shall be known as the "Town of Pittsfield Zoning Ordinance" and is herein called the "zoning ordinance" or just the "ordinance" where "ordinance" clearly means the zoning ordinance.

## 2.  Authority

The town meeting's authority to adopt the zoning ordinance is New Hampshire Revised Statutes Annotated RSA 674:16, Grant of Power; other enabling statutes in NH RSA; and enabling case law.

## 3.  Applicability

No person may use or authorize the use of any land or STRUCTURE except according to all applicable regulations of the zoning ordinance.

## 4.  Jurisdiction

The zoning ordinance shall be effective within the corporate boundaries of the town of Pittsfield, New Hampshire.

## 5.  Purpose

Pursuant to RSA 674:17 and RSA 674:21, VI, (a), the zoning ordinance is designed for the following purposes:

(a)  To lessen congestion in the STREETS.

(b)  To secure safety from fires, panic and other dangers.

(c)  To promote health and the general welfare.

(d)  To provide adequate light and air.

(e)  To prevent the overcrowding of land.

(f)  To avoid undue concentration of population.

(g)  To facilitate the adequate provision of transportation, solid waste facilities, water, sewerage, SCHOOLS, parks, child day care.

(h)  To assure proper use of natural resources and other public requirements.

(i)  To encourage the preservation of agricultural lands and BUILDINGS and the agricultural operations described in RSA 21:34-a supporting the agricultural lands and BUILDINGS.

(j)  To encourage the installation and use of solar, wind, or other renewable energy systems and protect access to energy sources by the regulation of orientation of STREETS, LOTS, and BUILDINGS; establishment of maximum BUILDING height, minimum SETBACK requirements, and limitations on type, height, and placement of vegetation; and encouragement of the use of solar skyspace easements under RSA 477.

(k)  To have reasonable consideration for the character of the area involved and its peculiar suitability for particular uses, to conserve the value of BUILDINGS, and to encourage the most appropriate use of land throughout the municipality.  (RSA 674:17, II.)

(l)  To accommodate reasonably amateur radio communications.  (RSA 674:17, III.)

(m)  To encourage the preservation of OPEN SPACE wherever possible.  (See RSA 674:21, VI, (a).)

**6. Administrator**
(a) The board of selectmen shall have charge of administering and enforcing the zoning ordinance except as follows:

(1) If the zoning ordinance explicitly designates a specific administrator for a specified part of the zoning ordinance, then that administrator shall administer that part of the zoning ordinance.

(2) The board of selectmen's charge to administer and enforce the zoning ordinance shall not interfere with any state or federal law empowering a specific administrator, for example, RSA 676:13, I, (building inspector); RSA 155-A:4, II, and RSA 155-A:7, I, (fire chief); and RSA 676:5, III, (planning board).

(b) The board of selectmen may authorize an agent to administer and enforce the zoning ordinance on the board's behalf and may revoke that authorization at any time.  Such an authorization or revocation shall be effective if and only if the board's minutes record the board's vote to authorize or revoke.

**7. Conflicting Provisions; Relationship to Other Ordinance or Regulation**
Wherever provisions of the zoning ordinance conflict, or wherever a provision of the zoning ordinance conflicts with a provision of another ordinance or regulation, the provision that imposes the greater restriction or higher standard shall control.  (RSA 676:14.)

**8. Separability**
The invalidity of any provision of the zoning ordinance shall not affect the validity of any other provision.

**9. Penalty Clause**
Any person who violates any of the provisions of this zoning ordinance, or any provision or specification of any application, plat, or plan approved by, or any requirement or condition of a permit or decision issued by, any local administrator or land use board acting under the authority of this zoning ordinance shall be guilty of a misdemeanor if a natural person, or guilty of a felony if any other person; and shall be subject to a civil penalty of $275 for the first offense, and $550 for subsequent offenses, for each day that such violation is found to continue after the conviction date or after the date on which the violator receives written notice from the municipality that the violator is in violation, whichever is earlier. Each day that a violation continues shall be a separate offense. (RSA 676:17, I; also see RSA 676:15 through RSA 676:18, Penalties and Remedies.)

**10. Mobile Home, Mobile Home Park and Trailer Park Ordinance Repealed**
The adoption of the zoning ordinance shall repeal the Mobile Home, Mobile Home Park and Trailer Park Ordinance for the Town of Pittsfield as heretofore amended.

**11. Amendment**
The zoning ordinance may be amended as provided in RSA chapter 675.

**12. Effective Date**
The zoning ordinance shall take effect immediately upon its passage.

# Article 2.  Interpretation Rules and Definitions

## 1.  Word or Phrase Interpretation Rules

(a) All words and phrases of the zoning ordinance shall be interpreted according to this section.

(b) In this section, "headword" means a word or phrase spelled in all capital letters and placed at the beginning of a definition in article 2, section 3, Definitions.

(c) If the zoning ordinance explicitly says that a word or phrase has a specific meaning to be used in a specified part of the zoning ordinance, then the word or phrase has that specific meaning throughout the specified part.

(d) If a word or phrase is a headword in article 2, section 3, Definitions, then the word or phrase has the meaning stated for it as a headword in article 2, section 3, except as provided in paragraph (c) of this section.

(e) If a word or phrase is not a headword in article 2, section 3, Definitions, then the word or phrase has the meaning stated for it in *Webster's Third New International Dictionary of the English Language, Unabridged*, Merriam-Webster, except as provided in paragraph (c) of this section.

## 2.  All-Capital-Letters Spelling of Defined Words and Phrases

All-capital-letters spelling is used to indicate that a word or phrase has the meaning stated for it as a headword in article 2, section 3, Definitions.

In this section, "headword" means a headword as defined in article 2, section 1, (b).

## 3.  Definitions

**ABUTTER:**
(a) In this definition of "ABUTTER," "street" means a street as defined in RSA 672:13.

(b) "ABUTTER" means any person whose property is located in New Hampshire and adjoins or is directly across the street or stream from the land under consideration by the local land use board. For purposes of receiving testimony only, and not for purposes of notification, the term "ABUTTER" shall include any person who is able to demonstrate that his land will be directly affected by the proposal under consideration. For purposes of receipt of notification by a municipality of a local land use board hearing, in the case of an abutting property being under a CONDOMINIUM or other collective form of ownership, the term "ABUTTER" means the officers of the collective or association, as defined in RSA 356-B:3, XXIII. For purposes of receipt of notification by a municipality of a local land use board hearing, in the case of an abutting property being under a MANUFACTURED HOUSING PARK form of ownership as defined in RSA 205-A:1, II, the term "ABUTTER" includes the MANUFACTURED HOUSING PARK owner and the tenants who own MANUFACTURED HOUSING which adjoins or is directly across the street or stream from the land under consideration by the local land use board.  (See RSA 672:3, Abutter.)

**SPECIAL EXCEPTION:** "SPECIAL EXCEPTION" has two meanings as stated in subparagraphs (a) and (b), and the context determines which meaning applies.

(a) "SPECIAL EXCEPTION" means a use permitted upon (1) certain conditions set forth in the zoning ordinance and (2) an approving authority's decision that the use satisfies those conditions.

(b) "SPECIAL EXCEPTION" means the approving authority's decision that the use defined in subparagraph (a) satisfies the conditions set forth in the zoning ordinance.

(c) In subparagraphs (a) and (b), "zoning ordinance" means the zoning ordinance excluding article 5, section 3, I, (b); article 5, section 3, V; article 5, section 4, Equitable Waiver of Dimensional Requirement; article 7, Variances; and article 17, section 12, Appeals and Variances. These parts of the zoning ordinance state and are limited to New Hampshire state or United States federal requirements for a VARIANCE under RSA 674:33, I, (b); RSA 674:33, V; or article 17, section 12, Appeals and Variances, or for an equitable waiver of a dimensional requirement under RSA 674:33-a.

(RSA 674:33, IV; also see article 6 for SPECIAL EXCEPTION regulations.)

**STABLE:** "STABLE" means a place that houses one or more horses except that "STABLE" excludes any residence that has three or fewer horses as pets.

**STORAGE CONTAINER:** "STORAGE CONTAINER" means a truck trailer, box trailer, school bus, MANUFACTURED HOUSING unit, or similar mobile container parked continuously for 31 days or more and used principally for storage and not used for any person's residential occupancy or transient lodging. (See article 14 for STORAGE CONTAINER permitting conditions.)

**STORY:**

(a) In this definition of "STORY," the words "attic" and "basement" have the following meanings:

    (1) "Attic" means that part of a BUILDING such that the roof frame meets the floor on opposite sides of the part of the BUILDING.

    (2) "Basement" means that part of a BUILDING such that more than one-half of the part the BUILDING vertically is below the average grade of the ground adjoining the BUILDING.

(b) "STORY" means that part of a BUILDING contained between any floor and the floor or roof next above the part of the BUILDING except that "STORY" excludes attics and basements.

**STREET:** "STREET" means either

(a) a highway as defined in RSA 229:1 or

(b) a road dedicated to the public use but not accepted by the city or town in which the road is located.

**STRUCTURE:** "STRUCTURE" means something constructed or built that has a fixed location on or in the ground or that is permanently attached to something that has a fixed location on or in the ground.

**STRUCTURE, ACCESSORY:** See ACCESSORY STRUCTURE.

**STRUCTURE, NONCONFORMING:** See NONCONFORMING STRUCTURE.

**STRUCTURE, PRINCIPAL:** See PRINCIPAL STRUCTURE.

# Article 4.  Nonconforming Uses and Lots

## 1.  Authority

(a) RSA 674:19, Applicability of Zoning Ordinance:
A zoning ordinance adopted under RSA 674:16 shall not apply to existing structures or to the existing use of any building. It shall apply to any alteration of a building for use for a purpose or in a manner which is substantially different from the use to which it was put before alteration.

(b) RSA 674:39, Five-Year Exemption:
I. Every subdivision plat approved by the planning board and properly recorded in the registry of deeds and every site plan approved by the planning board and properly recorded in the registry of deeds, if recording of site plans is required by the planning board or by local regulation, shall be exempt from all subsequent changes in subdivision regulations, site plan review regulations, impact fee ordinances, and zoning ordinances adopted by any city, town, or county in which there are located unincorporated towns or unorganized places, except those regulations and ordinances which expressly protect public health standards, such as water quality and sewage treatment requirements, for a period of 5 years after the date of approval; provided that:

    (a) Active and substantial development or building has begun on the site by the owner or the owner's successor in interest in accordance with the approved subdivision plat within 24 months after the date of approval, or in accordance with the terms of the approval, and, if a bond or other security to cover the costs of roads, drains, or sewers is required in connection with such approval, such bond or other security is posted with the city, town, or county in which there are located unincorporated towns or unorganized places, at the time of commencement of such development;

    (b) Development remains in full compliance with the public health regulations and ordinances specified in this section; and

    (c) At the time of approval and recording, the subdivision plat or site plan conforms to the subdivision regulations, site plan review regulations, and zoning ordinances then in effect at the location of such subdivision plat or site plan.

II. Once substantial completion of the improvements as shown on the subdivision plat or site plan has occurred in compliance with the approved subdivision plat or site plan or the terms of said approval or unless otherwise stipulated by the planning board, the rights of the owner or the owner's successor in interest shall vest and no subsequent changes in subdivision regulations, site plan regulations, or zoning ordinances, except impact fees adopted pursuant to RSA 674:21 and 675:2-4, shall operate to affect such improvements.

III. The planning board may, as part of its subdivision and site plan regulations or as a condition of subdivision plat or site plan approval, specify the threshold levels of work that shall constitute the following terms, with due regard to the scope and details of a particular project:

    (a) "Substantial completion of the improvements as shown on the subdivision plat or site plan," for purposes of fulfilling paragraph II; and

    (b) "Active and substantial development or building," for the purposes of fulfilling paragraph I.

IV. Failure of a planning board to specify by regulation or as a condition of subdivision plat or site plan approval what shall constitute "active and substantial development or building" shall entitle the subdivision plat or site plan approved by the planning board to the 5-year exemption described in paragraph I. The planning board may, for good cause, extend the 24-month period set forth in subparagraph I(a).

(c) RSA 676:12, I and VI, Certain Building Permits to Be Withheld prior to Zoning Amendments:
I. The building inspector shall not issue any building permit within the 120 days prior to the annual or special town or village district meeting if:

    (a) Application for such permit is made after the first legal notice of proposed changes in the building code or zoning ordinance has been posted pursuant to the provisions of RSA 675:7; and

    (b) The proposed changes in the building code or the zoning ordinance would, if adopted, justify refusal of such permit.

VI. The provisions of paragraph I shall not apply to any plat or application which has been the subject of notice by the planning board pursuant to RSA 676:4, I(d) prior to the first legal notice of a proposed change in a building code or zoning ordinance or any amendment thereto. No proposed subdivision or site plan review or zoning ordinance or amendment thereto shall affect a plat or application which has been the subject of notice by the planning board pursuant to RSA 676:4, I(d) so long as said plat or application was the subject of notice prior to the first legal notice of said change or amendment. The provisions of this paragraph shall also apply to proposals submitted to a planning board for design review pursuant to RSA 676:4, II(b), provided that a formal application is filed with the planning board within 12 months of the end of the design review process.

(d) RSA 155-B:2, Repair or Removal of Hazardous Building:
The governing body of any city or town may order the owner of any hazardous building within the municipality to correct the hazardous condition of such building or to raze or remove the same.

## 2. Purpose

The purposes of this article are as follows:

(a) To codify the New Hampshire state law of NONCONFORMING USES into the zoning ordinance.

(b) To encourage the discontinuance of NONCONFORMING USES.

(c) To encourage the elimination or reduction of nonconformance of NONCONFORMING LOTS.

(d) To provide for the continuance of lawfully established nonconformance if the transition to conformance is unreasonable.  (See RSA 674:19, which provides for the continuance of NONCONFORMING USES but says nothing about the development of NONCONFORMING LOTS.)

## 3. Nonconforming Uses

(a) Continuance of Nonconforming Activities:  Every NONCONFORMING ACTIVITY may continue to exist upon the following conditions:

    (1) The NONCONFORMING ACTIVITY shall not change to have a purpose, character, or effect on the neighborhood that differs substantially from the purpose, character, or effect on the neighborhood that the NONCONFORMING ACTIVITY had when it was first nonconforming.

    (2) The NONCONFORMING ACTIVITY shall not expand into any indoor or outdoor space that the NONCONFORMING ACTIVITY has not occupied as a NONCONFORMING ACTIVITY.

(3) The NONCONFORMING ACTIVITY shall not expand into any indoor or outdoor space that the NONCONFORMING ACTIVITY vacated and never reoccupied during the following two years.

(4) The NONCONFORMING ACTIVITY shall not expand so as to render premises or property proportionally less adequate.

(5) The NONCONFORMING ACTIVITY shall have no discontinuance of two years or more.

(b) Abandonment of Nonconforming Activities:  Every NONCONFORMING ACTIVITY that satisfies either of the following conditions (1) and (2) shall be deemed abandoned and shall be prohibited:

(1) The NONCONFORMING ACTIVITY shall be deemed abandoned and shall be prohibited if it violates one or more of the conditions in paragraph (a), (1) through (4), and if

(A) within 35 days after the earliest date when the zoning ordinance administrator sends the owner of the NONCONFORMING ACTIVITY a certified-mail notice of the violation, the owner has not submitted a written plan to eliminate the violation or

(B) within 95 days after the earliest date when the zoning ordinance administrator sends the owner of the NONCONFORMING ACTIVITY a certified-mail notice of the violation, the owner has not eliminated the violation.

(2) The NONCONFORMING ACTIVITY shall be deemed abandoned and shall be prohibited if it has a discontinuance of two years or more.  (See article 4, section 3, (a), (5).)

(c) Continuance of Nonconforming Structures:   Every NONCONFORMING STRUCTURE may continue to exist upon the following conditions:

(1) The NONCONFORMING STRUCTURE may be maintained or renovated and may be repaired or rebuilt after any damage if the maintenance, renovations, repairs, and rebuilding satisfy the following conditions (A) and (B):

(A) Maintenance, renovations, repairs, and rebuilding shall not give the NONCONFORMING STRUCTURE a purpose, character, or effect on the neighborhood that differs substantially from the purpose, character, or effect on the neighborhood that the NONCONFORMING STRUCTURE had when it was first nonconforming.

(B) Repairs and rebuilding after the NONCONFORMING STRUCTURE has sustained damage greater than or equal to 75% of the NONCONFORMING STRUCTURE'S PRINCIPAL FLOOR AREA shall be in substantial progress within two years after the date of the NONCONFORMING STRUCTURE'S damage.  (See article 4, section 1, (c), Vesting of Nonconforming Uses.)

(2) The NONCONFORMING STRUCTURE may have additions to its nonconforming parts if the additions satisfy the following conditions (A) through (C):

(A) The additions shall not give the NONCONFORMING STRUCTURE a purpose, character, or effect on the neighborhood that differs substantially from the purpose, character, or

effect on the neighborhood that the NONCONFORMING STRUCTURE had when it was first nonconforming.

(B) The additions in total since the NONCONFORMING STRUCTURE was first nonconforming shall not be substantial.

(C) The additions shall not render the LOT proportionally less adequate.

(3) The NONCONFORMING STRUCTURE may have additions to its conforming parts if the additions satisfy the following conditions (A) and (B):

(A) The additions shall not give the NONCONFORMING STRUCTURE a purpose, character, or effect on the neighborhood that differs substantially from the purpose, character, or effect on the neighborhood that the NONCONFORMING STRUCTURE had when it was first nonconforming.

(B) The additions shall create no nonconformance to the zoning ordinance except that an addition may create a nonconformance if the addition satisfies the conditions in subparagraph (2), for additions to nonconforming parts of the NONCONFORMING STRUCTURE.

(d) Abandonment of Nonconforming Structures:   Every NONCONFORMING STRUCTURE that satisfies either of the following conditions (1) and (2) shall be deemed abandoned and shall be prohibited:

(1) The NONCONFORMING STRUCTURE shall be deemed abandoned and shall be prohibited if it violates one or more of the conditions in paragraph (c), (1), (A); paragraph (c), (2); or paragraph (c), (3), and if

(A) within 35 days after the earliest date when the zoning ordinance administrator sends the owner of the NONCONFORMING STRUCTURE a certified-mail notice of the violation, the owner has not submitted a written plan to eliminate the violation or

(B) within 95 days after the earliest date when the zoning ordinance administrator sends the owner of the NONCONFORMING STRUCTURE a certified-mail notice of the violation, the owner has not eliminated the violation.

(2) The NONCONFORMING STRUCTURE shall be deemed abandoned and shall be prohibited if it has sustained damage greater than or equal to 75% of the NONCONFORMING STRUCTURE'S PRINCIPAL FLOOR AREA and if the NONCONFORMING STRUCTURE is not in substantial rebuilding within two years after the date of the NONCONFORMING STRUCTURE'S damage.

(e) Public-Taking Not-Conforming Structures:  Every lawfully existing STRUCTURE that becomes a not-conforming STRUCTURE because of an eminent-domain taking or that increases its nonconformance because of an eminent-domain taking shall be treated as a NONCONFORMING STRUCTURE under the zoning ordinance.

(f) Repair or Removal of Hazardous Buildings:   Under RSA chapter 155-B, Hazardous and Dilapidated Buildings, the board of selectmen may order the owner of any hazardous building

(d) That due to the degree of past construction or investment made in ignorance of the facts constituting the violation, the cost of correction so far outweighs any public benefit to be gained, that it would be inequitable to require the violation to be corrected.

II. In lieu of the findings required by the board under subparagraphs I(a) and (b), the owner may demonstrate to the satisfaction of the board that the violation has existed for 10 years or more, and that no enforcement action, including written notice of violation, has been commenced against the violation during that time by the municipality or any person directly affected.

III. Application and hearing procedures for equitable waivers under this section shall be governed by RSA 676:5 through 7. Rehearings and appeals shall be governed by RSA 677:2 through 14.

IV. Waivers shall be granted under this section only from physical layout, mathematical or dimensional requirements, and not from use restrictions. An equitable waiver granted under this section shall not be construed as a NONCONFORMING USE, and shall not exempt future use, construction, reconstruction, or additions on the property from full compliance with the ordinance. This section shall not be construed to alter the principle that owners of land are bound by constructive knowledge of all applicable requirements. This section shall not be construed to impose upon municipal officials any duty to guarantee the correctness of plans reviewed by them or property inspected by them.
(RSA 674:33-a.)

## 5.  Appeals to Board of Adjustment

I. Appeals to the board of adjustment concerning any matter within the board's powers as set forth in RSA 674:33 may be taken by any person aggrieved or by any officer, department, board, or bureau of the municipality affected by any decision of the administrative officer. Such appeal shall be taken within a reasonable time, as provided by the rules of the board, by filing with the officer from whom the appeal is taken and with the board a notice of appeal specifying the grounds thereof. The officer from whom the appeal is taken shall forthwith transmit to the board all the papers constituting the record upon which the action appealed from was taken.

II. For the purposes of this section:
(a) The "administrative officer" means any official or board who, in the municipality, has responsibility for issuing permits or certificates under the zoning ordinance, or for enforcing the ordinance, and may include a building inspector, board of selectmen, or other official or board with such responsibility.
(b) A "decision of the administrative officer" includes any decision involving construction, interpretation or application of the terms of the zoning ordinance. It does not include a discretionary decision to commence formal or informal enforcement proceedings, but does include any construction, interpretation or application of the terms of the ordinance which is implicated in such enforcement proceedings.

III. If, in the exercise of SUBDIVISION or site plan review, the planning board makes any decision or determination which is based upon the terms of the zoning ordinance, or upon any construction, interpretation, or application of the zoning ordinance, which would be appealable to the board of adjustment if it had been made by the administrative officer, then such decision may be appealed to the board of adjustment under this section; provided, however, that if the zoning ordinance contains an innovative land use control adopted pursuant to RSA 674:21 which delegates administration, including the granting of conditional or special use permits, to the planning board, then the planning

board's decision made pursuant to that delegation cannot be appealed to the board of adjustment, but may be appealed to the superior court as provided by RSA 677:15.

(RSA 676:5, I, II, and III.)

## 6. Materially Similar Applications

If (1) the board of adjustment has disapproved an application, (2) the disapproval was not appealed, (3) a subsequent application is made for a use that does not materially differ in nature and degree from its predecessor, and (4) a material change of circumstances affecting the merits of the subsequent application has not occurred, then the board may not reach the merits of the subsequent application. The applicant bears the burden of proving a material change of circumstances before the board.

## 7. Public Hearing; Notice

I. Prior to exercising its appeals powers, the board of adjustment shall hold a public hearing. Notice of the public hearing shall be given as follows:

(a) The appellant and every ABUTTER and holder of CONSERVATION, preservation, or agricultural preservation RESTRICTIONS shall be notified of the hearing by certified mail stating the time and place of the hearing, and such notice shall be given not less than 5 days before the date fixed for the hearing of the appeal. The board shall hear all ABUTTERS and holders of CONSERVATION, preservation, or agricultural preservation RESTRICTIONS desiring to submit testimony and all nonABUTTERS who can demonstrate that they are affected directly by the proposal under consideration. The board may hear such other persons as it deems appropriate.

(b) A public notice of the hearing shall be placed in a newspaper of general circulation in the area not less than 5 days before the date fixed for the hearing of the appeal.

II. The public hearing shall be held within 30 days of the receipt of the notice of appeal.

III. Any party may appear in person or by the party's agent or attorney at the hearing of an appeal.

IV. The cost of notice, whether mailed, posted, or published, shall be paid in advance by the applicant. Failure to pay such costs shall constitute valid grounds for the board to terminate further consideration and to deny the appeal without public hearing.

(RSA 676:7)

## 8. Review of Developments of Regional Impact

(a) Notice and hearing requirements of RSA 36:54 through RSA 36:58 apply to applications for DEVELOPMENTS OF potential REGIONAL IMPACT.

(b) Review Required: The board of adjustment, upon receipt of an application for development, shall review it promptly and determine whether or not the development, if approved, reasonably could be construed as having the potential for regional impact. Doubt concerning regional impact shall be resolved in a determination that the development has a potential regional impact. (RSA 36:56, I.)

## 9. Burden of Proof

On issues wherein the exercise of the board of adjustment's discretion is sought, the burden of proof is on the applicant.

## 10.  Issuance of Decision

(a) The board of adjustment shall issue a final written decision which either approves or disapproves an application for a local permit and make a copy of the decision available to the applicant. If the application is not approved, the board shall provide the applicant with written reasons for the disapproval. If the application is approved with conditions, the board shall include in the written decision a detailed description of all conditions necessary to obtain final approval.  (RSA 676:3, I.)

(b) Whenever the board of adjustment votes to approve or disapprove an application, the board shall set forth in its minutes of the meeting at which the vote is taken every finding of fact and every ruling of law that the board made regarding the application.  If the board affirms, modifies, or reverses a decision of an administrative officer, then the board shall set forth in the minutes every reason for the affirmation, modification, or reversal.  If the board approves an application for a permit, then the board shall set forth in the minutes how the application has satisfied each of the requirements for the permit.  If the board disapproves an application for a permit, then the board shall set forth in the minutes every requirement for the permit that the application failed to satisfy.  If the board approves an application for a permit but attaches any conditions, then the board shall set forth in the minutes every reason for each condition.

(c) Whenever the board of adjustment votes to approve or disapprove an application or deny a motion for rehearing, the minutes of the meeting at which such vote is taken, including the written decision containing the reasons therefor and all conditions of approval, shall be placed on file in the board's office and shall be made available for public inspection within 5 business days of such vote.  (RSA 676:3, II.)

(d) Whenever a plat is recorded to memorialize an approval issued by the board of adjustment, the final written decision, including all conditions of approval, shall be recorded with or on the plat. (RSA 676:3, III.)

## 11.  Motion for Rehearing, Rehearing, and Appeal to Superior Court

(a) Whenever a person or a municipality seeks a rehearing on or an appeal of a zoning-related order or decision, the procedures enacted under RSA chapter 677 shall be followed.  (RSA 677:1.)

(b) Within 30 days after any order or decision of the zoning board of adjustment, or any decision of the local legislative body or a board of appeals in regard to its zoning, the selectmen, any party to the action or proceedings, or any person directly affected thereby may apply for a rehearing in respect to any matter determined in the action or proceeding, or covered or included in the order, specifying in the motion for rehearing the ground therefor; and the board of adjustment, a board of appeals, or the local legislative body, may grant such rehearing if in its opinion good reason therefor is stated in the motion. This 30-day time period shall be counted in calendar days beginning with the date following the date upon which the board voted to approve or disapprove the application in accordance with RSA 21:35.  (RSA 677:2)

(c) A motion for rehearing made under RSA 677:2 shall set forth fully every ground upon which it is claimed that the decision or order complained of is unlawful or unreasonable.  (RSA 677:3, I.) A motion for rehearing is a prerequisite for an appeal to the superior court.  (RSA 677:3, I.)

(d) Upon the filing of a motion for a rehearing, the board of adjustment, a board of appeals, or the local legislative body shall within 30 days either grant or deny the application, or suspend the order or decision complained of pending further consideration.  (RSA 677:3, II.)

(e) If the board grants a rehearing, and if any new basis for aggrievement results from the rehearing, then a subsequent motion for rehearing that raises any new issues that are thrust upon the appealing party is necessary to preserve the new issues for an appeal to the superior court.

(f) Any person aggrieved by any order or decision of the zoning board of adjustment or any decision of the local legislative body may apply, by petition, to the superior court within 30 days after the date upon which the board voted to deny the motion for rehearing. For purposes of this paragraph, "person aggrieved" includes any party entitled to request a rehearing under RSA 677:2.  (RSA 677:4)

# Article 9.  Signs

## 1.  Authority
RSA 674:16, I, (d); RSA 674:16, V; and RSA 674:17.

## 2.  Purpose
The purposes of these sign regulations are as follows:

(a) To protect the public from distracting and hazardous signs.  (See RSA 674:17, I, (b) ("To secure safety from fires, panic and other dangers") and RSA 674:17, I, (c) ("To promote health and the general welfare").)
(b) To promote the general welfare by protecting the aesthetics of the town.  (See RSA 674:17, I, (c).)

## 3.  Definitions
In this article, the following terms have the following meanings:

"Animate" means to depict something moving except that "animate" excludes
(a) depicting moving text and
(b) sequentially displaying the letters "O," "P," "E," and "N."

"Flash" means to maintain an artificially illuminated display constant for more than .015 seconds and less than 3 minutes except that "flash" excludes
(a) maintaining a display of text constant for 3 seconds or longer,
(b) depicting moving text, and
(c) sequentially displaying the letters "O," "P," "E," and "N."
The purpose of the .015-second constant-display time is to specify a constant-display time at which the human eye sees an illuminated display as not flickering.

## 4.  Permitting Conditions for Outdoor Signs
Except as provided in article 4, section 3, Nonconforming Uses, every outdoor sign shall be permitted upon the following conditions and upon all other applicable conditions in the zoning ordinance:
(a) Prohibited Signs:  The sign shall not animate, flash, or emit sound.
(b) The sign and its illuminator, if any, shall not interfere with pedestrian or vehicular traffic or be confused with or obstruct the view or effectiveness of any official traffic signal or traffic marking.
(c) The source of lighting for every sign artificially illuminated by an external source shall be mounted and shielded so that the lighting is confined to the area of the sign and so that the light source is not visible three feet above grade at the boundary of adjoining property, including adjoining STREETS.
(d) Brightness:  The luminance of the source of lighting for every artificially illuminated sign shall be less than or equal to 230 candelas per square meter as measured at the brightest area on the face of the sign.  (See Freyssinier, J.P., N. Narendran, and J.D. Bullough. 2006. Luminance requirements for lighted signage. *Sixth International Conference on Solid State Lighting, Proceedings of SPIE* 6337, 63371M.)

# Article 14.  Storage Containers

## 1.  Authority
RSA 674:16, I, (d); RSA 674:16, V; and RSA 674:17.

## 2.  Purpose
The purpose of these STORAGE CONTAINER regulations is to promote the general welfare by protecting the aesthetics of the town.
(See RSA 674:17, I, (c).)

## 3.  Permitting Conditions for Storage Containers
Except as provided in article 4, section 3, Nonconforming Uses, every STORAGE CONTAINER shall be permitted upon the following conditions and upon all other applicable conditions in the zoning ordinance:

(a) The STORAGE CONTAINER shall be used for and only for storage.

(b) The STORAGE CONTAINER shall have a SETBACK from every STREET boundary or INTERIOR LOT LINE which SETBACK is greater than or equal to the minimum SETBACK specified for the STREET boundary or INTERIOR LOT LINE by article 3, section 4, (h), Table of Dimensional Requirements.

(c) No more than one STORAGE CONTAINER shall be on the LOT if the LOT is in the Urban District, the Suburban District, or the Rural District.

(d) No more than two STORAGE CONTAINERS shall be on the LOT if the LOT is in the Commercial District or the Light Industrial/Commercial District.

(e) The sum of the time during which one or more STORAGE CONTAINERS are on any one LOT during any 15-month period shall be no more than 12 months.

(f) The owner of the LOT where the STORAGE CONTAINER will be put shall tell the zoning ordinance administrator the date when the STORAGE CONTAINER is proposed to be put on the LOT.  The zoning ordinance administrator shall issue a permit for the STORAGE CONTAINER, and the permit shall state the date when the STORAGE CONTAINER is proposed to be put on the LOT.



**EXHIBIT**

MARSTON AFF.
EXHIBIT 2

# TOWN OF PITTSFIELD
# NEW HAMPSHIRE

## PERMIT
## FOR STORAGE CONTAINERS

(STORAGE CONTAINERS: Shall mean, any truck trailer, box trailer, school bus, mobile home or other similar facility used for storage or other purposes).

Storage Containers, whether registered or not, whether mobile or stationery, are not allowed on a permanent basis in any zoning district within the Town of Pittsfield. A storage container is permitted for storage purposes only, for a period of one year, with the approval of a parking permit issued by the Board of Selectmen or their designee, provided said storage container meets all setback requirements, and as limited by the following; a) maximum of one storage container per lot in the Urban, Suburban or Rural Districts. b) maximum of two storage containers per lot in the Light Industrial/Commercial Districts.

APPLICANTS NAME: _Joseph McCoy_

APPLICANTS ADDRESS: _322 Catamount Rd._

APPLICANTS TELEPHONE NUMBER: _603-435-5050_

LOCATION OF STORAGE UNIT: TAX MAP & LOT NUMBER: _R23-02-01_

ZONING DISTRICT: _RURAL_

SERIAL NUMBER OF STORAGE CONTAINER: _1H2V04523EB019801_

MAKE AND MANUFACTURER OF CONTAINER: _FP8-F2-45 FRUEHAUF_

SIGNATURE OF APPLICANT: _Joseph E McCoy_

DATE STORAGE USE IS TO BEGIN: _Sept. 1, 2015_

APPROVED: DATE: _9-1-15_

_Board of Selectmen_

Unit must be removed one year from the approved date above.



**EXHIBIT**

MARSTON AFF.
EXHIBIT 3

## Office of Code Enforcement

### TOWN OF PITTSFIELD
### Town Hall, 85 Main Street
### Pittsfield, New Hampshire

### NOTICE OF VIOLATION

Dear Mr., Joseph Mc Coy

    The property located at 322 Catamount Rd Pittsfield NH 03263, identified in the Town Tax Records as Map R23, Lot 02-01, and owned/occupied by you, your permit for a storage trailer has expired on September 1, 2016 and the trailers need to be removed according to our Zoning Ordinance article 14 section 3.

    Your immediate attention to this matter is appreciated.

    If you believe the Building Inspector is in error in the application or interpretation of any provision of the Building codes, you have the right to appeal to the Zoning Board of Appeals in a timely fashion. This stop work Order controls unless and until it is overturned by the Zoning Board of Appeals.

Thank you
Jesse Pacheco
Building Inspector

OFFICE 603-435-6774        FAX:603-435-7922        CELL:603-715-6624

Nov. 3, 2016

To: Jesse Pacheco,

EXHIBIT
tabbies
MARSTON AFF.
EXHIBIT 4

Hello,

I am writing in regards to seeking a 6 month extension for my trailer on my Property located at 322 Catamount Rd.

At the present, i have construction going on, my garage is leaking from the inside and it needs emergency work which will take me several months to fix. I am disabled, with just one working leg, and have to take care of every thing myself, and this has already been started. I will remove one trailer by the end of November. The other i will be dealing with over the cold winter months and will have it emptied and removed by the end of April 2017.

I am asking for this 6 month extention inorder to keep my tools and materials inside this trailer while i deal with this emergency construction situtation inorder to keep things out of the winter outside elements. It will be taken care of and i am sorry for the delay, but i am physcially handicapped, and will complete this task inorder to remain with good standards for this town and it's rules as a Pittsfield home owner.

Thank you For Your Time.
Sincerely,
Joseph McCoy

**Cara Marston**



EXHIBIT

MARSTON AFF.
EXHIBIT 5

**From:**     Bonnie Theriault
**Sent:**      Wednesday, May 17, 2017 5:40 PM
**To:**        Cara Marston
**Subject:**   RE: Office stuff

Jesse has left already and I'll let Mr. McCoy know tomorrow.

Bonnie

**From:** Cara Marston
**Sent:** Wednesday, May 17, 2017 5:14 PM
**To:** Bonnie Theriault
**Subject:** Re: Office stuff

McCoy can put his request in writing
Jesse can call my cell if he's still there

Cara M. Marston
Town Administrator
Town of Pittsfield
85 Main Street
Pittsfield, New Hampshire 03263
office 603.435.6773 x20
fax 603.435.7922 (yup, still have one, for nostalgic purposes)

Sent from my iPhone

On May 17, 2017, at 16:51, Bonnie Theriault <btheriault@pittsfieldnh.gov> wrote:

Hi there,

I hope you are having a fun afternoon. Sorry to bug you but Jesse was in and stated that he has to speak to you about the junkyard, and he'd like to talk with you before he calls Chairman Allard. He indicated that it was something he wanted to do as soon as possible. I explained that you would be in tomorrow but it appears that he wanted to speak with you right then. I told him I'd let you know.

Also, Joseph McCoy 435-5050 wants to get on the agenda for Tuesday night. Jesse had gone to his property regarding the storage container and he wants to speak to the Board about it this week. I advised Mr. McCoy that I had to check to see if there were any scheduled appointments first, and we'd get back to him tomorrow about his request. Shortly after that call, Jesse came in and asked if Mr. McCoy had called, and I explained what I told Mr. McCoy.

So, anyway, I hope you continue to have fun if you can, and I'll see you tomorrow.

Bonnie

Bonnie Theriault
Administrative Assistant



**TOWN OF PITTSFIELD**
**BOARD OF SELECTMEN**
**TOWN HALL, 85 MAIN STREET**
**PITTSFIELD, NH 03263**



MEETING MINUTES OF Tuesday June 13, 2017

**CALL TO ORDER**
Call to order at 6:06 p.m. by J.C. Allard, Chairman

**MEMBERS PRESENT**
J.C. Allard, Chairman
Gerard LeDuc, Vice-Chairman
Carole Richardson
Carl Anderson

**MEMBERS ABSENT**
None

**OTHERS PRESENT**
Cara Marston, Town Administrator
Ammy Ramsey, Recording Secretary

**PUBLIC INPUT** – regarding agenda items only

Dan Schroth would like to make an appointment with Cara to talk with her about putting together a petition article about getting rid of the Building Inspector position, Cara and Dan will meet tomorrow at 11 a.m.

**AGENDA REVIEW**
Gerard: None.
Carole: None.
Carl: None.
J.C.: None.

**NEW BUSINESS**

**ACTION ITEMS**
1. Interviews for vacant position on Board of Selectmen – 4 candidates
J.C. informed the public that the first item under new business is to conduct interviews and it may take some time to get through the process. Due to circumstances out of anyone's control this board finds itself with the requirement of standing in for the voters of Pittsfield to choose another member for the selectboard. We are going to do that item of great

8. Storage Container Permit extension concern – 322 Catamount Road (tabled 5/23/17)
Mr. McCoy stated that they originally got the permit in 2015, he went to Jesse to get an extension because they have found out their deck, and porch is rotted. They are requesting an extension because he is doing the work himself and is handicapped and it is taking them more time then expected to do all the repairs needed. So he is asking the board to grant a one year extension. J.C. asked if there was an issue with extending the permit. Cara stated that our Zoning Ordinance states it shall not be no more than 12 months. J.C. asked if this should go to the Zoning Board. Carl asked why this matter is in front of them. Cara explained that the selectboard are the administrators of the ordinance. Cara also expressed to the board that Mr. McCoy is here trying to do the right thing and if you look around town there are storage trailers on properties that may not have a permit. Mr. McCoy stated that Jesse collected $25.00 cash from him for the permit but later found out the there is no permit. Jesse also stated to him that they have no choice and must get rid of the trailer, when there are multiple trailers all over town that have been there for a long time. Carole asked if they have had the trailer for one year and now would like to have it there for another year and after that it will be gone. Mr. McCoy stated that they want to get rid of it but just need more time to do the work needed on their home.

Carole: I make a motion to extend the permit for one year.
Gerard: Second.
Discussion: None.
Motion carries 4-0

Cara will print out another permit and have everyone sign it.

**CHECK MANIFESTS**
1. Accounts Payable
Gerard: I make a motion to approve Accounts Payable.
Carl: Second.
Discussion: None.
Motion carries 4-0

2. Payroll
Gerard: I make a motion to approve Payroll and Direct Deposit.
Carl: Second.
Discussion: None.
Motion carries 4-0

**MINUTES**
1. May 23, 2017 – Public Meeting Minutes
Gerard: I make a motion to approve the May 23, 2017 Public Meeting Minutes.
Carl: Second.
Discussion: Carole has a few grammatical corrections and will give those to Ammy.
Motion carries 4-0

Motion carries 4-0 roll call was done and all approved.

The Board came out of non-public session at 9:09 p.m.

Gerard: I make a motion to seal the non-public minutes as they may affect adversely the reputation of any person other than a member of this board.
Carl: Second.
Discussion: None.
Motion carries 4-0 roll call (2/3 vote) was done and all approved.

Gerard: I make a motion to adjourn.
Carl: Second.
Discussion: None.
Motion carries 4-0

Approved:

_____          _____
J.C. Allard, Chairman                                          Date



EXHIBIT

MARSTON AFF.
EXHIBIT 7

# TOWN OF PITTSFIELD
# NEW HAMPSHIRE

## PERMIT
## FOR STORAGE CONTAINERS

(STORAGE CONTAINERS: Shall mean, any truck trailer, box trailer, school bus, mobile home or other similar facility used for storage or other purposes).

Storage Containers, whether registered or not, whether mobile or stationery, are not allowed on a permanent basis in any zoning district within the Town of Pittsfield. A storage container is permitted for storage purposes only, for a period of one year, with the approval of a parking permit issued by the Board of Selectmen or their designee, provided said storage container meets all setback requirements, and as limited by the following, a) maximum of one storage container per lot in the Urban, Suburban or Rural Districts. b) maximum of two storage containers per lot in the Light Industrial/Commercial Districts.

APPLICANTS NAME:  Joseph McCoy

APPLICANTS ADDRESS:  322 Catamount Rd.

APPLICANTS TELEPHONE NUMBER  (603) 435 - 5050

LOCATION OF STORAGE UNIT: TAX MAP & LOT NUMBER  R23 - 2 - 1

ZONING DISTRICT  Rural

SERIAL NUMBER OF STORAGE CONTAINER  1H2V045238B01901

MAKE AND MANUFACTURER OF CONTAINER  FP8-5245 - FRUALHAUF

SIGNATURE OF APPLICANT:  Joseph McCoy

DATE STORAGE USE IS TO BEGIN  6-13-2017

APPROVED  DATE  June 13, 2017

Board of Selectmen

Unit must be removed one year from the approved date above



# TOWN OF PITTSFIELD

Office of Selectmen
85 Main Street, Pittsfield NH 03263
admin@pittsfieldnh.gov ~ telephone (603) 435-6773 ~ fax (603



**EXHIBIT**

MARSTON AFF.
EXHIBIT 8

May 22, 2018

Joseph E. McCoy
322 Catamount Road
Pittsfield, NH 03263

Re: storage container permit expiration

Dear Mr. McCoy,

As you know, the storage trailer permit that the Board of Selectmen approved two years ago and extended at your request last June is due to expire next month.

Please consider this letter a friendly reminder that the trailer must be removed from the property for at least a three month period before you can apply for another permit to bring it back.

Thank you in advance for your anticipated cooperation.

Sincerely,

Pittsfield Board of Selectmen

RECEIVED
MAY 2018
Town of
Pittsfield, NH

EXHIBIT
MARSTON AFF.
EXHIBIT 9

May 29, 2018

Dear Board Members,

This concerns a storage trailer located on my property at 322 Catamount Rd. Pittsfield

Last june, 2017, i came to your meeting, i had 2 trailers to unload and remove, as requested. I've emptied and removed 1 so far and it's not an easy task. I am disabled with 1 working leg to move on and now that the weather has changed i am in the process of unloading the second. This will take more time, when i bought my home in pittsfield i had a huge ammount of belongings which came with me so i am asking for another permit inorder to accomplish this huge task.

I am crippled so it cannot
be done easily.
    Please let me know,
or, set aside a time to discuss
this further at your next meeting.

        Thank you

        Joseph McCoy

322 Catamount Rd.
P.O. Box 293
Pittsfield. N.H. 03263



**TOWN OF PITTSFIELD**
**BOARD OF SELECTMEN**
**TOWN HALL, 85 MAIN STREET**
**PITTSFIELD, NH 03263**



**EXHIBIT**
MARSTON AFF.
EXHIBIT 10

**MEETING MINUTES OF Tuesday June 12, 2018**

**CALL TO ORDER**
Call to order at 6:02 p.m. by J.C. Allard, Chairman

**MEMBERS PRESENT**
J.C. Allard, Chairman
Gerard LeDuc, Vice-Chairman
Carole Richardson
Carl Anderson
James Adams

**OTHERS PRESENT**
Cara Hayes, Town Administrator
Ammy Ramsey, Recording Secretary

**PUBLIC INPUT** – regarding agenda items only
There was no input.

**AGENDA REVIEW**
Gerard: None.
Jim: None.
Carole: Action item for police
J.C.: Action item for the CDC
Carl: Action items for Zoning Administrator

**APPOINTMENTS**
6:05 p.m. – Central NH Regional Planning Commission – Brownfield's project update
Mike Tardiff from the Central NH Regional Planning commission presented the board with some photos of some properties between Clark Street and Broadway and then described the status of the Brownfield's project and the potential of the program going forward for the town of Pittsfield. Mike explained the history of the program and that it assesses properties that have potential environmental issues and what it would take to get those properties redeveloped. Steve Rickerich, the consulting engineer with Ransom Consulting, was also present. He explained the steps of the environmental work that is involved in this project. The Central NH RPC has funded this project's environmental work through two grants that the RPC received and have designated to Pittsfield. In the next few months as

the project moves forward Tardiff will contact the Community Development Committee to keep them updated, too.

6:15 p.m. – Jay St. Jean Auctioneers – sale of tax deeded land – Map R4 Lots 1-1, 1-6, & 1-7
J.C. announced the appointment and Jay St. Jean presented the board with packets of information regarding their auction services. They believe that the 3 properties could sell for around 8 to 10 thousand dollars each. Carl inquired about the payment for their services if the properties do not sell. St. Jean explained the fee structure and how costs would be split between the purchaser and the seller.

NEW BUSINESS

DEPARTMENT UPDATES
1. Police Department
Acting Chief Collins updated the board with the hiring process, informed them of paperwork that needed to be filed with the Police Standards & Training regarding his hiring, and confirmed with the board to continue the coverage as it has been.

Carl: I make a motion to continue with having reduced coverage for 20 hours a week until June 26, 2018.
Jim: Second.
Discussion: None.
Motion carries 5-0

Carl inquired about the status of Officer Wood. Acting Chief Collins requested tabling the resignation until he gets a chance to talk with him.  They also discussed some details concerning the membership in the Central NH Special Operations Unit, if there was an annual agreement that needed signing or not.  Both Collins and DiGeorge were of the understanding that the agreement was signed upon joining as a member for coverage, not annually.

ADDED ITEM – ALL NIGHT PARKING BAN
Carole inquired about the parking ban and would like to remove the ban.

Carole: I make a motion to remove the parking ban.
Carl: Second.
Discussion: The board discussed the issues with the policy and the reasons why it was done and the reasons they should consider removing the ban and also the impact it would have for the winter parking ban. The board inquired with George and Acting Chief Collins concerning their opinions, George feels it is a good idea to have the parking ban and Acting Chief Collins stated he has not had a chance to observe situations and did not feel comfortable giving an opinion either way. Carl suggested removing the ban and look at the entire ordinance and talk with George and Acting Chief Collins in the fall.  Gerard stated he feels it is important to have because he sees what happens in town at night.
Motion 4-1. Gerard opposes.

ACTION ITEMS

1. CWS Fence & Guardrail quote – 2018 Tilton Hill Road project

J.C. announced item number 1, and inquired with George on the details. George explained the situation and the details on where the guardrail will be placed and the reasons why the rails are needed.

Carl: I make a motion to approve the CWS Fence & Guardrail quote for the 2018 Tilton Hill Road project.
Jim: Second.
Discussion: None.
Motion carries 5-0

ADDED ITEM – TEMPORARY, SEASONAL PART TIME HIRE

George expressed his concern about being shorthanded because of the employee that is out on workman's comp and stated he spoke with Ammy and she is willing to help for the summer months. There was discussion pertaining to hours she is available to work and a wage and how it will be funded from the budget.

Carl: I make a motion to hire Ammy Ramsey temporary and part time as a Light Equipment Operator at $16.00 an hour starting now until August 31, 2018.
Carole: Second.
Discussion: The total hours across town positions was discussed regarding overtime and full time status. This assignment is temporary, just to assist the highway department get the paving projects completed as there is a highway worker out on workers compensation leave.
Motion carries 5-0

2. Summer 2018 F.B. Argue Recreation Area seasonal part time hiring – substitute director

Carl: I make a motion to appoint Donna Keeley as the substitute director of the F.B. Argue Recreation Area.
Gerard: Second.
Discussion: None.
Motion carries 5-0

3. Website Committee appointment request – Ryan Wood

Carole: I make a motion to appoint Ryan Wood to the Website Committee.
Jim: Second.
Discussion: None.
Motion carries 5-0

4. Resignation – Patrol Officer Donald Wood

J.C. announced item number 4.
Gerard: I make a motion to table the resignation of Patrol Officer Donald Wood until the next meeting.
Carl: Second.

Discussion: None.
Motion carries 5-0

### 5. Community Development Committee resignation – Roland Carter
Gerard: I make a motion to accept the resignation of Roland Carter from the Community Development Committee.
Carl: Second.
Discussion: Gerard stated Roland is selling his home and Jim stated we should send out a letter of thanks for all his work.
Motion carries 5-0

### 6. Application for District Nursing Scholarship
J.C. announced item number 6.  Carole confirmed that there is just one applicant.

Carole: I make a motion to approve the applicant for the District Nursing Scholarship.
Jim: Second.
Discussion: None.
Motion carries 5-0

### 7. Donation to Conservation Commission Fund – $2,000.00, Chris Hill
J.C. announced item number 7.

Gerard: I make a motion to accept the donation of $2,000.00 for the Conservation Commission fund from Chris Hill.
Jim: Second.
Discussion: Carl stated we should send a letter of thanks.
Motion carries 5-0

### 8. Fee Waiver request for BCEP Solid Waste District – Lyman Park
J.C. announced item number 8.  Cara stated they are requesting a waiver because in the past the person that emptied the trash separated it but now with the nature of waste of the trash they are not able to safely separate the trash, which they then have to pay to get rid of the trash.

Carl: I make a motion to approve the Fee Waiver for BCEP for the caretakers of Lyman Park.
Carole: Second.
Discussion:
Motion carries 4-1 Gerard opposes

### 9. Request for Storage Container permit extension – 322 Catamount Road
There was some discussion pertaining to the last extension that was granted and the enforcement process going forward.

Carl: I make a motion to deny the extension request for the Storage Container Permit.
Jim: Second.

Discussion: Gerard stated we need to keep the man at his word.
Motion carries 5-0

The board discussed the terms of the letter and agreed to give them 30 days to remove the trailer.

### 10. Permission for Historical Society to apply to Planning Board
Clayton Wood stated the Historical Society would need a letter of approval from the property owner to speak to the Planning Board regarding their proposal of the relocation of the Society to the Washington House Lot.

Carl: I make a motion to approve the Historical Society to apply to the Planning Board.
Carole: Second.
Discussion: None.
Motion carries 5-0

### 11. Old Home Day application for Parade Permit – July 14, 2018
Carole: I make a motion to approve the Parade Permit for the Old Home Day Parade on July 14, 2018.
Jim: Second
Discussion: None.
Motion carries 5-0

### 12. Balloon Rally Fireworks contract – Atlas Fireworks
Jim: I make a motion to approve the Atlas Fireworks Balloon Rally Fireworks contract.
Carl: Second.
Discussion: Cara noted the recommended change from the insurance company.
Motion carries 5-0

### 13. Eversource BTLA appeals – consideration of legal counsel
Cara stated she sent out the information to Serge and he recommended Attorney Bolt and he would confer with him for contract terms.

Carl: I make a motion to approve Matt Serge to coordinate with Attorney Christopher Boldt from Donahue, Tucker and Ciandella to represent Pittsfield in the BTLA appeal.
Jim: Second.
Discussion: Carole confirmed that they are voting to have Serge find out the cost and then come to us.
Motion carries 5-0

### 14. NH E 9-1-1 Data Operations Liaison renewal
Cara stated the liaisons are currently her and Bonnie.
Carl: I make a motion to appoint Cara Hayes and Bernadette Theriault as the 911 Data Operations Liaisons.
Gerard: Second.

Discussion: None.
Motion carries 5-0

## 15. Notice of Intent to Excavate – Map R48 Lot 2

Carl: I make a motion to approve the Intent to Excavate for Map R48 Lot 2.
Carole: Second
Discussion: None.
Motion carries 5-0

## 16. Notice of Intent to Cut Timber – Map R42 Lot 8

Carl: I make a motion to approve the Intent to Cut Timber for Map R42 Lot 8.
Carole: Second.
Discussion: None.
Motion carries 5-0

## 17. Application for Solar Exemption – Map R7 Lot 1-5

Cara explained that this was approved at town meeting in 2016 and it is an exemption for the value of the solar equipment only (to have no property tax impact).

Carl: I make a motion to approve the application for Solar Exemption.
Gerard: Second.
Discussion: None.
Motion carries 5-0

## 18. Funds Transfer – 2018 appropriations to capital reserve and expendable trust funds

J.C. announced item number 18.

Gerard: I make a motion to approve the fund transfer of the 2018 appropriations to the capital reserve and expendable trust funds.
Jim: Second.
Discussion: None.
Motion carries 5-0

## 19. Funds Transfer – perpetual care for lots sold in Floral Park Cemetery

Carole: I make a motion to transfer funds to perpetual care for lots sold in Floral Park Cemetery.
Jim: Second.
Discussion: None.
Motion carries 5-0

## ADDED ITEM – COMMUNITY DEVELOPMENT COMMITTEE – FIRST IMPRESSIONS PROGRAM

J.C. explained that they have come to an agreement with the town of Tilton regarding the First Impressions Program and explained those details. This memorandum states that the town of Pittsfield and the town of Tilton will look at the other community and give some feedback.

Carl: I make a motion to approve J.C., Cara Hayes, and Louie Houle to sign the memorandum.
Carole: Second.
Discussion: None.
Motion carries 5-0

## ADDED ITEM - Zoning Administrator Deputy

Carl explained he will be on vacation and the Zoning Administrator duties should be covered and would suggest appointing a person as the deputy for not just this instance but also when he is not available to give a timely response.

Carl: I make a motion to appoint J.C. Allard as Deputy Zoning Administrator.
Jim: Second.
Discussion: None.
Motion carries 4-1 J.C. abstains

## ADDED ITEM - Donation of building supplies for the barn at the library

Carl stated that in trying to button up the barn at the library with Clayton Wood and Daren Nielsen and he purchased some supplies to get the job accomplished. Carl stated the job can be completed after some more materials are purchased. He would like a motion to accept the materials as a donation. Jim inquired about the dollar amount and Carl stated not more than $50.00.

Jim: I make a motion to accept the donation of materials needed to seal up the barn at the library.
Carole: Second.
Discussion: None.
Motion carries 5-0

## ADDED ITEM - Junkyard license renewals

Carl would like to be proactive with the junkyard licenses around town and suggests sending a letter of notice of the requirements that need to be done before their license expires to get the process started. It was decided to send out those letters and there was some discussion pertaining to some details on what those letters should contain.

## ADDED ITEM - Notice of Zoning Violation update

Carl stated a Notice of Zoning Violation is going to be sent to 140 Tilton Hill Road and gave some details on what the property owners can have for storage trailers.

Carl: I make a motion to send the Notice of Violation to 140 Tilton Hill Road.
Jim: Second.
Discussion: None.
Motion carries 5-0

**ADDED ITEM - Zoning Violation for excessive junk in the yard**
Cara stated that a Notice of Zoning Violation should be sent for a property because she received a complaint concerning excessive debris in the yard. It was decided to put that on the next agenda.

**ADDED ITEM - 33 Main Street purchase and sale agreement extension**
Carl stated that they received a request from Mr. Gamble to extend the purchase and sales agreement for 33 Main Street. There was some discussion pertaining to the details on the reason.

Jim: I make a motion to extend the purchase and sales agreement for 33 Main Street for 30 days.
Carole: Second.
Discussion: None.
Motion carries 5-0

**27. Signing of the Collective Barging Agreement for Teamsters Local #633**
J.C.: I make a motion to approve and sign the Collective Bargaining Agreement with the teamsters union as approved at 2018 town meeting.
Carl: Second.
Discussion: None.
Motion carries 5-0

**COMMITTEE REPORTS**
Gerard stated that BCEP will be changing the rates to 10 cents a pound from 7 cents.

Carl stated that the selectboard will be receiving a letter concerning the septic system at JNR Automotive and gave some details concerning the issue.

**INFORMATION ITEMS**
2. Letter of Commendation – Sergeant DiGeorge
J.C. announced that Sgt. DiGeorge received a letter of commendation and Sgt. DiGeorge explained the story and also informed the board about 2 other circumstances that may receive a letter, as well. Carole read both letters and Sgt. DiGeorge received an applause from all who attended the meeting. The board stated that the town of Pittsfield is honored and proud to have such a heroic member of the police department. Jim stated he will work on finding out where to send these types of letters to the Red Cross to have Sgt. DiGeorge recognized.

**OLD BUSINESS**
2. Josiah Carpenter Library chimney repair (tabled 4/24/2018)
Carl gave an update on the chimney repair, and stated they received a proposal and suggested that we continue to look for someone who will just repoint the chimney.

3. Historical Society public hearing request – relocation of Society headquarters (pending 4/24/2018)
It was decided to schedule the public hearings for the July meetings.

## CHECK MANIFESTS
1. Accounts Payable
Gerard: I make a motion to approve Accounts Payable.
Carl: Second.
Discussion: None.
Motion carries 5-0

2. Payroll
Gerard: I make a motion to approve Payroll and Direct Deposit.
Carl: Second.
Discussion: None.
Motion carries 5-0

## MINUTES
1. May 8, 2018 – Non Public Session Minutes (tabled 5/22/2018)

2. May 20, 2018 – Public Session Minutes
Gerard: I make a motion to table the May 20, 2018 Public Meeting Minutes.
Carl: Second.
Discussion:
Motion

3. May 20, 2018 – Non Public Session Minutes
Gerard: I make a motion to table the May 20, 2018 Non-Public Meeting Minutes.
Carl: Second.
Discussion: None.
Motion carries 5-0

4. May 22, 2018 – Public Session Minutes
Gerard: I make a motion to approve the May 22, 2018 Public Meeting Minutes.
Carl: Second.
Discussion: None.
Motion carries 5-0

5. June 2, 2018 – Public Session Minutes
Gerard: I make a motion to approve the June 2, 2018 minutes with corrections of the date and time.
Carl: Second.
Discussion: None.
Motion carries 5-0

**PUBLIC INPUT**

Adam Gauthier would like to remind the board about the meeting tomorrow night concerning school funding and gave some details on what will be discussed. He encourages everyone to come out. Adam also inquired about Atlantic Broadband taking over Metrocast and if that would affect the lines in Pittsfield and Cara explained that the cable franchise is currently on an extended contract agreement until either party requests to open the terms.

**NON-PUBLIC SESSION**

Gerard: I make a motion to go into Non-Public Session under RSA 91-A:3, II (d).

Jim: Second.

Discussion: None - Roll call was done and all approved.

When the Board returned to public session Gerard made a motion to seal the non-public minutes as they may affect adversely the reputation of any person other than a member of this board. Carole seconded the motion.

Motion carries with a 5-0 roll call (2/3 achieved) vote, all approved.

Carl: I make a motion to approve Jay St. Jean Auctioneers to auction the tax deeded properties R4 Lots 1-1, 1-6, & 1-7.

Jim: Second.

Discussion: None.

Motion carries 5-0

Carl: I make a motion to adjourn.

Carole: Second.

Discussion: None.

Motion carries 5-0

Approved:

James C. Allard, Chairman          Date  10 July 2018



# TOWN OF PITTSFIELD

Office of Selectmen
85 Main Street, Pittsfield NH 03263
admin@pittsfieldnh.gov ~ telephone (603) 435-6773 ~ fax (603) 435-7922



## NOTICE OF ZONING VIOLATION

June 12, 2018

mailed certified mail
and FIRST CLASS MAIL

Diane Dipoto
140 Tilton Hill Road
Pittsfield, NH 03263

notice of violation at:
140 Tilton Hill Road
Map R15 Lot 10

Dear Ms. Dipoto,

It has been brought to the attention of this office that zoning violations exist at your property, 140 Tilton Hill Road.

### VIOLATION

three unpermitted storage trailers on property
Pittsfield Zoning Ordinance – Article# 14. Storage Containers

### CORRECTIVE ACTION NEEDED

remove trailers or submit application for storage container permit(s)

### RIGHT TO APPEAL

This notice is a decision of the Zoning Ordinance Administrator and may be appealed to the Zoning Board of Adjustment in accordance with the provisions of the Pittsfield Zoning Ordinance Article 5, Section 5. Appeals to the Board of Adjustment, provided that such appeal is filed within thirty days of the date of this decision, per NH RSA 676:5 and the Pittsfield Zoning Board of Adjustment's Rules of Procedure.

### PENALTIES & FEES

Please be advised that violations of the provisions of the Pittsfield Zoning Ordinance include civil penalties of $275 for the first offense, and $550 for subsequent offences, for each day such violation is found to continue after the conviction date or after the date on which the violator received written notice, whichever is earlier, with each day that the violation continues being considered as a separate offense, as further described in Article 1, Section 9. Penalty Clause.

This correspondence serves as a formal notice of a zoning violation. You have 30 days notice from the receipt of this notice to cure this violation. In the event that the violations are not cured or remedied as provided for in this notice, the Town will pursue enforcement of the violations as provided for by law.

Should you have any questions please contact the Selectmen's Office at the contact information listed above.

Sincerely,

Pittsfield Board of Selectmen



**OFFICE OF SELECTMEN**
85 Main Street
Pittsfield, NH 03263-0098

NEOPOST
06/13/2018
US POSTAGE $000.47⁰

FIRST-CLASS MAIL

ZIP 03263
041M11290780



Diane Dipoto
140 Tilton Hill Road
Pittsfield, NH 03263

Dear Ms. Dipoto,



**OFFICE OF SELECTMEN**
85 Main Street
Pittsfield, NH 03263-0098

NEOPOST
06/13/2018
US POSTAGE $003.92⁰

FIRST-CLASS MAIL

ZIP 03263
041M11290780



**CERTIFIED MAIL**

91 7199 9991 7034 2973 3008

91 7199 9991 7034 2973 3008

Diane Dipoto
140 Tilton Hill Road
Pittsfield, NH 03263

Dear Ms. Dipoto,



# TOWN OF PITTSFIELD

Office of Selectmen
85 Main Street, Pittsfield NH 03263
admin@pittsfieldnh.gov ~ telephone (603) 435-6773 ~ fax (60



June 13, 2018

Joseph E. McCoy
322 Catamount Road
Pittsfield, NH 03263

Re: storage container permit expiration

*S/container*
*removed*

*no further violation*

Dear Mr. McCoy,

The Board of Selectmen considered your permit extension request dated May 29, 2018.  While they note the personal circumstances that have caused delay, the Board has to balance the terms of the zoning ordinance with your request, and as you have already been granted a year's extension beyond the 12 months permitted, they voted to not grant this second extension.

The Board has granted an additional thirty (30) days from the date of this letter to remove the storage container from your property.

Sincerely,

*Cara M. Hayes*

Cara M. Hayes
Town Administrator

# DrummondWoodsum

### ATTORNEYS AT LAW

**Matthew R. Serge**
Admitted in NH



May 24, 2019

James Hetu and Cynthia Hetu
272 Loudon Road
Pittsfield, NH 03263

RE:   Zoning Violation

Dear Mr. and Mrs. Hetu:

This office serves as general legal counsel to the Town of Pittsfield. The Town has asked us to contact you concerning an ongoing zoning ordinance violation on the property identified above. Specifically, you have been keeping a storage trailer on your property in violation of Article 14 of the Pittsfield Zoning Ordinance.

Article 14 of the Zoning Ordinance (entitled Storage Containers) provides that a storage container is permitted on a property only if the landowner complies with a series of conditions, including that the landowner obtain a permit from the Town. This permit states when the storage container will be placed on the lot, and the Ordinance further provides that the longest a contained can remain on a property is no more than 12 months in a 15-month period. For purposes of Article 14, a "Storage Container" includes a "truck trailer, box trailer, school bus, manufacture housing unit, or similar mobile container parked continuously for 31 days or more and used principally for storage and not used for any person's residential occupancy or transient lodging." A copy of applicable sections of the Zoning Ordinance are attached for reference.

The Town has sent you two Notices of Zoning Violation, dated December 4, 2018 and January 18, 2019 (copies attached). To date, you have not responded to these letters. The Town demands, therefore, that you remove the trailer(s) from your property by May 24, 2019, and that no trailers will be stored on the property until you receive a permit from the Town. If you fail to comply, the Town will initiate legal action to remove the trailer(s). If a lawsuit is filed, you may be required to pay civil fines to the Town of $275 per day, beginning February 17, 2019. In addition, if the Town is successful in its lawsuit, you will be required to pay for the Town's reasonable costs and attorney's fees.

If you have any questions, please contact the Town at (603) 435-6773. Thank you.

Sincerely,

Matthew R. Serge

cc:   Board of Selectmen

## Article 14.  Storage Containers

### 1.  Authority

RSA 674:16, I, (d); RSA 674:16, V; and RSA 674:17.

### 2.  Purpose

The purpose of these STORAGE CONTAINER regulations is to promote the general welfare by protecting the aesthetics of the town.  (See RSA 674:17, I, (c), and Taylor v. Plaistow, 152 N.H. 142, 872 A.2d 769 (2005) ("a municipality may exercise its zoning power solely to advance aesthetic values because the preservation or enhancement of the visual environment may promote the general welfare.").)

### 3.  Permitting Conditions for Storage Containers

Except as provided in article 4, section 3, Nonconforming Uses, every STORAGE CONTAINER shall be permitted upon the following conditions and upon all other applicable conditions in the zoning ordinance:

(a)  The STORAGE CONTAINER shall be used for and only for storage.

(b)  The STORAGE CONTAINER shall have a SETBACK from every STREET boundary or INTERIOR LOT LINE which SETBACK is greater than or equal to the minimum SETBACK specified for the STREET boundary or INTERIOR LOT LINE by article 3, section 4, (h), Table of Dimensional Requirements.

(c)  No more than one STORAGE CONTAINER shall be on the LOT if the LOT is in the Urban District, the Suburban District, or the Rural District.

(d)  No more than two STORAGE CONTAINERS shall be on the LOT if the LOT is in the Commercial District or the Light Industrial/Commercial District.

(e)  The sum of the time during which one or more STORAGE CONTAINERS are on any one LOT during any 15-month period shall be no more than 12 months.

(f)  The owner of the LOT where the STORAGE CONTAINER will be put shall tell the zoning ordinance administrator the date when the STORAGE CONTAINER is proposed to be put on the LOT.  The zoning ordinance administrator shall issue a permit for the STORAGE CONTAINER, and the permit shall state the date when the STORAGE CONTAINER is proposed to be put on the LOT.



# TOWN OF PITTSFIELD

**Office of Selectmen**
85 Main Street, Pittsfield NH 03263
admin@pittsfieldnh.gov ~ telephone (603) 435-6773 ~ fax (603) 435-7922

## NOTICE OF ZONING VIOLATION

December 4, 2018

James B. Hetu
Cynthia A. Hetu
272 Loudon Road
Pittsfield, NH 03263

mailed certified mail
and FIRST CLASS MAIL

notice of violation at:
272 Loudon Road
Map R35 Lot 10

Dear James & Cynthia,

It has been brought to the attention of this office that zoning violations exist at your property, 272 Loudon Road.

### VIOLATION

unpermitted storage trailer on property
Pittsfield Zoning Ordinance – Article# 14. Storage Containers

### CORRECTIVE ACTION NEEDED

remove trailer or submit application for storage container permit

### RIGHT TO APPEAL

This notice is a decision of the Zoning Ordinance Administrator and may be appealed to the Zoning Board of Adjustment in accordance with the provisions of the Pittsfield Zoning Ordinance Article 5, Section 5. Appeals to the Board of Adjustment, provided that such appeal is filed within thirty days of the date of this decision, per NH RSA 676:5 and the Pittsfield Zoning Board of Adjustment's Rules of Procedure.

### PENALTIES & FEES

Please be advised that violations of the provisions of the Pittsfield Zoning Ordinance include civil penalties of $275 for the first offense, and $550 for subsequent offences, for each day such violation is found to continue after the conviction date or after the date on which the violator received written notice, whichever is earlier, with each day that the violation continues being considered as a separate offense, as further described in Article 1, Section 9. Penalty Clause.

This correspondence serves as a formal notice of a zoning violation. You have 30 days notice from the receipt of this notice to cure this violation. In the event that the violations are not cured or remedied as provided for in this notice, the Town will pursue enforcement of the violations as provided for by law.

Should you have any questions please contact the Selectmen's Office at the contact information listed above.

Sincerely,

Pittsfield Board of Selectmen



# TOWN OF PITTSFIELD

**Office of Selectmen**
85 Main Street, Pittsfield NH 03263
admin@pittsfieldnh.gov ~ telephone (603) 435-6773 ~ fax (603) 435-7922

## SECOND - NOTICE OF ZONING VIOLATION

January 18, 2019

mailed certified mail
and FIRST CLASS MAIL

James B. Hetu
Cynthia A. Hetu
272 Loudon Road
Pittsfield, NH 03263

notice of violation at:
272 Loudon Road
Map R35 Lot 10

Dear James & Cynthia,

It has been brought to the attention of this office that zoning violations exist at your property, 272 Loudon Road.

### VIOLATION
unpermitted storage trailer on property
Pittsfield Zoning Ordinance – Article# 14. Storage Containers

### CORRECTIVE ACTION NEEDED
remove trailer or submit application for storage container permit

### RIGHT TO APPEAL
This notice is a decision of the Zoning Ordinance Administrator and may be appealed to the Zoning Board of Adjustment in accordance with the provisions of the Pittsfield Zoning Ordinance Article 5, Section 5. Appeals to the Board of Adjustment, provided that such appeal is filed within thirty days of the date of this decision, per NH RSA 676:5 and the Pittsfield Zoning Board of Adjustment's Rules of Procedure.

### PENALTIES & FEES
Please be advised that violations of the provisions of the Pittsfield Zoning Ordinance include civil penalties of $275 for the first offense, and $550 for subsequent offences, for each day such violation is found to continue after the conviction date or after the date on which the violator received written notice, whichever is earlier, with each day that the violation continues being considered as a separate offense, as further described in Article 1, Section 9. Penalty Clause.
This correspondence serves as a formal notice of a zoning violation. **You have 30 days notice from the receipt of this notice to cure this violation.** In the event that the violations are not cured or remedied as provided for in this notice, the Town will pursue enforcement of the violations as provided for by law.

Should you have any questions please contact the Selectmen's Office at the contact information listed above.

Sincerely,

Pittsfield Board of Selectmen



# TOWN OF PITTSFIELD

Office of Selectmen
85 Main Street, Pittsfield NH 03263
admin@pittsfieldnh.gov ~ telephone (603) 435-6773 ~ fax (603) 435-7922



## NOTICE OF ZONING VIOLATION

August 13, 2019

mailed certified mail
and FIRST CLASS MAIL

Sanel Realty Co. Inc.
11 Cram Avenue
Pittsfield, NH 03263

notice of violation at:
11 Cram Avenue
Map U3 Lot 11

Dear Sanel Realty Co. representative(s),

It has been brought to the attention of our office that zoning violations exist at your property, 11 Cram Avenue.

### VIOLATION

unpermitted storage trailer on property
Pittsfield Zoning Ordinance – Article# 14. Storage Containers

### CORRECTIVE ACTION NEEDED

remove trailer or submit application for storage container permit

### RIGHT TO APPEAL

This notice is a decision of the Zoning Ordinance Administrator and may be appealed to the Zoning Board of Adjustment in accordance with the provisions of the Pittsfield Zoning Ordinance Article 5, Section 5. Appeals to the Board of Adjustment, provided that such appeal is filed within thirty days of the date of this decision, per NH RSA 676:5 and the Pittsfield Zoning Board of Adjustment's Rules of Procedure.

### PENALTIES & FEES

Please be advised that violations of the provisions of the Pittsfield Zoning Ordinance include civil penalties of $275 for the first offense, and $550 for subsequent offences, for each day such violation is found to continue after the conviction date or after the date on which the violator received written notice, whichever is earlier, with each day that the violation continues being considered as a separate offense, as further described in Article 1, Section 9. Penalty Clause.

This correspondence serves as a formal notice of a zoning violation. **You have 30 days notice from the receipt of this notice to cure this violation.** In the event that the violations are not cured or remedied as provided for in this notice, the Town will pursue enforcement of the violations as provided for by law.

Should you have any questions please contact the Selectmen's Office at the contact information listed above.

Sincerely,

Pittsfield Board of Selectmen



**TOWN OF PITTSFIELD**
**BOARD OF SELECTMEN**
**TOWN HALL, 85 MAIN STREET**
**PITTSFIELD, NH  03263**



**MEETING MINUTES OF Tuesday May 23, 2017**

**CALL TO ORDER**
Call to order at 6:00 p.m. by J.C. Allard, Chairman

**MEMBERS PRESENT**
J.C. Allard, Chairman
Gerard LeDuc, Vice-Chairman
Carole Richardson
Carl Anderson

**MEMBERS ABSENT**
None

**OTHERS PRESENT**
Cara Marston, Town Administrator
Ammy Ramsey, Recording Secretary

**PUBLIC INPUT** – regarding agenda items only
Mary French inquired about the best time to speak about 81 Main Street would be, and J.C. explained that the public hearing would be the time to do so.

**AGENDA REVIEW**
Gerard: Report for Aqueduct under committee reports.
Carole: None.
Carl: None.
J.C.: None.

**PUBLIC HEARING**
6:15 p.m. – Pittsfield Historical Society proposed relocation to 81 Main Street

J.C. opened the public hearing to receive input from the public regarding the proposal by the Historical Society to take possession of town owned property at 81 Main Street which is adjacent to the Town Hall.

Adam Gauthier asked if there are any proposals printed to look at, Cara handed some out.

Mark Riel asked if the proposal is the actual letter, J.C. stated yes, with a copy of the tax card for people to see the property.

Mary French asked which item we are talking about, because under old business it says it's a sale and the proposal states it's a donation. J.C. explained that the public hearing is a discussion for the proposed donation of the property and the item under old business is referring to us trying to sell this property over the last year. This is a relatively new proposal from the Historical Society to take possession of the property. J.C. asked Carl to give a history of the property. Carl explained that we ran into an issue with selling this property with a clear title. In addition to the usual title problems with a property that is taken by tax deed this one had other issues, too. Carl stated that the likelihood of getting a clear title without doing an action to quite title which can cost ten to fifteen thousand dollars is out of the question. There have been several title companies working on it to accomplish this. If we were to take this to auction we still have to convey a clear title. To get a clear title it would easily cost ten to fifteen thousand dollars and have to go through the courts and that can be a lengthy process. Carl stated that they had a person interested in purchasing the property and they would take on the expense of clearing the title themselves, and at the point it would be rehabbed and restored to the tax rolls, at a low purchase price. Then the question would be if that would be in the best interest of the town, because you are rolling the dice when you sell a property as to how much additional burden could be put on the services in town. It's an unknown when you sell the property to know if the tax revenue that the town receives would be of benefit to the town. Or would we be better off donating this property to the Historical Society, so the town would have a nice place to keep the history of the town. It won't bring any revenue, but to Carl's understanding they would clear the title and tear down the existing building and build a new one. Otherwise we would be in for a 10 year wait to see what happens with the title.

Randy Severance stated that at the last meeting there was a non-public session held with the Historical Society and it was later revealed to us during public session that the non-public meeting minutes would be unsealed and put up on the website as agenda minutes. As of noon time today they were not on the website and requested a synopsis of that then private but not private meeting. J.C. stated the reason the minutes are not on the website is because they have not been approved and will be during this meeting. J.C. explained that it was a discussion concerning the desire of the Historical Society to take possession of 81 Main Street property. They would demolish the existing building and replace it with building yet to be designed to accommodate the possessions of the Historical Society. Part of that discussion pertained to the issues that Carl just explained with the title. Currently in the state of New Hampshire we have an advantage concerning titles for non-profit organizations relative to titles verses a private sale.

Adam Gauthier asked if there was a time table for demolition and moving forward, J.C. stated they don't have a formal commitment as they are waiting for approval. The Historical Society shares this board's interest in moving forward with getting the current structure down and construct a new building.

Mary French asked if that will be a stipulation put in the deed, Carl stated that we could. The other properties that have been sold in town for residential rehab have had time frame for improvements so the properties are better to look at. Carl feels that we would be looking for the same thing and thinks they are prepared for something like that, as well.

Justin Clough is in favor of history but considering the fact of serious constraints in regards to tax revenue.  With an offer on the table for this property who is willing to work the title process at their expense, he is wondering why we are not taking a closer look at that first.  He would like to see something more available for the Historical Society, but looking at this from a tax revenue purpose he finds it a little difficult to hand over a property that would not generate any tax revenue when we have an offer that could generate revenue.  Carl stated that we don't exactly have an offer on the table, however one could be generated.  Carl stated that there are things we have to consider when looking at it from that perspective.  You have to look at how much tax revenue it will be capable of generating.  Will it have a house on that small lot that will be taxed for $10,000.00 or $4,500.00.  And the other thing would be depending on the buyers and if it is a family that will cost the town more than that in services.  It's not an exclusion from someone coming and building but residential development does not usually enhance the tax situation. Justin's other concern is that previously he saw it was going to be rezoned so that it would be a business.  His question would be if it is generating just one dollar of tax revenue then wouldn't it be better than generating none.  Carl stated that just because you generate a dollar in revenue does not mean you are on the up side.

Mark Riel stated that the intention of the Historical Society is to put their current building back onto the tax rolls and it is assessed twice as much so it would generate tax revenue.  Justin asked if it could potentially be a tear down.  Mark stated the building is in good condition.

Mary French asked if the current Historical Society building was originally bought or donated, Mr. Berkson stated it was purchased.  She also is impressed with Pittsfield's Historical Society and how they handle the history of Pittsfield.  Mary asked if the previous residents lived there when the property was taken by tax deed.  Cara stated that she had passed away.  Mary feels that it would be a benefit to have the Historical Society there and has some possible suggestions for the deed.

Fred Okrent believes that the donation of the property to the Historical Society for the construction of a new building would be a great step forward for the revitalization of the town.

Adam Gauthier stated that he is not against the Historical Society he just would like some more information.  He asked if funding is available for this project or are they going to be doing some fundraising.  Mark Riel stated that they have some significant pledges for the project, that will get them to a point of clearing the title, demolishing the current structure, some site work, and a new structure up and enclosed.  There may be some fundraising later to finish the project.

Doug Martin asked if the rebuild would be period correct, J.C. stated that the town does not have a historic district that has that kind of requirement.  Doug commented that we are taking down history to put up a warehouse.  J.C. stated that the architectural design has not been done yet. Doug inquired about the building being climate controlled to properly store the Historical Society's items.  Mark Riel informed Doug that most historical societies do not have climate controlled atmosphere for the entire facility, they do for some of the paper items.  Mark stated that the 3 story building including the full basement that would hold the fire wagons and baggage carts, and stated that they want it to fit the Historical Society's image and benefit the town.  J.C. commented that anyone could take possession of the building would most likely tear it down because of the condition it is in.  Doug understands that but it would be private sector and not a gift or donation.

Randy Severance asked if the town still has an abandoned piece of property next to the library and if so wouldn't that be a better location for the Historical Society.  And has it been considered.  Mark Riel stated that they had looked at that and it would be costly in the long run for the upkeep of that building.

Lee Corson asked about a time frame for the new building to be up.  Mark Riel stated it is the intention to remove the existing building quickly, but we would need the title cleared before the construction process starts.

Justin Clough asked if the time has been taken to look at existing structures around town.  He is in favor of having a good Historical Society, but would it be more price advantageous to purchase and rehab to meet their needs and put this property back on the tax roll.  Justin inquired about the building down the street that has been vacant for a while and has a good location.  Ray Webber stated that then you would be taking that property off the tax roll.

Larry Berkson stated they have done some research and looked at all (14 currently) available properties in town.  Larry explained the building Justin referred to would be a big loss in tax revenue for the town, and they would not be able to afford the maintenance and upkeep that property would need.  They currently have a window with some major donors and would need to do something pretty hastily to capture that money and move forward and the project next door is the best option.

Justin Clough stated that he is only asking these questions because there was not much information given to the public.  He understands that they have done the research but there is not a lot of information available to know what's going on.

Adam Gauthier asked about parking, Mark Riel stated that it wouldn't be any worse than what they have now because they don't have any now.  Ray Webber stated that there will be some available behind the building.

Jim Gamble stated that he was the one with the purchase and sales agreement on this property, he does this for a living and he was prepared to purchase and rehab it.  He has been doing this for 42 years and agrees that it needs work but the work is doable.  He currently is rehabbing 114 Main Street.

Lee Corson inquired about how long it would take to get a clear title.  J.C. stated he is not sure how long it would take but it would be costly.  Carl stated it could take 6 months to a year.

Jim Gamble stated it was his attorney that found the problems with that title.  They said it was not hard it's just dealing with the lenders, and it would take 6 months to a year just like he explained to Carl.

Justin Clough asked if the Historical Society would be looking at the same time frame.  J.C. believes that it would be different because of their non-profit status.  Carl stated that the board could convey the property to anyone with a clear title or not, it's whether the buyer accepts the

title the way it is.  In the case of Mr. Gamble he can purchase it and rehab it, but when it comes time sell the property it would be in his best interest to clear the title.

Mary French requested clarification of clearing the title if it goes to the Historical Society.  J.C. stated that whoever the property is conveyed to would still have to clear the title.  And to his understanding the Historical Society would be the terminal holder because they would intend to hold the property in perpetuity, whereas a private citizen would fix it and sell it the title would come into question again.  It seems holding onto the title for a time seems to have less questions.  Mary feels that it would be important to put something in the deed that states if the Historical Society is not able to continue residing on that property they could not sell it and would return the property to the town.  She has examples that she would like to provide to the selectboard for their information.

J.C. closed the public hearing at 6:47 p.m.

Carl asked if we could do a poll to see how many would be in favor and who would not.  There was some discussion and a poll was done.  The majority was in favor of donating the property to the Historical Society.

**NEW BUSINESS**

**ACTION ITEMS**
1.  Property Tax Warrant – $4,211,170.00
J.C. stated that item number 1 is for the Property Tax Warrant.

Gerard: I make a motion to approve the Property Tax Warrant in the amount of $4,211,170.00.
Carl: Second.
Discussion: None.
Motion carries 4-0

2.  Notice of Intent to Cut Timber – Tax Map R30, Lot 4 – 520 Catamount Road
J.C. stated that item number 2 is for a Notice of Intent to Cut Timber for Tax Map R30, Lot 4 at 520 Catamount Road.

Carl: I make a motion to approve the Notice of Intent to Cut Tax Map R30, Lot 4, 520 Catamount Road.
Gerard: Second.
Discussion: None.
Motion carries 4-0

3.  Application for Current Use – Tax Map R2, Lot 7 – 113 Daroska Road
Gerard inquired if the current use was the 128 acres, Cara stated that it was the same ownership and contiguous.  J.C. stated that item number 3 is for an Application for Current Use for Tax Map R2, Lot 7 at 113 Daroska Road.  Carl inquired with Cara about the house location (on the abutting parcel) in reference to the 128 acres and the land that is currently in current use.

Carl: I make a motion to approve the Application for Current Use for Tax Map R2, Lot 7, 113 Daroska Road.
Carole: Second.
Discussion: None.
Motion carries 4-0

4.  Abatement – 2 & 4 Manchester Street - $1,357.81
J.C. stated that item number 4 is a request for an abatement for 2 & 4 Manchester Street in the amount of $1,357.81.

Gerard: I make a motion to approve the abatement for Tax Map U01, Lot 83 2 & 4 Manchester Street in the amount of $1,357.81.
Carl: Second.
Discussion: None.
Motion carries 3-1 Carole opposes.

5.  Conservation Commission Resignation – Owen David
J.C. stated that item number 5 is a resignation letter from Owen David.

Gerard: I make a motion to approve the resignation of Owen David from the Conservation Commission.
Carl: Second.
Discussion: None.
Motion carries 4-0

6.  Conservation Commission Appointment – Carl Wallman
J.C. stated that item number 6 is an appointment application for Carl Wallman to the Conservation Commission.

Gerard: I make a motion to approve the appointment of Carl Wallman to the Conservation Commission.
Carl: Second.
Discussion: None.
Motion carries 4-0

7.  Committee name change request - Economic Development to Community Development
J.C. stated that item number 7 is a request to change the name of the Economic Development Committee to be the Community Development Committee.

Carl: I make a motion to approve the name change request of the Economic Development Committee to Community Development Committee.
Carole: Second.
Discussion: None.
Motion carries 4-0

8. Economic (Community) Development Committee Appointment – Leroy Corson
J.C. stated that item number 8 is an appointment request of Leroy Corson to the new Community Development Committee.

Gerard: I make a motion to approve the appointment of Leroy Corson to the Economic (Community) Development Committee.
Carl: Second.
Discussion: None
Motion carries 4-0

9. Parks & Recreation Commission Appointment – David Stasiak
Gerard: I make a motion to approve the appointment of David Stasiak to Parks & Recreation Committee.
Carl: Second.
Discussion: None.
Motion carries 4-0

10. BCEP Solid Waste District disposal fee waiver – Josiah Carpenter Library
Carole: I make a motion to waive the fee waive the fee for the library.
Carl: Second.
Discussion: None.
Motion carries 3-1 Gerard abstains.

11. 42 Chestnut Street grant demolition project – easement addition to deed
Cara stated that this is something that FEMA requires with the project to make sure that anyone searching the title on the property that FEMA was involved with the project. It's part of the grant, if for some reason we wanted to sell this property we would have to go back to FEMA and ask their permission because they have an interest in the property, and then there would be a different easement going forward.

Carl: I make a motion to approve the easement addition to the deed to satisfy FEMA.
Carole: Second.
Discussion: None.
Motion carries 4-0

12. Proposed donations of personal property – Police Department
Cara stated that there were some donations dropped off at the police department of coloring books and stuffed animals for the officers to give to children in difficult situations.

Carl: I make a motion to accept the personal property donation for the police department as described.
Carole: Second.
Discussion: Carole asked if we have a person or group to thank. J.C. asked if we should send something to the church. Carl suggested sending a letter of thanks to them.
Motion carries 4-0

13. Proposed donation of personal property – Emergency Management
Cara stated that this would be retroactive because this came forward at the same time the donation policy was being discussed.  Rob Freese printed out the entire plan and the big color print outs needed for the hazardous mitigation materials.

Carl: I make a motion to accept the proposed donation of the personal property as described.
Gerard: Second.
Discussion: None.
Motion carries 4-0

14. Draft bid notice – LED street light conversion project
Cara presented the draft bid notice for the board to review.  She explained that she used several different examples to create this bid.  Carl would like to review this, because we need to make sure there is some kind of accommodation for either a relocation or possible addition of some lighting.  Carole confirmed this had to go out to bid with Cara because she thought there was a company that was already set up to do this project.  Cara also included the current street light inventory that was done by Sgt. DiGeorge that gave his opinion from a safety aspect if we need the light or not, then gave it to George for his review from a public works perspective.

Carl: I make a motion to table this until our next meeting so we have a chance to look at the bid proposal and the list of lighting.
Gerard: Second.
Discussion: Cara explained that there is 141 lights the town is paying for and when Sgt. DiGeorge went through the list he could not find 6 of them but found and additional 13 that we are not paying for.  Carole stated that the LED lights are supposed to be more effective so we may not need as many but who is going to tell us that.  Cara stated that part of the bid is going to do an audit and they should be able to tell us what we need and don't need.  Then they will bring it to you and you will have the final decision.
Motion carries 4-0 (to table)

Carole asked if we could have a time frame on this so we can get moving with this.  Carl stated that the motion to table is for 2 weeks.  Carole is hoping we get this done by fall.  Cara stated that as long as we can get a good list we can put it out to bid.  Cara stated that when looking at other municipalities that have done this there was a time of around 6 months.

15. Storage Container Permit extension concern – 322 Catamount Road
Cara stated that this original permit came to the board in the fall for an extension and now has lapsed, so Cara asked Jesse to go take a peek to see if it was still there.   Jesse stated that the gentleman was going to come in and ask to speak to the board, Cara stated she received a letter.  J.C. asked for the location and Jesse stated it was on Catamount Road.  Jesse explained that the man is disabled and has trouble getting in and out of the trailer so it is taking him longer to clean it out.  The other concern he brought forward is that other people in town have trailers and questioned why he has to move his is other people are not required to.  Carl asked Jesse if he is aware of other storage trailers in town that are supposed to have a permit.  Jesse stated that storage trailers are not allowed unless they are for construction reasons.  We don't have anything in our codes that they need a permit, but we have a paper that says if you have a storage container you have to be approved by the BOS.  Cara stated that is in the Zoning Ordinance.  Carl

asked Jesse if he is aware of any other trailers in town that shouldn't be, and Jesse stated that they are all over the place but are they grandfathered or not would be another question.  Carl asked if the trailer is registered, because to his understanding if the trailer was registered and so that it could be moved when needed it was not taxable and would be in a different category then a storage building.  Jesse has not seen anything that says that but it does say storage trailers.  Whether or not it's registered it is still storage on private properties and Jesse does not believe it was the intent of the ordinance to allow anyone to have the storage containers on their property.  Cara stated the ordinance does not say anything about registration.  Carl asked about the property next to the town shed and Cara informed him that he is taxed on those and is grandfathered and the other residents are not taxed.  Carl stated that could be a way to address the issue and start taxing the trailers.  Jesse explained that in other towns where he builds they sometimes are in need of a storage trailer to store stuff while the construction is going on and then when the construction is complete the trailer is removed and he believes that is what our ordinance is addressing.  J.C. asked if there is a difference between a trailer and a container.  Adam Gauthier stated that trailer is not mentioned in the ordinance and container is.  J.C. questioned if they should deal with trailers any differently.  Cara stated the definition of storage container on the permit application reads: would be any truck, trailer, box trailer, school bus, mobile home or any other facilities used for storage or other purposes whether registered or not.  J.C. asked what we should do about this item, and suggested tabling it because the gentleman requested to come in and speak with the board.  Carl stated he does not know how we can justify treating this one resident any different than any other.  J.C. stated he did do the right thing and came in and received a permit.  Jesse stated it originated from a complaint and the gentleman stated he was using the trailer while he built his garage and got the permit.  Cara stated that in order to change the ordinance you would have to go to town meeting.  Gerard stated he would like to see him come in front of the board since he did request to.  Cara asked about the other properties that are technically in violation, Carl stated they are not on the agenda at the moment.  Chief Pszonowsky stated the fire department is currently in violation to store equipment so we would be subject to anything that might come about.  Justin Clough stated that he believes it's not the trailer but the ordinance to be reviewed.  Carl would like to see this tabled and have Mr. McCoy come in and talk with us.

Carl: I make a motion to table.
Gerard: Second.
Discussion: None.
Motion carries 4-0

## COMMITTEE REPORTS

Gerard stated at the last Aqueduct meeting the board voted to pay the balance to Mr. Sancoucy.  Gerard also stated that the petition was submitted to the selectboard and since there has not been any movement the committee feels the selectboard is in violation of RSA 50.  Carl asked what RSA 50 says and Cara was not sure.  Cara stated the board's direction to the committee was to give us a vote on their proposal on the boundaries and a boundary list that agreed to the maps.  Fred Okrent stated that was voted on and sent.  Cara stated this meeting is the next meeting of the selectboard after that and is on the agenda under old business, so unsure of what RSA could be in violation.  J.C. inquired what the next step is, and Cara stated to establish the boundaries of the water district and included it in the agenda packet for the board along with the minutes.  Carl stated he has seen the boundaries and the list of properties, and personally has an issue with

properties being placed in a village district in which the property owner has no vote or say in what happens.  Carl stated to his understanding the only people who have a vote in the village district are those who are domiciled in the village district.  So if you own a property in the village district but do not live there you do not get a say.  J.C. asked if that meant the landlords would not have a say or vote, and Carl said yes if he understands it correctly.  Carl stated that the landlords and the people who own land would not have a vote but would still be subject to the rules made by others and he is opposed.

Carole had no committee reports but would like Ammy to include the list of state paving that Mr. Donovan provided that are proposed for next year.

| Road Route | Length | Limits |
|---|---|---|
| NH 107 | .8 | From Depot St. to NH 107 |
| Loudon Rd. / Concord Hill Rd. Main St. | 1 | From NH 28 to Clark St. |
| Barnstead Rd. | .2 | From NH 28 to NH 28 |
| Barnstead Rd. | .5 | From NH 28 to NH 28 |
| Carrol St. | .2 | From Main St. to Depot St. |
| NH 28 | 3.1 | From Epsom Circle to S. Barnstead Rd. |

Cara asked if these are proposed or slated, Carole stated they are slated.  Cara stated they usually receive notification from the state and then it becomes and information item on the Selectboard agenda.

J.C. stated that the new Community Development Committee will meet tomorrow evening at 6:30.

**INFORMATION ITEMS**
April Waste Water Treatment Facility Report was presented to the board.

**OLD BUSINESS**
1.  Town hall basement code issues (4/5/16)
Cara stated that until we know that the food pantry is completely moved out we can't move forward. There are some freezers down there and she spoke with one of the board members from the pantry and they are working on distributing those.  They did say the move has been successful and they are working on getting some insurance as a non-profit.

3.  Joy Street Pump Station concern (8/16/16, building/health to follow up)
Cara sent the letter and has not heard anything back, but it's only been a week.

4.  Consulting Services Contract for Municipalization of Pittsfield Aqueduct Co. (9/27/16)
Cara stated that Gerard stated the Aqueduct Committee voted to pay the balance, so asked if there is going to be a contract.  Fred Okrent stated the motion on that was to have the selectman approve the contract for the remaining balance, whether we use it or not is up in the air.  But it has to be an approved contract before we use it if we need to.  It has been voted on in the past and the money was set aside and it was a matter of book keeping.  Fred stated they approved it. J.C. asked now that they approved if we need to approve it.  Cara stated yes, that as long as

Sansoucy amended the contract amount because that was the problem.  The contract amount that was given was above the encumbered amount so we wanted the amendment to reflect the encumbered amount so we could approve that.  Fred stated he believed he sent it and will check on that.

5.  Library sewer line repair (4/4/17)
Cara stated that Bill Gilpatrick was over at Sanels who needed some sewer work done and he spoke with the company doing that work and asked them if they would put in a bid for the work needed at the library. Cara stated they did and she forwarded that to the board and was not sure if the library trustee was aware they need to act on this or if they are going to refer to the selectboard. J.C. stated he will contact them.

6.  Voter petition for formation of a Village Water District (4/4/17)
Cara stated that now that the board has seen what the committee voted on as a proposed list and map.  Cara feels that the map should be marked for the public to easily see.  The question would be if the board is ready to go forward with scheduling a public hearing on the proposed boundaries for the proposed water district.  Town counsel suggested not lumping everything into one public hearing and to first establish the boundaries.  The public hearing will be scheduled for June 27, 2017 during our regular scheduled meeting.

7.  2017 Balloon Rally fireworks proposal (5/2/17)
Cara stated that the contracts are ready to sign.  The Rotary Club will be paying Atlas Fireworks directly.

Carl: I make a motion to approve the fireworks contract for the 2017 Balloon Rally and have the chairman sign the contract.
Carole: Second.
Discussion: None.
Motion carries 4-0

Gerard asked if they will be doing anything for 81 Main St. tonight.  J.C. stated they should think about that before making a decision.  Gerard stated the proposal consisted of a 3 story building and there may be a restriction in our zoning for that.  Carl suggested putting a time frame for the existing building to come down and the lot cleaned up if it is approved, and requesting a drawing of what the new building will look like.  The board discussed those items and decided to have Cara contact the Historical Society and request a proposed architectural design and a time frame for the next selectboard meeting so they can make a decision.

**CHECK MANIFESTS**
1.  Accounts Payable
Gerard: I make a motion to approve Accounts Payable.
Carl: Second.
Discussion: None.
Motion carries 4-0

2.  Payroll
Gerard:  I make a motion to approve Payroll and Direct Deposit.

Carl: Second.
Discussion: None.
Motion carries 4-0

**MINUTES**
1.  May 9, 2017 – Public Meeting Minutes
Gerard: I make a motion to approve the May 9, 2017 Public Meeting Minutes.
Carl: Second.
Discussion: None.
Motion carries 4-0

Cara stated that an amendment for the Purchase and Sales Agreement is needed for the property that Sanel's is purchasing (Map U3, Lot 7).

Carl: I make a motion to extend the Purchase and Sales Agreement for 30 days till June 3, 2017.
Gerard: Second.
Discussion: None.
Motion 4-0

**PUBLIC INPUT**
Paul Nickerson would like the board to think about considering a hotel being put in town, he has two locations in mind and is working on putting something into motion.

Randy Severance stated you can put a stipulation in a deed when donating a property to also approve the architectural design of a building at a later time.  So the gifting can be done immediately and the design can be addressed later.  Carl stated the Historical Society would have to agree to making that stipulation.

Adam Gauthier asked about the roads that are slated to be paved, and he was given the list.

Paul Nickerson stated that we are not just giving a piece of land and inquired about the current property.  J.C. stated that they will be selling the current property and then it will return to the tax rolls.

J.C. stated they are going to go into non-public.

Carl:  I make a motion to go into non-public for RSA 91A:3-2 a,b,c,e.
Gerard: Second.
Discussion: None.
Roll call was done and all approved.

Gerard: I make a motion to seal.
Carl: Second.
Discussion: None.
Roll call was done and all approved.

J.C. called meeting back into public.

Cara stated that the applications for the vacant selectboard position are in with a few more days to have some more come in, and asked how the board would like to proceed.  The board had some discussion and decided to have them all contacted to come into the next meeting and be prepared for questions during the public session.  They will consider a decision at the following meeting.

Carole:  I make a motion to adjourn.
Gerard: Second.
Discussion: None.
Motion carries 4-0

Meeting adjourned at 9:40 p.m.

Approved:

_____           _____
J.C. Allard, Chairman                        Date

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

**Case No.: 1:20-cv-362-JL**

JOSEPH McCOY,

     Plaintiff,

vs.

TOWN OF PITTSFIELD

     Defendant.

---

**PLAINTIFF'S OBJECTION TO DEFENDANT TOWN OF PITTSFIELD'S MOTION**
**FOR SUMMARY JUDGMENT**

Plaintiff Joseph McCoy objects to Defendant Town of Pittsfield's Motion for Summary

Judgment (Doc. 17) and provides his incorporated Memorandum of Law in support of same.

**MEMORANDUM OF LAW**

**A.     Statement of Material Facts**

From mid-2016 onward, Mr. McCoy did not use his trailer principally for storage; rather,

he used it to display his support for President Donald Trump, and storage was its secondary

purpose:



37
1  have done it if they come and approached me on
2  September 1, which they did not, because there's
3  others in the town.  I was in the position to take
4  care of my storage but physically unable.  And if
5  you read my letter, I am pretty sure --
6      Q.  Mr. McCoy, let me stop you.  Back in 2015,
7  you were using this for storage; right?
8      A.  Back then, yes.
9      Q.  Yeah.  What you are saying is you think,
10 because other people may have had unpermitted
11 trailers --
12     A.  Not may have, they do.
13     Q.  Okay.  Well, we'll say "may have" because
14 I am asking the questions -- that you should not
15 have to comply with the requirements?  Is that what
16 you are saying?
17     A.  No, I am not saying that.  I am agreeing
18 from what you said it said.  I am not agreeing with
19 your not complying with you -- not complying --
20     Q.  So if there's a law -- no, Mr. McCoy,
21 here's my question.  If there's a law on the books
22 that says you should only have a permit -- a trailer
23 on for one year, you agree you have to comply with

45
1      screen.
2          (J. McCoy Deposition Exhibit D was marked
3      for identification.)
4      Q.  (By Mr. Dietel)  All right.  So how did the
5  "Concord Monitor" find out about your trailer?
6      A.  Ray Duckler says him and his photographer
7  was driving by.  If you read the newspaper, it will
8  explain.  They just was driving by and they seen it.
9      Q.  Was it getting attention in town before
10 then?
11     A.  Not really.  Because when you see my
12 trailer, it's on my property.  I have a wooden fence
13 with trees all over the place.  You really couldn't
14 see it.  And if you are coming up from town, it's a
15 good size of a football field from my driveway up
16 into my property where it was at.
17     Q.  Okay.  So when you paint the trailer back
18 in 2016, was it still primarily being used for
19 storage?
20     A.  Some, yes.
21     Q.  But was it still storing things?
22     A.  There were some things in there that I had
23 stored in there.  I was doing maintenance to my

46
1  place and some household items that we had to get
2  moved in my house.  And my son was doing most of the
3  work.  And he was working; so it took a while.
4      Q.  Okay.  So it was still a storage container
5  at that point?
6      A.  Somewhat, yes.
7      Q.  Okay.  Well, explain to me what you mean
8  by "somewhat."
9      A.  It was somewhat a storage trailer, but
10 then it was also my Trump trailer.
11     Q.  Okay.  What do you mean by that?
12     A.  My Trump trailer, you can look at it and
13 you can understand that was my Trump trailer.  I
14 like Trump.  I wanted him elected.  My son liked
15 him.  He's a graffiti artist.  And he asked, "Can I
16 do it?" and I says, "Yes."
17     Q.  So you intended this to be a sign?
18     A.  I didn't intend anything to be a sign.  My
19 son asked me if he could do it and I said, "Yes."  I
20 was a Trump supporter; so basically it was construed
21 as a sign.
22     Q.  Well, did you consider it to be a sign?
23     A.  After a while, getting close to the

47
1  election, yes.
2      Q.  At what point did you consider it to be a
3  sign?
4      A.  Mid 2016.
5      Q.  Mid 2016?
6      A.  Yeah, anywhere from -- well, anywhere,
7  basically, from the day that it was painted till the
8  election.
9      Q.  Okay.  And then it stopped being a sign
10 after the election?
11     A.  After the election, my son wanted to paint
12 the Pittsfield Balloon Race on it.  He's a graffiti
13 artist.  And I always have places for him to do his
14 work.  It keeps him out of mischief.  And I said,
15 "Yeah, go ahead and paint the front of it for the
16 balloon rally race."
17     Q.  I am not familiar with the balloon.  So
18 does Pittsfield have a balloon?
19     A.  Every year.  A balloon rally every year.
20     Q.  That's pretty cool.  When did that start?
21 Do you know?
22     A.  It had to be a long time before I was here
23 because you would see Pittsfield Balloon Rally signs

Deposition of Joseph McCoy ("McCoy Depo."), pp. 37:6-8, 45:17-47:4.[1]

---

[1] The Town alleges Mr. McCoy "considered it to be a sign," Doc. 17-1 at 5, but Mr. McCoy's deposition testimony demonstrates he principally used the trailer to express political speech.

The Town administrator, Cara Marston, admitted there was no process under which Mr. McCoy could request an extension of his storage container permit, and the Board had no authority to grant one:

| | Page 16 |
|---|---|
| 1 | Exhibit 4. |
| 2 | (Exhibit 4 marked for identification.) |
| 3 | BY MR. POJO: |
| 4 | Q. Are you aware of when the notice of violation that's |
| 5 | identified as Exhibit 3 was sent to Mr. McCoy? |
| 6 | A. I am not. |
| 7 | Q. Is there any way to determine when that notice was |
| 8 | sent? |
| 9 | A. No. |
| 10 | Q. Do you know why Mr. McCoy wrote this letter to the Town |
| 11 | on November 3rd, a little over two months after the |
| 12 | permit expired? |
| 13 | A. Because he wanted an extension on his storage container |
| 14 | permit. |
| 15 | Q. No, I know. I guess my question -- I should have asked |
| 16 | it more specifically. Do you know if he waited two |
| 17 | months to write this letter, or if he wrote this letter |
| 18 | immediately upon receiving the notice? |
| 19 | A. I am not aware of what Mr. McCoy's intentions were. |
| 20 | Q. Okay. Now, obviously -- so he's requesting a six-month |
| 21 | extension in this letter, right? |
| 22 | A. Yes. |
| 23 | Q. Are you aware if the ordinance allowed him to request |

| | Page 17 |
|---|---|
| 1 | such an extension? |
| 2 | A. There is no specific statement in that article that |
| 3 | discusses this, no. |
| 4 | Q. When you say "that article," what are you referring to? |
| 5 | A. The storage container permit article in the town |
| 6 | ordinance. |
| 7 | Q. Okay. |
| 8 | A. There is no extension process that's detailed. |
| 9 | Q. Okay. All right. So I'm placing before you another |
| 10 | document, and I'll just -- I'll scroll through it so you |
| 11 | can take a look at it. This is the first page. And I |
| 12 | took -- obviously it's a town zoning ordinance. And I |
| 13 | took two other portions of it. I omitted a whole bunch |
| 14 | of it, since it's a lengthy document. |
| 15 | This is the second page in this excerpt, and then |
| 16 | this is the third page. Are you familiar with this |
| 17 | document? |
| 18 | A. Yes. |
| 19 | Q. Okay. Can you tell us what it is? |
| 20 | A. The town zoning ordinance. |
| 21 | Q. Okay. So this is the second page here. The first page |
| 22 | is obviously the title page of the Town of Pittsfield |
| 23 | zoning ordinance. The second page is an excerpt from |

| | Page 18 |
|---|---|
| 1 | page 20 that contains the definition for storage |
| 2 | container. Do you see that? |
| 3 | A. Yes. |
| 4 | Q. And then the third page is article 14 which relates to |
| 5 | permitting conditions and other parameters for storage |
| 6 | containers. Do you see that? |
| 7 | A. Yes. |
| 8 | MR. POJO: Okay. So I'm going to mark this as |
| 9 | Exhibit 5. |
| 10 | (Exhibit 5 marked for identification.) |
| 11 | BY MR. POJO: |
| 12 | Q. So, Ms. Marston, when you were testifying just a moment |
| 13 | ago that there was no provision in the zoning ordinance |
| 14 | that provides for an extension of a permit for a storage |
| 15 | container, is this the article that you were |
| 16 | referencing? |
| 17 | A. Yes. |
| 18 | MR. DIETEL: Objection as to form. You can |
| 19 | answer, Cara. You can answer again. |
| 20 | THE WITNESS: Again. |
| 21 | BY MR. POJO: |
| 22 | Q. So you would agree then that article 14 does not provide |
| 23 | a resident with -- sorry. Let me strike that. |

| | Page 19 |
|---|---|
| 1 | You would agree with me that article 14 does not |
| 2 | provide the Town with the authority to extend a permit |
| 3 | for a storage container? |
| 4 | MR. DIETEL: Objection as to form. You can |
| 5 | answer that, Cara. |
| 6 | THE WITNESS: There's no provision for a |
| 7 | process. |
| 8 | BY MR. POJO: |
| 9 | Q. What do you mean by that? |
| 10 | A. There's no provision in any of the -- any of this article |
| 11 | detailing a process for asking for an extension. |
| 12 | Q. Does that mean that a resident cannot ask for an |
| 13 | extension? |
| 14 | A. No. It means that they can ask for an extension. |
| 15 | There's just no defined process for that extension. |
| 16 | Q. Which section here states that a resident can ask for an |
| 17 | extension? |
| 18 | A. There is no specific section that states that they can |
| 19 | ask for that. |
| 20 | Q. Okay. Is there a section that says that the Town can |
| 21 | grant an extension? |
| 22 | A. No. |
| 23 | Q. Okay. So when the Town received -- now, you testified |

Deposition of Cara Marston ("Marston Depo."), pp. 18:12-17, 19:1-21.  The Board of Selectmen

ignored this restriction and "granted" Mr. McCoy's first request for an extension in November

2016.  Doc. 17-1 at 6 & Ex. C ¶ 2.  Ms. Marston could not identify any reason why it proceeded

to "grant" it:

| Page 20 | Page 21 |
|---|---|
| 1     that the Town received Mr. McCoy's November 3rd letter, | 1     granting them the ability to do so, I guess.  The zoning |
| 2     right? | 2     ordinance is a document of the Town, and they were trying |
| 3   A.   Yes. | 3     to do their best. |
| 4   Q.   Did the Town take any action with respect to that | 4   Q.   Okay.  I mean, could this be -- could this instead be |
| 5     request? | 5     called a zoning variance? |
| 6   A.   Yes. | 6   A.   No.  A variance is a specific process with an application |
| 7   Q.   What did the Town do? | 7     to the zoning board of adjustment. |
| 8   A.   He was granted a six-month extension. | 8   Q.   Okay.  Did the board of selectmen have the authority to |
| 9   Q.   Okay.  So given your testimony that article 14 -- that | 9     grant the zoning variance? |
| 10     there's no section in article 14 that says the Town can | 10   A.   No. |
| 11     grant an extension, why did the Town then communicate to | 11   Q.   And it's safe to say that there was no -- the process for |
| 12     Mr. McCoy that it was granting his request for an | 12     applying for a zoning ordinance was not invoked here, |
| 13     extension? | 13     right? |
| 14   A.   As administrators of the zoning ordinance, they responded | 14   A.   That is correct. |
| 15     to a request from a resident asking for an extension. | 15   Q.   Do you know if the board of selectmen ever communicated |
| 16   Q.   I understand what they did, but why did it grant an | 16     to Mr. McCoy that instead of requesting an extension of |
| 17     extension if article 14 contains no section or provision | 17     the permit, he should have instead applied for a zoning |
| 18     stating that the Town can grant an extension? | 18     variance? |
| 19   A.   I don't have -- I guess I honestly don't know how to | 19   A.   He was not instructed to do so, no. |
| 20     answer that other than they were trying to help a | 20   Q.   Was the extension that the Town granted Mr. McCoy |
| 21     resident who was asking for an extension on the storage | 21     valid? |
| 22     container.  They read his request and wanted to work with | 22        MR. DIETEL:  Objection as to form.  You can |
| 23     him, regardless of there being no specific provision | 23     answer it, Cara. |

Marston Depo. pp. 20:4-23, 21:1-3.  She admitted the Board's "extension" could not be

considered a zoning variance because Mr. McCoy never invoked that process, and the Board had

no authority to grant zoning variances:

```
                                                          Page 21
1        granting them the ability to do so, I guess.  The zoning
2        ordinance is a document of the Town, and they were trying
3        to do their best.
4    Q.  Okay.  I mean, could this be -- could this instead be
5        called a zoning variance?
6    A.  No.  A variance is a specific process with an application
7        to the zoning board of adjustment.
8    Q.  Okay.  Did the board of selectmen have the authority to
9        grant the zoning variance?
10   A.  No.
11   Q.  And it's safe to say that there was no -- the process for
12       applying for a zoning ordinance was not invoked here,
13       right?
14   A.  That is correct.
15   Q.  Do you know if the board of selectmen ever communicated
16       to Mr. McCoy that instead of requesting an extension of
17       the permit, he should have instead applied for a zoning
18       variance?
19   A.  He was not instructed to do so, no.
20   Q.  Was the extension that the Town granted Mr. McCoy
21       valid?
22               MR. DIETEL:  Objection as to form.  You can
23       answer it, Cara.
```

Marston Depo. p. 21:4-14.  The Board could have instructed Mr. McCoy that the object of his request (an extension of the permit) could only be attained through a zoning variance, but Ms. Marston conceded the Board neglected to do that:

```
                                                          Page 21
1        granting them the ability to do so, I guess.  The zoning
2        ordinance is a document of the Town, and they were trying
3        to do their best.
4    Q.  Okay.  I mean, could this be -- could this instead be
5        called a zoning variance?
6    A.  No.  A variance is a specific process with an application
7        to the zoning board of adjustment.
8    Q.  Okay.  Did the board of selectmen have the authority to
9        grant the zoning variance?
10   A.  No.
11   Q.  And it's safe to say that there was no -- the process for
12       applying for a zoning ordinance was not invoked here,
13       right?
14   A.  That is correct.
15   Q.  Do you know if the board of selectmen ever communicated
16       to Mr. McCoy that instead of requesting an extension of
17       the permit, he should have instead applied for a zoning
18       variance?
19   A.  He was not instructed to do so, no.
20   Q.  Was the extension that the Town granted Mr. McCoy
21       valid?
22               MR. DIETEL:  Objection as to form.  You can
23       answer it, Cara.
```

Marston Depo. p. 21:15-19.

Mr. McCoy made another request for an extension of his permit in May 2017.  Doc. 17-1 at 7.  The Board, once again, "granted" his request for a one-year extension.  *Id.* at 8.  Like Mr. McCoy's first request for an extension, the Board conceded it had no authority to grant this request either:



Marston Depo. pp. 35:12-17, 36:1-10, 37:19-22.  The Town never informed Mr. McCoy he could not request another extension of the permit, or that he should have sought a zoning variance:



Marston Depo. pp. 23:9-17.

Mr. McCoy requested a third extension in May 2018.  <u>Doc. 17-1 at 10</u>.  The Board denied

that request.  *Id.*  The Board acknowledged, once again, it had no authority to grant a third

extension of the permit:



Marston Depo. p. 54:1-12.  The Town cannot identify any reasoning (whether in the Zoning

Ordinance or elsewhere) for why it denied Mr. McCoy's request, and it concedes there was

nothing different between this third request and his two prior requests, and, in "denying" Mr.

McCoy's third request for an extension, it nevertheless "granted" him a 30-day extension to

enable him to remove the trailer:



Marston Depo. pp. 52:14-23, 53:1-3, 54:14-23.

At his deposition, Mr. McCoy identified numerous property owners in Pittsfield with unpermitted storage containers on their properties who were treated differently:



Mr. McCoy is also submitting with this Objection a Declaration to which he has appended photographs of _**several hundred**_ trailers or storage containers located on properties in Pittsfield that (but for approximately 12 of them) do not have storage containers and that the Town has not directed to be removed.  *See* Exhibit A (Declaration of Joseph McCoy ("McCoy Dec.")) & Exhibits 1, 2.

For example, Carl Anderson had two trailers hidden on his property at 324 Barnstead Road (as recently as December 2020), did not have permits for them, and was not told by the Town to remove them.  McCoy Dec. ¶ 6 & Ex. 1 at 1.  Another group of unpermitted trailers is located on a property on Carroll Street on the outskirts of Pittsfield.  McCoy Dec. ¶ 7 & Ex. 1 at 2-3.  The next set of photographs shows unpermitted trailers Mr. McCoy requested that the Town remove after it directed him to remove his trailer.  McCoy Dec. ¶ 8 & Ex. 1 at 4.  Another group of approximately 30 unpermitted trailers is located on a property owned by Reese Freese (known as Tommy Trailor) at 16 Clark Street.  McCoy Dec. ¶ 9 & Ex. 1 at 5-15.  Gerard Leduc has an unpermitted trailer on his property at 24 Carroll Street.  McCoy Dec. ¶ 10 & Ex. 1 at 16.  Carole Dodge has at least two unpermitted trailers on her property at 80 Smith Hill Road.  McCoy Dec. ¶ 11 & Ex. 1 at 17-18.  Brendan Guida currently has an unpermitted 40-foot trailer on his property at 187 Barnstead Road.  McCoy Dec. ¶ 12 & Ex. 1 at 19.  He had a permit for it from January 29, 2020 to January 29, 2021.  McCoy Dec. ¶ 12.  The permit expired.  *Id.*  Finally, Ed Trzcinski at 217 Shingle Mill Brook Road has an unpermitted trailer on his property.  McCoy Dec. ¶ 13.  The remaining photographs of hundreds of trailers in Exhibit 2 are photographs taken of other trailers Mr. McCoy observed on properties in Pittsfield that did not have permits. McCoy Dec. ¶ 14 & Ex. 2.  The Town has not directed any of the trailers above (including those at the specific addresses above) to be removed.  McCoy Dec. ¶ 15.

Ms. Marston testified at her deposition that, during her time as Town Administrator (five years) only approximately 12 property owners in Pittsfield were granted permits for storage containers or trailers:

Page 71

```
1    want to kind of look at everything and then just make
2    sure, okay?
3              MR. DIETEL:  All right.
4              MR. FOJO:  Let's just go off the record for
5    five.
6              (Recess taken.)
7    BY MR. FOJO:
8  Q.  Just two or three more questions here and we'll be done.
9         Ms. Marston, were there any complaints made by any
10   board members concerning the trailer?
11 A.  Not that I'm aware of.
12 Q.  Other than the permits that Mr. McCoy obtained for his
13   trailer, and then the permit for the Tilton Hill Road
14   trailer, or storage container, were there any other
15   permits granted for any other storage containers in town
16   from 2015 to the present?
17 A.  Yes.
18 Q.  Do you recall how many such permits were granted?
19 A.  Twelve, maybe.
20 Q.  I know this may be difficult, but do you recall what
21   properties those permits pertained to?
22 A.  Let's see.  Cram Avenue.  I could make a quick list.
23   There was two sets on Tilton Hill, not just the one that
```

Page 72

```
1    we had previously talked about.  There was another set on
2    Tilton Hill.  There was another one further closer to
3    town on Catamount Road.  Cram Avenue, there was one.
4    Joyce Street, there were two.  Carroll Street there's
5    one.  Loudon Road.  Cameron Drive.  Those are the ones I
6    can come up with right off the top of my head.
7  Q.  Okay.  I want to go back to your affidavit real quick.
8  A.  Yes.
9  Q.  So I'm on paragraph 29.  And here you stated, "It has,
10   however, taken action against others in town with respect
11   to unpermitted storage containers, which were not used
12   for expressive purposes.  For example, in June, 2018, the
13   Town took action with respect to the Tilton Hill Trailers
14   as noted previously."  We discussed that.
15        And then in section B here, it says, "In 2019, the
16   Town brought suit to enforce article 14 in Town of
17   Pittsfield versus James Hotu, et al., case number
18   217-2019-cv-00663, Merrimack Superior Court.  This action
19   arose following lengthy efforts to obtain compliance."
20        What was the issue with -- can you briefly tell us
21   what happened with this particular enforcement effort?
22 A.  This one came to the board of selectmen that there was a
23   storage container at a property, and they looked into it
```

Marston Depo. pp. 71:12-72:6.  Three of those permits were for trailers on a property on Tilton Road, which Mr. McCoy did not include in the photographs referenced above.  Only one permit was granted for a trailer on Carroll Street; there are several other trailers, however, on Carroll Street.  *See* McCoy Dec. ¶¶ 7, 10 & Ex. 1 at 2-3, 16.  Assuming eight other permits were granted, *see* Marston Depo. pp. 71:12-72:6, there are still numerous trailers or storage containers Mr. McCoy identified above that did not have permits and that remain on properties in Pittsfield.

This should not be a surprise.  The Town – through its Code Enforcement Officer (Jesse Pacheco) conceded there were trailers "all over the place" when Mr. McCoy made his second extension request in 2017.  *See* Exhibit B (Board of Selectmen May 23, 2017 Meeting Minutes).  At that Board of Selectmen meeting, the Town Administrator (Cara Marston) also acknowledged there were "other properties that are technically in violation" of the Ordinance, but the Town had done nothing concerning those trailers.  *Id.*  A Board Member (Carl Anderson) later reiterated that fact in his January 11, 2020, letter to Mr. McCoy: "what was obvious was that there were illegal storage containers all over the place."  *See* Exhibit C (Letter).  Ms. Marston conceded that,

after the May 2017 Board meeting, the Town *__did not investigate__* whether Mr. Anderson's

statement was true, i.e., that there were other unpermitted storage containers in Pittsfield:

| Page 39 | Page 55 |
|---|---|
| 1  A.  The people in the audience at the time were frustrated with the process.<br>3  Q.  The other people attending the meeting?<br>4  A.  At that point in time, the selectboard members, Mr. McCoy. From what I can recollect, the conversation did get a little clumsy trying to figure out what exactly should we do here with this request. That's what I can recollect from it. Trying to move the item. Trying to, again, move the item.<br>10  Q.  So when you stated, "If you look around town, there are storage trailers around town that may not have a permit," was Mr. Pacheco's statement at the May 2017 board meeting the only basis that you relied on when you made that statement?<br>15  A.  Yes.<br>16  Q.  Okay. So between the May board meeting and this meeting, did the Town undertake any inquiry or investigation to determine if Mr. Pacheco's statement in the May meeting was true?<br>20  A.  No, not that I'm aware of.<br>21  Q.  Okay. So when you said it was getting emotional, what did you mean by that?<br>23  A.  I guess what I inflected from the tone of the people | 1  Q.  Okay. Do you know the Town's reasoning -- do you know of the Town's reasoning for -- let me move back. Let me strike that.<br>4  Do you know if the Town's reasoning for denying this most recent request for an extension had anything to do with what Mr. McCoy had painted on the trailer?<br>7  A.  That was never a topic of discussion.<br>8  Q.  Between the May 2017 and June 2017 board meetings and Mr. McCoy's request in 2018 to extend his permit, did the Town ever undertake any investigation or inquiry to determine if there were other trailers or storage containers in town that violated the ordinance?<br>13  A.  If they did, it would have been based on a complaint basis, not going out and canvassing the town for them.<br>15  Q.  Okay. Let me ask more specifically. During that period of time, did the Town ever investigate or inquire as to whether Mr. Pacheco's statement that there were other storage containers in town in violation of the ordinance was true?<br>20  A.  No.<br>21  Q.  Have you seen -- is there any record that you're aware of that reflects whether or not Mr. Pacheco's statement that there were other storage containers in town that violated |

Marston Depo. p. 39:16-20, 55:8-20.

**B.**     **The Town's Arguments are Erroneously Premised on the Application of the Zoning Ordinance to Mr. McCoy's Trailer**

The Town's arguments are premised almost entirely on the notions that the Zoning

Ordinance applied to Mr. McCoy's trailer; and the Board of Selectmen had the authority under

the Ordinance to grant two "extensions" of Mr. McCoy's permits, "deny" him a third

"extension," and then, following that denial, grant him a 30-day "extension" to allow him to

remove the trailer from his property.  This is inaccurate.

First, the Zoning Ordinance never applied to Mr. McCoy's trailer.  Article 2, Section 3 of

the Zoning Ordinance defines a "storage container" as "a truck trailer, box trailer, school bus,

MANUFACTURED HOUSING unit, or similar mobile container parked continuously for 31

days or more and **__used principally for storage__** and not used for any person's residential

occupancy or transient lodging."  From mid-2016 onward, Mr. McCoy used his trailer

principally to display his support for President Donald Trump, and storage was its secondary

purpose.  McCoy Depo., pp. 37:6-8, 45:17-47:4.  Thus, the Town could not have applied the

Ordinance to Mr. McCoy's trailer and demanded he obtain a storage container permit, seek an

"extension" of that permit, or deny him an "extension" of that permit and order him to remove

the trailer from his property.

Second, even if the Ordinance applied, the Town had no authority under the Ordinance to

grant Mr. McCoy "extensions" of his permit or deny him an "extension" of that permit.  Article

14, Section 3(e) of the Town's Zoning Ordinance prohibits maintaining a storage container on a

lot for more than 12 months: "every STORAGE CONTAINER shall be permitted upon the

following conditions and upon all other applicable conditions in the zoning ordinance: . . . The

sum of the time during which one or more STORAGE CONTAINERS are on any one LOT

during any 15-month period shall be no more than 12 months."[2]

The Town admitted, however, there was no process under which Mr. McCoy could

request an extension of his permit; the Board had no authority to grant one and could not identify

any reason why it did so; the Board's decision was not a zoning variance, and it did not direct

Mr. McCoy to seek one; the Board could not identify why it denied Mr. McCoy's third request

for an extension; and there was nothing different between this third request and his two prior

requests.  Thus, the Ordinance should not be at issue in this case.

**C.     The Town's Application of the Zoning Ordinance to Mr. McCoy was Unconstitutionally Vague**

The Town argues no reasonable jury would find its application of the Zoning Ordinance

to Mr. McCoy was unconstitutionally vague.  Doc. 17-1 at 20-21.  This is inaccurate.

---

[2] The Town barely acknowledges this restriction in its Motion.  *See, e.g.*, Doc. 17-1 at 7 (Town's extension was made "notwithstanding the plain language of the zoning ordinance, which provides . . . that storage containers . . . may not be on a lot for more than 12 months in any one 15 month period").

"A law is unconstitutionally vague when it 'fails to provide a person of ordinary
intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages
seriously discriminatory enforcement.'" *McCoy v. Town of Pittsfield*, 2020 DNH 217, 11
(quoting *United States v. Williams*, <u>553 U.S. 285, 292</u> (2008).  "'The degree of vagueness that
the Constitution tolerates - as well as the relative importance of fair notice and fair enforcement -
depends in part on the nature of the enactment.'"  *McCoy*, 2020 DNH 217, 11 (quoting *Village of
Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, <u>455 U.S. 489, 498</u> (1982)).  "'If, for
example, the law interferes with the right of free speech or of association, a more stringent
vagueness test should apply.'"  *Id.*  A "law can also be held to be void for vagueness on
discretionary enforcement grounds 'if it is an unrestricted delegation of power, which in practice
leaves the definition of its terms to law enforcement officers, and thereby invites arbitrary,
discriminatory and overzealous enforcement.'"  *Buckle Up Festival, LLC v. City of Cincinnati*,
<u>336 F. Supp. 3d 882, 887</u> (S.D. Ohio 2018) (quoting *Dambrot v. Central Michigan Univ.*, <u>55
F.3d 1177, 1183</u>–84 (6th Cir. 1995)).  "The key question is whether the provision 'provide[s]
explicit standards guiding [its] enforcement."  *Id.* (internal quotation and citation marks omitted).

For example, in *Buckle Up Festival, LLC v. City of Cincinnati*, <u>336 F. Supp. 3d 882</u> (S.D.
Ohio 2018), the District Court held a municipal ordinance that required an admission tax to be
paid to the city of Cincinnati based on amounts paid for admission to any public performance for
profit in the city was unconstitutionally vague, where the ordinance defined "admission" to
"include seats, chairs, tables and benches, reserved or otherwise, and other similar
accommodations and charges made therefor."  *Id.* at 884.  The Court held "the dictionary
definition for 'accommodations' falls short of providing minimal guidelines to those who enforce
this section of the Municipal Code."  *Id.*  The "Plaintiffs allege[d] that Defendants did not require

them to pay the admissions tax for its 2012 Bunbury music festival, but did require them to pay

the tax for the 2013 Bunbury music festival." *Id.*  The Court held "[t]his allegation supports

Plaintiffs' claim that Section 309-3 is vague, and therefore leads to arbitrary, discriminatory and

overzealous enforcement." *Id.*

The same situation occurred in this case: the Town applied the Ordinance to "grant" Mr.

McCoy two "extensions" (one for six months and then one for a year) of his storage container

permit in 2016 and 2017, respectively, but then applied the Ordinance to *deny* him a third (one-

year) "extension" of his permit while granting him a brief 30-day extension of the same permit to

allow him to remove the trailer.  There was nothing different about Mr. McCoy's third extension

request.  The Town admitted the Ordinance provides no authority or "process" for extending a

permit, and it could not identify any reasoning for its denial of a third extension.  Indeed,

although the Ordinance defines a "storage container," it provides no guidance for those who

administer or enforce it (the Board of Selectmen) concerning extensions of storage container

permits or what types of trailers fall within its ambit.  The Board's conduct demonstrates it

applied the Ordinance in an arbitrary and discriminatory fashion: it acknowledges Mr. McCoy

did not use the trailer principally for storage (and, thus, that the Ordinance did not apply to it) but

then required him to maintain a storage container permit, and it concedes it had no authority or

process under the Ordinance to extend that permit but then granted Mr. McCoy two extensions of

his permit and then denied him a third extension.  The Town's application of the Ordinance was

unconstitutionally vague.

**D.     The Town Discriminated Against Mr. McCoy in Ordering His Trailer Removed,
         Lacked <u>Any</u> Basis for its Decision, and Allowed Numerous Other Property Owners
         to Have Unpermitted Storage Containers and Trailers on their Properties**

To prevail on Count II, Mr. McCoy "must allege that he has 'been intentionally treated

differently from others similarly situated and that there is no rational basis for the difference in

treatment.'"  *McCoy*, 2020 DNH 217, 14 (quoting *Donovan v. City of Haverhill*, <u>311 F.3d 74,</u> <u>77</u> (1st Cir. 2002)).  "An individual is 'similarly situated' to others for equal protection purposes when 'a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated.'"  *McCoy*, 2020 DNH 217, 14 (quoting *Davis v. Coakley*, <u>802 F.3d 128, 133</u> (1st Cir. 2015)).  "Although '[e]xact correlation [between comparators] is neither likely nor necessary, . . . 'a class-of-one plaintiff bears the burden of showing that his comparators are similarly situated in all respects relevant to the challenged government action.'"  *McCoy*, 2020 DNH 217, 14 (*Gianfrancesco v. Town of Wrentham*, 712 F.3d 634, 640 (1st Cir. 2013)).

The Town alleges "[n]o reasonable jury could examine the undisputed facts . . . and conclude that McCoy was discriminated against based on his support for President Trump or his use of his Storage Container to express that support, or any other factor."  <u>Doc. 17-1 at 15</u>.[3]  The Town phrases the question incorrectly (presumably for its benefit).

In its Order on the Town's Motion for Judgment on the Pleadings, this Court summarizes Mr. McCoy's claim as follows: "McCoy asserts that the ordinance, as applied by Pittsfield, impermissibly creates two classes of residents - persons with unpermitted storage containers expressing political speech and persons with unpermitted storage containers not expressing political speech - and argues that the Town treats these classes differently in violation of the Constitution."  *McCoy*, 2020 DNH 217, 13.  Accordingly, "the relevant comparison points are property owners in Pittsfield with unpermitted storage containers on their properties, including trailers."  *Id.* at 14.

---

[3] Elsewhere, the Town alleges Mr. McCoy relies on a "generic class of comparators" – "property owners with storage containers without expressive content" – that is "woefully inadequate."  <u>Doc. 17-1 at 16</u>.

Despite the Court's articulation of the appropriate comparison points above, the Town insists Mr. McCoy's claim "is premised on a threadbare allegation that the Town singled him out for discrimination because of his support for President Trump, but allowed other unidentified storage containers in Town to evade regulation." Doc. 17-1 at 17. Based on that false premise, the Town alleges Mr. McCoy "does not identify any specific properties or individuals who were treated differently." *Id.* The Town also imposes on Mr. McCoy 10 separate "shared characteristics" it alleges he needs to identify concerning the storage containers he claims were treated differently. *Id.* at 17-18. It cites no authority, however, for the imposition of so many comparison points, nor does this Court's prior Order support it. Indeed, the Town's continuing insistence that it afforded Mr. McCoy such generous discretion under the Ordinance is nothing but a red herring because the Ordinance did not apply here. *See supra* pp. 11-12.

Mr. McCoy identified numerous property owners in Pittsfield with unpermitted storage containers on their properties who were treated differently, and he has submitted photographs of several hundred trailers or storage containers located on properties in Pittsfield that (but for approximately 12 of them) do not have permits and that the Town has not directed to be removed. *See* McCoy Dec. & Exhibits 1, 2. Ms. Marston testified that only approximately 12 of these trailers or storage containers were granted permits. Marston Depo. pp. 71:12-72:6. There remain ***hundreds*** of trailers or storage containers Mr. McCoy identified above that did not have permits and that remain on properties in Pittsfield.

Indeed, the Town conceded there were many unpermitted or "illegal" storage containers all over town. *See* Ex. B, C. The Town has never investigated these other storage containers. Although the Town contends it undertook enforcement action against *three* property owners with unpermitted trailers, *see* Doc. 17-1 at 18-19, there is no dispute of fact that it failed to address

many other unpermitted trailers located in Pittsfield, including many of those Mr. McCoy

identified above.  In contrast, in addition to those three property owners, it directed *Mr. McCoy*

to remove his trailer and concedes it lacked any reasoning or basis for doing so.

The Town alleges its enforcement action against the above three property owners

constitutes an "ample history" of enforcement activity, and, at worst, it merely engaged in "lax"

enforcement or slightly disparate enforcement that might occur in the "land use" context.  Doc.

17-1 at 19.  The undisputed facts above, however, demonstrate the Town knew there were

hundreds unpermitted trailers in Pittsfield, and it undertook no enforcement activity except for

three other property owners and Mr. McCoy.  This is not an issue of "lax" enforcement; it is a

total absence of enforcement and a violation of Mr. McCoy's equal protection rights.

E.     **Mr. McCoy's Claims are Ripe and He was not Required to Exhaust Administrative Remedies**

Finally, the Town argues Mr. McCoy's claims are not ripe because he did not pursue an

appeal of the Board of Selectmen's June 13, 2018 decision denying his third request for an

extension of his storage container permit to the Town's Zoning Board of Adjustment.  Doc. 17-1

at 21-24.  This is inaccurate:

"Generally, parties must exhaust their administrative remedies before appealing to the

courts.  This rule is "based on the reasonable policies of encouraging the exercise of

administrative expertise, preserving agency autonomy and promoting judicial

efficiency.  However, this rule, as applied, is flexible, and recognizes that exhaustion is not

required under some circumstances.  In limited situations, it is unnecessary to 'burden local

legislative bodies and [zoning boards] with the responsibility for rulings on subjects that are

beyond their ordinary competence.'  Thus, a petitioner need not exhaust administrative

remedies and may bring a declaratory judgment action to challenge the decisions of municipal

officers and boards when the action raises a question that is 'peculiarly suited to judicial rather than administrative treatment and no other adequate remedy is available.'  Judicial treatment may be particularly suitable when the constitutionality or validity of an ordinance is in question or when the agency at issue lacks the authority to act." *McNamara v. Hersh*, 945 A.2d 18, 20 (2008) (quoting *Blue Jay Realty Trust v. City of Franklin*, 132 N.H. 502, 509 (1989), and *Olson v. Town of Litchfield*, 112 N.H. 261, 262 (1972)).  "A party is not required to exhaust administrative remedies where the issue on appeal is a question of law rather than a question of the exercise of administrative discretion." *Pheasant Lane Realty Trust v. City of Nashua*, 143 N.H. 140, 141-42 (1998).

For example, in *Blue Jay Realty Trust*, the petitioners challenged the validity of amendments to the City's zoning ordinance by filing a declaratory judgment petition.  132 N.H. at 503.  The New Hampshire Supreme Court held the petitioners did not have to exhaust administrative remedies because "the charges of invalidity raised by th[e] petition require[d] determinations of statutory and constitutional law, not customarily passed upon by city councils."  *Id.* at 509; *see also Ashland School Dist. v. N.H. Div. for Children*, 141 N.H. 45, 47-48 (1996) (holding that statutory provisions setting forth financial obligations of local school districts did not require administrative appeal); *Metzger v. Brentwood*, 115 N.H. 287, 290 (1975) (holding that whether closed town road was "public right of way" was narrow legal question that did not require an application for a rehearing before appeal to superior court).

Similarly, in *Pheasant Lane Realty Trust*, the City of Nashua sought to issue a supplemental tax bill on a property.  The plaintiff, Pheasant Lane Realty Trust, argued the City lacked the authority to do so.  The New Hampshire Supreme Court held that whether the City had the authority to issue a supplemental assessment presented a question of statutory

interpretation better suited for judicial review.  143 N.H. at 142.  The Court held Pheasant Lane

Realty Trust was not required to exhaust administrative remedies.

Also, in *Porter v. Town of Sandwich*, 153 N.H. 175 (2006), the Court held questions

concerning whether the Town's assessment violated an agreement and/or a statute were better

suited for judicial review, and thus exhaustion of administrative remedies was not

required.  *Id.* at 175-76.

1. **Mr. McCoy's claims are peculiarly suited for judicial review.**

Mr. McCoy's claims challenge the validity and constitutionality of the Town's action in

ordering him to remove his trailer.  He asserts claims for violation of his freedom of speech

(Count I) and equal protection rights (Count II).  Regarding Count I, he alleges the Town applied

the Zoning Ordinance against him in a way that discriminates against either the content or

viewpoint of his speech, and the Town's application of the Ordinance was unconstitutionally

vague.  Regarding Count II, he alleges the Town treated similarly-situated property owners

differently than him.  He has not made any allegations concerning whether the Town should have

granted him a storage container permit, or whether the Town should have granted him a third

extension of that permit.  As the cases above demonstrate, Mr. McCoy's claims are not issues

that are routinely resolve by local zoning boards, nor are they within the power of local zoning

boards to correct.  Thus, Mr. McCoy's only remedy was to file this lawsuit.

2. **The doctrine of municipal estoppel prevents the Town from arguing Mr.
   McCoy failed to exhaust administrative remedies.**

Even if Mr. McCoy was required to exhaust his administrative remedies, the Board of

Selectmen did not have authority under the Zoning Ordinance to extend Mr. McCoy's storage

container permit, and its illegal "extensions" diverted Mr. McCoy from seeking a zoning

variance or appealing its decisions concerning his requests for extensions to the Zoning Board of

Appeals.  The Town's argument that Mr. McCoy failed to exhaust his administrative remedies is premised entirely on the notion that the Board of Selectman's denial of a third extension of his storage container permit was *valid*, and that its prior two "extensions" were also *valid*.  Its singular reliance on that notion is erroneous – and perhaps a bit disingenuous.

"The doctrine of municipal estoppel has been applied to municipalities to prevent unjust enrichment and to accord fairness to those who bargain with the agents of municipalities for the promises of the municipalities." *Thomas v. Town of Hooksett*, <u>903 A.2d 963, 966</u> (2006).  "The elements of estoppel are: first, a false representation or concealment of material facts made with knowledge of those facts; second, the party to whom the representation was made must have been ignorant of the truth of the matter; third, the representation must have been made with the intention of inducing the other party to rely upon it; and fourth, the other party must have been induced to rely upon the representation to his or her injury." *Id.* at 967.

All four elements are satisfied here.  First, the Town was aware the Ordinance did not apply to Mr. McCoy's trailer, and it had no authority to "grant" or "deny" him any "extension" of a permit for it.  Nevertheless, it required Mr. McCoy to obtain and maintain a permit for his trailer and did not direct him to seek a zoning variance.  Second, while the Board of Selectmen contends it could not have granted a zoning variance, there is no statute or ordinance stating it could not have granted a variance, and there is no way Mr. McCoy could have known the Board's purported "extensions" of his permit were illegal.  Indeed, the Town continues to insist its purported "extensions" were lawful.  Third, there is no question the Town intended to induce Mr. McCoy to rely on these "extensions" because it concocted an entire, unauthorized process based on them and then "denied" him a third request for an extension.  Fourth, Mr. McCoy did, in fact, rely on the Board's "extensions" and did not seek an appeal of those decisions.  The

Board of Selectmen's first "extension" of the permit in November 2016 – which the Town admits was illegal – diverted Mr. McCoy from applying to the Zoning Board of Adjustment for a zoning variance, or seeking an appeal of the Board's decision (and, thus, missing the deadline). The same result occurred when the Town "granted" the second "extension" in 2017, and when it granted him an additional 30-day "extension" in 2018.  When Mr. McCoy requested these extensions, the Board of Selectmen should (and could) have easily informed him he needed to apply for a zoning variance or else seek an appeal of its decisions.  It obviously failed to do that, and its illegal "extensions" and then "denial" of a third "extension" combined with a 30-day "extension" to remove the trailer diverted Mr. McCoy away from the appellate relief he needed to seek.  The Town's argument that Mr. McCoy failed to exhaust his administrative remedies is essentially asking this Court to reward the Board of Selectmen for its deceit.

**F.      The Court Should Grant Summary Judgment on Mr. McCoy's Claims**

"After giving notice and a reasonable time to respond, the court may: (1) grant summary judgment for a nonmovant; (2) grant the motion on grounds not raised by a party; or (3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute."  Fed. R. Civ. P. 56(f).  Here, although the Town filed a Motion for Summary Judgment, the facts are undisputed and demonstrate the Town's application of the Ordinance to Mr. McCoy was unconstitutionally vague, and it treated Mr. McCoy differently than other similarly-situated property owners with unpermitted trailers.  Thus, the Court may – and should – grant summary judgment in favor of Mr. McCoy on Counts I and II.  *See Praed v. Kurtz (In re Kurtz)*, No. 18-01072-KHK (Bankr. E.D. Va. Jan. 23, 2019) (granting summary judgment under Rule 56(f)(1) for non-moving plaintiff); *Ganatra v. Land*, CIVIL No. 1:12-cv-

00245-MR-DLH (W.D.N.C. Aug. 12, 2013) (granting summary judgment under Rule 56(f)(1)

for non-moving defendant).

## CONCLUSION

For the foregoing reasons, Mr. McCoy respectfully requests that the Court (1) deny the

Town's Motion for Summary Judgment; (2) grant summary judgment on Counts I and II in favor

of Mr. McCoy; and (3) grant any other relief deemed just and necessary.

> JOSEPH McCOY,
>
> By His Attorneys,
>
> FOJO LAW, P.L.L.C.

Dated:  July 12, 2021                    */s/ Robert M. Fojo*
                                         Robert M. Fojo (#19792)
                                         264 South River Road, Suite 464
                                         Bedford, NH 03110
                                         Direct: (603) 473-4694
                                         rfojo@fojolaw.com

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was electronically filed with the Clerk

of Court using CM/ECF on July 12, 2021.  I also certify that this document is being served this

day on all counsel of record via transmission of Electronic Filing generated by CM/ECF.

> */s/ Robert M. Fojo*
> Robert M. Fojo

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

**Case No.: 1:20-cv-362-JL**

JOSEPH McCOY,

     Plaintiff,

vs.

TOWN OF PITTSFIELD

     Defendant.

_____

## DECLARATION OF JOSEPH McCOY

I, Joseph McCoy, declare as follows under penalties of perjury:

1.     I am the Plaintiff in this lawsuit.

2.     I am over 18 years of age and am competent to make this Declaration.

3.     This Declaration is based on my personal knowledge and direct observations.

4.     I make this Declaration in support of Plaintiff's Objection to the Town of Pittsfield's Motion for Summary Judgment.

5.     Attached as Exhibits 1 and 2 are documents containing numerous photographs of several hundred trailers or storage containers located on properties in Pittsfield, New Hampshire. But for a handful of them, these trailers do not have storage container permits.  The Town has not directed these property owners to remove these trailers.

6.     For example, Carl Anderson had two trailers hidden on his property at 324 Barnstead Road and did not have permits for them.  *See* Ex. 1 at 1.

7.     Another group of trailers is located on a property on Carroll Street on the outskirts of Pittsfield.  *See* Ex. 1 at 2-3.

8.     The next set of photographs shows trailers I requested that the Town remove after it directed me to remove my trailer.  *See* Ex. 1 at 4.

9.     Another group of approximately 30 unpermitted trailers is located on a property owned by Reese Freese (known as Tommy Trailor) at 16 Clark Street.  Ex. 1 at 5-15.

10.     Gerard Leduc has an unpermitted trailer on his property at 24 Carroll Street.  Ex. 1 at 16.

11.     Carole Dodge has at least two unpermitted trailers on her property at 80 Smith Hill Road.  Ex. 1 at 17-18.

12.     Brendan Guida currently has an unpermitted 40-foot trailer on his property at 187 Barnstead Road.  Ex. 1 at 19.  He had a permit for it from January 29, 2020 to January 29, 2021.  The permit expired.  *Id.*

13.     Finally, Ed Trzcinski at 217 Shingle Mill Brook Road has an unpermitted trailer on his property.

14.     The remaining photographs of hundreds of other trailers in Exhibit 2 are photographs taken of trailers I observed on properties in Pittsfield that did not have permits.  *See* Ex. 2.

15.     The Town has not directed any of the trailers above to be removed.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on July 12, 2021
.

*Joseph McCoy*

Joseph McCoy

## EXHIBIT 1

**Carl Anderson (324 Barnstead Road)**



**Carroll Street**





**Other Trailers I Requested to Be Removed**



**Reese Freese (Tommy Trailor) (16 Clark Street)**























**Gerard Leduc (24 Carroll Street)**



**Carole Dodge (80 Smith Hill Road)**





**Brendon Guida (187 Barnstead Road)**



# EXHIBIT 2

**Other Trailers Observed in Pittsfield**



































**TOWN OF PITTSFIELD**
**BOARD OF SELECTMEN**
**TOWN HALL, 85 MAIN STREET**
**PITTSFIELD, NH  03263**

---

**MEETING MINUTES OF Tuesday May 23, 2017**

**CALL TO ORDER**
Call to order at 6:00 p.m. by J.C. Allard, Chairman

**MEMBERS PRESENT**
J.C. Allard, Chairman
Gerard LeDuc, Vice-Chairman
Carole Richardson
Carl Anderson

**MEMBERS ABSENT**
None

**OTHERS PRESENT**
Cara Marston, Town Administrator
Ammy Ramsey, Recording Secretary

**PUBLIC INPUT** – regarding agenda items only
Mary French inquired about the best time to speak about 81 Main Street would be, and J.C. explained that the public hearing would be the time to do so.

**AGENDA REVIEW**
Gerard: Report for Aqueduct under committee reports.
Carole: None.
Carl: None.
J.C.: None.

**PUBLIC HEARING**
6:15 p.m. – Pittsfield Historical Society proposed relocation to 81 Main Street

J.C. opened the public hearing to receive input from the public regarding the proposal by the Historical Society to take possession of town owned property at 81 Main Street which is adjacent to the Town Hall.

Adam Gauthier asked if there are any proposals printed to look at, Cara handed some out.

Mark Riel asked if the proposal is the actual letter, J.C. stated yes, with a copy of the tax card for people to see the property.

Mary French asked which item we are talking about, because under old business it says it's a sale and the proposal states it's a donation.  J.C. explained that the public hearing is a discussion for the proposed donation of the property and the item under old business is referring to us trying to sell this property over the last year.  This is a relatively new proposal from the Historical Society to take possession of the property.  J.C. asked Carl to give a history of the property.  Carl explained that we ran into an issue with selling this property with a clear title.  In addition to the usual title problems with a property that is taken by tax deed this one had other issues, too.  Carl stated that the likelihood of getting a clear title without doing an action to quite title which can cost ten to fifteen thousand dollars is out of the question.  There have been several title companies working on it to accomplish this.  If we were to take this to auction we still have to convey a clear title.  To get a clear title it would easily cost ten to fifteen thousand dollars and have to go through the courts and that can be a lengthy process.  Carl stated that they had a person interested in purchasing the property and they would take on the expense of clearing the title themselves, and at the point it would be rehabbed and restored to the tax rolls, at a low purchase price.  Then the question would be if that would be in the best interest of the town, because you are rolling the dice when you sell a property as to how much additional burden could be put on the services in town.  It's an unknown when you sell the property to know if the tax revenue that the town receives would be of benefit to the town.  Or would we be better off donating this property to the Historical Society, so the town would have a nice place to keep the history of the town.  It won't bring any revenue, but to Carl's understanding they would clear the title and tear down the existing building and build a new one.  Otherwise we would be in for a 10 year wait to see what happens with the title.

Randy Severance stated that at the last meeting there was a non-public session held with the Historical Society and it was later revealed to us during public session that the non-public meeting minutes would be unsealed and put up on the website as agenda minutes.  As of noon time today they were not on the website and requested a synopsis of that then private but not private meeting.  J.C. stated the reason the minutes are not on the website is because they have not been approved and will be during this meeting.  J.C. explained that it was a discussion concerning the desire of the Historical Society to take possession of 81 Main Street property.  They would demolish the existing building and replace it with building yet to be designed to accommodate the possessions of the Historical Society.  Part of that discussion pertained to the issues that Carl just explained with the title.  Currently in the state of New Hampshire we have an advantage concerning titles for non-profit organizations relative to titles verses a private sale.

Adam Gauthier asked if there was a time table for demolition and moving forward, J.C. stated they don't have a formal commitment as they are waiting for approval. The Historical Society shares this board's interest in moving forward with getting the current structure down and construct a new building.

Mary French asked if that will be a stipulation put in the deed, Carl stated that we could.  The other properties that have been sold in town for residential rehab have had time frame for improvements so the properties are better to look at.  Carl feels that we would be looking for the same thing and thinks they are prepared for something like that, as well.

Justin Clough is in favor of history but considering the fact of serious constraints in regards to tax revenue.  With an offer on the table for this property who is willing to work the title process at their expense, he is wondering why we are not taking a closer look at that first.  He would like to see something more available for the Historical Society, but looking at this from a tax revenue purpose he finds it a little difficult to hand over a property that would not generate any tax revenue when we have an offer that could generate revenue.  Carl stated that we don't exactly have an offer on the table, however one could be generated.  Carl stated that there are things we have to consider when looking at it from that perspective.  You have to look at how much tax revenue it will be capable of generating.  Will it have a house on that small lot that will be taxed for $10,000.00 or $4,500.00.  And the other thing would be depending on the buyers and if it is a family that will cost the town more than that in services.  It's not an exclusion from someone coming and building but residential development does not usually enhance the tax situation.  Justin's other concern is that previously he saw it was going to be rezoned so that it would be a business.  His question would be if it is generating just one dollar of tax revenue then wouldn't it be better than generating none.  Carl stated that just because you generate a dollar in revenue does not mean you are on the up side.

Mark Riel stated that the intention of the Historical Society is to put their current building back onto the tax rolls and it is assessed twice as much so it would generate tax revenue.  Justin asked if it could potentially be a tear down.  Mark stated the building is in good condition.

Mary French asked if the current Historical Society building was originally bought or donated, Mr. Berkson stated it was purchased.  She also is impressed with Pittsfield's Historical Society and how they handle the history of Pittsfield.  Mary asked if the previous residents lived there when the property was taken by tax deed.  Cara stated that she had passed away.  Mary feels that it would be a benefit to have the Historical Society there and has some possible suggestions for the deed.

Fred Okrent believes that the donation of the property to the Historical Society for the construction of a new building would be a great step forward for the revitalization of the town.

Adam Gauthier stated that he is not against the Historical Society he just would like some more information.  He asked if funding is available for this project or are they going to be doing some fundraising.  Mark Riel stated that they have some significant pledges for the project, that will get them to a point of clearing the title, demolishing the current structure, some site work, and a new structure up and enclosed.  There may be some fundraising later to finish the project.

Doug Martin asked if the rebuild would be period correct, J.C. stated that the town does not have a historic district that has that kind of requirement.  Doug commented that we are taking down history to put up a warehouse.  J.C. stated that the architectural design has not been done yet.  Doug inquired about the building being climate controlled to properly store the Historical Society's items.  Mark Riel informed Doug that most historical societies do not have climate controlled atmosphere for the entire facility, they do for some of the paper items.  Mark stated that the 3 story building including the full basement that would hold the fire wagons and baggage carts, and stated that they want it to fit the Historical Society's image and benefit the town.  J.C. commented that anyone could take possession of the building would most likely tear it down because of the condition it is in.  Doug understands that but it would be private sector and not a gift or donation.

Randy Severance asked if the town still has an abandoned piece of property next to the library and if so wouldn't that be a better location for the Historical Society. And has it been considered. Mark Riel stated that they had looked at that and it would be costly in the long run for the upkeep of that building.

Lee Corson asked about a time frame for the new building to be up. Mark Riel stated it is the intention to remove the existing building quickly, but we would need the title cleared before the construction process starts.

Justin Clough asked if the time has been taken to look at existing structures around town. He is in favor of having a good Historical Society, but would it be more price advantageous to purchase and rehab to meet their needs and put this property back on the tax roll. Justin inquired about the building down the street that has been vacant for a while and has a good location. Ray Webber stated that then you would be taking that property off the tax roll.

Larry Berkson stated they have done some research and looked at all (14 currently) available properties in town. Larry explained the building Justin referred to would be a big loss in tax revenue for the town, and they would not be able to afford the maintenance and upkeep that property would need. They currently have a window with some major donors and would need to do something pretty hastily to capture that money and move forward and the project next door is the best option.

Justin Clough stated that he is only asking these questions because there was not much information given to the public. He understands that they have done the research but there is not a lot of information available to know what's going on.

Adam Gauthier asked about parking, Mark Riel stated that it wouldn't be any worse than what they have now because they don't have any now. Ray Webber stated that there will be some available behind the building.

Jim Gamble stated that he was the one with the purchase and sales agreement on this property, he does this for a living and he was prepared to purchase and rehab it. He has been doing this for 42 years and agrees that it needs work but the work is doable. He currently is rehabbing 114 Main Street.

Lee Corson inquired about how long it would take to get a clear title. J.C. stated he is not sure how long it would take but it would be costly. Carl stated it could take 6 months to a year.

Jim Gamble stated it was his attorney that found the problems with that title. They said it was not hard it's just dealing with the lenders, and it would take 6 months to a year just like he explained to Carl.

Justin Clough asked if the Historical Society would be looking at the same time frame. J.C. believes that it would be different because of their non-profit status. Carl stated that the board could convey the property to anyone with a clear title or not, it's whether the buyer accepts the

title the way it is.  In the case of Mr. Gamble he can purchase it and rehab it, but when it comes time sell the property it would be in his best interest to clear the title.

Mary French requested clarification of clearing the title if it goes to the Historical Society.  J.C. stated that whoever the property is conveyed to would still have to clear the title.  And to his understanding the Historical Society would be the terminal holder because they would intend to hold the property in perpetuity, whereas a private citizen would fix it and sell it the title would come into question again.  It seems holding onto the title for a time seems to have less questions.  Mary feels that it would be important to put something in the deed that states if the Historical Society is not able to continue residing on that property they could not sell it and would return the property to the town.  She has examples that she would like to provide to the selectboard for their information.

J.C. closed the public hearing at 6:47 p.m.

Carl asked if we could do a poll to see how many would be in favor and who would not.  There was some discussion and a poll was done.  The majority was in favor of donating the property to the Historical Society.

**NEW BUSINESS**

**ACTION ITEMS**
1.  Property Tax Warrant – $4,211,170.00
J.C. stated that item number 1 is for the Property Tax Warrant.

Gerard: I make a motion to approve the Property Tax Warrant in the amount of $4,211,170.00.
Carl: Second.
Discussion: None.
Motion carries 4-0

2.  Notice of Intent to Cut Timber – Tax Map R30, Lot 4 – 520 Catamount Road
J.C. stated that item number 2 is for a Notice of Intent to Cut Timber for Tax Map R30, Lot 4 at 520 Catamount Road.

Carl: I make a motion to approve the Notice of Intent to Cut Tax Map R30, Lot 4, 520 Catamount Road.
Gerard: Second.
Discussion: None.
Motion carries 4-0

3.  Application for Current Use – Tax Map R2, Lot 7 – 113 Daroska Road
Gerard inquired if the current use was the 128 acres, Cara stated that it was the same ownership and contiguous.  J.C. stated that item number 3 is for an Application for Current Use for Tax Map R2, Lot 7 at 113 Daroska Road.  Carl inquired with Cara about the house location (on the abutting parcel) in reference to the 128 acres and the land that is currently in current use.

Carl: I make a motion to approve the Application for Current Use for Tax Map R2, Lot 7, 113 Daroska Road.
Carole: Second.
Discussion: None.
Motion carries 4-0

4. Abatement – 2 & 4 Manchester Street - $1,357.81
J.C. stated that item number 4 is a request for an abatement for 2 & 4 Manchester Street in the amount of $1,357.81.

Gerard: I make a motion to approve the abatement for Tax Map U01, Lot 83 2 & 4 Manchester Street in the amount of $1,357.81.
Carl: Second.
Discussion: None.
Motion carries 3-1 Carole opposes.

5. Conservation Commission Resignation – Owen David
J.C. stated that item number 5 is a resignation letter from Owen David.

Gerard: I make a motion to approve the resignation of Owen David from the Conservation Commission.
Carl: Second.
Discussion: None.
Motion carries 4-0

6. Conservation Commission Appointment – Carl Wallman
J.C. stated that item number 6 is an appointment application for Carl Wallman to the Conservation Commission.

Gerard: I make a motion to approve the appointment of Carl Wallman to the Conservation Commission.
Carl: Second.
Discussion: None.
Motion carries 4-0

7. Committee name change request - Economic Development to Community Development
J.C. stated that item number 7 is a request to change the name of the Economic Development Committee to be the Community Development Committee.

Carl: I make a motion to approve the name change request of the Economic Development Committee to Community Development Committee.
Carole: Second.
Discussion: None.
Motion carries 4-0

8. Economic (Community) Development Committee Appointment – Leroy Corson
J.C. stated that item number 8 is an appointment request of Leroy Corson to the new Community Development Committee.

Gerard: I make a motion to approve the appointment of Leroy Corson to the Economic (Community) Development Committee.
Carl: Second.
Discussion: None
Motion carries 4-0

9. Parks & Recreation Commission Appointment – David Stasiak
Gerard: I make a motion to approve the appointment of David Stasiak to Parks & Recreation Committee.
Carl: Second.
Discussion: None.
Motion carries 4-0

10. BCEP Solid Waste District disposal fee waiver – Josiah Carpenter Library
Carole: I make a motion to waive the fee waive the fee for the library.
Carl: Second.
Discussion: None.
Motion carries 3-1 Gerard abstains.

11. 42 Chestnut Street grant demolition project – easement addition to deed
Cara stated that this is something that FEMA requires with the project to make sure that anyone searching the title on the property that FEMA was involved with the project. It's part of the grant, if for some reason we wanted to sell this property we would have to go back to FEMA and ask their permission because they have an interest in the property, and then there would be a different easement going forward.

Carl: I make a motion to approve the easement addition to the deed to satisfy FEMA.
Carole: Second.
Discussion: None.
Motion carries 4-0

12. Proposed donations of personal property – Police Department
Cara stated that there were some donations dropped off at the police department of coloring books and stuffed animals for the officers to give to children in difficult situations.

Carl: I make a motion to accept the personal property donation for the police department as described.
Carole: Second.
Discussion: Carole asked if we have a person or group to thank. J.C. asked if we should send something to the church. Carl suggested sending a letter of thanks to them.
Motion carries 4-0

13. Proposed donation of personal property – Emergency Management
Cara stated that this would be retroactive because this came forward at the same time the donation policy was being discussed.  Rob Freese printed out the entire plan and the big color print outs needed for the hazardous mitigation materials.

Carl: I make a motion to accept the proposed donation of the personal property as described.
Gerard: Second.
Discussion: None.
Motion carries 4-0

14. Draft bid notice – LED street light conversion project
Cara presented the draft bid notice for the board to review.  She explained that she used several different examples to create this bid.  Carl would like to review this, because we need to make sure there is some kind of accommodation for either a relocation or possible addition of some lighting.  Carole confirmed this had to go out to bid with Cara because she thought there was a company that was already set up to do this project.  Cara also included the current street light inventory that was done by Sgt. DiGeorge that gave his opinion from a safety aspect if we need the light or not, then gave it to George for his review from a public works perspective.

Carl: I make a motion to table this until our next meeting so we have a chance to look at the bid proposal and the list of lighting.
Gerard: Second.
Discussion: Cara explained that there is 141 lights the town is paying for and when Sgt. DiGeorge went through the list he could not find 6 of them but found and additional 13 that we are not paying for.  Carole stated that the LED lights are supposed to be more effective so we may not need as many but who is going to tell us that.  Cara stated that part of the bid is going to do an audit and they should be able to tell us what we need and don't need.  Then they will bring it to you and you will have the final decision.
Motion carries 4-0 (to table)

Carole asked if we could have a time frame on this so we can get moving with this.  Carl stated that the motion to table is for 2 weeks.  Carole is hoping we get this done by fall.  Cara stated that as long as we can get a good list we can put it out to bid.  Cara stated that when looking at other municipalities that have done this there was a time of around 6 months.

15. Storage Container Permit extension concern – 322 Catamount Road
Cara stated that this original permit came to the board in the fall for an extension and now has lapsed, so Cara asked Jesse to go take a peek to see if it was still there.   Jesse stated that the gentleman was going to come in and ask to speak to the board, Cara stated she received a letter.  J.C. asked for the location and Jesse stated it was on Catamount Road.  Jesse explained that the man is disabled and has trouble getting in and out of the trailer so it is taking him longer to clean it out.   The other concern he brought forward is that other people in town have trailers and questioned why he has to move his is other people are not required to.  Carl asked Jesse if he is aware of other storage trailers in town that are supposed to have a permit.  Jesse stated that storage trailers are not allowed unless they are for construction reasons.  We don't have anything in our codes that they need a permit, but we have a paper that says if you have a storage container you have to be approved by the BOS.  Cara stated that is in the Zoning Ordinance.  Carl

asked Jesse if he is aware of any other trailers in town that shouldn't be, and Jesse stated that they are all over the place but are they grandfathered or not would be another question. Carl asked if the trailer is registered, because to his understanding if the trailer was registered and so that it could be moved when needed it was not taxable and would be in a different category then a storage building. Jesse has not seen anything that says that but it does say storage trailers. Whether or not it's registered it is still storage on private properties and Jesse does not believe it was the intent of the ordinance to allow anyone to have the storage containers on their property. Cara stated the ordinance does not say anything about registration. Carl asked about the property next to the town shed and Cara informed him that he is taxed on those and is grandfathered and the other residents are not taxed. Carl stated that could be a way to address the issue and start taxing the trailers. Jesse explained that in other towns where he builds they sometimes are in need of a storage trailer to store stuff while the construction is going on and then when the construction is complete the trailer is removed and he believes that is what our ordinance is addressing. J.C. asked if there is a difference between a trailer and a container. Adam Gauthier stated that trailer is not mentioned in the ordinance and container is. J.C. questioned if they should deal with trailers any differently. Cara stated the definition of storage container on the permit application reads: would be any truck, trailer, box trailer, school bus, mobile home or any other facilities used for storage or other purposes whether registered or not. J.C. asked what we should do about this item, and suggested tabling it because the gentleman requested to come in and speak with the board. Carl stated he does not know how we can justify treating this one resident any different than any other. J.C. stated he did do the right thing and came in and received a permit. Jesse stated it originated from a complaint and the gentleman stated he was using the trailer while he built his garage and got the permit. Cara stated that in order to change the ordinance you would have to go to town meeting. Gerard stated he would like to see him come in front of the board since he did request to. Cara asked about the other properties that are technically in violation, Carl stated they are not on the agenda at the moment. Chief Pszonowsky stated the fire department is currently in violation to store equipment so we would be subject to anything that might come about. Justin Clough stated that he believes it's not the trailer but the ordinance to be reviewed. Carl would like to see this tabled and have Mr. McCoy come in and talk with us.

Carl: I make a motion to table.
Gerard: Second.
Discussion: None.
Motion carries 4-0

**COMMITTEE REPORTS**
Gerard stated at the last Aqueduct meeting the board voted to pay the balance to Mr. Sancoucy. Gerard also stated that the petition was submitted to the selectboard and since there has not been any movement the committee feels the selectboard is in violation of RSA 50. Carl asked what RSA 50 says and Cara was not sure. Cara stated the board's direction to the committee was to give us a vote on their proposal on the boundaries and a boundary list that agreed to the maps. Fred Okrent stated that was voted on and sent. Cara stated this meeting is the next meeting of the selectboard after that and is on the agenda under old business, so unsure of what RSA could be in violation. J.C. inquired what the next step is, and Cara stated to establish the boundaries of the water district and included it in the agenda packet for the board along with the minutes. Carl stated he has seen the boundaries and the list of properties, and personally has an issue with

properties being placed in a village district in which the property owner has no vote or say in what happens.  Carl stated to his understanding the only people who have a vote in the village district are those who are domiciled in the village district.  So if you own a property in the village district but do not live there you do not get a say.  J.C. asked if that meant the landlords would not have a say or vote, and Carl said yes if he understands it correctly.  Carl stated that the landlords and the people who own land would not have a vote but would still be subject to the rules made by others and he is opposed.

Carole had no committee reports but would like Ammy to include the list of state paving that Mr. Donovan provided that are proposed for next year.

| Road Route | Length | Limits |
|---|---|---|
| NH 107 | .8 | From Depot St. to NH 107 |
| Loudon Rd. / Concord Hill Rd. Main St. | 1 | From NH 28 to Clark St. |
| Barnstead Rd. | .2 | From NH 28 to NH 28 |
| Barnstead Rd. | .5 | From NH 28 to NH 28 |
| Carrol St. | .2 | From Main St. to Depot St. |
| NH 28 | 3.1 | From Epsom Circle to S. Barnstead Rd. |

Cara asked if these are proposed or slated, Carole stated they are slated.  Cara stated they usually receive notification from the state and then it becomes and information item on the Selectboard agenda.

J.C. stated that the new Community Development Committee will meet tomorrow evening at 6:30.

**INFORMATION ITEMS**
April Waste Water Treatment Facility Report was presented to the board.

**OLD BUSINESS**
1.  Town hall basement code issues (4/5/16)
Cara stated that until we know that the food pantry is completely moved out we can't move forward. There are some freezers down there and she spoke with one of the board members from the pantry and they are working on distributing those.  They did say the move has been successful and they are working on getting some insurance as a non-profit.

3.  Joy Street Pump Station concern (8/16/16, building/health to follow up)
Cara sent the letter and has not heard anything back, but it's only been a week.

4.  Consulting Services Contract for Municipalization of Pittsfield Aqueduct Co. (9/27/16)
Cara stated that Gerard stated the Aqueduct Committee voted to pay the balance, so asked if there is going to be a contract.  Fred Okrent stated the motion on that was to have the selectman approve the contract for the remaining balance, whether we use it or not is up in the air.  But it has to be an approved contract before we use it if we need to.  It has been voted on in the past and the money was set aside and it was a matter of book keeping.  Fred stated they approved it. J.C. asked now that they approved if we need to approve it.  Cara stated yes, that as long as

Sansoucy amended the contract amount because that was the problem.  The contract amount that was given was above the encumbered amount so we wanted the amendment to reflect the encumbered amount so we could approve that.  Fred stated he believed he sent it and will check on that.

5.  Library sewer line repair (4/4/17)
Cara stated that Bill Gilpatrick was over at Sanels who needed some sewer work done and he spoke with the company doing that work and asked them if they would put in a bid for the work needed at the library. Cara stated they did and she forwarded that to the board and was not sure if the library trustee was aware they need to act on this or if they are going to refer to the selectboard. J.C. stated he will contact them.

6.  Voter petition for formation of a Village Water District (4/4/17)
Cara stated that now that the board has seen what the committee voted on as a proposed list and map.  Cara feels that the map should be marked for the public to easily see.  The question would be if the board is ready to go forward with scheduling a public hearing on the proposed boundaries for the proposed water district.  Town counsel suggested not lumping everything into one public hearing and to first establish the boundaries.  The public hearing will be scheduled for June 27, 2017 during our regular scheduled meeting.

7.  2017 Balloon Rally fireworks proposal (5/2/17)
Cara stated that the contracts are ready to sign.  The Rotary Club will be paying Atlas Fireworks directly.

Carl: I make a motion to approve the fireworks contract for the 2017 Balloon Rally and have the chairman sign the contract.
Carole: Second.
Discussion: None.
Motion carries 4-0

Gerard asked if they will be doing anything for 81 Main St. tonight.  J.C. stated they should think about that before making a decision.  Gerard stated the proposal consisted of a 3 story building and there may be a restriction in our zoning for that.  Carl suggested putting a time frame for the existing building to come down and the lot cleaned up if it is approved, and requesting a drawing of what the new building will look like.  The board discussed those items and decided to have Cara contact the Historical Society and request a proposed architectural design and a time frame for the next selectboard meeting so they can make a decision.

**CHECK MANIFESTS**
1.  Accounts Payable
Gerard: I make a motion to approve Accounts Payable.
Carl: Second.
Discussion: None.
Motion carries 4-0

2.  Payroll
Gerard:  I make a motion to approve Payroll and Direct Deposit.

Carl: Second.
Discussion: None.
Motion carries 4-0

**MINUTES**
1.  May 9, 2017 – Public Meeting Minutes
Gerard: I make a motion to approve the May 9, 2017 Public Meeting Minutes.
Carl: Second.
Discussion: None.
Motion carries 4-0

Cara stated that an amendment for the Purchase and Sales Agreement is needed for the property that Sanel's is purchasing (Map U3, Lot 7).

Carl: I make a motion to extend the Purchase and Sales Agreement for 30 days till June 3, 2017.
Gerard: Second.
Discussion: None.
Motion 4-0

**PUBLIC INPUT**
Paul Nickerson would like the board to think about considering a hotel being put in town, he has two locations in mind and is working on putting something into motion.

Randy Severance stated you can put a stipulation in a deed when donating a property to also approve the architectural design of a building at a later time.  So the gifting can be done immediately and the design can be addressed later.  Carl stated the Historical Society would have to agree to making that stipulation.

Adam Gauthier asked about the roads that are slated to be paved, and he was given the list.

Paul Nickerson stated that we are not just giving a piece of land and inquired about the current property.  J.C. stated that they will be selling the current property and then it will return to the tax rolls.

J.C. stated they are going to go into non-public.

Carl:  I make a motion to go into non-public for RSA 91A:3-2 a,b,c,e.
Gerard: Second.
Discussion: None.
Roll call was done and all approved.

Gerard: I make a motion to seal.
Carl: Second.
Discussion: None.
Roll call was done and all approved.

J.C. called meeting back into public.

Cara stated that the applications for the vacant selectboard position are in with a few more days to have some more come in, and asked how the board would like to proceed.  The board had some discussion and decided to have them all contacted to come into the next meeting and be prepared for questions during the public session.  They will consider a decision at the following meeting.

Carole:  I make a motion to adjourn.
Gerard: Second.
Discussion: None.
Motion carries 4-0

Meeting adjourned at 9:40 p.m.

Approved:

_____          _____
J.C. Allard, Chairman                        Date   27 June 2017



**MEETING AGENDA**
TOWN OF PITTSFIELD
BOARD OF SELECTMEN
TOWN OFFICE, 85 MAIN STREET
PITTSFIELD, NEW HAMPSHIRE 03263

---

## TUESDAY, MAY 23, 2017

**6:00 p.m.** –Call to order – Regular Session

*Please note: The meetings of the Board of Selectmen are recorded, audio and video.*

Public Input standards: The Board of Selectmen may accept the public's input that is addressed directly to the Chair in a courteous and respectful manner in a time frame of three minutes or less.

## PUBLIC INPUT – regarding agenda items only

## AGENDA REVIEW

## PUBLIC HEARING
  **6:15 p.m.** – Pittsfield Historical Society proposed relocation to 81 Main Street

## NEW BUSINESS

### ACTION ITEMS
1. Property Tax Warrant – $4,211,170.00
2. Notice of Intent to Cut Timber – Tax Map R30, Lot 4 – 520 Catamount Road
3. Application for Current Use – Tax Map R2, Lot 7 – 113 Daroska Road
4. Abatement – 2 & 4 Manchester Street - $1,357.81
5. Conservation Commission Resignation – Owen David
6. Conservation Commission Appointment – Carl Wallman
7. Committee name change request - Economic Development to Community Development
8. Economic (Community) Development Committee Appointment – Leroy Corson
9. Parks & Recreation Commission Appointment – David Stasiak
10. BCEP Solid Waste District disposal fee waiver – Josiah Carpenter Library
11. 42 Chestnut Street grant demolition project – easement addition to deed
12. Proposed donations of personal property – Police Department
13. Proposed donation of personal property – Emergency Management
14. Draft bid notice – LED street light conversion project
15. Storage Container Permit extension concern – 322 Catamount Road

### COMMITTEE REPORTS

### INFORMATION ITEMS
1. April Waste Water Treatment Facility report

## OLD BUSINESS
1. Town hall basement code issues (4/5/16)
2. Sale of town owned/tax-deeded property (7/26/16)
   a. 81 Main Street
   b. 37 Main Street – (deeded "back" to town, discussed 1/3/17)
3. Joy Street Pump Station concern (8/16/16, building/health to follow up)

4. Consulting Services Contract for Municipalization of Pittsfield Aqueduct Co. (9/27/16)
5. Library sewer line repair (4/4/17)
6. Voter petition for formation of a Village Water District (4/4/17)
7. 2017 Balloon Rally fireworks proposal (5/2/17)

## CHECK MANIFESTS
1. Accounts Payable
2. Payroll

## MINUTES
1. May 9, 2017 – Public Meeting Minutes

## PUBLIC INPUT

Hello Joe,

I'm writing to try to correct some incorrect information that is being spread verbally and through social media by you.

Before becoming a selectman in 2016, I frankly knew zero about the storage container article in the zoning ordinance. My *first* exposure to it was when you came to the board with your expired permit and literally begged the board to give you a one-year extension due to your disability and how long it would take to empty the trailer out. I'm sure you remember it, as does everyone else in the room at the time. Hopefully you remember that I was the one that made the motion to give you a *yearlong extension*. I remember you thanking us profusely and *swearing you'd have the trailer empty and gone by the end of the year!*

Over the course of that next year, in addition to a workload you can't even imagine, that the select board has to find a way to deal with, we received several complaints about storage containers. One of those complaints was about your trailer, and in addition, that you were operating a second hand store in the rural district without a variance (which as you know, we never pursued). We were never given a name**. Nothing was said about Trump being on the trailer**- not then, not ever- not from the - complainant and not from any member of the board. Let me assure you that none of this is related to Trump's name on the trailer (and which if you recall was no longer even on the trailer when you got a notice that your extension was nearly up). We happen to all be Republicans, and not one of us has ever bad-mouthed Trump at all that I know of. Personally, I liked Trump on your trailer better than I liked the balloons, but at the end of the day none of us gave a damn what you painted on it. Most of the time I still wear a Make America Great Again hat.

Anyway, what was obvious was that there were illegal storage containers all over the place (that's about the only *truth* I can find in your rants). So, what should we do about it? None of us had any idea when they were put in- before or after the zoning article. Many select boards had apparently just ignored the ordinance, thus creating a nearly impossible situation for *this* board. Most of us actually work-full time and it is hard to work 70 hours a week, keep up with everything else a select board has to do **AND** start going house by house figuring out what the story is with every existing storage container would be an almost impossible task. However, the rule is on the books and the select board is elected to enforce the rules whether we agree with them or not. So, as a board, we decided the best we could do is enforce the rule as storage trailers were added and that we knew about coming in during our term in office. We didn't make the rule. We weren't the ones that ignored the rule. We decided to not make the situation worse by ignoring it on our watch.

Fast forward to 11 months into your year long extension. It was obvious you had made zero progress emptying your trailer and we didn't want you to get to the end of year and have us on your ass about an expired permit. You keep claiming we demanded you get rid of the trailer a month early. *That was simply a courtesy to remind you that time was approaching when we would have to deal with it again!*

You say I was in your yard leaving a sign and told you I didn't know "what happened to your trailer". That is not what I said. I told you I didn't know who **complained** about your trailer. I didn't know then, and I don't know now. We were never given a name. But I do know that we gave you a year-long extension to keep it, you used up the year and we reminded you that you'd have to remove it. You

know what happened and I know what happened.  Did I make the motion to send you the letter?  Yes, I did.  And I would have done the same thing no matter who it was and no matter what they had painted on their trailer- I couldn't care less what the trailer looked like.  You made us a promise and we were not prepared to let that promise be broken.  Those are the rules and the only ones we are capable of enforcing are the ones that come in under our tenure.  You're being told by your neighbors and people who you think are friends that **you** have been picked on.  ***The truth is you've been treated just like everyone else that has brought in a storage container or a permit has expired since we took office!***

These people who are advising you are convincing you that the board of selectmen is only interested in taking care of their friends, that we treat newcomers differently.  ***THAT IS THE BIGGEST UNTRUTH THAT IS BEING TOLD!***

You are claiming I voted not to recommend Pritchard's article because "we need it to make the town pretty".  ***Once again, absolutely NOT what I said, and I have the audio to prove it!***  Frankly, I don't give a damn whether we have the storage container rule or not.  The voters decided to pass it long ago ***"to promote the general welfare by protecting the aesthetics of the town".***  That's verbatim from the zoning ordinance.  My comment was that if that's what the voters want, so be it.  My biggest problem with the proposed change is that it is not town wide.  Separating the rules by district will just add one more layer of confusion for the public.

In closing I wanted to send you this letter to set the record straight and remind you of what you agreed to.  This letter contains the truth and as with anyone who makes claims that are untrue in my presence, I will correct them with the truth.  I think that you should stick to what actually happened and not get personal because you are being instigated by others.  Being a selectman means a heavy work load for literally no compensation and at times includes tirades from people who, if they are honest with themselves, have no real justification.

Carl Anderson

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

JOSEPH McCOY                              )
                                         )
Plaintiff                                )
                                         )
v.                                       )        Civil Action No.:1:20-cv-00362-JL
                                         )
TOWN OF PITTSFIELD                       )
                                         )
Defendant                                )

## <u>MOTION TO STRIKE DECLARATION OF JOSEPH MCCOY,</u><br><u>WITH INCORPORATED MEMORANDUM OF LAW</u>

Pursuant to <u>Fed. R. Civ. P. 37(c)(1)</u> and (d)(1)(A)(ii), Defendant Town of Pittsfield

("Town") moves to strike Plaintiff's declaration and supporting exhibits, and says:

INTRODUCTION

Plaintiff recently submitted a declaration with supporting exhibits [Docs. 21-1 through

21-7] (the "Declaration") in support of his Objection to the Town's Motion for Summary

Judgment. The Declaration is the only affidavit or declaration provided in support of Plaintiff's

Objection. The Declaration purports to provide information and evidence of similarly situated

comparators necessary to support Plaintiff's class-of-one equal protection claim. The Court

should strike the Declaration. As detailed below, there is no justification for the late disclosure of

the Declaration and its contents, and the late production - after the close of discovery and the

submission of a motion for summary judgment - prejudices the Town.

FACTUAL BACKGROUND

Approximately one year ago, on August 11, 2020, Plaintiff produced initial disclosures

per <u>Fed. R. Civ. P. 26(a)(1)(A)</u>. *See* Affidavit of Robert Dietel ("Dietel Aff."), attached hereto as

Exhibit A, ¶ 2; *see also* Exhibit A-1 ("Initial Disclosures"). Plaintiff's Initial Disclosures did not include any of the information or photographs contained in Plaintiff's Declaration.

More than three months ago, on April 12, 2021, the Town propounded discovery requests on Plaintiff, including interrogatories and requests for production seeking information and documentation regarding Plaintiff's alleged damages, and in particular, any evidence of harassment, discrimination, and similarly situated comparators. *See* Dietel Aff., ¶ 3; Exhibit A-2 ("Interrogatories"); Dietel Aff., Exhibit A-3 ("Requests for Production"). Per the discovery plan, responses were due forty-five days later on May 27, 2021. Plaintiff missed the deadline, and to date, has not provided answers or responsive documents.[1]

Approximately two months ago, on May 14, 2021, a mid-litigation conference was held with the Court. During the mid-litigation conference, the parties discussed the state of discovery, including that Plaintiff's deposition had recently occurred, and that the Town had propounded discovery. Additionally, counsel for the Town disclosed that it would be filing a Motion for Summary Judgment by the June 1, 2021 deadline. Plaintiff's counsel raised no objection to the Town's discovery requests during the mid-litigation conference nor has any objection been filed or otherwise raised in anyway.

On June 1, 2021, discovery closed and the Town filed a Motion for Summary Judgment in reliance on the evidentiary record as then existing. Plaintiff's response was initially due on July 1, 2021. Plaintiff subsequently requested and received two extensions of that deadline, and ultimately filed his Objection and Declaration on July 12, 2021.

---

[1] On June 22, 2021, Plaintiff emailed ten documents to defense counsel, which were not responsive to the Town's discovery requests, and did not include any of the information or pictures produced with Plaintiff's Declaration.

To date, the Town's Interrogatories and Requests for Production remain unanswered. Trial is scheduled to occur in approximately three months. Oral argument on the Town's Motion for Summary Judgment is scheduled for September 17, 2021.

LEGAL ANALYSIS

Pursuant to Fed. R. Civ. P. 37(c)(1), Plaintiff's Declaration should be stricken. The rule is clear. "If a party fails to provide information or identify a witness as required by Rule 26(a) … the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c). As a consequence, "the baseline rule is that the required sanction in the ordinary case is mandatory preclusion of late-disclosed information." *See Harriman v. Hancock County*, 627 F.3d 22, 29 (1st Cir.2010) (quotation marks and bracketing omitted). "An array of factors," may be considered in determining whether preclusion is appropriate, including "the sanctioned party's justification for the late disclosure; the opponent-party's ability to overcome its adverse effects (i.e., harmlessness); the history of the litigation; the late disclosure's impact on the district court's docket, and the sanctioned party's need for the precluded evidence." *Id*. at 30 (citing *Esposito v. Home Depot U.S.A., Inc.*, 590 F.3d 72, 76 (1st Cir. 2009)). "Here, none of these factors suggests that this court should eschew the 'baseline rule' and impose any remedy other than precluding the previously undisclosed evidence." *Contour Design, Inc. v. Chance Mold Steel Co.*, No. 09-CV-451-JL, 2011 WL 4527404, at *4 (D.N.H. Sept. 28, 2011).

I.     *There is no justification for Plaintiff's delay in producing the information and images contained in his Declaration.*

The information and photographs in the Declaration were available to Plaintiff at the time he submitted his Initial Disclosure, and in fact, were in his possession. As a result, the information and pictures should have been produced.

During Plaintiff's deposition on May 7, 2021, Plaintiff was asked to identify his alleged comparators. In response, he provided some names of property owners, such as Carl Anderson, but explained that he had "a whole list" and "many photos of trailers in Town." *See* Exhibit A to Memorandum of Law in Support of Motion for Summary Judgment ("McCoy Dep.") at 55:20-21. When asked how long he had that list and photos, he responded "[w]ell, as of today, a while." *Id*. at 56:3. In order to clarify how long "a while" is, Plaintiff was asked "[b]ut we're clear, though, you have had them since before you brought the lawsuit; right?" Id. at 56:20-22. He responded "[b]efore and after." *Id.* at 56:23.

As a consequence of the above admission, there is no conceivable justification for the delayed production. Further, during the deposition, Plaintiff's counsel was asked specifically to produce "the list" and pictures as part of Plaintiff's discovery responses, which have not been provided. *See* McCoy Dep. at 57:1-4.

II.     *The late production is not harmless and prejudices the Town.*

The Town's Motion for Summary Judgment was prepared based on the information and documents available as of June 1, 2021 when discovery closed. This factor, standing alone, should result in the Declaration being stricken. *See Harriman*, 627 at 31 (ruling disclosure of affidavit after summary judgment is not "a harmless inconvenience" where "defendants prepared and filed a summary judgment motion premised on evidence submitted before the discovery deadline"); *see also Primus v. United States*, 389 F.3d 231, 236 (1st Cir. 2004)(finding prejudice when information disclosed after summary judgment motion filed but before trial was imminent).

Additionally, despite knowing that the Town was preparing a motion for summary judgment - a fact disclosed and discussed at the mid-litigation conference - Plaintiff took no

steps to minimize the harm caused by the late disclosure. The information contained in the Declaration had been specifically sought in the Town's interrogatories and requests for production, and specifically asked for during deposition, and yet, it was not produced.

Further, if the Court were to allow such a late disclosure, the Town should be given an opportunity to examine and evaluate the information provided in the Disclosure, which would require reopening discovery and likely extending the current pre-trial and trial dates. This fact is further evidence of the prejudice that would be caused to the Town.

In raising the above arguments, the Town does not concede nor suggest that the substance of the Declaration creates a genuine dispute of material fact. As addressed in the Town's Reply to Plaintiff's Objection to Summary Judgment, the existence of unpermitted trailers, even if accurate, is not evidence that they are illegal or similarly situated to Plaintiff's storage container.

III.    *The Court should strike the Declaration due to Plaintiff's failure to respond to the Town's Interrogatories and Requests for Production.*

Plaintiff's responses to the Town's discovery requests are long overdue, as described above. Accordingly, sanctions should issue per Fed. R. Civ. P. 37(d). Here, the appropriate sanction is to strike the affidavit for the reasons articulated above, and because Plaintiff has ignored his obligations under the discovery plan and rules to respond with written answers. The rules of Civil Procedure are intended "to secure the just, speedy, and inexpensive determination of every action and proceeding" and "should be construed, administered, and employed by the court" towards those ends. Fed. R. Civ. P. 1.  Plaintiff's failure to produce written responses is in plain violation of the Court's rules, and frustrates the purposes of Rule 1. Accordingly, it is appropriate and just to strike Plaintiff's Declaration.

IV.   *Plaintiff's affidavit is unreliable, lacks sufficient detail, and provides no basis to conclude that Plaintiff has personal knowledge as to the permit status of the storage containers and trailers listed therein.*

Affidavits or declarations made in support of summary judgment do not, in the ordinary course, need to be supported by other record evidence. However, the representations made must be based on "personal knowledge" and show that the individual providing the information "is competent to testify on the matters stated." *See* Fed. R. Civ. P. 56(c)(4). Plaintiff's Declaration does not meet this standard. Specifically, the Declaration represents that all of the trailers and storage containers referenced therein are not permitted, and that the Town has not directed that any of them be removed. Yet, Plaintiff does not articulate any basis for this alleged knowledge. If Plaintiff was a Town official, employee, or an owner of the trailers and containers cited, he would presumably have a basis to know their permit status and enforcement status. But, his own personal observations of trailers and containers in Town does not provide a basis for him to testify as to their permit status or enforcement status, and he does not identify any other basis of personal knowledge. Further, Plaintiff does not identify if he took the pictures provided, and he includes pictures of numerous trailers without providing any identifying information. Accordingly, the Declaration is insufficiently supported with personal knowledge or specific details, and should be stricken. *See Perez v. Volvo Car Corp.*, 247 F.3d 303, 316 (1st Cir. 2001) (holding affidavits in support or opposition to summary judgment "must meet certain rudiments" and must be grounded on personal knowledge and "supported with particularized factual information"); *see also Dow v. United Bhd. of Carpenters & Joiners*, 1 F.3d 56, 58 (1st Cir.1993) (holding that "unsupported speculation" will not suffice to block summary judgment).

WHEREFORE, the Town of Pittsfield respectfully requests that the Court:

A.  Strike the Declaration of Joseph McCoy;

B.  Award attorney's fees; and

C.  Grant such other relief as may be just.

Respectfully submitted,
**TOWN OF PITTSFIELD**

By Its Attorneys,
GALLAGHER, CALLAHAN & GARTRELL, P.C.

Dated:  July 23, 2021             By:____/s/ Robert J. Dietel_____
                                  Robert J. Dietel (#19540)
                                  214 North Main Street
                                  Concord, NH  03301
                                  603-228-1181
                                  dietel@gcglaw.com

## CERTIFICATE OF SERVICE

I, Robert J. Dietel, hereby certify that a copy of the foregoing was sent to all counsel of record via ECF.

Dated:  July 23, 2021             By:____/s/ Robert J. Dietel_____
                                  Robert J. Dietel

## FED. R. CIV. P. 37(d)(B) - CERTIFICATION

I, Robert J. Dietel, counsel for the Town, hereby certify that on May 29, 2021 I made a good faith effort to attempt to confer regarding Plaintiff's failure to produce responses to the Town's discovery requests.

Dated:  July 23, 2021             By:____/s/ Robert J. Dietel_____
                                  Robert J. Dietel



UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| JOSEPH McCOY | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No.:1:20-cv-00362-JL |
| | ) | |
| TOWN OF PITTSFIELD | ) | |
| | ) | |
| Defendant | ) | |

### DECLARATION OF ROBERT J. DIETEL

I, Robert J. Dietel, pursuant to 28 U.S.C. § 1746 hereby declare as follows:

1.      I am counsel for the Town of Pittsfield, New Hampshire in the above captioned matter.

2.      On August 11, 2020, I received Plaintiff's initial disclosures. A true and accurate copy of Plaintiff's initial disclosures are attached hereto as Exhibit A-1.

3.      On April 12, 2021, I propounded interrogatories and requests for admission on Plaintiff. A true and accurate copy of the Town's discovery requests is attached hereto as Exhibit A-2.

4.      On May 27, 2021, the deadline for responding to the Town's discovery requests passed but no responses or objections were provided.

5.      On May 29, 2021, I inquired as to the status and reasons for Plaintiff's failure to respond to the Town's discovery requests and noted the obligation of the parties to confer. In response, it was represented that written responses would be forthcoming but none have been produced. A true and accurate copy of this correspondence is attached hereto as Exhibit A-3.

I declare under penalty of perjury that the foregoing is true and correct.

July 23, 2021                            /s/ Robert J. Dietel
Date                                    Robert J. Dietel



## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

### Case No.: 1:20-cv-00362-JL

JOSEPH McCOY,

      Plaintiff,

vs.

TOWN OF PITTSFIELD

      Defendant.

_____

### PLAINTIFF'S INITIAL DISCLOSURE

Plaintiff Joseph McCoy provides the following initial disclosure pursuant to Federal Rule of Civil Procedure 26(a).

1.      **Individuals Likely to Have Discoverable Information (Fed. R. Civ. P. 26(a)(1)(A)(i))**

The following individuals likely have discoverable information Mr. McCoy may use to support his claims:

      **James C. Allard**
      c/o Town of Pittsfield
      85 Main Street
      Pittsfield, New Hampshire 03263

Mr. Allard likely has information concerning the trailer at issue in the Complaint, and the Town's actions and decisions concerning it.

      **Carl Anderson**
      c/o Town of Pittsfield
      85 Main Street
      Pittsfield, New Hampshire 03263

Mr. Anderson likely has information concerning the trailer at issue in the Complaint, and the Town's actions and decisions concerning it.

- 1 -

**Brian Bales**
222 Catamount Road
Pittsfield, New Hampshire 03263

Mr. Bales likely has information concerning the trailer at issue in the Complaint.

**Carole Dodge**
c/o Town of Pittsfield
85 Main Street
Pittsfield, New Hampshire 03263

Ms. Dodge likely has information concerning the trailer at issue in the Complaint, and the

Town's actions and decisions concerning it.

**Adam Gauthier**
c/o Town of Pittsfield
85 Main Street
Pittsfield, New Hampshire 03263

Ms. Gauthier likely has information concerning the trailer at issue in the Complaint, and

the Town's actions and decisions concerning it.

**Cara Marston**
c/o Town of Pittsfield
85 Main Street
Pittsfield, New Hampshire 03263

Ms. Marston likely has information concerning the trailer at issue in the Complaint, and

the Town's actions and decisions concerning it.

**Larry Konopka**
c/o Town of Pittsfield
85 Main Street
Pittsfield, New Hampshire 03263

Mr. Konopka likely has information concerning the trailer at issue in the Complaint, and

the Town's actions and decisions concerning it.

**Joseph McCoy**
322 Catamount Road
Pittsfield, New Hampshire 03263

Mr. McCoy likely has information concerning the trailer at issue in the Complaint, the Town's actions and decisions concerning it, and damages resulting from the Town's decisions and the trailer's removal.

**Linda McCoy**
322 Catamount Road
Pittsfield, New Hampshire 03263

Ms. McCoy likely has information concerning the trailer at issue in the Complaint, the Town's actions and decisions concerning it, and damages resulting from the Town's decisions and the trailer's removal.

**Paul Nickerson**
12 Norris Road
Pittsfield, New Hampshire 03263

Mr. Nickerson likely has information concerning the trailer at issue in the Complaint, and the Town's actions and decisions concerning it.

**Jesse Pacheco**
c/o Town of Pittsfield
85 Main Street
Pittsfield, New Hampshire 03263

Mr. Pacheco likely has information concerning the trailer at issue in the Complaint, and the Town's actions and decisions concerning it.

**James Pritchard**
c/o Town of Pittsfield
85 Main Street
Pittsfield, New Hampshire 03263

Mr. Pritchard likely has information concerning the trailer at issue in the Complaint, and the Town's actions and decisions concerning it.

**Matt St. George**
c/o Town of Pittsfield
85 Main Street
Pittsfield, New Hampshire 03263

Mr. St. George likely has information concerning the trailer at issue in the Complaint,

and the Town's actions and decisions concerning it.

**Bonnie Theriault**
c/o Town of Pittsfield
85 Main Street
Pittsfield, New Hampshire 03263

Ms. Theriault likely has information concerning the trailer at issue in the Complaint, and

the Town's actions and decisions concerning it.

**Clayton Woods**
c/o Town of Pittsfield
85 Main Street
Pittsfield, New Hampshire 03263

Mr. Woods likely has information concerning the trailer at issue in the Complaint, and

the Town's actions and decisions concerning it.

**2.     Documents (Fed. R. Civ. P. 26(a)(1)(A)(ii))**

Mr. McCoy has the following documents in his possession, custody, or control and may

use them to support his claims:

- September 1, 2015 Permit for Storage Containers;

- Notice of Violation (no date, approx. late 2016);

- October 31, 2016 Email from Jesse Pacheco to Cara Marston;

- November 15, 2016 Town Board of Selectmen Meeting Agenda;

- May 23, 2017 Town Board of Selectmen Meeting Agenda;

- May 23, 2017 Town Board of Selectmen Meeting Minutes;

- June 13, 2017 Permit for Storage Containers;

- May 8, 2018 Town Board of Selectmen Meeting Minutes;

- May 22, 2018 Letter from Town;

- June 12, 2018 Town Board of Selectmen Meeting Agenda;

- June 12, 2018 Town Board of Selectmen Meeting Minutes;

- January 11, 2020 letter from Mr. Anderson to Mr. McCoy;

- Photographs of the trailer.

3. **Computation of Damages (Fed. R. Civ. P. 26(a)(1)(A)(iii))**

Mr. McCoy has suffered $16,600 in damages in connection with the acquisition and removal of his trailer (and its contents), an amount still to be determined in connection with his emotional distress, and an amount to be determined later in connection with the violation of his Constitutional rights.

4. **Insurance (Fed. R. Civ. P. 26(a)(1)(A)(iv))**

Not applicable.


Mr. McCoy reserves the right to revise and/or supplement this Initial Disclosure as the case progresses and more information becomes available.

Respectfully submitted,

JOSEPH McCOY,

By Their Attorneys,

FOJO LAW, P.L.L.C.


Dated:  August 11, 2020                    _____*/s/Robert M. Fojo*_____
                                           Robert M. Fojo, Esq. (#19792)
                                           264 South River Road, Suite 464
                                           Bedford, NH 03110
                                           (603) 473-4694
                                           rfojo@FojoLaw.com


## CERTIFICATE OF SERVICE

I certify that the foregoing was transmitted on this date, via email, to Defendant's

counsel.


Dated:  August 11, 2020                    _____*/s/Robert M. Fojo*_____
                                           Robert M. Fojo

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

**EXHIBIT**

**A-2**

| | | |
|---|---|---|
| JOSEPH McCOY | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No.:1:20-cv-00362-JL |
| | ) | |
| TOWN OF PITTSFIELD | ) | |
| | ) | |
| Defendant | ) | |

### DEFENDANT'S FIRST SET OF INTERROGATORIES
### TO BE ANSWERED BY PLAINTIFF, JOSEPH MCCOY

NOW COMES the Defendant, Town of Pittsfield, by and through its attorneys, Gallagher, Callahan & Gartrell, P.C., and propounds the following Interrogatories to be answered by Plaintiff, Joseph McCoy, fully and in writing, under oath, and within 45 days after service of these Interrogatories and Requests for Production, in accordance with Federal Rules of Civil Procedure 26, 33, and 34.

I.    INTRODUCTION AND GENERAL INSTRUCTIONS

The following constitute interrogatories propounded by the Defendant to be answered by the Plaintiff under oath and are to be answered in a timely fashion. Answers are required to be full and complete and contain all relevant facts. If there are any documents which substantiate any answer, please refer to them and attach copies of them to the interrogatories. In answering each interrogatory, you are requested to make such inquiry of your attorney(s) and examine all documents in your care, custody, or control which in any way may concern the subject of these interrogatories, so as to enable you to make complete and true answers to these interrogatories.

Please note that if after answering these interrogatories subsequent information renders

any answer incomplete or inaccurate, you must timely amend your prior answer. Furthermore, all interrogatories regarding names and addresses of witnesses and all interrogatories regarding expert witnesses and/or the identification or production of documentary or physical evidence shall be deemed continuing so as to require supplemental answers if further information is obtained between the time the interrogatories are answered and the time of trial.

As used herein, the following terms have the following meanings, unless the context requires otherwise.

## II.   DEFINITIONS

A.   "Communication" or "communications" means any oral or written transmittal of information, or request for information, made from one person to another person, whether made in person, by telephone, email, text message, or by any other means.  "Communication" or "communications" as used herein, also means any documents made for the purpose of recording a communication, an idea, statement, opinion, or belief.

B.   "Complaint" means the Complaint in the above-captioned action.

C.   "Correspondence" means any written communication between one person and another, including, but without limitation, memoranda, letters, telegrams, facsimiles, e-mail, text messages, messages or posts over social media, and other electronic messages, notes, instant-messages, notices and postal cards.

D.   "Record" means any writing that records:

1.   The acts of a public body or officer;

2.   A listing of official papers, whether by alphabet or by number or a combination of both;

3.   The known or recorded facts regarding something or someone.

E.   "Document" or "documentation" means the original or any identical copies in your possession, custody and control, regardless of where located, and includes, but is not necessarily limited to, the following: notes, correspondence, reports, records, logs, diaries, file notes, memoranda (including written memoranda of telephone discussions, agreements, and any other acts, transactions, or activities), computer documents, invoices, time sheets, expense vouchers, contracts, pamphlets, receipts, books of account (including cash disbursement journals, cash receipt journals, balance sheets, income statements, reconciliation statements, or other similar financial statements), order forms, requisitions, bills, plans, drawings, specifications, sound recordings, minutes, diaries, notebooks, bulletins, circulars, forms, journals, inter-office and intra-office communications, photostats, computer generated or computer printed data, microfiche, microfilm, photographs, films, movies, sound tapes, studies, reports, analyses, comparisons, drafts, charts, summaries, advertisements, and any other written, drawn, typed, printed or graphic material or matter of any kind including, but without limitation, any marginal comments appearing on any documents or other writings.

This shall include any copy, draft, or working paper of any of the above documents that differ in any fashion from the original document being produced.

F.   "Relate" or "relating to" means directly or indirectly, in whole or in part, consisting of, referring to, reflecting, concerning, or being in any way logically or factually connected with the matter discussed.

G.   "Identify" or "Identity of" means provide the full name, address, business address, and telephone number of the individual or entity.

H.   "And" and "or" shall be construed to be both conjunctive and disjunctive, so that no Interrogatory shall be interpreted so as to exclude any information otherwise within its scope.

I.  "Plaintiff" shall mean Joseph McCoy, as the context may require, and every present and former agent, attorney, or representative of Joseph McCoy, as the case may be.

J.  "Defendant" shall mean Town of Pittsfield.

K.  "Gender" - whenever the masculine gender is used, it is intended to refer to any gender.

L.  "You" or "your" means the Plaintiff, Joseph McCoy.

M.  The terms "all," "any," or "each" encompass any and all of the matter discussed.

N.  "Storage Container" means the trailer described in paragraphs 9-10 of the Complaint.

O.  "Ordinance" means the ordinance described in paragraph 17 of the Complaint.

III.   CLAIM OF PRIVILEGE

If any information or document identified or requested herein is withheld for any reason under a claim of privilege or immunity or any other claim, please describe the particular document withheld as follows:

A.  The date of the document;

B.  The author or addresser of the document;

C.  The recipient or addressee of the document;

D.  The number of pages of the document;

E.  The present location of the document;

F.  The general subject matter of the document;

G.  Each person who sent, received, and obtained copies of the document;

H.  A general description of the document (i.e., letter, report, memoranda); and

I.  The basis of the privilege asserted with respect to, or other alleged ground for, nonproduction of the document.

IV.     FORM OF RESPONSE

Please respond to each Interrogatory separately. If there are no documents of the type described in any particular Interrogatory, this must be so stated. If any requested document has been destroyed and no copy exists, please identify the date of the destruction, the name and address of the person responsible for ordering destruction, and the purpose of the destruction of the document.

V.      SCOPE OF DOCUMENTS

Any request for documents seeks all documents in the care, custody, or control of Plaintiff.

VI.     FORM OF ATTACHMENTS AND PRODUCTION OF DOCUMENTS

All documents are to be produced as they are kept in the usual course of business including any labels, file markings, or similar identifying features, or shall be organized and labeled to correspond to the categories requested herein. Please organize and label the documents requested herein so as to indicate the Interrogatory to which they are to attach. Where a copy is produced pursuant to more than one Interrogatory, that document may be identified as being attached to or produced pursuant to any of those Interrogatories.

VII.    SUPPLEMENTAL ANSWERS TO INTERROGATORIES

These Interrogatories shall be deemed continuing and the Plaintiff shall serve upon the defendant in the form of Supplementary Answers any information which was unavailable to the Plaintiff at the time the Plaintiff submitted the answers hereto, but which becomes available to Plaintiff up to and including the time of trial. If, after Plaintiff has furnished answers to these Interrogatories, Plaintiff thereafter obtains information which renders such answers incomplete

5

or inaccurate, amended answers shall be served in accordance with Rule 26(e)(1).

VIII.   <u>SCOPE OF DISCOVERY</u>

Please note that the scope of discovery extends to any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable. To the extent Plaintiff lacks full knowledge and ability to answer completely any Interrogatory, Plaintiff is requested to provide the most complete responses that her available knowledge, facts, evidence, and information will permit and to list all sources known to Plaintiff which could provide information with respect to such Interrogatory.

IX.   <u>QUESTIONS REGARDING DIRECTIONS</u>

If Plaintiff is unsure of the intent or meaning of any of the general provisions or definitions, Plaintiff is hereby requested to have her attorneys contact attorneys of record for Defendant to understand the intent and meaning of any of the above.

## **INTERROGATORIES**

1.      Other than your counsel, identify all persons (as defined above) who participated in the preparation of answers to these interrogatories or otherwise consulted or supplied information regarding the same. As to each individual, identify the interrogatory(ies) with which they assisted.

ANSWER:

2.      Please identify and describe each property in the Town of Pittsfield that had or has an unpermitted storage container, which you believe supports the allegations in Count II of the Complaint that the Town of Pittsfield subjected you to disparate treatment in violation of the equal protection clause of the Fourteenth Amendment. With respect to each property identified, please describe where the property is located, and all factors that you believe make the property and/or storage container, a similarly situated comparator.

ANSWER:

3.      Please identify and describe all factors that you allege make the Ordinance, as applied by the Town to you or your property, unconstitutionally vague.

ANSWER:

4.      Please identify when you removed the Storage Container from your property and how you removed it.

ANSWER:

5.      Please identify where the Storage Container is currently located.

ANSWER:

6.      Please provide a detailed description of any damages that you claim as a result of, or in connection with, your allegations against Defendant, including but not limited to a complete itemization and accounting of any alleged property damage, lost or diminished wages, lost or diminished bonus(es), any other lost compensation, and any other damages of any kind that you claim.

ANSWER:

Respectfully submitted,

**TOWN OF PITTSFIELD**

By Its Attorneys,

GALLAGHER, CALLAHAN & GARTRELL, P.C.

Dated:  April 12, 2021

By:_____/s/ Robert J. Dietel_____
Robert J. Dietel (#19540)
214 North Main Street
Concord, NH  03301
603-228-1181
dietel@gcglaw.com

<u>CERTIFICATE OF SERVICE</u>

     I, Robert J. Dietel, hereby certify that on this April 12, 2021, a true and correct copy of the foregoing was sent to Plaintiff's counsel, Robert Fojo, Esq. via email.

Dated:  April 12, 2021

By:_____/s/ Robert J. Dietel_____
Robert J. Dietel (#19540)

* * * * * * * *


I, Joseph McCoy, on this _____ day of _____, 2021, hereby swear that the foregoing Answers to Interrogatories are true to the best of my knowledge, information and belief.



_____
Joseph McCoy


STATE OF NEW HAMPSHIRE
COUNTY OF _____


Before me, this _____ day of _____, 2021, the undersigned officer, personally appeared the said Joseph McCoy, and made oath that the facts contained in the foregoing Answers to Interrogatories are true to the best of her knowledge, information and belief.



_____
Justice of the Peace/Notary Public

10

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| JOSEPH McCOY | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No.:1:20-cv-00362-JL |
| | ) | |
| TOWN OF PITTSFIELD | ) | |
| | ) | |
| Defendant | ) | |

**DEFENDANT'S FIRST SET OF REQUESTS FOR PRODUCTION
TO BE ANSWERED BY PLAINTIFF, JOSEPH MCCOY**

NOW COMES the Defendant, Town of Pittsfield, by and through its attorneys, Gallagher, Callahan & Gartrell, P.C., and propounds the following Requests for Production to be answered by Plaintiff, Joseph McCoy, fully and in writing, under oath, and within 45 days after service of these Requests for Production, in accordance with Federal Rules of Civil Procedure 26 and 34.

I.    INTRODUCTION AND GENERAL INSTRUCTIONS

The following constitute document production requests propounded by the Defendant to be answered by the Plaintiff under oath and are to be answered in a timely fashion. Responses are required to be full and complete and contain all relevant documents. In answering each document production request, you are requested to make such inquiry of your attorney(s) and others and all documents in your possession, custody, or control which in any way may concern the subject of these requests, so as to enable you to make complete and true responses.

Please note that if after answering these document requests subsequent information renders any response incomplete or inaccurate, you must timely amend your prior response.

1

Furthermore, all requests for the production of documentary or physical evidence shall be deemed continuing so as to require supplemental answers if further information is obtained between the time the document requests are answered and the time of trial.

As used herein, the following terms have the following meanings, unless the context requires otherwise.

II.     DEFINITIONS

A.   "Communication" or "communications" means any oral or written transmittal of information, or request for information, made from one person to another person, whether made in person, by telephone, email, text message, social media, or by any other means. "Communication" or "communications" as used herein, also means any documents made for the purpose of recording a communication, an idea, statement, opinion, or belief.

B.   "Complaint" means the Complaint in the above-captioned action.

C.   "Correspondence" means any written communication between one person and another, including, but without limitation, memoranda, letters, telegrams, facsimiles, e-mail, text messages, messages or posts over social media, and other electronic messages, notes, instant-messages, notices and postal cards.

D.   "Record" means any writing that records:

1.  The acts of a public body or officer;

2.  A listing of official papers, whether by alphabet or by number or a combination of both;

3.  The known or recorded facts regarding something or someone.

E.   "Document" or "documentation" means the original or any identical copies in your possession, custody and control, regardless of where located, and includes, but is not necessarily

limited to, the following: notes, correspondence, reports, records, logs, diaries, file notes,
memoranda (including written memoranda of telephone discussions, agreements, and any other
acts, transactions, or activities), computer documents, invoices, time sheets, expense vouchers,
contracts, pamphlets, receipts, books of account (including cash disbursement journals, cash
receipt journals, balance sheets, income statements, reconciliation statements, or other similar
financial statements), order forms, requisitions, bills, plans, drawings, specifications, sound
recordings, minutes, diaries, notebooks, bulletins, circulars, forms, journals, inter-office and
intra-office communications, photostats, computer generated or computer printed data,
microfiche, microfilm, photographs, films, movies, sound tapes, studies, reports, analyses,
comparisons, drafts, charts, summaries, advertisements, and any other written, drawn, typed,
printed or graphic material or matter of any kind including, but without limitation, any marginal
comments appearing on any documents or other writings.

 This shall include any copy, draft, or working paper of any of the above documents that
differ in any fashion from the original document being produced.

 F. "Relate" or "relating to" means directly or indirectly, in whole or in part, consisting
of, referring to, reflecting, concerning, or being in any way logically or factually connected with
the matter discussed.

 G. "Identify" or "Identity of" means provide the full name, address, business address,
and telephone number of the individual or entity.

 H. "And" and "or" shall be construed to be both conjunctive and disjunctive, so that no
Interrogatory shall be interpreted so as to exclude any information otherwise within its scope.

 I. "Person" means any natural person or any legal entity, including but not limited to
any business or governmental entity, organization, or association.

J.  "Plaintiff" shall mean Joseph McCoy, as the context may require, and every present and former agent, attorney, or representative of Joseph McCoy, as the case may be.

K.  "Defendant" shall mean Town of Pittsfield.

L.  "Gender" - whenever the masculine gender is used, it is intended to refer to any gender.

M.  "You" or "your" means the Plaintiff, Joseph McCoy.

N.  The terms "all," "any," or "each" encompass any and all of the matter discussed.

O.  "Storage Container" means the trailer described in paragraphs 9-10 of the Complaint.

III.  <u>CLAIM OF PRIVILEGE</u>

If any document identified or requested herein is withheld for any reason under a claim of privilege or immunity or any other claim, please describe the particular document withheld as follows:

A.  The date of the document;

B.  The author or addresser of the document;

C.  The recipient or addressee of the document;

D.  The number of pages of the document;

E.  The present location of the document;

F.  The general subject matter of the document;

G.  Each person who sent, received, and obtained copies of the document;

H.  A general description of the document (i.e., letter, report, memoranda); and

I.  The basis of the privilege asserted with respect to, or other alleged ground for, nonproduction of the document.

IV.     FORM OF RESPONSE

Please respond to each Request separately. If there are no documents of the type described in any particular Request, this must be so stated. If any requested document has been destroyed and no copy exists, please identify the date of the destruction, the name and address of the person responsible for ordering destruction, and the purpose of the destruction of the document.

V.      SCOPE OF DOCUMENTS

Any request for documents seeks all documents in the care, custody, or control of Plaintiff.

VI.     FORM OF ATTACHMENTS AND PRODUCTION OF DOCUMENTS

All documents are to be produced as they are kept in the usual course of business including any labels, file markings, or similar identifying features, or shall be organized and labeled to correspond to the categories requested herein. Please organize and label the documents requested herein so as to indicate the Request to which they are to attach. Where a copy is produced pursuant to more than one Request, that document may be identified as being attached to or produced pursuant to any of those Requests.

VII.    SUPPLEMENTAL ANSWERS TO INTERROGATORIES

These Requests shall be deemed continuing and the Plaintiff shall serve upon the defendant in the form of Supplementary Responses any information which was unavailable to the Plaintiff at the time the Plaintiff submitted the answers hereto, but which becomes available to Plaintiff up to and including the time of trial. If, after Plaintiff has furnished responses to these Requests for Production, Plaintiff thereafter obtains information which renders such responses incomplete or inaccurate, amended answers shall be served in accordance with Rule 26(e)(1).

VIII.   <u>SCOPE OF DISCOVERY</u>

Please note that the scope of discovery extends to any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable. To the extent Plaintiff lacks full knowledge and ability to answer completely any Request, Plaintiff is requested to provide the most complete responses that her available knowledge, facts, evidence, and information will permit and to list all sources known to Plaintiff which could provide information with respect to such Request.

IX.   <u>QUESTIONS REGARDING DIRECTIONS</u>

If Plaintiff is unsure of the intent or meaning of any of the general provisions or definitions, Plaintiff is hereby requested to have his attorney contact attorneys of record for Defendant to understand the intent and meaning of any of the above.

## <u>REQUESTS FOR PRODUCTION</u>

1.      All non-privileged documents, communications, and correspondence that support or relate in any way to the allegations in your Complaint.


2.      All non-privileged documents, communications, and correspondence that support or relate in any way to the allegations in paragraph 19 of your Complaint, including a copy of the January 11, 2020 letter referenced therein.


3.      All non-privileged documents, communications, and correspondence that support or relate in any way to the allegations in paragraph 20 of your Complaint that "[t]he Board's order was based solely on the fact that the trailer depicted 'TRUMP' in large letters."


4.      All non-privileged documents, communications, and correspondence that support or relate in any way to the allegations in paragraph 22 of your Complaint that "the Board has allowed other residents in Pittsfield to have similar, unpermitted storage containers on their properties."


5.      All non-privileged documents, communications, and correspondence that support or relate in any way to the allegations in paragraph 23 of your Complaint that "[t]hree members of the Board of Selectmen - Mr. Anderson, Larry Konopka, and Jim Allard - repeatedly harassed Mr. McCoy about his trailer."


6.      All non-privileged documents, communications, and correspondence that support or relate in any way to the allegations in paragraph 23 of your Complaint that Mr. Anderson, Larry Konopka, and Jim Allard "undertook no steps to apply similar pressure to other property owners in the Town who had similar trailers."


7.      All non-privileged documents, communications, and correspondence that support or relate in any way to the allegations in paragraph 24 of your Complaint that "Mr. Pacheco admitted to Mr. McCoy that the Board of Selectmen alleged it ordered Mr. McCoy to remove the trailer because of complaints the Town had received about it…[and] the Town never received any complaints about Mr. McCoy's trailer."

8.     All non-privileged documents, communications, and correspondence that support or relate in any way to your allegation that "the Town applied the ordinance in a manner that discriminated against the content or viewpoint of [your] speech, and in a vague manner." *See* Memorandum Order, December 10, 2020 [Document 13] *12.

9.     All non-privileged documents, communications, and correspondence that support or relate in any way to your allegation that "the ordinance, as applied by Pittsfield, impermissibly creates two classes of residents - persons with unpermitted storage containers expressing political speech and persons with unpermitted storage containers not expressing political speech - and…that the Town treats these classes different in violation of the Constitution." *See* Memorandum Order, December 10, 2020 [Document 13] *13.

10.     All non-privileged communications or correspondence between you and any other Person(s) that relate in any way to the allegations in your Complaint, including specifically, the following Persons:
   a)     All Persons named in part 1 of your August 11, 2020 initial disclosures as likely to have discoverable information to support your claims, including specifically, Brian Bales, Linda McCoy, James Pritchard, and Jesse Pacheco.
   b)     Any publication, public medium, or other news source, including but not limited to the Concord Monitor and its reporters, relating to the allegations in the Complaint.

11.     All photographs, pictures, videos or other images that were made, captured, and/or created during the period between July 8, 2017 and May 23, 2018 and which depict the Storage Container.

12.     All photographs, pictures, videos or other images that were made, captured, and/or created after May 23, 2018 and which depict the Storage Container.

13.     All non-privileged documents, communications, and correspondence that support or relate in any way to your response to Defendant's Request for Admission #25, in which you assert that the "back of the trailer showed the word 'TRUMP'…" as of July 9, 2017.

14.     All non-privileged documents, communications, and correspondence that support or relate in any way to your response to Defendant's Request for Admission #30.

15.     All non-privileged documents, communications, and correspondence that support or relate in any way to your claim(s) for damages.

16.     To the extent not produced in response to the foregoing requests, all documents you may use to support the factual allegations, legal claims, and requests for relief raised or otherwise described in your Complaint.

Respectfully submitted,

**TOWN OF PITTSFIELD**

By Its Attorneys,

GALLAGHER, CALLAHAN & GARTRELL, P.C.

Dated:  April 12, 2021                         By:___/s/ Robert J. Dietel_____
                                               Robert J. Dietel (#19540)
                                               214 North Main Street
                                               Concord, NH  03301
                                               603-228-1181
                                               dietel@gcglaw.com

<u>CERTIFICATE OF SERVICE</u>

I, Robert J. Dietel, hereby certify that on this April 12, 2021, a true and correct copy of the foregoing was sent to Plaintiff's counsel, Robert Fojo, Esq. via email.

Dated:  April 12, 2021                         By:___/s/ Robert J. Dietel_____
                                               Robert J. Dietel (#19540)

* * * * * * * *

I, Joseph McCoy, on this _____ day of _____, 2021, hereby swear that the foregoing Responses to Requests for Production are complete to the best of my knowledge, information and belief.


_____
Joseph McCoy

STATE OF NEW HAMPSHIRE
COUNTY OF _____


Before me, this _____ day of _____, 2021, the undersigned officer, personally appeared the said Joseph McCoy, and made oath that the foregoing Responses to Requests for Production are complete to the best of his knowledge, information and belief.


_____
Justice of the Peace/Notary Public



| | |
|---|---|
| **From:** | Robert Fojo <rfojo@fojolaw.com> |
| **Sent:** | Tuesday, June 1, 2021 3:44 PM |
| **To:** | Robert J. Dietel |
| **Subject:** | Re: McCoy - Discovery Status |

Hi Rob:

I plan on beginning to get you documents this evening and responses by tomorrow or Thursday. I understand that may impact your intent on filing a motion for summary judgment. If that's an issue, I'm amenable to an agreed extension of that deadline so long as it encompasses the deposition of Marston next week.

**Robert M. Fojo**
Principal
Fojo Law, P.L.L.C.
264 South River Road, Suite 464
Bedford, NH 03110
Direct/Fax: (603) 473-4694
Email: rfojo@fojolaw.com
facebook.com/FojoLawFirm
@RobertFojo

On May 29, 2021, at 9:44 AM, Robert J. Dietel <dietel@gcglaw.com> wrote:

Robert,

Mr. McCoy's responses to the Town's Interrogatories and Requests for Production were due on Thursday of this past week but have not been produced. They were served on 4/12/21 and per the discovery plan due 45 days later (Thursday, 5/27/21). What is the status of Mr. McCoy's responses? We have received no objections or communication on these requests this week, despite my prior email to you of 5/26 noting the 5/27 deadline. Similarly, there were no objections or concerns raised on behalf of Mr. McCoy at the mid-litigation conference on 5/14 regarding the Town's requests.

As disclosed during the mid-litigation conference, the Town will be filing a MSJ on Tuesday, 6/1. At this point any late disclosure is prejudicing the Town, and we reserve the right to pursue any remedies available. In the meantime, we have an obligation to confer on the status, so please let me know where things stand.

Thank you,
Rob

Robert J. Dietel
Gallagher, Callahan & Gartrell, PC
214 N. Main Street
Concord, NH 03301
Mobile: 603-496-8343

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Joseph McCoy

     v.                            Civil No. 1:20-cv-362-JL
                                    Opinion No. 2021 DNH 158

Town of Pittsfield

## **MEMORANDUM ORDER**

After the court's denial of Defendant Town of Pittsfield's motion for judgment on the pleadings regarding certain counts of this civil rights lawsuit involving a political message on a trailer in a residential yard, two of Plaintiff Joseph McCoy's claims remain:  Count 1 for violation of his free speech rights, and Count 2 for violation of his equal protection rights. [1]  The Town now moves for summary judgment on these claims, arguing that the undisputed factual record demonstrates that the Town did not apply its zoning ordinance against him in an unconstitutionally vague manner or in any other way that violated his First Amendment rights, and did not selectively enforce the ordinance against him in violation of his equal protection rights.[2]  The Town also moves to strike a declaration and attachments to the declaration McCoy submitted as part of his objection to the summary judgment motion.[3]  This court has jurisdiction over McCoy's claims under 28 U.S.C. §§ 1331 and 1343 because the claims present federal questions and arise from federal civil rights statutes.

After consideration of the parties' submissions and hearing oral argument, the court grants the Town's motion for summary judgment and denies its motion to strike.  As for the

---

[1] Doc. no. 13.

[2] See Motion for Summary Judgment (doc. no. 17).

[3] See Motion to Strike (doc. no. 23).

content or viewpoint discrimination aspects of McCoy's First Amendment claim, summary

judgment is appropriate because McCoy cannot "point to specific, competent evidence" that

Town officials discriminated against him based on the expressive content on his trailer.

Sanchez-Rodriguez v. AT&T Mobility P.R., Inc., 673 F.3d 1, 9 (1st Cir. 2012). McCoy's

vagueness claim suffers the same fate because no reasonable fact finder could conclude that the

Town's application of the storage container ordinance failed to provide a person of ordinary

intelligence fair notice of what was prohibited, was so standardless that it authorized or

encouraged seriously discriminatory enforcement, or even led to discriminatory enforcement in

McCoy's case. Finally, the Town is entitled to summary judgment on McCoy's "class of one"

equal protection claim because he has not met his burdens of production and persuasion to

identify similarly situated landowners, demonstrated that the Town treated him differently than

these alleged comparators, or proven that the Town did not have a rational basis for its

enforcement of the ordinance against him.

## I.      **Applicable legal standard**

Summary judgment is appropriate where "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). A dispute is "genuine" if it could reasonably be resolved in either party's favor

at trial by a rational fact-finder, and "material" if it could sway the outcome under applicable

law. Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010). In analyzing a summary

judgment motion, the court "views all facts and draws all reasonable inferences in the light most

favorable to the non-moving party." Id.

The Town also moves to strike the entire McCoy declaration and attachments thereto

under Fed. R. Civ. P. 37(c)(1). "If a party fails to provide information or identify a witness as

required by Rule 26(a) . . . the party is not allowed to use that information or witness to supply

evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is

harmless." Fed. R. Civ. P. 37(c).  Thus, "the baseline rule is that the required sanction in the

ordinary case is mandatory preclusion of late-disclosed information." Harriman v. Hancock

County, 627 F.3d 22, 29 (1st Cir. 2010) (quotation marks and bracketing omitted).  The court

considers several factors in determining whether preclusion is appropriate, including "the

sanctioned party's justification for the late disclosure; the opponent-party's ability to overcome

its adverse effects (i.e., harmlessness); the history of the litigation; the late disclosure's impact on

the district court's docket, and the sanctioned party's need for the precluded evidence." Id. at 30

(citing Esposito v. Home Depot U.S.A., Inc., 590 F.3d 72, 76 (1st Cir. 2009)).

Moreover, under Rule 56, "[a]n affidavit or declaration used to support or oppose a

motion must be made on personal knowledge, set out facts that would be admissible in evidence,

and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ.

P. 56(c)(4).  "[P]ersonal knowledge is the touchstone" of the admissibility analysis. Perez v.

Volvo Car Corp., 247 F.3d 303, 315–16 (1st Cir. 2001). In addition, an affidavit's statements

"must concern facts as opposed to conclusions, assumptions, or surmise" to be admissible. Id. at

316.  Finally, because Rule 56 "requires a scalpel not a butcher knife," a court must only strike

the portions of an affidavit that are inadmissible, while crediting the remaining portions. HMC

Assets, LLC v. Conley, No. CV 14-10321-MBB, 2016 WL 4443152, at *2 (D. Mass. Aug. 22,

2016) (Bowler, M.J.) (quoting Perez, 247 F.3d at 315).

## II.   **Background**

The following facts are undisputed, unless otherwise noted.  See L.R. 56.1(b) ("All properly supported material facts set forth in the moving party's factual statement may be deemed admitted unless properly opposed by the adverse party.").

In early 2014, McCoy and his wife moved to Catamount Road in Pittsfield.  Shortly after moving to Pittsfield, McCoy purchased a 52-foot trailer and had it delivered to his property. McCoy used the trailer to store items from his prior residence, as well as items from storage units he had purchased.[4]  He also kept tools and other items in the trailer so that he could perform maintenance or other renovation work on his property.[5]  In August 2015, the Town's then building inspector, Jesse Pacheco, visited McCoy's property to conduct an inspection relating to a building permit that McCoy had obtained for work on his home.  During the inspection, Pacheco noticed the trailer and told McCoy that he needed to obtain a storage container permit[6] from the Town to keep the trailer on his property.

---

[4] McCoy Depo. (doc. no. 17-2), at 25:1-13.

[5] Id.

[6] From 1997 to 2015, the Town's Zoning Ordinance defined "storage container" as "any truck trailer, box trailer, school bus, mobile home or other similar facility used for storage or other purposes."  In 2016, the Town amended this definition in its ordinance to define a "storage container" as "a truck trailer, box trailer, school bus, MANUFACTURED HOUSING unit, or similar mobile container parked continuously for 31 days or more and used principally for storage and not used for any person's residential occupancy or transient lodging."  Ordinance, Article 3.

McCoy then applied for and obtained a storage container permit from the Town for the trailer,[7] effective September 1, 2015 (the "2015 Permit").[8]  Article 14 of the Town's Zoning Ordinance, applicable to storage containers, now provides (as it did when McCoy applied for his permit) that regulating and permitting conditions for storage containers are intended "to promote the general welfare by protecting the aesthetics of the town."  Under the ordinance, storage containers must be used only for storage, must meet certain setback requirements, and must not be kept on a lot for longer than 12-months during any 15-month period.  Consistent with this section of the ordinance, the 2015 Permit stated that the trailer was permitted for storage purposes only for a period of one year, must be removed by September 1, 2016, and was not allowed to be kept permanently.

Later in 2015, McCoy rented another storage container to keep on his property, but did not obtain a storage container permit for the rental container.  In January 2016, McCoy allowed his son to paint the side of his trailer with an image that reads "TRUMP! USA" with "2016" in smaller, red paint.  As of January 29, 2016, the trailer appeared as follows in a social media posting:

---

[7] The permit lists the serial number, make, and manufacturer of McCoy's trailer and McCoy does not dispute that these numbers are associated with some other trailer or container.

[8] See 2015 Permit, Exhibit 2 to Marston Affidavit (doc. no. 17-3).



McCoy Depo., Ex. D (doc. no. 17-2).

McCoy continued to use the trailer for storage but also used it to express his support for then-candidate Trump's bid to become President of the United States. In August 2016, the Concord Monitor published an article about the trailer and McCoy's support for candidate

Trump, which attracted more attention to the trailer and McCoy's property.   A staff photographer

from the Concord Monitor photographed the trailer as part of the article, as shown in the

following image:



Ex. A to McCoy Depo. (doc. no. 17-2), at 112.   This photograph depicts the expressive content at

issue in this lawsuit.

On September 1, 2016, McCoy's storage container permit for the trailer expired.

Pacheco wrote to McCoy sometime in September or October 2016 and informed him that the

2015 Permit had expired and that the trailer needed to be removed pursuant to Article 14, Section

3 of the ordinance.[9]   The Town also notified McCoy that he needed to remove the unpermitted

rental container, which did not feature any expressive content.   By handwritten letter dated

_____

[9] 2016 Notice of Violation, Ex. 3 to Marston Affidavit (doc. no. 17-3).

November 3, 2016, McCoy wrote to Pacheco and requested a six-month extension of the 2015

Permit.[10]  In his letter, McCoy wrote that he was seeking a six-month extension "to keep [his]

tools and materials inside this trailer while [he] deal[t] with [an] emergency construction

situation."  McCoy also cited the fact that he was handling the construction work himself and

was "physically handicapped," but would "complete this task [of removing the trailer in six

months] in order to remain with good standards for this town and it's [sic] rules as a Pittsfield

home owner."

On November 15, 2016, the Town's select board met and considered McCoy's request

to keep his trailer for an additional six months.  On a motion by Selectman Carl Anderson, which

passed by unanimous vote, the board granted McCoy's request.  At this time, Anderson and other

board members were well aware that McCoy was also using the trailer to express his support for

President Trump.  The board granted McCoy's extension request despite having received at least

one anonymous complaint[11] about the trailer and despite the fact that the applicable section of

the ordinance prohibits storage containers from remaining on a lot for more than 12 months in

any 15-month period.

McCoy continued to keep the trailer on his property into 2017 and in May 2017, Pacheco

visited McCoy's property.  After this visit, McCoy requested a meeting with the select board.

The board discussed McCoy's trailer during its May 23, 2017 meeting, but tabled any decisions

about the trailer until McCoy could appear before the board.  In the board's minutes from the

---

[10] Nov. 2016 Letter, Ex. F to McCoy Depo. (doc. no. 17-2), at 117.

[11] The Town has no record of who submitted the complaint or the basis for the complaint, and
Town witnesses similarly have no recollection of the complainant's identity or complaint's basis.

May 23 meeting, there is no discussion of McCoy's trailer being used to express support for President Trump or any other expressive purposes.

The board met with McCoy during its June 13, 2017 meeting.  McCoy explained that it was taking him longer than expected to finish the repairs on his home because he was handicapped and doing the work himself.  He then requested another extension of the storage container permit for the trailer, this time for one year, and that he planned to "get rid" of the trailer after that.  McCoy did not mention the trailer being used as a sign or indicate any interest in applying for a sign permit (a separate Town process) during this meeting.  According to minutes from this meeting, the board agreed to "extend the permit for one year."  On June 13, 2017, the board approved a new storage container permit for McCoy's trailer.[12]

By the end of July 2017, the side of the trailer that showed support for President Trump had been painted over with a scene of hot air balloons and a waving American flag.  The following image from social media shows the side of the trailer at issue as of July 30, 2017:

---

[12] At oral argument, counsel for both parties suggested that the distinction between granting a permit extension or a new permit was one of terminology, not of substance.  The court accepts this premise for purposes of this order.



Ex. H to McCoy Depo (doc. no. 17-2), at 119.

For the remainder of 2017 and well into 2018, the trailer continued to display the balloon

scene.  On May 22, 2018, the select board wrote to McCoy to remind him that his storage

container permit for the trailer was expiring in June 2018.  The board also reminded McCoy that

the trailer needed to be removed from his property for at least three months before he could

apply for another permit to "bring it back."[13]  McCoy responded by letter dated May 29, 2018. In his letter, McCoy referenced the fact that he had two trailers to unload and that he had emptied one, but because he was disabled, the task of emptying the other one was taking longer.  McCoy then requested "another permit in order to accomplish this huge task."[14]

The select board met on June 12, 2018 and considered McCoy's request.  After some deliberation, the board voted to deny the request.  The following day, Town Administrator Cara Marston (then Cara Hayes) wrote McCoy to inform him of the board's decision.  In her letter, Marston noted that while the board understood the "personal circumstances that have caused delay, [it] ha[d] to balance the terms of the zoning ordinance with [his] request," and voted to deny it.[15]  The board allowed McCoy an additional 30 days to remove the trailer from his property.  Thereafter, McCoy sold the trailer to a local business and removed it from his property.  The Town did not impose any penalties or take any other enforcement actions against McCoy relating to his trailer, other than to confirm that the trailer was removed following the board's June 2018 decision.

McCoy and the Town had no further engagement regarding the trailer until almost two years later when McCoy sued, alleging that the Town's actions regarding his trailer were discriminatory and motivated by political animus.[16]  After answering the complaint, the Town moved for judgment on the pleadings[17] and the court granted the motion in part and denied it in

---

[13] May 2018 Letter, Ex. 8 to Marston Affidavit (doc. no. 17-8), at 32.

[14] McCoy 2018 Letter, Ex. 9 to Marston Affidavit (doc. no. 17-8), at 33.

[15] Marston 2018 Letter, Ex. 12 to Marston Affidavit (doc. no. 17-8), at 47.

[16] See Doc. no. 1.

[17] See Doc. no. 10.

part.[18]  The parties exchanged some written discovery, although it appears McCoy has not responded to the Town's interrogatories or requests for production of documents, and deposed some witnesses.  The Town filed its motion for summary judgment on the agreed-upon deadline for such motions.

McCoy appears to argue that disputes of material fact preclude summary judgment for the Town.  First, McCoy alleges that beginning in mid-2016, he did not use the trailer principally for storage; he instead used it principally to display his support for President Trump and secondarily for storage.  McCoy contends that this fact is material because it shows that the Town should not have applied the storage container section of the ordinance against him at all, and that once it did apply that section, its application was unconstitutionally vague.  McCoy next alleges that there are numerous other unpermitted storage containers in Pittsfield that the Town has not taken enforcement action against.  As explained below, neither of these alleged factual disputes, if they can even be characterized as such, are sufficiently genuine or material to warrant denial of the Town's motion.

### III.   <u>Analysis</u>

Counts 1 and 2 of McCoy's complaint arise from 42 U.S.C. § 1983.  To prevail on his § 1983 claims, McCoy establish two elements:  "(i) that the conduct complained of has been committed under color of state law, and (ii) that this conduct worked a denial of rights secured by the Constitution or laws of the United States."  Rodríguez-Reyes v. Molina-Rodríguez, 711 F.3d 49, 55 (1st Cir. 2013).  The Town argues that even viewing the undisputed factual record in

---

[18] <u>See</u> Doc. no. 13.

McCoy's favor, McCoy cannot establish, as a matter of law, that the Town's conduct violated his constitutional rights.  The court addresses each count in turn.

### A.    Count 1 - First Amendment

1.    <u>As-applied content or viewpoint discrimination</u>

Because there was some confusion at oral argument about the nature of the claims McCoy is asserting in Count 1, the court summarizes the status of those claims here.  In his complaint, McCoy consolidated three types of First Amendment claims into Count 1:  content or viewpoint discrimination, overbreadth, and vagueness.  After the court's order on the Town's motion for judgment on the pleadings, only the content or viewpoint discrimination and vagueness claims remained.  Indeed, the court's order was clear that the content or viewpoint discrimination aspects of Count 1 survived the Town's motion for judgment on the pleadings. [19] Notwithstanding this clarity, neither party separately briefed the content and viewpoint discrimination claim and counsel for the parties admitted at oral argument that they mistakenly believed that the court had dismissed this claim.[20]

---

[19] Doc. no. 13, at 8; 18 ("For the reasons set forth above, Pittsfield's motion for judgment on the pleadings is GRANTED as to Counts 3, 4, and the overbreadth portion of Count 1, and DENIED as to the remainder of Count 1 and all of Count 2. Counts 3 and 4 and the overbreadth portion of Count 1 are dismissed with prejudice.").

[20] McCoy's counsel initially conceded at oral argument that he was no longer pursuing the content or viewpoint discrimination claim and acknowledged that the direct evidence of discrimination, if any, was thin at best.  He later argued that he misunderstood the court's judgment on the pleadings order and did not raise content or viewpoint discrimination in his summary judgment briefing because the Town's motion did not explicitly address this claim. This explanation is difficult for the court to accept.  McCoy was on notice that the Town was seeking summary judgment on all remaining claims and the Town was clear that part of its argument was that there "is no evidence of discrimination." Doc. 17-1, at 2, 15.  Since the beginning, this case has been about McCoy's allegation that the Town ordered him to remove his trailer because the trailer depicted the word "TRUMP" and that this decision was a "content-based and viewpoint-based restriction on speech."  Complaint (doc. no. 20) at ¶¶ 20, 29.  If, in the face of a summary judgment motion seeking complete dismissal of his lawsuit, McCoy had

The Town nevertheless argues that the undisputed facts show that it did not discriminate against McCoy based on the expressive content or political speech on his trailer.  The court agrees.

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'"  Reed v. Town of Gilbert, 135 S. Ct. 2218, 2226 (2015) (quoting U.S. Const. amend. I).  "As a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  United States v. Stevens, 559 U.S. 460, 468 (2010) (citing Ashcroft v. American Civil Liberties Union, 535 U.S. 564, 573 (2002)).

The government may restrict speech in nonpublic fora "as long as the restrictions are 'reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.'"  Cornelius v. NAACP Legal Defense and Education Fund, Inc., 473 U.S. 788, 800 (1985) (quoting Perry Educational Assn. v. Perry Local Educators' Assn., 460 U.S. 37, 46 (1983)).  "The existence of reasonable grounds for limiting access to a nonpublic forum, however, will not save a regulation that is in reality a facade for viewpoint-based discrimination."  Id. at 811.

First Amendment jurisprudence recognizes varying levels of discrimination.  Content discrimination occurs whenever a government regulates "particular speech because of the topic discussed or the idea or message expressed."  Reed, 135 S.Ct. at 2226-27.  Content-based restrictions "are subject to strict scrutiny, which requires the government to demonstrate that the restriction advances a 'compelling interest' and is 'narrowly tailored to achieve that interest.'"

---

evidence to support this aspect of Count 1, he had ample opportunity to present it and failed to do so.

Signs for Jesus v. Town of Pembroke, NH, 977 F.3d 93, 101 (1st Cir. 2020) (quoting Reed, 135 S.Ct. at 2218).  Viewpoint discrimination is "an egregious form of content discrimination" in which "the government targets not subject matter, but particular views taken by speakers on a subject."  Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819, 829 (1995).

In cases like this one involving political speech, the "First Amendment's guarantee of free speech applies with special vigor" and "affords the broadest protection to such political expression in order to ensure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people."  See Nat'l Org. for Marriage v. McKee, 649 F.3d 34, 51 (1st Cir. 2011) (quotations omitted).

McCoy neither provides nor points to any evidence to support his claims that the Town enforced the ordinance against him in a discriminatory manner based on its content, or targeted McCoy because the trailer expressed a viewpoint supporting President Trump.  In fact, the record evidence suggests the opposite.  During the time that the trailer contained the expressive content at issue, the select board granted McCoy two extensions of storage container permit and allowed him to keep the trailer on his property far longer than the express terms of the ordinance contemplated.  It was only in June 2018, well after the expressive content was removed from the trailer, that the Town ordered McCoy to remove it and refused to grant him any more permit extensions.[21]

---

[21] McCoy's counsel asserted at oral argument that the back side of the trailer continued to say "Trump," even after the main section facing the road was painted over with the balloon scene, implying that this somehow showed the Town's discriminatory animus.  McCoy's claims have never been about the alleged expressive content on the back side of the trailer.  Instead, starting with the complaint, McCoy has focused on the larger, 52-foot length, part of the trailer that faced the road and caught the Town's and public's attention.  See doc. no. 1, at ¶ 10 ("In July 2016, Mr. and Mrs. McCoy's son, Brian Bales, painted the word 'TRUMP' on the trailer in large white letters (against a green background).").  McCoy has also presented no evidence that anyone from

There is no evidence in the record from which a reasonable jury could conclude that members of the select board or other Town officials at any time held discriminatory animus against McCoy resulting from his use of the trailer to express support for President Trump. Similarly, there is no evidence that Town officials held animus but did not act on it during the time the trailer expressed support for Trump, waited until the trailer no longer showed support for Trump, and *only then* decided to punish McCoy for his prior support for Trump by requiring him to remove the trailer.  Nor is there evidence that Town officials harassed McCoy because of the expressive content on his trailer, as he alleged in his complaint.

When pressed about this at his deposition, McCoy answered that Town officials informed him that they had received complaints about his trailer and enforced the ordinance against him as a result of those complaints.[22]  Even if the court accepted as true McCoy's allegation that the select board ordered him to remove the trailer in response to anonymous, non-specific complaints, no rational factfinder could conclude that this demonstrates the Town's discriminatory animus.  Nor does the Town's decision to enforce its own ordinance in 2018 (when he was plainly in violation of the ordinance) show that it discriminated against McCoy based on the content or viewpoint expressed on the trailer in 2016 and 2017.  The Town is entitled to judgment as a matter of law on this aspect of McCoy's First Amendment claim.

---

the Town knew that the back side of the trailer allegedly continued to display his support for President Trump.

[22] McCoy Depo. (doc. no. 17-2), at 98:2-99:19-20, 100:20-101:5.

2.      As-applied vagueness

McCoy also argues that the Town violated his free speech rights because the "Ordinance, as applied by the Town, is an unconstitutionally vague restriction on expressive activity."[23]  The vagueness doctrine implicates the Due Process Clause of the Fourteenth Amendment, not purely the First Amendment.  See United States v. Williams, 553 U.S. 285, 304 (2008); Kolender v. Lawson, 461 U.S. 352, 353-54 (1983).  A law is unconstitutionally vague when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  Id.  "The degree of vagueness that the Constitution tolerates – as well as the relative importance of fair notice and fair enforcement – depends in part on the nature of the enactment."  Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498 (1982).  "Even when expressive rights are involved," however, "perfect clarity and precise guidance have never been required."  Butler v. O'Brien, 663 F.3d 514, 520 (1st Cir. 2011) (quoting Williams, 553 U.S. at 304).

The Town contends that McCoy's vagueness claim is factually unsupportable because he had ample notice of what was required under the ordinance and the Town adequately explained its decisions to him.  McCoy responds by first arguing that the storage container section of the ordinance did not apply to his trailer at all, which shows that the Town's use of that part of the ordinance was standardless to the point of authorizing or encouraging discriminatory enforcement.  He next argues that even if the storage container section applied, the Town's application was vague because the ordinance does not provide a process for seeking permit extensions or explain the grounds for granting an extension.  Lastly, McCoy argues that the Town applied the ordinance so inconsistently that a person of ordinary intelligence would not

---

[23] Doc. no. 1, at ¶ 28.

have fair notice of what is prohibited.  The court is not persuaded by any of McCoy's arguments and addresses each one in turn.

Even if the court accepted McCoy's argument that the storage container ordinance did not apply to his trailer (an assertion belied by McCoy's own behavior and other record evidence), it is unclear how that would affect McCoy's vagueness claim.  For example, if, as McCoy says, his trailer was not a "storage container" as defined in the ordinance, the select board should have denied his initial application for a storage container permit.  Had the board done that, McCoy would have no vagueness claim.  McCoy's vagueness claim instead depends on the Town applying the storage container section of the ordinance to his trailer, so his puzzling argument that the "Ordinance should not be at issue in this case" (doc. no. 21, at 12) does not help his cause.

Next, the court rejects McCoy's conclusory argument that the ordinance's lack of language regarding permit extensions somehow proves that the Town applied it in a vague manner.  This argument is neither legally nor factually supportable.[24]  On the facts, the Town has not conceded, as alleged by McCoy, that it had no authority to grant a permit extension.  And legally, the ordinance's silence on this issue does not equate to a prohibition.  See Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65, 93 (1st Cir.2004)  ("The mere fact that a regulation requires interpretation does not make it vague.").  Instead, the ordinance is clear that the select

---

[24] McCoy also raises this "exceeding authority" argument for the first time in his opposition to the Town's summary judgment motion.  It was not plead in his complaint or raised during the parties' briefing of the Town's motion for judgment on the pleadings.  In fact, McCoy relied on an entirely different theory to support his vagueness claim at the pleadings stage, and appears to have abandoned this theory now.  See doc. no. 12, at 4 ("That application [of the ordinance] is also vague: the Town's action fails to make clear whether all political speech may be prohibited, or only some types of speech or expression. These allegations adequately assert a valid claim for relief.").

board "shall have charge of administering and enforcing the zoning ordinance."[25]  See also N.H. RSA 41:8 ("The selectmen shall manage the prudential affairs of the town and perform duties by law prescribed."); Segre v. Ring, 103 N.H. 278, 280 (1961) (noting that "wide discretion should be given as to the methods" select boards employ to manage towns).  The authority to administer and enforce the ordinance includes the authority and discretion to decide whether to grant storage container permits and extensions of existing permits.  While the ordinance does not include specific provisions stating so, the select board's general authority encompasses the power to grant or deny permit extensions.  McCoy provides no authority stating otherwise.

Finally, while McCoy's inconsistent application argument has some superficial appeal, it does not create a trial worthy issue over whether the application was unconstitutionally vague.  It is true that the select board allowed McCoy to twice extend his permit, but denied him a third extension.  McCoy is incorrect, however, that "[t]here is nothing different about [his] third extension request."[26]  At least two key factors differentiate McCoy's third extension request from his prior requests.  First, significant time had passed from when McCoy initially received his permit in 2015 to when he made the third extension request in 2018.  That passage of time was undoubtedly a factor in the board's decision not to grant McCoy another permit extension.  Second, at the time the board denied McCoy a third extension, the expressive content on the trailer had been painted over.  This change in circumstances is material because McCoy is alleging that the board's decision was an "unconstitutionally vague restriction on expressive activity" and was so arbitrary or "standardless that it authorizes or encourages seriously

---

[25] Ordinance, Section 7, available at
https://www.pittsfieldnh.gov/sites/g/files/vyhlif3681/f/pages/zoning_ordinance_2021_2.pdf.

[26] Doc. no. 21, at 14.

discriminatory enforcement."  Without expressive content on the trailer at the time of the board's

2018 denial, the "vague restriction on expressive activity" and discriminatory enforcement

aspects of McCoy's vagueness claim are unsupportable, and McCoy has proffered no other

evidence suggesting that the board's 2018 decision restricted his expressive activity.[27]

The ordinance clearly provides that storage containers must be kept on a lot for no more

than 12 months during any 15-month period.  McCoy's initial storage container permit stated

that it could not remain on his property permanently and had to be removed one year from the

approved date.  After McCoy's initial permit expired after one year and the Town notified him

that his trailer could not remain in his yard, McCoy wrote to the select board requesting a six-

month extension of his permit.  In his letter, McCoy told the board that he needed to keep the

trailer longer to store items for emergency construction work that he (a disabled individual) was

performing himself, but that he would "have it emptied and removed by the end of April 2017."

He also indicated that he wished "to remain with good standards for this town and it's rules as a

Pittsfield homeowner."  The board granted McCoy's extension request.

In May 2017, McCoy again petitioned the board for a one-year extension of the permit

due to unforeseen home repairs and the added time it would take for him to perform the repairs

as a disabled person.  McCoy also appeared before the board to state his case for an additional

extension.  At this meeting, when asked by a board member whether the trailer would be gone

after another year, McCoy stated that he wanted to get rid of it, but just needed more time.  The

board granted McCoy's second extension request, this time providing him another year to keep

---

[27] Indeed, in the main case that McCoy relies on in his summary judgment briefing to support his vagueness claim, Buckle Up Festival, LLC v. City of Cincinnati, the city ordinance in question did not affect the plaintiff's First Amendment rights in any way.  See Buckle Up Festival, LLC, 336 F. Supp. 3d 882, 886 (S.D. Ohio 2018).

the trailer on his property.  A jury could infer from this evidence that McCoy understood his obligations under the ordinance and further understood or believed that the select board had the power to grant exceptions to the rules in the ordinance.  It certainly does not suggest that McCoy "had no choice but to guess at [the ordinance's] meaning and modes of application."  United States v. Hussein, 351 F.3d 9, 14 (1st Cir. 2003).

After the Town notified McCoy in May 2018 that his permit was set to expire, he again requested more time to keep the storage container on his property.  At that point, the trailer had been on McCoy's property since 2014, and nearly three years had passed since the Town first issued a storage container permit for the trailer in September 2015.  The select board considered McCoy's request and denied it by unanimous vote.  Following the vote, the board notified McCoy of its decision in writing and explained its reasoning, noting his "personal circumstances that have caused the delay," but "balanc[ing] the terms of the zoning ordinance with [his] request."  Importantly, the decision letter stated that "as you have already been granted a year's extension beyond the 12 months permitted, they voted not to grant this second extension." McCoy does not dispute any of these facts.  Under these circumstances, a person of ordinary intelligence would have understood how the storage container permitting and board deliberation process worked and, most importantly, would have had fair notice that he had run out of extensions.  It is unreasonable for McCoy to expect the select board to grant him permit extensions in perpetuity, which, under his theory, would be the only application of the ordinance that was not vague.

On this record, no rational fact finder could conclude that the Town's application of the ordinance was so inconsistent or "shifting" to the point that it was unconstitutionally vague. Instead, it was a proper exercise of the board's authority and discretion after material changes in

circumstances.  While the court does not suggest that, as a matter of law, laws applied in this

manner can never be unconstitutionally vague, the Town's application of the ordinance under the

facts and circumstances here does not constitute an unconstitutionally vague restriction on

McCoy's expressive activity.  The Town's motion for summary judgment is granted as to Count

1.

### B.       Count 2 - Equal Protection – Class of One Theory

In Count 2, McCoy asserts that the ordinance, as applied by Pittsfield, impermissibly

creates two classes of residents – persons with unpermitted storage containers expressing

political speech and persons with unpermitted storage containers not expressing political speech

– and argues that the Town treats these classes differently in violation of the Constitution.  To

prove this "class of one" theory of equal protection liability, McCoy must establish that he has

"been intentionally treated differently from others similarly situated and that there is no rational

basis for the difference in treatment."  Donovan v. City of Haverhill, 311 F.3d 74, 77 (1st Cir.

2002) (quoting Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam)).  The

Town contends that McCoy cannot prove any of these elements, and the court agrees.

**Similarly situated.**  "An individual is 'similarly situated' to others for equal protection

purposes when 'a prudent person, looking objectively at the incidents, would think them roughly

equivalent and the protagonists similarly situated.'"  Davis v. Coakley, 802 F.3d 128, 133 (1st

Cir. 2015) (quoting Barrington Cove Ltd. P'ship v. Rhode Island Hous. & Mortgage Fin. Corp.,

246 F.3d 1, 8 (1st Cir. 2001)).  At the summary judgment stage, McCoy has both the "burdens of

production and persuasion" to identify – "backed by competent evidence" – "instances where

persons similarly situated in all relevant respects were treated differently."  Cordi-Allen v.

Conlon, 494 F.3d 245, 250-51 (1st Cir. 2007) (quoting Buchanan v. Maine, 469 F.3d 158, 178

(1st Cir. 2006)); see also Gianfrancesco v. Town of Wrentham, 712 F.3d 634, 640 (1st Cir. 2013)

("[A] class-of-one plaintiff bears the burden of showing that his comparators are similarly

situated in all respects relevant to the challenged government action.").

These are "significant" burdens that are "enforced with particular rigor in the land-use

context." Cordi-Allen, 494 F.3d at 251. Although "[e]xact correlation" with comparators is

neither likely nor necessary, McCoy "must show an extremely high degree of similarity between

[himself] and the persons to whom [he] compare[s]" himself. Id. (quoting Clubside, Inc. v.

Valentin, 468 F.3d 144, 159 (2d Cir. 2006)). Said differently, McCoy "must show that the

parties with whom he seeks to be compared have engaged in the same activity vis-à-vis the

government entity without such distinguishing or mitigating circumstances as would render the

comparison" inapt. Id. (citing Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751 (1st Cir.

1996)). Summary judgment is therefore appropriate on class of one claims "where it is clear that

no reasonable jury could find the similarly situated" element met, even in cases where, as here,

"the plaintiffs have presented copious evidence concerning a multiplicity of possible

comparisons." Id. at 252.

The parties disagree on the relevant comparison points. McCoy relies on the court's

order on the Town's motion for judgment on the pleadings, where it stated that "the relevant

comparison points are property owners in Pittsfield with unpermitted storage containers on their

properties, including trailers, that do not express political speech."[28] The Town argues that there

are several additional comparison points that the court must consider and that McCoy cannot

---

[28] McCoy's identification of comparators for his equal protection claim again demonstrates the
illogicality of his argument that the storage container ordinance does not apply at all to his
trailer. Because if the storage container ordinance does not apply, the relevant comparators
change and McCoy's declaration and the accompanying photographs of unpermitted trailers are
irrelevant.

establish. Even assuming that McCoy's characterization of the relevant comparators is correct, he has not met his burden of providing competent evidence of such comparators or proving that they were similarly situated to him in all relevant respects.

As evidence of the alleged comparators, McCoy submitted a declaration with his objection to the Town's summary judgment motion that attached several exhibits containing photographs of alleged unpermitted storage containers. The Town moves to strike this evidence because McCoy did not disclose this information as part of his Rule 26 initial disclosures or in response to repeated formal and informal requests made by Town counsel during discovery. To ensure the court is ruling on a complete summary judgment record, the court will consider McCoy's declaration and attachments as part of this motion. The Town's concerns about McCoy's belated disclosure of this information and continued, unexplained failure to respond to interrogatories and document requests are valid and well taken, however, and nothing in this ruling should be construed as endorsing this type of discovery conduct.[29]

The Town argues that the relevant comparators are persons with permitted storage containers that expired, received extensions of the permit, and then were asked to remove the containers, similar to McCoy's experience with the Town. It also asserts that several other factors make up the relevant comparison points. McCoy rejoins that he has identified numerous other residents with unpermitted storage containers that have escaped enforcement action from

---

[29] At oral argument, McCoy's counsel tried to justify this discovery conduct by arguing that there was no real harm from his belated disclosures because the Town knew all along that these other unpermitted storage containers existed. Whether a litigant knew or should have known about a certain witness or item of evidence (absent timely, complete disclosures of the information during the litigation) does not excuse its opponent from meeting his fundamental discovery obligations under Rule 26. And even if the court accepted McCoy's premise about lack of harm, McCoy has not shown that the prior information the Town allegedly had about unpermitted storage containers was the same information contained in his declaration and the attached photographs.

the Town and that is sufficient to meet his burden of showing similarly situated landowners.  The
court disagrees.

McCoy's evidentiary proffer is too conclusory or speculative to satisfy his burden of
producing "competent evidence" of relevant comparators at the summary judgment stage.  See
DePoutot v. Raffaelly, 424 F.3d 112, 117 (1st Cir. 2005) (the nonmoving party "must
demonstrate, through submissions of evidentiary quality, that a trialworthy issue persists.
Factual specificity is required; a conglomeration of conclusory allegations, improbable
inferences, and unsupported speculation is insufficient to discharge the nonmovant's burden")
(quotations omitted).  In general, McCoy's declaration and photographs provide incomplete or
inadequate information to show that these other trailers were similarly situated to McCoy.
McCoy has provided photographs, addresses, and conclusory allegations that these property
owners did not have permits[30] for the trailers and the Town did not require them to remove them.
This "oversimplifies the analysis and fails to account for the fact that '[v]arious factual traits,
circumstantial nuances, and peculiarities can set entities apart, rendering them, by virtue of their
differences, amenable to disparate treatment.'"  Cordi-Allen, 494 F.3d at 252 (quoting Racine
Charter One, Inc. v. Racine Unified Sch. Dist., 424 F.3d 677, 681 (7th Cir. 2005)).  McCoy's
evidence is also deficient in several specific, material respects.

First, the court cannot decipher from this evidence which of the alleged comparators may
be "grandfathered" in; that is, they installed the storage containers before there was an ordinance
requiring a storage container permit.  In fact, the ordinance was not adopted until 1988, the
storage container article was not added until 1997, and the storage container was amended in

---

[30] In some instances, the property owners did have permits and received those permits after the
events at issue in this case, weakening their status as potential comparators.

2016.  Without this information, a reasonable jury cannot determine whether the alleged

comparators are similar in relevant respects.  See Cordi-Allen, 494 F.3d at 253 ("In the land-use

context, timing is critical and, thus, can supply an important basis for differential treatment.

Since zoning bylaws, environmental standards, and licensing criteria may change over time,

courts must be sensitive to the possibility that differential treatment — especially differential

treatment following a time lag — may indicate a change in policy rather than an intent to

discriminate").

Second, McCoy's declaration is missing other information about the trailers that would

help a fact finder determine whether they are truly similarly situated.  For example, McCoy does

not explain:  (1) whether the trailers have been parked in the same location continuously for

more than 31 days (many have wheels or appear mobile); (2) whether the trailers were being

used for residential occupancy or transient lodging (which would exclude them from the

definition of "storage container" in the ordinance); (3) whether the storage containers were

unpermitted during the same period that McCoy kept the trailer on his property; (4) whether any

of these landowners received permit extensions from the select board; or (5) whether the Town

took any enforcement action against these other landowners.[31]

McCoy must do "more than 'point to nearby parcels in a vacuum and leav[e] it to the

municipality to disprove conclusory allegations that the owners of those parcels are similarly

situated,'" albeit by the slimmest of margins.  Freeman v. Town of Hudson, 714 F.3d 29, 38 (1st

---

[31] It is undisputed that the Town has taken similar enforcement action against other landowners
with unpermitted storage containers on their property.  That alone may be enough to defeat a
"class of one" equal protection claim because, "[b]y definition, a class of one is not a class of
many." Cordi-Allen, 494 F.3d at 254; see also Campbell v. Rainbow City, Ala., 434 F.3d 1306,
1317 (11th Cir. 2006) (explaining that a class of one suit cannot be maintained when similar
burdens have been imposed on other individuals).

Cir. 2013) (quoting Cordi-Allen, 494 F.3d at 251).  Simply put, he has failed to marshal evidence

in support of his equal protection claim that is "sufficient to establish factual as well as

regulatory similarity."  Cordi-Allen, 494 F.3d at 251.  For this reason alone, the Town is entitled

to summary judgment on McCoy's equal protection claim.

 **Discriminatory enforcement against McCoy**.  Even assuming for purposes of this order

that McCoy has identified a group of similarly situated comparators, the summary judgment

record is devoid of any evidence that the Town selectively enforced the ordinance against

McCoy because of his trailer's expressive content.

 To maintain his equal protection claim, McCoy must also show that there is a trial worthy

issue as to whether the Town intentionally treated him differently than other similarly situated

landowners.  See Vill. of Willowbrook, 528 U.S. at 564 ("The purpose of the equal protection

clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction

against intentional and arbitrary discrimination, whether occasioned by express terms of a statute

or by its improper execution through duly constituted agents.") (emphasis added) (quoting Sioux

City Bridge Co. v. Dakota County, 260 U.S. 441, 445 (1923)); see also Barrington Cove, 246

F.3d at 7 ("In order to establish its [equal protection] claim, however, Barrington needed to

allege facts indicating that, 'compared with others similarly situated, [it] was selectively treated .

. . based on impermissible considerations such as race, religion, intent to inhibit or punish the

exercise of constitutional rights, or malicious or bad faith intent to injure a person.'") (quoting

Rubinovitz v. Rogato, 60 F.3d 906, 909-10 (1st Cir.1995)).

 While McCoy is correct that direct evidence of discriminatory intent is rare, here, even

the circumstantial evidence suggests that the Town acted with no discriminatory intent.  For

example, during the time period when McCoy used the trailer to express his support for President

Trump, the select board allowed him to keep the trailer on his property for far longer than what the ordinance allowed.  In fact, the undisputed evidence shows that the board went out of its way to accommodate McCoy during this time.  By the time the Town ordered McCoy to remove the trailer in June 2018, the expressive content at issue had been removed for almost a year.  The Town also presented evidence with its summary judgment motion – which McCoy does not meaningfully contest – that it took similar enforcement action against other landowners with unpermitted storage containers.  This further refutes the notion that McCoy was singled out for enforcement.

To show discriminatory enforcement, McCoy resorts back to his argument that the select board had no authority under the ordinance to grant extensions to storage container permits. Even if the court accepted McCoy's argument that the board lacked authority or acted unlawfully in granting permit extensions, this does not change the result.  "[T]he mere fact that [the Town] may have violated or abused federal or state regulatory regimes" in administering the ordinance "has no direct bearing on whether [the Town] violated [McCoy's] equal protection rights." Barrington Cove, 246 F.3d at 10-11.

**Rational basis.**  Finally, McCoy offers no evidence to show that the Town did not have a rational basis for ordering him to remove the trailer in June 2018.  By that time, the Town had allowed McCoy to keep the trailer on his property unpermitted from early 2014 to September 2015, afforded McCoy an extension of his original storage container permit, and granted him a new permit.  The trailer remained on McCoy's property for over four years when the ordinance only allowed storage containers for 12 months.  McCoy had promised the select board multiple times that he was in the process of removing items from his trailer and would have the trailer removed from his property.  Yet he continued to keep the trailer and store items inside the trailer

and continued to ask for extensions from the select board, all in recognition that he had no right to continue keeping the trailer on his property indefinitely.  By June 2018, the select board had run out of patience with McCoy and declined to allow him to keep the trailer on his property. This was a wholly rational decision.

More importantly, McCoy has failed to adduce evidence of an arbitrary or irrational motive for Town's order to remove the trailer.  And for good reason.  By the time the Town ordered him to remove the trailer, it no longer contained expressive content and there is no evidence that Town officials held arbitrary or irrational motives prior to its June 2018 removal order, so no rational fact finder could infer that the Town's actions were motivated by political animus against McCoy.  See Wojcik v. Massachusetts State Lottery Com'n., 300 F.3d 92, 104 (1st Cir. 2002) ("An equal protection claim will only succeed if the decision to treat an individual differently than those similarly situated is wholly 'arbitrary or irrational.'") (quoting Me. Cent. R.R. Co. v. Bhd. of Maint. Way Employees, 813 F.2d 484, 492 (1st Cir. 1987)).

### C.    Ripeness or failure to exhaust administrative remedies

The Town also argues that it is entitled to summary judgment on McCoy's claims because he failed to exhaust his remedies at the Town level before filing suit.  Specifically, the Town contends that McCoy should have sought a variance before the Town's Zoning Board of Adjustment or appealed the select board's 2018 decision ordering him to remove the trailer, and because he failed to do so, his claims in this case are not ripe.  McCoy responds, in part, that the Town should be municipally estopped from arguing that McCoy failed to exhaust his administrative remedies because the Town's own conduct dissuaded him from doing so.  The court need not reach these questions as a result of the above rulings in the Town's favor on the merits.

**IV.** <u>**Conclusion**</u>

For the reasons set forth above, the Town's motion for summary judgment[32] is

GRANTED and its motion to strike[33]  is DENIED.  The clerk shall enter judgment accordingly

and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated: October 6, 2021
cc:     Robert M. Fojo, Esq.
          Robert Joseph Dietel, Esq.

_____

[32] Doc. no. 17.

[33] Doc. no. 23.