No. 21-1907

**In the United States Court of Appeals**
**FOR THE FIRST CIRCUIT**

**JOSEPH McCOY**

**Plaintiff – Appellant**

**v.**

**TOWN OF PITTSFIELD**

**Defendant – Appellee**

**On Appeal from the U.S. District Court for the District of New Hampshire**
**No. 1:20-cv-00362 (Hon. Joseph Laplante)**

**Plaintiff-Appellant's Appendix**

Robert M. Fojo (Bar No. 1191945)
Fojo Law
264 South River Road, Suite 464
Bedford, NH 03110
(603) 473-4694
rfojo@fojolaw.com
*Counsel for Joseph McCoy*

# TABLE OF CONTENTS

Complaint ..................................................................................................................1

Order on Motion for Judgment on the Pleadings......................................................10

Town of Pittsfield's Motion for Summary Judgment ...............................................28

Memorandum of Law in Support of Motion for Summary Judgment ...................30

Transcript of Deposition of Mr. McCoy ..................................................................54

Exhibit A ...............................................................................................................165

Exhibit B ...............................................................................................................166

Exhibit C ...............................................................................................................167

Exhibit D ...............................................................................................................168

Exhibit E ...............................................................................................................169

Exhibit F ...............................................................................................................170

Exhibit G ...............................................................................................................171

Exhibit H ...............................................................................................................172

Exhibit I ...............................................................................................................173

Exhibit J ...............................................................................................................174

Exhibit B to Memorandum – Affidavit of Cara Marston .......................................176

Exhibit 1 to Marston Affidavit...............................................................................184

Exhibit 2 to Marston Affidavit...............................................................................199

Exhibit 3 to Marston Affidavit...............................................................................200

Exhibit 4 to Marston Affidavit...............................................................................201

Exhibit 5 to Marston Affidavit...............................................................................202

Exhibit 6 to Marston Affidavit...............................................................................203

Exhibit 7 to Marston Affidavit...............................................................................206

Exhibit 8 to Marston Affidavit...............................................................................207

Exhibit 9 to Marston Affidavit...............................................................................208

Exhibit 10 to Marston Affidavit.............................................................................210

Exhibit 11 to Marston Affidavit.............................................................................220

Exhibit 12 to Marston Affidavit..........................................................................222

Exhibit 13 to Marston Affidavit..........................................................................223

Exhibit 14 to Marston Affidavit..........................................................................227

Exhibit 15 to Marston Affidavit..........................................................................228

Exhibit A to Memorandum – Affidavit of Cara Marston ....................................241

Exhibit 1 to Marston Affidavit............................................................................249

Exhibit 2 to Marston Affidavit............................................................................264

Exhibit 3 to Marston Affidavit............................................................................265

Exhibit 4 to Marston Affidavit............................................................................266

Exhibit 5 to Marston Affidavit............................................................................267

Exhibit 6 to Marston Affidavit............................................................................268

Exhibit 7 to Marston Affidavit............................................................................271

Exhibit 8 to Marston Affidavit............................................................................272

Exhibit 9 to Marston Affidavit............................................................................273

Exhibit 10 to Marston Affidavit..........................................................................275

Exhibit 11 to Marston Affidavit..........................................................................285

Exhibit 12 to Marston Affidavit..........................................................................287

Exhibit 13 to Marston Affidavit..........................................................................288

Exhibit 14 to Marston Affidavit..........................................................................292

Exhibit C to Memorandum – Affidavit of Carl Anderson...................................293

Exhibit 1 to Anderson Affidavit .........................................................................297

Exhibit D to Memorandum – Responses to Requests for Admissions.................299

Exhibit E to Memorandum – Plaintiff's Initial Disclosure..................................325

Exhibit F to Memorandum – Affidavit of Robert J. Dietel .................................331

Corrected Exhibit B to Memorandum ..................................................................333

Exhibit 1 to Marston Affidavit............................................................................341

Exhibit 2 to Marston Affidavit............................................................................356

Exhibit 3 to Marston Affidavit............................................................................357

Exhibit 4 to Marston Affidavit............................................................................358

Exhibit 5 to Marston Affidavit..............................................................359

Exhibit 6 to Marston Affidavit..............................................................360

Exhibit 7 to Marston Affidavit..............................................................362

Exhibit 8 to Marston Affidavit..............................................................364

Exhibit 9 to Marston Affidavit..............................................................365

Exhibit 10 to Marston Affidavit............................................................367

Exhibit 11 to Marston Affidavit............................................................377

Exhibit 12 to Marston Affidavit............................................................379

Exhibit 13 to Marston Affidavit............................................................380

Exhibit 14 to Marston Affidavit............................................................384

Exhibit 15 to Marston Affidavit............................................................385

Mr. McCoy's Objection to Motion for Summary Judgment .................398

Exhibit A to Motion – Declaration of Joseph McCoy ..........................420

Exhibit 1 to McCoy Declaration ...........................................................422

Exhibit 2 to McCoy Declaration ...........................................................441

Exhibit B to Motion – May 23, 2017 Meeting Minutes .......................455

Exhibit C to Motion – Letter from Carl Anderson ..............................470

Pittsfield's Reply to Objection to Motion for Summary Judgment ......472

Order on Motion for Summary Judgment..............................................482

Transcript of September 17, 2021 Hearing...........................................512

Respectfully submitted,

JOSEPH McCOY,

By His Attorneys,

FOJO LAW

Dated:  April 15, 2022                        */s/Robert M. Fojo*
                                              Robert M. Fojo, Esq. (#1191945)
                                              264 River Road, Suite 464
                                              Bedford, NH 03110
                                              (603) 473-4694
                                              rfojo@FojoLaw.com

## CERTIFICATION

I certify that, on April 15, 2022, a copy of the foregoing was forwarded to Appellee's counsel through the Court's electronic filing system.

Dated:  April 15, 2022                        */s/Robert M. Fojo*
                                              Robert M. Fojo, Esq. (#1191945)

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

**Case No.:** _____

JOSEPH McCOY,

      Plaintiff,

vs.

TOWN OF PITTSFIELD

      Defendant.

_____

## COMPLAINT

Plaintiff Joseph McCoy brings the following Complaint for an injunction and damages against Defendant Town of Pittsfield.

### PARTIES

1.     Mr. McCoy is an individual with an address of 322 Catamount Road, Pittsfield, New Hampshire 03263.

2.     Defendant Town of Pittsfield is a municipal corporation and has a principal place of business at 85 Main Street, Pittsfield, New Hampshire 03263.

### JURISDICTION AND VENUE

3.     This Court has jurisdiction over Mr. McCoy's claims under 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343 (jurisdiction over claims arising under federal civil rights statutes).

4.     This Court has jurisdiction over Mr. McCoy's claims for an injunction under 42 U.S.C. § 1983.

1

Case 1:20-cv-00862    Document 1    Filed 03/20/20    Page 2 of 9

5.      This Court has personal jurisdiction over the Defendants because they reside in or conduct business in New Hampshire.

6.      This court also has pendant/supplemental jurisdiction under 28 U.S.C. § 1367(a) over any state law claims herein.

7.      Venue is proper in this District because all the parties conduct business in this District, a substantial number of the acts alleged occurred in New Hampshire, and a majority of Defendants' employees referenced in this Complaint and other witnesses reside in New Hampshire.

## FACTUAL BACKGROUND

8.      Mr. McCoy and his wife, Linda McCoy, moved to their current address in Pittsfield, New Hampshire, in early 2014.  Their property sits on Route 107.  Mr. McCoy is 62 years old and has trouble walking with a crippled leg.  He suffered that injury five years ago when he fell while working a construction job.  One of his knees snapped during surgery and fused.  Mrs. McCoy has arthritis and neck pain.  Both of them rely on disability income, which only yields them $7,000 per year in income.

9.      Mr. and Mrs. McCoy brought with them a 52-foot trailer and placed it in their front yard.

10.     In July 2016, Mr. and Mrs. McCoy's son, Brian Bales, painted the word "TRUMP" on the trailer in large white letters (against a green background).

11.     On August 11, 2016, Mr. McCoy's trailer caught the press's attention and landed on the front page (page A1) of the *Concord Monitor*.[1]

12.     The headline of the article in the *Concord Monitor* stated, "LOUD &

---

[1] https://www.concordmonitor.com/For-Pittsfield-family-Trump-is-a-sign-of-things-to-come-3969354

Case 1:20-cv-00352    Document 3    Filed 05/26/20    Page 52 of 9

PROUD  In Pittsfield, a 52-foot **sign** stands as one family's testament to Donald Trump and all that the Republican presidential nominee stands for."  (Emphasis added)

13.    In the article, Mr. McCoy states *why* he had the trailer in his front yard: "Trump is strong, tells it like it is, won't hold back no punches," he said.  "**That's why the trailer is out there.**  If I had to take it down to Washington, I'd get a tow truck, park it right down there.  That's 52 feet of Trump.  People need to see it."  (Emphasis added)

14.    The article demonstrates the *principal* use of the trailer was as a sign to express political speech, and that any use of the trailer for storage, if any storage existed, was *subordinate* to the trailer's use as a sign to express political speech.  In other words, the article demonstrates any use of the trailer for storage, if any storage existed, was not the *principal* use of the trailer.

15.    The Town of Pittsfield's Planning Board adopted regulations for "storage containers" on March 11, 1997 as part of the Town's Zoning Ordinance.  The Town adopted revised regulations for "storage containers" on March 8, 2016, as part of a comprehensive revision of the Zoning Ordinance.

16.    From 1997 to 2015, "storage container" was defined as "any truck trailer, box trailer, school bus, mobile home or other similar facility used for storage **or other purposes**."  (Emphasis added)

17.    From 2016 onward, Article 2, Section 3 of the Zoning Ordinance defines a "storage container" as "a truck trailer, box trailer, school bus, MANUFACTURED HOUSING unit, or similar mobile container parked continuously for 31 days or more and **used principally for storage** and not used for any person's residential occupancy or transient lodging" (hereinafter, "Ordinance").  (Emphasis added)

3

18.     Among the changes above that the Town adopted to the Storage Container Ordinance, it removed the phrase "or other purposes" from the definition of "storage container" because that phrase contradicted the purpose of the regulations: the phrase could, for example, convert a school bus used *only* for transporting school children into a "storage container" under the Ordinance and place a local school bus company in violation of the Ordinance.  A school bus, however, is obviously *not* a "storage container" under the Ordinance and *only* becomes a "storage container" if the school bus is used principally for storage.

19.     After the publication of the article in the *Concord Monitor*, the Town allegedly received several complaints concerning the trailer.  A member of the Town's Board of Selectmen, Carl Anderson, reported that information to Mr. McCoy and later confirmed it in a letter he wrote to Mr. McCoy dated January 11, 2020, stating "[o]ne of those complaints was about your trailer."

20.     The Town's Board of Selectmen ultimately issued an order and directed Mr. McCoy to remove the trailer by July 2018 pursuant to the Ordinance.  The Board's order was based solely on the fact that the trailer depicted "TRUMP" in large letters.

21.     Mr. McCoy's trailer, however, clearly did not meet the definition of "storage container" since he did not use the trailer "principally for storage" but was, instead, using the trailer principally as a sign to express political speech.  Rather, Mr. McCoy's trailer was a sign and clearly met the conditions in the Town's Zoning Ordinance, Article 9, Section 4, Permitting Conditions for Outdoor Signs.

22.     During this time and afterward, the Board has allowed other residents in Pittsfield to have similar, unpermitted storage containers on their properties.  Indeed, at a

4

Town Board of Selectman meeting on May 23, 2017, the Town's Code Enforcement

Officer (Jesse Pacheco) stated there are trailers "all over the place."  A Board Member

(Carl Anderson) later reiterated that fact in his January 11, 2020, letter to Mr. McCoy:

"what was obvious was that there were illegal storage containers all over the place."  At

the May 23, 2017 Board meeting, the Town Administrator (Cara Marston) also

acknowledged there were "other properties that are technically in violation" of the

Ordinance, but the Town had done nothing concerning those trailers.  Mr. Anderson

addressed those "other properties" at the May 23 meeting by stating they "are not on the

agenda."

23.    Three members of the Board of Selectmen – Mr. Anderson, Larry

Konopka, and Jim Allard – repeatedly harassed Mr. McCoy about his trailer; upon

information and belief, they undertook no steps to apply similar pressure to other property

owners in the Town who had similar trailers.

24.    Mr. Pacheco admitted to Mr. McCoy that the Board of Selectmen alleged it

ordered Mr. McCoy to remove the trailer because of complaints the Town had received

about it.  Upon information and belief, however, the Town never received any complaints

about Mr. McCoy's trailer.  Indeed, in his January 11, 2020, letter, Mr. Anderson admitted

he could not identify a single individual who complained about the trailer: "I didn't know

who complained about your trailer.  I didn't know then, and I don't know now.  We were

never given a name."

### COUNT I
### (42 USC § 1983 – Free Speech)

25.    Mr. McCoy incorporates herein each and every allegation made in the

Paragraphs above as if fully set forth herein.

26.    The Ordinance, as applied by the Town, is an unconstitutional abridgement of Mr. McCoy's right to freedom of speech under the United States Constitution, First and Fourteenth Amendments.

27.    The Ordinance, as applied by the Town, is an unconstitutionally overbroad restriction on expressive activity.

28.    The Ordinance, as applied by the Town, is an unconstitutionally vague restriction on expressive activity.

29.    The Ordinance, as applied by the Town, is a content-based and viewpoint-based restriction on speech.

30.    The Ordinance, as applied by the Town, does not serve a significant government interest.

31.    The Ordinance, as applied by the Town, does not leave open ample alternative channels of communication.

32.    The Ordinance, as applied by the Town, is neither narrowly tailored nor the least restrictive means to accomplish any permissible governmental purpose sought to be served by it.

33.    The Ordinance, as applied by the Town, is irrational and unreasonable, imposing unjustifiable restrictions on the exercise of protected constitutional rights. Because the Ordinance, as applied, is irrational and unreasonable, its application violates the due process guarantee of the Fourteenth Amendment to the United States Constitution.

34.    As a result of this conduct, Mr. McCoy is entitled to the remedies set forth

below.

## COUNT II
### (42 U.S.C. § 1983 – Equal Protection)

35.     Mr. McCoy incorporates each and every allegation made in the

Paragraphs above as if fully set forth herein.

36.     The Ordinance, as applied by the Town, violates the Equal Protection

Clause of the Fourteenth Amendment.  Specifically, it creates two classes: persons with

unpermitted storage containers that express political speech and persons with

unpermitted storage containers that do not express political speech.

37.     These classifications have a direct bearing on the fundamental interest in

free speech.  The Town has no compelling interest justifying the creation of these

classes and cannot show that these classifications are necessary to serve any legitimate

governmental interest.

38.     The Ordinance, as applied by the Town, singles out persons who have

unpermitted storage containers that express some form of political speech as a class to

be specifically isolated from speech.

39.     As a result of this conduct, Mr. McCoy is entitled to the remedies set

forth below.

## COUNT III
### (Intentional Infliction of Emotional Distress)

40.     Mr. McCoy incorporates each and every allegation made in the Paragraphs

above as if fully set forth herein.

41.     The Town, by extreme and outrageous conduct, intentionally or

7

recklessly caused severe emotional distress to Mr. McCoy by directing him to remove the trailer.

42.     The conduct above is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

43.     As a result of this conduct, Mr. McCoy has suffered damages in the form of extreme mental anguish and severe depression, and he has suffered a deterioration of his physical and mental well-being.

## COUNT IV
### (Negligent Infliction of Emotional Distress)

44.     Mr. McCoy incorporates each and every allegation made in the Paragraphs above as if fully set forth herein.

45.     The Town negligently caused severe emotional distress to Mr. McCoy by directing him to remove his trailer.

46.     The Town knew or should have known this conduct would cause Mr. McCoy to suffer severe emotional distress.

47.     As a result of this conduct, Mr. McCoy has suffered damages in the form of extreme mental anguish and severe depression, and he has suffered a deterioration of his physical and mental well-being.

WHEREFORE, Mr. McCoy respectfully prays for judgment against the Town of Pittsfield and the following remedies:

A.     Declare the Town's actions violated Mr. McCoy's rights under the First and Fourteenth Amendments to the United States Constitution;

B.     Declare that the Town's actions violated Mr. McCoy's rights under

8

the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

C.     Preliminarily and permanently enjoin the Town from continuing to restrict Mr. McCoy from displaying his trailer;

D.     Award monetary damages in an amount to be determined at trial in an amount no less than $10 million;

E.     Award punitive damages;

F.     Award pre- and post-judgment interest;

G.     Award attorney's fees, costs, and expenses;

H.     Any other relief this Court deems just and proper.

## **JURY TRIAL DEMAND**

Mr. McCoy demands a jury trial on all claims so triable.

JOSEPH McCOY,

By His Attorneys,

FOJO LAW, P.L.L.C.

Dated:  March 20, 2020                    _____*/s/ Robert M. Fojo*_____
                                         Robert M. Fojo (#19792)
                                         264 South River Road, Suite 464
                                         Bedford, NH 03110
                                         Direct: (603) 473-4694
                                         rfojo@fojolaw.com

9

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Joseph McCoy

     v.                               Civil No. 1:20-cv-362-JL
                                      Opinion No. 2020 DNH 217

Town of Pittsfield

**MEMORANDUM ORDER**

In this action, which pits a property owner against his town over the enforcement of a zoning ordinance, resolution of the Town's motion for judgment on the pleadings hinges on the sufficiency of the factual allegations in the plaintiff's complaint.  Plaintiff Joseph McCoy sued the Town of Pittsfield, alleging that the Town's order to remove a 52-foot trailer depicting the word "TRUMP" from his property violated his rights under the United States Constitution and caused him emotional distress.  He brought two claims under 42 U.S.C. § 1983 (Count 1 for violation of free speech rights and Count 2 for violation of equal protection rights) and two claims under New Hampshire law for intentional and negligent infliction of emotional distress (Counts 3 and 4).  This court has jurisdiction over McCoy's federal claims under 28 U.S.C. §§ 1331 and 1343 because the claims present federal questions and arise from federal civil rights statutes, and supplemental jurisdiction over his state law claims under 28 U.S.C. § 1367(a).

Pittsfield moves for judgment on the pleadings, arguing that McCoy relies solely on unsubstantiated legal conclusions to support his free speech and equal protection claims under § 1983, and that his state claims are also insufficiently supported by facts and barred by statutory immunity doctrines.  After reviewing the parties' submissions and hearing oral argument, the court grants the motion in part and denies it in part.  As for McCoy's free speech claim, his

10

complaint contains enough facts that, when construed in his favor, support the inference that the Town of Pittsfield applied the ordinance against him in a way that discriminates against either the content or viewpoint of his speech, and that the Town's application of the ordinance was unconstitutionally vague.  The court further finds that McCoy has plead sufficient facts to satisfy the "similarly situated" element of his "class of one" equal protection claim.  The court, however, grants Pittsfield's motion as to the overbreadth portion of McCoy's free speech claim and Counts 3 and 4 in full, as McCoy has conceded that he is no longer pursuing those claims.

## I.      Applicable legal standard

A motion for judgment on the pleadings under Rule 12(c) is evaluated under essentially the same standard as a Rule 12(b)(6) motion to dismiss for failure to state a claim.  See Simmons v. Galvin, 575 F.3d 24, 30 (1st Cir. 2009).  Under this standard, McCoy must plead "factual content that allows the court to draw the reasonable inference that the [Town] is liable for the misconduct alleged." Martinez v. Petrenko, 792 F.3d 173, 179 (1st Cir. 2015).  McCoy must also "do more than suggest in conclusory terms the existence of questions of fact about the elements of a claim." A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 81 (1st Cir. 2013).  Dismissal is warranted when a complaint's factual averments are "too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture." In re Montreal, Maine & Atl. Ry., Ltd., 888 F.3d 1, 6 (1st Cir. 2018) (quoting SEC v. Tambone, 597 F.3d 436, 442 (1st Cir. 2010) (en banc)).

## II.      Background

Because a motion for judgment on the pleadings "calls for an assessment of the merits of the case at an embryonic stage," the court construes all well-pleaded facts from the complaint in

the light most favorable to McCoy and draws all reasonable inferences in his favor.  Perez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008).  The following background conforms to this requirement.

McCoy and his wife moved to Pittsfield in early 2014.[1]  Their property sits along state Route 107.[2]  Along with their belongings, the McCoys brought a 52-foot trailer to their property and placed it in the front yard.[3]  In July 2016, McCoy's son painted the word "TRUMP" in large white letters on the trailer.[4]  The newly-painted trailer caught the attention of the local media and led to a story that was published in the *Concord Monitor* on August 11, 2016.[5]  According to McCoy, statements from the *Monitor* article show that he used the trailer primarily as a sign to express political speech, and secondarily (if at all) for storage.[6]

The trailer also caught the attention of Pittsfield residents and its Board of Selectmen. After the *Monitor* article was published, the Town allegedly received several complaints about McCoy's trailer, but McCoy believes this is untrue.[7]  Nevertheless, at some point after the article's publication, the Town's Board of Selectmen issued an order directing McCoy to remove the trailer by July 2018 pursuant to a Town ordinance, purportedly because the trailer was an

---

[1] Complaint (doc. no. 1), at ¶ 8.

[2] Id.

[3] Id. at ¶ 9.

[4] Id. at ¶ 10.

[5] Id. at ¶ 11.

[6] Id. at ¶¶ 12-14.

[7] Id. at ¶¶ 19, 24.

unpermitted storage container.[8]  According to McCoy, however, the removal order was based solely on the fact that the trailer depicted the word "TRUMP" in large letters. [9]

Pittsfield first adopted regulations for storage containers as part of its zoning ordinance in 1997.[10]  From 1997 to 2015, the ordinance defined "storage container" as "any truck trailer, box trailer, school bus, mobile home or other similar facility used for storage or other purposes."[11] After the Town amended its ordinance in March 2016, the definition of storage container changed to "a truck trailer, box trailer, school bus, MANUFACTURED HOUSING unit, or similar mobile container parked continuously for 31 days or more and used principally for storage and not used for any person's residential occupancy or transient lodging."[12]  McCoy contends that his trailer did not meet the definition of storage container in the post-2016 ordinance because he was not using the trailer "principally for storage" but was instead using the trailer principally as a sign to express political speech, and the trailer met the conditions in the ordinance for outdoor signs.[13]

McCoy alleges generally that "during this time and afterward," Pittsfield has allowed other residents to keep similar, unpermitted storage containers on their properties.[14]  He further

---

[8] Id. at ¶¶ 20-21.  McCoy does not provide the date of the Town's order.

[9] Id. at ¶ 20.

[10] Id. at ¶ 15.

[11] Id. at ¶ 16.

[12] Id. at ¶ 17.

[13] Id. at ¶ 21.

[14] Id. at ¶ 22.  McCoy alleges that a member of the Board of Selectmen – Carl Anderson – wrote him a letter dated January 11, 2020 that references the Town's decision to order McCoy to remove the trailer and the fact that other "illegal storage containers" existed in the Town.  Id. at

asserts that three members of the Board of Selectmen – Carl Anderson, Larry Konopka, and Jim Allard – repeatedly harassed him about his trailer, but did not apply similar pressure to other residents with unpermitted storage containers.[15]

### III.   <u>Analysis</u>

Counts 1 and 2 of McCoy's complaint arise from 42 U.S.C. § 1983.  To state a claim under § 1983, McCoy must plausibly plead two essential elements, "(i) that the conduct complained of has been committed under color of state law, and (ii) that this conduct worked a denial of rights secured by the Constitution or laws of the United States."  Rodríguez-Reyes v. Molina-Rodríguez, 711 F.3d 49, 55 (1st Cir. 2013).  Pittsfield challenges only the second element of McCoy's § 1983 claims, namely, whether its conduct encroached on McCoy's constitutional rights.  The court addresses each count in turn.

#### A.     **Count 1 (Free Speech)**

Through Count 1, McCoy alleges that the ordinance, as applied by Pittsfield, is an "unconstitutional abridgement" of his right to freedom of speech under the First and Fourteenth Amendments of the Constitution and unconstitutionally vague and overbroad.[16]  Pittsfield contends that McCoy's challenge to the ordinance fails because it is based only on undeveloped,

---

¶¶ 22, 24.  McCoy does not provide a copy of this letter as an exhibit to his complaint or objection to Pittsfield's motion for judgment on the pleadings.

[15] Id. at ¶ 23.  McCoy does not specify when this alleged harassment occurred, or whether it occurred before the Town issued its order to remove the trailer, after the order, or both before and after.

[16] Complaint (doc. no. 1), at ¶ 26.

bald legal conclusions, and lacks the required factual predicate to state a plausible claim for relief.[17]  For the following reasons, the court finds that Count 1 states a cause of action.

 "The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'"  Reed v. Town of Gilbert, 135 S. Ct. 2218, 2226 (2015) (quoting U.S. Const. amend. I).  "As a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  United States v. Stevens, 559 U.S. 460, 468 (2010) (citing Ashcroft v. American Civil Liberties Union, 535 U.S. 564, 573 (2002)); see also Iancu v. Brunetti, 139 S.Ct. 2294, 2299 (2019) ("The government may not discriminate against speech based on the ideas or opinions it conveys.").

The government may restrict speech in nonpublic fora "as long as the restrictions are 'reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.'"  Cornelius v. NAACP Legal Defense and Education Fund, Inc., 473 U.S. 788, 800 (1985) (quoting Perry Educational Assn. v. Perry Local Educators' Assn., 460 U.S. 37, 46 (1983)).  "The existence of reasonable grounds for limiting access to a nonpublic forum, however, will not save a regulation that is in reality a facade for viewpoint-based discrimination."  Id. at 811.

There are varying levels of discrimination under First Amendment jurisprudence. Content discrimination occurs whenever a government regulates "particular speech because of the topic discussed or the idea or message expressed."  Reed, 135 S.Ct. at 2226-27.  Content-based restrictions "are subject to strict scrutiny, which requires the government to demonstrate

---

[17] Doc. no. 10-1, at 5.

6

that the restriction advances a 'compelling interest' and is 'narrowly tailored to achieve that interest.'" Signs for Jesus v. Town of Pembroke, NH, 977 F.3d 93, 101 (1st Cir. 2020) (quoting Reed, 135 S.Ct. at 2218). Viewpoint discrimination is "an egregious form of content discrimination" in which "the government targets not subject matter, but particular views taken by speakers on a subject." Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819, 829 (1995). In cases like this one involving political speech, the "First Amendment's guarantee of free speech applies with special vigor" and "affords the broadest protection to such political expression in order to ensure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people." See Nat'l Org. for Marriage v. McKee, 649 F.3d 34, 51 (1st Cir. 2011) (quotations omitted).

Pittsfield labels McCoy's as-applied challenge as lacking factual support. It further argues that McCoy concedes, through his allegation that the trailer was a sign and not a storage container, that he had no right to keep the trailer on his property as a storage container and thus suffered no constitutional injury. Neither argument supports dismissal of Count 1.

In challenging the sufficiency of the factual support for Count 1, Pittsfield focuses on the portion of the complaint in which McCoy recites this claim (paragraphs 27-33) and not the remainder of the complaint. The court must, however, read the complaint "as a whole" when ruling on a motion for judgment on the pleadings. See Garcia-Catalan v. United States, 734 F.3d 100, 103 (1st Cir. 2013) (noting that "there need not be a one-to-one relationship between any single allegation and a necessary element of the cause of action"); Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 14 (1st Cir. 2011) ("The question confronting a court on a motion to dismiss is whether all the facts alleged, when viewed in the light most favorable to the plaintiffs, render the plaintiff's entitlement to relief plausible.") (emphasis added).

7

16

Viewed as a whole and in the light most favorable to McCoy, the complaint contains just enough factual allegations to survive a motion for judgment on the pleadings.  Specifically, in paragraph 20, McCoy alleges that the Town ordered him to remove the trailer for violating the "storage container" section of the ordinance because the trailer depicted the word "TRUMP" in large letters, yet allowed other unpermitted trailers (that did not depict political speech or support for Mr. Trump) to remain.  These allegations, taken as true for purposes of this motion, support a claim for unconstitutional content (banning unpermitted storage containers with political messages) or viewpoint (banning unpermitted storage containers expressing support for then-political candidate Donald J. Trump) discrimination.  See Rosenberger, 515 U.S. at 828-29 ("Discrimination against speech because of its message is presumed to be unconstitutional . . . [and] [w]hen the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant.") (citing Turner Broadcasting System, Inc. v. FCC, 512 U. S. 622, 641-43 (1994) and R.A.V. v. St. Paul, 505 U. S. 377, 391 (1992)).

As for McCoy's assertion that the trailer was a sign and not a storage container, the court disagrees that this amounts to a concession that McCoy has not suffered any constitutional injury from Pittsfield's application of the ordinance.  The court can draw the reasonable inference from this allegation that by applying the storage container rule to him when he was using the trailer as a sign, the Town applied the ordinance in a way that repressed his First Amendment rights.  In other words, Count 1 can be read to allege that Pittsfield should have applied the sign rules to him all along, but its real intent was to use the storage container rule as a cover for unconstitutionally restricting his speech rights.

McCoy also challenges the Town's application of the ordinance on overbreadth and vagueness grounds.[18]  Pittsfield seeks dismissal of these aspects of Count 1 because they are based solely on bare conclusions of law.[19]

**Overbreadth**.  Pittsfield is correct that McCoy only supports his overbreadth claim with pure conclusions of law,[20] which the court cannot accept as true for purposes of deciding this motion.  See Maldonado v. Fontanes, 568 F.3d 263, 268 (1st Cir. 2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  Without pointing to any specific factual allegation in the complaint, McCoy argues that he "adequately" alleges that Pittsfield's order to remove the trailer pursuant to the ordinance broadens the ordinance beyond its text to encompass unpermitted storage containers that express political speech.[21]  Even if the court were to accept this conclusory statement as true, it is insufficient to satisfy the rigorous standard for challenging a law or rule on overbreadth grounds.

Neither the United States Supreme Court nor the First Circuit Court of Appeals have determined "whether there is such a creature as an as-applied overbreadth challenge." McCullen v. Coakley, 708 F.3d 1, 11 (1st Cir. 2013), rev'd and remanded on other grounds, 573 U.S. 464 (2014).  Neither party addresses this argument in their motion papers, and other Circuit Courts of Appeal appear to be split on this question.  Compare, Farrell v. Burke, 449 F.3d 470, 498 (2d

---

[18] Doc. no. 12, at 4.  McCoy's counsel conceded at oral argument that he is not making facial overbreadth or vagueness challenges to the ordinance.

[19] Doc. no. 10-1, at 5.

[20] See Complaint (doc. no. 1), at ¶ 27 and ¶ 28.

[21] Doc. no. 12, at 4.

Cir. 2006) ("All overbreadth challenges are facial challenges, because an overbreadth challenge by its nature assumes that the measure is constitutional as applied to the party before the court."), with Turchick v. United States, 561 F.2d 719, 721 n.3 (8th Cir. 1977) ("The 'as applied' method vindicates a claimant whose conduct is within the First Amendment but invalidates the challenged statute only to the extent of the impermissible application").

It is clear, however, that an overbreadth challenge always contains a facial component. See Hill v. Colorado, 530 U.S. 703, 731–32 (2000) (noting that "the overbreadth doctrine enables litigants 'to challenge a statute, not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression'") (quoting Broadrick v. Oklahoma, 413 U.S. 601, 615 (1973)).  The court will therefore evaluate McCoy's overbreadth claim under the facial challenge rubric.

To show that the ordinance is overbroad, McCoy must prove that it "punishes a 'substantial' amount of protected free speech, 'judged in relation to the [rule's] plainly legitimate sweep.'" Virginia v. Hicks, 539 U.S. 113, 118-19 (2003) (quoting Broadrick, 413 U.S. at 615)). An overbreadth finding "suffices to invalidate all enforcement of that law, 'until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression.'" Id. at 119 (quoting Broadrick, 413 U.S. at 613).  This court must "vigorously enforce[ ] the requirement that a [law's] overbreadth be substantial, not only in an absolute sense, but also relative to the [law's] plainly legitimate sweep." United States v. Williams, 553 U.S. 285, 292 (2008)).  "Invalidation for overbreadth is 'strong medicine' that is not to be 'casually employed.'" Id. (quoting Los Angeles Police Dept. v. United Reporting Publishing Corp., 528 U.S. 32, 39 (1999)).

10

19

McCoy has not shown, either through the factual allegations in his complaint or in his objection to Pittsfield's motion, how the ordinance punishes a "substantial" amount of protected speech in an absolute sense or in relation to the ordinance's plainly legitimate sweep.  In fact, McCoy does not even address the ordinance's "perfectly constitutional" applications or attempt to argue why its application to him is substantially punitive relative to its legitimate applications.  Because McCoy's threadbare conclusions of law do not suffice to meet this vigorous standard at the pleadings stage, Pittsfield is entitled to judgment on the pleadings on the overbreadth portion of Count 1.

**Vagueness**.  McCoy's as-applied vagueness challenge fares slightly better.[22]  The vagueness doctrine implicates the Due Process Clause of the Fourteenth Amendment, not purely the First Amendment.  See Williams, 553 U.S. at 304; Kolender v. Lawson, 461 U.S. 352, 353-54 (1983).  A law is unconstitutionally vague when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  Id.  "The degree of vagueness that the Constitution tolerates – as well as the relative importance of fair notice and fair enforcement – depends in part on the nature of the enactment."  Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498 (1982).  "If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply."  Id. at 499.

---

[22] Unlike overbreadth claims, the First Circuit Court of Appeals has recognized as-applied vagueness claims.  See United States v. Zhen Zhou Wu, 711 F.3d 1, 15 (1st Cir. 2013) ("Outside the First Amendment context, we consider whether a statute is vague as applied to the particular facts at issue . . . .") (emphasis in original) (internal quotation marks omitted).

11

After reviewing the complaint and hearing oral argument, it is unclear to the court whether this vagueness challenge involves a lack of fair notice, risk of discriminatory enforcement, both, or neither.  Although the text of the ordinance does not reference speech, McCoy alleges that Pittsfield used the ordinance to regulate his speech when it ordered him to remove his trailer based on the ordinance and the fact that the trailer depicted "TRUMP" in large letters.[23]  McCoy argues that this application of the ordinance was unconstitutionally vague because the Town failed to make clear whether all political speech may be prohibited, or only some types of speech or expression.[24]  Accepting McCoy's factual allegation about the Town's basis for its removal order as true, which the court must for purposes of this motion, the court can reasonably infer from this allegation that a person of ordinary intelligence would not have fair notice of what is prohibited under the ordinance or what a trailer must look like in order to pass muster under the storage container section of the ordinance.

Because McCoy alleges that the order interferes with his free speech rights, a "greater degree of specificity" is required, and under this more-stringent vagueness test, the Town's application of the ordinance to McCoy could also be viewed as "so standardless that it authorizes" some form of discriminatory enforcement.  Buckley v. Valeo, 424 U.S. 1, 77 (1976). McCoy's complaint therefore contains minimally sufficient factual allegations to support a claim that the Town applied the ordinance against him (and interfered with his free speech rights) in a vague manner.  Pittsfield's motion for judgment on the pleadings on this portion of his claim accordingly must be denied.

---

[23] Complaint (doc. no. 1), at ¶ 20.

[24] Doc. no. 12, at 4.

In sum, McCoy's complaint alleges enough facts to state a plausible claim of constitutional injury stemming from the Town's application of the ordinance against him; namely, that the Town applied the ordinance in a manner that discriminated against the content or viewpoint of his speech, and in a vague manner. McCoy has not alleged sufficient facts to support a claim that the ordinance is unconstitutionally overbroad. Pittsfield's motion for judgment on the pleadings on Count 1 is therefore denied in part and granted in part.

### B.    Count 2 (Equal Protection – disparate treatment)

Pittsfield similarly argues that it is entitled to judgment on the pleadings on Count 2 of McCoy's complaint because that claim is not supported by sufficient factual allegations. Instead, Pittsfield asserts that McCoy has plead only "[g]eneral and conclusory allegations" that the Town treated other similarly situated landowners differently,[25] which are insufficient to carry his burden of proving an equal protection claim at the pleadings stage. McCoy counters that he has both sufficiently alleged the existence of other similarly situated landowners, and that the Town treated these landowners differently than him. In this procedural posture – a Rule 12 challenge to the pleadings – McCoy has the better of the arguments.

McCoy asserts that the ordinance, as applied by Pittsfield, impermissibly creates two classes of residents – persons with unpermitted storage containers expressing political speech and persons with unpermitted storage containers not expressing political speech – and argues that the Town treats these classes differently in violation of the Constitution.[26] Liberally construed,

---

[25] Doc. no. 10-1, at 7.

[26] Compl. (doc. no. 1) at ¶ 36.

13

this is a "class of one" theory of equal protection liability and, under such a theory, McCoy must allege that he has "been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Donovan v. City of Haverhill, 311 F.3d 74, 77 (1st Cir. 2002) (quoting Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam)).

Pittsfield's motion challenges the level of factual detail supporting the "similarly situated" element of McCoy's equal protection claim. For the following reasons, the court is not persuaded by Pittsfield's arguments.

"An individual is 'similarly situated' to others for equal protection purposes when 'a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated.'" Davis v. Coakley, 802 F.3d 128, 133 (1st Cir. 2015) (quoting Barrington Cove Ltd. P'ship v. Rhode Island Hous. & Mortgage Fin. Corp., 246 F.3d 1, 8 (1st Cir.2001)). Although "[e]xact correlation [between comparators] is neither likely nor necessary, id., "a class-of-one plaintiff bears the burden of showing that his comparators are similarly situated in all respects relevant to the challenged government action." Gianfrancesco v. Town of Wrentham, 712 F.3d 634, 640 (1st Cir. 2013).

Here, the relevant comparison points are property owners in Pittsfield with unpermitted storage containers on their properties, including trailers. McCoy sufficiently alleges that these similarly situated comparators exist (or existed at the time of the Town's action against him) and did not receive similar treatment as he did from the Town.

14

Gianfrancesco v. Town of Wrentham does not compel a different result, as Pittsfield

argues in its motion.[27]  There, the plaintiff simply alleged "that the regulatory and enforcement

measures taken against Tom's Tavern were not also taken against 'similarly situated

establishments'" but did not specify what made these other establishments similarly situated.

712 F.3d at 640.  This assertion was "so general and conclusory" that it could not survive a

motion to dismiss.  Id.; see also Bel-Air Nursing & Rehab Ctr., Inc. v. Town of Goffstown, No.

16-CV-259-JL, 2018 WL 264091, at *7 (D.N.H. Jan. 2, 2018) (holding that plaintiff's "vague

and conclusory reference to 'other business in analogous matters'" fell "far short" of showing of

similarly situated comparators necessary to survive a motion to dismiss).  Here, McCoy's

allegations, while generalized, provide further detail about the relevant comparators.  It also

appears that McCoy based his allegations of other similarly situated property owners on

whatever public information he had access to at the time.  And members of the Pittsfield Board

of Selectmen acknowledged that other unpermitted storage containers or trailers existed, and that

these property owners were not punished for violating the ordinance.[28]  McCoy has therefore

sufficiently alleged the existence of similarly situated comparators for purposes of his equal

protection claim.[29]

---

[27] Doc. no. 10-1, at 7.

[28] Doc. no 1, at ¶ 22.

[29] Under questioning at oral argument, McCoy's counsel acknowledged that his client obtained additional information about the alleged comparators, both through his own research and through public records requests to the Town.  Yet McCoy chose not to include that information in the complaint or his objection to Pittsfield's motion for judgment on the pleadings because he did not feel it was necessary under the case law.  Counsel for Pittsfield similarly relied on public records and other documents during oral argument that were not attached to its answer or motion for judgment on the pleadings.  The court's review of the instant motion would have been aided by this additional information and documentation, and had the court considered it, the motion

While McCoy must show "an extremely high degree of similarity between" himself and the persons to whom he compares himself to meet his burden of proving substantial similarity, here, he has done "more than 'point to nearby parcels in a vacuum and leav[e] it to the municipality to disprove conclusory allegations that the owners of those parcels are similarly situated,'" albeit by the slimmest of margins.  Freeman v. Town of Hudson, 714 F.3d 29, 38 (1st Cir. 2013) (quoting Cordi-Allen v. Conlon, 494 F.3d 245, 251 (1st Cir. 2007)).  For example, McCoy alleges that the Town allowed other landowners in Pittsfield to maintain unpermitted storage containers (without political speech written on them) on their properties, and admitted this to him on several occasions.  These property owners were similarly situated because they had unpermitted storage containers, including trailers, on their properties.  This is the most relevant, if not the only relevant, factor in the present comparator analysis.  And Pittsfield does not state in its motion what other information about these alleged comparators McCoy should have provided at this stage of the case to show that they were truly similarly situated to him.

McCoy has also plead enough facts to support the allegation that the Town treated these other similarly situated landowners differently than him.  Specifically, he alleges that the Town took no enforcement action against these other unpermitted trailers or storage containers and did not apply similar pressure or harassment to these other property owners.[30]  This is adequate

---

would not have converted to a motion for summary judgment.  See Giragosian v. Ryan, 547 F.3d 59, 65 (1st Cir. 2008) (When ruling on a Rule 12 motion, "[a] district court may also consider documents incorporated by reference in [the complaint], matters of public record, and other matters susceptible to judicial notice.") (quotations omitted).  Instead, the task of deciding this motion was frustratingly limited to drawing inferences from the few factual allegations actually plead in McCoy's complaint.

[30] Doc. no. 1, at ¶ 23.

factual content at the pleadings stage to "allow the court to draw the reasonable inference that

[Pittsfield]" violated McCoy's equal protection rights by intentionally treating other similarly

situated landowners differently.  Martinez, 792 F.3d at 179; see also Testa v. Salvatore Mancini

Res. & Activity Ctr., Inc., No. CV 18-00566-WES, 2019 WL 2929333, at *3 (D.R.I. July 8,

2019), report and recommendation adopted, No. 1:18-CV-566-MSM-LDA, 2020 WL 91554

(D.R.I. Jan. 8, 2020) (finding sufficient plaintiff's allegation that she, as an executive director

subject to an employment contract, was similarly situated to other "rank and file" employees

subject to a collective bargaining agreement).  The court accordingly cannot grant judgment on

the pleadings for Pittsfield on this basis alone.  Pittsfield may challenge the sufficiency of the

evidence of similarly situated comparators or other elements of McCoy's equal protection claim

through a properly supported motion under Rule 56 or Rule 50 later in the litigation.

### C.    Counts 3 and 4 (negligent and intentional infliction of emotional distress)

McCoy also asserts claims under New Hampshire law for negligent and intentional

infliction of emotional distress arising from the Town's order to remove his trailer.  Pittsfield

moves to dismiss these claims on various grounds,[31] but McCoy has not opposed that part of

Pittsfield's motion.  At oral argument, McCoy's counsel conceded that he is no longer pursuing

these claims and the court accordingly grants Pittsfield's motion and awards it judgment on the

pleadings on Counts 3 and 4.

---

[31] Doc. no. 10-1, at 7-10.

IV.    **Conclusion**

For the reasons set forth above, Pittsfield's motion for judgment on the pleadings[32] is

GRANTED as to Counts 3, 4, and the overbreadth portion of Count 1, and DENIED as to the

remainder of Count 1 and all of Count 2.  Counts 3 and 4 and the overbreadth portion of Count 1

are dismissed with prejudice.

    **SO ORDERED.**

    _____
    Joseph N. Laplante
    United States District Judge

Dated:  December 10, 2020

cc:    Robert M. Fojo, Esq.
       Robert Joseph Dietel, Esq.

---

[32] Doc. no. 10.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

JOSEPH McCOY                             )
                                        )
Plaintiff                               )
                                        )
v.                                      )        Civil Action No.:1:20-cv-00362-JL
                                        )        Jury Trial Demanded
TOWN OF PITTSFIELD                      )
                                        )
Defendant                               )

## **MOTION FOR SUMMARY JUDGMENT**

Defendant Town of Pittsfield moves for summary judgment pursuant to Fed. R. Civ. P. 56(c) and says:

1.      Plaintiff's Complaint, as narrowed by the Court's prior order (doc. 13), contains two claims. Count I alleges an as-applied vagueness challenge to the Town's zoning ordinance, and Count II alleges a "class of one" equal protection claim.

2.      The Town moves for summary judgment with respect to both counts because there are no genuine issues of material fact in dispute and the Town is entitled to judgment as a matter of law.

3.      The Town submits and incorporates, by reference, a memorandum of law and accompanying affidavits and exhibits in support of its motion for summary judgment. *See* Local Rule 7.1(a)(2).

4.      The Town did not seek Plaintiff's concurrence with respect to the relief requested herein due to the dispositive nature of this motion. *See* Local Rule 7.1(c).

28

WHEREFORE, the Town of Pittsfield respectfully requests that the Court:

A.  Grant this Motion for Summary Judgment; and

B.  Grant such other relief as the Court deems just and proper.

Respectfully submitted,

**TOWN OF PITTSFIELD**

By Its Attorneys,
GALLAGHER, CALLAHAN & GARTRELL, P.C.

Dated:  June 1, 2021             By:____/s/ Robert J. Dietel_____
Robert J. Dietel (#19540)
214 North Main Street
Concord, NH  03301
603-228-1181
dietel@gcglaw.com

## CERTIFICATE OF SERVICE

I, Robert J. Dietel, hereby certify that a copy of the foregoing was sent to all counsel of record via ECF.

Dated:  June 1, 2021             By:____/s/ Robert J. Dietel_____
Robert J. Dietel (#19540)

2

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

JOSEPH McCOY                                      )
                                                 )
Plaintiff                                        )
                                                 )
v.                                               )          Civil Action No.:1:20-cv-00362-JL
                                                 )          Jury Trial Demanded
TOWN OF PITTSFIELD                               )
                                                 )
Defendant                                        )

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION AND PROCEDURAL HISTORY

This past December, the Court ruled that Plaintiff Joseph McCoy's Complaint (doc. 1) contains "just enough factual allegations" to survive dismissal because, taken as true, it describes unconstitutional content or viewpoint discrimination by Defendant Town of Pittsfield. *See* Memorandum Order (doc. 13) ("Order") at 8.

With respect to Count I, the Court ruled that McCoy alleged "minimally sufficient facts to support a claim that the Town applied [its] ordinance against him…in a vague manner." *See* Order at 12. The Court accepted as true the allegation that the Town required him to remove his storage container because it "depicted 'TRUMP' in large letters" and that "a person of ordinary intelligence would not have fair notice of what was prohibited under the ordinance or what a trailer must look like in order to pass muster under the storage container section of the ordinance." *Id.*

With respect to Count II, the Court ruled that "liberally construed," McCoy alleges sufficient facts to state a "class of one" theory of equal protection liability; i.e., that he was harassed and singled out for enforcement of the ordinance, and required to remove his storage

30

container because of his support for Donald Trump, but "that the Town allowed other property owners to maintain unpermitted storage containers (without political speech written on them) on their property, and admitted this to him on several occasions." Order at 16.

McCoy's other allegations - an overbreadth challenge to the application of the ordinance, and allegations of intentional and negligent infliction of emotional distress - were dismissed with prejudice.

Since December, the Town has propounded Requests for Admission, Interrogatories and Requests for Production, and taken McCoy's deposition. The resulting record reveals that McCoy's claims are without foundation, and he knew or should have known that his allegations could not be substantiated prior to bringing suit. There is no evidence of discrimination. There is no evidence of selective enforcement. He cannot make out a "class of one" equal protection claim. And McCoy plainly knew the requirements of the ordinance and reasons for the Town's decisions. Despite his prior representations that he possesses evidence of discrimination, no such evidence has been produced. *See* Order at 15, FN 29 (noting assertion that supporting evidence exists). Summary judgment should enter for the Town.

## STATEMENT OF FACTS[1]

In early 2014, McCoy moved to 322 Catamount Road, Pittsfield, NH. Complaint (doc. 1), ¶¶ 1, 8. Approximately two weeks later, McCoy purchased a 52-foot trailer and had it delivered to his property empty (the "Storage Container"). Deposition of Joseph McCoy ("McCoy Dep."), attached hereto as Exhibit A, at 25:16-23. McCoy used the Storage Container to keep "tools and stuff" in it so that he could do maintenance to his property. *Id*. at 25:2-9.

---

[1] The following facts are undisputed for the purposes of this motion only.

In August 2015, the Town's then building inspector, Jesse Pacheco (the "Building Inspector"), visited McCoy's property to conduct an inspection relative to a building permit McCoy had obtained for work to his home. *See* McCoy Dep. at 26:8-23.

While visiting the McCoy property, the Building Inspector noticed the Storage Container and informed McCoy that it needed a permit. McCoy Dep. at 26:10-11 and 26:20-23. At that point (August 2015 ) the Storage Container had been on the property for a little over a year. *Id*. at 27:3-6. McCoy subsequently applied for and obtained a storage container permit effective September 1, 2015 (the "2015 Permit"). *Id*. at 26:20; Affidavit of Cara Marston ("Marston Aff."),  attached hereto as Exhibit B, at ¶ 6; *see also* Marston Aff., Exhibit 2.

The 2015 Permit was specific to the Storage Container, and informed McCoy of the Town's zoning ordinance requirements. *See* Martson Aff., Exhibit 2. In particular, the 2015 Permit recites that the Storage Container could be used for storage purposes only for a period of one year. *Id*. These requirements are plainly stated on the face of the permit, as shown by the following excerpt:

> Storage Containers, whether registered or not, whether mobile or stationery, are not allowed on a permanent basis in any zoning district within the Town of Pittsfield. A storage container is permitted for storage purposes only, for a period of one year, with the approval of a parking permit issued by the Board of Selectmen or their designee, provided said storage container meets all setback requirements, and as limited by the following; a) maximum of one storage container per lot in the Urban, Suburban or Rural Districts, b) maximum of two storage containers per lot in the Light Industrial/Commercial Districts.
>
> APPLICANTS NAME:  *Joseph McCoy*

*See* Martson Aff., Exhibit 2.

In 2015, sometime after securing the 2015 Permit, McCoy needed additional storage space, and rented a storage container (the "Rental Container"), which he placed between the Storage Container and his home. *See* McCoy Dep. at 21:16-19, 24:12-14.

In January 2016, during the run-up to the New Hampshire presidential primary, McCoy allowed his son to paint the side of the Storage Container with an image that reads "TRUMP! USA" with the date "2016" in smaller letters contained in the exclamation point. McCoy Dep. at 43:12-15. The image below shows the Storage Container as of January 29, 2016 and the Rental Container extending from behind it.



McCoy Dep. at Exhibit D.

The Storage Container continued to be used for storage during 2016 and after, but McCoy also considered it to be a sign. *See* McCoy Dep. at 46:9-10 ("It was somewhat a storage trailer, but then it was also my Trump trailer.").

 In August 2016 (three weeks before the 2015 Permit was set to expire), the Storage Container caught the attention of the local press and was the subject of an article in the *Concord Monitor*, published August 11, 2016. *See* McCoy Dep. at 44:9-17; Complaint ¶ 11. The Storage Container became widely known on social media and garnered a mix of praise and complaints from the public. *Id*. at 51:1-22 (acknowledging "[t]here was complaints and there was 'We love it.'").

On September 1, 2016, McCoy's 2015 Permit expired. As previously noted, under Article 14 of the zoning ordinance, such permits are for one year only, after which the storage container needs to be removed. *See* Marston Aff., Exhibit 1 at *32. When the Town is aware of zoning violations, it has taken action to enforce the zoning ordinance's terms. *See id*. at ¶ 25. Accordingly, the Town's Building Inspector wrote to McCoy sometime in September or October 2016, and informed McCoy that the 2015 Permit had expired, that the Storage Container needed to be removed, and specifically cited the authority for the directives (Article 14, Section 3 of the zoning ordinance). *See* Martson Aff., Exhibit 3 ("2016 Notice of Violation"). He also informed McCoy of his right to bring an appeal of the decision to the Town's zoning board of adjustment. *Id*. McCoy acknowledges having received the 2016 Notice of Violation. McCoy Dep. at 72:4-8.

Around this same time, McCoy alleges that he was also visited by the Building Inspector and told he would need to remove the Storage Container. McCoy Dep. at 72:8-11. He also required McCoy to remove the Rental Container, which did not feature any expressive content, and which had never been permitted by the Town. McCoy Dep. at 21:16-20, 40:5-8, 72:8-11.

5

34

McCoy further alleges that the Board of Selectman caused the Building Inspector "to remove it due to complaints." *Id*. 50:19-23. The Town, in fact, had received at least one anonymous complaint regarding McCoy's Storage Container in 2016, the specific content and source of which was not recorded. *See* Marston Aff. at ¶ 24. It is not unusual for the Town to receive anonymous complaints regarding alleged zoning violations. *See* Marston Aff. at ¶ 24. However, regardless of complaints, there is no question that the 2015 Permit had expired, and that the Town was aware of the expiration of the permit. *Id*. at ¶ 27. Prior to the publication of the *Concord Monitor* article, the Town was aware of McCoy's Storage Container due to McCoy's permit application and prior observation by the Building Inspector, and therefore, had specific knowledge that it was unlawfully on McCoy's property as of September 1, 2016. *See id*.

Following receipt of the 2016 Notice of Violation, McCoy wrote to the Board of Selectmen on November 3, 2016 and requested a six-month permit extension. Marston Aff., Exhibit 4 (the "Nov. 2016 Letter"). In his letter, he explained that he was having difficulty emptying the storage containers and needed additional time. *See id*. The Nov. 2016 Letter makes no mention of any need or desire by McCoy to use the Storage Container as a sign, and it is devoid of any mention of President Trump, or any alleged harassment by the Town, selectmen, or others.

On November 15, 2016, one week after the 2016 Presidential election, the Board of Selectmen met and considered McCoy's request for a six-month extension for the Storage Container. *See* Affidavit of Carl Anderson ("Anderson Aff."), attached hereto as Exhibit C, at ¶ 2. Based on the representations described in McCoy's letter - specifically, that McCoy was disabled and needed additional time to empty the Storage Container - the Board granted the extension. *Id*. The motion was made by Selectman Carl Anderson and passed by unanimous

6

35

vote. *Id*. At the time, the use of the Storage Container to express support for President Trump was publically well-known, and Anderson was specifically aware of such use, but it did not factor in deliberations. *Id*. at ¶ 3.

The Board's decision to grant a six-month extension was made despite the Town being aware of at least one complaint. *See* Marston Aff., at ¶ 24.  It was also made notwithstanding the plain language of the zoning ordinance, which provides, in pertinent part, that storage containers "shall be used for and only for storage" and may not be on a lot for more than 12 months in any one 15 month period. *See* Marston Aff, Exhibit 1 at 54.

As of November 2016, the Storage Container had been on the McCoy property for approximately two years, and was being used for both storage and expressive purposes. *See* McCoy Dep. at 46:9-10. Nevertheless, the only enforcement action that the Town took in 2016 with respect to McCoy, was notifying him of complaints, notifying him of the expiration of the 2016 Permit and his right to appeal, and requiring him to remove the Rental Container, which did not feature any expressive content. *See* McCoy Dep. at 21:16-20, 40:5-8.

In May 2017, the Building Inspector visited McCoy's property, and McCoy subsequently requested a meeting with the Board. *See* Marston Aff., Exhibit 5.

The Board met with McCoy on June 13, 2017 (McCoy's request had been tabled over from a prior May 23, 2017 meeting). *See* Marston Aff., Exhibit 6. As recited in the minutes of that meeting, McCoy represented to the Board that he was using the Storage Container for storing tools needed for repairs to his property, which was taking him longer than planned due to a disability. *Id*. at *10. There was no mention of the Storage Container being used for a sign or to express political content, or any allegation of harassment or discrimination.

During deliberations, the Board Chairman, Jim Allard, questioned if "there was an issue with extending the permit." *See* Martson Aff., Exhibit 5 at *10. The Town's administrator, Cara Marston, noted the 12 month limit in the zoning ordinance, and discussion followed as to whether the Town's zoning board of adjustment needed to be involved. *Id*. In apparent reference to the 12 month limit, the Building Inspector informed the Board that it had "no choice and must get rid of the trailer" but also noted that there are other trailers in Town "that have been there for a long time." *Id*. Selectwoman Carole Richardson inquired if the Storage Container would be removed after the year. *Id*. McCoy responded by confirming that "he just needed more time to do the work needed on their home." *Id*. The Board voted unanimously to grant the year extension. The Town then issued a new permit, which once again, informed McCoy of the zoning ordinance's requirements. *See* Martson Aff., Exhibit 7.

In granting another year extension, the Board allowed McCoy to keep the Storage Container on his property for a total of approximately four years (early 2014 through June 2018), when the ordinance allows only 12 months. It also did so, notwithstanding the fact that (1) the Storage Container continued to be used as a sign in support of President Trump, (2) the zoning ordinance provides storage containers may be used for storage only, and (3) despite the fact that McCoy has never applied for a sign permit. *See* Requests for Admission ("RFAs"), attached hereto as Exhibit D, at ¶¶ 38-40.[2] As in November 2016, there was no mention during the June 2017 meeting from McCoy or others of the Storage Container being used as a sign or any mention of any expressive content on it. *See* Martson Aff., Exhibit 5 at *10.

---

[2] The RFAs attached to the memorandum were admitted in full per Fed. R. Civ. P. 36(a)(3) because McCoy did not provide answers within 30 days of service, nor within a subsequent extension that was granted. *See* Affidavit of Robert J. Dietel ("Dietel Aff."), attached hereto as Exhibit F. McCoy's responses were not provided until 97 days after service of the RFAs. *Id*. Plaintiff has not moved to withdraw or set aside the admissions.

8

In the following month (July 2017), McCoy allowed the portion of the Storage Container that is the subject of the Complaint (the side facing the road) to be repainted with a scene of hot air balloons and a waving American flag. McCoy Dep., 83:19-84:6.[3] The following images depict the Storage Container prior to July 2017 and after its repainting in July 2017.



McCoy Dep., Exhibit A (depicting Storage Container pre-July 2017).



McCoy Dep., Exhibit H. (depicting Storage Container post-July 2017).

---

[3] McCoy contends in his deposition, and in responses to the Town's RFAs, that the rear doors of the Storage Container indicated some support for President Trump after July 2017. Whether they did or not, is not known to the Town, but also not material given that they are not the subject of the Complaint, as is plainly shown by the above images. *See also* Complaint ¶ 10 (describing sign as the image on the side of the Storage Container). There is also no allegation of discrimination or harassment in the Complaint with respect to the rear doors, nor any assertion or evidence that the Town knew what the rear doors looked like, or that they factored into any decision of the Town.

Over the course of the next year (June 2017-June 2018), the Storage Container displayed the balloon scene depicted at McCoy Dep., Exhibit H.

On May 22, 2018, the Board wrote to McCoy and reminded him that his 2017 Permit was set to expire in the following month and that the Storage Container would need to be removed. The Board noted that McCoy could apply for another permit provided the Storage Container was removed for three months. Marston Aff., at ¶ 17. McCoy responded to the Board's letter by requesting yet another extension. *Id*. at 18. This was his third request.

In a May 29, 2018 letter to the Board, McCoy once again requested an extension so that he could store personal belongings, as he had on two prior occasions in 2016 and 2017. He made no mention of any desire to maintain the Storage Container as a sign or to express support for President Trump. *See* Martson Aff., Exhibit 9.

The Board met on June 12, 2018 and considered McCoy's third request for an extension. *See* Martson Aff., ¶ 19. The Board discussed McCoy's prior permit history and his prior representations to the Board. *Id.* There was no discussion regarding the use of the Storage Container for any expressive purposes, nor its prior use to support President Trump. The Board voted unanimously to deny the request given the requirements of the zoning ordinance and prior extensions. The next day, on June 13, 2018, the Town Administrator wrote to McCoy and informed him of the Board's decision. *See* Martson Aff., ¶ 19, Exhibit 10. The letter contains a summary of the Board's reasoning, a portion of which follows:

> The Board of Selectmen considered your permit extension request dated May 29, 2018. While they note the personal circumstances that have caused delay, the Board has to balance the terms of the zoning ordinance with your request, and as you have already been granted a year's extension beyond the 12 months permitted, they voted to not grant this second extension.

*Id*. at Exhibit 10.

After receiving the Board's letter, McCoy sold the Storage Container to a local business. McCoy Dep., at 41:17. He has since decided that he does not want a Storage Container on his property. McCoy Dep., at 66:9-20 (stating "I wouldn't have a storage trailer in this town for nothing in the world…."). McCoy did not appeal the Board's decision. *See* Marston Aff., at ¶ 23.

The Board's June 2018 decision, denying a third extension, was not unique. In fact, on the very same night that it denied McCoy's request, it also voted to initiate enforcement action with respect to three unpermitted storage containers located on a different property at 140 Tilton Hill Road (the "Tilton Hill Trailers"). *See* Marston Aff., at ¶ 20. To the best of the Town's knowledge, the Tilton Hill Trailers did not display any expressive content.

On June 13, 2018, the same day the Board notified McCoy of its denial, it also sent a notice of violation to the owners of the Tilton Hill Trailers. *See* Marston Aff., Exhibit 11. The owners of the Tilton Hill Trailers subsequently applied for permits. *Id.* The owners were granted one storage container permit and required to remove the other two storage containers on their property. *Id.* This is similar to the treatment of McCoy in 2016, when McCoy was granted an extension for the Storage Container, but required to remove the Rental Container, which did not have any expressive content on its side.

In addition, the Board has since taken other enforcement measures with respect to Storage Containers in Town. It has required property owners to seek permits when the Town becomes specifically aware of unpermitted storage containers, and it has even taken a property owner to Court when compliance was not obtained. *See* Marston Aff., at ¶ 28. Because the Town has limited resources to dedicate to enforcement of the zoning ordinance, it has focused its enforcement efforts on instances where it is specifically aware of potential violations, as may

11

40

occur when it knows a permit has expired, receives complaints, or otherwise. *See id*. at ¶¶ 24-25, 28.

Despite the above history and factors, McCoy has alleged that his treatment by the Town was discriminatory and that he did not know of the reasons for the Board's decisions. In particular, he alleges that three individuals (Jim Allard, Larry Konopka, and Carl Anderson), "repeatedly harassed" him about his Storage Container. Complaint at ¶ 23. McCoy's Complaint does not describe what specific actions those individuals took with respect to him or his Storage Container. However, during Deposition, McCoy clarified the allegations.

In deposition, McCoy was asked:

> Q:    …I asked you what the Town did, what evidence you had that the town selectmen, the three individuals [Allard, Konopka, and Anderson], were trying to get this [Storage Container] off because it said "Trump." You said that you were informed that there were some complaints from some of the selectmen.
> A.    Complaints -- complaints by the building inspector and in the town minutes.
> Q.    Okay. What else?
> A.    Complaints.

McCoy Dep. at 98:2-99:6.

When pressed for further detail of the alleged discrimination, McCoy responded that he was told to get the Storage Container off his property and was told of "Complaints, complaints, complaints, complaints." McCoy Dep., at 99:19-20. In follow up, he was asked a final time to identify what specifically Allard, Konopka, and Anderson allegedly did to discriminate against him, and he responded as follows:

> Q:    I asked you a question. I said the only evidence you had that you were discriminated against because this was a Trump sign was because you said you were told about complaints.
> A.    Complaints.
> Q.    And I am asking you, there was nothing else?

12

A.      Just the complaints. And they would mention a permit, and that permit was illegal.

McCoy Dep. at 100:20-101:5.

McCoy was in fact informed of complaints. That point is not disputed. There is no question that the Building Inspector communicated with McCoy, and McCoy was informed he needed to obtain a permit, and remove the Rental Trailer, as detailed above.

Additionally, in 2017, Selectman Anderson was aware of complaints received by the Town regarding unpermitted storage containers, which he conveyed to McCoy. *See* Anderson Aff., at ¶ 7. The complaints did not relate to McCoy's use of the Storage Container to express support for President Trump, but rather, pertained to its permit status and that of other storage containers in Town. *Id*. Anderson shared this information with McCoy. *Id*., at ¶ 7; McCoy Dep. at 62:7-11.

Anderson - a life-long Republican and supporter of President Trump - was on friendly terms with McCoy at the time he shared the information regarding complaints. Anderson Aff., 12. In fact, McCoy has previously displayed a sign publically supporting Anderson in local Town elections. *See* McCoy Dep. at 62:4-12.

Later, in January 2020 (approximately a year and half after the June 2018 permitting decision), Anderson became aware that McCoy was spreading falsehoods regarding the Board's actions. *See* Anderson Aff., at ¶ 8. Accordingly, Anderson wrote to McCoy and explained his reasons for voting to deny McCoy's third permit request. *Id.*, Exhibit 1. In his letter, Anderson noted that he personally liked McCoy's support for Trump, but that Anderson believed he was required to enforce the ordinance on an even basis, stating "[t]he truth is you've been treated just like everyone else that has brought in a storage container or a permit has expired since we took

13

office!" Approximately two months after receiving Anderson's letter, McCoy filed the present suit against the Town.

## STANDARD OF REVIEW

When ruling on a motion for summary judgment, the Court must "constru[e] the record in the light most favorable to the nonmoving party and resolv[e] all reasonable inferences in that party's favor." *Pierce v. Cotuit Fire Dist.*, 741 F.3d 295, 301 (1st Cir. 2014). Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a). In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." *Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr.*, 103 F. 3d 196, 199–200 (1st Cir. 1996) (citations omitted). *See also Nolan v. CN8*, 656 F.3d 71, 76 (1st Cir. 2011). Nevertheless, if the non-moving party's "evidence is merely colorable, or is not significantly probative," no genuine dispute as to the material fact has been proved, and "summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (citations omitted).

## LEGAL ANALYSIS

I.  <u>The Town is entitled to summary judgment on McCoy's equal protection claim because the undisputed facts establish that there was no discrimination in the enforcement of the Town's zoning ordinance, the town had a rational basis for its decision, and he was not treated differently from other similarly situated individuals.</u>

In order to prevail on a "class of one" equal protection claim, McCoy must be able to present evidence upon which a reasonable jury could conclude that he was intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). The undisputed facts, however, make clear that there was no discrimination, the Town had a rational basis for its

14

43

treatment of McCoy, and McCoy fails to identify sufficient comparators to make out a "class of one" claim.

A. *The Town did not discriminate against McCoy*

No reasonable jury could examine the undisputed facts at issue in this case and conclude that McCoy was discriminated against based on his support for President Trump or his use of his Storage Container to express that support, or any other factor. To the contrary, the undisputed facts reveal that the Board exercised considerable discretion with respect to McCoy, and applied the zoning ordinance in an extremely light-handed manner with respect to his Storage Container.

The undisputed evidence is overwhelming:

- At the time the Board denied McCoy's 2018 permit request, the Storage Container no longer displayed the image "TRUMP! USA," and instead, depicted a balloon scene. McCoy admits this fact. Therefore, the central allegation in his suit - i.e., that "[t]he Board's order was based solely on the fact that the trailer depicted "TRUMP" in large letters" (Complaint, ¶ 20) - cannot be sustained.

- As of the June 2018 denial, the Storage Container had been on the property for approximately four years despite the ordinance's 12 month limitation.

- During the period of time in which McCoy's trailer was painted with the words "TRUMP! USA" he received two permits extensions (one on November 15, 2016 right after the presidential election, and another in June 2017), when in fact, the zoning ordinance does not provide for any extensions.

- The Board granted McCoy extensions despite the fact that it was aware of complaints regarding the trailers in both 2016 and 2017.

- The Board granted extensions in 2016 and 2017 despite the fact that McCoy was plainly in violation of the terms of the zoning ordinance.
  - Under the zoning ordinance, storage containers may be on a property for no more than 12 months in a 15 month period.
  - Under the zoning ordinance storage containers may be used for storage only, but McCoy admits he was using the Storage Container for dual purposes.

- Carl Anderson was on friendly terms with McCoy during the period when McCoy applied for permits, was a supporter of President Trump, and made the motion to approve McCoy's permit extension request in November 2016 when the Storage Container said "TRUMP! USA."

15

- During deposition, the only evidence McCoy was able to muster in support of discrimination was that he was informed - allegedly on multiple occasions - that the Town had received complaints and he needed to remove the trailer. These points are not in any way discriminatory or harassing on their own, and when pressed to provide more factual detail, McCoy could not muster a shred of any other evidence.[4]

In light of the above, McCoy cannot credibly allege that he was discriminated against. If anything, the Board allowed McCoy far more leeway in maintaining the Storage Container than the express terms of the ordinance provide. In deciding this motion for summary judgment, the Court need not go beyond this point. McCoy's equal protection claim should not be allowed to proceed to a jury given the overwhelming evidence in the record.

Nevertheless, even if there were some credible evidence of discrimination, McCoy's evidence of similarly situated comparators also fails. The undisputed facts demonstrate that McCoy was not treated differently from others. And the generic class of comparators relied on by McCoy - property owners with storage containers without expressive content - is woefully inadequate at this stage.

B. *McCoy's "class of one" claim fails because he does not identify <u>specific instances</u> where persons similarly situated <u>in all relevant aspects</u> were treated differently without any rational basis.*

To sustain a "class of one" equal protection claim, a plaintiff must identify <u>specific instances</u> where persons similarly situated <u>in all relevant</u> respects were treated differently without a rational basis. *See Buchanan v. Maine,* 469 F.3d 158, 178 (1st Cir.2006) ("Plaintiffs claiming an equal protection violation must first identify and relate *specific instances* where persons *situated similarly in all relevant aspects* were treated differently.") (*quoting Rubinovitz*

---

[4] On April 12, 2021, the Town propounded Interrogatories and Requests for Production, calling for McCoy to produce evidence of his claims. Per the agreed upon discovery plan, his responses were due on May 27, 2021. To date, no responses have been provided. *See* Dietel Aff. at ¶ 7. Additionally, McCoy's initial disclosures provide no evidence of any discrimination, harassment, or disparate treatment. *See* Initial Disclosures, attached hereto as Exhibit E. The exhibits referenced therein have not been provided by McCoy.

*v. Rogato*, 60 F.3d 906, 910 (1st Cir.1995). This requirement "is meant to be 'a very significant burden.'" *See Cordi-Allen*, 494 F.3d at 251 (internal citations omitted). In fact, "only in extreme circumstances will a land-use dispute give rise to an equal protection claim." *Torromeo v. Town of Fremont*, 438 F.3d 113, 118 (1st Cir.2006) (citation omitted). "Were the law otherwise, the federal court would be transmogrified into a supercharged version of a local zoning board—a zoning board on steroids, as it were." *Cordi-Allen*, 494 F.3d at 252.

Contrary to the above requirements, McCoy's "class of one" claim does not identify a single specific comparator. Instead, it is premised on a threadbare allegation that the Town singled him out for discrimination because of his support for President Trump, but allowed other unidentified storage containers in Town to evade regulation. Were this enough to sustain his claims, it would turn First Amendment precedent on its head. *See Cordi-Allen*, 494 F.3d at 251 (holding "[i]t is inadequate merely to point to nearby parcels in a vacuum and leave it to the municipality to disprove conclusory allegations that the owners of those parcels are similarly situated.")

Because McCoy does not identify any specific properties or individuals who were treated differently, he has not provided sufficient information to sustain his claims. *See id*. The burden is on McCoy to present this evidence, and not the Town. To do so, McCoy would need to identify specific properties that were in fact similarly situated in all relevant respects. Generic descriptions of other comparators are insufficient because "[v]arious factual traits, circumstantial nuances, and peculiarities can set entities apart, rendering them, by virtue of their differences, amenable to disparate treatment." *See Cordi-Allen*, 494 F.3d at 252 (quoting *Racine Charter One, Inc. v. Racine Unified Sch. Dist.*, 424 F.3d 677, 681 (7th Cir.2005).

17

In order to identify a storage container that is relevant in all respects to his own, McCoy

would need to identify a storage container with the following shared characteristics:

1. It must not be grandfathered under the zoning ordinance;
2. It must have been well known to the Town as needing a permit;
3. It must have received multiple permit extensions (for a total of several years at least) beyond what the ordinance allows;
4. It must have been the subject of complaints and public awareness and press;
5. It must have been used for a dual purposes (storage and something else);
6. The owner must have previously applied for permits and represented that he would remove the storage container but not follow through;
7. It must have been on a lot that had a history of other storage container violations, such as the unpermitted Rental Container on McCoy's property);
8. It must have been visible from a public road;
9. It must have had the above characteristics during the same time that McCoy sought a permit and was denied; and
10. It must have been in the same zoning district as McCoy (among other possible factors).

Absent such shared similarities, a reasonable jury could not conclude that McCoy has

identified an adequate comparator. *See Cordi-Allen*, 494 F.3d at 251 (holding in a class of one

equal protection claim, a plaintiff must show that they "engaged in the same activity ... without

such distinguishing or mitigating circumstances as would render the comparison inutile.").

In addition, McCoy also fails to identify any difference in treatment without rational

basis. While McCoy contends that the Town has allowed other unpermitted storage containers to

escape review because they did not contain political speech, this is plainly not true. For

example[5]:

- In June 2018, on the same day that the Board denied McCoy's third request for an extension, the Board initiated enforcement action with respect to the Tilton Hill Trailers as noted previously. As a result, one of those storage containers received a permit and the other two were removed. *See* Marston Aff., ¶ 28.

- In 2019, the Town brought suit to enforce Article 14 in *Town of Pittsfield v. James Hetu, et al*, Case No. 217-2019-cv-00663, Merrimack Superior Court. This action

---

[5] The examples recited in this motion are not comprehensive of all of the enforcement actions by the Town. They are intended as representative examples for the purpose of this motion.

arose following lengthy efforts to obtain compliance. *See* Marston Aff., ¶ 28, Exhibit 13.

- In the summer of 2019, the Town became aware of an unpermitted storage container at 11 Cram Avenue, issued a notice of violation, and subsequently received and approved a permit application. *See* Marston Aff., Exhibit 14. The Town's treatment with respect to the storage container at 11 Cram Avenue is consistent with the manner in which Mr. McCoy's 2015 Permit application was received and approved.

- With respect to McCoy, the Town allowed him to keep the Storage Container on his property in 2016 and 2017, but required the Rental Container, which did not display any expressive content, to be removed.

As the above demonstrates, there is ample history of the Town taking enforcement with respect to storage containers in Town, and not just with regard to McCoy. McCoy cannot identify any difference in treatment between him and other storage container, nor can he genuinely contend that the Town lacked a rational basis for denying his permit request in 2018.

Additionally, even if the Town was previously lax in enforcement, or inconsistent in application, that would not save McCoy's claims. *See Gray v. Town of Easton*, 115 F. Supp. 3d 312, 320 (D. Conn. 2015) ("the Equal Protection Clause does not require perfectly uniform enforcement efforts.") (*aff'd sub nom. Gray v. Maquat*, 669 F. App'x 4 (2d Cir. 2016)).

In the land-use context, the application and enforcement of regulations and ordinances may change over time, without it giving rise to a constitutional injury. As the First Circuit explained in *Cordi-Allen*, "[s]ince zoning bylaws, environmental standards, and licensing criteria may change over time, courts must be sensitive to the possibility that differential treatment—especially differential treatment following a time lag—may indicate a change in policy rather than an intent to discriminate." 494 F.3d 245, 253 (1st Cir. 2007) (quoting *Purze v. Vill. of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir.2002).

In light of the above, this Court should grant summary judgment for the Town with respect to Count II. *See Olech,* 528 U.S. at 565 (Breyer, J., concurring) (The "similarly situated"

requirement must be enforced with particular rigor in the land-use context because zoning decisions "will often, perhaps almost always, treat one landowner differently from another.").

II.    <u>The Town is entitled to summary judgment with respect to Count I (presenting an as-applied vagueness challenge) because no reasonable jury could find that the Town's ordinance, as applied to McCoy, was unconstitutionally vague.</u>

In Count I, McCoy alleges that a "person of reasonable intelligence would not have fair notice of what is prohibited under the ordinance or what a trailer must look like in order to pass muster under the storage container section of the ordinance" and that its application to McCoy could "be viewed as 'so standardless that it authorizes' some form of discriminatory enforcement." *See* Order, at 12 (clarifying Count I's factual allegations). The undisputed facts prove otherwise:

- McCoy had multiple conversations with the Building Inspector regarding the requirement that he obtain a permit for his Storage Container;

- McCoy received a Notice of Violation that informed him of the ordinance and the right to appeal decisions;

- McCoy met with the Board and discussed his Storage Container at length and was present while the Board debated the 12 month requirement and the status of other storage containers in Town;

- McCoy successfully applied for three permits (2015, 2016, and 2017);

- The Board gave McCoy advance notice of the expiration of his June 2017 permit and informed him of his right to seek a new permit after three months had passed;

- McCoy received written notice following the Board's June 2018 decision informing him of the basis for the Board's decision (*see* Marston Aff., Exhibit 12 (stating "the Board has to balance the terms of the zoning ordinance with your request, and as you have already been granted a year's extension beyond the 12 months permitted, they voted not to grant this second extenson");

- McCoy knew he needed to remove his unpermitted Rental Container in 2016 and did so;

- McCoy knew that the zoning ordinance was available for review and where to find it (*see* McCoy Dep., at 80:16-17 (acknowledging "you could go on the town website and read them")); and

- The ordinance, on its face, is plain, content neutral, and easily understood by a person of reasonable intelligence.

Given the above record, there can be no reasonable doubt that McCoy "in fact knew—or was chargeable with knowledge—that his conduct fell within the [ordinance's] proscriptions" and the reasons why he needed to remove the Storage Container in 2018. *See United States v. Cintolo,* 818 F.2d 980, 997 (1st Cir.).

III.  The Town is entitled to summary judgment because McCoy's claims of constitutional injury are not ripe because he did not pursue an appeal to the Town's zoning board of adjustment.

The Town zoning ordinance provides that the Board of Selectmen is the "zoning administrator" and, as such, is generally responsible for "administering and enforcing the zoning ordinance" including issuing storage container permits. *See* Marston Aff., Exhibit 1 at *7 (Article 1, Sec. 6); *see also* Marston Aff., Exhibit 1 at *54 (Article 14, Sec. 3(f)) ("The zoning ordinance administrator shall issue a permit for the STORAGE CONTAINER…"). However, when an individual is aggrieved by a decision of the Board with respect to a storage container permit, it is required to bring an appeal to the Town's zoning board of adjustment, or it loses its ability to challenge such decision. *See* Marston Aff., Exhibit 1 at *40 (Appeals to Board of Adjustment). Accordingly, despite the fact that the Board is the zoning administrator, it is the zoning board of adjustment that has final say over storage container permitting decisions if an appeal is pursued.

Given the above requirements, McCoy's allegations of unconstitutional enforcement - both his vagueness and class-of-one challenge - are not ripe. Specifically, he cannot claim that the Town subjected him to unequal protection of its laws, or applied the ordinance in a vague manner, if he did not avail himself of the procedures for resolving his claims at the municipal

level. If he had, it is possible the zoning board of adjustment could have overturned the Board's decision, or provided further reasoning regarding why the 2018 permit was denied, but this did not happen. Other federal circuits have reached the same conclusion regarding ripeness.

In *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342 (2d Cir.2005), the plaintiffs asserted First Amendment and RLUIPA claims based on allegations of discriminatory enforcement of a local zoning ordinance. On review, the Second Circuit Court of appeals extended the "final decision" requirements articulated in W*illiamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), to the plaintiffs' First Amendment and RLUIPA claims, and held they were not ripe because the plaintiffs had failed to appeal a cease-and-desist order and apply for a variance. In reaching its holding, the *Murphy* Court explained that in land-use contexts, "the *Williamson County* final decision requirement serves the essential goal of ripeness jurisprudence: it helps federal courts avoid entanglement in abstract disputes which would be better defined and more easily resolved with a more complete and concrete factual record." *See Guatay Christian Fellowship v. Cty. of San Diego*, 670 F.3d 957, 977 (9th Cir. 2011) (analyzing *Murphy*, 402 F.3d 342 (2d Cir.2005)). The *Murphy* Court noted, however, that in the First Amendment context, the final decision requirement should be "cautiously applied." *Id*. "Accordingly, it added a preliminary inquiry to its determination of whether the Murphys would be required to show that a final decision had been reached: (1) whether the Murphys experienced any immediate injury as a result of the government's actions, and (2) whether requiring them to pursue additional remedies would further define their alleged injuries." *Id*.

Applying the *Murphy* Court's analysis here, it is apparent McCoy's claims are not ripe. McCoy did not experience any immediate injury as a result of the Board's denial because, while

an appeal to the zoning board of adjustment was pending, he would have been able to maintain

his Storage Container on his property, and further, the Storage Container did not say "TRUMP!

USA" at the time. And, if McCoy had appealed, it would have further defined McCoy's alleged

injuries because if it had resulted in the grant of a permit, it would have negated any injury, and

regardless, it would have required each side (McCoy and the Board) to advance arguments to the

zoning board of adjustment as to why the Board's decision was lawful and reasonable or not.

The First Circuit, admittedly, has not directly addressed this issue. *See Roman Cath.*

*Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 90 (1st Cir. 2013) ("…we do not

resolve today the question of whether relaxed First Amendment ripeness standards apply

generally to claims predicated on alleged Free Exercise violations, nor do we resolve the

question of whether (and to what extent) *Williamson County* may apply to such claims.") (citing

*Murphy*, 402 F.3d 342 (2d Cir.2005)). But it has not precluded such a result, and the First Circuit

has recognized such claims can be dismissed " under general principles of prudential ripeness."

*Id*.

In light of the above, this Court should conclude that McCoy's claims are not ripe, lest it

invite property owners to short circuit state law procedures and create constitutional claims out

of any routine permit denial. "If disgruntled permit applicants could create constitutional claims

merely by alleging that they were treated differently from a similarly situated applicant, the

correctness of virtually any state permit denial would become subject to litigaton in federal

court." *Vill of Belle Terre v. Boraas*, 416 U.S. 1, 12 (1974) (Marshall, J, dissenting). Under the

facts in this case, there is no constitutional harm until the local board with final authority has had

the opportunity to weigh in and correct any perceived errors to the extent they exist. Until such

time, courts should issue restrain before wading into land-use disputes. *See Macone v. Wakefield*,

277 F.3d 1, 10 (1st Cir. 2002) (noting "extreme reluctance to entertain equal protection challenges to local planning decisions"); *Mangual v. Rotger–Sabat,* 317 F.3d 45, 59 (1st Cir.2003)("Determining ripeness requires evaluation of 'both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'")(quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)); *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.").

## CONCLUSION

The Town is entitled to summary judgment for the reasons set forth above.

Respectfully submitted,

**TOWN OF PITTSFIELD**

By Its Attorneys,
GALLAGHER, CALLAHAN & GARTRELL, P.C.

Dated: June 1, 2021          By:___/s/ Robert J. Dietel_____
Robert J. Dietel (#19540)
214 North Main Street
Concord, NH 03301
603-228-1181
dietel@gcglaw.com

## CERTIFICATE OF SERVICE

I, Robert J. Dietel, hereby certify that a copy of the foregoing was sent to all counsel of record via ECF.

Dated: June 1, 2021          By:___/s/ Robert J. Dietel_____
Robert J. Dietel



**EXHIBIT**
**A**
[MCCOY DEP.]

*In the Matter Of:*

MCCOY

vs

TOWN OF PITTSFIELD

---

JOSEPH MCCOY

May 07, 2021

---



**Certified**
**Videographers & Court Reporters**
**VIDEOCONFERENCING**

**603-666-4100**
**Toll Free: 1-888-212-2072**

814 Elm Street * Suite 400 * Manchester, NH  03101
Fax: 603-666-4145 * Email: info@avicorereporting.com
Website: www.avicorereporting.com

54

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Civil Action No.:
1:20-CV-00362-JL

* * * * * * * * * * * * * * * *
                                *
JOSEPH McCOY,                   *
                                *
        Plaintiff,              *
                                *
vs.                             *
                                *
TOWN OF PITTSFIELD, NH,         *
                                *
        Defendant.              *
                                *
* * * * * * * * * * * * * * * *


DEPOSITION OF JOSEPH McCOY

    Deposition taken by agreement of counsel via

Zoom on Friday, May 7, 2021, commencing at 1:00 P.M.



Court Reporter:
Tina L. Hayes, RPR, NH LCR #80
(RSA 310-A:161-181)

```
 1              A P P E A R A N C E S

 2  Representing the Plaintiff:

 3          FOJO LAW, PLLC
            121 Bay Street
 4          Manchester, NH  03104
            By:  Robert M. Fojo, Esquire
 5          (603)473-4694
            rfojo@fojolaw.com
 6
    Representing the Defendant:
 7
            GALLAGHER, CALLAHAN & GARTRELL, PC
 8          214 North Main Street
            Concord, NH  03301
 9          By:  Robert J. Dietel, Esquire
            (603)545-3613
10          dietel@gcglaw.com

11  Also present:

12          Cassandra Sferazo

13             S T I P U L A T I O N S

14
        It is agreed that the deposition shall be taken
15  in the first instance in stenotype and when
    transcribed may be used for all purposes for which
16  depositions are competent under the Federal Rules of
    Civil Procedure.
17
        Notice, filing, caption and all other
18  formalities are waived.  All objections except as to
    form are reserved and may be taken in court at time
19  of trial.

20      It is further agreed that if the deposition is
    not signed within 30 days, the signature of the
21  deponent is waived.

22

23
```

```
 1                      I N D E X

 2    WITNESS:

 3      Joseph McCoy

 4    EXAMINATION:                              PAGE

 5      By Mr. Dietel                             4

 6    ERRATA SHEET                              102

 7    CERTIFICATE OF REPORTER                   103

 8    EXHIBITS FOR IDENTIFICATION:

 9    MARKED           DESCRIPTION              PAGE

10    Exhibit A        Photograph                22

11    Exhibit B        Article 14, Storage Containers   31

12    Exhibit C        Town of Pittsfield Permit   38
                       for Storage Containers
13
      Exhibit D        Facebook Post dated         45
14                     January 29, 2016

15    Exhibit E        Notice of Violation Letter  70

16    Exhibit F        Handwritten Letter dated    76
                       November 3, 2016
17
      Exhibit G        Town of Pittsfield Permit   81
18                     for Storage Containers

19    Exhibit H        Facebook Post of Balloon    87
                       Picture dated July 30, 2017
20
      Exhibit I        Letter dated May 22, 2018   92
21
      Exhibit J        Letter dated May 29, 2018   93
22
         (Digital exhibits were provided to all counsel.)
23
```

4

```
 1              P R O C E E D I N G S

 2          MR. DIETEL:  We agree to the usual

 3      stipulations?

 4          MR. FOJO:  Yes.

 5                    JOSEPH McCOY,

 6  having been first duly sworn, was deposed and

 7  testified as follows:

 8                    EXAMINATION

 9  BY MR. DIETEL:

10      Q.   Mr. McCoy, I am Robert Dietel.  As I think

11  you know, I am counsel for the Town of Pittsfield.

12  And the purpose of today's meeting is obviously to

13  take your deposition and to go over some questions

14  with you about the facts of the case.

15          Before we get started and delve into those

16  details, I want to go over some ground rules with

17  you.  And I will start by saying that, you know,

18  since you said you can't -- you have got difficulty

19  hearing, I am going to need you to let me know --

20  you can raise a hand or something, but I am going to

21  need you to let me know if you are not hearing

22  anything that I am saying.

23      A.   Okay.
```

1    Q.    Similarly, if you are not understanding

2  any of the questions that I ask, I need you to let

3  me know that as well.

4    A.    Okay.

5    Q.    If you don't let me know, I am going to

6  assume that you understood and that you heard the

7  question and we're going to keep moving on.

8        The other thing that's important is, so

9  that the stenographer, the court reporter can get a

10  clear record, we're going to have to be careful that

11  we don't talk over each other, particularly given

12  that we're doing this by Zoom.  So you are going to

13  have to let me ask the questions, and then I will

14  stop, and you answer them -- I will let you answer

15  them, and then we can go back and forth from there.

16  I will do my best not to interrupt you.  You do your

17  best not to interrupt me.

18        If you give responses where you are

19  nodding your head or, you know, holding up a hand or

20  something like that, that doesn't get recorded.  So

21  I always need you to say your responses audibly so I

22  can hear them.

23        And if you need a break, you can let us

 1  know.  As long as there's not a question that's open

 2  and pending, we can take reasonable breaks from time

 3  to time.

 4          If your attorney, Robert, objects to

 5  something that I say, you are going to need to

 6  answer the question anyway unless he specifically

 7  instructs you not to.

 8          And, finally, and perhaps most

 9  importantly, Mr. McCoy, I know you just took your

10  oath, but I want to make sure you understand that

11  the testimony you are giving today is under oath and

12  that you have sworn to tell the truth.  Do you

13  understand that?

14       A.   Yes, sir, I do.

15       Q.   And do you understand all the instructions

16  I just explained to you?

17       A.   Basically, yes, I do.

18       Q.   Is there any specifically that you don't

19  understand?

20       A.   No.  I pretty much understand that -- with

21  my hearing, I am good.

22       Q.   Like I said, let me know if you are not

23  hearing anything.  You will see my lips moving,

1    so...

2        A.    Okay.

3        Q.    So, Mr. McCoy, for the record, can you

4    state your full name and tell us where you live?

5        A.    Joseph Edward McCoy.  And I live at

6    322 Catamount Road in Pittsfield, New Hampshire.

7        Q.    Any relation to the Hatfield McCoys?

8        A.    Yes.  They posted me on the front page of

9    the "Concord Monitor."

10        Q.    So where are you originally from?  I

11    understand you are not a lifelong resident of

12    Pittsfield; is that right?

13        A.    No.  I am originally from Ayer,

14    Massachusetts.

15        Q.    Okay.  And what brought you to

16    New Hampshire?

17        A.    Well, I have lived in New Hampshire and I

18    was working and -- working for myself and working

19    for local unions.  And I moved out of Manchester in

20    2014.  I had a lot of medical problems.  And I

21    bought my home out in the country to have a little

22    bit of quiet life.

23        Q.    Okay.  What was your profession?  What did

8

```
1   you do for a living?

2       A.   Carpenter.

3       Q.   A carpenter?

4       A.   Yes, sir.

5       Q.   Okay.  Residential construction or

6   commercial?  A little bit of everything?

7       A.   Everything.

8       Q.   Yeah.  Yeah.  Where did you learn that

9   trade?

10      A.   From my father when I was 14.  18 I

11  started working for Century 21, and I worked for

12  myself.  Then I got into local unions, and I was

13  running jobs all over New England.

14      Q.   Do you do that still?  Do you have -- are

15  you employed now?

16      A.   No.  I had an accident in 2010 and

17  multiple surgeries 2014.  I ended up with a metal

18  rod in my leg, gangrene, pseudomonas infection,

19  shock treatment, heart attack.  So I have been going

20  through some stuff over the years.

21      Q.   I am sorry to hear that, Mr. McCoy.  It

22  doesn't sound fun.  How are you doing now?

23      A.   I am okay.  I just don't get along like --
```

1  move around like I used to.

2      Q.    Yeah.  Yeah.  So what year did you move to

3  Pittsfield?

4      A.    About June or July 2014.

5      Q.    Okay.  How did you settle on the property

6  where you are now?

7      A.    Excuse me?

8      Q.    How did you choose the property where you

9  are now?

10     A.    Me and my wife was riding around looking

11  at properties.  And when I seen this place, we liked

12  it; so we bought it.

13     Q.    Okay.  Mr. McCoy, I meant to ask you at

14  the outset.  Have you ever been deposed before?

15     A.    In a lawsuit I had concerning my

16  construction.

17     Q.    Okay.  When was that?

18     A.    That was in possibly -- I am not really

19  sure of the date, but sometime in 2013.  They

20  settled out of court 2014.  So between there is when

21  I was deposed.

22     Q.    Okay.  Is that the only lawsuit -- that

23  and this one the only lawsuits you have ever been a

 1    party to?

 2         A.    As far as I know, yes.

 3         Q.    As far as you know?

 4         A.    Yeah.

 5         Q.    So, to your knowledge, you have never been

 6    a party to another lawsuit?

 7         A.    Well, before, there was one that didn't

 8    make it concerning the doctor and the dirty needle

 9    which ended up giving me pseudomonas and gangrene.

10    And my lawyer, they just didn't do good; so they

11    dropped my lawsuit.

12         Q.    Okay.  Have you ever been arrested or

13    convicted of a crime before?

14         A.    I would like to keep that to myself, if

15    possible, because I do not think it would concern my

16    case here.

17         Q.    I understand that, Mr. McCoy.  But I am

18    allowed to ask and you do have to tell me.

19              MR. FOJO:  Joe, it's okay for you to

20         answer it.  We can -- that's all I will say.

21              MR. DIETEL:  Robert, what's the basis for

22         your objection?

23              MR. FOJO:  I am not objecting.  I just

```
 1        told him it's okay for him to answer.
 2             MR. DIETEL:  I thought you said for him
 3        not to.
 4             MR. FOJO:  No, no.  I am not objecting.
 5        It's appropriate.  It's fine.
 6             Joe, we can always move to exclude
 7        information on various evidentiary grounds
 8        later.  But for now, there's no objection that
 9        I can lobby against the question; so you have
10        to answer it.  It's okay to answer it.
11             THE WITNESS:  Okay.
12        Q.  (By Mr. Dietel) So, Mr. McCoy, the
13   question was have you ever been arrested or
14   convicted of a crime before?
15        A.   Yes.
16        Q.   And what was -- how many times?
17        A.   I have no idea.  Three, four, five.  And I
18   had one major one.  I ended up accidentally shooting
19   a police officer, and I ended up doing 20 years in
20   prison for that.
21        Q.   Where was that, Mr. McCoy?
22        A.   That was in Georgia.
23        Q.   Georgia?
```

1    A.    Yeah.

2    Q.    What brought you down to Georgia?

3    A.    After Elvis Presley died, I just decided

4   to go south.  And I had worked down there with some

5   of my friends; so I went down there and stayed down

6   there to 2004, from '78 to 2004.  Then I came back

7   to Massachusetts, stayed 10 years, and moved to

8   New Hampshire.

9    Q.    So where were you incarcerated?

10    A.    Many prisons in Georgia.  My longest stint

11   was in Reidsville State Prison.  And I spent three

12   years -- a little over three years in lockdown.  It

13   was -- it was a difficult time.

14    Q.    And so what year was that that you had the

15   shooting?

16    A.    1984.

17    Q.    Okay.  You said, though, that you were

18   incarcerated from 1978 to 2004.  Was there something

19   prior to that?

20    A.    No.  You had asked me -- my -- my response

21   to that question, you asked me when I had moved to

22   Georgia and I said in 1978.  And I came back up

23   north 2004.  I wasn't -- I didn't say I was

1  incarcerated then.

2      Q.    Okay.  So what years -- so you were

3  incarcerated from 1984 to 2004?

4      A.    Yes.

5      Q.    Okay.  What other crimes have you been

6  arrested or charged with previously?

7      A.    When I was a kid, stolen vehicle.

8      Q.    What else?

9      A.    A burglary.  And that's about as far as I

10  want to go because I really don't remember all that

11  way back.  I am in a short of mind right now.

12      Q.    Well, Mr. McCoy, I am going to ask you, if

13  there's any others that you remember, you need to

14  tell me.

15      A.    If it's on my record and -- right now, I

16  don't remember.  That's the only thing I can tell

17  you.  My record is public knowledge if you want to

18  look at it.

19      Q.    Have you ever been charged or accused of

20  committing perjury?

21      A.    No.

22      Q.    Ever been charged with any crimes that

23  relate to your truthfulness?

```
 1        A.    No.  Not that I am aware of, no.

 2        Q.    Okay.  Since 2004, when you were released

 3   from prison, have you been charged or arrested --

 4   arrested or charged with a crime?

 5        A.    I was arrested in -- July 31, 2015, I was

 6   coming out of Walmart in Concord.  And a

 7   motorcyclist hit me, hit my truck from behind, and

 8   he was a retired Hampton police officer.  And they

 9   wanted to charge me with vehicular homicide.  And it

10   ended up when I had a lawyer.  The officer was found

11   to be 67, 66 years old, retired.  He was on

12   methamphetamine, Viagra, driving erratically.  And I

13   ended up -- plea bargained to a misdemeanor of

14   failure of right-of-way or some misdemeanor like

15   that.  I don't really remember.

16        Q.    Okay.  That was back in 2015, you said?

17        A.    2015.  And then in 2017, I been buying

18   storage units at auction since I can't work no more.

19   I posted on Craigslist I had a book of world coins.

20   And the same Concord Police Department detectives

21   and all of them, they answered my ad on Craigslist.

22   They wanted to buy them.  They came up here and they

23   had told me that my coins, which I have owned for
```

1  over 10 years, were stolen in a burglary.  They

2  arrested me for receiving stolen property.  And they

3  did a lot of lying; the cops did.

4        And my case went to trial, I am thinking,

5  March of 2018, right around there.  And the jury was

6  out 12 minutes and I was found not guilty.  They

7  were my coins, my property.  And the same cops who

8  was involved in the motorcycle accident tried to get

9  me for this.

10     Q.   Why did they believe you had stolen

11 property?

12     A.   Well, Detective Croft, who was in charge

13 of it, made some statement that -- the elderly lady,

14 her husband passed.  And he showed -- he showed her

15 them coins.  She immediately identified them as

16 hers.  When she was placed on the witness stand,

17 looked at the coins, she had never seen the coins.

18        Detective Croft, instead of -- they

19 charged me for a felony, said the coins were valued

20 at $4,000.  They were not.  Once my lawyer, Alex

21 Vitale, went and had them checked, they were valued

22 at $300.  But the detective, instead of

23 investigating the cause, went to a justice of the

1  peace, raised his right hand, and said, "We need to

2  arrest him for felony receiving stolen property."

3  And that's what they did.

4          And after the court case, there was -- a

5  lot of evidence come out that -- basically, there

6  was a lot of lies involved with the police who was

7  trying to target me for the motorcycle accident

8  and -- the motorcycle accident because of my

9  involvement in the shooting in '84.  So it was

10  target, target, target.  And they got -- they got

11  proved to be very misleading in that case.  Like I

12  said, the jury was out 12 minutes:  "Not guilty."

13      Q.   Okay.  So you had the car accident.  You

14  were charged with the stolen property.  Any other

15  charges or arrests since 2004?

16      A.   No.  None since I was been out.

17      Q.   Okay.  How did you choose this property in

18  Pittsfield?

19      A.   Well, like I said, me and my wife went

20  driving around looking at properties to buy because

21  we wanted to move.  And I had contacted the owner

22  here; so we stopped by and looked at the place.

23  Nice place, 3 acres.  It was out in the country.  I

1   have got my own pond.  I had a humongous garage,

2   three-bedroom home.  So I liked it, and we

3   decided -- when we left here, my wife had told me,

4   "We gonna buy that?  I want to."  And I said, "Yes."

5   So immediately, when we was leaving, spit on the

6   hand and shook on the deal and we bought this place.

7        Q.   Sounds pretty nice, Mr. McCoy.  Pittsfield

8   is a nice town, isn't it?

9        A.   Yes, it is.  It is.  I like it.  Some

10  things I don't like.  But it is a nice, quiet town.

11       Q.   Yeah.  Yeah.  How much did you pay for the

12  property?

13       A.   $124,000.

14       Q.   All right.  Who owned it previously?  Who

15  did you buy it from?

16       A.   A person named Bobby Brown.  He lived

17  across the street, an old farmhouse.  He was born

18  there and he owned, like, 70, 80 acres.  And he had

19  sold that and set up on this place across the street

20  from where he was born.

21       Q.   Okay.  Is he still kicking around?

22       A.   No.  He -- the reason I -- we did it real

23  quick, the transaction, he was -- had three heart

1   attacks.  His wife was on oxygen and he wanted to

2   get her placed in an elderly home before he passed.

3   So we hurried up and did the transaction.  And he

4   would come up and sit with me.  And about six months

5   later, he had passed.  He was a good guy.

6        Q.   Did he have any trailers on the property

7   when you bought it?

8        A.   No.  There was no trailers on the property

9   when I bought the property.

10       Q.   What about on any of your neighbors'

11  properties that you can see from yours?

12       A.   From -- see from my house?  I have only

13  got two neighbors, one across the street and one

14  down at the end of my driveway.  They don't have

15  trailers.  But if you ride around Pittsfield, you

16  are going to see trailers, trailers, trailers,

17  trailers all over the place.

18       Q.   Okay.  Did you say -- I thought I heard

19  you say earlier that you buy trailers at auction?

20       A.   No.  I buy storage units at auction.

21       Q.   Storage units at auction.  Tell me the

22  difference.

23       A.   What would -- the difference?  I don't

1    understand.

2         Q.    Well, when I think of a trailer, I am

3    thinking of, like, the trailer on the back, a

4    tractor-trailer?

5         A.    No.  This would be just like your TV show

6    "Storage Wars."

7         Q.    Oh, okay.  All right.

8         A.    That's what I did.

9         Q.    So you are talking about, like, storage

10   containers that are fixed, at a facility --

11        A.    Yeah, facility.

12        Q.    -- people put stuff in, and you buy and

13   you don't know what's inside?

14        A.    Correct.

15        Q.    So let's -- I am going to try and share my

16   screen with you, Mr. McCoy, and we'll see how this

17   works.  I am not the best at Zoom; so bear with me

18   for one minute here.

19        A.    Okay.  You don't mind if I smoke a

20   cigarette while we're doing this?

21        Q.    I do not mind, Mr. McCoy.

22        A.    All right.  Thank you.

23        Q.    So can you tell me what you are seeing on

1    the -- can you see my screen now?

2        A.   I see my Trump trailer.

3        Q.   All right.  So tell me:  What is this a

4    picture of?

5        A.   That is my Trump trailer that I brought up

6    here when I moved here in 2014.  But at that time,

7    it did not have the "Trump" symbol on it.  But that

8    is -- that is my President right there.  That's who

9    I was voting for; very, very strong about Mr. Trump.

10        Q.   I suspect we can agree democracy is an

11    important thing; right, Mr. McCoy?

12        A.   Excuse me?

13        Q.   I said democracy is an important thing;

14    right?

15        A.   I think what you believe in is the

16    important thing.

17        Q.   Yeah.  And, Mr. McCoy, can you see in this

18    picture -- can you describe to me what's underneath

19    where it says "Trump"?  There's two vehicles there?

20        A.   Yes.  There's two four-wheelers that I

21    purchased when I moved here and just some other

22    stuff up under it.

23        Q.   And what am I looking at behind the

1    trailer there?

2         A.   That is a building on the -- you are

3    talking about on the left side?

4         Q.   Well, it looks like you can see underneath

5    the trailer another trailer behind it?

6         A.   Oh, yes.  That was a trailer that I had

7    rented from Tommy Trailer [sic].  He owns a trailer

8    place in town, and he has over -- he's in the

9    commercial district and he has over 30, 40 trailers,

10   school buses, everything on his property in the --

11   in the commercial district downtown.  And at the

12   time -- do you see that building to the left?

13        Q.   Yes.

14        A.   I had bought a storage unit.  And that

15   entire building, from window, door, shingle, siding

16   wood, everything, was in that storage unit.  And I

17   had rented that trailer there to place all that

18   stuff in while I was building it and making repairs

19   on my property.  And that trailer I was told also

20   had to go.  I did not have a permit for that

21   trailer.  I did not need a permit, just like I don't

22   think I needed a permit for my other trailer.  But

23   the select board told me both of them have to go.

```
1        Q.   So, Mr. McCoy, when we talk about the

2   trailer, can we agree we're talking about the

3   trailer that's in this picture that we're looking

4   at?

5        A.   I don't understand.  Could you explain?

6        Q.   Sure.  We're going to be talking about the

7   trailer throughout this deposition.  And I just want

8   to have an agreement with you that when we talk

9   about the trailer, this is the thing we're talking

10  about?

11       A.   Yes, my Trump trailer.

12       Q.   Yeah.  Okay.

13       A.   I understand.

14          MR. DIETEL:  All right.  So, Robert, I

15       will mark this as Exhibit A.  And since we're

16       doing this by Zoom -- I know it's a little

17       different, but my plan will be to send you all

18       of the exhibits afterwards, if that works for

19       you.

20          MR. FOJO:  Fine.

21          (J. McCoy Deposition Exhibit A was marked

22       for identification.)

23       Q.   (By Mr. Dietel) All right.  So my screen
```

1   should be off now.

2           So the Trump trailer, Mr. McCoy, where did

3   you get that from?

4       A.   I had bought that when I moved up here

5   from a person in Londonderry named Dollar Bill.

6       Q.   When you say when you moved up here, do

7   you mean when you moved to Pittsfield?

8       A.   Yes, when I moved to Pittsfield.

9       Q.   Okay.  Had you researched before you

10  bought it if you could have it on your property?

11  Had you done anything to look at the zoning

12  ordinance?

13      A.   Well, I did not because there were so many

14  trailers around town.  And it sat there until I

15  painted "Trump" on it with no problem, no

16  complaints, no nothing.  And nobody ever approached

17  me.  I didn't understand.  Plus I was in and out of

18  hospitals, physicals, and I was more concerned about

19  myself.

20      Q.   How much did you pay for the Trump

21  trailer?

22      A.   Before it was Trump?

23      Q.   Yeah.

1        A.    $1,200.

2        Q.    Okay.  And how did you get it to the

3  property?

4        A.    Dollar Bill's transporter.  I paid him to

5  drive it from Londonderry up to my property.

6        Q.    Okay.  Can you describe the trailer to me?

7  I mean, physically, what's it like?

8        A.    I don't understand the question.

9        Q.    Well, I will rephrase it.  Is it the same

10  size as the trailer you had behind it, the one that

11  you rented?

12        A.    No.  The one I rented was a 20-foot sit-

13  on-the-ground storage container that Tommy Trailer

14  delivered up here when I needed it.

15        Q.    Okay.  And the Trump trailer was about

16  52 feet long you alleged in your complaint?

17        A.    I believe it was that.  I have never

18  measured it, but I believe that was the size.

19        Q.    Okay.  Was $1,200 a good price for it?

20        A.    To me, it was, yes.

21        Q.    What's the -- if you know, what's, like,

22  the going rate for a 52-foot tractor-trailer?

23        A.    I have no idea.

1      Q.   Okay.  What were you using it for?

2      A.   At that time, the process of moving.  I

3  moved from Manchester up here.  I had a lot of

4  belongings.  I had also bought a lot of storage

5  units, and I placed some of that in there.  And I

6  was also using it because I had to redo my -- keep

7  my tools and stuff in and I had to redo my deck,

8  redo my garage.  There was maintenance that needed

9  to be done on my property.  And I was not physically

10  able just to get out there and do it.  It had to

11  take years.  And there's still work that needs to be

12  done, but physically I am not really capable of

13  doing a lot.

14      Q.   Yeah.  Yeah.  So you had it before you

15  moved to Pittsfield?

16      A.   No.  I bought it about two weeks -- I

17  don't exactly know the date -- just a couple weeks

18  after I had moved here.  I still had to empty my

19  place out in Manchester.

20      Q.   I see.  And then you loaded it up with

21  stuff on the property?

22      A.   No.  It was placed here empty.

23      Q.   Okay.

 1        A.    And as I moved up, I put some of it in

 2    there.

 3        Q.    Okay.  So you got a permit for the Trump

 4    trailer back in 2015; right?

 5        A.    Correct.

 6        Q.    Okay.  How did you know to go apply for a

 7    permit?

 8        A.    The building inspector, Jesse Pacheco, he

 9    had came up.  I got a permit for my building that I

10    built.  And he had told me that I also needed a

11    permit for that trailer.  I had -- did not know,

12    never talked to anybody, never seen anybody.  So I

13    ended up getting a permit from him.  He was the

14    building inspector in charge of permits for storage

15    trailers, and he gave me a permit.

16        Q.    Yeah.  About when would you say you had

17    that conversation with him?  When did he come out to

18    look at your property?

19        A.    Oh, it had to be end of August 2015,

20    because he gave me the permit September 2015.  So

21    when he came up to inspect my building, make sure it

22    was -- the permit and everything was good, he

23    noticed the trailer.  So it was end of August 2015,

1  because I got a permit September the 1st, I believe,

2  2016 [sic].  So it was in a couple weeks.

3      Q.   Okay.  So you had had it on your property

4  for about year before you got the permit?

5      A.   July -- July -- yeah, a little over a

6  year.

7      Q.   Okay.  Did you check the zoning ordinance

8  before you went and got the permit?

9      A.   No.  I had no idea about zoning ordinance.

10  I never owned my own property, had no idea what was

11  needed.  Then I just moved it up here, because they

12  was all over the place.  That's why I moved it

13  there.

14      Q.   Okay.  You have since reviewed the town

15  zoning ordinance; right?

16      A.   Some of them.

17      Q.   Some of them?  Have you reviewed

18  Article 14 dealing with the storage containers?

19      A.   I don't know what Article 14 is.

20      Q.   Okay.  Have you reviewed the sections of

21  the zoning ordinance dealing with storage

22  containers?

23      A.   Some of them.  But I couldn't tell you

1  which is which because I am not into ordinances and

2  all that stuff.  I have been given some over the

3  years, ordinances, and I was given my permit.

4       Q.   All right.  I am going to show you

5  another.  Let's see if I can do this again.  I am

6  going to show you my screen again.

7       A.    Yeah.

8       Q.   All right.  Do you see a document,

9  Mr. McCoy, that says "Article 14, Storage

10  Containers"?

11       A.    I see it, yes.

12       Q.    Okay.  And do you know what this is?

13       A.     It's an ordinance, as far as I know.  I

14  don't know if the ordinance -- if the ordinance is

15  correct, if it was -- I don't know much about

16  ordinances, but I see your ordinance -- the

17  ordinance here.

18       Q.    Okay.  Well, I will tell you this is a

19  copy of the town's zoning ordinance that I pulled

20  off their website today.  Do you have any reason to

21  doubt that?

22       A.    Well --

23       Q.    I will give you a second to take a look at

```
 1   it.

 2        A.   Would this be the same ordinance that was

 3   in compliance when I moved here, or is this the one

 4   that has been redone?

 5        Q.   This is the current zoning ordinance.

 6        A.   Yeah.  Then I -- I have no understanding

 7   with that.  I have no connection to any ordinances

 8   as of today.

 9        Q.   Okay.  Let me ask you:  Do you see my

10   mouse?  It's the little hand moving around on the

11   screen?

12        A.   Yeah.

13        Q.   Okay.  It's next to this.  It's

14   Section 3(a).

15        A.   I see that.

16        Q.   Can you read to me what it says on this

17   line?

18        A.   That says (as read) "The storage container

19   shall be used for and only storage."

20        Q.   Okay.  And what does that mean to you?

21        A.   Well, on my permit, it completely says

22   something else.  It says a storage container can be

23   used for storage or other purposes.  So at the time
```

1  I got my permit, I was going by what was on my

2  permit:  could be used for storage or other

3  purposes.  And at the time, I wasn't into

4  ordinances.  But I don't -- I did not see this back

5  when I was involved with ordinances.

6      Q.  Okay.  Well, that's not the question I

7  asked you, Mr. McCoy.  What I asked you was what

8  does this line that you are reading here today mean

9  to you today?

10      A.  Well, today it wouldn't mean anything to

11  me because I don't have a storage container.

12      Q.  All right.  Well, I am not asking you if

13  you had a storage container.

14      A.  You asked me what it means today.  And it

15  doesn't mean anything to me today because this is --

16  I don't see these things.  And I have no use for

17  this today; so it doesn't mean anything to me.

18      Q.  Okay.  Well, let me ask this a different

19  way because you strike me as somebody, Mr. McCoy,

20  who, you know, words are important to you.

21      A.  Excuse me.  Can you say that again?

22      Q.  I said you strike me as somebody where

23  words are important to you.

1      A.    Words are --

2      Q.    So I will ask you.  This says "The storage

3  container shall be used for and only for storage."

4  So under the town's ordinance, could I use a storage

5  container as a bowling alley?

6           MR. FOJO:  Object to form.

7      A.    You would have to ask the town.

8      Q.    (By Mr. Dietel) Okay.  So you have no

9  opinion?  You don't know what that means?

10     A.    I just know that what you saying today,

11  that doesn't concern me.

12     Q.    Doesn't concern you?  Okay.

13          MR. DIETEL:  I am going to mark this as

14     Exhibit B.  This is the Article 14, Storage

15     Containers.

16          (J. McCoy Deposition Exhibit B was marked

17     for identification.)

18     Q.    (By Mr. Dietel) So, Mr. McCoy, you said

19  that you are familiar with your 2015 permit?

20     A.    Yes.  I have it.

21     Q.    All right.  So we're going to pull that up

22  and look at that now.

23          All right.  Mr. McCoy, do you see a

1    document that says "Town of Pittsfield Permit for

2    Storage Containers"?

3         A.   I see it.

4         Q.   So what is this document we're looking at?

5         A.   That is the document that Jesse gave me

6    for my container out there when he came up to

7    inspect my building and noticed my trailer.

8         Q.   Okay.  So you applied for this; right?

9         A.   Yes.

10        Q.   That's your signature on the document?

11        A.   That is my signature on that document.

12        Q.   Okay.  And you read this before you signed

13   it?

14        A.   I couldn't testify that I read the whole

15   thing because back in 2015 I was still involved in

16   medical.  So I can't say that I read everything, but

17   I listened to the building inspector and what he

18   told me.  And when I seen up top "used for storage

19   and other purposes," I thought I was okay.  But I

20   did not know that I did not need a permit.

21        Q.   So where does it say on this document "for

22   other purposes," Mr. McCoy?

23        A.   If you read right up under the main term

1    "Permit for Storage Containers," it says "Storage

2    containers:  Shall mean any truck trailer, box

3    trailer, school bus, mobile home, or other similar

4    facility used for storage or other purposes."

5        Q.    Okay.  Can we agree, Mr. McCoy, that it

6    then goes on to say "A storage container is

7    permitted for storage purposes only for a period of

8    one year"?

9        A.    That's what it says.

10       Q.    Can you keep it there for more than one

11   year?

12           MR. FOJO:  Object to form.

13       A.    Excuse me?

14       Q.    (By Mr. Dietel) So we just read that.  It

15   says "A storage container is permitted for storage

16   purposes only for a period of one year."  So can you

17   keep a trailer on your property, a storage

18   container, for more than one year?

19           MR. FOJO:  Object to form.

20       A.    Well, I would have to say what I am

21   reading is their ordinance.  But with all the other

22   trailers in town, including board members that have

23   these trailers and they have no permits and they

1  keep theirs -- so my point is, if they can do it,

2  they have had it before I moved here.  They still

3  have them there on their properties today.  I should

4  have been able to have my permit -- keep my trailer.

5  Not permit.  Keep my trailer.

6       Q.   (By Mr. Dietel) I understand the point you

7  are making, Mr. McCoy, but that was not the question

8  that I asked you.  What I asked you is, under the

9  permit's terms, can you keep a trailer for more than

10  one year?

11          MR. FOJO:  Object to form.

12       A.   Excuse me?  If you want me just to say yes

13  as far as what it is there, you take my answer as

14  yes.  But my answer would be everybody has storage

15  trailers, including board members, with no permits.

16  I was doing the right thing.  I was told to get a

17  permit.  And from then on, my permit became the only

18  permit in the town of Pittsfield.

19          So if it says you can't keep it there for

20  no more than one year, it doesn't say that I cannot

21  renew or get another permit, which I was trying to

22  do because of my disability.  And that's what I was

23  doing with the trailer.

1    Q    (By Mr. Dietel) Okay.  And what does it

2  say at the bottom of the document?  What's that last

3  line at the very bottom say?

4    A.    It says "Unit must be removed one year

5  from the approved date above."

6    Q.    So can we agree you got approved on

7  September 1, 2015; so you had to take your trailer

8  off by September 1, 2016?

9    A.    No.

10    Q.    No?  Why not?

11    A.    Because there was no permits for storage

12  trailers back then from what I have found out.  And,

13  again, I was given another permit due to my needs by

14  the select board to extend it from May 2017 through

15  June 2018.  I asked for an extension on the permit.

16  There is nothing that says you can't ask for another

17  extension.  It just says for one year.

18    Q.    I am asking a question, Mr. McCoy.

19    A.    My answer would be, if this only applies

20  to me, not the board members, not the other people

21  in town or anything, it falls under my impression

22  that September, after my trailer ran out, they were

23  targeting me on my Trump trailer.  That's my

36

1    understanding, my belief.  And when they came to me

2    a year later and said, "You got to get rid of it due

3    to complaints," nobody would tell me complaints.

4    But, yet again, this permit right here is probably

5    the only permit you are going to find in town during

6    that duration, from when I brought my trailer here

7    until my trailer was forced off my property.

8             And if it -- if you want to do the reading

9    as it is, why does everybody else in this town,

10   including board members and defendant, not have this

11   to concern what they have and still have, as of

12   today, on their property?  That's my problem.

13        Q.   So, Mr. McCoy, we agree this document says

14   that a storage container is permitted for storage

15   purposes only; correct?

16        A.   From what the document says, yes.

17        Q.   Yes.  And at the bottom, it says it has to

18   be removed after one year; correct?

19        A.   That's what it says.

20        Q.   And you are capable of reading those

21   sentences; correct?

22        A.   Yes.  And I am also capable of knowing,

23   due to my physical condition, there's no way I could

1  have done it if they come and approached me on

2  September 1, which they did not, because there's

3  others in the town.  I was in the position to take

4  care of my storage but physically unable.  And if

5  you read my letter, I am pretty sure --

6      Q.   Mr. McCoy, let me stop you.  Back in 2015,

7  you were using this for storage; right?

8      A.   Back then, yes.

9      Q.   Yeah.  What you are saying is you think,

10 because other people may have had unpermitted

11 trailers --

12     A.   Not may have, they do.

13     Q.   Okay.  Well, we'll say "may have" because

14 I am asking the questions -- that you should not

15 have to comply with the requirements?  Is that what

16 you are saying?

17     A.   No, I am not saying that.  I am agreeing

18 from what you said it said.  I am not agreeing with

19 your not complying with you -- not complying --

20     Q.   So if there's a law -- no, Mr. McCoy,

21 here's my question.  If there's a law on the books

22 that says you should only have a permit -- a trailer

23 on for one year, you agree you have to comply with

1    it?

2            MR. FOJO:  Object to form.

3        A.    I -- my personal opinion is that everybody

4    has them in Pittsfield.  And because mine was the

5    only one targeted and multiple problems with my

6    disability, I applied for a new permit.  It does not

7    say you cannot apply for a permit.  It says you can

8    have it for one year.  But if a person in my

9    disabled position has things that need to be

10   accomplished, maintenance, everything that I

11   physically cannot do -- the document, I see; agree

12   with you what it says.  But when it was just

13   concerning me, I don't agree with it.  So that's the

14   only answer I can give you for that.

15       Q.   Mr. McCoy, you ultimately took the

16   trailers off your property; right?

17       A.    Excuse me?

18            MR. DIETEL:  Hold on one second, actually.

19        I am going to take down this.  We're going to

20        mark this -- the 2015 permit as Exhibit C.  I

21        am going to stop sharing my screen.

22            (J. McCoy Deposition Exhibit C was marked

23        for identification.)

1    Q.    (By Mr. Dietel) Okay.  Mr. McCoy, the

2    permits [sic] aren't on your property anymore;

3    correct?  I mean -- I am sorry -- not the permits.

4    The trailers are not on your property anymore;

5    correct?

6    A.    Correct.

7    Q.    So when did you take the trailer you were

8    renting off?

9    A.    That had -- I am not sure of the date.  It

10    was 2017.  That was one of the ones that it took me

11    a long -- long physical problem to empty.  And,

12    remember, I had two trailers.

13         So Tommy Trailer, who's in the commercial

14    district, who's only allowed two trailers in the

15    commercial district unless they are grandfathered,

16    which they are not because he rented -- I rented one

17    that come off his property.  It's not grandfathered.

18    And he has over 30; so that violation of that

19    ordinance --

20    Q.    Mr. McCoy, I am going to interrupt you.

21    What I asked you was a simple question.  I asked you

22    when did you take the trailer off that you were

23    renting?

1    A.    Which one?

2    Q.    The trailer you were renting.

3    A.    That I was renting?  Sometime before the

4  winter of 2017.

5    Q.    Okay.  And why did you take it off your

6  property?

7    A.    Jesse Pacheco, Building Inspector, told me

8  I had to remove both of them due to complaint.

9    Q.    When did he tell you that?

10   A.    That, I don't -- I don't have the date.  I

11  don't know.

12   Q.    You recognize you need a permit for

13  trailers on your property; right?

14        MR. FOJO:  Object to form.

15   A.    No, I did not recognize that I needed a

16  permit for trailers until they approached me with

17  the complaints.  Well, no, I did not know that I

18  needed a permit until they showed up.

19   Q    (By Mr. Dietel) So that trailer you were

20  renting went back to Tommy Trailer?

21   A.    Yeah, right down the street among the

22  other 30 or so he's got on his property.

23   Q.    Okay.  And how much were you paying in

41

```
 1   rent for that trailer?

 2        A.    $75 a month.

 3        Q.    Okay.  Is that the going rate for

 4   trailers?

 5        A.    I have no idea.  I agreed to his price.

 6        Q.    Okay.  When did you move the Trump

 7   trailer?

 8        A.    When did I move it?

 9        Q.    Yeah.

10        A.    You mean remove it?

11        Q.    Yeah.  When did you take it off your

12   property?

13        A.    That was -- I am pretty sure I got the

14   date, but I don't know facts.  Sometime, I believe,

15   July of 2018.

16        Q.    Okay.  And where did you take it to?

17        A.    I sold it to Tommy Trailer.

18        Q.    To Tommy Trailer in town?

19        A.    Yeah.  And he placed it on his property,

20   then moved it to his other property in Barnstead

21   where it sits today.

22        Q.    How much did you sell it for?

23        A.    A thousand dollars.
```

1    Q.    And where is it today?

2    A.    One of -- Tommy Trailer's name is Reese

3    Freese [sic].  It's somewhere in Barnstead, I am

4    told.

5    Q.    How long has Tommy Trailer's business been

6    in operation?  Do you know?

7    A.    I have no idea.  From what I understand,

8    20 -- 20-something years.

9    Q.    A long time?

10    A.    Long time.

11    Q.    So I am going to show you another

12    document, Mr. McCoy.  And I appreciate your patience

13    with this process.  These Zoom depos are new for all

14    of us.

15    A.    Yeah.

16    Q.    Bear with me.

17          All right.  Can you describe to me what

18    you can see now?

19    A.    My Trump trailer sitting in the snow.

20    Q.    If I represent to you that this is a post

21    that I got from your Facebook account --

22    A.    Yeah.

23    Q.    -- do you agree?

1        A.    I agree.

2        Q.    Okay.  And the date up here at the top

3    says "January 29, 2016"?

4        A.    Correct.

5        Q.    So by January 2016, the trailer was

6    painted "Trump! USA," "2016" in little red letters

7    at the top of the exclamation point?

8        A.    Correct.

9        Q.    Okay.  When did you paint it?  Because I

10   presume you didn't paint it in the winter, and this

11   is a picture with a bunch of snow.

12       A.    No.  My son painted it sometime in

13   January.  He's a graffiti artist.  And we are all

14   Trump supporters.  And he spent the time out there

15   during that winter at that time painting it.

16       Q.    So he painted it in the winter?

17       A.    Yes, he did.

18       Q.    Okay.  And you think it was January 2016

19   that he did that?

20       A.    Right around there.

21       Q.    So that was before the -- was that before

22   the New Hampshire primary?

23       A.    Yes.

Case: 21-1907 Case: 21-1907 Document: 00117865824 Document: 103 Page: 103 Date Filed: 04/15/2022 Date Filed: 04/15/2022 of 1 Entry ID: 6490055

44

1      Q.   Yeah.  So you were an early Trump guy.

2      A.   Yes, I was.

3      Q.   Before it became popular, huh?

4      A.   Yes, I was.

5      Q.   All right.  So then the "Concord Monitor"

6  does an article about you in August of 2016?

7      A.   Correct.

8      Q.   So when did they first reach out to you?

9      A.   Well, me and my wife was sitting out in

10 the yard, and a car come up the driveway, and we

11 didn't know who they was.  And they explained he was

12 Ray Duckler of the "Concord Monitor" and they want

13 to do -- talk to me about my trailer.  So I had a

14 conversation with him about my trailer, what I

15 believed in my trailer, why it was there, who I was

16 electing.  And then next thing I know, he's got it

17 on the front page of the "Concord Monitor."

18     Q.   All right.  Mr. McCoy, I am going to pause

19 you because I just want to be clear for the record.

20          MR. DIETEL:  We're going to mark this

21      picture that we have been discussing as

22      Exhibit D.  It's the Facebook post dated

23      January 29, 2016.  And I will stop sharing my

```
 1        screen.

 2                (J. McCoy Deposition Exhibit D was marked

 3        for identification.)

 4        Q.   (By Mr. Dietel) All right.  So how did the

 5   "Concord Monitor" find out about your trailer?

 6        A.   Ray Duckler says him and his photographer

 7   was driving by.  If you read the newspaper, it will

 8   explain.  They just was driving by and they seen it.

 9        Q.   Was it getting attention in town before

10   then?

11        A.   Not really.  Because when you see my

12   trailer, it's on my property.  I have a wooden fence

13   with trees all over the place.  You really couldn't

14   see it.  And if you are coming up from town, it's a

15   good size of a football field from my driveway up

16   into my property where it was at.

17        Q.   Okay.  So when you paint the trailer back

18   in 2016, was it still primarily being used for

19   storage?

20        A.   Some, yes.

21        Q.   But was it still storing things?

22        A.   There were some things in there that I had

23   stored in there.  I was doing maintenance to my
```

1    place and some household items that we had to get

2    moved in my house.  And my son was doing most of the

3    work.  And he was working; so it took a while.

4         Q.   Okay.  So it was still a storage container

5    at that point?

6         A.   Somewhat, yes.

7         Q.   Okay.  Well, explain to me what you mean

8    by "somewhat."

9         A.   It was somewhat a storage trailer, but

10   then it was also my Trump trailer.

11        Q.   Okay.  What do you mean by that?

12        A.   My Trump trailer, you can look at it and

13   you can understand that was my Trump trailer.  I

14   like Trump.  I wanted him elected.  My son liked

15   him.  He's a graffiti artist.  And he asked, "Can I

16   do it?" and I says, "Yes."

17        Q.   So you intended this to be a sign?

18        A.   I didn't intend anything to be a sign.  My

19   son asked me if he could do it and I said, "Yes."  I

20   was a Trump supporter; so basically it was construed

21   as a sign.

22        Q.   Well, did you consider it to be a sign?

23        A.   After a while, getting close to the

1  election, yes.

2      Q.    At what point did you consider it to be a

3  sign?

4      A.    Mid 2016.

5      Q.    Mid 2016?

6      A.    Yeah, anywhere from -- well, anywhere,

7  basically, from the day that it was painted till the

8  election.

9      Q.    Okay.  And then it stopped being a sign

10  after the election?

11      A.    After the election, my son wanted to paint

12  the Pittsfield Balloon Race on it.  He's a graffiti

13  artist.  And I always have places for him to do his

14  work.  It keeps him out of mischief.  And I said,

15  "Yeah, go ahead and paint the front of it for the

16  balloon rally race."

17      Q.    I am not familiar with the balloon.  So

18  does Pittsfield have a balloon?

19      A.    Every year.  A balloon rally every year.

20      Q.    That's pretty cool.  When did that start?

21  Do you know?

22      A.    It had to be a long time before I was here

23  because you would see Pittsfield Balloon Rally signs

Case: 21-1907    Case: 21-1907   Document: 00117865824   Document: 117   Page: 107   Filed: Date Filed: 04/15/2022   04/15/2022   Entry ID: 6490055   of 1 Entry ID: 6490055

48

1  all over town, on 28, 107, every road they had in

2  town; balloon rally all over Facebook.

3       Q.   So that -- the post that we talked about,

4  Mr. McCoy, Exhibit D, that January 29, 2016, post --

5       A.   Yeah.

6       Q.   -- it got a lot of comments on Facebook;

7  right?

8       A.   Good ones and bad ones.

9       Q.   Yeah.  So this was pretty well-known in

10 Pittsfield?

11      A.   I can't say it was pretty well-known in

12 Pittsfield because I am on a country road.  And, you

13 know, I didn't have a lot of Facebook friends on

14 Pittsfield who seen it, this or that.  So after --

15 after a while, close to the election it got noticed

16 once the town told me to remove it due to complaints

17 and social media took off on it.

18      Q.   It got noticed before then; right?  The

19 "Concord Monitor" did its article in August of 2016?

20      A.   Yeah.

21      Q.   That was certainly -- it was certainly

22 very well-known at that point; right?

23      A.   It got noticed in mid 2016 in the "Concord

1    Monitor," all over the place.

2        Q.    Basically, everybody in town by that point

3    knew about it?

4        A.    Well, I don't know if I could say,

5    basically, everybody.

6        Q.    Okay.  But what would you say?  How

7    widespread was it known?

8        A.    I can't say that either.

9        Q.    You have no opinion on it?

10       A.    I have got -- I can't answer the question

11   like you are telling me.  You want me to count for

12   how many seen it?  I have no idea.

13       Q.    Okay.  Were there any other trailers in

14   town, Mr. McCoy, that were the subject of a "Concord

15   Monitor" article in 2016, to your knowledge?

16       A.    To my knowledge, no.

17       Q.    Have you ever heard of any other storage

18   containers in the town of Pittsfield getting this

19   much publicity?

20       A.    I haven't heard it.  I can't say one way

21   or the other.

22       Q.    This was probably the most famous storage

23   container in the town of Pittsfield.  Fair enough?

```
 1        A.    Could be.

 2        Q.    I see you nodding your head; so I will

 3   take that as a yes?

 4        A.    It could be.  It could not be.

 5        Q.    Anybody ever complain to you about it,

 6   Mr. McCoy?

 7        A.    Yes.

 8        Q.    Who?

 9        A.    Select board members, Democrats; people

10   drive by my house shooting me the finger, threaten

11   to come do stuff to me and my trailer.  Yes.  That

12   kept me up at night knowing that I was targeted;

13   even the Democrat down in Georgia:  "Burn the MF

14   down" on comments.  So that created a lot of

15   physical, emotional, and paranoia.  But I was a

16   Trump supporter, and it is what it is.

17        Q.    So lots of people were complaining about

18   it?

19        A.    I didn't know anybody personally

20   complaining, just some comments and people riding

21   by.  But I did know that the select board sent the

22   building inspector up here to remove it due to

23   complaints.
```

1    Q.   So, Mr. McCoy, though, that's not the

2  question I asked you again.  What I asked you was,

3  from what you are describing to me, a lot of

4  people -- let's set aside the select board.  A lot

5  of other people than the select board were

6  complaining about it, including even somebody as far

7  away as Georgia; correct?

8    A.   And you can add to that a lot of people

9  was liking it.

10   Q.   Okay.  So you agree.  A lot of people --

11   A.   It was different sides.  I can't agree to

12  what you are asking me.  There was complaints and

13  there was "We love it."

14   Q.   Okay.

15   A.   You will have to make your own assertion

16  to that question.  But there was complaints and

17  there was people loving it.  When they came to me as

18  complaints, it wasn't right.

19   Q.   Okay.  But, Mr. McCoy, there was more than

20  one person who complained; right?

21   A.   There was more than one person who loved

22  it.

23   Q.   Okay.  But there was more than one person

1  who complained; correct?

2      A.   There was more than one person who loved

3  it; so I can't say either way.  I am not going to

4  answer that question.  Because if there was 73 here,

5  2,000 there -- I am not going to answer that

6  question.  There was complaints and there was people

7  who loved it.  If you want to --

8      Q.   Mr. McCoy?  Mr. McCoy, I am going to

9  interrupt you.

10          (Reporter admonition.)

11     Q.   (By Mr. Dietel) Mr. McCoy?

12     A.   Yes.

13     Q.   I understand you have a point that you

14  want to make that there were lots of people that

15  liked it, but I am asking you a simple factual

16  question.  And as we discussed at the beginning of

17  this, you have an obligation to answer truthfully.

18  So I am asking you -- you have described to me many

19  complaints, including somebody all the way from

20  Georgia.  So I am asking you a factual question.

21  Did you get more than one complaint?

22     A.   Social media?  Yes.

23     Q.   Okay.  Did you get more than 10

1    complaints?

2        A.    No idea.

3        Q.    You don't remember?

4        A.    That was years ago; five, six years ago.

5        Q.    Is it possible you got more than 10?

6        A.    It's possibly I got less than 10.  I have

7    told you I have no idea.

8        Q.    Okay.  All right.  So I have read through

9    your complaint, Mr. McCoy.  I am going to tell you

10   my understanding of it.  I want you to correct me if

11   I am wrong.  As I understand it, you believe the

12   only reason the town enforced its zoning ordinance

13   against you was because your trailer said "Trump" on

14   it in 2016 and 2017; right?

15       A.    Correct.

16       Q.    Okay.  And you believe the town was

17   discriminating against you; correct?

18       A.    Correct.

19       Q.    Who specifically?  Was it individuals or

20   was it the town?

21       A.    You would have to ask the select board

22   because they claim they got the complaints.  And the

23   select board sent the building inspector up here,

1  who was in charge of storage ordinances, and he got

2  no complaints.  And then when he told me remove it

3  due to complaints, that's when I found out they was

4  coming from the select board.

5      Q.   So it was individuals on the select board

6  that you believe were targeting you?

7      A.   From what I was told.

8      Q.   Okay.  Who told you that?

9      A.   Building inspector.  He said "complaint

10  from the select board members" and I was to go see

11  them.

12      Q.   So it wasn't the town, as a whole?  It was

13  three selectmen?

14      A.   I don't know how many selectmen, but it

15  was from the select board.

16      Q.   Okay.  And not the town itself?

17      A.   Not the town.

18      Q.   Okay.  And you believe the decision to

19  require you to remove the trailer was unfair?

20      A.   Yes.

21      Q.   And you believe it violates your

22  constitutional rights?

23      A.   Yes.

1    Q.    And you believe this because you allege

2    there are other trailers in town that the town has

3    not required to be removed?

4    A.    Not alleged.  That's not an allege.  That

5    is a factual concern of what has taken place in this

6    town before I moved here and today, of May the 7th,

7    2021.

8    Q.    Okay.  So, Mr. McCoy, which trailers in

9    town?

10    A.    Could you be a little bit more specific on

11    that?

12    Q.    Sure.  You are telling me there's a number

13    of trailers in town that you feel are unlawful and

14    that the town is not enforcing its zoning ordinance

15    against; correct?

16    A.    Correct.

17    Q.    Okay.  I want to know what trailers are

18    those?  Who owns them and where are they located?

19    A.    Carl Anderson, 134 Barnstead Road;

20    Trzcinski.  I have a whole list.  I have many photos

21    of trailers in town.  Larry Konopka, select board;

22    Adam Gauthier, planning board.  They have trailers

23    on their properties, and they have been there.

Case: 21-1907 Case: 21-1907 Document: 00117865824 Document: 111-1 Page: 115 Page: 115 Date Filed: 04/15/2022 Date Filed: 04/15/2022 of 15 Entry ID: 6490055

56

1     Q.   Mr. McCoy, how long have you had that

2  information for?

3     A.   Well, as of today, a while.

4     Q.   Okay. Well, tell me what that means. You

5  had it before you brought your lawsuit?

6     A.   Of trailers on the property? Yes.

7     Q.   Yeah.

8     A.   They are all over town. You can't go to

9  the Dollar store, Rite Aid, gas station without

10  seeing a storage container.

11     Q.   You said you have a list?

12     A.   Yes, I do.

13     Q.   Okay. Have you produced that list to me

14  previously?

15     A.   That would be up to my lawyer.

16     Q.   Okay. Have you given me any of these

17  pictures that you talk about?

18     A.   I do not -- I do not correspond with you,

19  period. That's between you and my lawyer.

20     Q.   Okay. But we're clear, though, you have

21  had them since before you brought the lawsuit;

22  right?

23     A.   Before and after.

1          MR. DIETEL:  Okay.  Robert, I would like a

2      copy of that list and all of those pictures

3      when you respond to my discovery requests.

4          MR. FOJO:  Noted.

5      Q.   (By Mr. Dietel) So you said "Carl

6  Anderson."  Who else did you say has trailers on

7  their property that are unlawful?

8      A.   You can connect with my lawyer and he will

9  give you --

10     Q.   No, Mr. McCoy.  You have to answer my

11 questions.

12     A.   I answered "Carl Anderson," and there's

13 many others.

14     Q.   Well, who others?  Which others?

15     A.   Larry Konopka.

16     Q.   Larry Konopka.

17     A.   Adam Gauthier.  Carole Dodge, humongous

18 amount on her property today and has been there.

19 Bob Freese Reese [sic], over 30 in the commercial

20 district.  He's not allowed to have two and they are

21 not grandfathered.  They are all over the place.

22     Q.   What's that last name, Mr. McCoy, the last

23 one?  Bob Freese, is that what you said?

1        A.    Reese Freese, Tommy Trailer.

2        Q.    Tommy Trailer, that's --

3        A.    16 Clark Street.

4        Q.    So Bob Freese is Tommy Trailer.  Okay.

5        A.    Reese Freese.

6        Q.    So we have got Carl Anderson, Larry

7   Konopka, Adam Gauthier, Carole Dodge, Tommy Trailer.

8   Who else?

9        A.    And the others are just on property that I

10   have noticed.  I have no idea who lives there.

11        Q.    Do you know if any of those other ones

12   have permits?

13        A.    As far as I know, no permits.  I would

14   have found out.  I filed a right to know.  But, of

15   course, the town didn't give it to me.  They gave it

16   to you.  So I didn't get my right to know from the

17   town or anybody.

18        Q.    So, Mr. McCoy, you said in your complaint

19   that you were harassed by three individuals.  Do you

20   remember that?

21        A.    Yeah.

22        Q.    Who were they?

23        A.    Carl Anderson, Larry Konopka, Jim Allard.

1  Every time you turn around, "Get rid of the

2  trailer."  I go to their board meeting.  Like Carl

3  said, "You begged us for a permit."  That was a lie.

4  There is recordings of these meetings where I went

5  to these meetings and just let them know what I felt

6  about my trailer.

7       Q.   So at these meetings, you told them what

8  you were using your trailer for?

9       A.   I told them I was -- at that time, I was

10  using it for storage.  It took me a while to get

11  out, but I was also using it for my Trump trailer,

12  which they made complaints.  And I went to the

13  select board, held up the newspaper, and said, "You

14  sent the building inspector to my property,

15  complaints on my Trump trailer."  And the chief of

16  police was sitting right there.  He turned around

17  and he said, "I like that trailer."  Every time you

18  turn around, "Get rid of it.  Get rid of it.  Go to

19  a board meeting."

20       Q.   So when was this board meeting, Mr. McCoy?

21       A.   You will have to -- you will have to get

22  them recordings from Carl Anderson.  He stated in

23  his letter he has the recordings of that meeting

1  where I begged, and that's because I was in the

2  midst of hospitals, this and that.  Dates, I am not

3  sure of.

4       Q.    Was it in 2017?

5       A.    2016, the end, and 2017.

6       Q.    So you said Larry Konopka, Carl Anderson,

7  Jim Allard, they all harassed you.  Was there

8  anybody else that harassed you?

9       A.    There's people that I don't know the name.

10  They didn't like the Trump trailer.

11       Q.    Not selectmen?

12       A.    Not selectmen.

13       Q.    Okay.  So what specifically did Larry

14  Konopka do to harass you?

15       A.    Voted to remove my trailer, notified me to

16  remove my trailer, the whole select board:

17  "Complaints.  Remove it.  Complaints.  Complaints.

18  Remove it.  Complaints."

19            You will have to figure it out from there,

20  because that's all I heard, complaints, complaints.

21       Q.    So, Mr. McCoy, here's what I am hearing

22  you say:  They made you remove your trailer and they

23  told you that they had received complaints multiple

```
 1   times about your trailer.

 2        A.   Correct.

 3        Q.   Anything else?

 4        A.   "Complaints."

 5        Q.   Just that they told you there were a lot

 6   of complaints, and they kept telling you that?

 7        A.   Right.  "There's complaints."

 8        Q.   And when were those conversations with

 9   Larry Konopka?

10        A.   Well, if you want to get into that, during

11   election time Larry Konopka came up here to my

12   property to place his signs on my property.  I

13   didn't know him.

14        Q.   Let me interrupt you, Mr. McCoy.  When you

15   say "election time," are you talking about the 2016

16   Presidential election?

17        A.   No.  I am talking about the town election

18   of March of 2019.

19        Q.   Okay.  So in March --

20        A.   Then I found out about all the complaints.

21        Q.   So these conversations occurred in March

22   of 2019?

23        A.   During election time, yes.
```

1      Q.   Okay.  And this is the same for Larry -- I

2   am sorry.  This is the same for Carl Anderson and

3   Jim Allard, when you heard about this?

4      A.   Yes.  Not -- Jim Allard was not on my

5   property, but the other two was wanting to put up

6   their election sign.

7      Q.   Okay.  Were you friendly with these guys?

8      A.   Yes.  I didn't know them.

9      Q.   What was the nature of these

10  conversations?  Were these friendly conversations?

11     A.   Yeah.  They came up to place my [sic]

12  signs up and to vote for them March 2019.  And I did

13  not know who made the complaints then, but I did

14  find out.  And then one of their board members named

15  Carole Dodge sent me messages and explained to me

16  two individuals in town made complaints.  There's a

17  reason for my trailer being removed.  And they was

18  also on the board and running for the same election.

19     Q.   So, Mr. McCoy, you said you did find out

20  who made the complaints; right?

21     A.   Explain.

22          MR. DIETEL:  Tina, can you read back his

23          answer from the prior question?

```
 1              (Answer read.)
 2        Q.    (By Mr. Dietel) So, Mr. McCoy, you said in
 3   your answer "I did find out" about who made the
 4   complaints.  Who did you find out made the
 5   complaints?
 6        A.    Carl Anderson.
 7        Q.    Nobody else?
 8        A.    Carl Anderson.
 9        Q.    You said --
10        A.    He's the select board member that --
11        Q.    You said in the answer -- Mr. McCoy, you
12   said in the answer to your question -- to my
13   question -- you also said that Carole Dodge sent you
14   a message about two individuals.
15        A.    Many.
16        Q.    Sent you many messages.
17        A.    Concerning the removal of my Trump
18   trailer.
19        Q.    What were the content of those messages?
20   What did she tell you in them?
21        A.    She told me that my neighbor Clayton Wood,
22   who was the chairman of the planning board at the
23   time, made complaints to have my Trump trailer
```

64

1   removed.  She told me Jim Pritchard, who was running

2   for the same position as she was endorsing Carl

3   Anderson for, made the complaint about my trailer.

4   And then I found out she lied.

5       Q.   Why do you say she lied?

6       A.   She lied.

7       Q.   What's that based on, Mr. McCoy?  You said

8   you found out she lied.  What did you find out?

9       A.   She lied.

10      Q.   So you don't have any facts that you can

11  point to as to why she lied?

12      A.   She just lied during election time to help

13  her folks get elected.  Bottom line, that's what she

14  did.  And then when she was confronted on it, "Oh,

15  no."

16          She did.  She made them in black and

17  white.

18      Q.   So, Mr. McCoy, you have identified three

19  selectmen who you believe have individually harassed

20  you about the sign -- the Trump sign:  Larry

21  Konopka, Carl Anderson, Jim Allard.  Am I correct

22  they are all Republicans?

23      A.   I have no idea.

1      Q.    Do you know if they are Trump supporters?

2      A.    I have no idea.  They claim to be, but I

3   have no idea.

4      Q.    They claim to be?

5      A.    They claim to be.

6      Q.    Okay.  When have they claimed that?  Do

7   you recall?  How do you know that?

8      A.    In one of Carl Anderson's letter, which is

9   part of the complaint, "We're all Trump supporters."

10         MR. DIETEL:  So, Robert, I believe I have

11      asked for it in my discovery requests, but I

12      would like a copy of that letter that Carl

13      Anderson sent.  And I would also like a copy of

14      these messages that Mr. McCoy has referenced

15      from Carole Dodge.

16      Q.    (By Mr. Dietel) So, Mr. McCoy, I am going

17   to go over some ground that we have talked about for

18   clarity here.  We have talked about the town zoning

19   ordinance.  And you are aware now that a storage

20   container can only be used for storage purposes;

21   right?

22      A.    I am aware what they say now, but I am --

23      Q.    Okay.  Mr. McCoy, if somebody --

1       A.   Would you let me finish, please?

2       Q.   Yes, of course.

3       A.   I wasn't aware then.  I am aware now.  And

4    also I am aware that, since this has been going on,

5    the ordinance has been redone or whatever they want

6    to call it.  So it's two different -- two different

7    stories when you come to the ordinance, what was and

8    what is now, why it was changed.

9       Q.   So if you want to have a storage container

10    on your property, you can go and get a permit;

11    right?

12       A.   I wouldn't have a storage trailer in this

13    town for nothing in the world, what they did to me

14    to my last one.  I wouldn't even attempt it.

15       Q.   You don't want one on your property now?

16       A.   Don't want one.

17       Q.   Okay.  But if you wanted one, you can go

18    and apply for a permit?

19       A.   If I wanted one.  But that would not

20    happen.

21       Q.   Okay.  And we were talking about this

22    before.  You said that the trailer started to be

23    used primarily as a sign sometime in the middle of

1    2016; right?

2        A.    Correct.

3        Q.    Okay.

4        A.    Not primarily.  I did not say "primarily."

5    You said that.  I said it was part of my -- I am a

6    Trumper; so that -- it was a sign that I was proud

7    of.

8        Q.    So you had multiple uses for it.  You were

9    using it as a trailer for a storage container and

10   you were also using it as a sign?

11       A.    You could say that, yes.

12       Q.    But would you say that?

13       A.    I still had some things in it.  And my

14   Trump -- my Trump sign, that was my freedom of

15   speech.  That was who I was voting for.  And

16   everybody has whoever they want's signs.  I have

17   seen Hillary signs.  I have seen signs downtown;

18   basically, "Screw Trump.  Get rid of him."  And they

19   stayed there on Main Street.

20       Q.    Mr. McCoy, I am not trying to belabor the

21   point here, but I am trying to make sure I

22   understand what you are telling me.

23       A.    Could you repeat that?  I just had some

Case: 21-1907 Case: 21-1907 Document: 00117865824 Document: 127 Page: 127 Filed: Date Filed: 04/15/2022 04/15/2022 of 19 Entry ID: 6490055

68

1  beep and I didn't hear you.

2       Q.   Sure.  I am not trying to belabor the

3  point or beat a dead horse.  I am trying to

4  understand factually what happened and what you

5  thought you were using that trailer for.  I have

6  heard you say to me that it was used as a sign and

7  for storage, multiple uses; correct?

8       A.   Not multiple.  Two uses.

9       Q.   Two uses?

10      A.   When I brought it here, it was storage.

11 When Trump was running for office, it was also a

12 Trump sign.

13      Q.   Okay.  So two uses?

14      A.   (No response.)

15      Q.   Yes?  Two uses?

16      A.   Two, as far as I know, yes.

17      Q.   Okay.  I am going to pull up another

18 exhibit here.  Let's see.

19           Mr. McCoy, how are you right now?  Do you

20 need a break or anything?  We have been going for

21 about an hour and a half.

22      A.   I am good for a little while.  But I will

23 need a break in a while, unless you want to take one

1    now.

2          MR. FOJO:  I can use a brief one too.

3          MR. DIETEL:  All right.  Why don't we do a

4      quick five-minute break, then.

5          (A break was taken.)

6      Q.   (By Mr. Dietel) So we're back on the

7    record, Mr. McCoy.  You understand you are still

8    under oath?

9      A.   I do.

10     Q.   And you can still hear me?

11     A.   I can hear you.

12     Q.   Okay.  Did you speak with anybody while we

13   were on this little break here?

14     A.   Just my wife.  She wanted to know if I

15   wanted another coffee.

16     Q.   Okay.  I am going to show you another

17   exhibit.  Can you see my screen, Mr. McCoy?

18     A.   Yes.  I have a copy of that.

19     Q.   What are we looking at here?

20     A.   Notice of violation with no date.

21     Q.   Okay.  So am I correct in representing to

22   you that this letter says "Your permit for a storage

23   trailer has expired on September 1, 2016"?

70

```
 1        A.    Yeah.   That's what it says.

 2        Q.    And this was sent to you as a notice of

 3   violation after that permit expired?

 4        A.    I have no idea when it was sent to me.

 5   There's no date on it.

 6        Q.    You did receive this letter, Mr. McCoy?

 7        A.    Yes.   It was years ago.

 8        Q.    Okay.   When do you remember receiving it?

 9        A.    Excuse me?

10        Q.    I said when do you remember having

11   received it, to the best of your memory?

12        A.    Sometime the end of 2016 or so, right

13   around there.   I am really not sure on the date.

14        Q.    Okay.

15        A.    If it was dated, I would have known,

16   but --

17        Q.    It was after the "Concord Monitor" article

18   sometime in 2016?

19        A.    Yeah.

20            MR. DIETEL:   Okay.   I am going to mark

21        this as -- Exhibit E as the notice of violation

22        letter.

23            (J. McCoy Deposition Exhibit E was marked
```

1          for identification.)

2          Q.    (By Mr. Dietel) At the point that you got

3    this letter, Exhibit E, Mr. McCoy, your storage

4    container was painted "Trump."  We have already

5    established that; right?

6          A.    Correct.

7          Q.    Okay.  I am going to put another document

8    up.

9                All right.  Mr. McCoy, I just put another

10   document up on my screen.  Do you know what this is?

11   Can you see it?

12         A.    Yes.  It's my letter to the board of -- to

13   Jesse to go to the board of selectmen after he told

14   me to get rid of it due to complaints.

15         Q.    So that's the -- when you say "he told"

16   you, that's the notice of violation, Exhibit E, we

17   were just talking about; right?

18         A.    Could you say that again?

19         Q.    So we just looked at Exhibit E, which was

20   a notice of violation from Jesse Pacheco.  I think I

21   am pronouncing that right.

22         A.    Yeah.

23         Q.    And now we're looking at a letter that you

1    sent dated November 3, 2016, after you had found out

2    that there was -- your permit had expired.

3        A.    Yeah.

4        Q.    Okay.  So Jesse sent you that notice of

5    violation, then, sometime between August 2016, when

6    the "Concord Monitor" article is published, and this

7    date, November 23, 2016?

8        A.    Yeah.  It was right after the "Concord

9    Monitor" that Jesse came up to my place and gave me

10   that and let me know due to complaints I had to

11   remove them both.

12       Q.    Do you remember, Mr. McCoy -- I don't

13   remember.  Do you remember what the date of the

14   Presidential election was in 2016?

15       A.    I am pretty sure.  Wasn't it November 3?

16       Q.    It may have been.  Right abouts then;

17   right?

18       A.    Right about then.

19       Q.    Yeah.  So what are you asking for in this

20   letter?

21       A.    Well, if you notice the month, in

22   November, and if you understand how much disabled I

23   am, I could not remove my trailer within 30 days.

1   With Jesse, the message he had gave me, need to be

2   gone within 30 days or I will get a $500-a-day fine,

3   the fine really decimated me because I am on

4   disability.  So if they was going to charge me a

5   $500-a-day fine, then in a day and a half I would be

6   out of everything.  I could not pay my bills.  I

7   could not do anything.

8          And this letter here, I needed the time

9   because, if you notice the date to when that

10  occurred, winter was coming.  I can hardly walk when

11  it's summer out.  There's no way I can walk through

12  snow and everything.  So I sent this notice to them,

13  and they didn't respond to me.

14      Q.   Did the town ever actually fine you any

15  money, Mr. McCoy?

16      A.   No, they didn't.

17      Q.   So what were you saying you were using the

18  storage container for at this point?  What did you

19  tell the board?

20      A.   At that time, I still had building

21  supplies and stuff that I was redoing maintenance on

22  my house.  And, again, it was wintertime.  I

23  couldn't do none of that.  And I definitely could

1  not get out there and take everything out of my

2  trailer that was there.  There wasn't no place to

3  put it.  Two, I couldn't get it in.  Three, I

4  couldn't walk through the snow.

5          So that's why I wrote that letter, give me

6  an extension.  Not during -- give me an extension

7  during the summertime.  Don't tell me that you are

8  going to force it off in November when you know I am

9  completely disabled, which they understood.  They

10  made notice of that.  "We understand your

11  disability."

12          And this is what I wrote to Jesse to go to

13  the select board because Jesse told me I would have

14  to report to the select board.  They was the one

15  that sent him.

16      Q.   So I am understanding you to say you

17  needed to keep your stuff in there in the winter

18  because you still were going to be doing work on

19  your house, and you were disabled and having a hard

20  time moving things?

21      A.   Yeah.

22      Q.   So you didn't need the extension because

23  it was a Trump sign?

 1        A.    Excuse me?

 2        Q.    You didn't ask for the extension because

 3   it was a Trump sign.  You asked for it so you could

 4   store things in there; right?

 5        A.    Correct.

 6        Q.    Okay.  So you say in this letter,

 7   Mr. McCoy, towards the end -- you say -- and correct

 8   me if I am wrong.  I am trying to read your

 9   handwriting, which is pretty good.  You say "It will

10   be taken care of and I am sorry for the delay."

11             Why did you say "I am sorry"?

12        A.    Because I was being told by the building

13   inspector and the select board that I am violating

14   ordinances, which I had no idea I was even doing.  I

15   was concerned about me, my health, my wife, and my

16   property.

17        Q.    Did you want to comply with the rules of

18   the town?

19        A.    Because that's what they was telling me.

20   When you move to a town, you don't understand what's

21   going on.  And they come up and tell you, "Well,

22   these are the rules."  Of course you want to comply,

23   but then you find out they are not the rules later

1  on.  But you want to comply.  Because I didn't know

2  what was going on, physically beat, could not do it.

3  And I wanted to comply with what the town was

4  forcing on me.  And that's how it went.

5          MR. DIETEL:  Okay.  So we're going to mark

6      this letter as Exhibit F.  This is the

7      November 3, 2016, letter from Mr. McCoy.

8          (J. McCoy Deposition Exhibit F was marked

9      for identification.)

10     Q.   (By Mr. Dietel) So, Mr. McCoy, you send

11  that letter that we just discussed in November.

12  President Trump gets elected.  You asked for a

13  six-month extension; right?  And then am I correct

14  you go before the board of selectmen in June of

15  2017?

16     A.   I did go before them June or -- May or

17  June 2017.  But I wrote them a letter to request to

18  come up there and see them, and they never

19  responded.

20     Q.   Is that the letter we are talking about

21  right now, the November 3 letter?

22     A.   I am not sure.  It was very soon after

23  Jesse came up with the complaint from the select

1  board.  I wanted to talk to the select board and

2  nobody said anything; so I ended up going.

3         MR. DIETEL:  Robert, if there's another

4      letter out there, I would obviously like to see

5      it.

6         THE WITNESS:  Well, Carole says she has

7      the letter, but I haven't seen it.  And you

8      guys didn't give me my right to know; so I have

9      no idea on that.

10        MR. DIETEL:  I will respectfully disagree

11     with you, Mr. McCoy.

12     Q.   (By Mr. Dietel) Okay.  So November 2016

13  through June 2017, does the town do anything to make

14  you get the storage container off your property?

15     A.   Say that again.

16     Q.   Does the town do anything to make you get

17  the storage container off your property between

18  November 3, 2016, and when you met with the board in

19  June of 2017?

20     A.   Well, I don't remember that far back.

21  What I do remember, Jesse coming up here:  "Remove

22  it due to complaints."  I cannot pay their fines.  I

23  could not empty it.  So that's the reason I wrote

1    that letter.

2         Q.    When you say, Mr. McCoy, that Jesse came

3    up here, are you talking about when you met with him

4    back in September of 2016?

5         A.    Correct.

6         Q.    Were there any other visits?

7         A.    Yeah.  I reached out to him.  I wanted to

8    know about my letter that I sent to town that Carole

9    mentioned.  But I have no idea if they got it, if

10   they want to show it.  I asked to come up there and

11   speak with the board of selectmen concerning my

12   trailer and the complaint.  Didn't hear nothing.

13        Q.    So you asked for a six-month extension.

14   And, in fact, you kept your trailer on the property

15   for those six months?

16        A.    Of course, I did.

17        Q.    Okay.  All right.  I am going to show you

18   another document, Mr. McCoy.  All right.  Mr. McCoy,

19   I put the document up on my screen.  Do you know

20   what this is?  Can you see it?

21        A.    Yeah.  That's my -- that is a permit that

22   is not -- is not a permit.

23        Q.    Explain to me what you mean by that.

1    A.    The select board was not in charge of

2  permit ordinances back then.  The building inspector

3  was.  And I didn't know that at the time, but they

4  couldn't have gave me that permit.

5    Q.    Okay.  But you are aware that the town

6  required permits for storage containers and also

7  required permits for signs?

8    A.    About your storage containers, I found out

9  eventually.  Your signs?  Never heard about any

10  signs, never questioned about any signs, never got a

11  violation concerning any signs.

12    Q.    Mr. McCoy, in your own complaint at

13  paragraph 21, you say "Mr. McCoy's trailer, however,

14  clearly did not meet the definition of a storage

15  container since he did not use the trailer

16  principally for storage but was instead using the

17  trailer principally as a sign to express political

18  speech.  Rather Mr. McCoy's trailer was a sign and

19  clearly met the conditions in town zoning ordinance,

20  Article 9, Section 4, Permitting Conditions for

21  Outdoor Signs."

22          So by the time you filed your lawsuit, you

23  knew that there were permits required for signs;

1  right?

2      A.    Wrong.  I did not know that until I heard

3  you mention it concerning this court case in our

4  Zoom hearing about I had to have a sign permit.

5  Nobody ever contacted me, nothing in black and

6  white, no nothing concerning any sign ordinance.

7  And from what I understand, there is no sign

8  ordinance for political signs on property; so I

9  don't agree with it.

10     Q.    Okay.  You do agree, Mr. McCoy, you have

11 the ability to read the zoning ordinance; right?

12     A.    Excuse me?

13     Q.    You have the ability to read the zoning

14 ordinance; correct?

15         MR. FOJO:  Object to the form.

16     A.    Well, you could read them.  You could go

17 on the town website and read them.  And then you

18 will find out, when you read more, that Carole and

19 who she had posting ordinance and such on the sign

20 did not post them right on the website.  So, I mean,

21 that's right in black and white in part of the

22 information in the minutes.

23     Q     (By Mr. Dietel) Okay.  So, Mr. McCoy, if I

1    am understanding you correctly, you are saying that

2    the document that we're looking at, which is a 2017

3    permit for storage containers, which I am going mark

4    as Exhibit G --

5         A.   Yeah.

6              (J. McCoy Deposition Exhibit G was marked

7         for identification.)

8         Q.   (By Mr. Dietel) So this Exhibit G, you are

9    claiming this permit has no effect or meaning?

10        A.   It's not a legal permit.

11        Q.   Not a legal permit.  So what --

12        A.   The select board was not in charge of

13   storage ordinances, as I have been told and found

14   out.

15        Q.   You didn't have any permit for your

16   storage container, then.

17        A.   Excuse me?

18        Q.   You did not have any permit for your

19   storage container, under your theory; correct?

20        A.   If you understand the zoning and who in

21   charge, no, no permits.

22        Q.   No permits?

23        A.   No permits.  And if you will re- --

1    concerning this June permit, I went up there and

2    made my complaint back to the select board where I

3    was directed to go.  They didn't direct me to find

4    out my rights or anything.  They just direct me to

5    deal with them, the select board.

6            And if you will notice in paperwork I am

7    pretty sure you have, when I went up to that

8    meeting, it was in May.  I complained about them

9    making complaints, and they tabled it.  And when I

10   asked them why they tabled it -- and Carl, in his

11   letter, mentioned he's got these recordings, which

12   my right to know I was not allowed to have.  I would

13   have found them recordings, which he mentions in his

14   letter how I begged him and how I let them know that

15   I was charged for a permit $25.  And when I went to

16   renew, I found out there was no fee for a permit.

17   And I made the accusation at that meeting, "I am

18   going to leave the meeting, go to the police

19   station, and have the building inspector arrest me

20   for charging me for a permit."

21           So during the course of that meeting, they

22   tabled it, went into private session.  I wasn't

23   allowed to hear nothing.  Then they called me back

1  up a month or so later:  "Here.  Here's your permit

2  from the select board."  And I don't recognize that

3  permit as legal because the select board wasn't in

4  charge of permits from what I understand.

5      Q.   Okay, Mr. McCoy.  So I understand your

6  point.  You don't think you had a permit.  But can

7  we agree this Exhibit G, permit for storage

8  containers dated -- June 13, 2017 is the approval

9  date.  It's signed by the then board of selectmen;

10 correct?

11     A.   Signed by the selectmen.

12     Q.   So you testified earlier, Mr. McCoy, that

13 the trailer was repainted with a balloon scene in

14 July of 2017; correct?

15     A.   Pretty close, yes.

16     Q.   Yeah.  I am going to stop sharing my

17 screen, Mr. McCoy, and I am going to put up a

18 different document for you.

19         All right.  So, Mr. McCoy, what do you see

20 on your screen right now?

21     A.   That is my son's painting of the

22 Pittsfield balloon race.

23     Q.   Okay.  And what's the date on the top

```
 1   left-hand corner?

 2        A.   July 30, 2017.

 3        Q.   All right.  So he paints that in July of

 4   2017.  About how long did it take him to paint that?

 5        A.   Maybe a week.  I have no idea.  I am not

 6   outside much.

 7        Q.   Yeah.  Yeah.

 8        A.   He did a good job too.

 9        Q.   Yeah.  It's nice.  It's nice.

10             So in July of 2017, you are still a Trump

11   supporter; right?

12        A.   Correct.

13        Q.   You are still a Trump supporter today?

14        A.   Correct.

15        Q.   Okay.  So your political views have not

16   changed?

17        A.   They have not changed.

18        Q.   So whose idea was it to paint this as a

19   scene of the Pittsfield balloon festival or race?

20        A.   My son's.

21        Q.   Your son's?

22        A.   Yes.

23        Q.   When do you recall him bringing up the
```

1  idea?

2      A.   He asked me if he could do it.  Now, if

3  you understand, the back side of the trailer I

4  completely gave him.  He has been a graffiti artist.

5  He's in his mid twenties now.  He's been a graffiti

6  artist since he was 13, 14.  Other places we lived,

7  I built him big walls out of plywood.  I have got a

8  plywood behind my house down in the woods that he

9  also has.  But the back side of the trailer, it was

10  totally his to express his graffiti.  And he's

11  gotten pretty good.  He sells canvasses and stuff

12  now.  He's a good artist.

13      Q.   Okay.

14      A.   But he wanted to do it, and I said,

15  "Sure."

16      Q.   So you didn't hear that it was no longer a

17  Trump sign?

18      A.   Oh, there's "Trump" on it.

19      Q.   Where?

20      A.   Both the back doors from top to bottom,

21  right and left:  "Trump make America great again."

22  It was -- stayed on there, never changed to the day

23  it was removed from my property.

1    Q.    Okay.

2    A.    And you could see that when you come up

3  107, Catamount Road.  That's the only thing you

4  could see coming from town out towards my house:

5  "Trump make America great again."

6    Q.    Going which direction, Mr. McCoy?

7    A.    Excuse me?

8    Q.    Can you see it going from both directions?

9    A.    No.  It's only on the back doors.  And you

10  would see that coming from Catamount going towards

11  Northwood.

12    Q.    Do you have any pictures, Mr. McCoy, from

13  after July 2017 showing that?

14    A.    Yeah.  I have got -- I have got pictures

15  of the day it left.

16    Q.    Okay.  You can send those to me.  That

17  would be appreciated.

18    A.    I will send them to my lawyer.

19        MR. DIETEL:  So I am going to throw up

20    another document.  And just to be clear, I

21    believe we marked that picture we were just

22    discussing as -- if we did not, I would like to

23    mark it as Exhibit H.  This is the July 30,

1     2017, balloon picture.

2          (J. McCoy Deposition Exhibit H was marked

3     for identification.)

4     Q.   (By Mr. Dietel) Okay.  So, Mr. McCoy, we

5     discussed a permit that you received in June 2017

6     which had a one-year period, which means it expired

7     in June of 2018.  Did the town do anything in that

8     period of time to harass you about the Trump sign,

9     in your opinion?

10          A.   I don't understand the question.

11          Q.   Well, you have said that the town harassed

12     you about the -- sorry.  You said that the three

13     selectmen harassed you about the Trump sign.

14          A.   Correct.

15          Q.   Was there any effort to make you move the

16     trailer in 2017, the storage container?

17          A.   Well, at the end of 2016 November, they

18     said, "Get it off your property."  And that

19     continued until I finally went to the board and they

20     tabled it and gave me this.  So, yes, in 2016, they

21     were still trying to make me get rid of my Trump

22     trailer.

23          Q.   But not in 2017?

```
 1        A.   Oh, yes.  It was during 2017 too.  From
 2   October -- from just a little while after the
 3   "Concord Monitor," "Get rid of it.  Get rid of it."
 4   And all I heard was from, basically, Carl Anderson
 5   and the building inspector.  It all started out as
 6   complaints.
 7             So that still registered, and I was the
 8   only one being targeted in this town.  And I still
 9   had "Trump" on the trailer.  And my feelings, that
10   was my freedom of speech.  I could have "Trump" on
11   my trailer.  I have got signs all over the place.  I
12   will put them up.  I will keep putting them up.  But
13   when they told me to get rid of it right there, I
14   was tired of messing with the town, tired of them
15   messing with me, trying to live my life.  And I got
16   rid of the trailer because I thought I was doing
17   what I was supposed to be doing, and I find out the
18   select board didn't have the power to remove my
19   trailer.  They didn't have the power till 2018 after
20   this letter.  They took it away from the building
21   inspector.
22        Q.   Who had the power, in your opinion, to
23   remove your trailer?
```

1    A.    Zoning board.

2    Q.    Zoning board?

3    A.    Zoning board and Jesse Pacheco.

4    Q.    And the zoning board never told you to

5  remove your trailer; right?

6    A.    Never had an issue with the zoning board

7  at all.

8    Q.    Okay.  And you never appealed any of the

9  decisions of the board of selectmen to the zoning

10  board; right?

11    A.    I never knew I had that option until --

12  until after it was gone.  I never knew.

13    Q.    And you never appealed any of the

14  decisions of the board of selectmen to the

15  New Hampshire Superior Court, did you?

16    A.    Excuse me?

17    Q.    You never appealed any of the decisions of

18  the board of selectmen to the New Hampshire Superior

19  Court?

20        MR. FOJO:  Object to form.

21    A.    I don't -- I don't understand that.  I was

22  not even informed of my appeal process from the

23  select board, which was part of the process.  They

1    completely kept me away from the appeal process, did

2    not let me know there was one even involved in the

3    ordinances.  "Just get rid of it."

4            But now if you see the new permits,

5    everything in there, if you have this and that, they

6    give permits.  You've got a year.  And they are on

7    there now.  They have got a year.  And you can apply

8    to the zoning board for appeal process.  They never

9    gave me that option, never let me know about it.  I

10   was just following what they told me I was doing was

11   wrong and I was living in their town.

12       Q    (By Mr. Dietel) Mr. McCoy, we're going to

13   go back here and look at one of our prior exhibits

14   that we talked about.  This was Exhibit E, the

15   notice of violation.

16       A.   Could you scroll to the top?  Is that the

17   undated one?  Yes, that's the undated one.

18       Q.   This is undated notice of violation.

19       A.   Yeah.

20       Q.   Can you read to me what the final

21   paragraph there says?

22       A.   It says, "If you believe the building

23   inspector is in error in the application or

1  interpretation of any provision of the building

2  codes, you have to the right to appeal to the zoning

3  board of appeals in a timely fashion.  This stop

4  work order controls unless and until it is

5  overturned by the zoning board of appeals."

6          That part I don't understand.  But when

7  Jesse Pacheco sent me that, he was directed from the

8  select board down here to give me this from the

9  select board.  And they made sure, through their

10  building inspector, that I go to the select board

11  because that's where they told me to go.  So the

12  zoning board of appeals?  I had no idea.  I was

13  directed to go to the select board.  They kept me in

14  front of the select board from beginning to end.

15      Q.   Mr. McCoy, I just put up a new document.

16  Can you see it?

17      A.   I see it.

18      Q.   Do you know what this is?

19      A.   Could you --

20      Q.   Do you want me to adjust it a little bit?

21      A.   Yeah.  Okay.

22      Q.   Do you know what this is now?

23      A.   Yep.  That's the letter that the select

1  board sent me 2018 that the trailer has got to be

2  gone.

3       Q.   Do you agree with me it says that you can

4  remove it for a three-month period and then apply

5  for another permit to bring it back?

6       A.   I didn't have no way to remove, don't have

7  the funds to remove, was tired with the board

8  messing with me about my trailer; so I got rid of

9  it.

10      Q.   Mr. McCoy, you don't disagree with me that

11  that's what it says; correct?

12      A.   Well, I disagree with you because the

13  select board didn't have the power to do this.

14      Q.   So you received this letter; correct?

15      A.   Correct.  I got it.  And if you notice in

16  there, there's no mention of the appeal process to

17  me like there should have been as there in others

18  nowadays.

19           MR. DIETEL:  So we're going to mark that

20      letter as Exhibit I.  It's the May letter --

21      May 2018 letter from the board of selectmen.

22           (J. McCoy Deposition Exhibit I was marked

23      for identification.)

146

Case: 21-1907 Case: 21-1907 Document: 00117865824 Document: 152 Page: 152 Date Filed: 04/15/2022 Date Filed: 04/15/2022 Entry ID: 6490055 of 1 Entry ID: 6490055

93

1    Q.   (By Mr. Dietel) All right.  Mr. McCoy,

2  we're going to look at another document.  Can you

3  see this letter I just put up on the screen,

4  Mr. McCoy?

5    A.   Yeah.  That's my letter.

6    Q.   And what is this?  Can you describe it to

7  me?

8    A.   Yeah.  I was saying I needed time to deal

9  with my trailer.  I was going by what they told me I

10  had to do.  And I had no idea that what they was

11  telling me I had to do they didn't have the power to

12  do it.

13       And at that time, it took me a long time

14  to empty and unload the other trailer they told me

15  to get rid of.  So I was doing -- I was doing way

16  beyond what I was capable of doing.  And my wife was

17  out there with me.  She's disabled with neck

18  problems.  So we had a lot of pressure put on us

19  about these trailer removals.

20       MR. DIETEL:  We're going to mark this as

21    Exhibit J, the May 29, 2018, McCoy letter.

22       (J. McCoy Deposition Exhibit J was marked

23    for identification.)

Case: 21-1907 Case: 21-1907 Document: 00117865824 Document: 1 153 Date Filed: 04/15/2022 Date Filed: 04/15/2022 Entry ID: 6490055 Page: 153 of 1 Entry ID: 6490055

94

1       Q.   (By Mr. Dietel) So, Mr. McCoy, by this

2   point in May 2018, you have applied for two permits.

3   Now you are requesting another extension; correct?

4       A.   I applied -- I was told September 2015 to

5   get a permit; so I applied.  And then the next time,

6   it was in May of 2017 and I applied for another

7   permit.  Two permits.  Just two.

8       Q.   Mr. McCoy, you ultimately got told you

9   have got to take the storage container off your

10  property; right?

11      A.   Excuse me?

12      Q.   You ultimately get told that you have to

13  take the storage container off your property?

14      A.   Yeah, remove it.  Correct.

15      Q.   All right.  And what were the reasons you

16  were given?

17      A.   They never really -- they started --

18  first, they mentioned complaints.  That was the main

19  reason.  And I wasn't good with that because that

20  was my right under First Amendment to have "Trump."

21  And "Trump" stayed on that trailer until the day it

22  was gone.

23           So my problem was it was always about

1   Trump and they made it to be about Trump.  They come

2   to me with the so-called complaints about Trump.

3   And from day one till day end, at the end of the

4   day, May, June, "Get rid of" -- I was tired of

5   dealing with the town select board for everything

6   they put me through.

7       Q.    Mr. McCoy, how much money did you make in

8   2018?  Did you have a salary, or was it just the

9   disability?

10      A.    I am on disability.  Me and my wife make a

11  little bit over $7,000 a year.

12      Q.    Okay.  Is that your only source of income?

13      A.    Well, I have garage sales from the things

14  I bought and sold over the years, garage sales.

15      Q.    Tell me about those garage sales.

16      A.    Who wants to come to Pittsfield?  I don't

17  sell much.  Last weekend I might have made 2 bucks.

18  I still got a bunch of stuff.  But I am not selling

19  a bunch.  It just doesn't -- it just doesn't go.

20      Q.    What sort of stuff do you sell?

21      A.    Anything that you can imagine in a storage

22  unit:  dishes, pots and pans, household goods,

23  some artwork I have accumulated.  And I have still

1   got most of everything.  I've got a lot.

2       Q.   And you got that solely from the

3   storage --

4       A.   Yeah.

5       Q.   -- containers that you buy?

6       A.   Storage facilities, yes.

7       Q.   Okay.

8       A.   Since I got disabled, I just started

9   buying storage units.  I accumulated a lot of stuff.

10      Q.   How much money do you think you make in a

11  year from that?

12      A.   Not much.

13      Q.   Okay.  Less than a thousand bucks?

14      A.   No idea.

15      Q.   Okay.  Did you lose any money or wages or

16  salary or anything because the storage container was

17  gone?

18      A.   Yeah.  I lost a pretty good bit that I had

19  in that storage -- both the storage trailers.  And

20  besides the tools and stuff in it, there was stuff

21  in there that I would not sell until come time for

22  property taxes and then I would sell it to help pay

23  my taxes.  Because when you are only making $679 a

Case: 21-1907 Case: 21-1907 Document: 00117865824 Document: 1 Page: 156 Page: 156 Date Filed: 04/15/2022 Date Filed: 04/15/2022 of 1 Entry ID: 6490055

97

1    month -- the wife is only making $314 a month.  My

2    wife buys the food.  We eat dollar food, peaches.

3    We don't eat a lot.  After I pay three, four hundred

4    dollars a month on my building, I am left with a

5    couple hundred dollars a month.  So there's not a

6    lot of finances; so I -- I do that to help make up.

7         Q.   Mr. McCoy, at its core, you are saying the

8    town discriminated against you because you wrote

9    "Trump" on the side of the trailer?

10        A.   Correct.

11        Q.   What evidence do you have of that?

12        A.   Well, the building inspector coming up

13   here telling me specifically "Remove the trailer in

14   30 days due to complaints."  And I didn't find out

15   for a while about the complaints.  And then when I

16   went to a meeting January 29, 2020, I knew about the

17   complaints then, and they was from select board

18   members.

19             So I went to that meeting, and I was

20   endorsing an individual in town.  In my situation, I

21   presented it to the town.  I went around and got

22   signatures.  "Let everybody in town have storage

23   containers.  Give me mine back.  Everybody has them,

1   no permits," this and that.  Of course, the select

2   board did not want that.  The planning board and

3   select board did not want that to happen.

4       Q.   Mr. McCoy, that was a town warrant

5   article, you said?

6       A.   That was a town planning board meeting.

7   And I even -- I informed them.

8       Q.   What else?

9       A.   I informed them that I found out they made

10  the complaints and they are the ones who wanted me

11  to get rid of my Trump sign.  I also told them I

12  don't want to sue the town.  It's in the recordings.

13  Don't go to the minutes.  Go to the recordings.  "I

14  don't want to sue the town.  Let us have our

15  trailers back."

16          "No."

17      Q.   This is after the trailer was already

18  removed; right?

19      A.   A few months after.

20      Q.   Yeah.  So the town -- I asked you what the

21  town did, what evidence you had that the town

22  selectmen, these three individuals, were trying to

23  get this off because it said "Trump."  You said that

1  you were informed that there were some complaints

2  from some of the selectmen.

3      A.   Complaints -- complaints by the building

4  inspector and in the town minutes.

5      Q.   Okay.  What else?

6      A.   Complaints.

7      Q.   What other evidence do you have that this

8  was because of your Trump sign, that you had to

9  remove it?

10     A.   Well, you would have to look at -- we got

11 complaints on the trailer, the trailer.  "You have

12 to remove the trailer."  We got complaints.  Right

13 after it hit the "Concord Monitor," we got

14 complaints.  And when confronted, "Oh, we don't know

15 who sent the complaints.  We don't know where they

16 came from.  We don't know who signed them."

17          But these board members, those three and

18 others, "Get that off your property."

19          "Complaints, complaints, complaints,

20 complaints."  That's all they mentioned to me.

21 That's all they withheld.  And when I questioned

22 them on it, they don't know who signed it, don't

23 know where they came from, don't know anything about

1    it.  There's no complaints on file nowhere, but it

2    was "Complaints."

3              So any ordinary individual, when they tell

4    you from the beginning, "Remove it due to complaints

5    or we're going to fine you" and they keep coming

6    back to complaints, and when you question them on

7    the complaints, they fess up they don't know nothing

8    about the complaints, something went wrong and it

9    was not on me.

10        Q.    Anything else, Mr. McCoy?

11        A.    Complaints.

12        Q.    Just complaints?

13        A.    Complaints.

14        Q.    Okay.  I just want to be clear.  The only

15    evidence you have that this was about the Trump sign

16    is that you were notified there were complaints

17    about the Trump sign?

18        A.    (Audio interference.)

19              (Reporter clarification.)

20        Q.    I asked you a question.  I said the only

21    evidence you had that you were discriminated against

22    because this was a Trump sign was because you said

23    you were told about complaints?

1      A.    Complaints.

2      Q.    And I am asking you, there was nothing

3   else?

4      A.    Just the complaints.  And then they would

5   mention a permit, and that permit was illegal.

6           MR. DIETEL:  Okay.  I am going to -- I

7      don't have any further questions right now,

8      Robert.  I am going to leave open Mr. McCoy's

9      depo in the event anything bubbles up over the

10     next couple of weeks.  But otherwise, I don't

11     have any further questions right now.

12          MR. FOJO:  Okay.

13          MR. DIETEL:  All right.  Mr. McCoy, thank

14     you for your time today.

15          THE WITNESS:  You, too.  I hope you-all

16     have a good weekend.

17          MR. DIETEL:  Enjoy the weekend as well.

18     It should be a nice one.

19          (The deposition was suspended at

20     3:11 P.M.)

21

22

23

```
 1              E R R A T A   P A G E

 2          I, JOSEPH MCCOY, the witness herein, have
      read the transcript of my testimony and the same is
 3    true and correct, to the best of my knowledge, with
      the exception of the following changes noted below,
 4    if any:

 5    Page/Line                    Change/Reason

 6    _____        _____

 7    _____        _____

 8    _____        _____

 9    _____        _____

10    _____        _____

11    _____        _____

12    _____        _____

13    _____        _____

14    _____        _____

15    _____        _____

16    _____        _____

17    _____        _____

18    _____        _____

19                          _____
                            JOSEPH MCCOY
20
          Sworn to and subscribed before me,
21    this _____ day of _____, 2021.

22                          _____
                            Notary Public
23                          My commission expires:
```

```
 1                    C E R T I F I C A T E

 2          I, Tina L. Hayes, a Licensed Shorthand Reporter

 3     and Notary Public of the State of New Hampshire, do

 4     hereby certify that the foregoing is a true and

 5     accurate transcript of my stenographic notes of the

 6     deposition of JOSEPH MCCOY, who was duly sworn,

 7     taken on the date hereinbefore set forth.

 8          I further certify that I am neither attorney

 9     nor counsel for, nor related to or employed by any

10     of the parties to the action in which this

11     deposition was taken, and further that I am not a

12     relative or employee of any attorney or counsel

13     employed in this case, nor am I financially

14     interested in this action.

15          THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT

16     DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY

17     ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR

18     DIRECTION OF THE CERTIFYING REPORTER.

19

20                    _____

21                    Tina L. Hayes, RPR, LCR

22

23
```

**$**

**$1,200** 24:1,19
**$124,000** 17:13
**$25** 82:15
**$300** 15:22
**$314** 97:1
**$4,000** 15:20
**$500-a-day** 73:2,5
**$679** 96:23
**$7,000** 95:11
**$75** 41:2

**1**

**1** 35:7,8 37:2 69:23
**10** 12:7 15:1 52:23
53:5,6
**107** 48:1 86:3
**12** 15:6 16:12
**13** 83:8 85:6
**134** 55:19
**14** 8:10 27:18,19 28:9
31:14 85:6
**16** 58:3
**18** 8:10
**1978** 12:18,22
**1984** 12:16 13:3
**1st** 27:1

**2**

**2** 95:17
**2,000** 52:5
**20** 11:19 42:8
**20-foot** 24:12
**20-something** 42:8
**2004** 12:6,18,23 13:3
14:2 16:15
**2010** 8:16
**2013** 9:19
**2014** 7:20 8:17 9:4,20
20:6
**2015** 14:5,16,17 26:4,
19,20,23 31:19
32:15 35:7 37:6
38:20 94:4
**2016** 27:2 35:8 43:3,
5,6,18 44:6,23 45:18
47:4,5 48:4,19,23
49:15 53:14 60:5
61:15 67:1 69:23
70:12,18 72:1,5,7,14
76:7 77:12,18 78:4
87:17,20
**2017** 14:17 35:14
39:10 40:4 53:14
60:4,5 76:15,17
77:13,19 81:2 83:8,
14 84:2,4,10 86:13
87:1,5,16,23 88:1
94:6

**2018** 15:5 35:15
41:15 87:7 88:19
92:1,21 93:21 94:2
95:8
**2019** 61:18,22 62:12
**2020** 97:16
**2021** 55:7
**21** 8:11 79:13
**23** 72:7
**28** 48:1
**29** 43:3 44:23 48:4
93:21 97:16

**3**

**3** 16:23 72:1,15 76:7,
21 77:18
**3(a)** 29:14
**30** 21:9 39:18 40:22
57:19 72:23 73:2
84:2 86:23 97:14
**31** 14:5
**322** 7:6

**4**

**4** 79:20
**40** 21:9

**5**

**52** 24:16
**52-foot** 24:22

**6**

**66** 14:11
**67** 14:11

**7**

**70** 17:18
**73** 52:4
**78** 12:6
**7th** 55:6

**8**

**80** 17:18
**84** 16:9

**9**

**9** 79:20

**A**

**ability** 80:11,13
**abouts** 72:16
**accident** 8:16 15:8
16:7,8,13
**accidentally** 11:18
**accomplished** 38:10

**account** 42:21
**accumulated** 95:23
96:9
**accusation** 82:17
**accused** 13:19
**acres** 16:23 17:18
**ad** 14:21
**Adam** 55:22 57:17
58:7
**add** 51:8
**adjust** 91:20
**admonition** 52:10
**agree** 4:2 20:10 22:2
33:5 35:6 36:13
37:23 38:11,13
42:23 43:1 51:10,11
80:9,10 83:7 92:3
**agreed** 41:5
**agreeing** 37:17,18
**agreement** 22:8
**ahead** 47:15
**Aid** 56:9
**Alex** 15:20
**Allard** 58:23 60:7
62:3,4 64:21
**allege** 55:1,4
**alleged** 24:16 55:4
**alley** 31:5
**allowed** 10:18 39:14
57:20 82:12,23
**Amendment** 94:20
**America** 85:21 86:5
**amount** 57:18
**Anderson** 55:19
57:6,12 58:6,23
59:22 60:6 62:2
63:6,8 64:3,21 65:13
88:4
**Anderson's** 65:8
**anymore** 39:2,4
**appeal** 89:22 90:1,8
91:2 92:16
**appealed** 89:8,13,17
**appeals** 91:3,5,12
**application** 90:23
**applied** 32:8 38:6
94:2,4,5,6
**applies** 35:19
**apply** 26:6 38:7
66:18 90:7 92:4
**appreciated** 86:17
**approached** 23:16
37:1 40:16
**approval** 83:8
**approved** 35:5,6
**arrest** 16:2 82:19
**arrested** 10:12 11:13
13:6 14:3,4,5 15:2
**arrests** 16:15
**article** 27:18,19 28:9
31:14 44:6 48:19
49:15 70:17 72:6

79:20
**artist** 43:13 46:15
47:13 85:4,6,12
**artwork** 95:23
**assertion** 51:15
**assume** 5:6
**attack** 8:19
**attacks** 18:1
**attempt** 66:14
**attention** 45:9
**attorney** 6:4
**auction** 14:18 18:19,
20,21
**audibly** 5:21
**August** 26:19,23
44:6 48:19 72:5
**aware** 14:1 65:19,22
66:3,4 79:5
**Ayer** 7:13

**B**

**back** 5:15 12:6,22
13:11 14:16 19:3
26:4 30:4 32:15
35:12 37:6,8 40:20
45:17 62:22 69:6
77:20 78:4 79:2
82:2,23 85:3,9,20
86:9 90:13 92:5
97:23
**bad** 48:8
**balloon** 47:12,16,17,
18,19,23 48:2 83:13,
22 84:19 87:1
**bargained** 14:13
**Barnstead** 41:20
42:3 55:19
**based** 64:7
**basically** 6:17 16:5
46:20 47:7 49:2,5
67:18 88:4
**basis** 10:21
**bear** 19:17 42:16
**beat** 68:3 76:2
**beep** 68:1
**begged** 59:3 60:1
82:14
**beginning** 52:16
91:14
**belabor** 67:20 68:2
**belief** 36:1
**believed** 44:15
**belongings** 25:4
**big** 85:7
**Bill** 23:5
**Bill's** 24:4
**bills** 72:1
**bit** 7:22 8:6 55:10
91:20 95:11 96:18
**black** 64:16 80:5,21
**board** 21:23 33:22
34:15 35:14,20

36:10 50:9,21 51:4,5
53:21,23 54:4,5,10,
15 55:21,22 59:2,13,
19,20 60:16 62:14,
18 63:10,22 71:12,
13 73:19 74:13,14
75:13 76:14 77:1,18
78:11 79:1 81:12
82:2,5 83:2,3,9
87:19 88:18 89:1,2,
3,4,6,9,10 91:3,5,8,9,10,
12,13,14 92:1,7,13,
21 95:5 97:17
**Bob** 57:19,23 58:4
**Bobby** 17:16
**book** 14:19
**books** 37:21
**born** 17:17,20
**bottom** 35:2,3 36:17
64:13 85:20
**bought** 7:21 9:12
17:6 18:7,9 21:14
23:4,10 25:4,16
95:14
**bowling** 31:5
**box** 33:2
**break** 5:23 68:20,23
69:4,5,13
**breaks** 6:2
**bring** 92:5
**bringing** 84:23
**brought** 7:15 12:2
20:5 36:6 56:5,21
68:10
**Brown** 17:16
**bucks** 95:17 96:13
**building** 21:2,12,15,
18 26:8,9,14,21
32:7,17 40:7 50:22
53:23 54:9 59:14
73:20 75:12 79:2
82:19 88:5,20 90:22
91:1,10 97:4,12
**built** 26:10 85:7
**bunch** 43:11 95:18,
19
**burglary** 13:9 15:1
**Burn** 50:13
**bus** 33:3
**buses** 21:10
**business** 42:5
**buy** 14:22 16:20
17:4,15 18:19,20
19:12 96:5
**buying** 14:17 96:9
**buys** 97:2

**C**

**call** 66:6
**called** 82:23
**canvasses** 85:11
**capable** 25:12 36:20,
22 93:16

**car** 16:13 44:10

**care** 37:4 75:10

**careful** 5:10

**Carl** 55:19 57:5,12
58:6,23 59:2,22 60:6
62:2 63:6,8 64:2,21
65:8,12 82:10 88:4

**Carole** 57:17 58:7
62:15 63:13 65:15
77:6 78:8 80:18

**carpenter** 8:2,3

**case** 4:14 10:16 15:4
16:4,11 80:3

**Catamount** 7:6 86:3,
10

**Century** 8:11

**chairman** 63:22

**changed** 66:8 84:16,
17 85:22

**charge** 14:9 15:12
26:14 54:1 73:4 79:1
81:12,21 83:4

**charged** 13:6,19,22
14:3,4 15:19 16:14
82:15

**charges** 16:15

**charging** 82:20

**check** 27:7

**checked** 15:21

**chief** 59:15

**choose** 9:8 16:17

**cigarette** 19:20

**claim** 53:22 65:2,4,5

**claimed** 65:6

**claiming** 81:9

**clarity** 65:18

**Clark** 58:3

**Clayton** 63:21

**clear** 5:10 44:19
56:20 86:20

**close** 46:23 48:15
83:15

**codes** 91:2

**coffee** 69:15

**coins** 14:19,23 15:7,
15,17,19

**comments** 48:6
50:14,20

**commercial** 8:6 21:9,
11 39:13,15 57:19

**committing** 13:20

**complain** 50:5

**complained** 51:20
52:1 82:8

**complaining** 50:17,
20 51:6

**complaint** 24:16 40:8
52:21 53:9 54:9
58:18 64:3 65:9
76:23 78:12 79:12
82:2

**complaints** 23:16
36:3 40:17 48:16

50:23 51:12,16,18
52:6,19 53:1,22
54:2,3 59:12,15
60:17,18,20,23 61:4,
6,7,20 62:13,16,20
63:4,5,23 71:14
72:10 77:22 82:9
88:6 94:18 95:2
97:14,15,17

**completely** 29:21
74:9 85:4 90:1

**compliance** 29:3

**comply** 37:15,23
75:17,22 76:1,3

**complying** 37:19

**concern** 10:15 31:11,
12 36:11 55:5

**concerned** 23:18
75:15

**Concord** 7:9 14:6,20
44:5,12,17 45:5
48:19,23 49:14
70:17 72:6,8 88:23

**condition** 36:23

**conditions** 79:19,20

**confronted** 64:14

**connect** 57:8

**connection** 29:7

**constitutional** 54:22

**construction** 8:5
9:16

**construed** 46:20

**contacted** 16:21 80:5

**container** 24:13
29:18,22 30:11,13
31:3,5 32:6 33:6,15,
18 36:14 46:4 49:23
56:10 65:20 66:9
67:9 71:4 73:18
77:14,17 79:15
81:16,19 87:16 94:9,
13 96:16

**containers** 19:10
27:18,22 28:10
31:15 32:2 33:1,2
49:18 79:6,8 81:3
83:8 96:5 97:23

**content** 63:19

**continued** 87:19

**controls** 91:4

**conversation** 26:17
44:14

**conversations** 61:8,
21 62:10

**convicted** 10:13
11:14

**cool** 47:20

**cops** 15:3,7

**copy** 28:19 57:2
65:12,13 69:18

**core** 97:7

**corner** 84:1

**correct** 19:14 26:5
28:15 36:15,18,21
39:3,5,6 43:4,8 44:7
51:7 52:1 53:10,15,
17,18 55:15,16 61:2

64:21 67:2 68:7
69:21 71:6 75:5,7
76:13 78:5 80:14
81:19 83:10,14
84:12,14 87:14
92:11,14,15 94:3,14
97:10

**correctly** 81:1

**correspond** 56:18

**counsel** 4:11

**count** 49:11

**country** 7:21 16:23
48:12

**couple** 25:17 27:2
97:5

**court** 5:9 9:20 16:4
80:3 89:15,19

**Craigslist** 14:19,21

**created** 50:14

**crime** 10:13 11:14
14:4

**crimes** 13:5,22

**Croft** 15:12,18

**current** 29:5

**D**

**date** 9:19 25:17 35:5
39:9 40:10 41:14
43:2 69:20 70:5,13
72:7,13 73:9 83:9,23

**dated** 44:22 70:15
72:1 83:8

**Dates** 60:2

**day** 47:7 73:5 85:22
86:15 94:21 95:3,4

**days** 72:23 73:2
97:14

**dead** 68:3

**deal** 17:6 82:5 93:8

**dealing** 27:18,21
95:5

**decided** 12:3 17:3

**decimated** 73:3

**decision** 54:18

**decisions** 89:9,14,17

**deck** 25:7

**defendant** 36:10

**definition** 79:14

**delay** 75:10

**delivered** 24:14

**delve** 4:15

**democracy** 20:10,13

**Democrat** 50:13

**Democrats** 50:9

**Department** 14:20

**depos** 42:13

**deposed** 4:6 9:14,21

**deposition** 4:13 22:7,
21 31:16 38:22 45:2
70:23 76:8 81:6 87:2
92:22 93:22

**describe** 20:18 24:6
42:17 93:6

**describing** 51:3

**details** 14:23

**detective** 15:12,18,
22

**detectives** 14:20

**died** 12:3

**Dietel** 4:2,9,10 10:21
11:2,12 22:14,23
31:8,13,18 33:14
34:6 35:1 38:18 39:1
40:19 44:20 45:4
52:11 57:1,5 62:22
63:2 65:10,16 69:3,6
70:20 71:2 76:5,10
77:3,10,12 80:23
81:8 86:19 87:4
90:12 92:19 93:1,20
94:1

**difference** 18:22,23

**difficult** 12:13

**difficulty** 4:18

**direct** 82:3,4

**directed** 82:3 91:7,13

**direction** 86:6

**directions** 86:8

**dirty** 10:8

**disability** 34:22 38:6
73:4 74:11 95:9,10

**disabled** 38:9 72:22
74:9,19 93:17 96:8

**disagree** 77:10
92:10,12

**discovery** 57:3 65:11

**discriminated** 97:8

**discriminating** 53:17

**discussed** 52:16
76:11 87:5

**discussing** 44:21
86:22

**dishes** 95:22

**district** 21:9,11
39:14,15 57:20

**doctor** 10:8

**document** 28:8 32:1,
4,5,10,11,21 35:2
36:13,16 38:11
42:12 71:7,10 78:18,
19 81:2 83:18 86:20
91:15 93:2

**Dodge** 57:17 58:7
62:15 63:13 65:15

**dollar** 23:5 24:4 56:9
97:2

**dollars** 41:23 97:4,5

**door** 21:15

**doors** 85:20 86:9

**doubt** 28:21

**downtown** 21:11
67:17

**drive** 24:5 50:10

**driveway** 18:14
44:10 45:15

**driving** 14:12 16:20
45:7,8

**dropped** 10:11

**Duckler** 44:12 45:6

**due** 35:13 36:2,23
40:8 48:16 50:22
54:3 71:14 72:10
77:22 97:14

**duly** 4:6

**duration** 36:6

**E**

**earlier** 18:19 83:12

**early** 44:1

**eat** 97:2,3

**Edward** 7:5

**effect** 81:9

**effort** 87:15

**elderly** 15:13 18:2

**elected** 46:14 64:13
76:12

**electing** 44:16

**election** 47:1,8,10,11
48:15 61:11,15,16,
17,23 62:6,18 64:12
72:14

**Elvis** 12:3

**emotional** 50:15

**employed** 8:15

**empty** 25:18,22
39:11 77:23 93:14

**end** 18:14 26:19,23
60:5 70:12 75:7
87:17 91:14 95:3

**ended** 8:17 10:9
11:18,19 14:10,13
26:13 77:2

**endorsing** 64:2
97:20

**enforced** 53:12

**enforcing** 55:14

**England** 8:13

**entire** 21:15

**erratically** 14:12

**error** 90:23

**established** 71:5

**eventually** 79:9

**evidence** 16:5 97:11

**evidentiary** 11:7

**EXAMINATION** 4:8

**exclamation** 43:7

**exclude** 11:6

**Excuse** 9:7 20:12
30:21 33:13 34:12
38:17 70:9 75:1
80:12 81:17 86:7
89:16 94:11

**exhibit** 22:15,21
31:14,16 38:20,22
44:22 45:2 48:4
68:18 69:17 70:21,
23 71:3,16,19 76:6,8

81:4,6,8 83:7 86:23
87:2 90:14 92:20,22
93:21,22

**exhibits** 22:18 90:13

**expired** 69:23 70:3
72:2 87:6

**explain** 22:5 45:8
46:7 62:21 78:23

**explained** 6:16 44:11
62:15

**express** 79:17 85:10

**extend** 35:14

**extension** 35:15,17
74:6,22 75:2 76:13
78:13 94:3

**F**

**Facebook** 42:21
44:22 48:2,6,13

**facilities** 96:6

**facility** 19:10,11 33:4

**fact** 78:14

**facts** 4:14 41:14
64:10

**factual** 52:15,20 55:5

**factually** 68:4

**failure** 14:14

**Fair** 49:23

**falls** 35:21

**familiar** 31:19 47:17

**famous** 49:22

**farmhouse** 17:17

**fashion** 91:3

**father** 8:10

**fee** 82:16

**feel** 55:13

**feelings** 88:9

**feet** 24:16

**felony** 15:19 16:2

**felt** 59:5

**fence** 45:12

**festival** 84:19

**field** 45:15

**figure** 60:19

**filed** 58:14 79:22

**final** 90:20

**finally** 6:8 87:19

**finances** 97:6

**find** 36:5 45:5 62:14,
19 63:3,4 64:8 75:23
80:18 82:3 88:17
97:14

**fine** 11:5 22:20 73:2,
3,5,14

**fines** 77:22

**finger** 50:10

**finish** 66:1

**five-minute** 69:4

**fixed** 19:10

**FOJO** 4:4 10:19,23
11:4 22:20 31:6
33:12,19 34:11 38:2
40:14 57:4 69:2
80:15 89:20

**folks** 64:13

**food** 97:2

**football** 45:15

**force** 74:8

**forced** 36:7

**forcing** 76:4

**form** 31:6 33:12,19
34:11 38:2 40:14
80:15 89:20

**found** 14:10 15:6
35:12 54:3 58:14
61:20 64:4,8 72:1
79:8 81:13 82:13,16

**four-wheelers** 20:20

**freedom** 74:14 88:10

**Freese** 42:3 57:19,23
58:1,4,5

**friendly** 62:7,10

**friends** 12:5 48:13

**front** 8:7 44:17 47:15
91:14

**full** 7:4

**fun** 8:22

**funds** 92:7

**G**

**gangrene** 8:18 10:9

**garage** 17:1 25:8
95:13,14,15

**gas** 56:9

**Gauthier** 55:22 57:17
58:7

**gave** 26:15,20 32:5
58:15 72:9 73:1 79:4
85:4 87:20 90:9

**Georgia** 11:22,23
12:2,10,22 50:13
51:7 52:20

**get along** 8:23

**give** 5:18 28:23 38:14
57:9 58:15 74:5,6
77:8 90:6 91:8 97:23

**giving** 6:11 10:9

**good** 6:21 10:10 18:5
24:19 26:22 45:15
48:8 68:22 75:9 84:8
85:11,12 94:19
96:18

**goods** 95:22

**graffiti** 43:13 46:15
47:12 85:4,5,10

**grandfathered** 39:15,
17 57:21

**great** 85:21 86:5

**ground** 4:16 65:17

**grounds** 11:7

**guilty** 15:6 16:12

**guy** 18:5 44:1

**guys** 62:7 77:8

**H**

**half** 68:21 73:5

**Hampshire** 7:6,16,17
12:8 43:22 89:15,18

**Hampton** 14:8

**hand** 4:20 5:19 16:1
17:6 29:10

**handwriting** 75:9

**happen** 66:20

**happened** 68:4

**harass** 60:14 87:8

**harassed** 58:19 60:7,
8 64:19 87:11,13

**hard** 74:19

**Hatfield** 7:7

**head** 5:19 50:2

**health** 75:15

**hear** 5:22 8:21 68:1
69:10,11 78:12
82:23 85:16

**heard** 5:6 18:18
49:17,20 60:20 62:3
68:6 79:9 80:22 88:4

**hearing** 4:19,21 6:21,
23 60:21 80:4

**heart** 8:19 17:23

**held** 59:13

**Hillary** 67:17

**hit** 14:7

**Hold** 38:18

**holding** 5:19

**home** 7:21 17:2 18:2
33:3

**homicide** 14:9

**horse** 68:3

**hospitals** 23:18 60:2

**hour** 68:21

**house** 18:12 46:2
50:10 73:22 74:19
85:8 86:4

**household** 46:1
95:22

**humongous** 17:1
57:17

**hundred** 97:3,5

**hurried** 18:3

**husband** 15:14

**I**

**idea** 11:17 24:23
27:9,10 41:5 42:7
49:12 53:2,7 58:10
64:23 65:2,3 70:4
75:14 77:9 78:9
84:5,18 85:1 91:12
93:10 96:14

**identification** 22:22
31:17 38:23 45:3
71:1 76:9 81:7 87:3
92:23 93:23

**identified** 15:15
64:18

**imagine** 95:21

**immediately** 15:15
17:5

**important** 5:8 20:11,
13,16 30:20,23

**importantly** 6:9

**impression** 35:21

**incarcerated** 12:9,18
13:1,3

**including** 33:22
34:15 36:10 51:6
52:19

**income** 95:12

**individual** 97:20

**individually** 64:19

**individuals** 53:19
54:5 58:19 62:16
63:14

**infection** 8:18

**information** 11:7
56:2 80:22

**informed** 89:22

**inside** 19:13

**inspect** 26:21 32:7

**inspector** 26:8,14
32:17 40:7 50:22
53:23 54:9 59:14
75:13 79:2 82:19
88:5,21 90:23 91:10
97:12

**instructions** 6:15

**instructs** 6:7

**intend** 46:18

**intended** 46:17

**interpretation** 91:1

**interrupt** 5:16,17
39:20 52:9 61:14

**investigating** 15:23

**involved** 15:8 16:6
30:5 32:15 90:2

**involvement** 16:9

**issue** 89:6

**items** 46:1

**J**

**J** 22:21 31:16 38:22
45:2 70:23 76:8 81:6
87:2 92:22 93:22

**January** 43:3,5,13,18
44:23 48:4 97:16

**Jesse** 26:8 32:5 40:7
71:13,20 72:4,9 73:1
74:12,13 76:23
77:21 78:2 89:3 91:7

**Jim** 58:23 60:7 62:3,4
64:1,21

**job** 84:8

**jobs** 81:3

**Joe** 10:19 11:6

**Joseph** 4:5 7:5

**July** 9:4 14:5 27:5
41:15 83:14 84:2,3,
10 86:13,23

**June** 9:4 35:15
76:14,16,17 77:13,
19 82:1 83:8 87:5,7
95:4

**jury** 15:5 16:12

**justice** 15:23

**K**

**kicking** 17:21

**kid** 13:7

**knew** 49:3 79:23
89:11,12 97:16

**knowing** 36:22 50:12

**knowledge** 10:5
13:17 49:15,16

**Konopka** 55:21
57:15,16 58:7,23
60:6,14 61:9,11
64:21

**L**

**lady** 15:13

**Larry** 55:21 57:15,16
58:6,23 60:6,13
61:9,11 62:1 64:20

**law** 37:20,21

**lawsuit** 9:15,22 10:6,
11 56:5,21 79:22

**lawsuits** 9:23

**lawyer** 10:10 14:10
15:20 56:15,19 57:8
86:18

**learn** 8:8

**leave** 82:18

**leaving** 17:5

**left** 17:3 21:3,12
85:21 86:15 90:7 97:4

**left-hand** 84:1

**leg** 8:18

**legal** 81:10,11 83:3

**letter** 37:5 59:23
65:8,12 69:22 70:6,
22 71:3,12,23 72:20
73:8 74:5 75:6 76:6,
7,11,17,20,21 77:4,7
78:1,8 82:11,14
88:20 91:23 92:14,
20,21 93:3,5,21

**letters** 43:6

**lie** 59:3

**lied** 64:4,5,6,8,9,11,
12

**lies** 16:6

**life** 7:22 88:15

**lifelong** 7:11

**liking** 51:9

**lips** 6:23

**list** 55:20 56:11,13
57:2

**listened** 32:17

**live** 7:4,5 88:15

**lived** 7:17 17:16 85:6

**lives** 58:10

**living** 8:1 90:11

**loaded** 25:20

**lobby** 11:9

**local** 7:19 8:12

**located** 55:18

**lockdown** 12:12

**Londonderry** 23:5 24:5

**long** 6:1 24:16 39:11 42:5,9,10 47:22 56:1 84:4 93:13

**longer** 85:16

**longest** 12:10

**looked** 15:17 16:22 71:19

**lose** 96:15

**lost** 96:18

**lot** 7:20 15:3 16:5,6 25:3,4,13 48:6,13 50:14 51:3,4,8,10 61:5 93:18 96:1,9 97:3,6

**lots** 50:17 52:14

**love** 51:13

**loved** 51:21 52:2,7

**loving** 51:17

**lying** 15:3

---

**M**

**made** 15:13 59:12 60:22 62:13,16,20 63:3,4,23 64:3,16 74:10 82:2,17 91:9 95:1,17

**main** 32:23 67:19 94:18

**maintenance** 25:8 38:10 45:23 73:21

**major** 11:18

**make** 6:10 10:8 26:21 51:15 52:14 67:21 77:13,16 85:21 86:5 87:15,21 95:7,10 96:10 97:6

**making** 21:18 34:7 82:9 96:23 97:1

**Manchester** 7:19 25:3,19

**March** 15:5 61:18,19, 21 62:12

**mark** 22:15 31:13 38:20 44:20 70:20 76:5 81:3 86:23 92:19 93:20

**marked** 22:21 31:16 38:22 45:2 70:23 76:8 81:6 86:21 87:2 92:22 93:22

**Massachusetts** 7:14 12:7

**Mccoy** 4:5,10 6:9 7:3, 5 8:21 9:13 10:17 11:12,21 13:12 17:7 19:16,21 20:11,17 22:1,21 23:2 28:9 30:7,19 31:16,18,23 32:22 33:5 34:7 35:18 36:13 37:6,20 38:15,22 39:1,20 42:12 44:18 45:2 48:4 49:14 50:6 51:1,19 52:8,11 53:9 55:8 56:1 57:10,22 58:18 59:20 60:21 61:14 62:19 63:2,11 64:7,18 65:14,16,23 67:20 68:19 69:7,17 70:6,23 71:3,9 72:12 73:15 75:7 76:7,8,10 77:11 78:2,18 79:12 80:10,23 81:6 83:5, 12,17,19 86:6,12 87:2,4 90:12 91:15 92:10,22 93:1,4,21, 22 94:1,8 95:7 97:7

**Mccoy's** 79:13,18

**Mccoys** 7:7

**meaning** 81:9

**means** 30:14 31:9 56:4 87:6

**meant** 9:13

**measured** 24:18

**media** 48:17 52:22

**medical** 7:20 32:16

**meet** 79:14

**meeting** 4:12 59:2, 19,20,23 82:8,17,18, 21 97:16,19

**meetings** 59:4,5,7

**member** 63:10

**members** 33:22 34:15 35:20 36:10 50:9 54:10 62:14 97:18

**memory** 70:11

**mention** 80:3 92:16

**mentioned** 78:9 82:11 94:18

**mentions** 82:13

**message** 63:14 73:1

**messages** 62:15 63:16,19 65:14

**messing** 88:14,15 92:8

**met** 77:18 78:3 79:19

**metal** 8:17

**methamphetamine** 14:12

**MF** 50:13

**mid** 47:4,5 48:23 85:5

**middle** 66:23

**midst** 60:2

**mind** 13:11 19:19,21

**mine** 38:4 97:23

**minute** 19:18

**minutes** 15:6 16:12 80:22

**mischief** 47:14

**misdemeanor** 14:13, 14

**misleading** 16:11

**mobile** 33:3

**money** 73:15 95:7 96:10,15

**Monitor** 7:9 44:5,12, 17 45:5 48:19 49:1, 15 70:17 72:6,9 88:3

**month** 41:2 72:21 83:1 97:1,4,5

**months** 18:4 78:15

**motorcycle** 15:8 16:7,8

**motorcyclist** 14:7

**mouse** 29:10

**move** 9:1,2 11:6 16:21 41:6,8 75:20 87:15

**moved** 7:19 12:7,21 20:6,21 23:4,6,7,8 25:3,15,18 26:1 27:11,12 29:3 34:2 41:20 46:2 55:6

**moving** 5:7 6:23 25:2 29:10 74:20

**multiple** 8:17 38:5 60:23 67:8 68:7,8

---

**N**

**named** 17:16 23:5 62:14

**nature** 62:9

**neck** 93:17

**needed** 21:22 24:14 25:8 26:10 27:11 40:15,18 73:8 74:17 93:8

**needle** 10:8

**neighbor** 63:21

**neighbors** 18:13

**neighbors'** 18:10

**newspaper** 45:7 59:13

**nice** 16:23 17:7,8,10 84:9

**night** 50:12

**nodding** 5:19 50:2

**north** 12:23

**Northwood** 86:11

**Noted** 57:4

**notice** 69:20 70:2,21 71:16,20 72:4,21 73:9,12 74:10 82:6 90:15,18 92:15

**noticed** 26:23 32:7 48:15,18,23 58:10

**notified** 60:15

**November** 72:1,7,15, 22 74:8 76:7,11,21 77:12,18 87:17

**nowadays** 92:18

**number** 55:12

---

**O**

**oath** 6:10,11 69:8

**Object** 31:6 33:12,19 34:11 38:2 40:14 80:15 89:20

**objecting** 10:23 11:4

**objection** 10:22 11:8

**objects** 6:4

**obligation** 52:17

**occurred** 61:21 73:10

**October** 88:2

**office** 68:11

**officer** 11:19 14:8,10

**on-the-ground** 24:13

**one-year** 87:6

**open** 6:1

**operation** 42:6

**opinion** 31:9 38:3 49:9 87:9 88:22

**option** 89:11 90:9

**order** 91:4

**ordinance** 23:12 27:7,9,15,21 28:13, 14,16,17,19 29:2,5 31:4 33:21 39:19 53:12 55:14 65:19 66:5,7 79:19 80:6,8, 11,14,19

**ordinances** 28:1,3,16 29:7 30:4,5 54:1 75:14 79:2 81:13 90:3

**originally** 7:10,13

**Outdoor** 79:21

**outset** 9:14

**overturned** 91:5

**owned** 14:23 17:14, 18 27:10

**owner** 16:21

**owns** 21:7 55:18

**oxygen** 18:1

---

**P**

**Pacheco** 26:8 40:7 71:20 89:3 91:7

**paid** 24:4

**paint** 43:9,10 45:17 47:11,15 84:4,18

**painted** 23:15 43:6, 12,16 47:7 71:4

**painting** 43:15 83:21

**paints** 84:3

**pans** 95:22

**paperwork** 82:6

**paragraph** 79:13 90:21

**paranoia** 50:15

**part** 65:9 67:5 80:21 89:23 91:6

**party** 10:1,6

**passed** 15:14 18:2,5

**patience** 42:12

**pause** 44:18

**pay** 17:11 23:20 73:6 77:22 96:22 97:3

**paying** 40:23

**peace** 16:1

**peaches** 97:2

**pending** 6:2

**people** 19:12 35:20 37:10 50:9,17,20 51:4,5,8,10,17 52:6, 14 60:9

**period** 33:7,16 56:19 87:6,8 92:4

**perjury** 13:20

**permit** 21:20,21,22 26:3,7,9,11,13,15, 20,22 27:1,4,8 28:3 29:21 30:1,2 31:19 32:1,20 33:1 34:4,5, 17,18,21 35:13,15 36:4,5 37:22 38:6,7, 20 40:12,16,18 59:3 66:10,18 69:22 70:3 72:2 78:21,22 79:2,4 80:4 81:3,9,10,11, 15,18 82:1,15,16,20 83:1,3,6,7 87:5 92:5 94:5,7

**permit's** 34:9

**permits** 26:14 33:23 34:15 35:11 39:2,3 58:12,13 79:6,7,23 81:21,22,23 83:4 90:4,6 94:2,7

**permitted** 33:7,15 36:14

**Permitting** 79:20

**person** 17:16 23:5 38:8 51:20,21,23 52:2

**personal** 38:3

**personally** 50:19

**photographer** 45:6

**photos** 55:20

**physical** 36:23 39:11 50:15

**physically** 24:7 25:9, 12 37:4 38:11 76:2

**physicals** 23:18

**picture** 20:4,18 22:3 43:11 44:21 86:21 87:1

**pictures** 56:17 57:2 86:12,14

**Pittsfield** 4:11 7:6,12 9:3 16:18 17:7 18:15 23:7,8 25:15 32:1 34:18 38:4 47:12,18, 23 48:10,12,14 49:18,23 83:22 84:19 95:16

**place** 9:11 16:22,23
17:6,19 18:17 21:8,
17 25:19 27:12
45:13 46:1 49:1 55:5
57:21 61:12 62:11
72:9 74:2 88:11

**places** 47:13 85:6

**plan** 22:17

**planning** 55:22 63:22

**plea** 14:13

**plywood** 85:7,8

**point** 34:1,6 43:7
46:5 47:2 48:22 49:2
52:13 64:11 67:21
68:3 71:2 73:18 83:6
94:2

**police** 11:19 14:8,20
16:6 59:16 82:18

**political** 79:17 80:8
84:15

**pond** 17:1

**popular** 44:3

**position** 37:3 38:9
64:2

**possibly** 9:18 53:6

**post** 42:20 44:22
48:3,4 80:20

**posted** 7:8 14:19

**posting** 80:19

**pots** 95:22

**power** 88:18,19,22
92:13 93:11

**presented** 97:21

**President** 20:8 76:12

**Presidential** 61:16
72:14

**Presley** 12:3

**pressure** 93:18

**presume** 43:10

**pretty** 6:20 17:7 37:5
41:13 47:20 48:9,11
72:15 75:9 82:7
83:15 85:11 96:18

**previously** 13:6
17:14 56:14

**price** 24:19 41:5

**primarily** 45:18 66:23
67:4

**primary** 43:22

**principally** 79:16,17

**prior** 12:19 62:23
90:13

**prison** 11:20 12:11
14:3

**prisons** 12:10

**Pritchard** 64:1

**private** 82:22

**problem** 23:15 36:12
39:11 94:23

**problems** 7:20 38:5
93:18

**process** 25:2 42:13
89:22,23 90:1,8
92:16

**produced** 56:13

**profession** 7:23

**pronouncing** 71:21

**properties** 9:11
16:20 18:11 34:3
55:23

**property** 9:5,8 15:2,
7,11 16:2,14,17
17:12 18:6,8,9
21:10,19 23:10 24:3,
5 25:9,21 26:18
27:3,10 33:17 36:7,
12 38:16 39:2,4,17
40:6,13,22 41:12,19,
20 45:12,16 56:6
57:7,18 58:9 59:14
61:12 62:5 66:10,15
75:16 77:14,17
78:14 80:8 85:23
87:18 94:10,13
96:22

**proud** 67:6

**proved** 16:11

**provision** 91:1

**pseudomonas** 8:18
10:9

**public** 13:17

**publicity** 49:19

**published** 72:6

**pull** 31:21 68:17

**pulled** 28:19

**purchased** 20:21

**purpose** 4:12

**purposes** 29:23 30:3
32:19,22 33:4,7,16
36:15 65:20

**put** 19:12 26:1 62:5
71:7,9 74:3 78:19
83:17 88:12 91:15
93:3,18 95:6

**putting** 88:12

**Q**

**question** 5:7 6:1,6
11:9,13 12:21 24:8
30:6 34:7 35:18
37:21 39:21 49:10
51:2,16 52:4,6,16,20
62:23 63:12,13
87:10

**questioned** 79:10

**questions** 4:13 5:2,
13 37:14 57:11

**quick** 17:23 69:4

**quiet** 7:22 17:10

**R**

**race** 47:12,16 83:22
84:19

**raise** 4:20

**raised** 16:1

**rally** 47:16,19,23
48:2

**ran** 35:22

**rate** 24:22 41:3

**Ray** 44:12 45:6

**re-** 81:23

**reach** 44:8

**reached** 78:7

**read** 29:16,18 32:12,
14,16,23 33:14 37:5
45:7 53:8 62:22 63:1
75:8 80:11,13,16,17,
18 90:20

**reading** 30:8 33:21
36:8,20

**real** 17:22

**reason** 17:22 28:20
53:12 62:17 77:23
94:19

**reasonable** 6:2

**reasons** 94:15

**recall** 65:7 84:23

**receive** 70:6

**received** 60:23 70:11
87:5 92:14

**receiving** 15:2 16:2
70:8

**recognize** 40:12,15
83:2

**record** 5:10 7:3
13:15,17 44:19 69:7

**recorded** 5:20

**recordings** 59:4,22,
23 82:11,13

**red** 43:6

**redo** 25:6,7,8

**redoing** 73:21

**redone** 29:4 66:5

**Reese** 42:2 57:19
58:1,5

**referenced** 65:14

**registered** 88:7

**Reidsville** 12:11

**relate** 13:23

**relation** 7:7

**released** 14:2

**remember** 13:10,13,
16 14:15 39:12 53:3
58:20 70:8,10 72:12,
13 77:20,21

**removal** 63:17

**removals** 93:19

**remove** 40:8 41:10
48:16 50:22 54:2,19
60:15,16,17,18,22
72:11,23 77:21
88:18,23 89:5 92:4,
6,7 94:14 97:13

**removed** 35:4 36:18
55:3 62:17 64:1
85:23

**renew** 34:21 82:16

**rent** 41:1

**rented** 21:7,17 24:11,
12 39:16

**renting** 39:8,23 40:2,

3,20

**repainted** 83:13

**repairs** 21:18

**repeat** 67:23

**rephrase** 24:9

**report** 74:14

**reporter** 5:9 52:10

**represent** 42:20

**representing** 69:21

**Republicans** 64:22

**request** 76:17

**requesting** 94:3

**requests** 57:3 65:11

**require** 54:19

**required** 55:3 79:6,7,
23

**requirements** 37:15

**researched** 23:9

**resident** 7:11

**Residential** 8:5

**respectfully** 77:10

**respond** 57:3 73:13

**responded** 76:19

**response** 12:20
68:14

**responses** 5:18,21

**retired** 14:8,11

**reviewed** 27:14,17,
20

**rid** 36:2 59:1,18
67:18 71:14 87:21
88:3,13,16 90:3 92:8
93:15 95:4

**ride** 18:15

**riding** 9:10 50:20

**right-of-way** 14:14

**rights** 54:22 82:4

**Rite** 56:9

**road** 7:6 48:1,12
55:19 86:3

**Robert** 4:10 6:4
10:21 22:14 57:1
65:10 77:3

**rod** 8:18

**rules** 4:16 75:17,22,
23

**running** 8:13 62:18
64:1 68:11

**S**

**salary** 95:8 96:16

**sales** 95:13,14,15

**sat** 23:14

**scene** 83:13 84:19

**school** 21:10 33:3

**screen** 19:16 20:1
22:23 28:6 29:11
38:21 45:1 69:17
71:10 78:19 83:17,
20 93:3

3,20

**repainted** 83:13

**Screw** 67:18

**scroll** 90:16

**Section** 29:14 79:20

**sections** 27:20

**select** 21:23 35:14
50:9,21 51:4,5
53:21,23 54:4,5,10,
15 55:21 59:13
60:16 63:10 74:13,
14 75:13 76:23 77:1
79:1 81:12 82:2,5
83:2,3 88:18 89:23
91:8,9,10,13,14,23
92:13 95:5 97:17

**selectmen** 54:13,14
60:11,12 64:19
71:13 76:14 78:11
83:9,11 87:13 89:9,
14,18 92:21

**sell** 41:22 95:17,20
96:21,22

**selling** 95:18

**sells** 85:11

**send** 22:17 76:10
86:16,18

**sentences** 36:21

**September** 26:20
27:1 35:7,8,22 37:2
69:23 78:4 94:4

**session** 82:22

**set** 17:19 51:4

**settle** 9:5

**settled** 9:20

**share** 19:15

**sharing** 38:21 44:23
83:16

**shingle** 21:15

**shock** 8:19

**shook** 17:6

**shooting** 11:18 12:15
16:9 50:10

**short** 13:11

**show** 19:5 28:4,6
42:11 69:16 78:10,
17

**showed** 15:14 40:18

**showing** 86:13

**sic** 21:7 27:2 39:2
42:3 57:19 62:11

**side** 21:3 85:3,9 97:9

**sides** 51:11

**siding** 21:15

**sign** 46:17,18,21,22
47:3,9 62:6 64:20
66:23 67:6,10,14
68:6,12 74:23 75:3
79:17,18 80:4,6,7,19
85:17 87:8,13

**signature** 32:10,11

**signatures** 97:22

**signed** 32:12 83:9,11

**signs** 47:23 61:12
62:12 67:16,17 79:7,
9,10,11,21,23 80:8
88:11

**similar** 33:3
**Similarly** 5:1
**simple** 39:21 52:15
**sir** 6:14 8:4
**sit** 18:4
**sit-** 24:12
**sits** 41:21
**sitting** 42:19 44:9
59:16
**situation** 97:20
**six-month** 76:13
78:13
**size** 24:10,18 45:15
**smoke** 19:19
**snow** 42:19 43:11
73:12 74:4
**so-called** 95:2
**social** 48:17 52:22
**sold** 17:19 41:17
95:14
**solely** 96:2
**son** 43:12 46:2,14,19
47:11
**son's** 83:21 84:20,21
**sort** 95:20
**sound** 8:22
**Sounds** 17:7
**source** 95:12
**south** 12:4
**speak** 69:12 78:11
**specific** 55:10
**specifically** 6:6,18
53:19 60:13 97:13
**speech** 67:15 79:18
88:10
**spent** 12:11 43:14
**spit** 17:5
**stand** 15:16
**start** 4:17 47:20
**started** 4:15 8:11
66:22 88:5 94:17
96:8
**state** 7:4 12:11
**stated** 59:22
**statement** 15:13
**station** 56:9 82:19
**stayed** 12:5,7 67:19
85:22 94:21
**stenographer** 5:9
**stint** 12:10
**stipulations** 4:3
**stolen** 13:7 15:1,2,10
16:2,14
**stop** 5:14 37:6 38:21
44:23 83:16 91:3
**stopped** 16:22 47:9
**storage** 14:18 18:20,
21 19:6,9 21:14,16
24:13 25:4 26:14
27:18,21 28:9 29:18,
19,22,23 30:2,11,13

31:2,3,4,14 32:2,18
33:1,4,6,7,15,17
34:14 35:11 36:14
37:4,7 45:19 46:4,9
49:17,22 54:1 56:10
59:10 65:19,20 66:9,
12 67:9 68:7,10
69:22 71:3 73:18
77:14,17 79:6,8,14,
16 81:3,13,16,19
83:7 87:16 94:9,13
95:21 96:3,6,9,16,19
97:22
**store** 56:9 75:4
**stored** 45:23
**stories** 66:7
**storing** 45:21
**street** 17:17,19 18:13
40:21 58:3 67:19
**strike** 30:19,22
**strong** 20:9
**stuff** 8:20 19:12
20:22 21:18 25:7,21
28:2 50:11 73:21
74:17 85:11 95:18,
20 96:9,20
**subject** 49:14
**summer** 73:11
**summertime** 74:7
**Superior** 89:15,18
**supplies** 73:21
**supporter** 46:20
50:16 84:11,13
**supporters** 43:14
65:1,9
**supposed** 88:17
**surgeries** 8:17
**suspect** 20:10
**sworn** 4:6 6:12
**symbol** 20:7

---

**T**

**tabled** 82:9,10,22
87:20
**talk** 5:11 22:1,8 44:13
56:17 77:1
**talked** 26:12 48:3
65:17,18 90:14
**talking** 19:9 21:3
22:2,6,9 61:15,17
66:21 71:17 76:20
78:3
**target** 16:7,10
**targeted** 38:5 50:12
88:8
**targeting** 35:23 54:6
**taxes** 96:22,23
**telling** 49:11 55:12
61:6 67:22 75:19
93:11 97:13
**term** 32:23
**terms** 34:9
**testified** 4:7 83:12
**testify** 32:14

**testimony** 6:11
**theory** 81:19
**thing** 5:8 13:16
20:11,13,16 22:9
32:15 34:16 44:16
86:3
**things** 17:10 30:16
38:9 45:21,22 67:13
74:20 75:4 95:13
**thinking** 15:4 19:3
**thought** 11:2 18:18
32:19 68:5 88:16
**thousand** 41:23
96:13
**threaten** 50:10
**three-bedroom** 17:2
**three-month** 92:4
**throw** 86:19
**till** 47:7 88:19 95:3
**time** 6:2,3 12:13 20:6
21:12 25:2 29:23
30:3 42:9,10 43:14,
15 47:22 59:1,9,17
61:11,15,23 63:23
64:12 73:8,20 74:20
79:3,22 87:8 93:8,13
94:5 96:21
**timely** 91:3
**times** 11:16 61:1
**Tina** 62:22
**tired** 88:14 92:7 95:4
**today** 6:11 28:20
29:8 30:8,9,10,14,
15,17 31:10 34:3
36:12 41:21 42:1
55:6 56:3 57:18
84:13
**today's** 4:12
**told** 11:1 14:23 17:3
21:19,23 26:10
32:18 34:16 40:7
42:4 48:16 53:7
54:2,7,8 59:7,9
60:23 61:5 63:21
64:1 71:13,15 74:13
75:12 81:13 88:13
89:4 90:10 91:11
93:9,14 94:4,8,12
**Tommy** 21:7 24:13
39:13 40:20 41:17,
18 42:2,5 58:1,2,4,7
**tools** 25:7 96:20
**top** 32:18 43:2,7
83:23 85:20 90:16
**totally** 85:10
**town** 4:11 17:8,10
21:8 23:14 27:14
31:7 32:1 33:22
34:18 35:21 36:5,9
37:3 41:18 45:9,14
48:1,2,16 49:2,14,
18,23 53:12,16,20
54:12,16,17 55:2,6,
9,13,14,21 56:8
58:15,17 61:17
62:16 65:18 66:13
73:14 75:18,20 76:3
77:13,16 78:8 79:5,
19 80:17 86:4 87:7,

11 88:8,14 90:11
95:5 97:8,20,21,22
**town's** 28:19 31:4
**tractor-trailer** 19:4
24:22
**trade** 8:9
**trailer** 19:2,3 20:2,5
21:1,5,6,7,17,19,21,
22 22:2,3,7,9,11
23:2,21 24:6,10,13,
15 26:4,11,23 32:7
33:2,3,17 34:4,5,9,
23 35:7,22,23 36:6,7
37:22 39:7,13,22
40:2,19,20 41:1,7,
17,18 42:19 43:5
44:13,14,15 45:5,12,
17 46:9,10,12,13
50:11 53:13 54:19
58:1,2,4,7 59:2,6,8,
11,15,17 60:10,15,
16,22 61:1 62:17
63:18,23 64:3 66:12,
22 67:9 68:5 69:23
72:23 74:2 78:12,14
79:13,15,17,18
83:13 85:3,9 87:16,
22 88:9,11,16,19,23
89:5 92:1,8 93:9,14,
19 94:21 97:9,13
**Trailer's** 42:2,5
**trailers** 18:6,8,15,16,
17,19 21:9 23:14
26:15 33:22,23
34:15 35:12 37:11
38:16 39:4,12,14
40:13,16 41:4 49:13
55:2,8,13,17,21,22
56:6 57:6 96:19
**transaction** 17:23
18:3
**transporter** 24:4
**treatment** 8:19
**trees** 45:13
**trial** 15:4
**truck** 14:7 33:2
**Trump** 20:2,5,7,9,19
22:11 23:2,15,20,22
24:15 26:3 35:23
41:6 42:19 43:6,14
44:1 46:10,12,13,14,
20 50:16 53:13
59:11,15 60:10
63:17,23 64:20 65:1,
9 67:14,18 68:11,12
71:4 74:23 75:3
76:12 84:10,13
85:17,18,21 86:5
87:8,13,21 88:9,10
94:20,21 95:1,2 97:9
**Trumper** 67:6
**truth** 6:12
**truthfully** 52:17
**truthfulness** 13:23
**Trzcinski** 55:20
**turn** 59:1,18
**turned** 59:16
**TV** 19:5
**twenties** 85:5

---

**U**

**ultimately** 38:15
94:8,12
**unable** 37:4
**undated** 90:17,18
**underneath** 20:18
21:4
**understand** 6:10,13,
15,19,20 7:11 10:17
19:1 22:5,13 23:17
24:8 34:6 42:7 46:13
52:13 53:11 67:22
68:4 69:7 72:22
74:10 75:20 80:7
81:20 83:4,5 85:3
87:10 89:21 91:6
**understanding** 5:1
29:6 36:1 53:10
74:16 81:1
**understood** 5:6 74:9
**unfair** 54:19
**unions** 7:19 8:12
**unit** 21:14,16 35:4
95:22
**units** 14:18 18:20,21
25:5 96:9
**unlawful** 55:13 57:7
**unload** 93:14
**unpermitted** 37:10
**USA** 43:6
**usual** 4:2

---

**V**

**valued** 15:19,21
**vehicle** 13:7
**vehicles** 20:19
**vehicular** 14:9
**Viagra** 14:12
**views** 84:15
**violates** 54:21
**violating** 75:13
**violation** 39:18 69:20
70:3,21 71:16,20
72:5 79:11 90:15,18
**visits** 78:6
**Vitale** 15:21
**vote** 62:12
**Voted** 60:15
**voting** 20:9 67:15

---

**W**

**wages** 96:15
**walk** 73:10,11 74:4
**walls** 85:7
**Walmart** 14:6
**want's** 67:16
**wanted** 14:9,22
16:21 18:1 46:14
47:11 66:17,19
69:14,15 76:3 77:1

Case: 21-1907 Case: 21-1907 Document: 00117865824 Page: 169 Filed: 04/15/2022 Date Filed: 04/15/2022 of Entry ID: 6490055

Index: wanting..Zoom

110

78:7 85:14

**wanting** 62:5

**Wars** 19:6

**website** 28:20 80:17,
20

**week** 84:5

**weekend** 95:17

**weeks** 25:16,17 27:2

**well-known** 48:9,11,
22

**white** 64:17 80:6,21

**widespread** 49:7

**wife** 9:10 16:19 17:3
18:1 44:9 69:14
75:15 93:16 95:10
97:1,2

**window** 21:15

**winter** 40:4 43:10,15,
16 73:10 74:17

**wintertime** 73:22

**wood** 21:16 63:21

**wooden** 45:12

**woods** 85:8

**words** 30:20,23 31:1

**work** 14:18 25:11
46:3 47:14 74:18
91:4

**worked** 8:11 12:4

**working** 7:18 8:11
46:3

**works** 19:17 22:18

**world** 14:19 66:13

**wrong** 53:11 75:8
80:2 90:11

**wrote** 74:5,12 76:17
77:23 97:8

---

**Y**

---

**yard** 44:10

**year** 9:2 12:14 27:4,6
33:8,11,16,18 34:10,
20 35:4,17 36:2,18
37:23 38:8 47:19
90:6,7 95:11 96:11

**years** 8:20 11:19
12:7,12 13:2 14:11
15:1 25:11 28:3 42:8
53:4 70:7 95:14

---

**Z**

---

**zoning** 23:11 27:7,9,
15,21 28:19 29:5
53:12 55:14 65:18
79:19 80:11,13
81:20 89:1,2,3,4,6,9
90:8 91:2,5,12

**Zoom** 5:12 19:17
22:16 42:13 80:4



Joe McCoy raises his arms in praise of the Trump sign his stepson Brian Bales created on his property on Rt. 107 in Pittsfield, N.H, August, 8, 2016. GEOFF FORESTER—Monitor staff

EXHIBIT A

J. McCOY
05/07/2021

Tina L. Hayes, RPR, LCR #80
AVICORE Reporting & Video

EXHIBIT 6

J. McCOY
05/07/2021

Tina L. Hayes, RPR, LCR #80
AVICORE Reporting & Video

# Article 14.  Storage Containers

## 1.  Authority
RSA 674:16, I, (d); RSA 674:16, V; and RSA 674:17.

## 2.  Purpose
The purpose of these STORAGE CONTAINER regulations is to promote the general welfare by protecting the aesthetics of the town.
(See RSA 674:17, I, (c).)

## 3.  Permitting Conditions for Storage Containers
Except as provided in article 4, section 3, Nonconforming Uses, every STORAGE CONTAINER shall be permitted upon the following conditions and upon all other applicable conditions in the zoning ordinance:

(a)  The STORAGE CONTAINER shall be used for and only for storage.

(b)  The STORAGE CONTAINER shall have a SETBACK from every STREET boundary or INTERIOR LOT LINE which SETBACK is greater than or equal to the minimum SETBACK specified for the STREET boundary or INTERIOR LOT LINE by article 3, section 4, (h), Table of Dimensional Requirements.

(c)  No more than one STORAGE CONTAINER shall be on the LOT if the LOT is in the Urban District, the Suburban District, or the Rural District.

(d)  No more than two STORAGE CONTAINERS shall be on the LOT if the LOT is in the Commercial District or the Light Industrial/Commercial District.

(e)  The sum of the time during which one or more STORAGE CONTAINERS are on any one LOT during any 15-month period shall be no more than 12 months.

(f)  The owner of the LOT where the STORAGE CONTAINER will be put shall tell the zoning ordinance administrator the date when the STORAGE CONTAINER is proposed to be put on the LOT.  The zoning ordinance administrator shall issue a permit for the STORAGE CONTAINER, and the permit shall state the date when the STORAGE CONTAINER is proposed to be put on the LOT.



EXHIBIT 6
J. McCOY
05/07/2021
Tina L. Hayes, RPR, LCR #80
AVICORE Reporting & Video

# TOWN OF PITTSFIELD
# NEW HAMPSHIRE

## PERMIT
## FOR STORAGE CONTAINERS

(STORAGE CONTAINERS: Shall mean, any truck trailer, box trailer, school bus, mobile home or other similar facility used for storage or other purposes).

Storage Containers, whether registered or not, whether mobile or stationery, are not allowed on a permanent basis in any zoning district within the Town of Pittsfield. A storage container is permitted for storage purposes only, for a period of one year, with the approval of a parking permit issued by the Board of Selectmen or their designee, provided said storage container meets all setback requirements, and as limited by the following; a) maximum of one storage container per lot in the Urban, Suburban or Rural Districts, b) maximum of two storage containers per lot in the Light Industrial/Commercial Districts.

APPLICANTS NAME: _Joseph McCoy_

APPLICANTS ADDRESS: _322 Catamount Rd._

APPLICANTS TELEPHONE NUMBER: _603-435-5050_

LOCATION OF STORAGE UNIT: TAX MAP & LOT NUMBER: _R23-02-01_

ZONING DISTRICT: _RURAL_

SERIAL NUMBER OF STORAGE CONTAINER: _1H2VO4523EB019801_

MAKE AND MANUFACTURER OF CONTAINER: _FP8-F2-45 FRUEHAUF_

SIGNATURE OF APPLICANT: _Joseph E McCoy_

DATE STORAGE USE IS TO BEGIN: _Sept. 1, 2015_

APPROVED: DATE: _9-1-15_

_____
_____
_____
Board of Selectmen

Unit must be removed one year from the approved date above.

167







EXHIBIT
J. McCOY
05/07/2021
Tina L. Hayes, RPR, LCR #80
AVICORE Reporting & Video



# Office of Code Enforcement

## TOWN OF PITTSFIELD
**Town Hall, 85 Main Street**
**Pittsfield, New Hampshire**

### NOTICE OF VIOLATION

Dear Mr., Joseph Mc Coy

The property located at 322 Catamount Rd Pittsfield NH 03263, identified in the Town Tax Records as Map R23, Lot 02-01, and owned/occupied by you, your permit for a storage trailer has expired on September 1, 2016 and the trailers need to be removed according to our Zoning Ordinance article 14 section 3.

Your immediate attention to this matter is appreciated.

If you believe the Building Inspector is in error in the application or interpretation of any provision of the Building codes, you have the right to appeal to the Zoning Board of Appeals in a timely fashion. This stop work Order controls unless and until it is overturned by the Zoning Board of Appeals.

Thank you
Jesse Pacheco
Building Inspector

OFFICE 603-435-6774        FAX:603-435-7922        CELL:603-715-6624    169

Nov 3, 2016

To: Jesse Pacheco,



Hello,

I am writing in regards to seeking a 6 month extension for my trailer on my Property located at 322 Catamount Rd.

At the present, i have construction going on, my garage is leaking from the inside and it needs emergency work which will take me several months to fix. I am disabled with just one working leg, and have to take care of everything myself, and this has already been started. I will remove one trailer by the end of November. The other i will be dealing with over the cold winter months and will have it emptied and removed by the end of April 2017.

I am asking for this 6 month extention inorder to keep my tools and materials inside this trailer while i deal with this emergency construction situation inorder to keep things out of the winter outside elements. It will be taken care of and i am sorry for the delay, but i am physcially handicapped, and will complete this task inorder to remain with good standards for this town and it's rules as a Pittsfield home owner.

Thank you For Your Time.
Sincerely,
Joseph McCoy

170

**EXHIBIT G**

J. McCOY
05/07/2021

Tina L. Hayes, RPR, LCR #80
AVICORE Reporting & Video

# TOWN OF PITTSFIELD
# NEW HAMPSHIRE

## PERMIT
## FOR STORAGE CONTAINERS

(STORAGE CONTAINERS: Shall mean, any truck trailer, box trailer, school bus, mobile home or other similar facility used for storage or other purposes).

Storage Containers, whether registered or not, whether mobile or stationery, are not allowed on a permanent basis in any zoning district within the Town of Pittsfield. A storage container is permitted for storage purposes only, for a period of one year, with the approval of a parking permit issued by the Board of Selectmen or their designee, provided said storage container meets all setback requirements, and as limited by the following: a) maximum of one storage container per lot in the Urban, Suburban or Rural Districts. b) maximum of two storage containers per lot in the Light Industrial/Commercial Districts.

APPLICANTS NAME: _Joseph McCoy_

APPLICANTS ADDRESS: _322 Catamount Rd._

APPLICANTS TELEPHONE NUMBER: _(603) 435 - 5050_

LOCATION OF STORAGE UNIT. TAX MAP & LOT NUMBER: _R23-2-1_

ZONING DISTRICT _Rural_

SERIAL NUMBER OF STORAGE CONTAINER _1H2V0452380190l_

MAKE AND MANUFACTURER OF CONTAINER _FP8-5245 - FRUALHAUF_

SIGNATURE OF APPLICANT: _Joseph McCoy_

DATE STORAGE USE IS TO BEGIN: _6-13-2017_

APPROVED DATE _June 13, 2017_          _[signatures]_

_[signatures]_

Board of Selectmen

Unit must be removed one year from the approved date above

171







# TOWN OF PITTSFIELD

Office of Selectmen
85 Main Street, Pittsfield NH 03263
admin@pittsfieldnh.gov ~ telephone (603) 435-6773 ~ fax (603) 435-7922

May 22, 2018

EXHIBIT 1
J. McCOY
05/07/2021
Tina L. Hayes, RPR, LCR #80
AVICORE Reporting & Video

Joseph E. McCoy
322 Catamount Road
Pittsfield, NH 03263

Re: storage container permit expiration

Dear Mr. McCoy,

As you know, the storage trailer permit that the Board of Selectmen approved two years ago and extended at your request last June is due to expire next month.

Please consider this letter a friendly reminder that the trailer must be removed from the property for at least a three month period before you can apply for another permit to bring it back.

Thank you in advance for your anticipated cooperation.

Sincerely,

Pittsfield Board of Selectmen



RECEIVED
MAY 2018
Town of
Pittsfield, NH



EXHIBIT J
J. McCOY
05/07/2021
Tina L. Hayes, RPR, LCR #80
AVICORE Reporting & Video

May 29, 2018

Dear Board Members,

This concerns a storage trailer located on my property at 322 Catamount Rd. Pittsfield

Last june, 2017, i came to your meeting, i had 2 trailers to unload and remove, as requested. I've emptied and removed 1 so far and it's not an easy task. I am disabled with 1 working leg to move on and now that the weather has changed i am in the process of unloading the second. This will take more time, when i bought my home in pittsfield i had a huge ammount of belongings which came with me so i am asking for another permit inorder to accomplish this huge task.

174

I am crippled so it cannot
be done easily.
Please let me know,
or, set aside a time to discuss
this further at your next meeting.

Thank you

Joseph McCoy

322 Catamount Rd.
P.O. Box 293
Pittsfield. N.H. 03263

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

**EXHIBIT**
**B**
[MARSTON AFF.]

JOSEPH McCOY            )
                       )
Plaintiff              )
                       )
v.                     )            Civil Action No.:1:20-cv-00362-JL
                       )
TOWN OF PITTSFIELD     )
                       )
Defendant              )

**<u>AFFIDAVIT OF CARA MARSTON</u>**

      I, Cara Marston, with personal knowledge, on oath depose and say as follows:

1.      I am a resident of the Town of Pittsfield, and I have been employed by the Town for more than twenty years.

2.      I have been the Town Administrator for the Town since December 2015.

3.      Subject to the Board of Selectmen's delegation and direction, my responsibilities as Town Administrator include assisting the Board in the performance of its duties as the Zoning Administrator of the Town's zoning ordinance, and overseeing and communicating with Town staff regarding administration of the zoning ordinance.

4.      A true and accurate copy of excerpts of the Town's zoning ordinance are attached hereto as Exhibit 1. A complete copy of the Town's zoning ordinance is available at:

https://www.pittsfieldnh.gov/sites/g/files/vyhlif3681/f/pages/zoning_ordinance_2021_2.pdf

5.      I am aware of the allegations raised by Joseph McCoy in the above captioned suit, and I have personal knowledge regarding the Town's actions with respect to the granting of storage container permits to Mr. McCoy in 2015, 2016, 2017, and the Board's decision to deny a 2018 permit request from Mr. McCoy. I also have personal knowledge regarding the Town's

permitting and enforcement efforts with respect to other storage containers in the Town during the period between 2015 and the present.

6.      In 2015, Mr. McCoy applied for and received a storage container permit, which was approved effective September 1, 2015 (the "2015 Permit"). A true and accurate copy of the 2015 Permit is attached hereto as Exhibit 2.

7.      Per the Town's zoning ordinance, storage container permits may be granted for a one year period for storage purposes only. *See* Exhibit 1 at Article 14.

8.      The 2015 Permit informed Mr. McCoy that his storage container could be used for storage purposes only and must be removed one year from the approved date (i.e., September 1, 2016).

9.      As of September 1, 2016, Mr. McCoy had not removed his storage container. In addition, he was maintaining an additional unpermitted storage container on his property. Accordingly, the Town's building inspector issued a Notice of Violation to Mr. McCoy. The notice informed Mr. McCoy that his 2015 Permit had expired, that his storage containers needed to be removed, but that he had a right to appeal to the Town's Zoning Board of Adjustment. A true and accurate copy of the Notice of Violation is attached hereto as Exhibit 3.

10.     On November 3, 2016, Mr. McCoy wrote to the building inspector and requested an extension of his 2015 Permit, and he represented that he needed the storage container for storage purposes only. A true and accurate copy of Mr. McCoy's November 3, 2016 letter is attached hereto as Exhibit 4.

11.     On November 15, 2016, the Board unanimously voted to approve the six month extension. The motion to approve was made by Selectman Carl Anderson.

2

12.      In May 2017, Mr. McCoy requested a meeting with the Town's Board of Selectmen ("Board") regarding his storage container. This request followed a visit to Mr. McCoy's property from the Town's building inspector. A true and accurate copy of an email documenting Mr. McCoy's request is attached hereto as Exhibit 5.

13.      On May 23, 2017, the Board began deliberations regarding Mr. McCoy's extension request and discussed enforcement of the storage container ordinance generally. The Board's deliberations were tabled so that the Board could meet with Mr. McCoy. A true and accurate copy of the minutes of the May 23, 2017 meeting with the Board are attached hereto as Exhibit 15.

14.      On June 13, 2017, the Board met with Mr. McCoy to consider his request for another extension of his storage container permit. During the meeting, Mr. McCoy represented that he needed the storage container for storage purposes related to work he was performing on his deck and due to a disability. There was no discussion or mention during the meeting of the storage container being used to display any speech or other expressive content. A true and accurate copy of the minutes of the June 13, 2017 meeting with the Board is attached hereto as Exhibit 6.

15.      During the June 13th meeting, I advised the Board that the zoning ordinance states that a storage container permit "shall not [sic] be no more than 12 months." The Board approved Mr. McCoy's request by a unanimous vote despite the 12 month limitation and the fact that the storage container had been on Mr. McCoy's property since sometime in 2014. A true and accurate copy of the 2017 permit is attached hereto as Exhibit 7.

16.      As Zoning Administrator, the Board or its designee(s) are vested with approving or denying permits for storage containers and individuals aggrieved by such decisions may appeal to the Town's Zoning Board of Adjustment. *See* Exhibit 1 at pages 6-7, 39.

17.     Per the Town's zoning ordinance, signs may be permitted under Article 9 upon application by a Town resident. *See* Exhibit 1 at Article 9. Mr. McCoy never requested or otherwise applied for a sign permit from the Town, and never represented or communicated to the Town any desire or intent to use his storage container as a sign.

18.     On May 22, 2018, the Board wrote to Mr. McCoy and reminded him that his 2017 permit was set to expire in the following month and that his storage container would need to be removed. A true and accurate copy of the Board's May 2018 correspondence is attached hereto as Exhibit 8.

19.     On May 29, 2018, Mr. McCoy wrote to the Board and requested a third permit extension. A true and accurate copy of Mr. McCoy's correspondence is attached hereto as Exhibit 9.

20.     On June 12, 2018, the Board considered Mr. McCoy's request for a third extension, and denied it by unanimous vote. The Board discussed Mr. McCoy's permit history and his prior representations to the Board. There was no discussion regarding the use of the storage container for any expressive purposes, nor any mention of use as a Trump sign in 2016 and 2017. A true and accurate copy of the minutes of the June 2018 meeting are attached as Exhibit 10.

21.     During the Board's June 12, 2018, the Board also took up and considered complaints regarding three other unpermitted storage containers in Town, located at 140 Tilton Hill Road, (the "Tilton Hill Trailers") and agreed to send a Notice of Violation to the owners of the storage containers. *See* Exhibit 10 at page 7 ("Notice of Zoning Violation update").

22.     On June 13, 2018, the Board sent a notice of violation to the owners of the Tilton Hill Trailers. A true and accurate copy of the notice of violation is attached as Exhibit 11. In response, the owners of the Tilton Hill Trailers applied for and received a permit for one of their

three storage containers. The other two trailers were removed. The Tilton Hill Trailers did not display any expressive content to the Town's knowledge.

23. On June 13, 2018, I wrote to Mr. McCoy and informed him of the Board's decision, and noted the Board's reasons. A true and accurate copy of my correspondence is attached as Exhibit 12.

24. Mr. McCoy did not appeal the Board's denial of his third permit request.

25. The Town, in the ordinary course, sometimes receives anonymous complaints regarding storage containers and other alleged zoning violations. The Town had received an anonymous complaint regarding Mr. McCoy's trailer sometime in 2016, which was not recorded, and received a similar anonymous complaint regarding the Tilton Hill Trailers in 2018.

26. During my tenure as Town Administrator, the Town has engaged in enforcement with respect to storage containers in instances when it has become aware of potential violations, and without regard to whether a storage container has been used for expressive purposes or not. For example, with respect to Mr. McCoy, the Town learned of an unpermitted trailer on his property in 2015 and subsequently required that he seek and obtain a permit.

27. Ultimately, the Town did not impose any penalties or take any other enforcement actions against Mr. McCoy other than to confirm that his storage container was removed following the Board's June 2018 decision.

28. Mr. McCoy's storage containers were known to the Town based on visual inspection of the Town's building inspector, permit applications and correspondence received from Mr. McCoy, and public testimony from Mr. McCoy. Accordingly, the Town was aware that Mr. McCoy had trailers on his property that were not grandfathered and that he needed to comply with Article 14 of the Zoning Ordinance.

5

180

29.    The Town has limited resources to dedicate toward enforcement of the storage container provisions of the zoning ordinance. It has, however, taken action against others in Town with respect to unpermitted storage containers, which were not used for expressive purposes. For example:

    A.    In June 2018, the Town took action with respect to the Tilton Hill Trailers as noted previously.

    B.    In 2019, the Town brought suit to enforce Article 14 in *Town of Pittsfield v. James Hetu, et al*, Case No. 217-2019-cv-00663, Merrimack Superior Court. This action arose following lengthy efforts to obtain compliance. A true and accurate copy of correspondence with respect to the Town's enforcement efforts is attached as Exhibit 13.

    C.    In the summer of 2019, the Town became aware of an unpermitted storage container at 11 Cram Avenue, issued a notice of violation, and subsequently received and approved a permit application. A true and accurate copy of the notice of violation is attached as Exhibit 14. The Town's treatment with respect to the storage container at 11 Cram Avenue is consistent with the manner in which Mr. McCoy's 2015 Permit application was received and approved.

30.    Based on my review of Mr. McCoy's permit history, and the Town's enforcement actions with respect to other properties, the following is apparent:

    a.    Mr. McCoy's storage container was allowed to remain on his property far beyond the 12 month limit of the zoning ordinance, which is in excess of the time period allowed to other storage containers;

b.  The Town did not require Mr. McCoy to remove the storage container until 2018 (when it was no longer painted "Trump" on the side); and

c.  The Board's actions with respect to Mr. McCoy's storage container were consistent with the treatment of other storage containers in the Town that were made known to the Board as needing permit approvals, and which did not feature any signs or other expressive content.

7

Affiant sayeth further not.


_6/4/2021_
Date

_Cara Marston_
Cara Marston


STATE OF NEW HAMPSHIRE
COUNTY OF

     Before me, the undersigned officer, personally appeared the said Cara Marston, known to me or satisfactorily proven to be the person whose name is subscribed to the within instrument, and acknowledged that she executed the same for the purposes therein contained and did state under oath the within facts are true to the beset of her knowledge and belief.


_Rhonda E. Davignon_
Printed Name: Rhonda E. Davignon
Notary Public
My Commission Expires: _12/2/25_

RHONDA E. DAVIGNON
MY COMMISSION EXPIRES
DEC. 2, 2025
NOTARY PUBLIC
NEW HAMPSHIRE

8





EXHIBIT

MARSTON AFF.
EXHIBIT 1

# TOWN OF PITTSFIELD
# ZONING ORDINANCE

Adopted March 8, 1988

Most recently amended March 9, 2021

# Article 1.  General Provisions

### 1. Title

This zoning ordinance shall be known as the "Town of Pittsfield Zoning Ordinance" and is herein called the "zoning ordinance" or just the "ordinance" where "ordinance" clearly means the zoning ordinance.

### 2. Authority

The town meeting's authority to adopt the zoning ordinance is New Hampshire Revised Statutes Annotated RSA 674:16, Grant of Power; other enabling statutes in NH RSA; and enabling case law.

### 3. Applicability

No person may use or authorize the use of any land or STRUCTURE except according to all applicable regulations of the zoning ordinance.

### 4. Jurisdiction

The zoning ordinance shall be effective within the corporate boundaries of the town of Pittsfield, New Hampshire.

### 5. Purpose

Pursuant to RSA 674:17 and RSA 674:21, VI, (a), the zoning ordinance is designed for the following purposes:

(a)   To lessen congestion in the STREETS.

(b)   To secure safety from fires, panic and other dangers.

(c)   To promote health and the general welfare.

(d)   To provide adequate light and air.

(e)   To prevent the overcrowding of land.

(f)   To avoid undue concentration of population.

(g)   To facilitate the adequate provision of transportation, solid waste facilities, water, sewerage, SCHOOLS, parks, child day care.

(h)   To assure proper use of natural resources and other public requirements.

(i)   To encourage the preservation of agricultural lands and BUILDINGS and the agricultural operations described in RSA 21:34-a supporting the agricultural lands and BUILDINGS.

(j)   To encourage the installation and use of solar, wind, or other renewable energy systems and protect access to energy sources by the regulation of orientation of STREETS, LOTS, and BUILDINGS; establishment of maximum BUILDING height, minimum SETBACK requirements, and limitations on type, height, and placement of vegetation; and encouragement of the use of solar skyspace easements under RSA 477.

(k)   To have reasonable consideration for the character of the area involved and its peculiar suitability for particular uses, to conserve the value of BUILDINGS, and to encourage the most appropriate use of land throughout the municipality.  (RSA 674:17, II.)

(l)   To accommodate reasonably amateur radio communications.  (RSA 674:17, III.)

(m)  To encourage the preservation of OPEN SPACE wherever possible.  (See RSA 674:21, VI, (a).)

## 6. Administrator

(a) The board of selectmen shall have charge of administering and enforcing the zoning ordinance except as follows:

    (1) If the zoning ordinance explicitly designates a specific administrator for a specified part of the zoning ordinance, then that administrator shall administer that part of the zoning ordinance.

    (2) The board of selectmen's charge to administer and enforce the zoning ordinance shall not interfere with any state or federal law empowering a specific administrator, for example, RSA 676:13, I, (building inspector); RSA 155-A:4, II, and RSA 155-A:7, I, (fire chief); and RSA 676:5, III, (planning board).

(b) The board of selectmen may authorize an agent to administer and enforce the zoning ordinance on the board's behalf and may revoke that authorization at any time.  Such an authorization or revocation shall be effective if and only if the board's minutes record the board's vote to authorize or revoke.

## 7. Conflicting Provisions; Relationship to Other Ordinance or Regulation

Wherever provisions of the zoning ordinance conflict, or wherever a provision of the zoning ordinance conflicts with a provision of another ordinance or regulation, the provision that imposes the greater restriction or higher standard shall control.  (RSA 676:14.)

## 8. Separability

The invalidity of any provision of the zoning ordinance shall not affect the validity of any other provision.

## 9. Penalty Clause

Any person who violates any of the provisions of this zoning ordinance, or any provision or specification of any application, plat, or plan approved by, or any requirement or condition of a permit or decision issued by, any local administrator or land use board acting under the authority of this zoning ordinance shall be guilty of a misdemeanor if a natural person, or guilty of a felony if any other person; and shall be subject to a civil penalty of $275 for the first offense, and $550 for subsequent offenses, for each day that such violation is found to continue after the conviction date or after the date on which the violator receives written notice from the municipality that the violator is in violation, whichever is earlier. Each day that a violation continues shall be a separate offense. (RSA 676:17, I; also see RSA 676:15 through RSA 676:18, Penalties and Remedies.)

## 10. Mobile Home, Mobile Home Park and Trailer Park Ordinance Repealed

The adoption of the zoning ordinance shall repeal the Mobile Home, Mobile Home Park and Trailer Park Ordinance for the Town of Pittsfield as heretofore amended.

## 11. Amendment

The zoning ordinance may be amended as provided in RSA chapter 675.

## 12. Effective Date

The zoning ordinance shall take effect immediately upon its passage.

## Article 2.  Interpretation Rules and Definitions

### 1.  Word or Phrase Interpretation Rules

(a) All words and phrases of the zoning ordinance shall be interpreted according to this section.

(b) In this section, "headword" means a word or phrase spelled in all capital letters and placed at the beginning of a definition in article 2, section 3, Definitions.

(c) If the zoning ordinance explicitly says that a word or phrase has a specific meaning to be used in a specified part of the zoning ordinance, then the word or phrase has that specific meaning throughout the specified part.

(d) If a word or phrase is a headword in article 2, section 3, Definitions, then the word or phrase has the meaning stated for it as a headword in article 2, section 3, except as provided in paragraph (c) of this section.

(e) If a word or phrase is not a headword in article 2, section 3, Definitions, then the word or phrase has the meaning stated for it in *Webster's Third New International Dictionary of the English Language, Unabridged*, Merriam-Webster, except as provided in paragraph (c) of this section.

### 2.  All-Capital-Letters Spelling of Defined Words and Phrases

All-capital-letters spelling is used to indicate that a word or phrase has the meaning stated for it as a headword in article 2, section 3, Definitions.

In this section, "headword" means a headword as defined in article 2, section 1, (b).

### 3.  Definitions

**ABUTTER:**
(a) In this definition of "ABUTTER," "street" means a street as defined in RSA 672:13.

(b) "ABUTTER" means any person whose property is located in New Hampshire and adjoins or is directly across the street or stream from the land under consideration by the local land use board. For purposes of receiving testimony only, and not for purposes of notification, the term "ABUTTER" shall include any person who is able to demonstrate that his land will be directly affected by the proposal under consideration. For purposes of receipt of notification by a municipality of a local land use board hearing, in the case of an abutting property being under a CONDOMINIUM or other collective form of ownership, the term "ABUTTER" means the officers of the collective or association, as defined in RSA 356-B:3, XXIII. For purposes of receipt of notification by a municipality of a local land use board hearing, in the case of an abutting property being under a MANUFACTURED HOUSING PARK form of ownership as defined in RSA 205-A:1, II, the term "ABUTTER" includes the MANUFACTURED HOUSING PARK owner and the tenants who own MANUFACTURED HOUSING which adjoins or is directly across the street or stream from the land under consideration by the local land use board.  (See RSA 672:3, Abutter.)

**SPECIAL EXCEPTION:** "SPECIAL EXCEPTION" has two meanings as stated in subparagraphs (a) and (b), and the context determines which meaning applies.

(a) "SPECIAL EXCEPTION" means a use permitted upon (1) certain conditions set forth in the zoning ordinance and (2) an approving authority's decision that the use satisfies those conditions.

(b) "SPECIAL EXCEPTION" means the approving authority's decision that the use defined in subparagraph (a) satisfies the conditions set forth in the zoning ordinance.

(c) In subparagraphs (a) and (b), "zoning ordinance" means the zoning ordinance excluding article 5, section 3, I, (b); article 5, section 3, V; article 5, section 4, Equitable Waiver of Dimensional Requirement; article 7, Variances; and article 17, section 12, Appeals and Variances.  These parts of the zoning ordinance state and are limited to New Hampshire state or United States federal requirements for a VARIANCE under RSA 674:33, I, (b); RSA 674:33, V; or article 17, section 12, Appeals and Variances, or for an equitable waiver of a dimensional requirement under RSA 674:33-a.

(RSA 674:33, IV; also see article 6 for SPECIAL EXCEPTION regulations.)

**STABLE:** "STABLE" means a place that houses one or more horses except that "STABLE" excludes any residence that has three or fewer horses as pets.

**STORAGE CONTAINER:** "STORAGE CONTAINER" means a truck trailer, box trailer, school bus, MANUFACTURED HOUSING unit, or similar mobile container parked continuously for 31 days or more and used principally for storage and not used for any person's residential occupancy or transient lodging.  (See article 14 for STORAGE CONTAINER permitting conditions.)

**STORY:**

(a) In this definition of "STORY," the words "attic" and "basement" have the following meanings:

   (1) "Attic" means that part of a BUILDING such that the roof frame meets the floor on opposite sides of the part of the BUILDING.

   (2) "Basement" means that part of a BUILDING such that more than one-half of the part the BUILDING vertically is below the average grade of the ground adjoining the BUILDING.

(b) "STORY" means that part of a BUILDING contained between any floor and the floor or roof next above the part of the BUILDING except that "STORY" excludes attics and basements.

**STREET:** "STREET" means either

(a) a highway as defined in RSA 229:1 or

(b) a road dedicated to the public use but not accepted by the city or town in which the road is located.

**STRUCTURE:** "STRUCTURE" means something constructed or built that has a fixed location on or in the ground or that is permanently attached to something that has a fixed location on or in the ground.

**STRUCTURE, ACCESSORY:**  See ACCESSORY STRUCTURE.

**STRUCTURE, NONCONFORMING:**  See NONCONFORMING STRUCTURE.

**STRUCTURE, PRINCIPAL:**  See PRINCIPAL STRUCTURE.

# Article 4.  Nonconforming Uses and Lots

## 1.  Authority

(a) RSA 674:19, Applicability of Zoning Ordinance:
A zoning ordinance adopted under RSA 674:16 shall not apply to existing structures or to the existing use of any building. It shall apply to any alteration of a building for use for a purpose or in a manner which is substantially different from the use to which it was put before alteration.

(b) RSA 674:39, Five-Year Exemption:
I. Every subdivision plat approved by the planning board and properly recorded in the registry of deeds and every site plan approved by the planning board and properly recorded in the registry of deeds, if recording of site plans is required by the planning board or by local regulation, shall be exempt from all subsequent changes in subdivision regulations, site plan review regulations, impact fee ordinances, and zoning ordinances adopted by any city, town, or county in which there are located unincorporated towns or unorganized places, except those regulations and ordinances which expressly protect public health standards, such as water quality and sewage treatment requirements, for a period of 5 years after the date of approval; provided that:

    (a) Active and substantial development or building has begun on the site by the owner or the owner's successor in interest in accordance with the approved subdivision plat within 24 months after the date of approval, or in accordance with the terms of the approval, and, if a bond or other security to cover the costs of roads, drains, or sewers is required in connection with such approval, such bond or other security is posted with the city, town, or county in which there are located unincorporated towns or unorganized places, at the time of commencement of such development;

    (b) Development remains in full compliance with the public health regulations and ordinances specified in this section; and

    (c) At the time of approval and recording, the subdivision plat or site plan conforms to the subdivision regulations, site plan review regulations, and zoning ordinances then in effect at the location of such subdivision plat or site plan.

II. Once substantial completion of the improvements as shown on the subdivision plat or site plan has occurred in compliance with the approved subdivision plat or site plan or the terms of said approval or unless otherwise stipulated by the planning board, the rights of the owner or the owner's successor in interest shall vest and no subsequent changes in subdivision regulations, site plan regulations, or zoning ordinances, except impact fees adopted pursuant to RSA 674:21 and 675:2-4, shall operate to affect such improvements.

III. The planning board may, as part of its subdivision and site plan regulations or as a condition of subdivision plat or site plan approval, specify the threshold levels of work that shall constitute the following terms, with due regard to the scope and details of a particular project:

    (a) "Substantial completion of the improvements as shown on the subdivision plat or site plan," for purposes of fulfilling paragraph II; and

    (b) "Active and substantial development or building," for the purposes of fulfilling paragraph I.

IV. Failure of a planning board to specify by regulation or as a condition of subdivision plat or site plan approval what shall constitute "active and substantial development or building" shall entitle the subdivision plat or site plan approved by the planning board to the 5-year exemption described in paragraph I. The planning board may, for good cause, extend the 24-month period set forth in subparagraph I(a).

(c) RSA 676:12, I and VI, Certain Building Permits to Be Withheld prior to Zoning Amendments:
I. The building inspector shall not issue any building permit within the 120 days prior to the annual or special town or village district meeting if:

    (a) Application for such permit is made after the first legal notice of proposed changes in the building code or zoning ordinance has been posted pursuant to the provisions of RSA 675:7; and

    (b) The proposed changes in the building code or the zoning ordinance would, if adopted, justify refusal of such permit.

VI. The provisions of paragraph I shall not apply to any plat or application which has been the subject of notice by the planning board pursuant to RSA 676:4, I(d) prior to the first legal notice of a proposed change in a building code or zoning ordinance or any amendment thereto. No proposed subdivision or site plan review or zoning ordinance or amendment thereto shall affect a plat or application which has been the subject of notice by the planning board pursuant to RSA 676:4, I(d) so long as said plat or application was the subject of notice prior to the first legal notice of said change or amendment. The provisions of this paragraph shall also apply to proposals submitted to a planning board for design review pursuant to RSA 676:4, II(b), provided that a formal application is filed with the planning board within 12 months of the end of the design review process.

(d) RSA 155-B:2, Repair or Removal of Hazardous Building:
The governing body of any city or town may order the owner of any hazardous building within the municipality to correct the hazardous condition of such building or to raze or remove the same.

## 2. Purpose

The purposes of this article are as follows:

(a) To codify the New Hampshire state law of NONCONFORMING USES into the zoning ordinance.

(b) To encourage the discontinuance of NONCONFORMING USES.

(c) To encourage the elimination or reduction of nonconformance of NONCONFORMING LOTS.

(d) To provide for the continuance of lawfully established nonconformance if the transition to conformance is unreasonable. (See RSA 674:19, which provides for the continuance of NONCONFORMING USES but says nothing about the development of NONCONFORMING LOTS.)

## 3. Nonconforming Uses

(a) Continuance of Nonconforming Activities: Every NONCONFORMING ACTIVITY may continue to exist upon the following conditions:

    (1) The NONCONFORMING ACTIVITY shall not change to have a purpose, character, or effect on the neighborhood that differs substantially from the purpose, character, or effect on the neighborhood that the NONCONFORMING ACTIVITY had when it was first nonconforming.

    (2) The NONCONFORMING ACTIVITY shall not expand into any indoor or outdoor space that the NONCONFORMING ACTIVITY has not occupied as a NONCONFORMING ACTIVITY.

(3) The NONCONFORMING ACTIVITY shall not expand into any indoor or outdoor space that the NONCONFORMING ACTIVITY vacated and never reoccupied during the following two years.

(4) The NONCONFORMING ACTIVITY shall not expand so as to render premises or property proportionally less adequate.

(5) The NONCONFORMING ACTIVITY shall have no discontinuance of two years or more.

(b) Abandonment of Nonconforming Activities:  Every NONCONFORMING ACTIVITY that satisfies either of the following conditions (1) and (2) shall be deemed abandoned and shall be prohibited:

(1) The NONCONFORMING ACTIVITY shall be deemed abandoned and shall be prohibited if it violates one or more of the conditions in paragraph (a), (1) through (4), and if

(A) within 35 days after the earliest date when the zoning ordinance administrator sends the owner of the NONCONFORMING ACTIVITY a certified-mail notice of the violation, the owner has not submitted a written plan to eliminate the violation or

(B) within 95 days after the earliest date when the zoning ordinance administrator sends the owner of the NONCONFORMING ACTIVITY a certified-mail notice of the violation, the owner has not eliminated the violation.

(2) The NONCONFORMING ACTIVITY shall be deemed abandoned and shall be prohibited if it has a discontinuance of two years or more.  (See article 4, section 3, (a), (5).)

(c) Continuance of Nonconforming Structures:   Every NONCONFORMING STRUCTURE may continue to exist upon the following conditions:

(1) The NONCONFORMING STRUCTURE may be maintained or renovated and may be repaired or rebuilt after any damage if the maintenance, renovations, repairs, and rebuilding satisfy the following conditions (A) and (B):

(A) Maintenance, renovations, repairs, and rebuilding shall not give the NONCONFORMING STRUCTURE a purpose, character, or effect on the neighborhood that differs substantially from the purpose, character, or effect on the neighborhood that the NONCONFORMING STRUCTURE had when it was first nonconforming.

(B) Repairs and rebuilding after the NONCONFORMING STRUCTURE has sustained damage greater than or equal to 75% of the NONCONFORMING STRUCTURE'S PRINCIPAL FLOOR AREA shall be in substantial progress within two years after the date of the NONCONFORMING STRUCTURE'S damage.  (See article 4, section 1, (c), Vesting of Nonconforming Uses.)

(2) The NONCONFORMING STRUCTURE may have additions to its nonconforming parts if the additions satisfy the following conditions (A) through (C):

(A) The additions shall not give the NONCONFORMING STRUCTURE a purpose, character, or effect on the neighborhood that differs substantially from the purpose, character, or

effect on the neighborhood that the NONCONFORMING STRUCTURE had when it was first nonconforming.

(B) The additions in total since the NONCONFORMING STRUCTURE was first nonconforming shall not be substantial.

(C) The additions shall not render the LOT proportionally less adequate.

(3) The NONCONFORMING STRUCTURE may have additions to its conforming parts if the additions satisfy the following conditions (A) and (B):

(A) The additions shall not give the NONCONFORMING STRUCTURE a purpose, character, or effect on the neighborhood that differs substantially from the purpose, character, or effect on the neighborhood that the NONCONFORMING STRUCTURE had when it was first nonconforming.

(B) The additions shall create no nonconformance to the zoning ordinance except that an addition may create a nonconformance if the addition satisfies the conditions in subparagraph (2), for additions to nonconforming parts of the NONCONFORMING STRUCTURE.

(d) Abandonment of Nonconforming Structures:  Every NONCONFORMING STRUCTURE that satisfies either of the following conditions (1) and (2) shall be deemed abandoned and shall be prohibited:

(1) The NONCONFORMING STRUCTURE shall be deemed abandoned and shall be prohibited if it violates one or more of the conditions in paragraph (c), (1), (A); paragraph (c), (2); or paragraph (c), (3), and if

(A) within 35 days after the earliest date when the zoning ordinance administrator sends the owner of the NONCONFORMING STRUCTURE a certified-mail notice of the violation, the owner has not submitted a written plan to eliminate the violation or

(B) within 95 days after the earliest date when the zoning ordinance administrator sends the owner of the NONCONFORMING STRUCTURE a certified-mail notice of the violation, the owner has not eliminated the violation.

(2) The NONCONFORMING STRUCTURE shall be deemed abandoned and shall be prohibited if it has sustained damage greater than or equal to 75% of the NONCONFORMING STRUCTURE'S PRINCIPAL FLOOR AREA and if the NONCONFORMING STRUCTURE is not in substantial rebuilding within two years after the date of the NONCONFORMING STRUCTURE'S damage.

(e) Public-Taking Not-Conforming Structures:  Every lawfully existing STRUCTURE that becomes a not-conforming STRUCTURE because of an eminent-domain taking or that increases its nonconformance because of an eminent-domain taking shall be treated as a NONCONFORMING STRUCTURE under the zoning ordinance.

(f) Repair or Removal of Hazardous Buildings:  Under RSA chapter 155-B, Hazardous and Dilapidated Buildings, the board of selectmen may order the owner of any hazardous building

(d) That due to the degree of past construction or investment made in ignorance of the facts constituting the violation, the cost of correction so far outweighs any public benefit to be gained, that it would be inequitable to require the violation to be corrected.

II. In lieu of the findings required by the board under subparagraphs I(a) and (b), the owner may demonstrate to the satisfaction of the board that the violation has existed for 10 years or more, and that no enforcement action, including written notice of violation, has been commenced against the violation during that time by the municipality or any person directly affected.

III. Application and hearing procedures for equitable waivers under this section shall be governed by RSA 676:5 through 7. Rehearings and appeals shall be governed by RSA 677:2 through 14.

IV. Waivers shall be granted under this section only from physical layout, mathematical or dimensional requirements, and not from use restrictions. An equitable waiver granted under this section shall not be construed as a NONCONFORMING USE, and shall not exempt future use, construction, reconstruction, or additions on the property from full compliance with the ordinance. This section shall not be construed to alter the principle that owners of land are bound by constructive knowledge of all applicable requirements. This section shall not be construed to impose upon municipal officials any duty to guarantee the correctness of plans reviewed by them or property inspected by them.
(RSA 674:33-a.)

## 5.  Appeals to Board of Adjustment

I. Appeals to the board of adjustment concerning any matter within the board's powers as set forth in RSA 674:33 may be taken by any person aggrieved or by any officer, department, board, or bureau of the municipality affected by any decision of the administrative officer. Such appeal shall be taken within a reasonable time, as provided by the rules of the board, by filing with the officer from whom the appeal is taken and with the board a notice of appeal specifying the grounds thereof. The officer from whom the appeal is taken shall forthwith transmit to the board all the papers constituting the record upon which the action appealed from was taken.

II. For the purposes of this section:
(a) The "administrative officer" means any official or board who, in the municipality, has responsibility for issuing permits or certificates under the zoning ordinance, or for enforcing the ordinance, and may include a building inspector, board of selectmen, or other official or board with such responsibility.
(b) A "decision of the administrative officer" includes any decision involving construction, interpretation or application of the terms of the zoning ordinance. It does not include a discretionary decision to commence formal or informal enforcement proceedings, but does include any construction, interpretation or application of the terms of the ordinance which is implicated in such enforcement proceedings.

III. If, in the exercise of SUBDIVISION or site plan review, the planning board makes any decision or determination which is based upon the terms of the zoning ordinance, or upon any construction, interpretation, or application of the zoning ordinance, which would be appealable to the board of adjustment if it had been made by the administrative officer, then such decision may be appealed to the board of adjustment under this section; provided, however, that if the zoning ordinance contains an innovative land use control adopted pursuant to RSA 674:21 which delegates administration, including the granting of conditional or special use permits, to the planning board, then the planning

board's decision made pursuant to that delegation cannot be appealed to the board of adjustment, but may be appealed to the superior court as provided by RSA 677:15.

(RSA 676:5, I, II, and III.)

### 6. Materially Similar Applications

If (1) the board of adjustment has disapproved an application, (2) the disapproval was not appealed, (3) a subsequent application is made for a use that does not materially differ in nature and degree from its predecessor, and (4) a material change of circumstances affecting the merits of the subsequent application has not occurred, then the board may not reach the merits of the subsequent application. The applicant bears the burden of proving a material change of circumstances before the board.

### 7. Public Hearing; Notice

I. Prior to exercising its appeals powers, the board of adjustment shall hold a public hearing. Notice of the public hearing shall be given as follows:

(a) The appellant and every ABUTTER and holder of CONSERVATION, preservation, or agricultural preservation RESTRICTIONS shall be notified of the hearing by certified mail stating the time and place of the hearing, and such notice shall be given not less than 5 days before the date fixed for the hearing of the appeal. The board shall hear all ABUTTERS and holders of CONSERVATION, preservation, or agricultural preservation RESTRICTIONS desiring to submit testimony and all nonABUTTERS who can demonstrate that they are affected directly by the proposal under consideration. The board may hear such other persons as it deems appropriate.

(b) A public notice of the hearing shall be placed in a newspaper of general circulation in the area not less than 5 days before the date fixed for the hearing of the appeal.

II. The public hearing shall be held within 30 days of the receipt of the notice of appeal.

III. Any party may appear in person or by the party's agent or attorney at the hearing of an appeal.

IV. The cost of notice, whether mailed, posted, or published, shall be paid in advance by the applicant. Failure to pay such costs shall constitute valid grounds for the board to terminate further consideration and to deny the appeal without public hearing.

(RSA 676:7)

### 8. Review of Developments of Regional Impact

(a) Notice and hearing requirements of RSA 36:54 through RSA 36:58 apply to applications for DEVELOPMENTS OF potential REGIONAL IMPACT.

(b) Review Required: The board of adjustment, upon receipt of an application for development, shall review it promptly and determine whether or not the development, if approved, reasonably could be construed as having the potential for regional impact. Doubt concerning regional impact shall be resolved in a determination that the development has a potential regional impact. (RSA 36:56, I.)

### 9. Burden of Proof

On issues wherein the exercise of the board of adjustment's discretion is sought, the burden of proof is on the applicant.

## 10.  Issuance of Decision

(a) The board of adjustment shall issue a final written decision which either approves or disapproves an application for a local permit and make a copy of the decision available to the applicant. If the application is not approved, the board shall provide the applicant with written reasons for the disapproval. If the application is approved with conditions, the board shall include in the written decision a detailed description of all conditions necessary to obtain final approval.  (RSA 676:3, I.)

(b) Whenever the board of adjustment votes to approve or disapprove an application, the board shall set forth in its minutes of the meeting at which the vote is taken every finding of fact and every ruling of law that the board made regarding the application.  If the board affirms, modifies, or reverses a decision of an administrative officer, then the board shall set forth in the minutes every reason for the affirmation, modification, or reversal.  If the board approves an application for a permit, then the board shall set forth in the minutes how the application has satisfied each of the requirements for the permit.  If the board disapproves an application for a permit, then the board shall set forth in the minutes every requirement for the permit that the application failed to satisfy.  If the board approves an application for a permit but attaches any conditions, then the board shall set forth in the minutes every reason for each condition.

(c) Whenever the board of adjustment votes to approve or disapprove an application or deny a motion for rehearing, the minutes of the meeting at which such vote is taken, including the written decision containing the reasons therefor and all conditions of approval, shall be placed on file in the board's office and shall be made available for public inspection within 5 business days of such vote.  (RSA 676:3, II.)

(d) Whenever a plat is recorded to memorialize an approval issued by the board of adjustment, the final written decision, including all conditions of approval, shall be recorded with or on the plat. (RSA 676:3, III.)

## 11.  Motion for Rehearing, Rehearing, and Appeal to Superior Court

(a) Whenever a person or a municipality seeks a rehearing on or an appeal of a zoning-related order or decision, the procedures enacted under RSA chapter 677 shall be followed.  (RSA 677:1.)

(b) Within 30 days after any order or decision of the zoning board of adjustment, or any decision of the local legislative body or a board of appeals in regard to its zoning, the selectmen, any party to the action or proceedings, or any person directly affected thereby may apply for a rehearing in respect to any matter determined in the action or proceeding, or covered or included in the order, specifying in the motion for rehearing the ground therefor; and the board of adjustment, a board of appeals, or the local legislative body, may grant such rehearing if in its opinion good reason therefor is stated in the motion. This 30-day time period shall be counted in calendar days beginning with the date following the date upon which the board voted to approve or disapprove the application in accordance with RSA 21:35.  (RSA 677:2)

(c) A motion for rehearing made under RSA 677:2 shall set forth fully every ground upon which it is claimed that the decision or order complained of is unlawful or unreasonable.  (RSA 677:3, I.) A motion for rehearing is a prerequisite for an appeal to the superior court.  (RSA 677:3, I.)

(d) Upon the filing of a motion for a rehearing, the board of adjustment, a board of appeals, or the local legislative body shall within 30 days either grant or deny the application, or suspend the order or decision complained of pending further consideration.  (RSA 677:3, II.)

(e) If the board grants a rehearing, and if any new basis for aggrievement results from the rehearing, then a subsequent motion for rehearing that raises any new issues that are thrust upon the appealing party is necessary to preserve the new issues for an appeal to the superior court.

(f) Any person aggrieved by any order or decision of the zoning board of adjustment or any decision of the local legislative body may apply, by petition, to the superior court within 30 days after the date upon which the board voted to deny the motion for rehearing. For purposes of this paragraph, "person aggrieved" includes any party entitled to request a rehearing under RSA 677:2. (RSA 677:4)

# Article 9.  Signs

## 1.  Authority
RSA 674:16, I, (d); RSA 674:16, V; and RSA 674:17.

## 2.  Purpose
The purposes of these sign regulations are as follows:

(a) To protect the public from distracting and hazardous signs.  (See RSA 674:17, I, (b) ("To secure safety from fires, panic and other dangers") and RSA 674:17, I, (c) ("To promote health and the general welfare").)
(b) To promote the general welfare by protecting the aesthetics of the town.  (See RSA 674:17, I, (c).)

## 3.  Definitions
In this article, the following terms have the following meanings:

"Animate" means to depict something moving except that "animate" excludes
(a) depicting moving text and
(b) sequentially displaying the letters "O," "P," "E," and "N."

"Flash" means to maintain an artificially illuminated display constant for more than .015 seconds and less than 3 minutes except that "flash" excludes
(a) maintaining a display of text constant for 3 seconds or longer,
(b) depicting moving text, and
(c) sequentially displaying the letters "O," "P," "E," and "N."
The purpose of the .015-second constant-display time is to specify a constant-display time at which the human eye sees an illuminated display as not flickering.

## 4.  Permitting Conditions for Outdoor Signs
Except as provided in article 4, section 3, Nonconforming Uses, every outdoor sign shall be permitted upon the following conditions and upon all other applicable conditions in the zoning ordinance:
(a) Prohibited Signs:  The sign shall not animate, flash, or emit sound.
(b) The sign and its illuminator, if any, shall not interfere with pedestrian or vehicular traffic or be confused with or obstruct the view or effectiveness of any official traffic signal or traffic marking.
(c) The source of lighting for every sign artificially illuminated by an external source shall be mounted and shielded so that the lighting is confined to the area of the sign and so that the light source is not visible three feet above grade at the boundary of adjoining property, including adjoining STREETS.
(d) Brightness:  The luminance of the source of lighting for every artificially illuminated sign shall be less than or equal to 230 candelas per square meter as measured at the brightest area on the face of the sign.  (See Freyssinier, J.P., N. Narendran, and J.D. Bullough. 2006. Luminance requirements for lighted signage. *Sixth International Conference on Solid State Lighting, Proceedings of SPIE* 6337, 63371M.)

# Article 14.  Storage Containers

## 1.  Authority
RSA 674:16, I, (d); RSA 674:16, V; and RSA 674:17.

## 2.  Purpose
The purpose of these STORAGE CONTAINER regulations is to promote the general welfare by protecting the aesthetics of the town.
(See RSA 674:17, I, (c).)

## 3.  Permitting Conditions for Storage Containers
Except as provided in article 4, section 3, Nonconforming Uses, every STORAGE CONTAINER shall be permitted upon the following conditions and upon all other applicable conditions in the zoning ordinance:

(a)  The STORAGE CONTAINER shall be used for and only for storage.

(b)  The STORAGE CONTAINER shall have a SETBACK from every STREET boundary or INTERIOR LOT LINE which SETBACK is greater than or equal to the minimum SETBACK specified for the STREET boundary or INTERIOR LOT LINE by article 3, section 4, (h), Table of Dimensional Requirements.

(c)  No more than one STORAGE CONTAINER shall be on the LOT if the LOT is in the Urban District, the Suburban District, or the Rural District.

(d)  No more than two STORAGE CONTAINERS shall be on the LOT if the LOT is in the Commercial District or the Light Industrial/Commercial District.

(e)  The sum of the time during which one or more STORAGE CONTAINERS are on any one LOT during any 15-month period shall be no more than 12 months.

(f)  The owner of the LOT where the STORAGE CONTAINER will be put shall tell the zoning ordinance administrator the date when the STORAGE CONTAINER is proposed to be put on the LOT.  The zoning ordinance administrator shall issue a permit for the STORAGE CONTAINER, and the permit shall state the date when the STORAGE CONTAINER is proposed to be put on the LOT.



**EXHIBIT**
MARSTON AFF.
EXHIBIT 2

# TOWN OF PITTSFIELD
# NEW HAMPSHIRE

# PERMIT
# FOR STORAGE CONTAINERS

(**STORAGE CONTAINERS**: Shall mean, any truck trailer, box trailer, school bus, mobile home or other similar facility used for storage or other purposes).

Storage Containers, whether registered or not, whether mobile or stationery, are not allowed on a permanent basis in any zoning district within the Town of Pittsfield. A storage container is permitted for storage purposes only, for a period of one year, with the approval of a parking permit issued by the Board of Selectmen or their designee, provided said storage container meets all setback requirements, and as limited by the following; a) maximum of one storage container per lot in the Urban, Suburban or Rural Districts; b) maximum of two storage containers per lot in the Light Industrial/Commercial Districts.

APPLICANTS NAME: Joseph McCoy

APPLICANTS ADDRESS: 322 Catamount Rd.

APPLICANTS TELEPHONE NUMBER: 603-435-5050

LOCATION OF STORAGE UNIT: TAX MAP & LOT NUMBER: R23-02-01

ZONING DISTRICT: RURAL

SERIAL NUMBER OF STORAGE CONTAINER: 1H2V04523EB019801

MAKE AND MANUFACTURER OF CONTAINER: FP8-F2-45 FRUEHAUF

SIGNATURE OF APPLICANT: Joseph E McCoy

DATE STORAGE USE IS TO BEGIN: Sept. 1, 2015

APPROVED: DATE: 9-1-15

Board of Selectmen

Unit must be removed one year from the approved date above.

199



**EXHIBIT**

MARSTON AFF.
EXHIBIT 3

## Office of Code Enforcement

### Town of Pittsfield
**Town Hall, 85 Main Street**
**Pittsfield, New Hampshire**

## NOTICE OF VIOLATION

Dear Mr., Joseph Mc Coy

The property located at 322 Catamount Rd Pittsfield NH 03263, identified in the Town Tax Records as Map R23, Lot 02-01, and owned/occupied by you, your permit for a storage trailer has expired on September 1, 2016 and the trailers need to be removed according to our Zoning Ordinance article 14 section 3.

Your immediate attention to this matter is appreciated.

If you believe the Building Inspector is in error in the application or interpretation of any provision of the Building codes, you have the right to appeal to the Zoning Board of Appeals in a timely fashion. This stop work Order controls unless and until it is overturned by the Zoning Board of Appeals.

Thank you
Jesse Pacheco
Building Inspector

OFFICE 603-435-6774          FAX:603-435-7922          CELL:603-715-6624   200

To: Jesse Pacheco,



EXHIBIT
MARSTON AFF.
EXHIBIT 4

Hello,

I am writing in regards to seeking a 6 month extension for my trailer on my property located at 322 Catamount Rd.

At the present, i have construction going on, my garage is leaking from the inside and it needs emergency work which will take me several months to fix. I am disabled with just one working leg, and have to take care of every thing myself, and this has already been started. I will remove one trailer by the end of November. The other i will be dealing with over the cold winter months and will have it emptied and removed by the end of April 2017.

I am asking for this 6 month extension inorder to keep my tools and materials inside this trailer while i deal with this emergency construction situation inorder to keep things out of the winter outside elements. It will be taken care of and i am sorry for the delay, but i am physcially handicapped and will complete this task inorder to remain with good standards for this town and it's rules as a Pittsfield home owner.

Thank you For Your Time.
Sincerely,
Joseph McCoy

201

## Cara Marston

**From:** Bonnie Theriault
**Sent:** Wednesday, May 17, 2017 5:40 PM
**To:** Cara Marston
**Subject:** RE: Office stuff



Jesse has left already and I'll let Mr. McCoy know tomorrow.

Bonnie

**From:** Cara Marston
**Sent:** Wednesday, May 17, 2017 5:14 PM
**To:** Bonnie Theriault
**Subject:** Re: Office stuff

McCoy can put his request in writing
Jesse can call my cell if he's still there

Cara M. Marston
Town Administrator
Town of Pittsfield
85 Main Street
Pittsfield, New Hampshire 03263
office 603.435.6773 x20
fax 603.435.7922 (yup, still have one, for nostalgic purposes)

Sent from my iPhone

On May 17, 2017, at 16:51, Bonnie Theriault <btheriault@pittsfieldnh.gov> wrote:

Hi there,

I hope you are having a fun afternoon. Sorry to bug you but Jesse was in and stated that he has to speak
to you about the junkyard, and he'd like to talk with you before he calls Chairman Allard. He indicated
that it was something he wanted to do as soon as possible. I explained that you would be in tomorrow
but it appears that he wanted to speak with you right then. I told him I'd let you know.

Also, Joseph McCoy 435-5050 wants to get on the agenda for Tuesday night. Jesse had gone to his
property regarding the storage container and he wants to speak to the Board about it this week. I
advised Mr. McCoy that I had to check to see if there were any scheduled appointments first, and we'd
get back to him tomorrow about his request. Shortly after that call, Jesse came in and asked if Mr.
McCoy had called, and I explained what I told Mr. McCoy.

So, anyway, I hope you continue to have fun if you can, and I'll see you tomorrow.

Bonnie

Bonnie Theriault
Administrative Assistant

1



**TOWN OF PITTSFIELD**
**BOARD OF SELECTMEN**
**TOWN HALL, 85 MAIN STREET**
**PITTSFIELD, NH 03263**



EXHIBIT

MARSTON AFF.
EXHIBIT 6

MEETING MINUTES OF Tuesday June 13, 2017

**CALL TO ORDER**
Call to order at 6:06 p.m. by J.C. Allard, Chairman

**MEMBERS PRESENT**
J.C. Allard, Chairman
Gerard LeDuc, Vice-Chairman
Carole Richardson
Carl Anderson

**MEMBERS ABSENT**
None

**OTHERS PRESENT**
Cara Marston, Town Administrator
Ammy Ramsey, Recording Secretary

**PUBLIC INPUT** – regarding agenda items only

Dan Schroth would like to make an appointment with Cara to talk with her about putting together a petition article about getting rid of the Building Inspector position, Cara and Dan will meet tomorrow at 11 a.m.

**AGENDA REVIEW**
Gerard: None.
Carole: None.
Carl: None.
J.C.: None.

**NEW BUSINESS**

**ACTION ITEMS**
1. Interviews for vacant position on Board of Selectmen – 4 candidates
J.C. informed the public that the first item under new business is to conduct interviews and it may take some time to get through the process. Due to circumstances out of anyone's control this board finds itself with the requirement of standing in for the voters of Pittsfield to choose another member for the selectboard. We are going to do that item of great

8. Storage Container Permit extension concern – 322 Catamount Road (tabled 5/23/17)
Mr. McCoy stated that they originally got the permit in 2015, he went to Jesse to get an extension because they have found out their deck, and porch is rotted. They are requesting an extension because he is doing the work himself and is handicapped and it is taking them more time then expected to do all the repairs needed. So he is asking the board to grant a one year extension. J.C. asked if there was an issue with extending the permit. Cara stated that our Zoning Ordinance states it shall not be no more than 12 months. J.C. asked if this should go to the Zoning Board. Carl asked why this matter is in front of them. Cara explained that the selectboard are the administrators of the ordinance. Cara also expressed to the board that Mr. McCoy is here trying to do the right thing and if you look around town there are storage trailers on properties that may not have a permit. Mr. McCoy stated that Jesse collected $25.00 cash from him for the permit but later found out the there is no permit. Jesse also stated to him that they have no choice and must get rid of the trailer, when there are multiple trailers all over town that have been there for a long time. Carole asked if they have had the trailer for one year and now would like to have it there for another year and after that it will be gone. Mr. McCoy stated that they want to get rid of it but just need more time to do the work needed on their home.

Carole: I make a motion to extend the permit for one year.
Gerard: Second.
Discussion: None.
Motion carries 4-0

Cara will print out another permit and have everyone sign it.

**CHECK MANIFESTS**
1. Accounts Payable
Gerard: I make a motion to approve Accounts Payable.
Carl: Second.
Discussion: None.
Motion carries 4-0

2. Payroll
Gerard: I make a motion to approve Payroll and Direct Deposit.
Carl: Second.
Discussion: None.
Motion carries 4-0

**MINUTES**
1. May 23, 2017 – Public Meeting Minutes
Gerard: I make a motion to approve the May 23, 2017 Public Meeting Minutes.
Carl: Second.
Discussion: Carole has a few grammatical corrections and will give those to Ammy.
Motion carries 4-0

Motion carries 4-0 roll call was done and all approved.

The Board came out of non-public session at 9:09 p.m.

Gerard: I make a motion to seal the non-public minutes as they may affect adversely the reputation of any person other than a member of this board.
Carl: Second.
Discussion: None.
Motion carries 4-0 roll call (2/3 vote) was done and all approved.

Gerard: I make a motion to adjourn.
Carl: Second.
Discussion: None.
Motion carries 4-0

Approved:

J.C. Allard, Chairman                    Date



EXHIBIT

MARSTON AFF.
EXHIBIT 7

# TOWN OF PITTSFIELD
## NEW HAMPSHIRE

# PERMIT
## FOR STORAGE CONTAINERS

(**STORAGE CONTAINERS**: Shall mean, any truck trailer, box trailer, school bus, mobile home or other similar facility used for storage or other purposes).

Storage Containers, whether registered or not, whether mobile or stationery, are not allowed on a permanent basis in any zoning district within the Town of Pittsfield. A storage container is permitted for storage purposes only, for a period of one year, with the approval of a parking permit issued by the Board of Selectmen or their designee, provided said storage container meets all setback requirements, and as limited by the following: a) maximum of one storage container per lot in the Urban, Suburban or Rural Districts. b) maximum of two storage containers per lot in the Light Industrial/Commercial Districts.

APPLICANTS NAME: Joseph McCoy

APPLICANTS ADDRESS: 322 Catamount Rd.

APPLICANTS TELEPHONE NUMBER: (603) 435 - 5050

LOCATION OF STORAGE UNIT: TAX MAP & LOT NUMBER: R23 - 2 - 1

ZONING DISTRICT: Rural

SERIAL NUMBER OF STORAGE CONTAINER: JH 2V045238B01901

MAKE AND MANUFACTURER OF CONTAINER: FP8- 5245 - FRVALHAVT

SIGNATURE OF APPLICANT: Joseph McCoy

DATE STORAGE USE IS TO BEGIN: 6/13-2017

APPROVED DATE: June 13, 2017

Board of Selectmen

Unit must be removed one year from the approved date above

206



# TOWN OF PITTSFIELD

Office of Selectmen
85 Main Street, Pittsfield NH 03263
admin@pittsfieldnh.gov ~ telephone (603) 435-6773 ~ fax (603



May 22, 2018

Joseph E. McCoy
322 Catamount Road
Pittsfield, NH 03263

Re: storage container permit expiration

Dear Mr. McCoy,

As you know, the storage trailer permit that the Board of Selectmen approved two years ago and extended at your request last June is due to expire next month.

Please consider this letter a friendly reminder that the trailer must be removed from the property for at least a three month period before you can apply for another permit to bring it back.

Thank you in advance for your anticipated cooperation.

Sincerely,

Pittsfield Board of Selectmen



**EXHIBIT**
MARSTON AFF.
EXHIBIT 9

May 29, 2018

Dear Board Members,

This concerns a storage trailer located on my property at 322 Catamount Rd. Pittsfield

Last june, 2017, i came to your meeting, i had 2 trailors to unload and remove, as requested. I've emptied and removed 1 so far and it's not an easy task. I am disabled with 1 working leg to move on and now that the weather has changed i am in the process of unloading the second. This will take more time, when i bought my home in pittsfield i had a huge ammount of belongings which came with me so i am asking for another permit inorder to accomplish this huge task.

I am crippled so it cannot
be done easily.
        Please let me know,
or, set aside a time to discuss
this further at your next meeting.

            Thank you

            Joseph M'Ey

        322 Catamount Rd.
        P.O. Box 293
        Pittsfield. N.N. 03263



**TOWN OF PITTSFIELD**
**BOARD OF SELECTMEN**
**TOWN HALL, 85 MAIN STREET**
**PITTSFIELD, NH 03263**



**MEETING MINUTES OF Tuesday June 12, 2018**

## CALL TO ORDER
Call to order at 6:02 p.m. by J.C. Allard, Chairman

## MEMBERS PRESENT
J.C. Allard, Chairman
Gerard LeDuc, Vice-Chairman
Carole Richardson
Carl Anderson
James Adams

## OTHERS PRESENT
Cara Hayes, Town Administrator
Ammy Ramsey, Recording Secretary

## PUBLIC INPUT – regarding agenda items only
There was no input.

## AGENDA REVIEW
Gerard: None.
Jim: None.
Carole: Action item for police
J.C.: Action item for the CDC
Carl: Action items for Zoning Administrator

## APPOINTMENTS
6:05 p.m. – Central NH Regional Planning Commission – Brownfield's project update
Mike Tardiff from the Central NH Regional Planning commission presented the board with some photos of some properties between Clark Street and Broadway and then described the status of the Brownfield's project and the potential of the program going forward for the town of Pittsfield. Mike explained the history of the program and that it assesses properties that have potential environmental issues and what it would take to get those properties redeveloped. Steve Rickerich, the consulting engineer with Ransom Consulting, was also present. He explained the steps of the environmental work that is involved in this project. The Central NH RPC has funded this project's environmental work through two grants that the RPC received and have designated to Pittsfield. In the next few months as

the project moves forward Tardiff will contact the Community Development Committee to keep them updated, too.

6:15 p.m. – Jay St. Jean Auctioneers – sale of tax deeded land – Map R4 Lots 1-1, 1-6, & 1-7
J.C. announced the appointment and Jay St. Jean presented the board with packets of information regarding their auction services. They believe that the 3 properties could sell for around 8 to 10 thousand dollars each. Carl inquired about the payment for their services if the properties do not sell. St. Jean explained the fee structure and how costs would be split between the purchaser and the seller.

## NEW BUSINESS

## DEPARTMENT UPDATES
### 1. Police Department
Acting Chief Collins updated the board with the hiring process, informed them of paperwork that needed to be filed with the Police Standards & Training regarding his hiring, and confirmed with the board to continue the coverage as it has been.

Carl: I make a motion to continue with having reduced coverage for 20 hours a week until June 26, 2018.
Jim: Second.
Discussion: None.
Motion carries 5-0

Carl inquired about the status of Officer Wood. Acting Chief Collins requested tabling the resignation until he gets a chance to talk with him. They also discussed some details concerning the membership in the Central NH Special Operations Unit, if there was an annual agreement that needed signing or not. Both Collins and DiGeorge were of the understanding that the agreement was signed upon joining as a member for coverage, not annually.

## ADDED ITEM – ALL NIGHT PARKING BAN
Carole inquired about the parking ban and would like to remove the ban.

Carole: I make a motion to remove the parking ban.
Carl: Second.
Discussion: The board discussed the issues with the policy and the reasons why it was done and the reasons they should consider removing the ban and also the impact it would have for the winter parking ban. The board inquired with George and Acting Chief Collins concerning their opinions, George feels it is a good idea to have the parking ban and Acting Chief Collins stated he has not had a chance to observe situations and did not feel comfortable giving an opinion either way. Carl suggested removing the ban and look at the entire ordinance and talk with George and Acting Chief Collins in the fall. Gerard stated he feels it is important to have because he sees what happens in town at night.
Motion 4-1. Gerard opposes.

## ACTION ITEMS

### 1. CWS Fence & Guardrail quote – 2018 Tilton Hill Road project

J.C. announced item number 1, and inquired with George on the details. George explained the situation and the details on where the guardrail will be placed and the reasons why the rails are needed.

Carl: I make a motion to approve the CWS Fence & Guardrail quote for the 2018 Tilton Hill Road project.
Jim: Second.
Discussion: None.
Motion carries 5-0

### ADDED ITEM – TEMPORARY, SEASONAL PART TIME HIRE

George expressed his concern about being shorthanded because of the employee that is out on workman's comp and stated he spoke with Ammy and she is willing to help for the summer months. There was discussion pertaining to hours she is available to work and a wage and how it will be funded from the budget.

Carl: I make a motion to hire Ammy Ramsey temporary and part time as a Light Equipment Operator at $16.00 an hour starting now until August 31, 2018.
Carole: Second.
Discussion: The total hours across town positions was discussed regarding overtime and full time status. This assignment is temporary, just to assist the highway department get the paving projects completed as there is a highway worker out on workers compensation leave.
Motion carries 5-0

### 2. Summer 2018 F.B. Argue Recreation Area seasonal part time hiring – substitute director

Carl: I make a motion to appoint Donna Keeley as the substitute director of the F.B. Argue Recreation Area.
Gerard: Second.
Discussion: None.
Motion carries 5-0

### 3. Website Committee appointment request – Ryan Wood

Carole: I make a motion to appoint Ryan Wood to the Website Committee.
Jim: Second.
Discussion: None.
Motion carries 5-0

### 4. Resignation – Patrol Officer Donald Wood

J.C. announced item number 4.
Gerard: I make a motion to table the resignation of Patrol Officer Donald Wood until the next meeting.
Carl: Second.

Discussion: None.
Motion carries 5-0

### 5. Community Development Committee resignation – Roland Carter

Gerard: I make a motion to accept the resignation of Roland Carter from the Community Development Committee.

Carl: Second.

Discussion: Gerard stated Roland is selling his home and Jim stated we should send out a letter of thanks for all his work.

Motion carries 5-0

### 6. Application for District Nursing Scholarship

J.C. announced item number 6. Carole confirmed that there is just one applicant.

Carole: I make a motion to approve the applicant for the District Nursing Scholarship.

Jim: Second.

Discussion: None.

Motion carries 5-0

### 7. Donation to Conservation Commission Fund – $2,000.00, Chris Hill

J.C. announced item number 7.

Gerard: I make a motion to accept the donation of $2,000.00 for the Conservation Commission fund from Chris Hill.

Jim: Second.

Discussion: Carl stated we should send a letter of thanks.

Motion carries 5-0

### 8. Fee Waiver request for BCEP Solid Waste District – Lyman Park

J.C. announced item number 8. Cara stated they are requesting a waiver because in the past the person that emptied the trash separated it but now with the nature of waste of the trash they are not able to safely separate the trash, which they then have to pay to get rid of the trash.

Carl: I make a motion to approve the Fee Waiver for BCEP for the caretakers of Lyman Park.

Carole: Second.

Discussion:

Motion carries 4-1 Gerard opposes

### 9. Request for Storage Container permit extension – 322 Catamount Road

There was some discussion pertaining to the last extension that was granted and the enforcement process going forward.

Carl: I make a motion to deny the extension request for the Storage Container Permit.

Jim: Second.

Discussion: Gerard stated we need to keep the man at his word.
Motion carries 5-0

The board discussed the terms of the letter and agreed to give them 30 days to remove the trailer.

## 10. Permission for Historical Society to apply to Planning Board

Clayton Wood stated the Historical Society would need a letter of approval from the property owner to speak to the Planning Board regarding their proposal of the relocation of the Society to the Washington House Lot.

Carl: I make a motion to approve the Historical Society to apply to the Planning Board.
Carole: Second.
Discussion: None.
Motion carries 5-0

## 11. Old Home Day application for Parade Permit – July 14, 2018

Carole: I make a motion to approve the Parade Permit for the Old Home Day Parade on July 14, 2018.
Jim: Second
Discussion: None.
Motion carries 5-0

## 12. Balloon Rally Fireworks contract – Atlas Fireworks

Jim: I make a motion to approve the Atlas Fireworks Balloon Rally Fireworks contract.
Carl: Second.
Discussion: Cara noted the recommended change from the insurance company.
Motion carries 5-0

## 13. Eversource BTLA appeals – consideration of legal counsel

Cara stated she sent out the information to Serge and he recommended Attorney Bolt and he would confer with him for contract terms.

Carl: I make a motion to approve Matt Serge to coordinate with Attorney Christopher Boldt from Donahue, Tucker and Ciandella to represent Pittsfield in the BTLA appeal.
Jim: Second.
Discussion: Carole confirmed that they are voting to have Serge find out the cost and then come to us.
Motion carries 5-0

## 14. NH E 9-1-1 Data Operations Liaison renewal

Cara stated the liaisons are currently her and Bonnie.
Carl: I make a motion to appoint Cara Hayes and Bernadette Theriault as the 911 Data Operations Liaisons.
Gerard: Second.

Discussion: None.
Motion carries 5-0

### 15. Notice of Intent to Excavate – Map R48 Lot 2
Carl: I make a motion to approve the Intent to Excavate for Map R48 Lot 2.
Carole: Second
Discussion: None.
Motion carries 5-0

### 16. Notice of Intent to Cut Timber – Map R42 Lot 8
Carl: I make a motion to approve the Intent to Cut Timber for Map R42 Lot 8.
Carole: Second.
Discussion: None.
Motion carries 5-0

### 17. Application for Solar Exemption – Map R7 Lot 1-5
Cara explained that this was approved at town meeting in 2016 and it is an exemption for the value of the solar equipment only (to have no property tax impact).

Carl: I make a motion to approve the application for Solar Exemption.
Gerard: Second.
Discussion: None.
Motion carries 5-0

### 18. Funds Transfer – 2018 appropriations to capital reserve and expendable trust funds
J.C. announced item number 18.

Gerard: I make a motion to approve the fund transfer of the 2018 appropriations to the capital reserve and expendable trust funds.
Jim: Second.
Discussion: None.
Motion carries 5-0

### 19. Funds Transfer – perpetual care for lots sold in Floral Park Cemetery
Carole: I make a motion to transfer funds to perpetual care for lots sold in Floral Park Cemetery.
Jim: Second.
Discussion: None.
Motion carries 5-0

### ADDED ITEM – COMMUNITY DEVELOPMENT COMMITTEE – FIRST IMPRESSIONS PROGRAM
J.C. explained that they have come to an agreement with the town of Tilton regarding the First Impressions Program and explained those details. This memorandum states that the town of Pittsfield and the town of Tilton will look at the other community and give some feedback.

Carl: I make a motion to approve J.C., Cara Hayes, and Louie Houle to sign the memorandum.
Carole: Second.
Discussion: None.
Motion carries 5-0

## ADDED ITEM - Zoning Administrator Deputy

Carl explained he will be on vacation and the Zoning Administrator duties should be covered and would suggest appointing a person as the deputy for not just this instance but also when he is not available to give a timely response.

Carl: I make a motion to appoint J.C. Allard as Deputy Zoning Administrator.
Jim: Second.
Discussion: None.
Motion carries 4-1 J.C. abstains

## ADDED ITEM - Donation of building supplies for the barn at the library

Carl stated that in trying to button up the barn at the library with Clayton Wood and Daren Nielsen and he purchased some supplies to get the job accomplished. Carl stated the job can be completed after some more materials are purchased. He would like a motion to accept the materials as a donation. Jim inquired about the dollar amount and Carl stated not more than $50.00.

Jim: I make a motion to accept the donation of materials needed to seal up the barn at the library.
Carole: Second.
Discussion: None.
Motion carries 5-0

## ADDED ITEM - Junkyard license renewals

Carl would like to be proactive with the junkyard licenses around town and suggests sending a letter of notice of the requirements that need to be done before their license expires to get the process started. It was decided to send out those letters and there was some discussion pertaining to some details on what those letters should contain.

## ADDED ITEM - Notice of Zoning Violation update

Carl stated a Notice of Zoning Violation is going to be sent to 140 Tilton Hill Road and gave some details on what the property owners can have for storage trailers.

Carl: I make a motion to send the Notice of Violation to 140 Tilton Hill Road.
Jim: Second.
Discussion: None.
Motion carries 5-0

**ADDED ITEM - Zoning Violation for excessive junk in the yard**

Cara stated that a Notice of Zoning Violation should be sent for a property because she received a complaint concerning excessive debris in the yard. It was decided to put that on the next agenda.

**ADDED ITEM - 33 Main Street purchase and sale agreement extension**

Carl stated that they received a request from Mr. Gamble to extend the purchase and sales agreement for 33 Main Street. There was some discussion pertaining to the details on the reason.

Jim: I make a motion to extend the purchase and sales agreement for 33 Main Street for 30 days.

Carole: Second.

Discussion: None.

Motion carries 5-0

**27. Signing of the Collective Barging Agreement for Teamsters Local #633**

J.C.: I make a motion to approve and sign the Collective Bargaining Agreement with the teamsters union as approved at 2018 town meeting.

Carl: Second.

Discussion: None.

Motion carries 5-0

**COMMITTEE REPORTS**

Gerard stated that BCEP will be changing the rates to 10 cents a pound from 7 cents.

Carl stated that the selectboard will be receiving a letter concerning the septic system at JNR Automotive and gave some details concerning the issue.

**INFORMATION ITEMS**

2. Letter of Commendation – Sergeant DiGeorge

J.C. announced that Sgt. DiGeorge received a letter of commendation and Sgt. DiGeorge explained the story and also informed the board about 2 other circumstances that may receive a letter, as well. Carole read both letters and Sgt. DiGeorge received an applause from all who attended the meeting. The board stated that the town of Pittsfield is honored and proud to have such a heroic member of the police department. Jim stated he will work on finding out where to send these types of letters to the Red Cross to have Sgt. DiGeorge recognized.

**OLD BUSINESS**

2. Josiah Carpenter Library chimney repair (tabled 4/24/2018)

Carl gave an update on the chimney repair, and stated they received a proposal and suggested that we continue to look for someone who will just repoint the chimney.

3. Historical Society public hearing request - relocation of Society headquarters (pending 4/24/2018)
It was decided to schedule the public hearings for the July meetings.

**CHECK MANIFESTS**
1. Accounts Payable
Gerard: I make a motion to approve Accounts Payable.
Carl: Second.
Discussion: None.
Motion carries 5-0

2. Payroll
Gerard: I make a motion to approve Payroll and Direct Deposit.
Carl: Second.
Discussion: None.
Motion carries 5-0

**MINUTES**
1. May 8, 2018 - Non Public Session Minutes (tabled 5/22/2018)

2. May 20, 2018 - Public Session Minutes
Gerard: I make a motion to table the May 20, 2018 Public Meeting Minutes.
Carl: Second.
Discussion:
Motion

3. May 20, 2018 - Non Public Session Minutes
Gerard: I make a motion to table the May 20, 2018 Non-Public Meeting Minutes.
Carl: Second.
Discussion: None.
Motion carries 5-0

4. May 22, 2018 - Public Session Minutes
Gerard: I make a motion to approve the May 22, 2018 Public Meeting Minutes.
Carl: Second.
Discussion: None.
Motion carries 5-0

5. June 2, 2018 - Public Session Minutes
Gerard: I make a motion to approve the June 2, 2018 minutes with corrections of the date and time.
Carl: Second.
Discussion: None.
Motion carries 5-0

**PUBLIC INPUT**

Adam Gauthier would like to remind the board about the meeting tomorrow night concerning school funding and gave some details on what will be discussed. He encourages everyone to come out. Adam also inquired about Atlantic Broadband taking over Metrocast and if that would affect the lines in Pittsfield and Cara explained that the cable franchise is currently on an extended contract agreement until either party requests to open the terms.

**NON-PUBLIC SESSION**

Gerard: I make a motion to go into Non-Public Session under RSA 91-A:3, II (d).
Jim: Second.
Discussion: None - Roll call was done and all approved.

When the Board returned to public session Gerard made a motion to seal the non-public minutes as they may affect adversely the reputation of any person other than a member of this board. Carole seconded the motion.

Motion carries with a 5-0 roll call (2/3 achieved) vote, all approved.

Carl: I make a motion to approve Jay St. Jean Auctioneers to auction the tax deeded properties R4 Lots 1-1, 1-6, & 1-7.
Jim: Second.
Discussion: None.
Motion carries 5-0

Carl: I make a motion to adjourn.
Carole: Second.
Discussion: None.
Motion carries 5-0

Approved:

_James C. Allard, Chairman_          _10 July 2018_
James C. Allard, Chairman            Date



# TOWN OF PITTSFIELD

Office of Selectmen
85 Main Street, Pittsfield NH 03263
admin@pittsfieldnh.gov ~ telephone (603) 435-6773 ~ fax (603) 435-7922



**EXHIBIT**
MARSTON AFF.
EXHIBIT 11

## NOTICE OF ZONING VIOLATION

June 12, 2018

mailed certified mail
and FIRST CLASS MAIL

Diane Dipoto
140 Tilton Hill Road
Pittsfield, NH 03263

notice of violation at:
140 Tilton Hill Road
Map R15 Lot 10

Dear Ms. Dipoto,

It has been brought to the attention of this office that zoning violations exist at your property, 140 Tilton Hill Road.

### VIOLATION

three unpermitted storage trailers on property
Pittsfield Zoning Ordinance – Article# 14. Storage Containers

### CORRECTIVE ACTION NEEDED

remove trailers or submit application for storage container permit(s)

### RIGHT TO APPEAL

This notice is a decision of the Zoning Ordinance Administrator and may be appealed to the Zoning Board of Adjustment in accordance with the provisions of the Pittsfield Zoning Ordinance Article 5, Section 5. Appeals to the Board of Adjustment, provided that such appeal is filed within thirty days of the date of this decision, per NH RSA 676:5 and the Pittsfield Zoning Board of Adjustment's Rules of Procedure.

### PENALTIES & FEES

Please be advised that violations of the provisions of the Pittsfield Zoning Ordinance include civil penalties of $275 for the first offense, and $550 for subsequent offences, for each day such violation is found to continue after the conviction date or after the date on which the violator received written notice, whichever is earlier, with each day that the violation continues being considered as a separate offense, as further described in Article 1, Section 9. Penalty Clause.

This correspondence serves as a formal notice of a zoning violation. You have 30 days notice from the receipt of this notice to cure this violation. In the event that the violations are not cured or remedied as provided for in this notice, the Town will pursue enforcement of the violations as provided for by law.

Should you have any questions please contact the Selectmen's Office at the contact information listed above.

Sincerely,

Pittsfield Board of Selectmen



**OFFICE OF SELECTMEN**
85 Main Street
Pittsfield, NH 03263-0098

NEOPOST          FIRST-CLASS MAIL
06/13/2018
US POSTAGE $000.47º


ZIP 03263
041M11290780

Diane Dipoto
140 Tilton Hill Road
Pittsfield, NH 03263

Dear Ms. Dipoto,

---

**CERTIFIED MAIL**



**OFFICE OF SELECTMEN**
85 Main Street
Pittsfield, NH 03263-0098



91 7199 9991 7034 2973 3008

NEOPOST          FIRST-CLASS MAIL
06/13/2018
US POSTAGE $003.92º


ZIP 03263
041M11290780

91 7199 9991 7034 2973 3008

Diane Dipoto
140 Tilton Hill Road
Pittsfield, NH 03263

Dear Ms. Dipoto

221



# TOWN OF PITTSFIELD

Office of Selectmen
85 Main Street, Pittsfield NH 03263
admin@pittsfieldnh.gov ~ telephone (603) 435-6773 ~ fax (60



**EXHIBIT**
MARSTON AFF.
EXHIBIT 12

June 13, 2018

Joseph E. McCoy
322 Catamount Road
Pittsfield, NH 03263

*s/Container
removed
no further violation*

Re: storage container permit expiration

Dear Mr. McCoy,

The Board of Selectmen considered your permit extension request dated May 29, 2018. While they note the personal circumstances that have caused delay, the Board has to balance the terms of the zoning ordinance with your request, and as you have already been granted a year's extension beyond the 12 months permitted, they voted to not grant this second extension.

The Board has granted an additional thirty (30) days from the date of this letter to remove the storage container from your property.

Sincerely,

Cara M. Hayes
Cara M. Hayes
Town Administrator

# DrummondWoodsum

### ATTORNEYS AT LAW

**Matthew R. Serge**
Admitted in NH



**EXHIBIT**

MARSTON AFF.
EXHIBIT 13

603.710.2099 Fax

May 24, 2019

James Hetu and Cynthia Hetu
272 Loudon Road
Pittsfield, NH 03263

      RE:   Zoning Violation

Dear Mr. and Mrs. Hetu:

This office serves as general legal counsel to the Town of Pittsfield. The Town has asked us to contact you concerning an ongoing zoning ordinance violation on the property identified above. Specifically, you have been keeping a storage trailer on your property in violation of Article 14 of the Pittsfield Zoning Ordinance.

Article 14 of the Zoning Ordinance (entitled Storage Containers) provides that a storage container is permitted on a property only if the landowner complies with a series of conditions, including that the landowner obtain a permit from the Town. This permit states where the storage container will be placed on the lot, and the Ordinance further provides that the longest a contained can remain on a property is no more than 12 months in a 15-month period. For purposes of Article 14, a "Storage Container" includes a "truck trailer, box trailer, school bus, manufacture housing unit, or similar mobile container parked continuously for 31 days or more and used principally for storage and not used for any person's residential occupancy or transient lodging." A copy of applicable sections of the Zoning Ordinance are attached for reference.

The Town has sent you two Notices of Zoning Violation, dated December 4, 2018 and January 18, 2019 (copies attached). To date, you have not responded to these letters. The Town demands, therefore, that you remove the trailer(s) from your property by May 24, 2019, and that no trailers will be stored on the property until you receive a permit from the Town. If you fail to comply, the Town will initiate legal action to remove the trailer(s). If a lawsuit is filed, you may be required to pay civil fines to the Town of $275 per day, beginning February 17, 2019. In addition, if the Town is successful in its lawsuit, you will be required to pay for the Town's reasonable costs and attorney's fees.

If you have any questions, please contact the Town at (603) 435-6773. Thank you.

Sincerely,

Matthew R. Serge

cc:   Board of Selectmen

## Article 14. Storage Containers

### 1. Authority

RSA 674:16, I, (d); RSA 674:16, V; and RSA 674:17.

### 2. Purpose

The purpose of these STORAGE CONTAINER regulations is to promote the general welfare by protecting the aesthetics of the town. (See RSA 674:17, I, (c), and Taylor v. Plaistow, 152 N.H. 142, 872 A.2d 769 (2005) ("a municipality may exercise its zoning power solely to advance aesthetic values because the preservation or enhancement of the visual environment may promote the general welfare.").)

### 3. Permitting Conditions for Storage Containers

Except as provided in article 4, section 3, Nonconforming Uses, every STORAGE CONTAINER shall be permitted upon the following conditions and upon all other applicable conditions in the zoning ordinance:

(a) The STORAGE CONTAINER shall be used for and only for storage.

(b) The STORAGE CONTAINER shall have a SETBACK from every STREET boundary or INTERIOR LOT LINE which SETBACK is greater than or equal to the minimum SETBACK specified for the STREET boundary or INTERIOR LOT LINE by article 3, section 4, (h), Table of Dimensional Requirements.

(c) No more than one STORAGE CONTAINER shall be on the LOT if the LOT is in the Urban District, the Suburban District, or the Rural District.

(d) No more than two STORAGE CONTAINERS shall be on the LOT if the LOT is in the Commercial District or the Light Industrial/Commercial District.

(e) The sum of the time during which one or more STORAGE CONTAINERS are on any one LOT during any 15-month period shall be no more than 12 months.

(f) The owner of the LOT where the STORAGE CONTAINER will be put shall tell the zoning ordinance administrator the date when the STORAGE CONTAINER is proposed to be put on the LOT. The zoning ordinance administrator shall issue a permit for the STORAGE CONTAINER, and the permit shall state the date when the STORAGE CONTAINER is proposed to be put on the LOT.

77



# TOWN OF PITTSFIELD

Office of Selectmen
85 Main Street, Pittsfield NH 03263
admin@pittsfieldnh.gov ~ telephone (603) 435-6773 ~ fax (603) 435-7922

## NOTICE OF ZONING VIOLATION

December 4, 2018

James B. Hetu
Cynthia A. Hetu
272 Loudon Road
Pittsfield, NH 03263

mailed certified mail
and FIRST CLASS MAIL

notice of violation at:
272 Loudon Road
Map R35 Lot 10

Dear James & Cynthia,

It has been brought to the attention of this office that zoning violations exist at your property, 272 Loudon Road.

### VIOLATION

unpermitted storage trailer on property
Pittsfield Zoning Ordinance – Article# 14. Storage Containers

### CORRECTIVE ACTION NEEDED

remove trailer or submit application for storage container permit

### RIGHT TO APPEAL

This notice is a decision of the Zoning Ordinance Administrator and may be appealed to the Zoning Board of Adjustment in accordance with the provisions of the Pittsfield Zoning Ordinance Article 5, Section 5. Appeals to the Board of Adjustment, provided that such appeal is filed within thirty days of the date of this decision, per NH RSA 676:5 and the Pittsfield Zoning Board of Adjustment's Rules of Procedure.

### PENALTIES & FEES

Please be advised that violations of the provisions of the Pittsfield Zoning Ordinance include civil penalties of $275 for the first offense, and $550 for subsequent offences, for each day such violation is found to continue after the conviction date or after the date on which the violator received written notice, whichever is earlier, with each day that the violation continues being considered as a separate offense, as further described in Article 1, Section 9. Penalty Clause.

This correspondence serves as a formal notice of a zoning violation. You have 30 days notice from the receipt of this notice to cure this violation. In the event that the violations are not cured or remedied as provided for in this notice, the Town will pursue enforcement of the violations as provided for by law.

Should you have any questions please contact the Selectmen's Office at the contact information listed above.

Sincerely,

Pittsfield Board of Selectmen

225



# TOWN OF PITTSFIELD

Office of Selectmen
85 Main Street, Pittsfield NH 03263
admin@pittsfieldnh.gov ~ telephone (603) 435-6773 ~ fax (603) 435-7922

## SECOND - NOTICE OF ZONING VIOLATION

January 18, 2019

James B. Hetu
Cynthia A. Hetu
272 Loudon Road
Pittsfield, NH 03263

mailed certified mail
and FIRST CLASS MAIL

notice of violation at:
272 Loudon Road
Map R35 Lot 10

Dear James & Cynthia,

It has been brought to the attention of this office that zoning violations exist at your property, 272 Loudon Road.

### VIOLATION

unpermitted storage trailer on property
Pittsfield Zoning Ordinance – Article# 14. Storage Containers

### CORRECTIVE ACTION NEEDED

remove trailer or submit application for storage container permit

### RIGHT TO APPEAL

This notice is a decision of the Zoning Ordinance Administrator and may be appealed to the Zoning Board of Adjustment in accordance with the provisions of the Pittsfield Zoning Ordinance Article 5, Section 5. Appeals to the Board of Adjustment, provided that such appeal is filed within thirty days of the date of this decision, per NH RSA 676:5 and the Pittsfield Zoning Board of Adjustment's Rules of Procedure.

### PENALTIES & FEES

Please be advised that violations of the provisions of the Pittsfield Zoning Ordinance include civil penalties of $275 for the first offense, and $550 for subsequent offences, for each day such violation is found to continue after the conviction date or after the date on which the violator received written notice, whichever is earlier, with each day that the violation continues being considered as a separate offense, as further described in Article 1, Section 9. Penalty Clause.

This correspondence serves as a formal notice of a zoning violation. **You have 30 days notice from the receipt of this notice to cure this violation.** In the event that the violations are not cured or remedied as provided for in this notice, the Town will pursue enforcement of the violations as provided for by law.

Should you have any questions please contact the Selectmen's Office at the contact information listed above.

Sincerely,

Pittsfield Board of Selectmen



# TOWN OF PITTSFIELD

Office of Selectmen
85 Main Street, Pittsfield NH 03263
admin@pittsfieldnh.gov ~ telephone (603) 435-6773 ~ fax (603) 435-7922



**EXHIBIT**

MARSTON AFF.
EXHIBIT 14

### NOTICE OF ZONING VIOLATION

August 13, 2019

mailed certified mail
and FIRST CLASS MAIL

Sanel Realty Co. Inc.
11 Cram Avenue
Pittsfield, NH 03263

notice of violation at:
11 Cram Avenue
Map U3 Lot 11

Dear Sanel Realty Co. representative(s),

It has been brought to the attention of our office that zoning violations exist at your property, 11 Cram Avenue.

**VIOLATION**

unpermitted storage trailer on property
Pittsfield Zoning Ordinance – Article# 14. Storage Containers

**CORRECTIVE ACTION NEEDED**

remove trailer or submit application for storage container permit

**RIGHT TO APPEAL**

This notice is a decision of the Zoning Ordinance Administrator and may be appealed to the Zoning Board of Adjustment in accordance with the provisions of the Pittsfield Zoning Ordinance Article 5, Section 5. Appeals to the Board of Adjustment, provided that such appeal is filed within thirty days of the date of this decision, per NH RSA 676:5 and the Pittsfield Zoning Board of Adjustment's Rules of Procedure.

**PENALTIES & FEES**

Please be advised that violations of the provisions of the Pittsfield Zoning Ordinance include civil penalties of $275 for the first offense, and $550 for subsequent offences, for each day such violation is found to continue after the conviction date or after the date on which the violator received written notice, whichever is earlier, with each day that the violation continues being considered as a separate offense, as further described in Article 1, Section 9. Penalty Clause.

This correspondence serves as a formal notice of a zoning violation. **You have 30 days notice from the receipt of this notice to cure this violation.** In the event that the violations are not cured or remedied as provided for in this notice, the Town will pursue enforcement of the violations as provided for by law.

Should you have any questions please contact the Selectmen's Office at the contact information listed above.

Sincerely,

Pittsfield Board of Selectmen



**TOWN OF PITTSFIELD**
**BOARD OF SELECTMEN**
**TOWN HALL, 85 MAIN STREET**
**PITTSFIELD, NH 03263**



EXHIBIT

MARSTON AFF.
EXHIBIT 15

**MEETING MINUTES OF Tuesday May 23, 2017**

**CALL TO ORDER**
Call to order at 6:00 p.m. by J.C. Allard, Chairman

**MEMBERS PRESENT**
J.C. Allard, Chairman
Gerard LeDuc, Vice-Chairman
Carole Richardson
Carl Anderson

**MEMBERS ABSENT**
None

**OTHERS PRESENT**
Cara Marston, Town Administrator
Ammy Ramsey, Recording Secretary

**PUBLIC INPUT** – regarding agenda items only
Mary French inquired about the best time to speak about 81 Main Street would be, and J.C. explained that the public hearing would be the time to do so.

**AGENDA REVIEW**
Gerard: Report for Aqueduct under committee reports.
Carole: None.
Carl: None.
J.C.: None.

**PUBLIC HEARING**
6:15 p.m. – Pittsfield Historical Society proposed relocation to 81 Main Street

J.C. opened the public hearing to receive input from the public regarding the proposal by the Historical Society to take possession of town owned property at 81 Main Street which is adjacent to the Town Hall.

Adam Gauthier asked if there are any proposals printed to look at, Cara handed some out.

Mark Riel asked if the proposal is the actual letter, J.C. stated yes, with a copy of the tax card for people to see the property.

Mary French asked which item we are talking about, because under old business it says it's a sale and the proposal states it's a donation. J.C. explained that the public hearing is a discussion for the proposed donation of the property and the item under old business is referring to us trying to sell this property over the last year. This is a relatively new proposal from the Historical Society to take possession of the property. J.C. asked Carl to give a history of the property. Carl explained that we ran into an issue with selling this property with a clear title. In addition to the usual title problems with a property that is taken by tax deed this one had other issues, too. Carl stated that the likelihood of getting a clear title without doing an action to quite title which can cost ten to fifteen thousand dollars is out of the question. There have been several title companies working on it to accomplish this. If we were to take this to auction we still have to convey a clear title. To get a clear title it would easily cost ten to fifteen thousand dollars and have to go through the courts and that can be a lengthy process. Carl stated that they had a person interested in purchasing the property and they would take on the expense of clearing the title themselves, and at the point it would be rehabbed and restored to the tax rolls, at a low purchase price. Then the question would be if that would be in the best interest of the town, because you are rolling the dice when you sell a property as to how much additional burden could be put on the services in town. It's an unknown when you sell the property to know if the tax revenue that the town receives would be of benefit to the town. Or would we be better off donating this property to the Historical Society, so the town would have a nice place to keep the history of the town. It won't bring any revenue, but to Carl's understanding they would clear the title and tear down the existing building and build a new one. Otherwise we would be in for a 10 year wait to see what happens with the title.

Randy Severance stated that at the last meeting there was a non-public session held with the Historical Society and it was later revealed to us during public session that the non-public meeting minutes would be unsealed and put up on the website as agenda minutes. As of noon time today they were not on the website and requested a synopsis of that then private but not private meeting. J.C. stated the reason the minutes are not on the website is because they have not been approved and will be during this meeting. J.C. explained that it was a discussion concerning the desire of the Historical Society to take possession of 81 Main Street property. They would demolish the existing building and replace it with building yet to be designed to accommodate the possessions of the Historical Society. Part of that discussion pertained to the issues that Carl just explained with the title. Currently in the state of New Hampshire we have an advantage concerning titles for non-profit organizations relative to titles verses a private sale.

Adam Gauthier asked if there was a time table for demolition and moving forward, J.C. stated they don't have a formal commitment as they are waiting for approval. The Historical Society shares this board's interest in moving forward with getting the current structure down and construct a new building.

Mary French asked if that will be a stipulation put in the deed, Carl stated that we could. The other properties that have been sold in town for residential rehab have had time frame for improvements so the properties are better to look at. Carl feels that we would be looking for the same thing and thinks they are prepared for something like that, as well.

Justin Clough is in favor of history but considering the fact of serious constraints in regards to tax revenue. With an offer on the table for this property who is willing to work the title process at their expense, he is wondering why we are not taking a closer look at that first. He would like to see something more available for the Historical Society, but looking at this from a tax revenue purpose he finds it a little difficult to hand over a property that would not generate any tax revenue when we have an offer that could generate revenue. Carl stated that we don't exactly have an offer on the table, however one could be generated. Carl stated that there are things we have to consider when looking at it from that perspective. You have to look at how much tax revenue it will be capable of generating. Will it have a house on that small lot that will be taxed for $10,000.00 or $4,500.00. And the other thing would be depending on the buyers and if it is a family that will cost the town more than that in services. It's not an exclusion from someone coming and building but residential development does not usually enhance the tax situation. Justin's other concern is that previously he saw it was going to be rezoned so that it would be a business. His question would be if it is generating just one dollar of tax revenue then wouldn't it be better than generating none. Carl stated that just because you generate a dollar in revenue does not mean you are on the up side.

Mark Riel stated that the intention of the Historical Society is to put their current building back onto the tax rolls and it is assessed twice as much so it would generate tax revenue. Justin asked if it could potentially be a tear down. Mark stated the building is in good condition.

Mary French asked if the current Historical Society building was originally bought or donated, Mr. Berkson stated it was purchased. She also is impressed with Pittsfield's Historical Society and how they handle the history of Pittsfield. Mary asked if the previous residents lived there when the property was taken by tax deed. Cara stated that she had passed away. Mary feels that it would be a benefit to have the Historical Society there and has some possible suggestions for the deed.

Fred Okrent believes that the donation of the property to the Historical Society for the construction of a new building would be a great step forward for the revitalization of the town.

Adam Gauthier stated that he is not against the Historical Society he just would like some more information. He asked if funding is available for this project or are they going to be doing some fundraising. Mark Riel stated that they have some significant pledges for the project, that will get them to a point of clearing the title, demolishing the current structure, some site work, and a new structure up and enclosed. There may be some fundraising later to finish the project.

Doug Martin asked if the rebuild would be period correct, J.C. stated that the town does not have a historic district that has that kind of requirement. Doug commented that we are taking down history to put up a warehouse. J.C. stated that the architectural design has not been done yet. Doug inquired about the building being climate controlled to properly store the Historical Society's items. Mark Riel informed Doug that most historical societies do not have climate controlled atmosphere for the entire facility, they do for some of the paper items. Mark stated that the 3 story building including the full basement that would hold the fire wagons and baggage carts, and stated that they want it to fit the Historical Society's image and benefit the town. J.C. commented that anyone could take possession of the building would most likely tear it down because of the condition it is in. Doug understands that but it would be private sector and not a gift or donation.

Randy Severance asked if the town still has an abandoned piece of property next to the library and if so wouldn't that be a better location for the Historical Society.  And has it been considered.  Mark Riel stated that they had looked at that and it would be costly in the long run for the upkeep of that building.

Lee Corson asked about a time frame for the new building to be up.  Mark Riel stated it is the intention to remove the existing building quickly, but we would need the title cleared before the construction process starts.

Justin Clough asked if the time has been taken to look at existing structures around town.  He is in favor of having a good Historical Society, but would it be more price advantageous to purchase and rehab to meet their needs and put this property back on the tax roll.  Justin inquired about the building down the street that has been vacant for a while and has a good location.  Ray Webber stated that then you would be taking that property off the tax roll.

Larry Berkson stated they have done some research and looked at all (14 currently) available properties in town.  Larry explained the building Justin referred to would be a big loss in tax revenue for the town, and they would not be able to afford the maintenance and upkeep that property would need.  They currently have a window with some major donors and would need to do something pretty hastily to capture that money and move forward and the project next door is the best option.

Justin Clough stated that he is only asking these questions because there was not much information given to the public.  He understands that they have done the research but there is not a lot of information available to know what's going on.

Adam Gauthier asked about parking, Mark Riel stated that it wouldn't be any worse than what they have now because they don't have any now.  Ray Webber stated that there will be some available behind the building.

Jim Gamble stated that he was the one with the purchase and sales agreement on this property, he does this for a living and he was prepared to purchase and rehab it.  He has been doing this for 42 years and agrees that it needs work but the work is doable.  He currently is rehabbing 114 Main Street.

Lee Corson inquired about how long it would take to get a clear title.  J.C. stated he is not sure how long it would take but it would be costly.  Carl stated it could take 6 months to a year.

Jim Gamble stated it was his attorney that found the problems with that title.  They said it was not hard it's just dealing with the lenders, and it would take 6 months to a year just like he explained to Carl.

Justin Clough asked if the Historical Society would be looking at the same time frame.   J.C. believes that it would be different because of their non-profit status.  Carl stated that the board could convey the property to anyone with a clear title or not, it's whether the buyer accepts the

title the way it is. In the case of Mr. Gamble he can purchase it and rehab it, but when it comes time sell the property it would be in his best interest to clear the title.

Mary French requested clarification of clearing the title if it goes to the Historical Society. J.C. stated that whoever the property is conveyed to would still have to clear the title. And to his understanding the Historical Society would be the terminal holder because they would intend to hold the property in perpetuity, whereas a private citizen would fix it and sell it the title would come into question again. It seems holding onto the title for a time seems to have less questions. Mary feels that it would be important to put something in the deed that states if the Historical Society is not able to continue residing on that property they could not sell it and would return the property to the town. She has examples that she would like to provide to the selectboard for their information.

J.C. closed the public hearing at 6:47 p.m.

Carl asked if we could do a poll to see how many would be in favor and who would not. There was some discussion and a poll was done. The majority was in favor of donating the property to the Historical Society.

**NEW BUSINESS**

**ACTION ITEMS**
1. Property Tax Warrant – $4,211,170.00
J.C. stated that item number 1 is for the Property Tax Warrant.

Gerard: I make a motion to approve the Property Tax Warrant in the amount of $4,211,170.00.
Carl: Second.
Discussion: None.
Motion carries 4-0

2. Notice of Intent to Cut Timber – Tax Map R30, Lot 4 – 520 Catamount Road
J.C. stated that item number 2 is for a Notice of Intent to Cut Timber for Tax Map R30, Lot 4 at 520 Catamount Road.

Carl: I make a motion to approve the Notice of Intent to Cut Tax Map R30, Lot 4, 520 Catamount Road.
Gerard: Second.
Discussion: None.
Motion carries 4-0

3. Application for Current Use – Tax Map R2, Lot 7 – 113 Daroska Road
Gerard inquired if the current use was the 128 acres, Cara stated that it was the same ownership and contiguous. J.C. stated that item number 3 is for an Application for Current Use for Tax Map R2, Lot 7 at 113 Daroska Road. Carl inquired with Cara about the house location (on the abutting parcel) in reference to the 128 acres and the land that is currently in current use.

Carl: I make a motion to approve the Application for Current Use for Tax Map R2, Lot 7, 113 Daroska Road.
Carole: Second.
Discussion: None.
Motion carries 4-0

4.  Abatement – 2 & 4 Manchester Street - $1,357.81
J.C. stated that item number 4 is a request for an abatement for 2 & 4 Manchester Street in the amount of $1,357.81.

Gerard: I make a motion to approve the abatement for Tax Map U01, Lot 83 2 & 4 Manchester Street in the amount of $1,357.81.
Carl: Second.
Discussion: None.
Motion carries 3-1 Carole opposes.

5.  Conservation Commission Resignation – Owen David
J.C. stated that item number 5 is a resignation letter from Owen David.

Gerard: I make a motion to approve the resignation of Owen David from the Conservation Commission.
Carl: Second.
Discussion: None.
Motion carries 4-0

6.  Conservation Commission Appointment – Carl Wallman
J.C. stated that item number 6 is an appointment application for Carl Wallman to the Conservation Commission.

Gerard: I make a motion to approve the appointment of Carl Wallman to the Conservation Commission.
Carl: Second.
Discussion: None.
Motion carries 4-0

7.  Committee name change request - Economic Development to Community Development
J.C. stated that item number 7 is a request to change the name of the Economic Development Committee to be the Community Development Committee.

Carl: I make a motion to approve the name change request of the Economic Development Committee to Community Development Committee.
Carole: Second.
Discussion: None.
Motion carries 4-0

8. Economic (Community) Development Committee Appointment – Leroy Corson
J.C. stated that item number 8 is an appointment request of Leroy Corson to the new Community Development Committee.

Gerard: I make a motion to approve the appointment of Leroy Corson to the Economic (Community) Development Committee.
Carl: Second.
Discussion: None
Motion carries 4-0

9. Parks & Recreation Commission Appointment – David Stasiak
Gerard: I make a motion to approve the appointment of David Stasiak to Parks & Recreation Committee.
Carl: Second.
Discussion: None.
Motion carries 4-0

10. BCEP Solid Waste District disposal fee waiver – Josiah Carpenter Library
Carole: I make a motion to waive the fee waive the fee for the library.
Carl: Second.
Discussion: None.
Motion carries 3-1 Gerard abstains.

11. 42 Chestnut Street grant demolition project – easement addition to deed
Cara stated that this is something that FEMA requires with the project to make sure that anyone searching the title on the property that FEMA was involved with the project. It's part of the grant, if for some reason we wanted to sell this property we would have to go back to FEMA and ask their permission because they have an interest in the property, and then there would be a different easement going forward.

Carl: I make a motion to approve the easement addition to the deed to satisfy FEMA.
Carole: Second.
Discussion: None.
Motion carries 4-0

12. Proposed donations of personal property – Police Department
Cara stated that there were some donations dropped off at the police department of coloring books and stuffed animals for the officers to give to children in difficult situations.

Carl: I make a motion to accept the personal property donation for the police department as described.
Carole: Second.
Discussion: Carole asked if we have a person or group to thank. J.C. asked if we should send something to the church. Carl suggested sending a letter of thanks to them.
Motion carries 4-0

13. Proposed donation of personal property – Emergency Management

Cara stated that this would be retroactive because this came forward at the same time the donation policy was being discussed. Rob Freese printed out the entire plan and the big color print outs needed for the hazardous mitigation materials.

Carl: I make a motion to accept the proposed donation of the personal property as described.
Gerard: Second.
Discussion: None.
Motion carries 4-0

14. Draft bid notice – LED street light conversion project

Cara presented the draft bid notice for the board to review. She explained that she used several different examples to create this bid. Carl would like to review this, because we need to make sure there is some kind of accommodation for either a relocation or possible addition of some lighting. Carole confirmed this had to go out to bid with Cara because she thought there was a company that was already set up to do this project. Cara also included the current street light inventory that was done by Sgt. DiGeorge that gave his opinion from a safety aspect if we need the light or not, then gave it to George for his review from a public works perspective.

Carl: I make a motion to table this until our next meeting so we have a chance to look at the bid proposal and the list of lighting.
Gerard: Second.
Discussion: Cara explained that there is 141 lights the town is paying for and when Sgt. DiGeorge went through the list he could not find 6 of them but found and additional 13 that we are not paying for. Carole stated that the LED lights are supposed to be more effective so we may not need as many but who is going to tell us that. Cara stated that part of the bid is going to do an audit and they should be able to tell us what we need and don't need. Then they will bring it to you and you will have the final decision.
Motion carries 4-0 (to table)

Carole asked if we could have a time frame on this so we can get moving with this. Carl stated that the motion to table is for 2 weeks. Carole is hoping we get this done by fall. Cara stated that as long as we can get a good list we can put it out to bid. Cara stated that when looking at other municipalities that have done this there was a time of around 6 months.

15. Storage Container Permit extension concern – 322 Catamount Road

Cara stated that this original permit came to the board in the fall for an extension and now has lapsed, so Cara asked Jesse to go take a peek to see if it was still there. Jesse stated that the gentleman was going to come in and ask to speak to the board, Cara stated she received a letter. J.C. asked for the location and Jesse stated it was on Catamount Road. Jesse explained that the man is disabled and has trouble getting in and out of the trailer so it is taking him longer to clean it out. The other concern he brought forward is that other people in town have trailers and questioned why he has to move his is other people are not required to. Carl asked Jesse if he is aware of other storage trailers in town that are supposed to have a permit. Jesse stated that storage trailers are not allowed unless they are for construction reasons. We don't have anything in our codes that they need a permit, but we have a paper that says if you have a storage container you have to be approved by the BOS. Cara stated that is in the Zoning Ordinance. Carl

asked Jesse if he is aware of any other trailers in town that shouldn't be, and Jesse stated that they are all over the place but are they grandfathered or not would be another question. Carl asked if the trailer is registered, because to his understanding if the trailer was registered and so that it could be moved when needed it was not taxable and would be in a different category then a storage building. Jesse has not seen anything that says that but it does say storage trailers. Whether or not it's registered it is still storage on private properties and Jesse does not believe it was the intent of the ordinance to allow anyone to have the storage containers on their property. Cara stated the ordinance does not say anything about registration. Carl asked about the property next to the town shed and Cara informed him that he is taxed on those and is grandfathered and the other residents are not taxed. Carl stated that could be a way to address the issue and start taxing the trailers. Jesse explained that in other towns where he builds they sometimes are in need of a storage trailer to store stuff while the construction is going on and then when the construction is complete the trailer is removed and he believes that is what our ordinance is addressing. J.C. asked if there is a difference between a trailer and a container. Adam Gauthier stated that trailer is not mentioned in the ordinance and container is. J.C. questioned if they should deal with trailers any differently. Cara stated the definition of storage container on the permit application reads: would be any truck, trailer, box trailer, school bus, mobile home or any other facilities used for storage or other purposes whether registered or not. J.C. asked what we should do about this item, and suggested tabling it because the gentleman requested to come in and speak with the board. Carl stated he does not know how we can justify treating this one resident any different than any other. J.C. stated he did do the right thing and came in and received a permit. Jesse stated it originated from a complaint and the gentleman stated he was using the trailer while he built his garage and got the permit. Cara stated that in order to change the ordinance you would have to go to town meeting. Gerard stated he would like to see him come in front of the board since he did request to. Cara asked about the other properties that are technically in violation, Carl stated they are not on the agenda at the moment. Chief Pszonowsky stated the fire department is currently in violation to store equipment so we would be subject to anything that might come about. Justin Clough stated that he believes it's not the trailer but the ordinance to be reviewed. Carl would like to see this tabled and have Mr. McCoy come in and talk with us.

Carl: I make a motion to table.
Gerard: Second.
Discussion: None.
Motion carries 4-0

**COMMITTEE REPORTS**
Gerard stated at the last Aqueduct meeting the board voted to pay the balance to Mr. Sancoucy. Gerard also stated that the petition was submitted to the selectboard and since there has not been any movement the committee feels the selectboard is in violation of RSA 50. Carl asked what RSA 50 says and Cara was not sure. Cara stated the board's direction to the committee was to give us a vote on their proposal on the boundaries and a boundary list that agreed to the maps. Fred Okrent stated that was voted on and sent. Cara stated this meeting is the next meeting of the selectboard after that and is on the agenda under old business, so unsure of what RSA could be in violation. J.C. inquired what the next step is, and Cara stated to establish the boundaries of the water district and included it in the agenda packet for the board along with the minutes. Carl stated he has seen the boundaries and the list of properties, and personally has an issue with

properties being placed in a village district in which the property owner has no vote or say in what happens. Carl stated to his understanding the only people who have a vote in the village district are those who are domiciled in the village district. So if you own a property in the village district but do not live there you do not get a say. J.C. asked if that meant the landlords would not have a say or vote, and Carl said yes if he understands it correctly. Carl stated that the landlords and the people who own land would not have a vote but would still be subject to the rules made by others and he is opposed.

Carole had no committee reports but would like Ammy to include the list of state paving that Mr. Donovan provided that are proposed for next year.

| Road Route | Length | Limits |
|---|---|---|
| NH 107 | .8 | From Depot St. to NH 107 |
| Loudon Rd. / Concord Hill Rd. Main St. | 1 | From NH 28 to Clark St. |
| Barnstead Rd. | .2 | From NH 28 to NH 28 |
| Barnstead Rd. | .5 | From NH 28 to NH 28 |
| Carrol St. | .2 | From Main St. to Depot St. |
| NH 28 Barnstead Rd. | 3.1 | From Epsom Circle to S. |

Cara asked if these are proposed or slated, Carole stated they are slated. Cara stated they usually receive notification from the state and then it becomes and information item on the Selectboard agenda.

J.C. stated that the new Community Development Committee will meet tomorrow evening at 6:30.

**INFORMATION ITEMS**
April Waste Water Treatment Facility Report was presented to the board.

**OLD BUSINESS**
1. Town hall basement code issues (4/5/16)
Cara stated that until we know that the food pantry is completely moved out we can't move forward. There are some freezers down there and she spoke with one of the board members from the pantry and they are working on distributing those. They did say the move has been successful and they are working on getting some insurance as a non-profit.

3. Joy Street Pump Station concern (8/16/16, building/health to follow up)
Cara sent the letter and has not heard anything back, but it's only been a week.

4. Consulting Services Contract for Municipalization of Pittsfield Aqueduct Co. (9/27/16)
Cara stated that Gerard stated the Aqueduct Committee voted to pay the balance, so asked if there is going to be a contract. Fred Okrent stated the motion on that was to have the selectman approve the contract for the remaining balance, whether we use it or not is up in the air. But it has to be an approved contract before we use it if we need to. It has been voted on in the past and the money was set aside and it was a matter of book keeping. Fred stated they approved it. J.C. asked now that they approved if we need to approve it. Cara stated yes, that as long as

Sansoucy amended the contract amount because that was the problem.  The contract amount that was given was above the encumbered amount so we wanted the amendment to reflect the encumbered amount so we could approve that.  Fred stated he believed he sent it and will check on that.

5.  Library sewer line repair (4/4/17)
Cara stated that Bill Gilpatrick was over at Sanels who needed some sewer work done and he spoke with the company doing that work and asked them if they would put in a bid for the work needed at the library. Cara stated they did and she forwarded that to the board and was not sure if the library trustee was aware they need to act on this or if they are going to refer to the selectboard. J.C. stated he will contact them.

6.  Voter petition for formation of a Village Water District (4/4/17)
Cara stated that now that the board has seen what the committee voted on as a proposed list and map.  Cara feels that the map should be marked for the public to easily see.  The question would be if the board is ready to go forward with scheduling a public hearing on the proposed boundaries for the proposed water district.  Town counsel suggested not lumping everything into one public hearing and to first establish the boundaries.  The public hearing will be scheduled for June 27, 2017 during our regular scheduled meeting.

7.  2017 Balloon Rally fireworks proposal (5/2/17)
Cara stated that the contracts are ready to sign.  The Rotary Club will be paying Atlas Fireworks directly.

Carl: I make a motion to approve the fireworks contract for the 2017 Balloon Rally and have the chairman sign the contract.
Carole: Second.
Discussion: None.
Motion carries 4-0

Gerard asked if they will be doing anything for 81 Main St. tonight.  J.C. stated they should think about that before making a decision.  Gerard stated the proposal consisted of a 3 story building and there may be a restriction in our zoning for that.  Carl suggested putting a time frame for the existing building to come down and the lot cleaned up if it is approved, and requesting a drawing of what the new building will look like.  The board discussed those items and decided to have Cara contact the Historical Society and request a proposed architectural design and a time frame for the next selectboard meeting so they can make a decision.

**CHECK MANIFESTS**
1.  Accounts Payable
Gerard: I make a motion to approve Accounts Payable.
Carl: Second.
Discussion: None.
Motion carries 4-0

2.  Payroll
Gerard:  I make a motion to approve Payroll and Direct Deposit.

Carl: Second.
Discussion: None.
Motion carries 4-0

**MINUTES**
1.  May 9, 2017 – Public Meeting Minutes
Gerard: I make a motion to approve the May 9, 2017 Public Meeting Minutes.
Carl: Second.
Discussion: None.
Motion carries 4-0

Cara stated that an amendment for the Purchase and Sales Agreement is needed for the property that Sanel's is purchasing (Map U3, Lot 7).

Carl: I make a motion to extend the Purchase and Sales Agreement for 30 days till June 3, 2017.
Gerard: Second.
Discussion: None.
Motion 4-0

**PUBLIC INPUT**
Paul Nickerson would like the board to think about considering a hotel being put in town, he has two locations in mind and is working on putting something into motion.

Randy Severance stated you can put a stipulation in a deed when donating a property to also approve the architectural design of a building at a later time.  So the gifting can be done immediately and the design can be addressed later.  Carl stated the Historical Society would have to agree to making that stipulation.

Adam Gauthier asked about the roads that are slated to be paved, and he was given the list.

Paul Nickerson stated that we are not just giving a piece of land and inquired about the current property.  J.C. stated that they will be selling the current property and then it will return to the tax rolls.

J.C. stated they are going to go into non-public.

Carl:  I make a motion to go into non-public for RSA 91A:3-2 a,b,c,e.
Gerard: Second.
Discussion: None.
Roll call was done and all approved.

Gerard: I make a motion to seal.
Carl: Second.
Discussion: None.
Roll call was done and all approved.

J.C. called meeting back into public.

Cara stated that the applications for the vacant selectboard position are in with a few more days to have some more come in, and asked how the board would like to proceed.  The board had some discussion and decided to have them all contacted to come into the next meeting and be prepared for questions during the public session.  They will consider a decision at the following meeting.

Carole:  I make a motion to adjourn.
Gerard: Second.
Discussion: None.
Motion carries 4-0

Meeting adjourned at 9:40 p.m.

Approved:

_____          27 June 2017
_____
J.C. Allard, Chairman              Date



UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

JOSEPH McCOY                                )
                                            )
Plaintiff                                   )
                                            )
v.                                          )          Civil Action No.:1:20-cv-00362-JL
                                            )
TOWN OF PITTSFIELD                          )
                                            )
Defendant                                   )

### AFFIDAVIT OF CARA MARSTON

I, Cara Marston, with personal knowledge, on oath depose and say as follows:

1.      I am a resident of the Town of Pittsfield, and I have been employed by the Town for more than twenty years.

2.      I have been the Town Administrator for the Town since December 2015.

3.      Subject to the Board of Selectmen's delegation and direction, my responsibilities as Town Administrator include assisting the Board in the performance of its duties as the Zoning Administrator of the Town's zoning ordinance, and overseeing and communicating with Town staff regarding administration of the zoning ordinance.

4.      A true and accurate copy of excerpts of the Town's zoning ordinance are attached hereto as Exhibit 1. A complete copy of the Town's zoning ordinance is available at:

https://www.pittsfieldnh.gov/sites/g/files/vyhlif3681/f/pages/zoning_ordinance_2021_2.pdf

5.      I am aware of the allegations raised by Joseph McCoy in the above captioned suit, and I have personal knowledge regarding the Town's actions with respect to the granting of storage container permits to Mr. McCoy in 2015, 2016, 2017, and the Board's decision to deny a 2018 permit request from Mr. McCoy. I also have personal knowledge regarding the Town's

permitting and enforcement efforts with respect to other storage containers in the Town during the period between 2015 and the present.

6.      In 2015, Mr. McCoy applied for and received a storage container permit, which was approved effective September 1, 2015 (the "2015 Permit"). A true and accurate copy of the 2015 Permit is attached hereto as Exhibit 2.

7.      Per the Town's zoning ordinance, storage container permits may be granted for a one year period for storage purposes only. *See* Exhibit 1 at Article 14.

8.      The 2015 Permit informed Mr. McCoy that his storage container could be used for storage purposes only and must be removed one year from the approved date (i.e., September 1, 2016).

9.      As of September 1, 2016, Mr. McCoy had not removed his storage container. In addition, he was maintaining an additional unpermitted storage container on his property. Accordingly, the Town's building inspector issued a Notice of Violation to Mr. McCoy. The notice informed Mr. McCoy that his 2015 Permit had expired, that his storage containers needed to be removed, but that he had a right to appeal to the Town's Zoning Board of Adjustment. A true and accurate copy of the Notice of Violation is attached hereto as Exhibit 3.

10.      On November 3, 2016, Mr. McCoy wrote to the building inspector and requested an extension of his 2015 Permit, and he represented that he needed the storage container for storage purposes only. A true and accurate copy of Mr. McCoy's November 3, 2016 letter is attached hereto as Exhibit 4.

11.      On November 15, 2016, the Board unanimously voted to approve the six month extension. The motion to approve was made by Selectman Carl Anderson.

2

12.     In May 2017, Mr. McCoy requested a meeting with the Town's Board of Selectmen ("Board") regarding his storage container. This request followed a visit to Mr. McCoy's property from the Town's building inspector. A true and accurate copy of an email documenting Mr. McCoy's request is attached hereto as Exhibit 5.

13.     On June 13, 2017, the Board met with Mr. McCoy to consider his request for another extension of his storage container permit. During the meeting, Mr. McCoy represented that he needed the storage container for storage purposes related to work he was performing on his deck and due to a disability. There was no discussion or mention during the meeting of the storage container being used to display any speech or other expressive content. A true and accurate copy of the minutes of the June 13, 2017 meeting with the Board is attached hereto as Exhibit 6.

14.     During the June 13th meeting, I advised the Board that the zoning ordinance states that a storage container permit "shall not [sic] be no more than 12 months." The Board approved Mr. McCoy's request by a unanimous vote despite the 12 month limitation and the fact that the storage container had been on Mr. McCoy's property since sometime in 2014. A true and accurate copy of the 2017 permit is attached hereto as Exhibit 7.

15.     As Zoning Administrator, the Board or its designee(s) are vested with approving or denying permits for storage containers and individuals aggrieved by such decisions may appeal to the Town's Zoning Board of Adjustment. *See* Exhibit 1 at pages 6-7, 39.

16.     Per the Town's zoning ordinance, signs may be permitted under Article 9 upon application by a Town resident. *See* Exhibit 1 at Article 9. Mr. McCoy never requested or otherwise applied for a sign permit from the Town, and never represented or communicated to the Town any desire or intent to use his storage container as a sign.

3

243

17.     On May 22, 2018, the Board wrote to Mr. McCoy and reminded him that his 2017 permit was set to expire in the following month and that his storage container would need to be removed. A true and accurate copy of the Board's May 2018 correspondence is attached hereto as Exhibit 8.

18.     On May 29, 2018, Mr. McCoy wrote to the Board and requested a third permit extension. A true and accurate copy of Mr. McCoy's correspondence is attached hereto as Exhibit 9.

19.     On June 12, 2018, the Board considered Mr. McCoy's request for a third extension, and denied it by unanimous vote. The Board discussed Mr. McCoy's permit history and his prior representations to the Board. There was no discussion regarding the use of the storage container for any expressive purposes, nor any mention of use as a Trump sign in 2016 and 2017. A true and accurate copy of the minutes of the June 2018 meeting are attached as Exhibit 10.

20.     During the Board's June 12, 2018, the Board also took up and considered complaints regarding three other unpermitted storage containers in Town, located at 140 Tilton Hill Road, (the "Tilton Hill Trailers") and agreed to send a Notice of Violation to the owners of the storage containers. *See* Exhibit 10 at page 7 ("Notice of Zoning Violation update").

21.     On June 13, 2018, the Board sent a notice of violation to the owners of the Tilton Hill Trailers. A true and accurate copy of the notice of violation is attached as Exhibit 11. In response, the owners of the Tilton Hill Trailers applied for and received a permit for one of their three storage containers. The other two trailers were removed. The Tilton Hill Trailers did not display any expressive content to the Town's knowledge.

22.     On June 13, 2018, I wrote to Mr. McCoy and informed him of the Board's decision, and noted the Board's reasons. A true and accurate copy of my correspondence is attached as Exhibit 12.

23.     Mr. McCoy did not appeal the Board's denial of his third permit request.

24.     The Town, in the ordinary course, sometimes receives anonymous complaints regarding storage containers and other alleged zoning violations. The Town had received an anonymous complaint regarding Mr. McCoy's trailer sometime in 2016, which was not recorded, and received a similar anonymous complaint regarding the Tilton Hill Trailers in 2018.

25.     During my tenure as Town Administrator, the Town has engaged in enforcement with respect to storage containers in instances when it has become aware of potential violations, and without regard to whether a storage container has been used for expressive purposes or not. For example, with respect to Mr. McCoy, the Town learned of an unpermitted trailer on his property in 2015 and subsequently required that he seek and obtain a permit.

26.     Ultimately, the Town did not impose any penalties or take any other enforcement actions against Mr. McCoy other than to confirm that his storage container was removed following the Board's June 2018 decision.

27.     Mr. McCoy's storage containers were known to the Town based on visual inspection of the Town's building inspector, permit applications and correspondence received from Mr. McCoy, and public testimony from Mr. McCoy. Accordingly, the Town was aware that Mr. McCoy had trailers on his property that were not grandfathered and that he needed to comply with Article 14 of the Zoning Ordinance.

28.     The Town has limited resources to dedicate toward enforcement of the storage container provisions of the zoning ordinance. It has, however, taken action against others in Town with respect to unpermitted storage containers, which were not used for expressive purposes. For example:

A. In June 2018, the Town took action with respect to the Tilton Hill Trailers as noted previously.

B. In 2019, the Town brought suit to enforce Article 14 in *Town of Pittsfield v. James Hetu, et al*, Case No. 217-2019-cv-00663, Merrimack Superior Court. This action arose following lengthy efforts to obtain compliance. A true and accurate copy of correspondence with respect to the Town's enforcement efforts is attached as Exhibit 13.

C. In the summer of 2019, the Town became aware of an unpermitted storage container at 11 Cram Avenue, issued a notice of violation, and subsequently received and approved a permit application. A true and accurate copy of the notice of violation is attached as Exhibit 14. The Town's treatment with respect to the storage container at 11 Cram Avenue is consistent with the manner in which Mr. McCoy's 2015 Permit application was received and approved.

29.     Based on my review of Mr. McCoy's permit history, and the Town's enforcement actions with respect to other properties, the following is apparent:

a. Mr. McCoy's storage container was allowed to remain on his property far beyond the 12 month limit of the zoning ordinance, which is in excess of the time period allowed to other storage containers;

b. The Town did not require Mr. McCoy to remove the storage container until 2018 (when it was no longer painted "Trump" on the side); and

c. The Board's actions with respect to Mr. McCoy's storage container were consistent with the treatment of other storage containers in the Town that were

6

246

made known to the Board as needing permit approvals, and which did not feature

any signs or other expressive content.

Affiant sayeth further not.

May 28, 2021
Date

Cara Marston
Cara Marston

STATE OF NEW HAMPSHIRE
COUNTY OF

Before me, the undersigned officer, personally appeared the said Cara Marston, known to me or satisfactorily proven to be the person whose name is subscribed to the within instrument, and acknowledged that she executed the same for the purposes therein contained and did state under oath the within facts are true to the beset of her knowledge and belief.

Bernadette C. Theriault
Printed Name:
Notary Public Bernadette C. Theriault
My Commission Expires: 06. 29. 2021



8





EXHIBIT

MARSTON AFF.
EXHIBIT 1

# Town of Pittsfield
# Zoning Ordinance

Adopted March 8, 1988

Most recently amended March 9, 2021

# Article 1.  General Provisions

### 1.  Title

This zoning ordinance shall be known as the "Town of Pittsfield Zoning Ordinance" and is herein called the "zoning ordinance" or just the "ordinance" where "ordinance" clearly means the zoning ordinance.

### 2.  Authority

The town meeting's authority to adopt the zoning ordinance is New Hampshire Revised Statutes Annotated RSA 674:16, Grant of Power; other enabling statutes in NH RSA; and enabling case law.

### 3.  Applicability

No person may use or authorize the use of any land or STRUCTURE except according to all applicable regulations of the zoning ordinance.

### 4.  Jurisdiction

The zoning ordinance shall be effective within the corporate boundaries of the town of Pittsfield, New Hampshire.

### 5.  Purpose

Pursuant to RSA 674:17 and RSA 674:21, VI, (a), the zoning ordinance is designed for the following purposes:

(a)  To lessen congestion in the STREETS.

(b)  To secure safety from fires, panic and other dangers.

(c)  To promote health and the general welfare.

(d)  To provide adequate light and air.

(e)  To prevent the overcrowding of land.

(f)  To avoid undue concentration of population.

(g)  To facilitate the adequate provision of transportation, solid waste facilities, water, sewerage, SCHOOLS, parks, child day care.

(h)  To assure proper use of natural resources and other public requirements.

(i)  To encourage the preservation of agricultural lands and BUILDINGS and the agricultural operations described in RSA 21:34-a supporting the agricultural lands and BUILDINGS.

(j)  To encourage the installation and use of solar, wind, or other renewable energy systems and protect access to energy sources by the regulation of orientation of STREETS, LOTS, and BUILDINGS; establishment of maximum BUILDING height, minimum SETBACK requirements, and limitations on type, height, and placement of vegetation; and encouragement of the use of solar skyspace easements under RSA 477.

(k)  To have reasonable consideration for the character of the area involved and its peculiar suitability for particular uses, to conserve the value of BUILDINGS, and to encourage the most appropriate use of land throughout the municipality.  (RSA 674:17, II.)

(l)  To accommodate reasonably amateur radio communications.  (RSA 674:17, III.)

(m)  To encourage the preservation of OPEN SPACE wherever possible.  (See RSA 674:21, VI, (a).)

## 6. Administrator

(a) The board of selectmen shall have charge of administering and enforcing the zoning ordinance except as follows:

(1) If the zoning ordinance explicitly designates a specific administrator for a specified part of the zoning ordinance, then that administrator shall administer that part of the zoning ordinance.

(2) The board of selectmen's charge to administer and enforce the zoning ordinance shall not interfere with any state or federal law empowering a specific administrator, for example, RSA 676:13, I, (building inspector); RSA 155-A:4, II, and RSA 155-A:7, I, (fire chief); and RSA 676:5, III, (planning board).

(b) The board of selectmen may authorize an agent to administer and enforce the zoning ordinance on the board's behalf and may revoke that authorization at any time.  Such an authorization or revocation shall be effective if and only if the board's minutes record the board's vote to authorize or revoke.

## 7.  Conflicting Provisions; Relationship to Other Ordinance or Regulation

Wherever provisions of the zoning ordinance conflict, or wherever a provision of the zoning ordinance conflicts with a provision of another ordinance or regulation, the provision that imposes the greater restriction or higher standard shall control.  (RSA 676:14.)

## 8. Separability

The invalidity of any provision of the zoning ordinance shall not affect the validity of any other provision.

## 9. Penalty Clause

Any person who violates any of the provisions of this zoning ordinance, or any provision or specification of any application, plat, or plan approved by, or any requirement or condition of a permit or decision issued by, any local administrator or land use board acting under the authority of this zoning ordinance shall be guilty of a misdemeanor if a natural person, or guilty of a felony if any other person; and shall be subject to a civil penalty of $275 for the first offense, and $550 for subsequent offenses, for each day that such violation is found to continue after the conviction date or after the date on which the violator receives written notice from the municipality that the violator is in violation, whichever is earlier. Each day that a violation continues shall be a separate offense. (RSA 676:17, I; also see RSA 676:15 through RSA 676:18, Penalties and Remedies.)

## 10.  Mobile Home, Mobile Home Park and Trailer Park Ordinance Repealed

The adoption of the zoning ordinance shall repeal the Mobile Home, Mobile Home Park and Trailer Park Ordinance for the Town of Pittsfield as heretofore amended.

## 11.  Amendment

The zoning ordinance may be amended as provided in RSA chapter 675.

## 12.  Effective Date

The zoning ordinance shall take effect immediately upon its passage.

## Article 2.  Interpretation Rules and Definitions

### 1.  Word or Phrase Interpretation Rules

(a) All words and phrases of the zoning ordinance shall be interpreted according to this section.

(b) In this section, "headword" means a word or phrase spelled in all capital letters and placed at the beginning of a definition in article 2, section 3, Definitions.

(c) If the zoning ordinance explicitly says that a word or phrase has a specific meaning to be used in a specified part of the zoning ordinance, then the word or phrase has that specific meaning throughout the specified part.

(d) If a word or phrase is a headword in article 2, section 3, Definitions, then the word or phrase has the meaning stated for it as a headword in article 2, section 3, except as provided in paragraph (c) of this section.

(e) If a word or phrase is not a headword in article 2, section 3, Definitions, then the word or phrase has the meaning stated for it in *Webster's Third New International Dictionary of the English Language, Unabridged*, Merriam-Webster, except as provided in paragraph (c) of this section.

### 2.  All-Capital-Letters Spelling of Defined Words and Phrases

All-capital-letters spelling is used to indicate that a word or phrase has the meaning stated for it as a headword in article 2, section 3, Definitions.

In this section, "headword" means a headword as defined in article 2, section 1, (b).

### 3.  Definitions

**ABUTTER:**
(a) In this definition of "ABUTTER," "street" means a street as defined in RSA 672:13.

(b) "ABUTTER" means any person whose property is located in New Hampshire and adjoins or is directly across the street or stream from the land under consideration by the local land use board. For purposes of receiving testimony only, and not for purposes of notification, the term "ABUTTER" shall include any person who is able to demonstrate that his land will be directly affected by the proposal under consideration. For purposes of receipt of notification by a municipality of a local land use board hearing, in the case of an abutting property being under a CONDOMINIUM or other collective form of ownership, the term "ABUTTER" means the officers of the collective or association, as defined in RSA 356-B:3, XXIII. For purposes of receipt of notification by a municipality of a local land use board hearing, in the case of an abutting property being under a MANUFACTURED HOUSING PARK form of ownership as defined in RSA 205-A:1, II, the term "ABUTTER" includes the MANUFACTURED HOUSING PARK owner and the tenants who own MANUFACTURED HOUSING which adjoins or is directly across the street or stream from the land under consideration by the local land use board.  (See RSA 672:3, Abutter.)

**SPECIAL EXCEPTION:** "SPECIAL EXCEPTION" has two meanings as stated in subparagraphs (a) and (b), and the context determines which meaning applies.

(a) "SPECIAL EXCEPTION" means a use permitted upon (1) certain conditions set forth in the zoning ordinance and (2) an approving authority's decision that the use satisfies those conditions.

(b) "SPECIAL EXCEPTION" means the approving authority's decision that the use defined in subparagraph (a) satisfies the conditions set forth in the zoning ordinance.

(c) In subparagraphs (a) and (b), "zoning ordinance" means the zoning ordinance excluding article 5, section 3, I, (b); article 5, section 3, V; article 5, section 4, Equitable Waiver of Dimensional Requirement; article 7, Variances; and article 17, section 12, Appeals and Variances. These parts of the zoning ordinance state and are limited to New Hampshire state or United States federal requirements for a VARIANCE under RSA 674:33, I, (b); RSA 674:33, V; or article 17, section 12, Appeals and Variances, or for an equitable waiver of a dimensional requirement under RSA 674:33-a.

(RSA 674:33, IV; also see article 6 for SPECIAL EXCEPTION regulations.)

**STABLE:** "STABLE" means a place that houses one or more horses except that "STABLE" excludes any residence that has three or fewer horses as pets.

**STORAGE CONTAINER:** "STORAGE CONTAINER" means a truck trailer, box trailer, school bus, MANUFACTURED HOUSING unit, or similar mobile container parked continuously for 31 days or more and used principally for storage and not used for any person's residential occupancy or transient lodging. (See article 14 for STORAGE CONTAINER permitting conditions.)

**STORY:**

(a) In this definition of "STORY," the words "attic" and "basement" have the following meanings:

   (1) "Attic" means that part of a BUILDING such that the roof frame meets the floor on opposite sides of the part of the BUILDING.

   (2) "Basement" means that part of a BUILDING such that more than one-half of the part the BUILDING vertically is below the average grade of the ground adjoining the BUILDING.

(b) "STORY" means that part of a BUILDING contained between any floor and the floor or roof next above the part of the BUILDING except that "STORY" excludes attics and basements.

**STREET:** "STREET" means either

(a) a highway as defined in RSA 229:1 or

(b) a road dedicated to the public use but not accepted by the city or town in which the road is located.

**STRUCTURE:** "STRUCTURE" means something constructed or built that has a fixed location on or in the ground or that is permanently attached to something that has a fixed location on or in the ground.

**STRUCTURE, ACCESSORY:** See ACCESSORY STRUCTURE.

**STRUCTURE, NONCONFORMING:** See NONCONFORMING STRUCTURE.

**STRUCTURE, PRINCIPAL:** See PRINCIPAL STRUCTURE.

# Article 4.  Nonconforming Uses and Lots

## 1.  Authority

(a) RSA 674:19, Applicability of Zoning Ordinance:
A zoning ordinance adopted under RSA 674:16 shall not apply to existing structures or to the existing use of any building. It shall apply to any alteration of a building for use for a purpose or in a manner which is substantially different from the use to which it was put before alteration.

(b) RSA 674:39, Five-Year Exemption:
I. Every subdivision plat approved by the planning board and properly recorded in the registry of deeds and every site plan approved by the planning board and properly recorded in the registry of deeds, if recording of site plans is required by the planning board or by local regulation, shall be exempt from all subsequent changes in subdivision regulations, site plan review regulations, impact fee ordinances, and zoning ordinances adopted by any city, town, or county in which there are located unincorporated towns or unorganized places, except those regulations and ordinances which expressly protect public health standards, such as water quality and sewage treatment requirements, for a period of 5 years after the date of approval; provided that:
   (a) Active and substantial development or building has begun on the site by the owner or the owner's successor in interest in accordance with the approved subdivision plat within 24 months after the date of approval, or in accordance with the terms of the approval, and, if a bond or other security to cover the costs of roads, drains, or sewers is required in connection with such approval, such bond or other security is posted with the city, town, or county in which there are located unincorporated towns or unorganized places, at the time of commencement of such development;
   (b) Development remains in full compliance with the public health regulations and ordinances specified in this section; and
   (c) At the time of approval and recording, the subdivision plat or site plan conforms to the subdivision regulations, site plan review regulations, and zoning ordinances then in effect at the location of such subdivision plat or site plan.

II. Once substantial completion of the improvements as shown on the subdivision plat or site plan has occurred in compliance with the approved subdivision plat or site plan or the terms of said approval or unless otherwise stipulated by the planning board, the rights of the owner or the owner's successor in interest shall vest and no subsequent changes in subdivision regulations, site plan regulations, or zoning ordinances, except impact fees adopted pursuant to RSA 674:21 and 675:2-4, shall operate to affect such improvements.

III. The planning board may, as part of its subdivision and site plan regulations or as a condition of subdivision plat or site plan approval, specify the threshold levels of work that shall constitute the following terms, with due regard to the scope and details of a particular project:
   (a) "Substantial completion of the improvements as shown on the subdivision plat or site plan," for purposes of fulfilling paragraph II; and
   (b) "Active and substantial development or building," for the purposes of fulfilling paragraph I.

IV. Failure of a planning board to specify by regulation or as a condition of subdivision plat or site plan approval what shall constitute "active and substantial development or building" shall entitle the subdivision plat or site plan approved by the planning board to the 5-year exemption described in paragraph I. The planning board may, for good cause, extend the 24-month period set forth in subparagraph I(a).

254

(c) RSA 676:12, I and VI, Certain Building Permits to Be Withheld prior to Zoning Amendments:
I. The building inspector shall not issue any building permit within the 120 days prior to the annual or special town or village district meeting if:

    (a) Application for such permit is made after the first legal notice of proposed changes in the building code or zoning ordinance has been posted pursuant to the provisions of RSA 675:7; and

    (b) The proposed changes in the building code or the zoning ordinance would, if adopted, justify refusal of such permit.

VI. The provisions of paragraph I shall not apply to any plat or application which has been the subject of notice by the planning board pursuant to RSA 676:4, I(d) prior to the first legal notice of a proposed change in a building code or zoning ordinance or any amendment thereto. No proposed subdivision or site plan review or zoning ordinance or amendment thereto shall affect a plat or application which has been the subject of notice by the planning board pursuant to RSA 676:4, I(d) so long as said plat or application was the subject of notice prior to the first legal notice of said change or amendment. The provisions of this paragraph shall also apply to proposals submitted to a planning board for design review pursuant to RSA 676:4, II(b), provided that a formal application is filed with the planning board within 12 months of the end of the design review process.

(d) RSA 155-B:2, Repair or Removal of Hazardous Building:
The governing body of any city or town may order the owner of any hazardous building within the municipality to correct the hazardous condition of such building or to raze or remove the same.

## 2. Purpose

The purposes of this article are as follows:

(a) To codify the New Hampshire state law of NONCONFORMING USES into the zoning ordinance.

(b) To encourage the discontinuance of NONCONFORMING USES.

(c) To encourage the elimination or reduction of nonconformance of NONCONFORMING LOTS.

(d) To provide for the continuance of lawfully established nonconformance if the transition to conformance is unreasonable. (See RSA 674:19, which provides for the continuance of NONCONFORMING USES but says nothing about the development of NONCONFORMING LOTS.)

## 3. Nonconforming Uses

(a) Continuance of Nonconforming Activities: Every NONCONFORMING ACTIVITY may continue to exist upon the following conditions:

    (1) The NONCONFORMING ACTIVITY shall not change to have a purpose, character, or effect on the neighborhood that differs substantially from the purpose, character, or effect on the neighborhood that the NONCONFORMING ACTIVITY had when it was first nonconforming.

    (2) The NONCONFORMING ACTIVITY shall not expand into any indoor or outdoor space that the NONCONFORMING ACTIVITY has not occupied as a NONCONFORMING ACTIVITY.

(3) The NONCONFORMING ACTIVITY shall not expand into any indoor or outdoor space that the NONCONFORMING ACTIVITY vacated and never reoccupied during the following two years.

(4) The NONCONFORMING ACTIVITY shall not expand so as to render premises or property proportionally less adequate.

(5) The NONCONFORMING ACTIVITY shall have no discontinuance of two years or more.

(b) Abandonment of Nonconforming Activities:  Every NONCONFORMING ACTIVITY that satisfies either of the following conditions (1) and (2) shall be deemed abandoned and shall be prohibited:

(1) The NONCONFORMING ACTIVITY shall be deemed abandoned and shall be prohibited if it violates one or more of the conditions in paragraph (a), (1) through (4), and if

(A) within 35 days after the earliest date when the zoning ordinance administrator sends the owner of the NONCONFORMING ACTIVITY a certified-mail notice of the violation, the owner has not submitted a written plan to eliminate the violation or

(B) within 95 days after the earliest date when the zoning ordinance administrator sends the owner of the NONCONFORMING ACTIVITY a certified-mail notice of the violation, the owner has not eliminated the violation.

(2) The NONCONFORMING ACTIVITY shall be deemed abandoned and shall be prohibited if it has a discontinuance of two years or more.  (See article 4, section 3, (a), (5).)

(c) Continuance of Nonconforming Structures:   Every NONCONFORMING STRUCTURE may continue to exist upon the following conditions:

(1) The NONCONFORMING STRUCTURE may be maintained or renovated and may be repaired or rebuilt after any damage if the maintenance, renovations, repairs, and rebuilding satisfy the following conditions (A) and (B):

(A) Maintenance, renovations, repairs, and rebuilding shall not give the NONCONFORMING STRUCTURE a purpose, character, or effect on the neighborhood that differs substantially from the purpose, character, or effect on the neighborhood that the NONCONFORMING STRUCTURE had when it was first nonconforming.

(B) Repairs and rebuilding after the NONCONFORMING STRUCTURE has sustained damage greater than or equal to 75% of the NONCONFORMING STRUCTURE'S PRINCIPAL FLOOR AREA shall be in substantial progress within two years after the date of the NONCONFORMING STRUCTURE'S damage.  (See article 4, section 1, (c), Vesting of Nonconforming Uses.)

(2) The NONCONFORMING STRUCTURE may have additions to its nonconforming parts if the additions satisfy the following conditions (A) through (C):

(A) The additions shall not give the NONCONFORMING STRUCTURE a purpose, character, or effect on the neighborhood that differs substantially from the purpose, character, or

effect on the neighborhood that the NONCONFORMING STRUCTURE had when it was first nonconforming.

(B) The additions in total since the NONCONFORMING STRUCTURE was first nonconforming shall not be substantial.

(C) The additions shall not render the LOT proportionally less adequate.

(3) The NONCONFORMING STRUCTURE may have additions to its conforming parts if the additions satisfy the following conditions (A) and (B):

(A) The additions shall not give the NONCONFORMING STRUCTURE a purpose, character, or effect on the neighborhood that differs substantially from the purpose, character, or effect on the neighborhood that the NONCONFORMING STRUCTURE had when it was first nonconforming.

(B) The additions shall create no nonconformance to the zoning ordinance except that an addition may create a nonconformance if the addition satisfies the conditions in subparagraph (2), for additions to nonconforming parts of the NONCONFORMING STRUCTURE.

(d) Abandonment of Nonconforming Structures:   Every NONCONFORMING STRUCTURE that satisfies either of the following conditions (1) and (2) shall be deemed abandoned and shall be prohibited:

(1) The NONCONFORMING STRUCTURE shall be deemed abandoned and shall be prohibited if it violates one or more of the conditions in paragraph (c), (1), (A); paragraph (c), (2); or paragraph (c), (3), and if

(A) within 35 days after the earliest date when the zoning ordinance administrator sends the owner of the NONCONFORMING STRUCTURE a certified-mail notice of the violation, the owner has not submitted a written plan to eliminate the violation or

(B) within 95 days after the earliest date when the zoning ordinance administrator sends the owner of the NONCONFORMING STRUCTURE a certified-mail notice of the violation, the owner has not eliminated the violation.

(2) The NONCONFORMING STRUCTURE shall be deemed abandoned and shall be prohibited if it has sustained damage greater than or equal to 75% of the NONCONFORMING STRUCTURE'S PRINCIPAL FLOOR AREA and if the NONCONFORMING STRUCTURE is not in substantial rebuilding within two years after the date of the NONCONFORMING STRUCTURE'S damage.

(e) Public-Taking Not-Conforming Structures:  Every lawfully existing STRUCTURE that becomes a not-conforming STRUCTURE because of an eminent-domain taking or that increases its nonconformance because of an eminent-domain taking shall be treated as a NONCONFORMING STRUCTURE under the zoning ordinance.

(f) Repair or Removal of Hazardous Buildings:   Under RSA chapter 155-B, Hazardous and Dilapidated Buildings, the board of selectmen may order the owner of any hazardous building

(d) That due to the degree of past construction or investment made in ignorance of the facts constituting the violation, the cost of correction so far outweighs any public benefit to be gained, that it would be inequitable to require the violation to be corrected.

II. In lieu of the findings required by the board under subparagraphs I(a) and (b), the owner may demonstrate to the satisfaction of the board that the violation has existed for 10 years or more, and that no enforcement action, including written notice of violation, has been commenced against the violation during that time by the municipality or any person directly affected.

III. Application and hearing procedures for equitable waivers under this section shall be governed by RSA 676:5 through 7. Rehearings and appeals shall be governed by RSA 677:2 through 14.

IV. Waivers shall be granted under this section only from physical layout, mathematical or dimensional requirements, and not from use restrictions. An equitable waiver granted under this section shall not be construed as a NONCONFORMING USE, and shall not exempt future use, construction, reconstruction, or additions on the property from full compliance with the ordinance. This section shall not be construed to alter the principle that owners of land are bound by constructive knowledge of all applicable requirements. This section shall not be construed to impose upon municipal officials any duty to guarantee the correctness of plans reviewed by them or property inspected by them.
(RSA 674:33-a.)

## 5.  Appeals to Board of Adjustment

I. Appeals to the board of adjustment concerning any matter within the board's powers as set forth in RSA 674:33 may be taken by any person aggrieved or by any officer, department, board, or bureau of the municipality affected by any decision of the administrative officer. Such appeal shall be taken within a reasonable time, as provided by the rules of the board, by filing with the officer from whom the appeal is taken and with the board a notice of appeal specifying the grounds thereof. The officer from whom the appeal is taken shall forthwith transmit to the board all the papers constituting the record upon which the action appealed from was taken.

II. For the purposes of this section:
(a) The "administrative officer" means any official or board who, in the municipality, has responsibility for issuing permits or certificates under the zoning ordinance, or for enforcing the ordinance, and may include a building inspector, board of selectmen, or other official or board with such responsibility.
(b) A "decision of the administrative officer" includes any decision involving construction, interpretation or application of the terms of the zoning ordinance. It does not include a discretionary decision to commence formal or informal enforcement proceedings, but does include any construction, interpretation or application of the terms of the ordinance which is implicated in such enforcement proceedings.

III. If, in the exercise of SUBDIVISION or site plan review, the planning board makes any decision or determination which is based upon the terms of the zoning ordinance, or upon any construction, interpretation, or application of the zoning ordinance, which would be appealable to the board of adjustment if it had been made by the administrative officer, then such decision may be appealed to the board of adjustment under this section; provided, however, that if the zoning ordinance contains an innovative land use control adopted pursuant to RSA 674:21 which delegates administration, including the granting of conditional or special use permits, to the planning board, then the planning

board's decision made pursuant to that delegation cannot be appealed to the board of adjustment, but may be appealed to the superior court as provided by RSA 677:15.

(RSA 676:5, I, II, and III.)

## 6. Materially Similar Applications

If (1) the board of adjustment has disapproved an application, (2) the disapproval was not appealed, (3) a subsequent application is made for a use that does not materially differ in nature and degree from its predecessor, and (4) a material change of circumstances affecting the merits of the subsequent application has not occurred, then the board may not reach the merits of the subsequent application.  The applicant bears the burden of proving a material change of circumstances before the board.

## 7. Public Hearing; Notice

I. Prior to exercising its appeals powers, the board of adjustment shall hold a public hearing. Notice of the public hearing shall be given as follows:

(a) The appellant and every ABUTTER and holder of CONSERVATION, preservation, or agricultural preservation RESTRICTIONS shall be notified of the hearing by certified mail stating the time and place of the hearing, and such notice shall be given not less than 5 days before the date fixed for the hearing of the appeal. The board shall hear all ABUTTERS and holders of CONSERVATION, preservation, or agricultural preservation RESTRICTIONS desiring to submit testimony and all nonABUTTERS who can demonstrate that they are affected directly by the proposal under consideration. The board may hear such other persons as it deems appropriate.

(b) A public notice of the hearing shall be placed in a newspaper of general circulation in the area not less than 5 days before the date fixed for the hearing of the appeal.

II. The public hearing shall be held within 30 days of the receipt of the notice of appeal.

III. Any party may appear in person or by the party's agent or attorney at the hearing of an appeal.

IV. The cost of notice, whether mailed, posted, or published, shall be paid in advance by the applicant. Failure to pay such costs shall constitute valid grounds for the board to terminate further consideration and to deny the appeal without public hearing.

(RSA 676:7)

## 8. Review of Developments of Regional Impact

(a) Notice and hearing requirements of RSA 36:54 through RSA 36:58 apply to applications for DEVELOPMENTS OF potential REGIONAL IMPACT.

(b) Review Required:  The board of adjustment, upon receipt of an application for development, shall review it promptly and determine whether or not the development, if approved, reasonably could be construed as having the potential for regional impact. Doubt concerning regional impact shall be resolved in a determination that the development has a potential regional impact.  (RSA 36:56, I.)

## 9. Burden of Proof

On issues wherein the exercise of the board of adjustment's discretion is sought, the burden of proof is on the applicant.

## 10. Issuance of Decision

(a) The board of adjustment shall issue a final written decision which either approves or disapproves an application for a local permit and make a copy of the decision available to the applicant. If the application is not approved, the board shall provide the applicant with written reasons for the disapproval. If the application is approved with conditions, the board shall include in the written decision a detailed description of all conditions necessary to obtain final approval.  (RSA 676:3, I.)

(b) Whenever the board of adjustment votes to approve or disapprove an application, the board shall set forth in its minutes of the meeting at which the vote is taken every finding of fact and every ruling of law that the board made regarding the application.  If the board affirms, modifies, or reverses a decision of an administrative officer, then the board shall set forth in the minutes every reason for the affirmation, modification, or reversal.  If the board approves an application for a permit, then the board shall set forth in the minutes how the application has satisfied each of the requirements for the permit.  If the board disapproves an application for a permit, then the board shall set forth in the minutes every requirement for the permit that the application failed to satisfy.  If the board approves an application for a permit but attaches any conditions, then the board shall set forth in the minutes every reason for each condition.

(c) Whenever the board of adjustment votes to approve or disapprove an application or deny a motion for rehearing, the minutes of the meeting at which such vote is taken, including the written decision containing the reasons therefor and all conditions of approval, shall be placed on file in the board's office and shall be made available for public inspection within 5 business days of such vote.  (RSA 676:3, II.)

(d) Whenever a plat is recorded to memorialize an approval issued by the board of adjustment, the final written decision, including all conditions of approval, shall be recorded with or on the plat. (RSA 676:3, III.)

## 11. Motion for Rehearing, Rehearing, and Appeal to Superior Court

(a) Whenever a person or a municipality seeks a rehearing on or an appeal of a zoning-related order or decision, the procedures enacted under RSA chapter 677 shall be followed.  (RSA 677:1.)

(b) Within 30 days after any order or decision of the zoning board of adjustment, or any decision of the local legislative body or a board of appeals in regard to its zoning, the selectmen, any party to the action or proceedings, or any person directly affected thereby may apply for a rehearing in respect to any matter determined in the action or proceeding, or covered or included in the order, specifying in the motion for rehearing the ground therefor; and the board of adjustment, a board of appeals, or the local legislative body, may grant such rehearing if in its opinion good reason therefor is stated in the motion. This 30-day time period shall be counted in calendar days beginning with the date following the date upon which the board voted to approve or disapprove the application in accordance with RSA 21:35.  (RSA 677:2)

(c) A motion for rehearing made under RSA 677:2 shall set forth fully every ground upon which it is claimed that the decision or order complained of is unlawful or unreasonable.  (RSA 677:3, I.) A motion for rehearing is a prerequisite for an appeal to the superior court.  (RSA 677:3, I.)

(d) Upon the filing of a motion for a rehearing, the board of adjustment, a board of appeals, or the local legislative body shall within 30 days either grant or deny the application, or suspend the order or decision complained of pending further consideration.  (RSA 677:3, II.)

(e) If the board grants a rehearing, and if any new basis for aggrievement results from the rehearing, then a subsequent motion for rehearing that raises any new issues that are thrust upon the appealing party is necessary to preserve the new issues for an appeal to the superior court.

(f) Any person aggrieved by any order or decision of the zoning board of adjustment or any decision of the local legislative body may apply, by petition, to the superior court within 30 days after the date upon which the board voted to deny the motion for rehearing. For purposes of this paragraph, "person aggrieved" includes any party entitled to request a rehearing under RSA 677:2.  (RSA 677:4)

# Article 9.  Signs

## 1.  Authority
RSA 674:16, I, (d); RSA 674:16, V; and RSA 674:17.

## 2.  Purpose
The purposes of these sign regulations are as follows:

(a)  To protect the public from distracting and hazardous signs.  (See RSA 674:17, I, (b) ("To secure safety from fires, panic and other dangers") and RSA 674:17, I, (c) ("To promote health and the general welfare").)

(b)  To promote the general welfare by protecting the aesthetics of the town.  (See RSA 674:17, I, (c).)

## 3.  Definitions
In this article, the following terms have the following meanings:

"Animate" means to depict something moving except that "animate" excludes
(a)  depicting moving text and
(b)  sequentially displaying the letters "O," "P," "E," and "N."

"Flash" means to maintain an artificially illuminated display constant for more than .015 seconds and less than 3 minutes except that "flash" excludes
(a)  maintaining a display of text constant for 3 seconds or longer,
(b)  depicting moving text, and
(c)  sequentially displaying the letters "O," "P," "E," and "N."
The purpose of the .015-second constant-display time is to specify a constant-display time at which the human eye sees an illuminated display as not flickering.

## 4.  Permitting Conditions for Outdoor Signs
Except as provided in article 4, section 3, Nonconforming Uses, every outdoor sign shall be permitted upon the following conditions and upon all other applicable conditions in the zoning ordinance:
(a) Prohibited Signs:  The sign shall not animate, flash, or emit sound.
(b) The sign and its illuminator, if any, shall not interfere with pedestrian or vehicular traffic or be confused with or obstruct the view or effectiveness of any official traffic signal or traffic marking.
(c) The source of lighting for every sign artificially illuminated by an external source shall be mounted and shielded so that the lighting is confined to the area of the sign and so that the light source is not visible three feet above grade at the boundary of adjoining property, including adjoining STREETS.
(d) Brightness:  The luminance of the source of lighting for every artificially illuminated sign shall be less than or equal to 230 candelas per square meter as measured at the brightest area on the face of the sign.  (See Freyssinier, J.P., N. Narendran, and J.D. Bullough. 2006. Luminance requirements for lighted signage. *Sixth International Conference on Solid State Lighting, Proceedings of SPIE* 6337, 63371M.)

# Article 14.  Storage Containers

## 1. Authority
RSA 674:16, I, (d); RSA 674:16, V; and RSA 674:17.

## 2. Purpose
The purpose of these STORAGE CONTAINER regulations is to promote the general welfare by protecting the aesthetics of the town.
(See RSA 674:17, I, (c).)

## 3. Permitting Conditions for Storage Containers
Except as provided in article 4, section 3, Nonconforming Uses, every STORAGE CONTAINER shall be permitted upon the following conditions and upon all other applicable conditions in the zoning ordinance:

(a) The STORAGE CONTAINER shall be used for and only for storage.

(b) The STORAGE CONTAINER shall have a SETBACK from every STREET boundary or INTERIOR LOT LINE which SETBACK is greater than or equal to the minimum SETBACK specified for the STREET boundary or INTERIOR LOT LINE by article 3, section 4, (h), Table of Dimensional Requirements.

(c) No more than one STORAGE CONTAINER shall be on the LOT if the LOT is in the Urban District, the Suburban District, or the Rural District.

(d) No more than two STORAGE CONTAINERS shall be on the LOT if the LOT is in the Commercial District or the Light Industrial/Commercial District.

(e) The sum of the time during which one or more STORAGE CONTAINERS are on any one LOT during any 15-month period shall be no more than 12 months.

(f) The owner of the LOT where the STORAGE CONTAINER will be put shall tell the zoning ordinance administrator the date when the STORAGE CONTAINER is proposed to be put on the LOT.  The zoning ordinance administrator shall issue a permit for the STORAGE CONTAINER, and the permit shall state the date when the STORAGE CONTAINER is proposed to be put on the LOT.



**EXHIBIT**
MARSTON AFF.
EXHIBIT 2

# TOWN OF PITTSFIELD
# NEW HAMPSHIRE

# PERMIT
# FOR STORAGE CONTAINERS

(STORAGE CONTAINERS: Shall mean, any truck trailer, box trailer, school bus, mobile home or other similar facility used for storage or other purposes).

Storage Containers, whether registered or not, whether mobile or stationery, are not allowed on a permanent basis in any zoning district within the Town of Pittsfield. A storage container is permitted for storage purposes only, for a period of one year, with the approval of a parking permit issued by the Board of Selectmen or their designee, provided said storage container meets all setback requirements, and as limited by the following; a) maximum of one storage container per lot in the Urban, Suburban or Rural Districts; b) maximum of two storage containers per lot in the Light Industrial/Commercial Districts.

APPLICANTS NAME: _Joseph McCoy_

APPLICANTS ADDRESS: _322 Catamount Rd._

APPLICANTS TELEPHONE NUMBER: _603-435-5050_

LOCATION OF STORAGE UNIT: TAX MAP & LOT NUMBER: _R23-02-01_

ZONING DISTRICT: _RURAL_

SERIAL NUMBER OF STORAGE CONTAINER: _1H2V045 23 EB019801_

MAKE AND MANUFACTURER OF CONTAINER: _FP8-F2-45 FRUEHAUF_

SIGNATURE OF APPLICANT: _Joseph S McCoy_

DATE STORAGE USE IS TO BEGIN: _Sept. 1, 2015_

APPROVED: DATE: _9-1-15_

_Board of Selectmen_

Unit must be removed one year from the approved date above.

**EXHIBIT**

tabbies

MARSTON AFF.
EXHIBIT 3



## Office of Code Enforcement

**TOWN OF PITTSFIELD**
**Town Hall, 85 Main Street**
**Pittsfield, New Hampshire**

### NOTICE OF VIOLATION

Dear Mr., Joseph Mc Coy

The property located at 322 Catamount Rd Pittsfield NH 03263, identified in the Town Tax Records as Map R23, Lot 02-01, and owned/occupied by you, your permit for a storage trailer has expired on September 1, 2016 and the trailers need to be removed according to our Zoning Ordinance article 14 section 3.

Your immediate attention to this matter is appreciated.

If you believe the Building Inspector is in error in the application or interpretation of any provision of the Building codes, you have the right to appeal to the Zoning Board of Appeals in a timely fashion. This stop work Order controls unless and until it is overturned by the Zoning Board of Appeals.

Thank you
Jesse Pacheco
Building Inspector

OFFICE 603-435-6774          FAX:603-435-7922          CELL:603-715-6624     265

Nov. 3, 2016

EXHIBIT
MARSTON AFF.
EXHIBIT 4

To: Jesse Pachico,

Hello,

I am writing in regards to seeking a 6 month extension for my trailer on my Property located at 322 Catamount Rd.

At the present, i have construction going on, my garage is leaking from the inside and it needs emergency work which will take me several months to fix I am disabled with just one working leg, and have to take care of every thing myself, and this has already been started. I will remove one trailer by the end of November. The other i will be dealing with over the cold winter months and will have it emptied and removed by the end of April 2017.

I am asking for this 6 month extention inorder to keep my tools and materials inside this trailer while i deal with this emergency construction situation inorder to keep things out of the winter outside elements. It will be taken care of and i am sorry for the delay, but i am physcially handicapped, and will complete this task inorder to remain with good standards for this town and it's rules as a Pittsfield home owner.

Thank you For Your Time.
Sincerely,
Joseph McCoy

**Cara Marston**

| | |
|---|---|
| **From:** | Bonnie Theriault |
| **Sent:** | Wednesday, May 17, 2017 5:40 PM |
| **To:** | Cara Marston |
| **Subject:** | RE: Office stuff |

**EXHIBIT**

MARSTON AFF.
EXHIBIT 5

Jesse has left already and I'll let Mr. McCoy know tomorrow.

Bonnie

**From:** Cara Marston
**Sent:** Wednesday, May 17, 2017 5:14 PM
**To:** Bonnie Theriault
**Subject:** Re: Office stuff

McCoy can put his request in writing
Jesse can call my cell if he's still there

Cara M. Marston
Town Administrator
Town of Pittsfield
85 Main Street
Pittsfield, New Hampshire 03263
office 603.435.6773 x20
fax 603.435.7922 (yup, still have one, for nostalgic purposes)

Sent from my iPhone

On May 17, 2017, at 16:51, Bonnie Theriault <btheriault@pittsfieldnh.gov> wrote:

Hi there,

I hope you are having a fun afternoon. Sorry to bug you but Jesse was in and stated that he has to speak
to you about the junkyard, and he'd like to talk with you before he calls Chairman Allard. He indicated
that it was something he wanted to do as soon as possible. I explained that you would be in tomorrow
but it appears that he wanted to speak with you right then. I told him I'd let you know.

Also, Joseph McCoy 435-5050 wants to get on the agenda for Tuesday night. Jesse had gone to his
property regarding the storage container and he wants to speak to the Board about it this week. I
advised Mr. McCoy that I had to check to see if there were any scheduled appointments first, and we'd
get back to him tomorrow about his request. Shortly after that call, Jesse came in and asked if Mr.
McCoy had called, and I explained what I told Mr. McCoy.

So, anyway, I hope you continue to have fun if you can, and I'll see you tomorrow.

Bonnie

Bonnie Theriault
Administrative Assistant

1



**TOWN OF PITTSFIELD**
**BOARD OF SELECTMEN**
**TOWN HALL, 85 MAIN STREET**
**PITTSFIELD, NH 03263**



**EXHIBIT**

MARSTON AFF.
EXHIBIT 6

**MEETING MINUTES OF Tuesday June 13, 2017**

**CALL TO ORDER**
Call to order at 6:06 p.m. by J.C. Allard, Chairman

**MEMBERS PRESENT**
J.C. Allard, Chairman
Gerard LeDuc, Vice-Chairman
Carole Richardson
Carl Anderson

**MEMBERS ABSENT**
None

**OTHERS PRESENT**
Cara Marston, Town Administrator
Ammy Ramsey, Recording Secretary

**PUBLIC INPUT** – regarding agenda items only

Dan Schroth would like to make an appointment with Cara to talk with her about putting together a petition article about getting rid of the Building Inspector position, Cara and Dan will meet tomorrow at 11 a.m.

**AGENDA REVIEW**
Gerard: None.
Carole: None.
Carl: None.
J.C.: None.

**NEW BUSINESS**

**ACTION ITEMS**
1. Interviews for vacant position on Board of Selectmen – 4 candidates
J.C. informed the public that the first item under new business is to conduct interviews and it may take some time to get through the process. Due to circumstances out of anyone's control this board finds itself with the requirement of standing in for the voters of Pittsfield to choose another member for the selectboard. We are going to do that item of great

8. Storage Container Permit extension concern – 322 Catamount Road (tabled 5/23/17)
Mr. McCoy stated that they originally got the permit in 2015, he went to Jesse to get an extension because they have found out their deck, and porch is rotted. They are requesting an extension because he is doing the work himself and is handicapped and it is taking them more time then expected to do all the repairs needed. So he is asking the board to grant a one year extension. J.C. asked if there was an issue with extending the permit. Cara stated that our Zoning Ordinance states it shall not be no more than 12 months.    J.C. asked if this should go to the Zoning Board.  Carl asked why this matter is in front of them.  Cara explained that the selectboard are the administrators of the ordinance. Cara also expressed to the board that Mr. McCoy is here trying to do the right thing and if you look around town there are storage trailers on properties that may not have a permit. Mr. McCoy stated that Jesse collected $25.00 cash from him for the permit but later found out the there is no permit.  Jesse also stated to him that they have no choice and must get rid of the trailer, when there are multiple trailers all over town that have been there for a long time.  Carole asked if they have had the trailer for one year and now would like to have it there for another year and after that it will be gone.  Mr. McCoy stated that they want to get rid of it but just need more time to do the work needed on their home.

Carole: I make a motion to extend the permit for one year.
Gerard: Second.
Discussion: None.
Motion carries 4-0

Cara will print out another permit and have everyone sign it.

**CHECK MANIFESTS**
1. Accounts Payable
Gerard: I make a motion to approve Accounts Payable.
Carl: Second.
Discussion: None.
Motion carries 4-0

2. Payroll
Gerard: I make a motion to approve Payroll and Direct Deposit.
Carl: Second.
Discussion: None.
Motion carries 4-0

**MINUTES**
1. May 23, 2017 – Public Meeting Minutes
Gerard: I make a motion to approve the May 23, 2017 Public Meeting Minutes.
Carl: Second.
Discussion: Carole has a few grammatical corrections and will give those to Ammy.
Motion carries 4-0

Motion carries 4-0 roll call was done and all approved.

The Board came out of non-public session at 9:09 p.m.

Gerard: I make a motion to seal the non-public minutes as they may affect adversely the reputation of any person other than a member of this board.
Carl: Second.
Discussion: None.
Motion carries 4-0 roll call (2/3 vote) was done and all approved.

Gerard: I make a motion to adjourn.
Carl: Second.
Discussion: None.
Motion carries 4-0

Approved:

_____          _____
J.C. Allard, Chairman                        Date



**EXHIBIT**
MARSTON AFF.
EXHIBIT 7

## TOWN OF PITTSFIELD
## NEW HAMPSHIRE

## PERMIT
## FOR STORAGE CONTAINERS

(STORAGE CONTAINERS: Shall mean, any truck trailer, box trailer, school bus, mobile home or other similar facility used for storage or other purposes).

Storage Containers, whether registered or not, whether mobile or stationery, are not allowed on a permanent basis in any zoning district within the Town of Pittsfield. A storage container is permitted for storage purposes only, for a period of one year, with the approval of a parking permit issued by the Board of Selectmen or their designee, provided said storage container meets all setback requirements, and as limited by the following, a) maximum of one storage container per lot in the Urban, Suburban or Rural Districts, b) maximum of two storage containers per lot in the Light Industrial/Commercial Districts.

APPLICANTS NAME: Joseph McCoy

APPLICANTS ADDRESS: 322 Catamount Rd.

APPLICANTS TELEPHONE NUMBER: (603) 435 - 5050

LOCATION OF STORAGE UNIT: TAX MAP & LOT NUMBER: R23 - 2 - 1

ZONING DISTRICT: Rural

SERIAL NUMBER OF STORAGE CONTAINER: 1H 2V0452 3 8 B0190 1

MAKE AND MANUFACTURER OF CONTAINER: FP8 - 52 45 - FR VALHAV T

SIGNATURE OF APPLICANT: Joseph McCoy

DATE STORAGE USE IS TO BEGIN: 6-13-2017

APPROVED DATE: June 13, 2017

Board of Selectmen

Unit must be removed one year from the approved date above

271



# TOWN OF PITTSFIELD

Office of Selectmen
85 Main Street, Pittsfield NH 03263
admin@pittsfieldnh.gov ~ telephone (603) 435-6773 ~ fax (603



May 22, 2018

Joseph E. McCoy
322 Catamount Road
Pittsfield, NH 03263

Re: storage container permit expiration

Dear Mr. McCoy,

As you know, the storage trailer permit that the Board of Selectmen approved two years ago and extended at your request last June is due to expire next month.

Please consider this letter a friendly reminder that the trailer must be removed from the property for at least a three month period before you can apply for another permit to bring it back.

Thank you in advance for your anticipated cooperation.

Sincerely,

Pittsfield Board of Selectmen



EXHIBIT

MARSTON AFF.
EXHIBIT 9

May 29, 2018

Dear Board Members,

This concerns a storage trailer located on my property at 322 Catamount Rd. Pittsfield

Last june, 2017, i came to your meeting, i had 2 trailers to unload and remove, as requested. I've emptied and removed 1 so far and it's not an easy task! I am disabled with 1 working leg to move on and now that the weather has changed i am in the process of unloading the second.
This will take more time, when i bought my home in pittsfield i had a huge ammount of belongings which came with me so i am asking for another permit inorder to accomplish this huge task.

273

I am crippled so it cannot
be done easily.

Please let me know,
or, set aside a time to discuss
this further at your next meeting.

Thank you

Joseph McEy

322 Catamount Rd.
P.O. Box 293
Pittsfield. N.N. 03263



**TOWN OF PITTSFIELD**
**BOARD OF SELECTMEN**
**TOWN HALL, 85 MAIN STREET**
**PITTSFIELD, NH 03263**



**EXHIBIT**
MARSTON AFF.
EXHIBIT 10

**MEETING MINUTES OF Tuesday June 12, 2018**

**CALL TO ORDER**
Call to order at 6:02 p.m. by J.C. Allard, Chairman

**MEMBERS PRESENT**
J.C. Allard, Chairman
Gerard LeDuc, Vice-Chairman
Carole Richardson
Carl Anderson
James Adams

**OTHERS PRESENT**
Cara Hayes, Town Administrator
Ammy Ramsey, Recording Secretary

**PUBLIC INPUT** – regarding agenda items only
There was no input.

**AGENDA REVIEW**
Gerard: None.
Jim: None.
Carole: Action item for police
J.C.: Action item for the CDC
Carl: Action items for Zoning Administrator

**APPOINTMENTS**
6:05 p.m. – Central NH Regional Planning Commission – Brownfield's project update
Mike Tardiff from the Central NH Regional Planning commission presented the board with some photos of some properties between Clark Street and Broadway and then described the status of the Brownfield's project and the potential of the program going forward for the town of Pittsfield. Mike explained the history of the program and that it assesses properties that have potential environmental issues and what it would take to get those properties redeveloped. Steve Rickerich, the consulting engineer with Ransom Consulting, was also present. He explained the steps of the environmental work that is involved in this project. The Central NH RPC has funded this project's environmental work through two grants that the RPC received and have designated to Pittsfield. In the next few months as

275

the project moves forward Tardiff will contact the Community Development Committee to keep them updated, too.

6:15 p.m. – Jay St. Jean Auctioneers – sale of tax deeded land – Map R4 Lots 1-1, 1-6, & 1-7
J.C. announced the appointment and Jay St. Jean presented the board with packets of information regarding their auction services. They believe that the 3 properties could sell for around 8 to 10 thousand dollars each. Carl inquired about the payment for their services if the properties do not sell. St. Jean explained the fee structure and how costs would be split between the purchaser and the seller.

## NEW BUSINESS

## DEPARTMENT UPDATES
### 1. Police Department
Acting Chief Collins updated the board with the hiring process, informed them of paperwork that needed to be filed with the Police Standards & Training regarding his hiring, and confirmed with the board to continue the coverage as it has been.

Carl: I make a motion to continue with having reduced coverage for 20 hours a week until June 26, 2018.
Jim: Second.
Discussion: None.
Motion carries 5-0

Carl inquired about the status of Officer Wood. Acting Chief Collins requested tabling the resignation until he gets a chance to talk with him.  They also discussed some details concerning the membership in the Central NH Special Operations Unit, if there was an annual agreement that needed signing or not.  Both Collins and DiGeorge were of the understanding that the agreement was signed upon joining as a member for coverage, not annually.

## ADDED ITEM – ALL NIGHT PARKING BAN
Carole inquired about the parking ban and would like to remove the ban.

Carole: I make a motion to remove the parking ban.
Carl: Second.
Discussion: The board discussed the issues with the policy and the reasons why it was done and the reasons they should consider removing the ban and also the impact it would have for the winter parking ban. The board inquired with George and Acting Chief Collins concerning their opinions, George feels it is a good idea to have the parking ban and Acting Chief Collins stated he has not had a chance to observe situations and did not feel comfortable giving an opinion either way. Carl suggested removing the ban and look at the entire ordinance and talk with George and Acting Chief Collins in the fall. Gerard stated he feels it is important to have because he sees what happens in town at night.
Motion 4-1. Gerard opposes.

## ACTION ITEMS

### 1. CWS Fence & Guardrail quote – 2018 Tilton Hill Road project

J.C. announced item number 1, and inquired with George on the details. George explained the situation and the details on where the guardrail will be placed and the reasons why the rails are needed.

Carl: I make a motion to approve the CWS Fence & Guardrail quote for the 2018 Tilton Hill Road project.
Jim: Second.
Discussion: None.
Motion carries 5-0

### ADDED ITEM – TEMPORARY, SEASONAL PART TIME HIRE

George expressed his concern about being shorthanded because of the employee that is out on workman's comp and stated he spoke with Ammy and she is willing to help for the summer months. There was discussion pertaining to hours she is available to work and a wage and how it will be funded from the budget.

Carl: I make a motion to hire Ammy Ramsey temporary and part time as a Light Equipment Operator at $16.00 an hour starting now until August 31, 2018.
Carole: Second.
Discussion: The total hours across town positions was discussed regarding overtime and full time status. This assignment is temporary, just to assist the highway department get the paving projects completed as there is a highway worker out on workers compensation leave.
Motion carries 5-0

### 2. Summer 2018 F.B. Argue Recreation Area seasonal part time hiring – substitute director

Carl: I make a motion to appoint Donna Keeley as the substitute director of the F.B. Argue Recreation Area.
Gerard: Second.
Discussion: None.
Motion carries 5-0

### 3. Website Committee appointment request – Ryan Wood

Carole: I make a motion to appoint Ryan Wood to the Website Committee.
Jim: Second.
Discussion: None.
Motion carries 5-0

### 4. Resignation – Patrol Officer Donald Wood

J.C. announced item number 4.
Gerard: I make a motion to table the resignation of Patrol Officer Donald Wood until the next meeting.
Carl: Second.

Discussion: None.
Motion carries 5-0

### 5. Community Development Committee resignation – Roland Carter

Gerard: I make a motion to accept the resignation of Roland Carter from the Community Development Committee.
Carl: Second.
Discussion: Gerard stated Roland is selling his home and Jim stated we should send out a letter of thanks for all his work.
Motion carries 5-0

### 6. Application for District Nursing Scholarship

J.C. announced item number 6. Carole confirmed that there is just one applicant.

Carole: I make a motion to approve the applicant for the District Nursing Scholarship.
Jim: Second.
Discussion: None.
Motion carries 5-0

### 7. Donation to Conservation Commission Fund – $2,000.00, Chris Hill

J.C. announced item number 7.

Gerard: I make a motion to accept the donation of $2,000.00 for the Conservation Commission fund from Chris Hill.
Jim: Second.
Discussion: Carl stated we should send a letter of thanks.
Motion carries 5-0

### 8. Fee Waiver request for BCEP Solid Waste District – Lyman Park

J.C. announced item number 8. Cara stated they are requesting a waiver because in the past the person that emptied the trash separated it but now with the nature of waste of the trash they are not able to safely separate the trash, which they then have to pay to get rid of the trash.

Carl: I make a motion to approve the Fee Waiver for BCEP for the caretakers of Lyman Park.
Carole: Second.
Discussion:
Motion carries 4-1 Gerard opposes

### 9. Request for Storage Container permit extension – 322 Catamount Road

There was some discussion pertaining to the last extension that was granted and the enforcement process going forward.

Carl: I make a motion to deny the extension request for the Storage Container Permit.
Jim: Second.

Discussion: Gerard stated we need to keep the man at his word.
Motion carries 5-0

The board discussed the terms of the letter and agreed to give them 30 days to remove the trailer.

### 10. Permission for Historical Society to apply to Planning Board
Clayton Wood stated the Historical Society would need a letter of approval from the property owner to speak to the Planning Board regarding their proposal of the relocation of the Society to the Washington House Lot.

Carl: I make a motion to approve the Historical Society to apply to the Planning Board.
Carole: Second.
Discussion: None.
Motion carries 5-0

### 11. Old Home Day application for Parade Permit – July 14, 2018
Carole: I make a motion to approve the Parade Permit for the Old Home Day Parade on July 14, 2018.
Jim: Second
Discussion: None.
Motion carries 5-0

### 12. Balloon Rally Fireworks contract – Atlas Fireworks
Jim: I make a motion to approve the Atlas Fireworks Balloon Rally Fireworks contract.
Carl: Second.
Discussion: Cara noted the recommended change from the insurance company.
Motion carries 5-0

### 13. Eversource BTLA appeals – consideration of legal counsel
Cara stated she sent out the information to Serge and he recommended Attorney Bolt and he would confer with him for contract terms.

Carl: I make a motion to approve Matt Serge to coordinate with Attorney Christopher Boldt from Donahue, Tucker and Ciandella to represent Pittsfield in the BTLA appeal.
Jim: Second.
Discussion: Carole confirmed that they are voting to have Serge find out the cost and then come to us.
Motion carries 5-0

### 14. NH E 9-1-1 Data Operations Liaison renewal
Cara stated the liaisons are currently her and Bonnie.
Carl: I make a motion to appoint Cara Hayes and Bernadette Theriault as the 911 Data Operations Liaisons.
Gerard: Second.

Discussion: None.
Motion carries 5-0

### 15. Notice of Intent to Excavate – Map R48 Lot 2
Carl: I make a motion to approve the Intent to Excavate for Map R48 Lot 2.
Carole: Second
Discussion: None.
Motion carries 5-0

### 16. Notice of Intent to Cut Timber – Map R42 Lot 8
Carl: I make a motion to approve the Intent to Cut Timber for Map R42 Lot 8.
Carole: Second.
Discussion: None.
Motion carries 5-0

### 17. Application for Solar Exemption – Map R7 Lot 1-5
Cara explained that this was approved at town meeting in 2016 and it is an exemption for the value of the solar equipment only (to have no property tax impact).

Carl: I make a motion to approve the application for Solar Exemption.
Gerard: Second.
Discussion: None.
Motion carries 5-0

### 18. Funds Transfer – 2018 appropriations to capital reserve and expendable trust funds
J.C. announced item number 18.

Gerard: I make a motion to approve the fund transfer of the 2018 appropriations to the capital reserve and expendable trust funds.
Jim: Second.
Discussion: None.
Motion carries 5-0

### 19. Funds Transfer – perpetual care for lots sold in Floral Park Cemetery
Carole: I make a motion to transfer funds to perpetual care for lots sold in Floral Park Cemetery.
Jim: Second.
Discussion: None.
Motion carries 5-0

### ADDED ITEM – COMMUNITY DEVELOPMENT COMMITTEE – FIRST IMPRESSIONS PROGRAM
J.C. explained that they have come to an agreement with the town of Tilton regarding the First Impressions Program and explained those details. This memorandum states that the town of Pittsfield and the town of Tilton will look at the other community and give some feedback.

Carl: I make a motion to approve J.C., Cara Hayes, and Louie Houle to sign the memorandum.
Carole: Second.
Discussion: None.
Motion carries 5-0

## ADDED ITEM - Zoning Administrator Deputy

Carl explained he will be on vacation and the Zoning Administrator duties should be covered and would suggest appointing a person as the deputy for not just this instance but also when he is not available to give a timely response.

Carl: I make a motion to appoint J.C. Allard as Deputy Zoning Administrator.
Jim: Second.
Discussion: None.
Motion carries 4-1 J.C. abstains

## ADDED ITEM - Donation of building supplies for the barn at the library

Carl stated that in trying to button up the barn at the library with Clayton Wood and Daren Nielsen and he purchased some supplies to get the job accomplished. Carl stated the job can be completed after some more materials are purchased. He would like a motion to accept the materials as a donation. Jim inquired about the dollar amount and Carl stated not more than $50.00.

Jim: I make a motion to accept the donation of materials needed to seal up the barn at the library.
Carole: Second.
Discussion: None.
Motion carries 5-0

## ADDED ITEM - Junkyard license renewals

Carl would like to be proactive with the junkyard licenses around town and suggests sending a letter of notice of the requirements that need to be done before their license expires to get the process started. It was decided to send out those letters and there was some discussion pertaining to some details on what those letters should contain.

## ADDED ITEM - Notice of Zoning Violation update

Carl stated a Notice of Zoning Violation is going to be sent to 140 Tilton Hill Road and gave some details on what the property owners can have for storage trailers.

Carl: I make a motion to send the Notice of Violation to 140 Tilton Hill Road.
Jim: Second.
Discussion: None.
Motion carries 5-0

**ADDED ITEM - Zoning Violation for excessive junk in the yard**

Cara stated that a Notice of Zoning Violation should be sent for a property because she received a complaint concerning excessive debris in the yard. It was decided to put that on the next agenda.

**ADDED ITEM - 33 Main Street purchase and sale agreement extension**

Carl stated that they received a request from Mr. Gamble to extend the purchase and sales agreement for 33 Main Street. There was some discussion pertaining to the details on the reason.

Jim: I make a motion to extend the purchase and sales agreement for 33 Main Street for 30 days.

Carole: Second.

Discussion: None.

Motion carries 5-0

**27. Signing of the Collective Barging Agreement for Teamsters Local #633**

J.C.: I make a motion to approve and sign the Collective Bargaining Agreement with the teamsters union as approved at 2018 town meeting.

Carl: Second.

Discussion: None.

Motion carries 5-0

**COMMITTEE REPORTS**

Gerard stated that BCEP will be changing the rates to 10 cents a pound from 7 cents.

Carl stated that the selectboard will be receiving a letter concerning the septic system at JNR Automotive and gave some details concerning the issue.

**INFORMATION ITEMS**

2. Letter of Commendation – Sergeant DiGeorge

J.C. announced that Sgt. DiGeorge received a letter of commendation and Sgt. DiGeorge explained the story and also informed the board about 2 other circumstances that may receive a letter, as well. Carole read both letters and Sgt. DiGeorge received an applause from all who attended the meeting. The board stated that the town of Pittsfield is honored and proud to have such a heroic member of the police department. Jim stated he will work on finding out where to send these types of letters to the Red Cross to have Sgt. DiGeorge recognized.

**OLD BUSINESS**

2. Josiah Carpenter Library chimney repair (tabled 4/24/2018)

Carl gave an update on the chimney repair, and stated they received a proposal and suggested that we continue to look for someone who will just repoint the chimney.

3. Historical Society public hearing request – relocation of Society headquarters (pending 4/24/2018)
It was decided to schedule the public hearings for the July meetings.

## CHECK MANIFESTS
1. Accounts Payable
Gerard: I make a motion to approve Accounts Payable.
Carl: Second.
Discussion: None.
Motion carries 5-0

2. Payroll
Gerard: I make a motion to approve Payroll and Direct Deposit.
Carl: Second.
Discussion: None.
Motion carries 5-0

## MINUTES
1. May 8, 2018 – Non Public Session Minutes (tabled 5/22/2018)

2. May 20, 2018 – Public Session Minutes
Gerard: I make a motion to table the May 20, 2018 Public Meeting Minutes.
Carl: Second.
Discussion:
Motion

3. May 20, 2018 – Non Public Session Minutes
Gerard: I make a motion to table the May 20, 2018 Non-Public Meeting Minutes.
Carl: Second.
Discussion: None.
Motion carries 5-0

4. May 22, 2018 – Public Session Minutes
Gerard: I make a motion to approve the May 22, 2018 Public Meeting Minutes.
Carl: Second.
Discussion: None.
Motion carries 5-0

5. June 2, 2018 – Public Session Minutes
Gerard: I make a motion to approve the June 2, 2018 minutes with corrections of the date and time.
Carl: Second.
Discussion: None.
Motion carries 5-0

**PUBLIC INPUT**

Adam Gauthier would like to remind the board about the meeting tomorrow night concerning school funding and gave some details on what will be discussed. He encourages everyone to come out. Adam also inquired about Atlantic Broadband taking over Metrocast and if that would affect the lines in Pittsfield and Cara explained that the cable franchise is currently on an extended contract agreement until either party requests to open the terms.

**NON-PUBLIC SESSION**

Gerard: I make a motion to go into Non-Public Session under RSA 91-A:3, II (d).
Jim: Second.
Discussion: None - Roll call was done and all approved.

When the Board returned to public session Gerard made a motion to seal the non-public minutes as they may affect adversely the reputation of any person other than a member of this board. Carole seconded the motion.

Motion carries with a 5-0 roll call (2/3 achieved) vote, all approved.

Carl: I make a motion to approve Jay St. Jean Auctioneers to auction the tax deeded properties R4 Lots 1-1, 1-6, & 1-7.
Jim: Second.
Discussion: None.
Motion carries 5-0

Carl: I make a motion to adjourn.
Carole: Second.
Discussion: None.
Motion carries 5-0

Approved:

_James C. Allard_    _10 July 2018_
James C. Allard, Chairman    Date



# TOWN OF PITTSFIELD

Office of Selectmen
85 Main Street, Pittsfield NH 03263
admin@pittsfieldnh.gov ~ telephone (603) 435-6773 ~ fax (603) 435-7922



## NOTICE OF ZONING VIOLATION

June 12, 2018

mailed certified mail
and FIRST CLASS MAIL

Diane Dipoto
140 Tilton Hill Road
Pittsfield, NH 03263

notice of violation at:
140 Tilton Hill Road
Map R15 Lot 10

Dear Ms. Dipoto,

It has been brought to the attention of this office that zoning violations exist at your property, 140 Tilton Hill Road.

### VIOLATION
three unpermitted storage trailers on property
Pittsfield Zoning Ordinance – Article# 14. Storage Containers

### CORRECTIVE ACTION NEEDED
remove trailers or submit application for storage container permit(s)

### RIGHT TO APPEAL
This notice is a decision of the Zoning Ordinance Administrator and may be appealed to the Zoning Board of Adjustment in accordance with the provisions of the Pittsfield Zoning Ordinance Article 5, Section 5. Appeals to the Board of Adjustment, provided that such appeal is filed within thirty days of the date of this decision, per NH RSA 676:5 and the Pittsfield Zoning Board of Adjustment's Rules of Procedure.

### PENALTIES & FEES
Please be advised that violations of the provisions of the Pittsfield Zoning Ordinance include civil penalties of $275 for the first offense, and $550 for subsequent offences, for each day such violation is found to continue after the conviction date or after the date on which the violator received written notice, whichever is earlier, with each day that the violation continues being considered as a separate offense, as further described in Article 1, Section 9. Penalty Clause.

This correspondence serves as a formal notice of a zoning violation. You have 30 days notice from the receipt of this notice to cure this violation. In the event that the violations are not cured or remedied as provided for in this notice, the Town will pursue enforcement of the violations as provided for by law.

Should you have any questions please contact the Selectmen's Office at the contact information listed above.

Sincerely,

Pittsfield Board of Selectmen

285



**OFFICE OF SELECTMEN**
85 Main Street
Pittsfield, NH 03263-0098

NEOPOST          FIRST-CLASS MAIL
06/13/2018
US POSTAGE $000.47⁰



ZIP 03263
041M11290780

Diane Dipoto
140 Tilton Hill Road
Pittsfield, NH 03263

Dear Ms. Dipoto,

---

**CERTIFIED MAIL**



**OFFICE OF SELECTMEN**
85 Main Street
Pittsfield, NH 03263-0098



91 7199 9991 7034 2973 3008

NEOPOST          FIRST-CLASS MAIL
06/13/2018
US POSTAGE $003.92⁰



ZIP 03263
041M11290780

91 7199 9991 7034 2973 3008

Diane Dipoto
140 Tilton Hill Road
Pittsfield, NH 03263

Dear Ms. Dipoto,

286



# TOWN OF PITTSFIELD

Office of Selectmen
85 Main Street, Pittsfield NH 03263
admin@pittsfieldnh.gov ~ telephone (603) 435-6773 ~ fax (60



June 13, 2018

Joseph E. McCoy
322 Catamount Road
Pittsfield, NH 03263

*S/container*
*removed*
*no further violation*

Re: storage container permit expiration

Dear Mr. McCoy,

The Board of Selectmen considered your permit extension request dated May 29, 2018. While they note the personal circumstances that have caused delay, the Board has to balance the terms of the zoning ordinance with your request, and as you have already been granted a year's extension beyond the 12 months permitted, they voted to not grant this second extension.

The Board has granted an additional thirty (30) days from the date of this letter to remove the storage container from your property.

Sincerely,

Cara M. Hayes
Cara M. Hayes
Town Administrator

287

# Drummond Woodsum

**ATTORNEYS AT LAW**

**Matthew R. Serge**
Admitted in NH



EXHIBIT

MARSTON AFF.
EXHIBIT 13

May 24, 2019

James Hetu and Cynthia Hetu
272 Loudon Road
Pittsfield, NH 03263

      RE:   Zoning Violation

Dear Mr. and Mrs. Hetu:

This office serves as general legal counsel to the Town of Pittsfield. The Town has asked us to contact you concerning an ongoing zoning ordinance violation on the property identified above. Specifically, you have been keeping a storage trailer on your property in violation of Article 14 of the Pittsfield Zoning Ordinance.

Article 14 of the Zoning Ordinance (entitled Storage Containers) provides that a storage container is permitted on a property only if the landowner complies with a series of conditions, including that the landowner obtain a permit from the Town. This permit states when the storage container will be placed on the lot, and the Ordinance further provides that the longest a contained can remain on a property is no more than 12 months in a 15-month period. For purposes of Article 14, a "Storage Container" includes a "truck trailer, box trailer, school bus, manufacture housing unit, or similar mobile container parked continuously for 31 days or more and used principally for storage and not used for any person's residential occupancy or transient lodging." A copy of applicable sections of the Zoning Ordinance are attached for reference.

The Town has sent you two Notices of Zoning Violation, dated December 4, 2018 and January 18, 2019 (copies attached). To date, you have not responded to these letters. The Town demands, therefore, that you remove the trailer(s) from your property by May 24, 2019, and that no trailers will be stored on the property until you receive a permit from the Town. If you fail to comply, the Town will initiate legal action to remove the trailer(s). If a lawsuit is filed, you may be required to pay civil fines to the Town of $275 per day, beginning February 17, 2019. In addition, if the Town is successful in its lawsuit, you will be required to pay for the Town's reasonable costs and attorney's fees.

If you have any questions, please contact the Town at (603) 435-6773. Thank you.

Sincerely,

Matthew R. Serge

cc:    Board of Selectmen

### Article 14. Storage Containers

#### 1. Authority

RSA 674:16, I, (d); RSA 674:16, V; and RSA 674:17.

#### 2. Purpose

The purpose of these STORAGE CONTAINER regulations is to promote the general welfare by protecting the aesthetics of the town. (See RSA 674:17, I, (c), and Taylor v. Plaistow, 152 N.H. 142, 872 A.2d 769 (2005) ("a municipality may exercise its zoning power solely to advance aesthetic values because the preservation or enhancement of the visual environment may promote the general welfare.").)

#### 3. Permitting Conditions for Storage Containers

Except as provided in article 4, section 3, Nonconforming Uses, every STORAGE CONTAINER shall be permitted upon the following conditions and upon all other applicable conditions in the zoning ordinance:

(a) The STORAGE CONTAINER shall be used for and only for storage.

(b) The STORAGE CONTAINER shall have a SETBACK from every STREET boundary or INTERIOR LOT LINE which SETBACK is greater than or equal to the minimum SETBACK specified for the STREET boundary or INTERIOR LOT LINE by article 3, section 4, (h), Table of Dimensional Requirements.

(c) No more than one STORAGE CONTAINER shall be on the LOT if the LOT is in the Urban District, the Suburban District, or the Rural District.

(d) No more than two STORAGE CONTAINERS shall be on the LOT if the LOT is in the Commercial District or the Light Industrial/Commercial District.

(e) The sum of the time during which one or more STORAGE CONTAINERS are on any one LOT during any 15-month period shall be no more than 12 months.

(f) The owner of the LOT where the STORAGE CONTAINER will be put shall tell the zoning ordinance administrator the date when the STORAGE CONTAINER is proposed to be put on the LOT. The zoning ordinance administrator shall issue a permit for the STORAGE CONTAINER, and the permit shall state the date when the STORAGE CONTAINER is proposed to be put on the LOT.



# TOWN OF PITTSFIELD

Office of Selectmen
85 Main Street, Pittsfield NH 03263
admin@pittsfieldnh.gov ~ telephone (603) 435-6773 ~ fax (603) 435-7922

## NOTICE OF ZONING VIOLATION

December 4, 2018

James B. Hetu
Cynthia A. Hetu
272 Loudon Road
Pittsfield, NH 03263

mailed certified mail
and FIRST CLASS MAIL

notice of violation at:
272 Loudon Road
Map R35 Lot 10

Dear James & Cynthia,

It has been brought to the attention of this office that zoning violations exist at your property, 272 Loudon Road.

### VIOLATION

unpermitted storage trailer on property
Pittsfield Zoning Ordinance – Article# 14. Storage Containers

### CORRECTIVE ACTION NEEDED

remove trailer or submit application for storage container permit

### RIGHT TO APPEAL

This notice is a decision of the Zoning Ordinance Administrator and may be appealed to the Zoning Board of Adjustment in accordance with the provisions of the Pittsfield Zoning Ordinance Article 5, Section 5. Appeals to the Board of Adjustment, provided that such appeal is filed within thirty days of the date of this decision, per NH RSA 676:5 and the Pittsfield Zoning Board of Adjustment's Rules of Procedure.

### PENALTIES & FEES

Please be advised that violations of the provisions of the Pittsfield Zoning Ordinance include civil penalties of $275 for the first offense, and $550 for subsequent offences, for each day such violation is found to continue after the conviction date or after the date on which the violator received written notice, whichever is earlier, with each day that the violation continues being considered as a separate offense, as further described in Article 1, Section 9. Penalty Clause.

This correspondence serves as a formal notice of a zoning violation. You have 30 days notice from the receipt of this notice to cure this violation. In the event that the violations are not cured or remedied as provided for in this notice, the Town will pursue enforcement of the violations as provided for by law.

Should you have any questions please contact the Selectmen's Office at the contact information listed above.

Sincerely,

Pittsfield Board of Selectmen



# TOWN OF PITTSFIELD

Office of Selectmen
85 Main Street, Pittsfield NH 03263
admin@pittsfieldnh.gov ~ telephone (603) 435-6773 ~ fax (603) 435-7922

## SECOND - NOTICE OF ZONING VIOLATION

January 18, 2019

mailed certified mail
and FIRST CLASS MAIL

James B. Hetu
Cynthia A. Hetu
272 Loudon Road
Pittsfield, NH 03263

notice of violation at:
272 Loudon Road
Map R35 Lot 10

Dear James & Cynthia,

It has been brought to the attention of this office that zoning violations exist at your property, 272 Loudon Road.

### VIOLATION

unpermitted storage trailer on property
Pittsfield Zoning Ordinance – Article# 14. Storage Containers

### CORRECTIVE ACTION NEEDED

remove trailer or submit application for storage container permit

### RIGHT TO APPEAL

This notice is a decision of the Zoning Ordinance Administrator and may be appealed to the Zoning Board of Adjustment in accordance with the provisions of the Pittsfield Zoning Ordinance Article 5, Section 5. Appeals to the Board of Adjustment, provided that such appeal is filed within thirty days of the date of this decision, per NH RSA 676:5 and the Pittsfield Zoning Board of Adjustment's Rules of Procedure.

### PENALTIES & FEES

Please be advised that violations of the provisions of the Pittsfield Zoning Ordinance include civil penalties of $275 for the first offense, and $550 for subsequent offences, for each day such violation is found to continue after the conviction date or after the date on which the violator received written notice, whichever is earlier, with each day that the violation continues being considered as a separate offense, as further described in Article 1, Section 9. Penalty Clause.

This correspondence serves as a formal notice of a zoning violation. **You have 30 days notice from the receipt of this notice to cure this violation.** In the event that the violations are not cured or remedied as provided for in this notice, the Town will pursue enforcement of the violations as provided for by law.

Should you have any questions please contact the Selectmen's Office at the contact information listed above.

Sincerely,

Pittsfield Board of Selectmen

291



# TOWN OF PITTSFIELD

Office of Selectmen
85 Main Street, Pittsfield NH 03263
admin@pittsfieldnh.gov ~ telephone (603) 435-6773 ~ fax (603) 435-7922



EXHIBIT
MARSTON AFF.
EXHIBIT 14

## NOTICE OF ZONING VIOLATION

August 13, 2019

mailed certified mail
and FIRST CLASS MAIL

Sanel Realty Co. Inc.
11 Cram Avenue
Pittsfield, NH 03263

notice of violation at:
11 Cram Avenue
Map U3 Lot 11

Dear Sanel Realty Co. representative(s),

It has been brought to the attention of our office that zoning violations exist at your property, 11 Cram Avenue.

### VIOLATION

unpermitted storage trailer on property
Pittsfield Zoning Ordinance – Article# 14. Storage Containers

### CORRECTIVE ACTION NEEDED

remove trailer or submit application for storage container permit

### RIGHT TO APPEAL

This notice is a decision of the Zoning Ordinance Administrator and may be appealed to the Zoning Board of Adjustment in accordance with the provisions of the Pittsfield Zoning Ordinance Article 5, Section 5. Appeals to the Board of Adjustment, provided that such appeal is filed within thirty days of the date of this decision, per NH RSA 676:5 and the Pittsfield Zoning Board of Adjustment's Rules of Procedure.

### PENALTIES & FEES

Please be advised that violations of the provisions of the Pittsfield Zoning Ordinance include civil penalties of $275 for the first offense, and $550 for subsequent offences, for each day such violation is found to continue after the conviction date or after the date on which the violator received written notice, whichever is earlier, with each day that the violation continues being considered as a separate offense, as further described in Article 1, Section 9. Penalty Clause.

This correspondence serves as a formal notice of a zoning violation. **You have 30 days notice from the receipt of this notice to cure this violation.** In the event that the violations are not cured or remedied as provided for in this notice, the Town will pursue enforcement of the violations as provided for by law.

Should you have any questions please contact the Selectmen's Office at the contact information listed above.

Sincerely,

Pittsfield Board of Selectmen

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

**EXHIBIT**

**C**

[ANDERSON AFF.]

| | |
|---|---|
| JOSEPH McCOY | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| TOWN OF PITTSFIELD | ) |
| | ) |
| Defendant | ) |

Civil Action No.:1:20-cv-00362-JL

## AFFIDAVIT OF CARL ANDERSON

I, Carl Anderson, with personal knowledge, on oath depose and say as follows:

1.      I am a resident of the Town of Pittsfield, New Hampshire, and I have served on the

Town's Board of Selectmen ("Board") since 2016.

2.      On November 15, 2016, the Board received a request from Joseph McCoy to grant a six-

month extension of his 2015 storage container permit. In his correspondence to the Board, Mr.

McCoy represented that he needed the extension because he was disabled and needed additional

time to move items out of the storage container. I made a motion to approve his request, which

passed by unanimous vote.

3.      As of November 15, 2016, I was aware that Mr. McCoy had painted the side of his

storage container in support of Donald Trump, which did not factor into my deliberations.

4.      In June 2017, Mr. McCoy requested another year extension of his 2015 storage container

permit.

5.      On June 13, 2017 the Board meet and considered his request. I voted to approve the

extension based on Mr. McCoy's representations that he was disabled and needed to use the

storage container for reasons related to his disability.

293

6.      Mr. McCoy was present during the June 2017 meeting. During the meeting, he made no mention of any desire or intent to use the trailer as a sign and there was no discussion of any such use. The depiction of the word "Trump" on the storage container was not considered by the Board in its deliberations in anyway.

7.      Following the June 2017 approval, I became aware of complaints regarding unpermitted storage containers, including Mr. McCoy's, and I informed Mr. McCoy of this fact. The complaints did not relate to Mr. McCoy's use of his storage container to communicate support for President Trump.  In fact, I later learned that in the summer of 2017, Mr. McCoy had the "Trump" image on the side of his storage container repainted to depict a balloon scene.

8.      On June 12, 2018, the Board reviewed a third request for a permit extension from Mr. McCoy, which was denied. During this meeting, the Board voted to pursue enforcement measures against another set of unpermitted storage containers located on Tilton Hill Road.

9.      Following the denial of Mr. McCoy's 2018 permit request, I became aware that Mr. McCoy was spreading false information regarding the reasons for the denial. I subsequently wrote a letter to him in January 2020 to correct this misinformation. My letter to Mr. McCoy contains an accurate description of my reasons for voting for his application in 2016 and 2017, and against his application in 2018. A true and accurate copy of my letter is attached hereto as Exhibit 1.

10.     In the letter, I note that there are "illegal trailers all over the place…" This sentiment was intended to express my personal sense that there are likely unpermitted storage containers in Town that have evaded review by the Board. However, I also believe many such storage containers in Town are in fact grandfathered and preexist the Zoning Ordinance or are otherwise lawful.

2

11.     Absent a significant expenditure of resources by the Town, it would be impractical and wasteful to attempt to document the status of each storage container in Town. As described in the letter, the Town has limited resources for enforcement of the Town's storage container ordinance and must be prudent in the allocation of its resources. Therefore, I have supported enforcement actions when the Town has had specific knowledge that a storage container is not grandfathered and not permitted. My decisions have been based on the requirements of the zoning ordinance only.

12.     At no time did I harass or otherwise discriminate against Mr. McCoy. The notion that I would discriminate against Mr. McCoy based on his support for President Trump is not credible. I am a life-long Republican, have been a public supporter of President Trump, and was on friendly terms with Mr. McCoy prior to the initiation of his suit against the Town.

3

295

Affiant sayeth further not.

_5/28/2021_
Date

Carl Anderson

STATE OF NEW HAMPSHIRE
COUNTY OF

Before me, the undersigned officer, personally appeared the said Carl Anderson, known to me or satisfactorily proven to be the person whose name is subscribed to the within instrument, and acknowledged that he executed the same for the purposes therein contained and did state under oath the within facts are true to the beset of his knowledge and belief.

Printed Name: Cara M. Marston
Notary Public
My Commission Expires: 5|15|2024

4