

EXHIBIT

ANDERSON AFF.
EXHIBIT 1

Hello Joe,

I'm writing to try to correct some incorrect information that is being spread verbally and through social media by you.

Before becoming a selectman in 2016, I frankly knew zero about the storage container article in the zoning ordinance. My *first* exposure to it was when you came to the board with your expired permit and literally begged the board to give you a one-year extension due to your disability and how long it would take to empty the trailer out. I'm sure you remember it, as does everyone else in the room at the time. Hopefully you remember that I was the one that made the motion to give you a *yearlong extension*. I remember you thanking us profusely and *swearing you'd have the trailer empty and gone by the end of the year!*

Over the course of that next year, in addition to a workload you can't even imagine, that the select board has to find a way to deal with, we received several complaints about storage containers. One of those complaints was about your trailer, and in addition, that you were operating a second hand store in the rural district without a variance (which as you know, we never pursued). We were never given a name***. Nothing was said about Trump being on the trailer***- not then, not ever- not from the - complainant and not from any member of the board. Let me assure you that none of this is related to Trump's name on the trailer (and which if you recall was no longer even on the trailer when you got a notice that your extension was nearly up). We happen to all be Republicans, and not one of us has ever bad-mouthed Trump at all that I know of. Personally, I liked Trump on your trailer better than I liked the balloons, but at the end of the day none of us gave a damn what you painted on it. Most of the time I still wear a Make America Great Again hat.

Anyway, what was obvious was that there were illegal storage containers all over the place (that's about the only *truth* I can find in your rants). So, what should we do about it? None of us had any idea when they were put in- before or after the zoning article. Many select boards had apparently just ignored the ordinance, thus creating a nearly impossible situation for *this* board. Most of us actually work-full time and it is hard to work 70 hours a week, keep up with everything else a select board has to do ***AND*** start going house by house figuring out what the story is with every existing storage container would be an almost impossible task. However, the rule is on the books and the select board is elected to enforce the rules whether we agree with them or not. So, as a board, we decided the best we could do is enforce the rule as storage trailers were added and that we knew about coming in during our term in office. We didn't make the rule. We weren't the ones that ignored the rule. We decided to not make the situation worse by ignoring it on our watch.

Fast forward to 11 months into your year long extension. It was obvious you had made zero progress emptying your trailer and we didn't want you to get to the end of year and have us on your ass about an expired permit. You keep claiming we demanded you get rid of the trailer a month early. ***That was simply a courtesy to remind you that time was approaching when we would have to deal with it again!***

You say I was in your yard leaving a sign and told you I didn't know "what happened to your trailer". That is not what I said. I told you I didn't know who ***complained*** about your trailer. I didn't know then, and I don't know now. We were never given a name. But I do know that we gave you a year-long extension to keep it, you used up the year and we reminded you that you'd have to remove it. You

know what happened and I know what happened.  Did I make the motion to send you the letter?  Yes, I did.  And I would have done the same thing no matter who it was and no matter what they had painted on their trailer- I couldn't care less what the trailer looked like.  You made us a promise and we were not prepared to let that promise be broken.  Those are the rules and the only ones we are capable of enforcing are the ones that come in under our tenure.  You're being told by your neighbors and people who you think are friends that *you* have been picked on.  ***The truth is you've been treated just like everyone else that has brought in a storage container or a permit has expired since we took office!***

These people who are advising you are convincing you that the board of selectmen is only interested in taking care of their friends, that we treat newcomers differently.  ***THAT IS THE BIGGEST UNTRUTH THAT IS BEING TOLD!***

You are claiming I voted not to recommend Pritchard's article because "we need it to make the town pretty".  ***Once again, absolutely NOT what I said, and I have the audio to prove it!***  Frankly, I don't give a damn whether we have the storage container rule or not.  The voters decided to pass it long ago ***"to promote the general welfare by protecting the aesthetics of the town".***  That's verbatim from the zoning ordinance.  My comment was that if that's what the voters want, so be it.  My biggest problem with the proposed change is that it is not town wide.  Separating the rules by district will just add one more layer of confusion for the public.

In closing I wanted to send you this letter to set the record straight and remind you of what you agreed to.  This letter contains the truth and as with anyone who makes claims that are untrue in my presence, I will correct them with the truth.  I think that you should stick to what actually happened and not get personal because you are being instigated by others.  Being a selectman means a heavy work load for literally no compensation and at times includes tirades from people who, if they are honest with themselves, have no real justification.

Carl Anderson

298



**EXHIBIT**

**D**

[TOWN RFA]

| | |
|---|---|
| **From:** | Robert Fojo <rfojo@fojolaw.com> |
| **Sent:** | Wednesday, March 31, 2021 6:10 PM |
| **To:** | Robert J. Dietel |
| **Subject:** | McCoy/Pittsfield |
| **Attachments:** | 2021-03-31 Responses to RFA.pdf |

Rob:

See attached.  Thanks.

Robert M. Fojo
Principal



FOJO LAW

264 South River Road
Suite 464
Bedford, NH 03110
Direct/Fax: (603) 473-4694
Email: rfojo@fojolaw.com
facebook.com/FojoLawFirm
@RobertFojo

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

## Case No.: 1:20-cv-362-JL

JOSEPH McCOY,

      Plaintiff,

vs.

TOWN OF PITTSFIELD

      Defendant.

---

## PLAINTIFF JOSEPH McCOY's RESPONSES TO TOWN OF PITTSFIELD's FIRST SET OF REQUESTS FOR ADMISSIONS

Plaintiff Joseph McCoy responds to the Town of Pittsfield's Request for Admissions:

1.    On September 1, 2015 you were granted a storage container permit by the Town for the trailer described at paragraph 9 and 10 of your Complaint, which is the trailer that is subject of this litigation (the "Trailer").

    **RESPONSE:** Admitted.

2.    The 2015 Storage Container Permit states that "[a] storage container is permitted for storage purposes only, for a period of one year."

    **RESPONSE:** Admitted.

3.    **Exhibit A** to these Requests for Admissions is a genuine copy of the September 1, 2015 storage container permit approval that you received from the Town (the "2015 Permit").

    **RESPONSE:** Admitted.

4.  Between September 1, 2015 and January 29, 2016, the Trailer was painted with the words "TRUMP! USA".

    **RESPONSE:** Admitted.

5.  As of January 29, 2016, the Trailer was painted with the words "TRUMP! USA".

    **RESPONSE:** Admitted.

6.  **Exhibit B** to these Requests for Admissions is a genuine copy of a Facebook post that depicts the trailer as of January 29, 2016.

    **RESPONSE:** Admitted.

7.  The 2015 Permit expired on September 1, 2016.

    **RESPONSE:** Admitted.

8.  **Exhibit C** to these Requests for Admissions is a genuine copy of a Notice of Violation that you received following expiration of the 2015 Permit.

    **RESPONSE:** Admitted.

9.  **Exhibit D** to these Requests for Admissions is a genuine copy of a Facebook post that depicts the trailer as of September 11, 2016.

    **RESPONSE:** Admitted

10. On November 3, 2016, you wrote to the Town and requested a 6 month extension of the 2015 Permit.

    **RESPONSE:** Admitted.

11. **Exhibit E** to these Requests for Admissions is a genuine copy of a November 3, 2016 letter that you wrote requesting a six month extension of the 2015 Permit.

    **RESPONSE:** Admitted.

301

12.   In support of your November 2016 request for an extension, you represented that "I am asking for this 6 month extension in order to keep my tools and materials inside this trailer while I deal with this emergency construction situation in order to keep things out of the winter outside elements."

      **RESPONSE:** Admitted.

13.   Your November 3, 2016 request for an extension to allow the Trailer on your property was granted.

      **RESPONSE:** Denied. Under the revised ordinance, the 2015 permit could not have been extended; rather, it could only have been a zoning variance. The Board of Selectmen did not have the authority, however, to grant a zoning variance.

14.   At the time your November 3, 2016 request was granted, the trailer was painted with the words "TRUMP! USA".

      **RESPONSE:** Denied. Please see response to Request No. 13.

15.   In May 2017, you requested approval to maintain the Trailer on your property for an additional year.

      **RESPONSE:** Admitted.

16.   On June 13, 2017, you met with the Town's selectmen to discuss your request for an extension of the storage container permit.

      **RESPONSE:** Admitted.

17.   During the June 13, 2017 meeting with the Selectmen, you represented that the permit was needed so you could complete work to your home.

      **RESPONSE:** Admitted.

18.   During the June 13, 2017, were asked "if they have had the trailer for one year and now would like to have it there for another year and after that it will be gone?"

      **RESPONSE:** Admitted.

3

19.  In response to the above question, you represented that you "want to get rid of it but just need more time to the work needed on their home."

**RESPONSE:** Admitted.

20.  The Town granted your request by unanimous vote of the selectmen (4-0).

**RESPONSE:** Denied. See response to Request No. 13. Thus, any "permit" issued would be void because the Board of Selectmen did not have authority to issue a storage container permit on behalf of the Town of Pittsfield.

21.  **Exhibit F** to these Requests for Admissions is a genuine copy the portion of the June 13, 2017 minutes of the Town's Board of Selectmen meeting addressing your request for an extension of the storage container permit.

**RESPONSE:** Admitted.

22.  **Exhibit G** to these Requests for Admissions is a genuine copy of your June 2017 storage container permit (the "2017 Permit").

**RESPONSE:** Denied. See response to Request No. 20.

23.  The 2017 Permit was granted "for storage purposes only, for a period of one year"

**RESPONSE:** Denied. See response to Request No. 20.

24.  As of June 13, 2017, the Trailer was painted with the words "TRUMP! USA".

**RESPONSE:** Admitted.

25.  As of July 9, 2017, the Trailer no longer depicted, showed, or otherwise displayed the words "TRUMP! USA".

**RESPONSE:** Admitted in part; denied in part. The Trailer no longer depicted, showed, or otherwise displayed the character string "! USA." But it is not accurate that the Trailer no longer depicted, showed, or otherwise displayed the word "TRUMP." The back of the trailer showed the word "TRUMP" as shown in Exhibit D (of September 11, 2016). In addition, although the trailer did not show the *word* "USA," the trailer showed the USA flag occupying one-third of the 52-foot-long side of the trailer.

4

26. As of July 9, 2017, the Trailer was being painted with a scene depicting hot air balloons.

   **RESPONSE:** Admitted.

27. **Exhibit H** to these Requests for Admissions is a genuine copy of a Facebook post that depicts the Trailer as of July 9, 2017.

   **RESPONSE:** Admitted.

28. **Exhibit I** to these Requests for Admissions is a genuine copy of a Facebook post that depicts the Trailer as of July 30, 2017.

   **RESPONSE:** Admitted.

29. On May 22, 2018 the Town notified you that your 2017 Permit was set to expire in June 2018 and that to maintain the Trailer on your property you would need to remove it for a period of three months and then reapply.

   **RESPONSE:** Denied.

30. As of May 22, 2018, the Trailer did not depict the words "TRUMP! USA"

   **RESPONSE:** Admitted in part; denied in part. See response to Request No. 25.

31. **Exhibit J** to these Requests for Admissions is a genuine copy of a May 22, 2018 letter from the Town to you regarding the Trailer.

   **RESPONSE:** Admitted.

32. On May 29, 2018 you requested an extension of your storage container permit.

   **RESPONSE:** Admitted.

33. As of May 29, 2018, the Trailer had been on your property for more than two years and eight months.

   **RESPONSE:** Admitted.

5

34.    **Exhibit K** to these Requests for Admissions is a genuine copy of a May 29, 2018 letter
       you wrote to the Town.

       **RESPONSE:** Admitted.

35.    In support of your request for an extension in May 2018, you represented that you needed
       additional time to unload property you were storing in the Trailer.

       **RESPONSE:** Admitted.

36.    By letter dated June 13, 2018 you were notified by the Town's board of selectmen that
       your permit request was denied and that the Trailer had to be removed within 30 days.

       **RESPONSE:** Admitted.

37.    **Exhibit L** to these Requests for Admissions is a genuine copy of a June 13, 2018 letter
       from the Town informing you of the Town's decision with respect to your May 2018
       request for a storage container permit.

       **RESPONSE:** Admitted.

38.    You never applied for a sign permit for the Trailer.

       **RESPONSE:** Admitted.

39.    You have never requested approval from the Town to maintain a sign on your property at
       322 Catamount Road, Pittsfield, NH.

       **RESPONSE:** Admitted.

40.    You never applied for any form of approval or permit for the Trailer other than as a
       storage container.

       **RESPONSE:** Admitted.

6

41.    You did not appeal the Town's June 13, 2018 decision denying you a storage container permit.

**RESPONSE:** Denied.

42.    Between June 13, 2018 and the present, you have not applied for any permit to maintain the Trailer on your property.

**RESPONSE:** Admitted.

43.    You were in possession of the document provided at Exhibit A, and/or aware of its contents, prior to filing the Complaint in this action.

**RESPONSE:** Admitted.

44.    You made or were aware of the Facebook post provided at Exhibit B prior to filing the Complaint in this action.

**RESPONSE:** Admitted.

45.    You were in possession of the document provided at Exhibit C, and/or aware of its contents, prior to filing the Complaint in this action.

**RESPONSE:** Admitted.

46.    You made or were aware of the Facebook post provided at Exhibit D prior to filing the Complaint in this action.

**RESPONSE:** Admitted.

47.    You were in possession of the document provided at Exhibit E, and/or aware of its contents, prior to filing the Complaint in this action.

**RESPONSE:** Admitted.

48.    You were in possession of the document provided at Exhibit F, and/or aware of its contents, prior to filing the Complaint in this action.

**RESPONSE:** Admitted.

7

49. You were in possession of the document provided at Exhibit G, and/or aware of its contents, prior to filing the Complaint in this action.

    **RESPONSE:** Admitted.

50. You were aware of the Facebook post provided at Exhibit H, and/or aware of its contents, prior to filing the Complaint in this action.

    **RESPONSE:** Admitted.

51. You made or were aware of the Facebook post provided at Exhibit I, prior to filing the Complaint in this action.

    **RESPONSE:** Admitted.

52. You were in possession of the document provided at Exhibit J, and/or aware of its contents, prior to filing the Complaint in this action.

    **RESPONSE:** Admitted.

53. You were in possession of the document provided at Exhibit K, and/or aware of its contents, prior to filing the Complaint in this action.

    **RESPONSE:** Admitted.

54. You were in possession of the document provided at Exhibit L, and/or aware of its contents, prior to filing the Complaint in this action.

    **RESPONSE:** Admitted.

8

Respectfully submitted,

JOSEPH McCOY,

By His Attorneys,

FOJO LAW, P.L.L.C.

Dated: March 31, 2021                    _____/s/ Robert M. Fojo_____
                                         Robert M. Fojo (#19792)
                                         264 South River Road, Suite 464
                                         Bedford, NH 03110
                                         Direct: (603) 473-4694
                                         rfojo@fojolaw.com

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was emailed to Defendant's counsel

on March 31, 2020.

                                         _____/s/ Robert M. Fojo_____
                                         Robert M. Fojo

9

The above answers and information supplied herein are full, complete and accurate to the best of my knowledge, information and belief.

Dated: 3-12-2021

*Joseph McCoy*
Joseph McCoy

STATE OF New Hampshire

County of Merrimack

Signed and sworn to (or affirmed) before me on this 12ᵗʰ day of March, 2021 by Joseph McCoy, whose identity was determined by (check box that applies and complete blank line, if any):

☐ My personal knowledge of the identity of said person OR

☐ The oath or affirmation of a credible witness, _____ (name of witness), the witness being personally known to me OR

☑ The following identification documents: DL NHLI 3345 901 _____ (driver's license, passport, other).

Notary Public/Justice of the Peace

My Commission Expires: _____

COMMISSION
EXPIRES
October 17, 2023
2013
NEW HAMPSHIRE
NOTARY PUBLIC

10



EXHIBIT
A
[TOWN RFA]

# TOWN OF PITTSFIELD
# NEW HAMPSHIRE

## PERMIT
## FOR STORAGE CONTAINERS

(STORAGE CONTAINERS: Shall mean, any truck trailer, box trailer, school bus, mobile home or other similar facility used for storage or other purposes).

Storage Containers, whether registered or not, whether mobile or stationery, are not allowed on a permanent basis in any zoning district within the Town of Pittsfield. A storage container is permitted for storage purposes only, for a period of one year, with the approval of a parking permit issued by the Board of Selectmen or their designee, provided said storage container meets all setback requirements, and as limited by the following; a) maximum of one storage container per lot in the Urban, Suburban or Rural Districts, b) maximum of two storage containers per lot in the Light Industrial/Commercial Districts.

APPLICANTS NAME: _Joseph McCoy_

APPLICANTS ADDRESS: _322 Catamount Rd._

APPLICANTS TELEPHONE NUMBER: _603-435-5050_

LOCATION OF STORAGE UNIT: TAX MAP & LOT NUMBER: _R23-02-01_

ZONING DISTRICT: _RURAL_

SERIAL NUMBER OF STORAGE CONTAINER: _1H2V045 23 EB01980 1_

MAKE AND MANUFACTURER OF CONTAINER: _FP8-F2-45 FRUEHAUF_

SIGNATURE OF APPLICANT: _Joseph E McCoy_

DATE STORAGE USE IS TO BEGIN: _Sept. 1, 2015_

APPROVED: DATE: _9-1-15_

Board of Selectmen

Unit must be removed one year from the approved date above.

310





**Joseph Mccoy**
January 29, 2016 · 🌐

52 FEET OF TRUMP!!!   GET THE POINT!



👍 9                                    7 Comments  5 Shares

👍 Like              💬 Comment              ➤ Share



EXHIBIT

C

[TOWN RFA]



## Office of Code Enforcement

**TOWN OF PITTSFIELD**
**Town Hall, 85 Main Street**
**Pittsfield, New Hampshire**

### NOTICE OF VIOLATION

Dear Mr., Joseph Mc Coy

The property located at 322 Catamount Rd Pittsfield NH 03263, identified in the Town Tax Records as Map R23, Lot 02-01, and owned/occupied by you, your permit for a storage trailer has expired on September 1, 2016 and the trailers need to be removed according to our Zoning Ordinance article 14 section 3.

Your immediate attention to this matter is appreciated.

If you believe the Building Inspector is in error in the application or interpretation of any provision of the Building codes, you have the right to appeal to the Zoning Board of Appeals in a timely fashion. This stop work Order controls unless and until it is overturned by the Zoning Board of Appeals.

Thank you
Jesse Pacheco
Building Inspector

OFFICE 603-435-6774          FAX:603-435-7922          CELL:603-715-6624

312



[TOWN RFA]



**Joseph Mccoy**
September 11, 2016 · 🌐

•••

Let's get the vote started!



👍 8                                                          3 Comments

👍 Like                    💬 Comment                    ↪ Share

**Elaine Smith-page**
Go trump
Like · **Reply** · 4y

**Paula A Miller**
Hi. Do you have electric heaters? I need a lil one for my dragons room.
Like · **Reply** · 2y

    **Joseph Mccoy**
    sorry no, i slod all last month, but will keep an eye out...
    Like · **Reply** · 2y                    👍 1

    Write a reply...                    🙂 📷 GIF 🎴

Write a comment...                    🙂 📷 GIF 🎴

313

Nov. 3, 2016

To: Jesse Pacheco,

Hello,

I am writing in regards to seeking a 6 month extension for my trailer on my Property located at 322 Catamount Rd.

At the present, i have construction going on, my garage is leaking from the inside and it needs emergency work which will take me several months to fix. I am disabled with just one working leg, and have to take care of every thing my self, and this has already been started. I will remove one trailer by the end of November. The other i will be dealing with over the cold winter months and will have it emptied and removed by the end of April 2017.

I am asking for this 6 month extention inorder to keep my tools and materials inside this trailer while i deal with this emergency construction situation inorder to keep things out of the winter outside elements. It will be taken care of and i am sorry for the delay, but i am physcially handicapped, and will complete this task inorder to remain with good standards for this town and it's rules as a Pittsfield home owner.

Thank you For Your Time.
Sincerely,
Joseph McCoy

EXHIBIT
E
[TOWN RFA]

314



**EXHIBIT**

F

[TOWN RFA]



**TOWN OF PITTSFIELD**
**BOARD OF SELECTMEN**
**TOWN HALL, 85 MAIN STREET**
**PITTSFIELD, NH 03263**

**MEETING MINUTES OF Tuesday June 13, 2017**

**CALL TO ORDER**
Call to order at 6:06 p.m. by J.C. Allard, Chairman

**MEMBERS PRESENT**
J.C. Allard, Chairman
Gerard LeDuc, Vice-Chairman
Carole Richardson
Carl Anderson

**MEMBERS ABSENT**
None

**OTHERS PRESENT**
Cara Marston, Town Administrator
Ammy Ramsey, Recording Secretary

**PUBLIC INPUT** – regarding agenda items only

Dan Schroth would like to make an appointment with Cara to talk with her about putting together a petition article about getting rid of the Building Inspector position, Cara and Dan will meet tomorrow at 11 a.m.

**AGENDA REVIEW:**
Gerard: None.
Carole: None.
Carl: None.
J.C.: None.

**NEW BUSINESS**

**ACTION ITEMS**
1. Interviews for vacant position on Board of Selectmen – 4 candidates
J.C. informed the public that the first item under new business is to conduct interviews and it may take some time to get through the process. Due to circumstances out of anyone's control this board finds itself with the requirement of standing in for the voters of Pittsfield to choose another member for the selectboard. We are going to do that item of great

315

8. Storage Container Permit extension concern – 322 Catamount Road (tabled 5/23/17)
Mr. McCoy stated that they originally got the permit in 2015, he went to Jesse to get an extension because they have found out their deck, and porch is rotted. They are requesting an extension because he is doing the work himself and is handicapped and it is taking them more time then expected to do all the repairs needed. So he is asking the board to grant a one year extension. J.C. asked if there was an issue with extending the permit. Cara stated that our Zoning Ordinance states it shall not be no more than 12 months.  J.C. asked if this should go to the Zoning Board.  Carl asked why this matter is in front of them.  Cara explained that the selectboard are the administrators of the ordinance. Cara also expressed to the board that Mr. McCoy is here trying to do the right thing and if you look around town there are storage trailers on properties that may not have a permit. Mr. McCoy stated that Jesse collected $25.00 cash from him for the permit but later found out the there is no permit. Jesse also stated to him that they have no choice and must get rid of the trailer, when there are multiple trailers all over town that have been there for a long time. Carole asked if they have had the trailer for one year and now would like to have it there for another year and after that it will be gone. Mr. McCoy stated that they want to get rid of it but just need more time to do the work needed on their home.

Carole: I make a motion to extend the permit for one year.
Gerard: Second.
Discussion: None.
Motion carries 4-0

Cara will print out another permit and have everyone sign it.

**CHECK MANIFESTS**
1. Accounts Payable
Gerard: I make a motion to approve Accounts Payable.
Carl: Second.
Discussion: None.
Motion carries 4-0

2. Payroll
Gerard: I make a motion to approve Payroll and Direct Deposit.
Carl: Second.
Discussion: None.
Motion carries 4-0

**MINUTES**
1. May 23, 2017 – Public Meeting Minutes
Gerard: I make a motion to approve the May 23, 2017 Public Meeting Minutes.
Carl: Second.
Discussion: Carole has a few grammatical corrections and will give those to Ammy.
Motion carries 4-0

316

Motion carries 4-0 roll call was done and all approved.

The Board came out of non-public session at 9:09 p.m.

Gerard: I make a motion to seal the non-public minutes as they may affect adversely the reputation of any person other than a member of this board.
Carl: Second.
Discussion: None.
Motion carries 4-0 roll call (2/3 vote) was done and all approved.

Gerard: I make a motion to adjourn.
Carl: Second.
Discussion: None.
Motion carries 4-0

Approved:

J.C. Allard, Chairman                    Date

*copy - for your records*



**EXHIBIT**

**G**

[TOWN RFA]

# TOWN OF PITTSFIELD
# NEW HAMPSHIRE

## PERMIT
## FOR STORAGE CONTAINERS

(STORAGE CONTAINERS: Shall mean, any truck trailer, box trailer, school bus, mobile home or other similar facility used for storage or other purposes).

Storage Containers, whether registered or not, whether mobile or stationery, are not allowed on a permanent basis in any zoning district within the Town of Pittsfield. A storage container is permitted for storage purposes only, for a period of one year, with the approval of a parking permit issued by the Board of Selectmen or their designee, provided said storage container meets all setback requirements, and as limited by the following; a) maximum of one storage container per lot in the Urban, Suburban or Rural Districts, b) maximum of two storage containers per lot in the Light Industrial/Commercial Districts.

APPLICANTS NAME: Joseph McCoy

APPLICANTS ADDRESS: 322 Catamount Rd.

APPLICANTS TELEPHONE NUMBER: (603) 435-5050

LOCATION OF STORAGE UNIT: TAX MAP & LOT NUMBER: R23-2-1

ZONING DISTRICT: Rural

SERIAL NUMBER OF STORAGE CONTAINER: JH2V045238B01901

MAKE AND MANUFACTURER OF CONTAINER: FPS-5245 - FR VALHAVT

SIGNATURE OF APPLICANT: Joseph McCoy

DATE STORAGE USE IS TO BEGIN: 6-13-2017

APPROVED DATE: June 13, 2017

Board of Selectmen

Unit must be removed one year from the approved date above

318



**EXHIBIT**

H

[TOWN RFA]



**Brian Bales**
July 9, 2017 · 🌐

• • •

Not done yet but progress ain't always pretty



👍❤️ 23                                6 Comments  2 Shares

👍 Like              💬 Comment              ↪ Share

View 5 more comments

**Erin Russell**
Great job **Brian Bales** 👍 1
Like · Reply · 3y · Edited

Write a comment...

319



[TOWN RFA]



**Joseph Mccoy**
July 30, 2017 · 🌐

• • •



**Brian Bales**
July 30, 2017 · 🌐

👍 2

👍 Like          💬 Comment          ↪ Share

Write a comment...

320





# TOWN OF PITTSFIELD

Office of Selectmen
85 Main Street, Pittsfield NH 03263
admin@pittsfieldnh.gov ~ telephone (603) 435-6773 ~ fax (603) 435-7922

May 22, 2018

Joseph E. McCoy
322 Catamount Road
Pittsfield, NH 03263

Re: storage container permit expiration

Dear Mr. McCoy,

As you know, the storage trailer permit that the Board of Selectmen approved two years ago and extended at your request last June is due to expire next month.

Please consider this letter a friendly reminder that the trailer must be removed from the property for at least a three month period before you can apply for another permit to bring it back.

Thank you in advance for your anticipated cooperation.

Sincerely,

Pittsfield Board of Selectmen





EXHIBIT

K

[TOWN RFA]

May 29, 2018

Dear Board Members,

This concerns a storage trailer located on my property at 322 Catamount Rd. Pittsfield

Last june, 2017, i came to your meeting, i had 2 trailers to unload and remove, as requested. I've emptied and removed 1 so far and it's not an easy task. I am disabled with 1 working leg to move on and now that the weather has changed i am in the process of unloading the second.

This will take more time, when i bought my home in pittsfield i had a huge ammount of belongings which came with me so i am asking for another permit inorder to accomplish this huge task.

I am crippled so it cannot
be done easily.
        Please let me know,
or, set aside a time to discuss
this further at your next meeting.

            Thank you

            Joseph M'Loy

        322 Catamount Rd.
        P.O. Box 293
        Pittsfield. N.N. 03263



# TOWN OF PITTSFIELD

 

Office of Selectmen
85 Main Street, Pittsfield NH 03263
admin@pittsfieldnh.gov ~ telephone (603) 435-6773 ~ fax (603) 435-7922

June 13, 2018

Joseph E. McCoy
322 Catamount Road
Pittsfield, NH 03263

*S/Container removed*

*no further violation*

Re: storage container permit expiration

Dear Mr. McCoy,

The Board of Selectmen considered your permit extension request dated May 29, 2018. While they note the personal circumstances that have caused delay, the Board has to balance the terms of the zoning ordinance with your request, and as you have already been granted a year's extension beyond the 12 months permitted, they voted to not grant this second extension.

The Board has granted an additional thirty (30) days from the date of this letter to remove the storage container from your property.

Sincerely,

*Cara M. Hayes*

Cara M. Hayes
Town Administrator

324



**EXHIBIT**
**E**
[P. INITIAL DISC.]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

### Case No.: 1:20-cv-00362-JL

JOSEPH McCOY,

      Plaintiff,

vs.

TOWN OF PITTSFIELD

      Defendant.

_____

### PLAINTIFF'S INITIAL DISCLOSURE

Plaintiff Joseph McCoy provides the following initial disclosure pursuant to Federal Rule

of Civil Procedure 26(a).

**1.**     **Individuals Likely to Have Discoverable Information (Fed. R. Civ. P. 26(a)(1)(A)(i))**

The following individuals likely have discoverable information Mr. McCoy may use to

support his claims:

> **James C. Allard**
> c/o Town of Pittsfield
> 85 Main Street
> Pittsfield, New Hampshire 03263

Mr. Allard likely has information concerning the trailer at issue in the Complaint, and the

Town's actions and decisions concerning it.

> **Carl Anderson**
> c/o Town of Pittsfield
> 85 Main Street
> Pittsfield, New Hampshire 03263

Mr. Anderson likely has information concerning the trailer at issue in the Complaint, and

the Town's actions and decisions concerning it.

- 1 -

325

**Brian Bales**
222 Catamount Road
Pittsfield, New Hampshire 03263

Mr. Bales likely has information concerning the trailer at issue in the Complaint.

**Carole Dodge**
c/o Town of Pittsfield
85 Main Street
Pittsfield, New Hampshire 03263

Ms. Dodge likely has information concerning the trailer at issue in the Complaint, and the

Town's actions and decisions concerning it.

**Adam Gauthier**
c/o Town of Pittsfield
85 Main Street
Pittsfield, New Hampshire 03263

Ms. Gauthier likely has information concerning the trailer at issue in the Complaint, and

the Town's actions and decisions concerning it.

**Cara Marston**
c/o Town of Pittsfield
85 Main Street
Pittsfield, New Hampshire 03263

Ms. Marston likely has information concerning the trailer at issue in the Complaint, and

the Town's actions and decisions concerning it.

**Larry Konopka**
c/o Town of Pittsfield
85 Main Street
Pittsfield, New Hampshire 03263

Mr. Konopka likely has information concerning the trailer at issue in the Complaint, and

the Town's actions and decisions concerning it.

326

**Joseph McCoy**
322 Catamount Road
Pittsfield, New Hampshire 03263

Mr. McCoy likely has information concerning the trailer at issue in the Complaint, the

Town's actions and decisions concerning it, and damages resulting from the Town's decisions

and the trailer's removal.

**Linda McCoy**
322 Catamount Road
Pittsfield, New Hampshire 03263

Ms. McCoy likely has information concerning the trailer at issue in the Complaint, the

Town's actions and decisions concerning it, and damages resulting from the Town's decisions

and the trailer's removal.

**Paul Nickerson**
12 Norris Road
Pittsfield, New Hampshire 03263

Mr. Nickerson likely has information concerning the trailer at issue in the Complaint, and

the Town's actions and decisions concerning it.

**Jesse Pacheco**
c/o Town of Pittsfield
85 Main Street
Pittsfield, New Hampshire 03263

Mr. Pacheco likely has information concerning the trailer at issue in the Complaint, and

the Town's actions and decisions concerning it.

**James Pritchard**
c/o Town of Pittsfield
85 Main Street
Pittsfield, New Hampshire 03263

Mr. Pritchard likely has information concerning the trailer at issue in the Complaint, and

the Town's actions and decisions concerning it.

**Matt St. George**
c/o Town of Pittsfield
85 Main Street
Pittsfield, New Hampshire 03263

Mr. St. George likely has information concerning the trailer at issue in the Complaint,

and the Town's actions and decisions concerning it.

**Bonnie Theriault**
c/o Town of Pittsfield
85 Main Street
Pittsfield, New Hampshire 03263

Ms. Theriault likely has information concerning the trailer at issue in the Complaint, and

the Town's actions and decisions concerning it.

**Clayton Woods**
c/o Town of Pittsfield
85 Main Street
Pittsfield, New Hampshire 03263

Mr. Woods likely has information concerning the trailer at issue in the Complaint, and

the Town's actions and decisions concerning it.

2.     **Documents (Fed. R. Civ. P. 26(a)(1)(A)(ii))**

Mr. McCoy has the following documents in his possession, custody, or control and may

use them to support his claims:

- September 1, 2015 Permit for Storage Containers;

- Notice of Violation (no date, approx. late 2016);

- October 31, 2016 Email from Jesse Pacheco to Cara Marston;

- November 15, 2016 Town Board of Selectmen Meeting Agenda;

- May 23, 2017 Town Board of Selectmen Meeting Agenda;

- May 23, 2017 Town Board of Selectmen Meeting Minutes;

- June 13, 2017 Permit for Storage Containers;

- 4 -

- May 8, 2018 Town Board of Selectmen Meeting Minutes;

- May 22, 2018 Letter from Town;

- June 12, 2018 Town Board of Selectmen Meeting Agenda;

- June 12, 2018 Town Board of Selectmen Meeting Minutes;

- January 11, 2020 letter from Mr. Anderson to Mr. McCoy;

- Photographs of the trailer.

**3.      Computation of Damages (Fed. R. Civ. P. 26(a)(1)(A)(iii))**

Mr. McCoy has suffered $16,600 in damages in connection with the acquisition and removal of his trailer (and its contents), an amount still to be determined in connection with his emotional distress, and an amount to be determined later in connection with the violation of his Constitutional rights.

**4.      Insurance (Fed. R. Civ. P. 26(a)(1)(A)(iv))**

Not applicable.


Mr. McCoy reserves the right to revise and/or supplement this Initial Disclosure as the case progresses and more information becomes available.

- 5 -

329

Respectfully submitted,

JOSEPH McCOY,

By Their Attorneys,

FOJO LAW, P.L.L.C.

Dated:  August 11, 2020                        _____/s/Robert M. Fojo_____
                                               Robert M. Fojo, Esq. (#19792)
                                               264 South River Road, Suite 464
                                               Bedford, NH 03110
                                               (603) 473-4694
                                               rfojo@FojoLaw.com


## CERTIFICATE OF SERVICE

I certify that the foregoing was transmitted on this date, via email, to Defendant's counsel.


Dated:  August 11, 2020                _____/s/Robert M. Fojo_____
                                       Robert M. Fojo

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE



| | |
|---|---|
| JOSEPH McCOY | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | )        Civil Action No.:1:20-cv-00362-JL |
| | ) |
| TOWN OF PITTSFIELD | ) |
| | ) |
| Defendant | ) |

### AFFIDAVIT OF ROBERT J. DIETEL

I, Robert J. Dietel, with personal knowledge, on oath depose and say as follows:

1.      I am counsel for the Town of Pittsfield, New Hampshire in the above captioned matter.

2.      On December 24, 2020, I served Requests for Admission on Plaintiff's counsel.

3.      Per Fed. R. Civ. P. 36(a)(3) responses to the Requests were due on January 23, 2021.

4.      On January 25, 2021, I emailed Plaintiff's counsel and inquired as to the status of Plaintiff's responses, which had not been provided. In response, Plaintiff's counsel requested an extension to Friday, January 29, 2021, which was granted. However, no responses or objections were provided within the extended time period.

5.      Ultimately, responses to the Town's Requests for Admission were provided on March 31, 2021 (97 days after service). The responses include denials to several of the requests. However, Plaintiffs has filed no motion to amend or withdraw the admission of those requests, which occurred by operation of Fed. R. Civ. P. 36(a)(3) on January 29, 2021.

6.      Additionally, on April 12, 2021, Defendant propounded Interrogatories and Requests for Production on Plaintiff. Per the discovery plan, response were due on May 27, 2021. No responses have been received.

331

7.    On May 29, 2021, I inquired of Plaintiff's counsel regarding the status of his client's

responses to Defendant's discovery requests. A reply was received on the afternoon of June 1,

2021 indicating that some production will be forthcoming, but has not yet been produced.

Affiant sayeth further not.

_6/1/21_

Date

Robert J. Dietel

STATE OF NEW HAMPSHIRE
COUNTY OF

Before me, the undersigned officer, personally appeared the said Robert Dietel, known to
me or satisfactorily proven to be the person whose name is subscribed to the within instrument,
and acknowledged that he executed the same for the purposes therein contained and did state
under oath the within facts are true to the beset of his knowledge and belief.

Printed Name: _Elizabeth A LaClar_
Notary Public
My Commission Expires: _8/23/22_

2

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

**EXHIBIT**

**B**

[MARSTON AFF.]

JOSEPH McCOY                    )
                               )
Plaintiff                      )
                               )
v.                             )          Civil Action No.:1:20-cv-00362-JL
                               )
TOWN OF PITTSFIELD             )
                               )
Defendant                      )

## AFFIDAVIT OF CARA MARSTON

I, Cara Marston, with personal knowledge, on oath depose and say as follows:

1.      I am a resident of the Town of Pittsfield, and I have been employed by the Town for

more than twenty years.

2.      I have been the Town Administrator for the Town since December 2015.

3.      Subject to the Board of Selectmen's delegation and direction, my responsibilities as

Town Administrator include assisting the Board in the performance of its duties as the Zoning

Administrator of the Town's zoning ordinance, and overseeing and communicating with Town

staff regarding administration of the zoning ordinance.

4.      A true and accurate copy of excerpts of the Town's zoning ordinance are attached hereto

as Exhibit 1. A complete copy of the Town's zoning ordinance is available at:

https://www.pittsfieldnh.gov/sites/g/files/vyhlif3681/f/pages/zoning_ordinance_2021_2.pdf

5.      I am aware of the allegations raised by Joseph McCoy in the above captioned suit, and I

have personal knowledge regarding the Town's actions with respect to the granting of storage

container permits to Mr. McCoy in 2015, 2016, 2017, and the Board's decision to deny a 2018

permit request from Mr. McCoy. I also have personal knowledge regarding the Town's

333

permitting and enforcement efforts with respect to other storage containers in the Town during the period between 2015 and the present.

6.      In 2015, Mr. McCoy applied for and received a storage container permit, which was approved effective September 1, 2015 (the "2015 Permit"). A true and accurate copy of the 2015 Permit is attached hereto as Exhibit 2.

7.      Per the Town's zoning ordinance, storage container permits may be granted for a one year period for storage purposes only. *See* Exhibit 1 at Article 14.

8.      The 2015 Permit informed Mr. McCoy that his storage container could be used for storage purposes only and must be removed one year from the approved date (i.e., September 1, 2016).

9.      As of September 1, 2016, Mr. McCoy had not removed his storage container. In addition, he was maintaining an additional unpermitted storage container on his property. Accordingly, the Town's building inspector issued a Notice of Violation to Mr. McCoy. The notice informed Mr. McCoy that his 2015 Permit had expired, that his storage containers needed to be removed, but that he had a right to appeal to the Town's Zoning Board of Adjustment. A true and accurate copy of the Notice of Violation is attached hereto as Exhibit 3.

10.     On November 3, 2016, Mr. McCoy wrote to the building inspector and requested an extension of his 2015 Permit, and he represented that he needed the storage container for storage purposes only. A true and accurate copy of Mr. McCoy's November 3, 2016 letter is attached hereto as Exhibit 4.

11.     On November 15, 2016, the Board unanimously voted to approve the six month extension. The motion to approve was made by Selectman Carl Anderson.

12.     In May 2017, Mr. McCoy requested a meeting with the Town's Board of Selectmen ("Board") regarding his storage container. This request followed a visit to Mr. McCoy's property from the Town's building inspector. A true and accurate copy of an email documenting Mr. McCoy's request is attached hereto as Exhibit 5.

13.     On May 23, 2017, the Board began deliberations regarding Mr. McCoy's extension request and discussed enforcement of the storage container ordinance generally. The Board's deliberations were tabled so that the Board could meet with Mr. McCoy. A true and accurate copy of the minutes of the May 23, 2017 meeting with the Board are attached hereto as Exhibit 15.

14.     On June 13, 2017, the Board met with Mr. McCoy to consider his request for another extension of his storage container permit. During the meeting, Mr. McCoy represented that he needed the storage container for storage purposes related to work he was performing on his deck and due to a disability. There was no discussion or mention during the meeting of the storage container being used to display any speech or other expressive content. A true and accurate copy of the minutes of the June 13, 2017 meeting with the Board is attached hereto as Exhibit 6.

15.     During the June 13th meeting, I advised the Board that the zoning ordinance states that a storage container permit "shall not [sic] be no more than 12 months." The Board approved Mr. McCoy's request by a unanimous vote despite the 12 month limitation and the fact that the storage container had been on Mr. McCoy's property since sometime in 2014. A true and accurate copy of the 2017 permit is attached hereto as Exhibit 7.

16.     As Zoning Administrator, the Board or its designee(s) are vested with approving or denying permits for storage containers and individuals aggrieved by such decisions may appeal to the Town's Zoning Board of Adjustment. *See* Exhibit 1 at pages 6-7, 39.

3

17.     Per the Town's zoning ordinance, signs may be permitted under Article 9 upon application by a Town resident. *See* Exhibit 1 at Article 9. Mr. McCoy never requested or otherwise applied for a sign permit from the Town, and never represented or communicated to the Town any desire or intent to use his storage container as a sign.

18.     On May 22, 2018, the Board wrote to Mr. McCoy and reminded him that his 2017 permit was set to expire in the following month and that his storage container would need to be removed. A true and accurate copy of the Board's May 2018 correspondence is attached hereto as Exhibit 8.

19.     On May 29, 2018, Mr. McCoy wrote to the Board and requested a third permit extension. A true and accurate copy of Mr. McCoy's correspondence is attached hereto as Exhibit 9.

20.     On June 12, 2018, the Board considered Mr. McCoy's request for a third extension, and denied it by unanimous vote. The Board discussed Mr. McCoy's permit history and his prior representations to the Board. There was no discussion regarding the use of the storage container for any expressive purposes, nor any mention of use as a Trump sign in 2016 and 2017. A true and accurate copy of the minutes of the June 2018 meeting are attached as Exhibit 10.

21.     During the Board's June 12, 2018, the Board also took up and considered complaints regarding three other unpermitted storage containers in Town, located at 140 Tilton Hill Road, (the "Tilton Hill Trailers") and agreed to send a Notice of Violation to the owners of the storage containers. *See* Exhibit 10 at page 7 ("Notice of Zoning Violation update").

22.     On June 13, 2018, the Board sent a notice of violation to the owners of the Tilton Hill Trailers. A true and accurate copy of the notice of violation is attached as Exhibit 11. In response, the owners of the Tilton Hill Trailers applied for and received a permit for one of their

4

336

three storage containers. The other two trailers were removed. The Tilton Hill Trailers did not display any expressive content to the Town's knowledge.

23.     On June 13, 2018, I wrote to Mr. McCoy and informed him of the Board's decision, and noted the Board's reasons. A true and accurate copy of my correspondence is attached as Exhibit 12.

24.     Mr. McCoy did not appeal the Board's denial of his third permit request.

25.     The Town, in the ordinary course, sometimes receives anonymous complaints regarding storage containers and other alleged zoning violations. The Town had received an anonymous complaint regarding Mr. McCoy's trailer sometime in 2016, which was not recorded, and received a similar anonymous complaint regarding the Tilton Hill Trailers in 2018.

26.     During my tenure as Town Administrator, the Town has engaged in enforcement with respect to storage containers in instances when it has become aware of potential violations, and without regard to whether a storage container has been used for expressive purposes or not. For example, with respect to Mr. McCoy, the Town learned of an unpermitted trailer on his property in 2015 and subsequently required that he seek and obtain a permit.

27.     Ultimately, the Town did not impose any penalties or take any other enforcement actions against Mr. McCoy other than to confirm that his storage container was removed following the Board's June 2018 decision.

28.     Mr. McCoy's storage containers were known to the Town based on visual inspection of the Town's building inspector, permit applications and correspondence received from Mr. McCoy, and public testimony from Mr. McCoy. Accordingly, the Town was aware that Mr. McCoy had trailers on his property that were not grandfathered and that he needed to comply with Article 14 of the Zoning Ordinance.

29.     The Town has limited resources to dedicate toward enforcement of the storage container provisions of the zoning ordinance. It has, however, taken action against others in Town with respect to unpermitted storage containers, which were not used for expressive purposes. For example:

   A.  In June 2018, the Town took action with respect to the Tilton Hill Trailers as noted previously.

   B.  In 2019, the Town brought suit to enforce Article 14 in *Town of Pittsfield v. James Hetu, et al*, Case No. 217-2019-cv-00663, Merrimack Superior Court. This action arose following lengthy efforts to obtain compliance. A true and accurate copy of correspondence with respect to the Town's enforcement efforts is attached as Exhibit 13.

   C.  In the summer of 2019, the Town became aware of an unpermitted storage container at 11 Cram Avenue, issued a notice of violation, and subsequently received and approved a permit application. A true and accurate copy of the notice of violation is attached as Exhibit 14. The Town's treatment with respect to the storage container at 11 Cram Avenue is consistent with the manner in which Mr. McCoy's 2015 Permit application was received and approved.

30.     Based on my review of Mr. McCoy's permit history, and the Town's enforcement actions with respect to other properties, the following is apparent:

   a.  Mr. McCoy's storage container was allowed to remain on his property far beyond the 12 month limit of the zoning ordinance, which is in excess of the time period allowed to other storage containers;

6

338

b. The Town did not require Mr. McCoy to remove the storage container until 2018 (when it was no longer painted "Trump" on the side); and

c. The Board's actions with respect to Mr. McCoy's storage container were consistent with the treatment of other storage containers in the Town that were made known to the Board as needing permit approvals, and which did not feature any signs or other expressive content.

Affiant sayeth further not.

_6/4/2021_
Date

_Cara Marston_
Cara Marston

STATE OF NEW HAMPSHIRE
COUNTY OF

Before me, the undersigned officer, personally appeared the said Cara Marston, known to me or satisfactorily proven to be the person whose name is subscribed to the within instrument, and acknowledged that she executed the same for the purposes therein contained and did state under oath the within facts are true to the beset of her knowledge and belief.

_Rhonda E. Davignon_

Printed Name: Rhonda E. Davignon
Notary Public
My Commission Expires: _12/2/25_

RHONDA E. DAVIGNON
MY COMMISSION
EXPIRES
DEC. 2, 2025
NOTARY PUBLIC
NEW HAMPSHIRE

8





EXHIBIT

MARSTON AFF.
EXHIBIT 1
_____

# Town of Pittsfield
# Zoning Ordinance

Adopted March 8, 1988

Most recently amended March 9, 2021

# Article 1.  General Provisions

### 1. Title
This zoning ordinance shall be known as the "Town of Pittsfield Zoning Ordinance" and is herein called the "zoning ordinance" or just the "ordinance" where "ordinance" clearly means the zoning ordinance.

### 2. Authority
The town meeting's authority to adopt the zoning ordinance is New Hampshire Revised Statutes Annotated RSA 674:16, Grant of Power; other enabling statutes in NH RSA; and enabling case law.

### 3. Applicability
No person may use or authorize the use of any land or STRUCTURE except according to all applicable regulations of the zoning ordinance.

### 4. Jurisdiction
The zoning ordinance shall be effective within the corporate boundaries of the town of Pittsfield, New Hampshire.

### 5. Purpose
Pursuant to RSA 674:17 and RSA 674:21, VI, (a), the zoning ordinance is designed for the following purposes:

(a)   To lessen congestion in the STREETS.

(b)   To secure safety from fires, panic and other dangers.

(c)   To promote health and the general welfare.

(d)   To provide adequate light and air.

(e)   To prevent the overcrowding of land.

(f)   To avoid undue concentration of population.

(g)   To facilitate the adequate provision of transportation, solid waste facilities, water, sewerage, SCHOOLS, parks, child day care.

(h)   To assure proper use of natural resources and other public requirements.

(i)   To encourage the preservation of agricultural lands and BUILDINGS and the agricultural operations described in RSA 21:34-a supporting the agricultural lands and BUILDINGS.

(j)   To encourage the installation and use of solar, wind, or other renewable energy systems and protect access to energy sources by the regulation of orientation of STREETS, LOTS, and BUILDINGS; establishment of maximum BUILDING height, minimum SETBACK requirements, and limitations on type, height, and placement of vegetation; and encouragement of the use of solar skyspace easements under RSA 477.

(k)   To have reasonable consideration for the character of the area involved and its peculiar suitability for particular uses, to conserve the value of BUILDINGS, and to encourage the most appropriate use of land throughout the municipality.  (RSA 674:17, II.)

(l)   To accommodate reasonably amateur radio communications.  (RSA 674:17, III.)

(m)  To encourage the preservation of OPEN SPACE wherever possible.  (See RSA 674:21, VI, (a).)

### 6. Administrator

(a) The board of selectmen shall have charge of administering and enforcing the zoning ordinance except as follows:

  (1) If the zoning ordinance explicitly designates a specific administrator for a specified part of the zoning ordinance, then that administrator shall administer that part of the zoning ordinance.

  (2) The board of selectmen's charge to administer and enforce the zoning ordinance shall not interfere with any state or federal law empowering a specific administrator, for example, RSA 676:13, I, (building inspector); RSA 155-A:4, II, and RSA 155-A:7, I, (fire chief); and RSA 676:5, III, (planning board).

(b) The board of selectmen may authorize an agent to administer and enforce the zoning ordinance on the board's behalf and may revoke that authorization at any time. Such an authorization or revocation shall be effective if and only if the board's minutes record the board's vote to authorize or revoke.

### 7. Conflicting Provisions; Relationship to Other Ordinance or Regulation

Wherever provisions of the zoning ordinance conflict, or wherever a provision of the zoning ordinance conflicts with a provision of another ordinance or regulation, the provision that imposes the greater restriction or higher standard shall control. (RSA 676:14.)

### 8. Separability

The invalidity of any provision of the zoning ordinance shall not affect the validity of any other provision.

### 9. Penalty Clause

Any person who violates any of the provisions of this zoning ordinance, or any provision or specification of any application, plat, or plan approved by, or any requirement or condition of a permit or decision issued by, any local administrator or land use board acting under the authority of this zoning ordinance shall be guilty of a misdemeanor if a natural person, or guilty of a felony if any other person; and shall be subject to a civil penalty of $275 for the first offense, and $550 for subsequent offenses, for each day that such violation is found to continue after the conviction date or after the date on which the violator receives written notice from the municipality that the violator is in violation, whichever is earlier. Each day that a violation continues shall be a separate offense. (RSA 676:17, I; also see RSA 676:15 through RSA 676:18, Penalties and Remedies.)

### 10. Mobile Home, Mobile Home Park and Trailer Park Ordinance Repealed

The adoption of the zoning ordinance shall repeal the Mobile Home, Mobile Home Park and Trailer Park Ordinance for the Town of Pittsfield as heretofore amended.

### 11. Amendment

The zoning ordinance may be amended as provided in RSA chapter 675.

### 12. Effective Date

The zoning ordinance shall take effect immediately upon its passage.

## Article 2.  Interpretation Rules and Definitions

### 1.  Word or Phrase Interpretation Rules

(a) All words and phrases of the zoning ordinance shall be interpreted according to this section.

(b) In this section, "headword" means a word or phrase spelled in all capital letters and placed at the beginning of a definition in article 2, section 3, Definitions.

(c) If the zoning ordinance explicitly says that a word or phrase has a specific meaning to be used in a specified part of the zoning ordinance, then the word or phrase has that specific meaning throughout the specified part.

(d) If a word or phrase is a headword in article 2, section 3, Definitions, then the word or phrase has the meaning stated for it as a headword in article 2, section 3, except as provided in paragraph (c) of this section.

(e) If a word or phrase is not a headword in article 2, section 3, Definitions, then the word or phrase has the meaning stated for it in *Webster's Third New International Dictionary of the English Language, Unabridged*, Merriam-Webster, except as provided in paragraph (c) of this section.

### 2.  All-Capital-Letters Spelling of Defined Words and Phrases

All-capital-letters spelling is used to indicate that a word or phrase has the meaning stated for it as a headword in article 2, section 3, Definitions.

In this section, "headword" means a headword as defined in article 2, section 1, (b).

### 3.  Definitions

**ABUTTER:**
(a) In this definition of "ABUTTER," "street" means a street as defined in RSA 672:13.

(b) "ABUTTER" means any person whose property is located in New Hampshire and adjoins or is directly across the street or stream from the land under consideration by the local land use board. For purposes of receiving testimony only, and not for purposes of notification, the term "ABUTTER" shall include any person who is able to demonstrate that his land will be directly affected by the proposal under consideration. For purposes of receipt of notification by a municipality of a local land use board hearing, in the case of an abutting property being under a CONDOMINIUM or other collective form of ownership, the term "ABUTTER" means the officers of the collective or association, as defined in RSA 356-B:3, XXIII. For purposes of receipt of notification by a municipality of a local land use board hearing, in the case of an abutting property being under a MANUFACTURED HOUSING PARK form of ownership as defined in RSA 205-A:1, II, the term "ABUTTER" includes the MANUFACTURED HOUSING PARK owner and the tenants who own MANUFACTURED HOUSING which adjoins or is directly across the street or stream from the land under consideration by the local land use board.  (See RSA 672:3, Abutter.)

344

**SPECIAL EXCEPTION:** "SPECIAL EXCEPTION" has two meanings as stated in subparagraphs (a) and (b), and the context determines which meaning applies.

(a) "SPECIAL EXCEPTION" means a use permitted upon (1) certain conditions set forth in the zoning ordinance and (2) an approving authority's decision that the use satisfies those conditions.

(b) "SPECIAL EXCEPTION" means the approving authority's decision that the use defined in subparagraph (a) satisfies the conditions set forth in the zoning ordinance.

(c) In subparagraphs (a) and (b), "zoning ordinance" means the zoning ordinance excluding article 5, section 3, I, (b); article 5, section 3, V; article 5, section 4, Equitable Waiver of Dimensional Requirement; article 7, Variances; and article 17, section 12, Appeals and Variances. These parts of the zoning ordinance state and are limited to New Hampshire state or United States federal requirements for a VARIANCE under RSA 674:33, I, (b); RSA 674:33, V; or article 17, section 12, Appeals and Variances, or for an equitable waiver of a dimensional requirement under RSA 674:33-a.

(RSA 674:33, IV; also see article 6 for SPECIAL EXCEPTION regulations.)

**STABLE:** "STABLE" means a place that houses one or more horses except that "STABLE" excludes any residence that has three or fewer horses as pets.

**STORAGE CONTAINER:** "STORAGE CONTAINER" means a truck trailer, box trailer, school bus, MANUFACTURED HOUSING unit, or similar mobile container parked continuously for 31 days or more and used principally for storage and not used for any person's residential occupancy or transient lodging. (See article 14 for STORAGE CONTAINER permitting conditions.)

**STORY:**

(a) In this definition of "STORY," the words "attic" and "basement" have the following meanings:

(1) "Attic" means that part of a BUILDING such that the roof frame meets the floor on opposite sides of the part of the BUILDING.

(2) "Basement" means that part of a BUILDING such that more than one-half of the part the BUILDING vertically is below the average grade of the ground adjoining the BUILDING.

(b) "STORY" means that part of a BUILDING contained between any floor and the floor or roof next above the part of the BUILDING except that "STORY" excludes attics and basements.

**STREET:** "STREET" means either

(a) a highway as defined in RSA 229:1 or

(b) a road dedicated to the public use but not accepted by the city or town in which the road is located.

**STRUCTURE:** "STRUCTURE" means something constructed or built that has a fixed location on or in the ground or that is permanently attached to something that has a fixed location on or in the ground.

**STRUCTURE, ACCESSORY:** See ACCESSORY STRUCTURE.

**STRUCTURE, NONCONFORMING:** See NONCONFORMING STRUCTURE.

**STRUCTURE, PRINCIPAL:** See PRINCIPAL STRUCTURE.

# Article 4.  Nonconforming Uses and Lots

### 1.  Authority

(a) RSA 674:19, Applicability of Zoning Ordinance:
A zoning ordinance adopted under RSA 674:16 shall not apply to existing structures or to the existing use of any building. It shall apply to any alteration of a building for use for a purpose or in a manner which is substantially different from the use to which it was put before alteration.

(b) RSA 674:39, Five-Year Exemption:
I. Every subdivision plat approved by the planning board and properly recorded in the registry of deeds and every site plan approved by the planning board and properly recorded in the registry of deeds, if recording of site plans is required by the planning board or by local regulation, shall be exempt from all subsequent changes in subdivision regulations, site plan review regulations, impact fee ordinances, and zoning ordinances adopted by any city, town, or county in which there are located unincorporated towns or unorganized places, except those regulations and ordinances which expressly protect public health standards, such as water quality and sewage treatment requirements, for a period of 5 years after the date of approval; provided that:

    (a) Active and substantial development or building has begun on the site by the owner or the owner's successor in interest in accordance with the approved subdivision plat within 24 months after the date of approval, or in accordance with the terms of the approval, and, if a bond or other security to cover the costs of roads, drains, or sewers is required in connection with such approval, such bond or other security is posted with the city, town, or county in which there are located unincorporated towns or unorganized places, at the time of commencement of such development;

    (b) Development remains in full compliance with the public health regulations and ordinances specified in this section; and

    (c) At the time of approval and recording, the subdivision plat or site plan conforms to the subdivision regulations, site plan review regulations, and zoning ordinances then in effect at the location of such subdivision plat or site plan.

II. Once substantial completion of the improvements as shown on the subdivision plat or site plan has occurred in compliance with the approved subdivision plat or site plan or the terms of said approval or unless otherwise stipulated by the planning board, the rights of the owner or the owner's successor in interest shall vest and no subsequent changes in subdivision regulations, site plan regulations, or zoning ordinances, except impact fees adopted pursuant to RSA 674:21 and 675:2-4, shall operate to affect such improvements.

III. The planning board may, as part of its subdivision and site plan regulations or as a condition of subdivision plat or site plan approval, specify the threshold levels of work that shall constitute the following terms, with due regard to the scope and details of a particular project:

    (a) "Substantial completion of the improvements as shown on the subdivision plat or site plan," for purposes of fulfilling paragraph II; and

    (b) "Active and substantial development or building," for the purposes of fulfilling paragraph I.

IV. Failure of a planning board to specify by regulation or as a condition of subdivision plat or site plan approval what shall constitute "active and substantial development or building" shall entitle the subdivision plat or site plan approved by the planning board to the 5-year exemption described in paragraph I. The planning board may, for good cause, extend the 24-month period set forth in subparagraph I(a).

(c) RSA 676:12, I and VI, Certain Building Permits to Be Withheld prior to Zoning Amendments:
I. The building inspector shall not issue any building permit within the 120 days prior to the annual or special town or village district meeting if:

    (a) Application for such permit is made after the first legal notice of proposed changes in the building code or zoning ordinance has been posted pursuant to the provisions of RSA 675:7; and

    (b) The proposed changes in the building code or the zoning ordinance would, if adopted, justify refusal of such permit.

VI. The provisions of paragraph I shall not apply to any plat or application which has been the subject of notice by the planning board pursuant to RSA 676:4, I(d) prior to the first legal notice of a proposed change in a building code or zoning ordinance or any amendment thereto. No proposed subdivision or site plan review or zoning ordinance or amendment thereto shall affect a plat or application which has been the subject of notice by the planning board pursuant to RSA 676:4, I(d) so long as said plat or application was the subject of notice prior to the first legal notice of said change or amendment. The provisions of this paragraph shall also apply to proposals submitted to a planning board for design review pursuant to RSA 676:4, II(b), provided that a formal application is filed with the planning board within 12 months of the end of the design review process.

(d) RSA 155-B:2, Repair or Removal of Hazardous Building:
The governing body of any city or town may order the owner of any hazardous building within the municipality to correct the hazardous condition of such building or to raze or remove the same.

## 2. Purpose

The purposes of this article are as follows:

(a) To codify the New Hampshire state law of NONCONFORMING USES into the zoning ordinance.

(b) To encourage the discontinuance of NONCONFORMING USES.

(c) To encourage the elimination or reduction of nonconformance of NONCONFORMING LOTS.

(d) To provide for the continuance of lawfully established nonconformance if the transition to conformance is unreasonable. (See RSA 674:19, which provides for the continuance of NONCONFORMING USES but says nothing about the development of NONCONFORMING LOTS.)

## 3. Nonconforming Uses

(a) Continuance of Nonconforming Activities: Every NONCONFORMING ACTIVITY may continue to exist upon the following conditions:

    (1) The NONCONFORMING ACTIVITY shall not change to have a purpose, character, or effect on the neighborhood that differs substantially from the purpose, character, or effect on the neighborhood that the NONCONFORMING ACTIVITY had when it was first nonconforming.

    (2) The NONCONFORMING ACTIVITY shall not expand into any indoor or outdoor space that the NONCONFORMING ACTIVITY has not occupied as a NONCONFORMING ACTIVITY.

(3) The NONCONFORMING ACTIVITY shall not expand into any indoor or outdoor space that the NONCONFORMING ACTIVITY vacated and never reoccupied during the following two years.

(4) The NONCONFORMING ACTIVITY shall not expand so as to render premises or property proportionally less adequate.

(5) The NONCONFORMING ACTIVITY shall have no discontinuance of two years or more.

(b) Abandonment of Nonconforming Activities:  Every NONCONFORMING ACTIVITY that satisfies either of the following conditions (1) and (2) shall be deemed abandoned and shall be prohibited:

(1) The NONCONFORMING ACTIVITY shall be deemed abandoned and shall be prohibited if it violates one or more of the conditions in paragraph (a), (1) through (4), and if

(A) within 35 days after the earliest date when the zoning ordinance administrator sends the owner of the NONCONFORMING ACTIVITY a certified-mail notice of the violation, the owner has not submitted a written plan to eliminate the violation or

(B) within 95 days after the earliest date when the zoning ordinance administrator sends the owner of the NONCONFORMING ACTIVITY a certified-mail notice of the violation, the owner has not eliminated the violation.

(2) The NONCONFORMING ACTIVITY shall be deemed abandoned and shall be prohibited if it has a discontinuance of two years or more.  (See article 4, section 3, (a), (5).)

(c) Continuance of Nonconforming Structures:   Every NONCONFORMING STRUCTURE may continue to exist upon the following conditions:

(1) The NONCONFORMING STRUCTURE may be maintained or renovated and may be repaired or rebuilt after any damage if the maintenance, renovations, repairs, and rebuilding satisfy the following conditions (A) and (B):

(A) Maintenance, renovations, repairs, and rebuilding shall not give the NONCONFORMING STRUCTURE a purpose, character, or effect on the neighborhood that differs substantially from the purpose, character, or effect on the neighborhood that the NONCONFORMING STRUCTURE had when it was first nonconforming.

(B) Repairs and rebuilding after the NONCONFORMING STRUCTURE has sustained damage greater than or equal to 75% of the NONCONFORMING STRUCTURE'S PRINCIPAL FLOOR AREA shall be in substantial progress within two years after the date of the NONCONFORMING STRUCTURE'S damage.  (See article 4, section 1, (c), Vesting of Nonconforming Uses.)

(2) The NONCONFORMING STRUCTURE may have additions to its nonconforming parts if the additions satisfy the following conditions (A) through (C):

(A) The additions shall not give the NONCONFORMING STRUCTURE a purpose, character, or effect on the neighborhood that differs substantially from the purpose, character, or

effect on the neighborhood that the NONCONFORMING STRUCTURE had when it was first nonconforming.

(B) The additions in total since the NONCONFORMING STRUCTURE was first nonconforming shall not be substantial.

(C) The additions shall not render the LOT proportionally less adequate.

(3) The NONCONFORMING STRUCTURE may have additions to its conforming parts if the additions satisfy the following conditions (A) and (B):

(A) The additions shall not give the NONCONFORMING STRUCTURE a purpose, character, or effect on the neighborhood that differs substantially from the purpose, character, or effect on the neighborhood that the NONCONFORMING STRUCTURE had when it was first nonconforming.

(B) The additions shall create no nonconformance to the zoning ordinance except that an addition may create a nonconformance if the addition satisfies the conditions in subparagraph (2), for additions to nonconforming parts of the NONCONFORMING STRUCTURE.

(d) Abandonment of Nonconforming Structures:  Every NONCONFORMING STRUCTURE that satisfies either of the following conditions (1) and (2) shall be deemed abandoned and shall be prohibited:

(1) The NONCONFORMING STRUCTURE shall be deemed abandoned and shall be prohibited if it violates one or more of the conditions in paragraph (c), (1), (A); paragraph (c), (2); or paragraph (c), (3), and if

(A) within 35 days after the earliest date when the zoning ordinance administrator sends the owner of the NONCONFORMING STRUCTURE a certified-mail notice of the violation, the owner has not submitted a written plan to eliminate the violation or

(B) within 95 days after the earliest date when the zoning ordinance administrator sends the owner of the NONCONFORMING STRUCTURE a certified-mail notice of the violation, the owner has not eliminated the violation.

(2) The NONCONFORMING STRUCTURE shall be deemed abandoned and shall be prohibited if it has sustained damage greater than or equal to 75% of the NONCONFORMING STRUCTURE'S PRINCIPAL FLOOR AREA and if the NONCONFORMING STRUCTURE is not in substantial rebuilding within two years after the date of the NONCONFORMING STRUCTURE'S damage.

(e) Public-Taking Not-Conforming Structures:  Every lawfully existing STRUCTURE that becomes a not-conforming STRUCTURE because of an eminent-domain taking or that increases its nonconformance because of an eminent-domain taking shall be treated as a NONCONFORMING STRUCTURE under the zoning ordinance.

(f) Repair or Removal of Hazardous Buildings:  Under RSA chapter 155-B, Hazardous and Dilapidated Buildings, the board of selectmen may order the owner of any hazardous building

(d) That due to the degree of past construction or investment made in ignorance of the facts constituting the violation, the cost of correction so far outweighs any public benefit to be gained, that it would be inequitable to require the violation to be corrected.

II. In lieu of the findings required by the board under subparagraphs I(a) and (b), the owner may demonstrate to the satisfaction of the board that the violation has existed for 10 years or more, and that no enforcement action, including written notice of violation, has been commenced against the violation during that time by the municipality or any person directly affected.

III. Application and hearing procedures for equitable waivers under this section shall be governed by RSA 676:5 through 7. Rehearings and appeals shall be governed by RSA 677:2 through 14.

IV. Waivers shall be granted under this section only from physical layout, mathematical or dimensional requirements, and not from use restrictions. An equitable waiver granted under this section shall not be construed as a NONCONFORMING USE, and shall not exempt future use, construction, reconstruction, or additions on the property from full compliance with the ordinance. This section shall not be construed to alter the principle that owners of land are bound by constructive knowledge of all applicable requirements. This section shall not be construed to impose upon municipal officials any duty to guarantee the correctness of plans reviewed by them or property inspected by them.
(RSA 674:33-a.)

## 5. Appeals to Board of Adjustment

I. Appeals to the board of adjustment concerning any matter within the board's powers as set forth in RSA 674:33 may be taken by any person aggrieved or by any officer, department, board, or bureau of the municipality affected by any decision of the administrative officer. Such appeal shall be taken within a reasonable time, as provided by the rules of the board, by filing with the officer from whom the appeal is taken and with the board a notice of appeal specifying the grounds thereof. The officer from whom the appeal is taken shall forthwith transmit to the board all the papers constituting the record upon which the action appealed from was taken.

II. For the purposes of this section:
(a) The "administrative officer" means any official or board who, in the municipality, has responsibility for issuing permits or certificates under the zoning ordinance, or for enforcing the ordinance, and may include a building inspector, board of selectmen, or other official or board with such responsibility.
(b) A "decision of the administrative officer" includes any decision involving construction, interpretation or application of the terms of the zoning ordinance. It does not include a discretionary decision to commence formal or informal enforcement proceedings, but does include any construction, interpretation or application of the terms of the ordinance which is implicated in such enforcement proceedings.

III. If, in the exercise of SUBDIVISION or site plan review, the planning board makes any decision or determination which is based upon the terms of the zoning ordinance, or upon any construction, interpretation, or application of the zoning ordinance, which would be appealable to the board of adjustment if it had been made by the administrative officer, then such decision may be appealed to the board of adjustment under this section; provided, however, that if the zoning ordinance contains an innovative land use control adopted pursuant to RSA 674:21 which delegates administration, including the granting of conditional or special use permits, to the planning board, then the planning

board's decision made pursuant to that delegation cannot be appealed to the board of adjustment, but may be appealed to the superior court as provided by RSA 677:15.

(RSA 676:5, I, II, and III.)

## 6. Materially Similar Applications

If (1) the board of adjustment has disapproved an application, (2) the disapproval was not appealed, (3) a subsequent application is made for a use that does not materially differ in nature and degree from its predecessor, and (4) a material change of circumstances affecting the merits of the subsequent application has not occurred, then the board may not reach the merits of the subsequent application. The applicant bears the burden of proving a material change of circumstances before the board.

## 7. Public Hearing; Notice

I. Prior to exercising its appeals powers, the board of adjustment shall hold a public hearing. Notice of the public hearing shall be given as follows:

(a) The appellant and every ABUTTER and holder of CONSERVATION, preservation, or agricultural preservation RESTRICTIONS shall be notified of the hearing by certified mail stating the time and place of the hearing, and such notice shall be given not less than 5 days before the date fixed for the hearing of the appeal. The board shall hear all ABUTTERS and holders of CONSERVATION, preservation, or agricultural preservation RESTRICTIONS desiring to submit testimony and all nonABUTTERS who can demonstrate that they are affected directly by the proposal under consideration. The board may hear such other persons as it deems appropriate.

(b) A public notice of the hearing shall be placed in a newspaper of general circulation in the area not less than 5 days before the date fixed for the hearing of the appeal.

II. The public hearing shall be held within 30 days of the receipt of the notice of appeal.

III. Any party may appear in person or by the party's agent or attorney at the hearing of an appeal.

IV. The cost of notice, whether mailed, posted, or published, shall be paid in advance by the applicant. Failure to pay such costs shall constitute valid grounds for the board to terminate further consideration and to deny the appeal without public hearing.

(RSA 676:7)

## 8. Review of Developments of Regional Impact

(a) Notice and hearing requirements of RSA 36:54 through RSA 36:58 apply to applications for DEVELOPMENTS OF potential REGIONAL IMPACT.

(b) Review Required:  The board of adjustment, upon receipt of an application for development, shall review it promptly and determine whether or not the development, if approved, reasonably could be construed as having the potential for regional impact. Doubt concerning regional impact shall be resolved in a determination that the development has a potential regional impact.  (RSA 36:56, I.)

## 9. Burden of Proof

On issues wherein the exercise of the board of adjustment's discretion is sought, the burden of proof is on the applicant.

## 10. Issuance of Decision

(a) The board of adjustment shall issue a final written decision which either approves or disapproves an application for a local permit and make a copy of the decision available to the applicant. If the application is not approved, the board shall provide the applicant with written reasons for the disapproval. If the application is approved with conditions, the board shall include in the written decision a detailed description of all conditions necessary to obtain final approval. (RSA 676:3, I.)

(b) Whenever the board of adjustment votes to approve or disapprove an application, the board shall set forth in its minutes of the meeting at which the vote is taken every finding of fact and every ruling of law that the board made regarding the application. If the board affirms, modifies, or reverses a decision of an administrative officer, then the board shall set forth in the minutes every reason for the affirmation, modification, or reversal. If the board approves an application for a permit, then the board shall set forth in the minutes how the application has satisfied each of the requirements for the permit. If the board disapproves an application for a permit, then the board shall set forth in the minutes every requirement for the permit that the application failed to satisfy. If the board approves an application for a permit but attaches any conditions, then the board shall set forth in the minutes every reason for each condition.

(c) Whenever the board of adjustment votes to approve or disapprove an application or deny a motion for rehearing, the minutes of the meeting at which such vote is taken, including the written decision containing the reasons therefor and all conditions of approval, shall be placed on file in the board's office and shall be made available for public inspection within 5 business days of such vote. (RSA 676:3, II.)

(d) Whenever a plat is recorded to memorialize an approval issued by the board of adjustment, the final written decision, including all conditions of approval, shall be recorded with or on the plat. (RSA 676:3, III.)

## 11. Motion for Rehearing, Rehearing, and Appeal to Superior Court

(a) Whenever a person or a municipality seeks a rehearing on or an appeal of a zoning-related order or decision, the procedures enacted under RSA chapter 677 shall be followed. (RSA 677:1.)

(b) Within 30 days after any order or decision of the zoning board of adjustment, or any decision of the local legislative body or a board of appeals in regard to its zoning, the selectmen, any party to the action or proceedings, or any person directly affected thereby may apply for a rehearing in respect to any matter determined in the action or proceeding, or covered or included in the order, specifying in the motion for rehearing the ground therefor; and the board of adjustment, a board of appeals, or the local legislative body, may grant such rehearing if in its opinion good reason therefor is stated in the motion. This 30-day time period shall be counted in calendar days beginning with the date following the date upon which the board voted to approve or disapprove the application in accordance with RSA 21:35. (RSA 677:2)

(c) A motion for rehearing made under RSA 677:2 shall set forth fully every ground upon which it is claimed that the decision or order complained of is unlawful or unreasonable. (RSA 677:3, I.) A motion for rehearing is a prerequisite for an appeal to the superior court. (RSA 677:3, I.)

(d) Upon the filing of a motion for a rehearing, the board of adjustment, a board of appeals, or the local legislative body shall within 30 days either grant or deny the application, or suspend the order or decision complained of pending further consideration. (RSA 677:3, II.)

(e) If the board grants a rehearing, and if any new basis for aggrievement results from the rehearing, then a subsequent motion for rehearing that raises any new issues that are thrust upon the appealing party is necessary to preserve the new issues for an appeal to the superior court.

(f) Any person aggrieved by any order or decision of the zoning board of adjustment or any decision of the local legislative body may apply, by petition, to the superior court within 30 days after the date upon which the board voted to deny the motion for rehearing. For purposes of this paragraph, "person aggrieved" includes any party entitled to request a rehearing under RSA 677:2.  (RSA 677:4)

# Article 9.  Signs

## 1.  Authority
RSA 674:16, I, (d); RSA 674:16, V; and RSA 674:17.

## 2.  Purpose
The purposes of these sign regulations are as follows:

(a)  To protect the public from distracting and hazardous signs.  (See RSA 674:17, I, (b) ("To secure safety from fires, panic and other dangers") and RSA 674:17, I, (c) ("To promote health and the general welfare").)
(b)  To promote the general welfare by protecting the aesthetics of the town.  (See RSA 674:17, I, (c).)

## 3.  Definitions
In this article, the following terms have the following meanings:

"Animate" means to depict something moving except that "animate" excludes
(a)  depicting moving text and
(b)  sequentially displaying the letters "O," "P," "E," and "N."

"Flash" means to maintain an artificially illuminated display constant for more than .015 seconds and less than 3 minutes except that "flash" excludes
(a)  maintaining a display of text constant for 3 seconds or longer,
(b)  depicting moving text, and
(c)  sequentially displaying the letters "O," "P," "E," and "N."
The purpose of the .015-second constant-display time is to specify a constant-display time at which the human eye sees an illuminated display as not flickering.

## 4.  Permitting Conditions for Outdoor Signs
Except as provided in article 4, section 3, Nonconforming Uses, every outdoor sign shall be permitted upon the following conditions and upon all other applicable conditions in the zoning ordinance:
(a) Prohibited Signs:  The sign shall not animate, flash, or emit sound.
(b) The sign and its illuminator, if any, shall not interfere with pedestrian or vehicular traffic or be confused with or obstruct the view or effectiveness of any official traffic signal or traffic marking.
(c) The source of lighting for every sign artificially illuminated by an external source shall be mounted and shielded so that the lighting is confined to the area of the sign and so that the light source is not visible three feet above grade at the boundary of adjoining property, including adjoining STREETS.
(d) Brightness:  The luminance of the source of lighting for every artificially illuminated sign shall be less than or equal to 230 candelas per square meter as measured at the brightest area on the face of the sign.  (See Freyssinier, J.P., N. Narendran, and J.D. Bullough. 2006. Luminance requirements for lighted signage. *Sixth International Conference on Solid State Lighting, Proceedings of SPIE* 6337, 63371M.)

# Article 14.  Storage Containers

## 1.  Authority
RSA 674:16, I, (d); RSA 674:16, V; and RSA 674:17.

## 2.  Purpose
The purpose of these STORAGE CONTAINER regulations is to promote the general welfare by protecting the aesthetics of the town.
(See RSA 674:17, I, (c).)

## 3.  Permitting Conditions for Storage Containers
Except as provided in article 4, section 3, Nonconforming Uses, every STORAGE CONTAINER shall be permitted upon the following conditions and upon all other applicable conditions in the zoning ordinance:

(a)  The STORAGE CONTAINER shall be used for and only for storage.

(b)  The STORAGE CONTAINER shall have a SETBACK from every STREET boundary or INTERIOR LOT LINE which SETBACK is greater than or equal to the minimum SETBACK specified for the STREET boundary or INTERIOR LOT LINE by article 3, section 4, (h), Table of Dimensional Requirements.

(c)  No more than one STORAGE CONTAINER shall be on the LOT if the LOT is in the Urban District, the Suburban District, or the Rural District.

(d)  No more than two STORAGE CONTAINERS shall be on the LOT if the LOT is in the Commercial District or the Light Industrial/Commercial District.

(e)  The sum of the time during which one or more STORAGE CONTAINERS are on any one LOT during any 15-month period shall be no more than 12 months.

(f)  The owner of the LOT where the STORAGE CONTAINER will be put shall tell the zoning ordinance administrator the date when the STORAGE CONTAINER is proposed to be put on the LOT.  The zoning ordinance administrator shall issue a permit for the STORAGE CONTAINER, and the permit shall state the date when the STORAGE CONTAINER is proposed to be put on the LOT.



**EXHIBIT**
MARSTON AFF.
EXHIBIT 2

# TOWN OF PITTSFIELD
# NEW HAMPSHIRE

# PERMIT
# FOR STORAGE CONTAINERS

**(STORAGE CONTAINERS:** Shall mean, any truck trailer, box trailer, school bus, mobile home or other similar facility used for storage or other purposes).

Storage Containers, whether registered or not, whether mobile or stationery, are not allowed on a permanent basis in any zoning district within the Town of Pittsfield. A storage container is permitted for storage purposes only, for a period of one year, with the approval of a parking permit issued by the Board of Selectmen or their designee, provided said storage container meets all setback requirements, and as limited by the following; a) maximum of one storage container per lot in the Urban, Suburban or Rural Districts; b) maximum of two storage containers per lot in the Light Industrial/Commercial Districts.

APPLICANTS NAME: _Joseph M$^c$Coy_

APPLICANTS ADDRESS: _322 Catamount Rd._

APPLICANTS TELEPHONE NUMBER: _603-435-5050_

LOCATION OF STORAGE UNIT: TAX MAP & LOT NUMBER: _R23-02-01_

ZONING DISTRICT: _RURAL_

SERIAL NUMBER OF STORAGE CONTAINER: _1H2V04523EB019801_

MAKE AND MANUFACTURER OF CONTAINER: _FP8-F2-45 FRUEHAUF_

SIGNATURE OF APPLICANT: _Joseph E M$^c$Coy_

DATE STORAGE USE IS TO BEGIN: _Sept. 1, 2015_

APPROVED: DATE: _9-1-15_

_Board of Selectmen_

Unit must be removed one year from the approved date above.

356



**EXHIBIT**

tabbies

MARSTON AFF.
EXHIBIT 3

## Office of Code Enforcement

### TOWN OF PITTSFIELD
### Town Hall, 85 Main Street
### Pittsfield, New Hampshire

## NOTICE OF VIOLATION

Dear Mr., Joseph Mc Coy

The property located at 322 Catamount Rd Pittsfield NH 03263, identified in the Town Tax Records as Map R23, Lot 02-01, and owned/occupied by you, your permit for a storage trailer has expired on September 1, 2016 and the trailers need to be removed according to our Zoning Ordinance article 14 section 3.

Your immediate attention to this matter is appreciated.

If you believe the Building Inspector is in error in the application or interpretation of any provision of the Building codes, you have the right to appeal to the Zoning Board of Appeals in a timely fashion. This stop work Order controls unless and until it is overturned by the Zoning Board of Appeals.

Thank you
Jesse Pacheco
Building Inspector

OFFICE 603-435-6774          FAX:603-435-7922          CELL:603-715-6624    357

To: Jesse Pacheco,


**EXHIBIT**
MARSTON AFF.
EXHIBIT 4

Hello,

I am writing in regards to seeking a 6 month extension for my trailer on my property located at 322 Catamount Rd.

At the present, i have construction going on, my garage is leaking from the inside and it needs emergency work which will take me several months to fix. I am disabled with just one working leg, and have to take care of every thing myself, and this has already been started. I will remove one trailer by the end of November. The other i will be dealing with over the cold winter months and will have it emptied and removed by the end of April 2017.

I am asking for this 6 month extention inorder to keep my tools and materials inside this trailer while i deal with this emergency construction situtation inorder to keep things out of the winter outside elements. It will be taken care of and i am sorry for the delay, but i am physcially handicapped and will complete this task inorder to remain with good standards for this town and it's rules as a Pittsfield home owner.

Thank you For Your Time.
Sincerely,
Joseph McCoy

358

## Cara Marston

**From:** Bonnie Theriault
**Sent:** Wednesday, May 17, 2017 5:40 PM
**To:** Cara Marston
**Subject:** RE: Office stuff

EXHIBIT

MARSTON AFF.
EXHIBIT 5

Jesse has left already and I'll let Mr. McCoy know tomorrow.

Bonnie

**From:** Cara Marston
**Sent:** Wednesday, May 17, 2017 5:14 PM
**To:** Bonnie Theriault
**Subject:** Re: Office stuff

McCoy can put his request in writing
Jesse can call my cell if he's still there

Cara M. Marston
Town Administrator
Town of Pittsfield
85 Main Street
Pittsfield, New Hampshire 03263
office 603.435.6773 x20
fax 603.435.7922 (yup, still have one, for nostalgic purposes)

Sent from my iPhone

On May 17, 2017, at 16:51, Bonnie Theriault <btheriault@pittsfieldnh.gov> wrote:

Hi there,

I hope you are having a fun afternoon. Sorry to bug you but Jesse was in and stated that he has to speak to you about the junkyard, and he'd like to talk with you before he calls Chairman Allard. He indicated that it was something he wanted to do as soon as possible. I explained that you would be in tomorrow but it appears that he wanted to speak with you right then. I told him I'd let you know.

Also, Joseph McCoy 435-5050 wants to get on the agenda for Tuesday night. Jesse had gone to his property regarding the storage container and he wants to speak to the Board about it this week. I advised Mr. McCoy that I had to check to see if there were any scheduled appointments first, and we'd get back to him tomorrow about his request. Shortly after that call, Jesse came in and asked if Mr. McCoy had called, and I explained what I told Mr. McCoy.

So, anyway, I hope you continue to have fun if you can, and I'll see you tomorrow.

Bonnie

Bonnie Theriault
Administrative Assistant

1



**TOWN OF PITTSFIELD**
**BOARD OF SELECTMEN**
**TOWN HALL, 85 MAIN STREET**
**PITTSFIELD, NH 03263**



EXHIBIT

MARSTON AFF.
EXHIBIT 6

**MEETING MINUTES OF Tuesday June 13, 2017**

**CALL TO ORDER**
Call to order at 6:06 p.m. by J.C. Allard, Chairman

**MEMBERS PRESENT**
J.C. Allard, Chairman
Gerard LeDuc, Vice-Chairman
Carole Richardson
Carl Anderson

**MEMBERS ABSENT**
None

**OTHERS PRESENT**
Cara Marston, Town Administrator
Ammy Ramsey, Recording Secretary

**PUBLIC INPUT** – regarding agenda items only

Dan Schroth would like to make an appointment with Cara to talk with her about putting together a petition article about getting rid of the Building Inspector position, Cara and Dan will meet tomarrow at 11 a.m.

**AGENDA REVIEW**
Gerard: None.
Carole: None.
Carl: None.
J.C.: None.

**NEW BUSINESS**

**ACTION ITEMS**
1. Interviews for vacant position on Board of Selectmen – 4 candidates
J.C. informed the public that the first item under new business is to conduct interviews and it may take some time to get through the process. Due to circumstances out of anyone's control this board finds itself with the requirement of standing in for the voters of Pittsfield to choose another member for the selectboard. We are going to do that item of great

360

8. Storage Container Permit extension concern – 322 Catamount Road (tabled 5/23/17)
Mr. McCoy stated that they originally got the permit in 2015, he went to Jesse to get an extension because they have found out their deck, and porch is rotted. They are requesting an extension because he is doing the work himself and is handicapped and it is taking them more time then expected to do all the repairs needed. So he is asking the board to grant a one year extension. J.C. asked if there was an issue with extending the permit. Cara stated that our Zoning Ordinance states it shall not be no more than 12 months. J.C. asked if this should go to the Zoning Board. Carl asked why this matter is in front of them. Cara explained that the selectboard are the administrators of the ordinance. Cara also expressed to the board that Mr. McCoy is here trying to do the right thing and if you look around town there are storage trailers on properties that may not have a permit. Mr. McCoy stated that Jesse collected $25.00 cash from him for the permit but later found out the there is no permit. Jesse also stated to him that they have no choice and must get rid of the trailer, when there are multiple trailers all over town that have been there for a long time. Carole asked if they have had the trailer for one year and now would like to have it there for another year and after that it will be gone. Mr. McCoy stated that they want to get rid of it but just need more time to do the work needed on their home.

Carole: I make a motion to extend the permit for one year.
Gerard: Second.
Discussion: None.
Motion carries 4-0

Cara will print out another permit and have everyone sign it.

**CHECK MANIFESTS**
1. Accounts Payable
Gerard: I make a motion to approve Accounts Payable.
Carl: Second.
Discussion: None.
Motion carries 4-0

2. Payroll
Gerard: I make a motion to approve Payroll and Direct Deposit.
Carl: Second.
Discussion: None.
Motion carries 4-0

**MINUTES**
1. May 23, 2017 – Public Meeting Minutes
Gerard: I make a motion to approve the May 23, 2017 Public Meeting Minutes.
Carl: Second.
Discussion: Carole has a few grammatical corrections and will give those to Ammy.
Motion carries 4-0

Motion carries 4-0 roll call was done and all approved.

The Board came out of non-public session at 9:09 p.m.

Gerard: I make a motion to seal the non-public minutes as they may affect adversely the reputation of any person other than a member of this board.
Carl: Second.
Discussion: None.
Motion carries 4-0 roll call (2/3 vote) was done and all approved.

Gerard: I make a motion to adjourn.
Carl: Second.
Discussion: None.
Motion carries 4-0

Approved:

J.C. Allard, Chairman                    Date



EXHIBIT

MARSTON AFF.
EXHIBIT 7

# TOWN OF PITTSFIELD
# NEW HAMPSHIRE

## PERMIT
## FOR STORAGE CONTAINERS

(**STORAGE CONTAINERS**: Shall mean, any truck trailer, box trailer, school bus, mobile home or other similar facility used for storage or other purposes).

Storage Containers, whether registered or not, whether mobile or stationery, are not allowed on a permanent basis in any zoning district within the Town of Pittsfield. A storage container is permitted for storage purposes only, for a period of one year, with the approval of a parking permit issued by the Board of Selectmen or their designee, provided said storage container meets all setback requirements, and as limited by the following, a) maximum of one storage container per lot in the Urban, Suburban or Rural Districts. b) maximum of two storage containers per lot in the Light Industrial/Commercial Districts.

APPLICANTS NAME: Joseph McCoy

APPLICANTS ADDRESS: 322 Catamount Rd.

APPLICANTS TELEPHONE NUMBER: (603) 435-5050

LOCATION OF STORAGE UNIT: TAX MAP & LOT NUMBER: R23-2-1

ZONING DISTRICT: Rural

SERIAL NUMBER OF STORAGE CONTAINER: 1H2V045238B01901

MAKE AND MANUFACTURER OF CONTAINER: FP8-5245 - FRVALHAVT

SIGNATURE OF APPLICANT: Joseph McCoy

DATE STORAGE USE IS TO BEGIN: 6-13-2017

APPROVED DATE: June 13, 2017

Board of Selectmen

Unit must be removed one year from the approved date above

363



# TOWN OF PITTSFIELD

Office of Selectmen
85 Main Street, Pittsfield NH 03263
admin@pittsfieldnh.gov ~ telephone (603) 435-6773 ~ fax (603)



EXHIBIT
MARSTON AFF.
EXHIBIT 8

May 22, 2018

Joseph E. McCoy
322 Catamount Road
Pittsfield, NH 03263

Re: storage container permit expiration

Dear Mr. McCoy,

As you know, the storage trailer permit that the Board of Selectmen approved two years ago and extended at your request last June is due to expire next month.

Please consider this letter a friendly reminder that the trailer must be removed from the property for at least a three month period before you can apply for another permit to bring it back.

Thank you in advance for your anticipated cooperation.

Sincerely,

Pittsfield Board of Selectmen



RECEIVED
MAY 2018
Town of
Pittsfield, NH

EXHIBIT
MARSTON AFF.
EXHIBIT 9

May 29, 2018

Dear Board Members,

This concerns a storage trailer located on my property at 322 Catamount Rd. Pittsfield

Last june, 2017, i came to your meeting, i had 2 trailors to unload and remove, as requested. I've emptied and removed 1 so far and it's not an easy task! I am disabled with 1 working leg to move on and now that the weather has changed i am in the process of unloading the second. This will take more time, when i bought my home in pittsfield i had a huge amount of belongings which came with me so i am asking for another permit inorder to accomplish this huge task.

I am crippled so it cannot
be done easily.
    Please let me know,
or, set aside a time to discuss
this further at your next meeting.

        Thank you

        Joseph M'Ly

    322 Catamount Rd.
    P.O. Box 293
    Pittsfield, N.H. 03263



**TOWN OF PITTSFIELD
BOARD OF SELECTMEN
TOWN HALL, 85 MAIN STREET
PITTSFIELD, NH 03263**



EXHIBIT

MARSTON AFF.
EXHIBIT 10

**MEETING MINUTES OF Tuesday June 12, 2018**

**CALL TO ORDER**
Call to order at 6:02 p.m. by J.C. Allard, Chairman

**MEMBERS PRESENT**
J.C. Allard, Chairman
Gerard LeDuc, Vice-Chairman
Carole Richardson
Carl Anderson
James Adams

**OTHERS PRESENT**
Cara Hayes, Town Administrator
Ammy Ramsey, Recording Secretary

**PUBLIC INPUT** – regarding agenda items only
There was no input.

**AGENDA REVIEW**
Gerard: None.
Jim: None.
Carole: Action item for police
J.C.: Action item for the CDC
Carl: Action items for Zoning Administrator

**APPOINTMENTS**
6:05 p.m. – Central NH Regional Planning Commission – Brownfield's project update
Mike Tardiff from the Central NH Regional Planning commission presented the board with some photos of some properties between Clark Street and Broadway and then described the status of the Brownfield's project and the potential of the program going forward for the town of Pittsfield. Mike explained the history of the program and that it assesses properties that have potential environmental issues and what it would take to get those properties redeveloped. Steve Rickerich, the consulting engineer with Ransom Consulting, was also present. He explained the steps of the environmental work that is involved in this project. The Central NH RPC has funded this project's environmental work through two grants that the RPC received and have designated to Pittsfield. In the next few months as

the project moves forward Tardiff will contact the Community Development Committee to keep them updated, too.

6:15 p.m. – Jay St. Jean Auctioneers – sale of tax deeded land – Map R4 Lots 1-1, 1-6, & 1-7
J.C. announced the appointment and Jay St. Jean presented the board with packets of information regarding their auction services. They believe that the 3 properties could sell for around 8 to 10 thousand dollars each. Carl inquired about the payment for their services if the properties do not sell. St. Jean explained the fee structure and how costs would be split between the purchaser and the seller.

NEW BUSINESS

DEPARTMENT UPDATES
1. Police Department
Acting Chief Collins updated the board with the hiring process, informed them of paperwork that needed to be filed with the Police Standards & Training regarding his hiring, and confirmed with the board to continue the coverage as it has been.

Carl: I make a motion to continue with having reduced coverage for 20 hours a week until June 26, 2018.
Jim: Second.
Discussion: None.
Motion carries 5-0

Carl inquired about the status of Officer Wood. Acting Chief Collins requested tabling the resignation until he gets a chance to talk with him. They also discussed some details concerning the membership in the Central NH Special Operations Unit, if there was an annual agreement that needed signing or not. Both Collins and DiGeorge were of the understanding that the agreement was signed upon joining as a member for coverage, not annually.

ADDED ITEM – ALL NIGHT PARKING BAN
Carole inquired about the parking ban and would like to remove the ban.

Carole: I make a motion to remove the parking ban.
Carl: Second.
Discussion: The board discussed the issues with the policy and the reasons why it was done and the reasons they should consider removing the ban and also the impact it would have for the winter parking ban. The board inquired with George and Acting Chief Collins concerning their opinions, George feels it is a good idea to have the parking ban and Acting Chief Collins stated he has not had a chance to observe situations and did not feel comfortable giving an opinion either way. Carl suggested removing the ban and look at the entire ordinance and talk with George and Acting Chief Collins in the fall. Gerard stated he feels it is important to have because he sees what happens in town at night.
Motion 4-1. Gerard opposes.

**ACTION ITEMS**

**1. CWS Fence & Guardrail quote – 2018 Tilton Hill Road project**

J.C. announced item number 1, and inquired with George on the details. George explained the situation and the details on where the guardrail will be placed and the reasons why the rails are needed.

Carl: I make a motion to approve the CWS Fence & Guardrail quote for the 2018 Tilton Hill Road project.

Jim: Second.

Discussion: None.

Motion carries 5-0

**ADDED ITEM – TEMPORARY, SEASONAL PART TIME HIRE**

George expressed his concern about being shorthanded because of the employee that is out on workman's comp and stated he spoke with Ammy and she is willing to help for the summer months. There was discussion pertaining to hours she is available to work and a wage and how it will be funded from the budget.

Carl: I make a motion to hire Ammy Ramsey temporary and part time as a Light Equipment Operator at $16.00 an hour starting now until August 31, 2018.

Carole: Second.

Discussion: The total hours across town positions was discussed regarding overtime and full time status. This assignment is temporary, just to assist the highway department get the paving projects completed as there is a highway worker out on workers compensation leave.

Motion carries 5-0

**2. Summer 2018 F.B. Argue Recreation Area seasonal part time hiring – substitute director**

Carl: I make a motion to appoint Donna Keeley as the substitute director of the F.B. Argue Recreation Area.

Gerard: Second.

Discussion: None.

Motion carries 5-0

**3. Website Committee appointment request – Ryan Wood**

Carole: I make a motion to appoint Ryan Wood to the Website Committee.

Jim: Second.

Discussion: None.

Motion carries 5-0

**4. Resignation – Patrol Officer Donald Wood**

J.C. announced item number 4.

Gerard: I make a motion to table the resignation of Patrol Officer Donald Wood until the next meeting.

Carl: Second.

Discussion: None.
Motion carries 5-0

### 5. Community Development Committee resignation – Roland Carter
Gerard: I make a motion to accept the resignation of Roland Carter from the Community Development Committee.
Carl: Second.
Discussion: Gerard stated Roland is selling his home and Jim stated we should send out a letter of thanks for all his work.
Motion carries 5-0

### 6. Application for District Nursing Scholarship
J.C. announced item number 6. Carole confirmed that there is just one applicant.

Carole: I make a motion to approve the applicant for the District Nursing Scholarship.
Jim: Second.
Discussion: None.
Motion carries 5-0

### 7. Donation to Conservation Commission Fund – $2,000.00, Chris Hill
J.C. announced item number 7.

Gerard: I make a motion to accept the donation of $2,000.00 for the Conservation Commission fund from Chris Hill.
Jim: Second.
Discussion: Carl stated we should send a letter of thanks.
Motion carries 5-0

### 8. Fee Waiver request for BCEP Solid Waste District – Lyman Park
J.C. announced item number 8. Cara stated they are requesting a waiver because in the past the person that emptied the trash separated it but now with the nature of waste of the trash they are not able to safely separate the trash, which they then have to pay to get rid of the trash.

Carl: I make a motion to approve the Fee Waiver for BCEP for the caretakers of Lyman Park.
Carole: Second.
Discussion:
Motion carries 4-1 Gerard opposes

### 9. Request for Storage Container permit extension – 322 Catamount Road
There was some discussion pertaining to the last extension that was granted and the enforcement process going forward.

Carl: I make a motion to deny the extension request for the Storage Container Permit.
Jim: Second.

Discussion: Gerard stated we need to keep the man at his word.
Motion carries 5-0

The board discussed the terms of the letter and agreed to give them 30 days to remove the trailer.

### 10. Permission for Historical Society to apply to Planning Board
Clayton Wood stated the Historical Society would need a letter of approval from the property owner to speak to the Planning Board regarding their proposal of the relocation of the Society to the Washington House Lot.

Carl: I make a motion to approve the Historical Society to apply to the Planning Board.
Carole: Second.
Discussion: None.
Motion carries 5-0

### 11. Old Home Day application for Parade Permit – July 14, 2018
Carole: I make a motion to approve the Parade Permit for the Old Home Day Parade on July 14, 2018.
Jim: Second
Discussion: None.
Motion carries 5-0

### 12. Balloon Rally Fireworks contract – Atlas Fireworks
Jim: I make a motion to approve the Atlas Fireworks Balloon Rally Fireworks contract.
Carl: Second.
Discussion: Cara noted the recommended change from the insurance company.
Motion carries 5-0

### 13. Eversource BTLA appeals – consideration of legal counsel
Cara stated she sent out the information to Serge and he recommended Attorney Bolt and he would confer with him for contract terms.

Carl: I make a motion to approve Matt Serge to coordinate with Attorney Christopher Boldt from Donahue, Tucker and Ciandella to represent Pittsfield in the BTLA appeal.
Jim: Second.
Discussion: Carole confirmed that they are voting to have Serge find out the cost and then come to us.
Motion carries 5-0

### 14. NH E 9-1-1 Data Operations Liaison renewal
Cara stated the liaisons are currently her and Bonnie.
Carl: I make a motion to appoint Cara Hayes and Bernadette Theriault as the 911 Data Operations Liaisons.
Gerard: Second.

Discussion: None.
Motion carries 5-0

### 15. Notice of Intent to Excavate – Map R48 Lot 2
Carl: I make a motion to approve the Intent to Excavate for Map R48 Lot 2.
Carole: Second
Discussion: None.
Motion carries 5-0

### 16. Notice of Intent to Cut Timber – Map R42 Lot 8
Carl: I make a motion to approve the Intent to Cut Timber for Map R42 Lot 8.
Carole: Second.
Discussion: None.
Motion carries 5-0

### 17. Application for Solar Exemption – Map R7 Lot 1-5
Cara explained that this was approved at town meeting in 2016 and it is an exemption for the value of the solar equipment only (to have no property tax impact).

Carl: I make a motion to approve the application for Solar Exemption.
Gerard: Second.
Discussion: None.
Motion carries 5-0

### 18. Funds Transfer – 2018 appropriations to capital reserve and expendable trust funds
J.C. announced item number 18.

Gerard: I make a motion to approve the fund transfer of the 2018 appropriations to the capital reserve and expendable trust funds.
Jim: Second.
Discussion: None.
Motion carries 5-0

### 19. Funds Transfer – perpetual care for lots sold in Floral Park Cemetery
Carole: I make a motion to transfer funds to perpetual care for lots sold in Floral Park Cemetery.
Jim: Second.
Discussion: None.
Motion carries 5-0

### ADDED ITEM – COMMUNITY DEVELOPMENT COMMITTEE – FIRST IMPRESSIONS PROGRAM
J.C. explained that they have come to an agreement with the town of Tilton regarding the First Impressions Program and explained those details. This memorandum states that the town of Pittsfield and the town of Tilton will look at the other community and give some feedback.

Carl: I make a motion to approve J.C., Cara Hayes, and Louie Houle to sign the memorandum.
Carole: Second.
Discussion: None.
Motion carries 5-0

## ADDED ITEM - Zoning Administrator Deputy

Carl explained he will be on vacation and the Zoning Administrator duties should be covered and would suggest appointing a person as the deputy for not just this instance but also when he is not available to give a timely response.

Carl: I make a motion to appoint J.C. Allard as Deputy Zoning Administrator.
Jim: Second.
Discussion: None.
Motion carries 4-1 J.C. abstains

## ADDED ITEM - Donation of building supplies for the barn at the library

Carl stated that in trying to button up the barn at the library with Clayton Wood and Daren Nielsen and he purchased some supplies to get the job accomplished. Carl stated the job can be completed after some more materials are purchased. He would like a motion to accept the materials as a donation. Jim inquired about the dollar amount and Carl stated not more than $50.00.

Jim: I make a motion to accept the donation of materials needed to seal up the barn at the library.
Carole: Second.
Discussion: None.
Motion carries 5-0

## ADDED ITEM - Junkyard license renewals

Carl would like to be proactive with the junkyard licenses around town and suggests sending a letter of notice of the requirements that need to be done before their license expires to get the process started. It was decided to send out those letters and there was some discussion pertaining to some details on what those letters should contain.

## ADDED ITEM - Notice of Zoning Violation update

Carl stated a Notice of Zoning Violation is going to be sent to 140 Tilton Hill Road and gave some details on what the property owners can have for storage trailers.

Carl: I make a motion to send the Notice of Violation to 140 Tilton Hill Road.
Jim: Second.
Discussion: None.
Motion carries 5-0

**ADDED ITEM - Zoning Violation for excessive junk in the yard**

Cara stated that a Notice of Zoning Violation should be sent for a property because she received a complaint concerning excessive debris in the yard. It was decided to put that on the next agenda.

**ADDED ITEM - 33 Main Street purchase and sale agreement extension**

Carl stated that they received a request from Mr. Gamble to extend the purchase and sales agreement for 33 Main Street. There was some discussion pertaining to the details on the reason.

Jim: I make a motion to extend the purchase and sales agreement for 33 Main Street for 30 days.

Carole: Second.

Discussion: None.

Motion carries 5-0

**27. Signing of the Collective Barging Agreement for Teamsters Local #633**

J.C.: I make a motion to approve and sign the Collective Bargaining Agreement with the teamsters union as approved at 2018 town meeting.

Carl: Second.

Discussion: None.

Motion carries 5-0

**COMMITTEE REPORTS**

Gerard stated that BCEP will be changing the rates to 10 cents a pound from 7 cents.

Carl stated that the selectboard will be receiving a letter concerning the septic system at JNR Automotive and gave some details concerning the issue.

**INFORMATION ITEMS**

2. Letter of Commendation – Sergeant DiGeorge

J.C. announced that Sgt. DiGeorge received a letter of commendation and Sgt. DiGeorge explained the story and also informed the board about 2 other circumstances that may receive a letter, as well. Carole read both letters and Sgt. DiGeorge received an applause from all who attended the meeting. The board stated that the town of Pittsfield is honored and proud to have such a heroic member of the police department. Jim stated he will work on finding out where to send these types of letters to the Red Cross to have Sgt. DiGeorge recognized.

**OLD BUSINESS**

2. Josiah Carpenter Library chimney repair (tabled 4/24/2018)

Carl gave an update on the chimney repair, and stated they received a proposal and suggested that we continue to look for someone who will just repoint the chimney.

3. Historical Society public hearing request – relocation of Society headquarters (pending 4/24/2018)
It was decided to schedule the public hearings for the July meetings.

**CHECK MANIFESTS**
1. Accounts Payable
Gerard: I make a motion to approve Accounts Payable.
Carl: Second.
Discussion: None.
Motion carries 5-0

2. Payroll
Gerard: I make a motion to approve Payroll and Direct Deposit.
Carl: Second.
Discussion: None.
Motion carries 5-0

**MINUTES**
1. May 8, 2018 – Non Public Session Minutes (tabled 5/22/2018)

2. May 20, 2018 – Public Session Minutes
Gerard: I make a motion to table the May 20, 2018 Public Meeting Minutes.
Carl: Second.
Discussion:
Motion

3. May 20, 2018 – Non Public Session Minutes
Gerard: I make a motion to table the May 20, 2018 Non-Public Meeting Minutes.
Carl: Second.
Discussion: None.
Motion carries 5-0

4. May 22, 2018 – Public Session Minutes
Gerard: I make a motion to approve the May 22, 2018 Public Meeting Minutes.
Carl: Second.
Discussion: None.
Motion carries 5-0

5. June 2, 2018 – Public Session Minutes
Gerard: I make a motion to approve the June 2, 2018 minutes with corrections of the date and time.
Carl: Second.
Discussion: None.
Motion carries 5-0

**PUBLIC INPUT**

Adam Gauthier would like to remind the board about the meeting tomorrow night concerning school funding and gave some details on what will be discussed. He encourages everyone to come out. Adam also inquired about Atlantic Broadband taking over Metrocast and if that would affect the lines in Pittsfield and Cara explained that the cable franchise is currently on an extended contract agreement until either party requests to open the terms.

**NON-PUBLIC SESSION**

Gerard: I make a motion to go into Non-Public Session under RSA 91-A:3, II (d).

Jim: Second.

Discussion: None - Roll call was done and all approved.

When the Board returned to public session Gerard made a motion to seal the non-public minutes as they may affect adversely the reputation of any person other than a member of this board. Carole seconded the motion.

Motion carries with a 5-0 roll call (2/3 achieved) vote, all approved.

Carl: I make a motion to approve Jay St. Jean Auctioneers to auction the tax deeded properties R4 Lots 1-1, 1-6, & 1-7.

Jim: Second.

Discussion: None.

Motion carries 5-0

Carl: I make a motion to adjourn.

Carole: Second.

Discussion: None.

Motion carries 5-0

Approved:

_James C. Allard, Chairman_    Date _10 July 2018_



# TOWN OF PITTSFIELD

Office of Selectmen
85 Main Street, Pittsfield NH 03263
admin@pittsfieldnh.gov ~ telephone (603) 435-6773 ~ fax (603) 435-7922

**EXHIBIT**

MARSTON AFF.
EXHIBIT 11

## NOTICE OF ZONING VIOLATION

June 12, 2018

mailed certified mail
and FIRST CLASS MAIL

Diane Dipoto
140 Tilton Hill Road
Pittsfield, NH 03263

notice of violation at:
140 Tilton Hill Road
Map R15 Lot 10

Dear Ms. Dipoto,

It has been brought to the attention of this office that zoning violations exist at your property, 140 Tilton Hill Road.

### VIOLATION

three unpermitted storage trailers on property
Pittsfield Zoning Ordinance – Article# 14. Storage Containers

### CORRECTIVE ACTION NEEDED

remove trailers or submit application for storage container permit(s)

### RIGHT TO APPEAL

This notice is a decision of the Zoning Ordinance Administrator and may be appealed to the Zoning Board of Adjustment in accordance with the provisions of the Pittsfield Zoning Ordinance Article 5, Section 5. Appeals to the Board of Adjustment, provided that such appeal is filed within thirty days of the date of this decision, per NH RSA 676:5 and the Pittsfield Zoning Board of Adjustment's Rules of Procedure.

### PENALTIES & FEES

Please be advised that violations of the provisions of the Pittsfield Zoning Ordinance include civil penalties of $275 for the first offense, and $550 for subsequent offences, for each day such violation is found to continue after the conviction date or after the date on which the violator received written notice, whichever is earlier, with each day that the violation continues being considered as a separate offense, as further described in Article 1, Section 9. Penalty Clause.

This correspondence serves as a formal notice of a zoning violation. You have 30 days notice from the receipt of this notice to cure this violation. In the event that the violations are not cured or remedied as provided for in this notice, the Town will pursue enforcement of the violations as provided for by law.

Should you have any questions please contact the Selectmen's Office at the contact information listed above.

Sincerely,

Pittsfield Board of Selectmen



**OFFICE OF SELECTMEN**
85 Main Street
Pittsfield, NH 03263-0098

NEOPOST          FIRST-CLASS MAIL
06/13/2018
US POSTAGE $000.47⁰


ZIP 03263
041M11290780

Diane Dipoto
140 Tilton Hill Road
Pittsfield, NH 03263

Dear Ms. Dipoto,

---

**CERTIFIED MAIL**



**OFFICE OF SELECTMEN**
85 Main Street
Pittsfield, NH 03263-0098



91 7199 9991 7034 2973 3008

NEOPOST          FIRST-CLASS MAIL
06/13/2018
US POSTAGE $003.92⁰


ZIP 03263
041M11290780

91 7199 9991 7034 2973 3008

Diane Dipoto
140 Tilton Hill Road
Pittsfield, NH 03263

Dear Ms. Dipoto,

378



# TOWN OF PITTSFIELD

Office of Selectmen
85 Main Street, Pittsfield NH 03263
admin@pittsfieldnh.gov ~ telephone (603) 435-6773 ~ fax (60[...]



June 13, 2018

Joseph E. McCoy
322 Catamount Road
Pittsfield, NH 03263

S/container
removed
no further violation

Re: storage container permit expiration

Dear Mr. McCoy,

The Board of Selectmen considered your permit extension request dated May 29, 2018. While they note the personal circumstances that have caused delay, the Board has to balance the terms of the zoning ordinance with your request, and as you have already been granted a year's extension beyond the 12 months permitted, they voted to not grant this second extension.

The Board has granted an additional thirty (30) days from the date of this letter to remove the storage container from your property.

Sincerely,

Cara M. Hayes
Cara M. Hayes
Town Administrator

379

# DrummondWoodsum

### ATTORNEYS AT LAW

**Matthew R. Serge**
Admitted in NH



May 24, 2019

James Hetu and Cynthia Hetu
272 Loudon Road
Pittsfield, NH 03263

     RE:   Zoning Violation

Dear Mr. and Mrs. Hetu:

This office serves as general legal counsel to the Town of Pittsfield. The Town has asked us to contact you concerning an ongoing zoning ordinance violation on the property identified above. Specifically, you have been keeping a storage trailer on your property in violation of Article 14 of the Pittsfield Zoning Ordinance.

Article 14 of the Zoning Ordinance (entitled Storage Containers) provides that a storage container is permitted on a property only if the landowner complies with a series of conditions, including that the landowner obtain a permit from the Town. This permit states when the storage container will be placed on the lot, and the Ordinance further provides that the longest a contained can remain on a property is no more than 12 months in a 15-month period. For purposes of Article 14, a "Storage Container" includes a "truck trailer, box trailer, school bus, manufacture housing unit, or similar mobile container parked continuously for 31 days or more and used principally for storage and not used for any person's residential occupancy or transient lodging." A copy of applicable sections of the Zoning Ordinance are attached for reference.

The Town has sent you two Notices of Zoning Violation, dated December 4, 2018 and January 18, 2019 (copies attached). To date, you have not responded to these letters. The Town demands, therefore, that you remove the trailer(s) from your property by May 24, 2019, and that no trailers will be stored on the property until you receive a permit from the Town. If you fail to comply, the Town will initiate legal action to remove the trailer(s). If a lawsuit is filed, you may be required to pay civil fines to the Town of $275 per day, beginning February 17, 2019. In addition, if the Town is successful in its lawsuit, you will be required to pay for the Town's reasonable costs and attorney's fees.

If you have any questions, please contact the Town at (603) 435-6773. Thank you.

Sincerely,

Matthew R. Serge

cc:    Board of Selectmen

## Article 14. Storage Containers

### 1. Authority

RSA 674:16, I, (d); RSA 674:16, V; and RSA 674:17.

### 2. Purpose

The purpose of these STORAGE CONTAINER regulations is to promote the general welfare by protecting the aesthetics of the town. (See RSA 674:17, I, (c), and Taylor v. Plaistow, 152 N.H. 142, 872 A.2d 769 (2005) ("a municipality may exercise its zoning power solely to advance aesthetic values because the preservation or enhancement of the visual environment may promote the general welfare.").)

### 3. Permitting Conditions for Storage Containers

Except as provided in article 4, section 3, Nonconforming Uses, every STORAGE CONTAINER shall be permitted upon the following conditions and upon all other applicable conditions in the zoning ordinance:

(a) The STORAGE CONTAINER shall be used for and only for storage.

(b) The STORAGE CONTAINER shall have a SETBACK from every STREET boundary or INTERIOR LOT LINE which SETBACK is greater than or equal to the minimum SETBACK specified for the STREET boundary or INTERIOR LOT LINE by article 3, section 4, (h), Table of Dimensional Requirements.

(c) No more than one STORAGE CONTAINER shall be on the LOT if the LOT is in the Urban District, the Suburban District, or the Rural District.

(d) No more than two STORAGE CONTAINERS shall be on the LOT if the LOT is in the Commercial District or the Light Industrial/Commercial District.

(e) The sum of the time during which one or more STORAGE CONTAINERS are on any one LOT during any 15-month period shall be no more than 12 months.

(f) The owner of the LOT where the STORAGE CONTAINER will be put shall tell the zoning ordinance administrator the date when the STORAGE CONTAINER is proposed to be put on the LOT. The zoning ordinance administrator shall issue a permit for the STORAGE CONTAINER, and the permit shall state the date when the STORAGE CONTAINER is proposed to be put on the LOT.



# TOWN OF PITTSFIELD

Office of Selectmen
85 Main Street, Pittsfield NH 03263
admin@pittsfieldnh.gov ~ telephone (603) 435-6773 ~ fax (603) 435-7922

## NOTICE OF ZONING VIOLATION

December 4, 2018

mailed certified mail
and FIRST CLASS MAIL

James B. Hetu
Cynthia A. Hetu
272 Loudon Road
Pittsfield, NH 03263

notice of violation at:
272 Loudon Road
Map R35 Lot 10

Dear James & Cynthia,

It has been brought to the attention of this office that zoning violations exist at your property, 272 Loudon Road.

### VIOLATION

unpermitted storage trailer on property
Pittsfield Zoning Ordinance – Article# 14. Storage Containers

### CORRECTIVE ACTION NEEDED

remove trailer or submit application for storage container permit

### RIGHT TO APPEAL

This notice is a decision of the Zoning Ordinance Administrator and may be appealed to the Zoning Board of Adjustment in accordance with the provisions of the Pittsfield Zoning Ordinance Article 5, Section 5. Appeals to the Board of Adjustment, provided that such appeal is filed within thirty days of the date of this decision, per NH RSA 676:5 and the Pittsfield Zoning Board of Adjustment's Rules of Procedure.

### PENALTIES & FEES

Please be advised that violations of the provisions of the Pittsfield Zoning Ordinance include civil penalties of $275 for the first offense, and $550 for subsequent offences, for each day such violation is found to continue after the conviction date or after the date on which the violator received written notice, whichever is earlier, with each day that the violation continues being considered as a separate offense, as further described in Article 1, Section 9. Penalty Clause.
This correspondence serves as a formal notice of a zoning violation. You have 30 days notice from the receipt of this notice to cure this violation. In the event that the violations are not cured or remedied as provided for in this notice, the Town will pursue enforcement of the violations as provided for by law.

Should you have any questions please contact the Selectmen's Office at the contact information listed above.

Sincerely,

Pittsfield Board of Selectmen



# TOWN OF PITTSFIELD

Office of Selectmen
85 Main Street, Pittsfield NH 03263
admin@pittsfieldnh.gov ~ telephone (603) 435-6773 ~ fax (603) 435-7922

## SECOND - NOTICE OF ZONING VIOLATION

January 18, 2019

James B. Hetu
Cynthia A. Hetu
272 Loudon Road
Pittsfield, NH 03263

mailed certified mail
and FIRST CLASS MAIL

notice of violation at:
272 Loudon Road
Map R35 Lot 10

Dear James & Cynthia,

It has been brought to the attention of this office that zoning violations exist at your property, 272 Loudon Road.

### VIOLATION
unpermitted storage trailer on property
Pittsfield Zoning Ordinance – Article# 14. Storage Containers

### CORRECTIVE ACTION NEEDED
remove trailer or submit application for storage container permit

### RIGHT TO APPEAL
This notice is a decision of the Zoning Ordinance Administrator and may be appealed to the Zoning Board of Adjustment in accordance with the provisions of the Pittsfield Zoning Ordinance Article 5, Section 5. Appeals to the Board of Adjustment, provided that such appeal is filed within thirty days of the date of this decision, per NH RSA 676:5 and the Pittsfield Zoning Board of Adjustment's Rules of Procedure.

### PENALTIES & FEES
Please be advised that violations of the provisions of the Pittsfield Zoning Ordinance include civil penalties of $275 for the first offense, and $550 for subsequent offences, for each day such violation is found to continue after the conviction date or after the date on which the violator received written notice, whichever is earlier, with each day that the violation continues being considered as a separate offense, as further described in Article 1, Section 9. Penalty Clause.

This correspondence serves as a formal notice of a zoning violation. **You have 30 days notice from the receipt of this notice to cure this violation.** In the event that the violations are not cured or remedied as provided for in this notice, the Town will pursue enforcement of the violations as provided for by law.

Should you have any questions please contact the Selectmen's Office at the contact information listed above.

Sincerely,

Pittsfield Board of Selectmen



# TOWN OF PITTSFIELD

Office of Selectmen

85 Main Street, Pittsfield NH 03263

admin@pittsfieldnh.gov ~ telephone (603) 435-6773 ~ fax (603) 435-7922



**EXHIBIT**

MARSTON AFF.
EXHIBIT 14

## NOTICE OF ZONING VIOLATION

August 13, 2019

mailed certified mail
and FIRST CLASS MAIL

Sanel Realty Co. Inc.
11 Cram Avenue
Pittsfield, NH 03263

notice of violation at:
11 Cram Avenue
Map U3 Lot 11

Dear Sanel Realty Co. representative(s),

It has been brought to the attention of our office that zoning violations exist at your property, 11 Cram Avenue.

### VIOLATION
unpermitted storage trailer on property
Pittsfield Zoning Ordinance – Article# 14. Storage Containers

### CORRECTIVE ACTION NEEDED
remove trailer or submit application for storage container permit

### RIGHT TO APPEAL
This notice is a decision of the Zoning Ordinance Administrator and may be appealed to the Zoning Board of Adjustment in accordance with the provisions of the Pittsfield Zoning Ordinance Article 5, Section 5. Appeals to the Board of Adjustment, provided that such appeal is filed within thirty days of the date of this decision, per NH RSA 676:5 and the Pittsfield Zoning Board of Adjustment's Rules of Procedure.

### PENALTIES & FEES
Please be advised that violations of the provisions of the Pittsfield Zoning Ordinance include civil penalties of $275 for the first offense, and $550 for subsequent offences, for each day such violation is found to continue after the conviction date or after the date on which the violator received written notice, whichever is earlier, with each day that the violation continues being considered as a separate offense, as further described in Article 1, Section 9. Penalty Clause.

This correspondence serves as a formal notice of a zoning violation. **You have 30 days notice from the receipt of this notice to cure this violation.** In the event that the violations are not cured or remedied as provided for in this notice, the Town will pursue enforcement of the violations as provided for by law.

Should you have any questions please contact the Selectmen's Office at the contact information listed above.

Sincerely,

Pittsfield Board of Selectmen

384



**TOWN OF PITTSFIELD
BOARD OF SELECTMEN
TOWN HALL, 85 MAIN STREET
PITTSFIELD, NH 03263**



EXHIBIT
MARSTON AFF.
EXHIBIT 15

**MEETING MINUTES OF Tuesday May 23, 2017**

**CALL TO ORDER**
Call to order at 6:00 p.m. by J.C. Allard, Chairman

**MEMBERS PRESENT**
J.C. Allard, Chairman
Gerard LeDuc, Vice-Chairman
Carole Richardson
Carl Anderson

**MEMBERS ABSENT**
None

**OTHERS PRESENT**
Cara Marston, Town Administrator
Ammy Ramsey, Recording Secretary

**PUBLIC INPUT** – regarding agenda items only
Mary French inquired about the best time to speak about 81 Main Street would be, and J.C. explained that the public hearing would be the time to do so.

**AGENDA REVIEW**
Gerard: Report for Aqueduct under committee reports.
Carole: None.
Carl: None.
J.C.: None.

**PUBLIC HEARING**
6:15 p.m. – Pittsfield Historical Society proposed relocation to 81 Main Street

J.C. opened the public hearing to receive input from the public regarding the proposal by the Historical Society to take possession of town owned property at 81 Main Street which is adjacent to the Town Hall.

Adam Gauthier asked if there are any proposals printed to look at, Cara handed some out.

Mark Riel asked if the proposal is the actual letter, J.C. stated yes, with a copy of the tax card for people to see the property.

Mary French asked which item we are talking about, because under old business it says it's a sale and the proposal states it's a donation. J.C. explained that the public hearing is a discussion for the proposed donation of the property and the item under old business is referring to us trying to sell this property over the last year. This is a relatively new proposal from the Historical Society to take possession of the property. J.C. asked Carl to give a history of the property. Carl explained that we ran into an issue with selling this property with a clear title. In addition to the usual title problems with a property that is taken by tax deed this one had other issues, too. Carl stated that the likelihood of getting a clear title without doing an action to quite title which can cost ten to fifteen thousand dollars is out of the question. There have been several title companies working on it to accomplish this. If we were to take this to auction we still have to convey a clear title. To get a clear title it would easily cost ten to fifteen thousand dollars and have to go through the courts and that can be a lengthy process. Carl stated that they had a person interested in purchasing the property and they would take on the expense of clearing the title themselves, and at the point it would be rehabbed and restored to the tax rolls, at a low purchase price. Then the question would be if that would be in the best interest of the town, because you are rolling the dice when you sell a property as to how much additional burden could be put on the services in town. It's an unknown when you sell the property to know if the tax revenue that the town receives would be of benefit to the town. Or would we be better off donating this property to the Historical Society, so the town would have a nice place to keep the history of the town. It won't bring any revenue, but to Carl's understanding they would clear the title and tear down the existing building and build a new one. Otherwise we would be in for a 10 year wait to see what happens with the title.

Randy Severance stated that at the last meeting there was a non-public session held with the Historical Society and it was later revealed to us during public session that the non-public meeting minutes would be unsealed and put up on the website as agenda minutes. As of noon time today they were not on the website and requested a synopsis of that then private but not private meeting. J.C. stated the reason the minutes are not on the website is because they have not been approved and will be during this meeting. J.C. explained that it was a discussion concerning the desire of the Historical Society to take possession of 81 Main Street property. They would demolish the existing building and replace it with building yet to be designed to accommodate the possessions of the Historical Society. Part of that discussion pertained to the issues that Carl just explained with the title. Currently in the state of New Hampshire we have an advantage concerning titles for non-profit organizations relative to titles verses a private sale.

Adam Gauthier asked if there was a time table for demolition and moving forward, J.C. stated they don't have a formal commitment as they are waiting for approval. The Historical Society shares this board's interest in moving forward with getting the current structure down and construct a new building.

Mary French asked if that will be a stipulation put in the deed, Carl stated that we could. The other properties that have been sold in town for residential rehab have had time frame for improvements so the properties are better to look at. Carl feels that we would be looking for the same thing and thinks they are prepared for something like that, as well.

Justin Clough is in favor of history but considering the fact of serious constraints in regards to tax revenue. With an offer on the table for this property who is willing to work the title process at their expense, he is wondering why we are not taking a closer look at that first. He would like to see something more available for the Historical Society, but looking at this from a tax revenue purpose he finds it a little difficult to hand over a property that would not generate any tax revenue when we have an offer that could generate revenue. Carl stated that we don't exactly have an offer on the table, however one could be generated. Carl stated that there are things we have to consider when looking at it from that perspective. You have to look at how much tax revenue it will be capable of generating. Will it have a house on that small lot that will be taxed for $10,000.00 or $4,500.00. And the other thing would be depending on the buyers and if it is a family that will cost the town more than that in services. It's not an exclusion from someone coming and building but residential development does not usually enhance the tax situation. Justin's other concern is that previously he saw it was going to be rezoned so that it would be a business. His question would be if it is generating just one dollar of tax revenue then wouldn't it be better than generating none. Carl stated that just because you generate a dollar in revenue does not mean you are on the up side.

Mark Riel stated that the intention of the Historical Society is to put their current building back onto the tax rolls and it is assessed twice as much so it would generate tax revenue. Justin asked if it could potentially be a tear down. Mark stated the building is in good condition.

Mary French asked if the current Historical Society building was originally bought or donated, Mr. Berkson stated it was purchased. She also is impressed with Pittsfield's Historical Society and how they handle the history of Pittsfield. Mary asked if the previous residents lived there when the property was taken by tax deed. Cara stated that she had passed away. Mary feels that it would be a benefit to have the Historical Society there and has some possible suggestions for the deed.

Fred Okrent believes that the donation of the property to the Historical Society for the construction of a new building would be a great step forward for the revitalization of the town.

Adam Gauthier stated that he is not against the Historical Society he just would like some more information. He asked if funding is available for this project or are they going to be doing some fundraising. Mark Riel stated that they have some significant pledges for the project, that will get them to a point of clearing the title, demolishing the current structure, some site work, and a new structure up and enclosed. There may be some fundraising later to finish the project.

Doug Martin asked if the rebuild would be period correct, J.C. stated that the town does not have a historic district that has that kind of requirement. Doug commented that we are taking down history to put up a warehouse. J.C. stated that the architectural design has not been done yet. Doug inquired about the building being climate controlled to properly store the Historical Society's items. Mark Riel informed Doug that most historical societies do not have climate controlled atmosphere for the entire facility, they do for some of the paper items. Mark stated that the 3 story building including the full basement that would hold the fire wagons and baggage carts, and stated that they want it to fit the Historical Society's image and benefit the town. J.C. commented that anyone could take possession of the building would most likely tear it down because of the condition it is in. Doug understands that but it would be private sector and not a gift or donation.

Randy Severance asked if the town still has an abandoned piece of property next to the library and if so wouldn't that be a better location for the Historical Society.  And has it been considered. Mark Riel stated that they had looked at that and it would be costly in the long run for the upkeep of that building.

Lee Corson asked about a time frame for the new building to be up.  Mark Riel stated it is the intention to remove the existing building quickly, but we would need the title cleared before the construction process starts.

Justin Clough asked if the time has been taken to look at existing structures around town.  He is in favor of having a good Historical Society, but would it be more price advantageous to purchase and rehab to meet their needs and put this property back on the tax roll.  Justin inquired about the building down the street that has been vacant for a while and has a good location.  Ray Webber stated that then you would be taking that property off the tax roll.

Larry Berkson stated they have done some research and looked at all (14 currently) available properties in town.  Larry explained the building Justin referred to would be a big loss in tax revenue for the town, and they would not be able to afford the maintenance and upkeep that property would need.  They currently have a window with some major donors and would need to do something pretty hastily to capture that money and move forward and the project next door is the best option.

Justin Clough stated that he is only asking these questions because there was not much information given to the public.  He understands that they have done the research but there is not a lot of information available to know what's going on.

Adam Gauthier asked about parking, Mark Riel stated that it wouldn't be any worse than what they have now because they don't have any now.  Ray Webber stated that there will be some available behind the building.

Jim Gamble stated that he was the one with the purchase and sales agreement on this property, he does this for a living and he was prepared to purchase and rehab it.  He has been doing this for 42 years and agrees that it needs work but the work is doable.  He currently is rehabbing 114 Main Street.

Lee Corson inquired about how long it would take to get a clear title.  J.C. stated he is not sure how long it would take but it would be costly.  Carl stated it could take 6 months to a year.

Jim Gamble stated it was his attorney that found the problems with that title.  They said it was not hard it's just dealing with the lenders, and it would take 6 months to a year just like he explained to Carl.

Justin Clough asked if the Historical Society would be looking at the same time frame.   J.C. believes that it would be different because of their non-profit status.  Carl stated that the board could convey the property to anyone with a clear title or not, it's whether the buyer accepts the

title the way it is. In the case of Mr. Gamble he can purchase it and rehab it, but when it comes time sell the property it would be in his best interest to clear the title.

Mary French requested clarification of clearing the title if it goes to the Historical Society. J.C. stated that whoever the property is conveyed to would still have to clear the title. And to his understanding the Historical Society would be the terminal holder because they would intend to hold the property in perpetuity, whereas a private citizen would fix it and sell it the title would come into question again. It seems holding onto the title for a time seems to have less questions. Mary feels that it would be important to put something in the deed that states if the Historical Society is not able to continue residing on that property they could not sell it and would return the property to the town. She has examples that she would like to provide to the selectboard for their information.

J.C. closed the public hearing at 6:47 p.m.

Carl asked if we could do a poll to see how many would be in favor and who would not. There was some discussion and a poll was done. The majority was in favor of donating the property to the Historical Society.

**NEW BUSINESS**

**ACTION ITEMS**
1. Property Tax Warrant – $4,211,170.00
J.C. stated that item number 1 is for the Property Tax Warrant.

Gerard: I make a motion to approve the Property Tax Warrant in the amount of $4,211,170.00.
Carl: Second.
Discussion: None.
Motion carries 4-0

2. Notice of Intent to Cut Timber – Tax Map R30, Lot 4 – 520 Catamount Road
J.C. stated that item number 2 is for a Notice of Intent to Cut Timber for Tax Map R30, Lot 4 at 520 Catamount Road.

Carl: I make a motion to approve the Notice of Intent to Cut Tax Map R30, Lot 4, 520 Catamount Road.
Gerard: Second.
Discussion: None.
Motion carries 4-0

3. Application for Current Use – Tax Map R2, Lot 7 – 113 Daroska Road
Gerard inquired if the current use was the 128 acres, Cara stated that it was the same ownership and contiguous. J.C. stated that item number 3 is for an Application for Current Use for Tax Map R2, Lot 7 at 113 Daroska Road. Carl inquired with Cara about the house location (on the abutting parcel) in reference to the 128 acres and the land that is currently in current use.

Carl: I make a motion to approve the Application for Current Use for Tax Map R2, Lot 7, 113 Daroska Road.
Carole: Second.
Discussion: None.
Motion carries 4-0

4. Abatement – 2 & 4 Manchester Street - $1,357.81
J.C. stated that item number 4 is a request for an abatement for 2 & 4 Manchester Street in the amount of $1,357.81.

Gerard: I make a motion to approve the abatement for Tax Map U01, Lot 83 2 & 4 Manchester Street in the amount of $1,357.81.
Carl: Second.
Discussion: None.
Motion carries 3-1 Carole opposes.

5. Conservation Commission Resignation – Owen David
J.C. stated that item number 5 is a resignation letter from Owen David.

Gerard: I make a motion to approve the resignation of Owen David from the Conservation Commission.
Carl: Second.
Discussion: None.
Motion carries 4-0

6. Conservation Commission Appointment – Carl Wallman
J.C. stated that item number 6 is an appointment application for Carl Wallman to the Conservation Commission.

Gerard: I make a motion to approve the appointment of Carl Wallman to the Conservation Commission.
Carl: Second.
Discussion: None.
Motion carries 4-0

7. Committee name change request - Economic Development to Community Development
J.C. stated that item number 7 is a request to change the name of the Economic Development Committee to be the Community Development Committee.

Carl: I make a motion to approve the name change request of the Economic Development Committee to Community Development Committee.
Carole: Second.
Discussion: None.
Motion carries 4-0

8. Economic (Community) Development Committee Appointment – Leroy Corson
J.C. stated that item number 8 is an appointment request of Leroy Corson to the new Community Development Committee.

Gerard: I make a motion to approve the appointment of Leroy Corson to the Economic (Community) Development Committee.
Carl: Second.
Discussion: None
Motion carries 4-0

9. Parks & Recreation Commission Appointment – David Stasiak
Gerard: I make a motion to approve the appointment of David Stasiak to Parks & Recreation Committee.
Carl: Second.
Discussion: None.
Motion carries 4-0

10. BCEP Solid Waste District disposal fee waiver – Josiah Carpenter Library
Carole: I make a motion to waive the fee waive the fee for the library.
Carl: Second.
Discussion: None.
Motion carries 3-1 Gerard abstains.

11. 42 Chestnut Street grant demolition project – easement addition to deed
Cara stated that this is something that FEMA requires with the project to make sure that anyone searching the title on the property that FEMA was involved with the project. It's part of the grant, if for some reason we wanted to sell this property we would have to go back to FEMA and ask their permission because they have an interest in the property, and then there would be a different easement going forward.

Carl: I make a motion to approve the easement addition to the deed to satisfy FEMA.
Carole: Second.
Discussion: None.
Motion carries 4-0

12. Proposed donations of personal property – Police Department
Cara stated that there were some donations dropped off at the police department of coloring books and stuffed animals for the officers to give to children in difficult situations.

Carl: I make a motion to accept the personal property donation for the police department as described.
Carole: Second.
Discussion: Carole asked if we have a person or group to thank. J.C. asked if we should send something to the church. Carl suggested sending a letter of thanks to them.
Motion carries 4-0

13. Proposed donation of personal property – Emergency Management
Cara stated that this would be retroactive because this came forward at the same time the donation policy was being discussed.  Rob Freese printed out the entire plan and the big color print outs needed for the hazardous mitigation materials.

Carl: I make a motion to accept the proposed donation of the personal property as described.
Gerard: Second.
Discussion: None.
Motion carries 4-0

14. Draft bid notice – LED street light conversion project
Cara presented the draft bid notice for the board to review.  She explained that she used several different examples to create this bid.  Carl would like to review this, because we need to make sure there is some kind of accommodation for either a relocation or possible addition of some lighting.  Carole confirmed this had to go out to bid with Cara because she thought there was a company that was already set up to do this project.  Cara also included the current street light inventory that was done by Sgt. DiGeorge that gave his opinion from a safety aspect if we need the light or not, then gave it to George for his review from a public works perspective.

Carl: I make a motion to table this until our next meeting so we have a chance to look at the bid proposal and the list of lighting.
Gerard: Second.
Discussion: Cara explained that there is 141 lights the town is paying for and when Sgt. DiGeorge went through the list he could not find 6 of them but found and additional 13 that we are not paying for.  Carole stated that the LED lights are supposed to be more effective so we may not need as many but who is going to tell us that.  Cara stated that part of the bid is going to do an audit and they should be able to tell us what we need and don't need.  Then they will bring it to you and you will have the final decision.
Motion carries 4-0 (to table)

Carole asked if we could have a time frame on this so we can get moving with this.  Carl stated that the motion to table is for 2 weeks.  Carole is hoping we get this done by fall.  Cara stated that as long as we can get a good list we can put it out to bid.  Cara stated that when looking at other municipalities that have done this there was a time of around 6 months.

15. Storage Container Permit extension concern – 322 Catamount Road
Cara stated that this original permit came to the board in the fall for an extension and now has lapsed, so Cara asked Jesse to go take a peek to see if it was still there.   Jesse stated that the gentleman was going to come in and ask to speak to the board, Cara stated she received a letter.  J.C. asked for the location and Jesse stated it was on Catamount Road.  Jesse explained that the man is disabled and has trouble getting in and out of the trailer so it is taking him longer to clean it out.   The other concern he brought forward is that other people in town have trailers and questioned why he has to move his is other people are not required to.  Carl asked Jesse if he is aware of other storage trailers in town that are supposed to have a permit.  Jesse stated that storage trailers are not allowed unless they are for construction reasons.  We don't have anything in our codes that they need a permit, but we have a paper that says if you have a storage container you have to be approved by the BOS.  Cara stated that is in the Zoning Ordinance.  Carl

asked Jesse if he is aware of any other trailers in town that shouldn't be, and Jesse stated that they are all over the place but are they grandfathered or not would be another question. Carl asked if the trailer is registered, because to his understanding if the trailer was registered and so that it could be moved when needed it was not taxable and would be in a different category then a storage building. Jesse has not seen anything that says that but it does say storage trailers. Whether or not it's registered it is still storage on private properties and Jesse does not believe it was the intent of the ordinance to allow anyone to have the storage containers on their property. Cara stated the ordinance does not say anything about registration. Carl asked about the property next to the town shed and Cara informed him that he is taxed on those and is grandfathered and the other residents are not taxed. Carl stated that could be a way to address the issue and start taxing the trailers. Jesse explained that in other towns where he builds they sometimes are in need of a storage trailer to store stuff while the construction is going on and then when the construction is complete the trailer is removed and he believes that is what our ordinance is addressing. J.C. asked if there is a difference between a trailer and a container. Adam Gauthier stated that trailer is not mentioned in the ordinance and container is. J.C. questioned if they should deal with trailers any differently. Cara stated the definition of storage container on the permit application reads: would be any truck, trailer, box trailer, school bus, mobile home or any other facilities used for storage or other purposes whether registered or not. J.C. asked what we should do about this item, and suggested tabling it because the gentleman requested to come in and speak with the board. Carl stated he does not know how we can justify treating this one resident any different than any other. J.C. stated he did do the right thing and came in and received a permit. Jesse stated it originated from a complaint and the gentleman stated he was using the trailer while he built his garage and got the permit. Cara stated that in order to change the ordinance you would have to go to town meeting. Gerard stated he would like to see him come in front of the board since he did request to. Cara asked about the other properties that are technically in violation, Carl stated they are not on the agenda at the moment. Chief Pszonowsky stated the fire department is currently in violation to store equipment so we would be subject to anything that might come about. Justin Clough stated that he believes it's not the trailer but the ordinance to be reviewed. Carl would like to see this tabled and have Mr. McCoy come in and talk with us.

Carl: I make a motion to table.
Gerard: Second.
Discussion: None.
Motion carries 4-0.

**COMMITTEE REPORTS**
Gerard stated at the last Aqueduct meeting the board voted to pay the balance to Mr. Sancoucy. Gerard also stated that the petition was submitted to the selectboard and since there has not been any movement the committee feels the selectboard is in violation of RSA 50. Carl asked what RSA 50 says and Cara was not sure. Cara stated the board's direction to the committee was to give us a vote on their proposal on the boundaries and a boundary list that agreed to the maps. Fred Okrent stated that was voted on and sent. Cara stated this meeting is the next meeting of the selectboard after that and is on the agenda under old business, so unsure of what RSA could be in violation. J.C. inquired what the next step is, and Cara stated to establish the boundaries of the water district and included it in the agenda packet for the board along with the minutes. Carl stated he has seen the boundaries and the list of properties, and personally has an issue with

properties being placed in a village district in which the property owner has no vote or say in what happens. Carl stated to his understanding the only people who have a vote in the village district are those who are domiciled in the village district. So if you own a property in the village district but do not live there you do not get a say. J.C. asked if that meant the landlords would not have a say or vote, and Carl said yes if he understands it correctly. Carl stated that the landlords and the people who own land would not have a vote but would still be subject to the rules made by others and he is opposed.

Carole had no committee reports but would like Ammy to include the list of state paving that Mr. Donovan provided that are proposed for next year.

| Road Route | Length | Limits |
|---|---|---|
| NH 107 | .8 | From Depot St. to NH 107 |
| Loudon Rd. / Concord Hill Rd. Main St. | 1 | From NH 28 to Clark St. |
| Barnstead Rd. | .2 | From NH 28 to NH 28 |
| Barnstead Rd. | .5 | From NH 28 to NH 28 |
| Carrol St. | .2 | From Main St. to Depot St. |
| NH 28 | 3.1 | From Epsom Circle to S. Barnstead Rd. |

Cara asked if these are proposed or slated, Carole stated they are slated. Cara stated they usually receive notification from the state and then it becomes and information item on the Selectboard agenda.

J.C. stated that the new Community Development Committee will meet tomorrow evening at 6:30.

**INFORMATION ITEMS**
April Waste Water Treatment Facility Report was presented to the board.

**OLD BUSINESS**
1. Town hall basement code issues (4/5/16)
Cara stated that until we know that the food pantry is completely moved out we can't move forward. There are some freezers down there and she spoke with one of the board members from the pantry and they are working on distributing those. They did say the move has been successful and they are working on getting some insurance as a non-profit.

3. Joy Street Pump Station concern (8/16/16, building/health to follow up)
Cara sent the letter and has not heard anything back, but it's only been a week.

4. Consulting Services Contract for Municipalization of Pittsfield Aqueduct Co. (9/27/16)
Cara stated that Gerard stated the Aqueduct Committee voted to pay the balance, so asked if there is going to be a contract. Fred Okrent stated the motion on that was to have the selectman approve the contract for the remaining balance, whether we use it or not is up in the air. But it has to be an approved contract before we use it if we need to. It has been voted on in the past and the money was set aside and it was a matter of book keeping. Fred stated they approved it. J.C. asked now that they approved if we need to approve it. Cara stated yes, that as long as

Sansoucy amended the contract amount because that was the problem. The contract amount that was given was above the encumbered amount so we wanted the amendment to reflect the encumbered amount so we could approve that. Fred stated he believed he sent it and will check on that.

5. Library sewer line repair (4/4/17)
Cara stated that Bill Gilpatrick was over at Sanels who needed some sewer work done and he spoke with the company doing that work and asked them if they would put in a bid for the work needed at the library. Cara stated they did and she forwarded that to the board and was not sure if the library trustee was aware they need to act on this or if they are going to refer to the selectboard. J.C. stated he will contact them.

6. Voter petition for formation of a Village Water District (4/4/17)
Cara stated that now that the board has seen what the committee voted on as a proposed list and map. Cara feels that the map should be marked for the public to easily see. The question would be if the board is ready to go forward with scheduling a public hearing on the proposed boundaries for the proposed water district. Town counsel suggested not lumping everything into one public hearing and to first establish the boundaries. The public hearing will be scheduled for June 27, 2017 during our regular scheduled meeting.

7. 2017 Balloon Rally fireworks proposal (5/2/17)
Cara stated that the contracts are ready to sign. The Rotary Club will be paying Atlas Fireworks directly.

Carl: I make a motion to approve the fireworks contract for the 2017 Balloon Rally and have the chairman sign the contract.
Carole: Second.
Discussion: None.
Motion carries 4-0

Gerard asked if they will be doing anything for 81 Main St. tonight. J.C. stated they should think about that before making a decision. Gerard stated the proposal consisted of a 3 story building and there may be a restriction in our zoning for that. Carl suggested putting a time frame for the existing building to come down and the lot cleaned up if it is approved, and requesting a drawing of what the new building will look like. The board discussed those items and decided to have Cara contact the Historical Society and request a proposed architectural design and a time frame for the next selectboard meeting so they can make a decision.

**CHECK MANIFESTS**
1. Accounts Payable
Gerard: I make a motion to approve Accounts Payable.
Carl: Second.
Discussion: None.
Motion carries 4-0

2. Payroll
Gerard: I make a motion to approve Payroll and Direct Deposit.

Carl: Second.
Discussion: None.
Motion carries 4-0

**MINUTES**
1.  May 9, 2017 – Public Meeting Minutes
Gerard: I make a motion to approve the May 9, 2017 Public Meeting Minutes.
Carl: Second.
Discussion: None.
Motion carries 4-0

Cara stated that an amendment for the Purchase and Sales Agreement is needed for the property that Sanel's is purchasing (Map U3, Lot 7).

Carl: I make a motion to extend the Purchase and Sales Agreement for 30 days till June 3, 2017.
Gerard: Second.
Discussion: None.
Motion 4-0

**PUBLIC INPUT**
Paul Nickerson would like the board to think about considering a hotel being put in town, he has two locations in mind and is working on putting something into motion.

Randy Severance stated you can put a stipulation in a deed when donating a property to also approve the architectural design of a building at a later time.  So the gifting can be done immediately and the design can be addressed later.  Carl stated the Historical Society would have to agree to making that stipulation.

Adam Gauthier asked about the roads that are slated to be paved, and he was given the list.

Paul Nickerson stated that we are not just giving a piece of land and inquired about the current property.  J.C. stated that they will be selling the current property and then it will return to the tax rolls.

J.C. stated they are going to go into non-public.

Carl:  I make a motion to go into non-public for RSA 91A:3-2 a,b,c,e.
Gerard: Second.
Discussion: None.
Roll call was done and all approved.

Gerard: I make a motion to seal.
Carl: Second.
Discussion: None.
Roll call was done and all approved.

J.C. called meeting back into public.

Cara stated that the applications for the vacant selectboard position are in with a few more days to have some more come in, and asked how the board would like to proceed.  The board had some discussion and decided to have them all contacted to come into the next meeting and be prepared for questions during the public session.  They will consider a decision at the following meeting.

Carole:  I make a motion to adjourn.
Gerard: Second.
Discussion: None.
Motion carries 4-0

Meeting adjourned at 9:40 p.m.

Approved:

_____          27 June 2017
J.C. Allard, Chairman                     Date

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

**Case No.: 1:20-cv-362-JL**

JOSEPH McCOY,

     Plaintiff,

vs.

TOWN OF PITTSFIELD

     Defendant.

_____

**PLAINTIFF'S OBJECTION TO DEFENDANT TOWN OF PITTSFIELD'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Joseph McCoy objects to Defendant Town of Pittsfield's Motion for Summary Judgment (Doc. 17) and provides his incorporated Memorandum of Law in support of same.

**MEMORANDUM OF LAW**

**A.      Statement of Material Facts**

From mid-2016 onward, Mr. McCoy did not use his trailer principally for storage; rather, he used it to display his support for President Donald Trump, and storage was its secondary purpose:

398

**37**

1  have done it if they come and approached me on
2  September 1, which they did not, because there's
3  others in the town.  I was in the position to take
4  care of my storage but physically unable.  And if
5  you read my letter, I am pretty sure --
6      Q.  Mr. McCoy, let me stop you.  Back in 2015,
7  you were using this for storage; right?
8      A.  Back then, yes.
9      Q.  Yeah.  What you are saying is you think,
10  because other people may have had unpermitted
11  trailers --
12      A.  Not may have, they do.
13      Q.  Okay.  Well, we'll say "may have" because
14  I am asking the questions -- that you should not
15  have to comply with the requirements?  Is that what
16  you are saying?
17      A.  No, I am not saying that.  I am agreeing
18  from what you said it said.  I am not agreeing with
19  your not complying with you -- not complying --
20      Q.  So if there's a law -- no, Mr. McCoy,
21  here's my question.  If there's a law on the books
22  that says you should only have a permit -- a trailer
23  on for one year, you agree you have to comply with

**45**

1      screen.
2          (J. McCoy Deposition Exhibit D was marked
3      for identification.)
4      Q.  (By Mr. Dietel) All right.  So how did the
5  "Concord Monitor" find out about your trailer?
6      A.  Ray Duckler says him and his photographer
7  was driving by.  If you read the newspaper, it will
8  explain.  They just was driving by and they seen it.
9      Q.  Was it getting attention in town before
10  then?
11      A.  Not really.  Because when you see my
12  trailer, it's on my property.  I have a wooden fence
13  with trees all over the place.  You really couldn't
14  see it.  And if you are coming up from town, it's a
15  good size of a football field from my driveway up
16  into my property where it was at.
17      Q.  Okay.  So when you paint the trailer back
18  in 2016, was it still primarily being used for
19  storage?
20      A.  Some, yes.
21      Q.  But was it still storing things?
22      A.  There were some things in there that I had
23  stored in there.  I was doing maintenance to my

**46**

1  place and some household items that we had to get
2  moved in my house.  And my son was doing most of the
3  work.  And he was working; so it took a while.
4      Q.  Okay.  So it was still a storage container
5  at that point?
6      A.  Somewhat, yes.
7      Q.  Okay.  Well, explain to me what you mean
8  by "somewhat."
9      A.  It was somewhat a storage trailer, but
10  then it was also my Trump trailer.
11      Q.  Okay.  What do you mean by that?
12      A.  My Trump trailer, you can look at it and
13  you can understand that was my Trump trailer.  I
14  like Trump.  I wanted him elected.  My son liked
15  him.  He's a graffiti artist.  And he asked, "Can I
16  do it?" and I says, "Yes."
17      Q.  So you intended this to be a sign?
18      A.  I didn't intend anything to be a sign.  My
19  son asked me if he could do it and I said, "Yes."  I
20  was a Trump supporter; so basically it was construed
21  as a sign.
22      Q.  Well, did you consider it to be a sign?
23      A.  After a while, getting close to the

**47**

1  election, yes.
2      Q.  At what point did you consider it to be a
3  sign?
4      A.  Mid 2016.
5      Q.  Mid 2016?
6      A.  Yeah, anywhere from -- well, anywhere,
7  basically, from the day that it was painted till the
8  election.
9      Q.  Okay.  And then it stopped being a sign
10  after the election?
11      A.  After the election, my son wanted to paint
12  the Pittsfield Balloon Race on it.  He's a graffiti
13  artist.  And I always have places for him to do his
14  work.  It keeps him out of mischief.  And I said,
15  "Yeah, go ahead and paint the front of it for the
16  balloon rally race."
17      Q.  I am not familiar with the balloon.  So
18  does Pittsfield have a balloon?
19      A.  Every year.  A balloon rally every year.
20      Q.  That's pretty cool.  When did that start?
21  Do you know?
22      A.  It had to be a long time before I was here
23  because you would see Pittsfield Balloon Rally signs

Deposition of Joseph McCoy ("McCoy Depo."), pp. 37:6-8, 45:17-47:4.[1]

---

[1] The Town alleges Mr. McCoy "considered it to be a sign," Doc. 17-1 at 5, but Mr. McCoy's deposition testimony demonstrates he principally used the trailer to express political speech.

The Town administrator, Cara Marston, admitted there was no process under which Mr. McCoy could request an extension of his storage container permit, and the Board had no authority to grant one:

| Page 16 |
|---|
| 1    Exhibit 4. |
| 2              (Exhibit 4 marked for identification.) |
| 3    BY MR. POJO: |
| 4    Q.   Are you aware of when the notice of violation that's |
| 5         identified as Exhibit 3 was sent to Mr. McCoy? |
| 6    A.   I am not. |
| 7    Q.   Is there any way to determine when that notice was |
| 8         sent? |
| 9    A.   No. |
| 10   Q.   Do you know why Mr. McCoy wrote this letter to the Town |
| 11        on November 3rd, a little over two months after the |
| 12        permit expired? |
| 13   A.   Because he wanted an extension on his storage container |
| 14        permit. |
| 15   Q.   No, I know.  I guess my question -- I should have asked |
| 16        it more specifically.  Do you know if he waited two |
| 17        months to write this letter, or if he wrote this letter |
| 18        immediately upon receiving the notice? |
| 19   A.   I am not aware of what Mr. McCoy's intentions were. |
| 20   Q.   Okay.  Now, obviously -- so he's requesting a six-month |
| 21        extension in this letter, right? |
| 22   A.   Yes. |
| 23   Q.   Are you aware if the ordinance allowed him to request |

| Page 17 |
|---|
| 1    such an extension? |
| 2    A.   There is no specific statement in that article that |
| 3         discusses this, no. |
| 4    Q.   When you say "that article," what are you referring to? |
| 5    A.   The storage container permit article in the town |
| 6         ordinance. |
| 7    Q.   Okay. |
| 8    A.   There is no extension process that's detailed. |
| 9    Q.   Okay.  All right.  So I'm placing before you another |
| 10        document, and I'll just -- I'll scroll through it so you |
| 11        can take a look at it.  This is the first page.  And I |
| 12        took -- obviously it's a town zoning ordinance.  And I |
| 13        took two other portions of it.  I omitted a whole bunch |
| 14        of it, since it's a lengthy document. |
| 15             This is the second page in this excerpt, and then |
| 16        this is the third page.  Are you familiar with this |
| 17        document? |
| 18   A.   Yes. |
| 19   Q.   Okay.  Can you tell us what it is? |
| 20   A.   The town zoning ordinance. |
| 21   Q.   Okay.  So this is the second page here.  The first page |
| 22        is obviously the title page of the Town of Pittsfield |
| 23        zoning ordinance.  The second page is an excerpt from |

| Page 18 |
|---|
| 1    page 20 that contains the definition for storage |
| 2    container.  Do you see that? |
| 3    A.   Yes. |
| 4    Q.   And then the third page is article 14 which relates to |
| 5         permitting conditions and other parameters for storage |
| 6         containers.  Do you see that? |
| 7    A.   Yes. |
| 8              MR. POJO:  Okay.  So I'm going to mark this as |
| 9    Exhibit 5. |
| 10             (Exhibit 5 marked for identification.) |
| 11   BY MR. POJO: |
| 12   Q.   So, Ms. Marston, when you were testifying just a moment |
| 13        ago that there was no provision in the zoning ordinance |
| 14        that provides for an extension of a permit for a storage |
| 15        container, is this the article that you were |
| 16        referencing? |
| 17   A.   Yes. |
| 18             MR. DIETEL:  Objection as to form.  You can |
| 19        answer, Cara.  You can answer again. |
| 20             THE WITNESS:  Again. |
| 21   BY MR. POJO: |
| 22   Q.   So you would agree then that article 14 does not provide |
| 23        a resident with -- sorry.  Let me strike that. |

| Page 19 |
|---|
| 1    You would agree with me that article 14 does not |
| 2    provide the Town with the authority to extend a permit |
| 3    for a storage container? |
| 4              MR. DIETEL:  Objection as to form.  You can |
| 5         answer that, Cara. |
| 6              THE WITNESS:  There's no provision for a |
| 7    process. |
| 8    BY MR. POJO: |
| 9    Q.   What do you mean by that? |
| 10   A.   There's no provision in any of the -- any of this article |
| 11        detailing a process for asking for an extension. |
| 12   Q.   Does that mean that a resident cannot ask for an |
| 13        extension? |
| 14   A.   No.  It means that they can ask for an extension. |
| 15        There's just no defined process for that extension. |
| 16   Q.   Which section here states that a resident can ask for an |
| 17        extension? |
| 18   A.   There is no specific section that states that they can |
| 19        ask for that. |
| 20   Q.   Okay.  Is there a section that says that the Town can |
| 21        grant an extension? |
| 22   A.   No. |
| 23   Q.   Okay.  So when the Town received -- now, you testified |

Deposition of Cara Marston ("Marston Depo."), pp. 18:12-17, 19:1-21.  The Board of Selectmen ignored this restriction and "granted" Mr. McCoy's first request for an extension in November 2016.  Doc. 17-1 at 6 & Ex. C ¶ 2.  Ms. Marston could not identify any reason why it proceeded to "grant" it:

| Page 20 | | Page 21 | |
|---|---|---|---|
| 1 | that the Town received Mr. McCoy's November 3rd letter, | 1 | granting them the ability to do so, I guess.  The zoning |
| 2 | right? | 2 | ordinance is a document of the Town, and they were trying |
| 3 | A.   Yes. | 3 | to do their best. |
| 4 | Q.   Did the Town take any action with respect to that | 4 | Q.   Okay.  I mean, could this be -- could this instead be |
| 5 |      request? | 5 |      called a zoning variance? |
| 6 | A.   Yes. | 6 | A.   No.  A variance is a specific process with an application |
| 7 | Q.   What did the Town do? | 7 |      to the zoning board of adjustment. |
| 8 | A.   He was granted a six-month extension. | 8 | Q.   Okay.  Did the board of selectmen have the authority to |
| 9 | Q.   Okay.  So given your testimony that article 14 -- that | 9 |      grant the zoning variance? |
| 10 |      there's no section in article 14 that says the Town can | 10 | A.   No. |
| 11 |      grant an extension, why did the Town then communicate to | 11 | Q.   And it's safe to say that there was no -- the process for |
| 12 |      Mr. McCoy that it was granting his request for an | 12 |      applying for a zoning ordinance was not invoked here, |
| 13 |      extension? | 13 |      right? |
| 14 | A.   As administrators of the zoning ordinance, they responded | 14 | A.   That is correct. |
| 15 |      to a request from a resident asking for an extension. | 15 | Q.   Do you know if the board of selectmen ever communicated |
| 16 | Q.   I understand what they did, but why did it grant an | 16 |      to Mr. McCoy that instead of requesting an extension of |
| 17 |      extension if article 14 contains no section or provision | 17 |      the permit, he should have instead applied for a zoning |
| 18 |      stating that the Town can grant an extension? | 18 |      variance? |
| 19 | A.   I don't have -- I guess I honestly don't know how to | 19 | A.   He was not instructed to do so, no. |
| 20 |      answer that other than they were trying to help a | 20 | Q.   Was the extension that the Town granted Mr. McCoy |
| 21 |      resident who was asking for an extension on the storage | 21 |      valid? |
| 22 |      container.  They read his request and wanted to work with | 22 |           MR. DIETEL:  Objection as to form.  You can |
| 23 |      him, regardless of there being no specific provision | 23 |      answer it, Cara. |

Marston Depo. pp. 20:4-23, 21:1-3.  She admitted the Board's "extension" could not be considered a zoning variance because Mr. McCoy never invoked that process, and the Board had no authority to grant zoning variances:

```
                                                    Page 21
1      granting them the ability to do so, I guess.  The zoning
2      ordinance is a document of the Town, and they were trying
3      to do their best.
4   Q. Okay.  I mean, could this be -- could this instead be
5      called a zoning variance?
6   A. No.  A variance is a specific process with an application
7      to the zoning board of adjustment.
8   Q. Okay.  Did the board of selectmen have the authority to
9      grant the zoning variance?
10  A. No.
11  Q. And it's safe to say that there was no -- the process for
12     applying for a zoning ordinance was not invoked here,
13     right?
14  A. That is correct.
15  Q. Do you know if the board of selectmen ever communicated
16     to Mr. McCoy that instead of requesting an extension of
17     the permit, he should have instead applied for a zoning
18     variance?
19  A. He was not instructed to do so, no.
20  Q. Was the extension that the Town granted Mr. McCoy
21     valid?
22          MR. DIETEL:  Objection as to form.  You can
23     answer it, Cara.
```

Marston Depo. p. 21:4-14.  The Board could have instructed Mr. McCoy that the object of his request (an extension of the permit) could only be attained through a zoning variance, but Ms. Marston conceded the Board neglected to do that:

```
                                                    Page 21
1      granting them the ability to do so, I guess.  The zoning
2      ordinance is a document of the Town, and they were trying
3      to do their best.
4   Q. Okay.  I mean, could this be -- could this instead be
5      called a zoning variance?
6   A. No.  A variance is a specific process with an application
7      to the zoning board of adjustment.
8   Q. Okay.  Did the board of selectmen have the authority to
9      grant the zoning variance?
10  A. No.
11  Q. And it's safe to say that there was no -- the process for
12     applying for a zoning ordinance was not invoked here,
13     right?
14  A. That is correct.
15  Q. Do you know if the board of selectmen ever communicated
16     to Mr. McCoy that instead of requesting an extension of
17     the permit, he should have instead applied for a zoning
18     variance?
19  A. He was not instructed to do so, no.
20  Q. Was the extension that the Town granted Mr. McCoy
21     valid?
22          MR. DIETEL:  Objection as to form.  You can
23     answer it, Cara.
```

Marston Depo. p. 21:15-19.

Mr. McCoy made another request for an extension of his permit in May 2017. Doc. 17-1 at 7. The Board, once again, "granted" his request for a one-year extension. *Id.* at 8. Like Mr. McCoy's first request for an extension, the Board conceded it had no authority to grant this request either:



Marston Depo. pp. 35:12-17, 36:1-10, 37:19-22. The Town never informed Mr. McCoy he could not request another extension of the permit, or that he should have sought a zoning variance:



Marston Depo. pp. 23:9-17.

Mr. McCoy requested a third extension in May 2018. Doc. 17-1 at 10. The Board denied that request. *Id.* The Board acknowledged, once again, it had no authority to grant a third extension of the permit:

```
                                                        Page 54
 1   Q.  The rest of the sentence says, "And as you have already
 2       been granted a year's extension beyond the 12 months
 3       permitted, they voted to not grant this second
 4       extension."  Do you see that?
 5   A.  Yes.
 6   Q.  So this letter acknowledges that there was no provision
 7       in article 14 for granting an extension beyond the
 8       12-month limit for such permits, right?
 9           MR. DIETEL:  Objection as to form.  You can
10       answer the question.
11           THE WITNESS:  That was just stating that they'd
12       already granted extensions beyond the initial time frame.
13   BY MR. FOJO:
14   Q.  Okay.  The last sentence, it says, "The board has granted
15       an additional 30 days from the date of this letter to
16       remove the storage container from your property."  Do you
17       see that?
18   A.  Yes.
19   Q.  Was that, in effect, an additional 30-day extension of
20       the permit?
21   A.  I guess technically it is, although it's not a permit
22       that's signed by the board of selectmen, but it was
23       reflected in their board vote.
```

Marston Depo. p. 54:1-12. The Town cannot identify any reasoning (whether in the Zoning Ordinance or elsewhere) for why it denied Mr. McCoy's request, and it concedes there was nothing different between this third request and his two prior requests, and, in "denying" Mr. McCoy's third request for an extension, it nevertheless "granted" him a 30-day extension to enable him to remove the trailer:



Marston Depo. pp. 52:14-23, 53:1-3, 54:14-23.

At his deposition, Mr. McCoy identified numerous property owners in Pittsfield with

unpermitted storage containers on their properties who were treated differently:



Mr. McCoy is also submitting with this Objection a Declaration to which he has appended

photographs of **_several hundred_** trailers or storage containers located on properties in Pittsfield

that (but for approximately 12 of them) do not have storage containers and that the Town has not

directed to be removed.  *See* Exhibit A (Declaration of Joseph McCoy ("McCoy Dec.")) &

Exhibits 1, 2.

For example, Carl Anderson had two trailers hidden on his property at 324 Barnstead Road (as recently as December 2020), did not have permits for them, and was not told by the Town to remove them.  McCoy Dec. ¶ 6 & Ex. 1 at 1.  Another group of unpermitted trailers is located on a property on Carroll Street on the outskirts of Pittsfield.  McCoy Dec. ¶ 7 & Ex. 1 at 2-3.  The next set of photographs shows unpermitted trailers Mr. McCoy requested that the Town remove after it directed him to remove his trailer.  McCoy Dec. ¶ 8 & Ex. 1 at 4.  Another group of approximately 30 unpermitted trailers is located on a property owned by Reese Freese (known as Tommy Trailor) at 16 Clark Street.  McCoy Dec. ¶ 9 & Ex. 1 at 5-15.  Gerard Leduc has an unpermitted trailer on his property at 24 Carroll Street.  McCoy Dec. ¶ 10 & Ex. 1 at 16.  Carole Dodge has at least two unpermitted trailers on her property at 80 Smith Hill Road.  McCoy Dec. ¶ 11 & Ex. 1 at 17-18.  Brendan Guida currently has an unpermitted 40-foot trailer on his property at 187 Barnstead Road.  McCoy Dec. ¶ 12 & Ex. 1 at 19.  He had a permit for it from January 29, 2020 to January 29, 2021.  McCoy Dec. ¶ 12.  The permit expired.  *Id.*  Finally, Ed Trzcinski at 217 Shingle Mill Brook Road has an unpermitted trailer on his property.  McCoy Dec. ¶ 13.  The remaining photographs of hundreds of trailers in Exhibit 2 are photographs taken of other trailers Mr. McCoy observed on properties in Pittsfield that did not have permits.  McCoy Dec. ¶ 14 & Ex. 2.  The Town has not directed any of the trailers above (including those at the specific addresses above) to be removed.  McCoy Dec. ¶ 15.

Ms. Marston testified at her deposition that, during her time as Town Administrator (five years) only approximately 12 property owners in Pittsfield were granted permits for storage containers or trailers:

| Page 71 | Page 72 |
|---|---|
| 1  want to kind of look at everything and then just make<br>2  sure, okay?<br>3  　　　　　　MR. DIETEL:  All right.<br>4  　　　　　　MR. FOJO:  Let's just go off the record for<br>5  five.<br>6  　　　　　　(Recess taken.)<br>7  BY MR. FOJO:<br>8  Q.  Just two or three more questions here and we'll be done.<br>9  　　　　Ms. Marston, were there any complaints made by any<br>10  board members concerning the trailer?<br>11  A.  Not that I'm aware of.<br>12  Q.  Other than the permits that Mr. McCoy obtained for his<br>13  　　trailer, and then the permit for the Tilton Hill Road<br>14  　　trailer, or storage container, were there any other<br>15  　　permits granted for any other storage containers in town<br>16  　　from 2015 to the present?<br>17  A.  Yes.<br>18  Q.  Do you recall how many such permits were granted?<br>19  A.  Twelve, maybe.<br>20  Q.  I know this may be difficult, but do you recall what<br>21  　　properties those permits pertained to?<br>22  A.  Let's see.  Cram Avenue.  I could make a quick list.<br>23  　　There was two sets on Tilton Hill, not just the one that | 1  we had previously talked about.  There was another set on<br>2  Tilton Hill.  There was another one further closer to<br>3  town on Catamount Road.  Cram Avenue, there was one.<br>4  Joyce Street, there were two.  Carroll Street there's<br>5  one.  Loudon Road.  Cameron Drive.  Those are the ones I<br>6  can come up with right off the top of my head.<br>7  Q.  Okay.  I want to go back to your affidavit real quick.<br>8  A.  Yes.<br>9  Q.  So I'm on paragraph 29.  And then you stated, "It has,<br>10  however, taken action against others in town with respect<br>11  to unpermitted storage containers, which were not used<br>12  for expressive purposes.  For example, in June, 2018, the<br>13  Town took action with respect to the Tilton Hill Trailers<br>14  as noted previously."  We discussed that.<br>15  　　And then in section B here, it says, "In 2019, the<br>16  Town brought suit to enforce article 14 in Town of<br>17  Pittsfield versus James Hetu, et al., case number<br>18  217-2019-cv-00663, Merrimack Superior Court.  This action<br>19  arose following lengthy efforts to obtain compliance."<br>20  　　What was the issue with -- can you briefly tell us<br>21  what happened with this particular enforcement effort?<br>22  A.  This one came to the board of selectmen that there was a<br>23  storage container at a property, and they looked into it |

Marston Depo. pp. 71:12–72:6.  Three of those permits were for trailers on a property on Tilton Road, which Mr. McCoy did not include in the photographs referenced above.  Only one permit was granted for a trailer on Carroll Street; there are several other trailers, however, on Carroll Street.  *See* McCoy Dec. ¶¶ 7, 10 & Ex. 1 at 2-3, 16.  Assuming eight other permits were granted, *see* Marston Depo. pp. 71:12–72:6, there are still numerous trailers or storage containers Mr. McCoy identified above that did not have permits and that remain on properties in Pittsfield.

This should not be a surprise.  The Town – through its Code Enforcement Officer (Jesse Pacheco) conceded there were trailers "all over the place" when Mr. McCoy made his second extension request in 2017.  *See* Exhibit B (Board of Selectmen May 23, 2017 Meeting Minutes).  At that Board of Selectmen meeting, the Town Administrator (Cara Marston) also acknowledged there were "other properties that are technically in violation" of the Ordinance, but the Town had done nothing concerning those trailers.  *Id.*  A Board Member (Carl Anderson) later reiterated that fact in his January 11, 2020, letter to Mr. McCoy: "what was obvious was that there were illegal storage containers all over the place."  *See* Exhibit C (Letter).  Ms. Marston conceded that,

after the May 2017 Board meeting, the Town ***did not investigate*** whether Mr. Anderson's

statement was true, i.e., that there were other unpermitted storage containers in Pittsfield:



Marston Depo. p. 39:16-20, 55:8-20.

## B.    The Town's Arguments are Erroneously Premised on the Application of the Zoning Ordinance to Mr. McCoy's Trailer

The Town's arguments are premised almost entirely on the notions that the Zoning

Ordinance applied to Mr. McCoy's trailer; and the Board of Selectmen had the authority under

the Ordinance to grant two "extensions" of Mr. McCoy's permits, "deny" him a third

"extension," and then, following that denial, grant him a 30-day "extension" to allow him to

remove the trailer from his property.  This is inaccurate.

First, the Zoning Ordinance never applied to Mr. McCoy's trailer.  Article 2, Section 3 of

the Zoning Ordinance defines a "storage container" as "a truck trailer, box trailer, school bus,

MANUFACTURED HOUSING unit, or similar mobile container parked continuously for 31

days or more and **used principally for storage** and not used for any person's residential

occupancy or transient lodging."  From mid-2016 onward, Mr. McCoy used his trailer

principally to display his support for President Donald Trump, and storage was its secondary purpose.  McCoy Depo., pp. 37:6-8, 45:17-47:4.  Thus, the Town could not have applied the Ordinance to Mr. McCoy's trailer and demanded he obtain a storage container permit, seek an "extension" of that permit, or deny him an "extension" of that permit and order him to remove the trailer from his property.

Second, even if the Ordinance applied, the Town had no authority under the Ordinance to grant Mr. McCoy "extensions" of his permit or deny him an "extension" of that permit.  Article 14, Section 3(e) of the Town's Zoning Ordinance prohibits maintaining a storage container on a lot for more than 12 months: "every STORAGE CONTAINER shall be permitted upon the following conditions and upon all other applicable conditions in the zoning ordinance: . . . The sum of the time during which one or more STORAGE CONTAINERS are on any one LOT during any 15-month period shall be no more than 12 months."[2]

The Town admitted, however, there was no process under which Mr. McCoy could request an extension of his permit; the Board had no authority to grant one and could not identify any reason why it did so; the Board's decision was not a zoning variance, and it did not direct Mr. McCoy to seek one; the Board could not identify why it denied Mr. McCoy's third request for an extension; and there was nothing different between this third request and his two prior requests.  Thus, the Ordinance should not be at issue in this case.

## C.    The Town's Application of the Zoning Ordinance to Mr. McCoy was Unconstitutionally Vague

The Town argues no reasonable jury would find its application of the Zoning Ordinance to Mr. McCoy was unconstitutionally vague.  Doc. 17-1 at 20-21.  This is inaccurate.

---

[2] The Town barely acknowledges this restriction in its Motion.  *See*, *e.g.*, Doc. 17-1 at 7 (Town's extension was made "notwithstanding the plain language of the zoning ordinance, which provides . . . that storage containers . . . may not be on a lot for more than 12 months in any one 15 month period").

409

"A law is unconstitutionally vague when it 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *McCoy v. Town of Pittsfield*, 2020 DNH 217, 11 (quoting *United States v. Williams*, 553 U.S. 285, 292 (2008)).  "'The degree of vagueness that the Constitution tolerates - as well as the relative importance of fair notice and fair enforcement - depends in part on the nature of the enactment.'"  *McCoy*, 2020 DNH 217, 11 (quoting *Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982)).  "'If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply.'"  *Id.*  A "law can also be held to be void for vagueness on discretionary enforcement grounds 'if it is an unrestricted delegation of power, which in practice leaves the definition of its terms to law enforcement officers, and thereby invites arbitrary, discriminatory and overzealous enforcement.'"  *Buckle Up Festival, LLC v. City of Cincinnati*, 336 F. Supp. 3d 882, 887 (S.D. Ohio 2018) (quoting *Dambrot v. Central Michigan Univ.*, 55 F.3d 1177, 1183–84 (6th Cir. 1995)).  "The key question is whether the provision 'provide[s] explicit standards guiding [its] enforcement."  *Id.* (internal quotation and citation marks omitted).

For example, in *Buckle Up Festival, LLC v. City of Cincinnati*, 336 F. Supp. 3d 882 (S.D. Ohio 2018), the District Court held a municipal ordinance that required an admission tax to be paid to the city of Cincinnati based on amounts paid for admission to any public performance for profit in the city was unconstitutionally vague, where the ordinance defined "admission" to "include seats, chairs, tables and benches, reserved or otherwise, and other similar accommodations and charges made therefor."  *Id.* at 884.  The Court held "the dictionary definition for 'accommodations' falls short of providing minimal guidelines to those who enforce this section of the Municipal Code."  *Id.*  The "Plaintiffs allege[d] that Defendants did not require

them to pay the admissions tax for its 2012 Bunbury music festival, but did require them to pay the tax for the 2013 Bunbury music festival." *Id.* The Court held "[t]his allegation supports Plaintiffs' claim that Section 309-3 is vague, and therefore leads to arbitrary, discriminatory and overzealous enforcement." *Id.*

The same situation occurred in this case: the Town applied the Ordinance to "grant" Mr. McCoy two "extensions" (one for six months and then one for a year) of his storage container permit in 2016 and 2017, respectively, but then applied the Ordinance to *deny* him a third (one-year) "extension" of his permit while granting him a brief 30-day extension of the same permit to allow him to remove the trailer. There was nothing different about Mr. McCoy's third extension request. The Town admitted the Ordinance provides no authority or "process" for extending a permit, and it could not identify any reasoning for its denial of a third extension. Indeed, although the Ordinance defines a "storage container," it provides no guidance for those who administer or enforce it (the Board of Selectmen) concerning extensions of storage container permits or what types of trailers fall within its ambit. The Board's conduct demonstrates it applied the Ordinance in an arbitrary and discriminatory fashion: it acknowledges Mr. McCoy did not use the trailer principally for storage (and, thus, that the Ordinance did not apply to it) but then required him to maintain a storage container permit, and it concedes it had no authority or process under the Ordinance to extend that permit but then granted Mr. McCoy two extensions of his permit and then denied him a third extension. The Town's application of the Ordinance was unconstitutionally vague.

**D.      The Town Discriminated Against Mr. McCoy in Ordering His Trailer Removed, Lacked <u>Any</u> Basis for its Decision, and Allowed Numerous Other Property Owners to Have Unpermitted Storage Containers and Trailers on their Properties**

To prevail on Count II, Mr. McCoy "must allege that he has 'been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in

treatment.'" *McCoy*, 2020 DNH 217, 14 (quoting *Donovan v. City of Haverhill*, 311 F.3d 74, 77 (1st Cir. 2002)).  "An individual is 'similarly situated' to others for equal protection purposes when 'a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated.'" *McCoy*, 2020 DNH 217, 14 (quoting *Davis v. Coakley*, 802 F.3d 128, 133 (1st Cir. 2015)).  "Although '[e]xact correlation [between comparators] is neither likely nor necessary, . . . 'a class-of-one plaintiff bears the burden of showing that his comparators are similarly situated in all respects relevant to the challenged government action.'" *McCoy*, 2020 DNH 217, 14 (*Gianfrancesco v. Town of Wrentham*, 712 F.3d 634, 640 (1st Cir. 2013)).

The Town alleges "[n]o reasonable jury could examine the undisputed facts . . . and conclude that McCoy was discriminated against based on his support for President Trump or his use of his Storage Container to express that support, or any other factor."  Doc. 17-1 at 15.[3]  The Town phrases the question incorrectly (presumably for its benefit).

In its Order on the Town's Motion for Judgment on the Pleadings, this Court summarizes Mr. McCoy's claim as follows: "McCoy asserts that the ordinance, as applied by Pittsfield, impermissibly creates two classes of residents - persons with unpermitted storage containers expressing political speech and persons with unpermitted storage containers not expressing political speech - and argues that the Town treats these classes differently in violation of the Constitution."  *McCoy*, 2020 DNH 217, 13.  Accordingly, "the relevant comparison points are property owners in Pittsfield with unpermitted storage containers on their properties, including trailers."  *Id.* at 14.

---

[3] Elsewhere, the Town alleges Mr. McCoy relies on a "generic class of comparators" – "property owners with storage containers without expressive content" – that is "woefully inadequate."  Doc. 17-1 at 16.

Despite the Court's articulation of the appropriate comparison points above, the Town insists Mr. McCoy's claim "is premised on a threadbare allegation that the Town singled him out for discrimination because of his support for President Trump, but allowed other unidentified storage containers in Town to evade regulation." Doc. 17-1 at 17. Based on that false premise, the Town alleges Mr. McCoy "does not identify any specific properties or individuals who were treated differently." *Id.* The Town also imposes on Mr. McCoy 10 separate "shared characteristics" it alleges he needs to identify concerning the storage containers he claims were treated differently. *Id.* at 17-18. It cites no authority, however, for the imposition of so many comparison points, nor does this Court's prior Order support it. Indeed, the Town's continuing insistence that it afforded Mr. McCoy such generous discretion under the Ordinance is nothing but a red herring because the Ordinance did not apply here. *See supra* pp. 11-12.

Mr. McCoy identified numerous property owners in Pittsfield with unpermitted storage containers on their properties who were treated differently, and he has submitted photographs of several hundred trailers or storage containers located on properties in Pittsfield that (but for approximately 12 of them) do not have permits and that the Town has not directed to be removed. *See* McCoy Dec. & Exhibits 1, 2. Ms. Marston testified that only approximately 12 of these trailers or storage containers were granted permits. Marston Depo. pp. 71:12-72:6. There remain **_hundreds_** of trailers or storage containers Mr. McCoy identified above that did not have permits and that remain on properties in Pittsfield.

Indeed, the Town conceded there were many unpermitted or "illegal" storage containers all over town. *See* Ex. B, C. The Town has never investigated these other storage containers. Although the Town contends it undertook enforcement action against *three* property owners with unpermitted trailers, *see* Doc. 17-1 at 18-19, there is no dispute of fact that it failed to address

many other unpermitted trailers located in Pittsfield, including many of those Mr. McCoy identified above.  In contrast, in addition to those three property owners, it directed *Mr. McCoy* to remove his trailer and concedes it lacked any reasoning or basis for doing so.

The Town alleges its enforcement action against the above three property owners constitutes an "ample history" of enforcement activity, and, at worst, it merely engaged in "lax" enforcement or slightly disparate enforcement that might occur in the "land use" context.  Doc. 17-1 at 19.  The undisputed facts above, however, demonstrate the Town knew there were hundreds unpermitted trailers in Pittsfield, and it undertook no enforcement activity except for three other property owners and Mr. McCoy.  This is not an issue of "lax" enforcement; it is a total absence of enforcement and a violation of Mr. McCoy's equal protection rights.

## E.    Mr. McCoy's Claims are Ripe and He was not Required to Exhaust Administrative Remedies

Finally, the Town argues Mr. McCoy's claims are not ripe because he did not pursue an appeal of the Board of Selectmen's June 13, 2018 decision denying his third request for an extension of his storage container permit to the Town's Zoning Board of Adjustment.  Doc. 17-1 at 21-24.  This is inaccurate:

"Generally, parties must exhaust their administrative remedies before appealing to the courts.  This rule is "based on the reasonable policies of encouraging the exercise of administrative expertise, preserving agency autonomy and promoting judicial efficiency.  However, this rule, as applied, is flexible, and recognizes that exhaustion is not required under some circumstances.  In limited situations, it is unnecessary to 'burden local legislative bodies and [zoning boards] with the responsibility for rulings on subjects that are beyond their ordinary competence.'  Thus, a petitioner need not exhaust administrative remedies and may bring a declaratory judgment action to challenge the decisions of municipal

officers and boards when the action raises a question that is 'peculiarly suited to judicial rather than administrative treatment and no other adequate remedy is available.' Judicial treatment may be particularly suitable when the constitutionality or validity of an ordinance is in question or when the agency at issue lacks the authority to act." *McNamara v. Hersh*, 945 A.2d 18, 20 (2008) (quoting *Blue Jay Realty Trust v. City of Franklin*, 132 N.H. 502, 509 (1989), and *Olson v. Town of Litchfield*, 112 N.H. 261, 262 (1972)). "A party is not required to exhaust administrative remedies where the issue on appeal is a question of law rather than a question of the exercise of administrative discretion." *Pheasant Lane Realty Trust v. City of Nashua*, 143 N.H. 140, 141-42 (1998).

For example, in *Blue Jay Realty Trust*, the petitioners challenged the validity of amendments to the City's zoning ordinance by filing a declaratory judgment petition. 132 N.H. at 503. The New Hampshire Supreme Court held the petitioners did not have to exhaust administrative remedies because "the charges of invalidity raised by th[e] petition require[d] determinations of statutory and constitutional law, not customarily passed upon by city councils." *Id.* at 509; *see also Ashland School Dist. v. N.H. Div. for Children*, 141 N.H. 45, 47-48 (1996) (holding that statutory provisions setting forth financial obligations of local school districts did not require administrative appeal); *Metzger v. Brentwood*, 115 N.H. 287, 290 (1975) (holding that whether closed town road was "public right of way" was narrow legal question that did not require an application for a rehearing before appeal to superior court).

Similarly, in *Pheasant Lane Realty Trust*, the City of Nashua sought to issue a supplemental tax bill on a property. The plaintiff, Pheasant Lane Realty Trust, argued the City lacked the authority to do so. The New Hampshire Supreme Court held that whether the City had the authority to issue a supplemental assessment presented a question of statutory

interpretation better suited for judicial review.  143 N.H. at 142.  The Court held Pheasant Lane Realty Trust was not required to exhaust administrative remedies.

Also, in *Porter v. Town of Sandwich*, 153 N.H. 175 (2006), the Court held questions concerning whether the Town's assessment violated an agreement and/or a statute were better suited for judicial review, and thus exhaustion of administrative remedies was not required.  *Id.* at 175-76.

### 1.    Mr. McCoy's claims are peculiarly suited for judicial review.

Mr. McCoy's claims challenge the validity and constitutionality of the Town's action in ordering him to remove his trailer.  He asserts claims for violation of his freedom of speech (Count I) and equal protection rights (Count II).  Regarding Count I, he alleges the Town applied the Zoning Ordinance against him in a way that discriminates against either the content or viewpoint of his speech, and the Town's application of the Ordinance was unconstitutionally vague.  Regarding Count II, he alleges the Town treated similarly-situated property owners differently than him.  He has not made any allegations concerning whether the Town should have granted him a storage container permit, or whether the Town should have granted him a third extension of that permit.  As the cases above demonstrate, Mr. McCoy's claims are not issues that are routinely resolve by local zoning boards, nor are they within the power of local zoning boards to correct.  Thus, Mr. McCoy's only remedy was to file this lawsuit.

### 2.    The doctrine of municipal estoppel prevents the Town from arguing Mr. McCoy failed to exhaust administrative remedies.

Even if Mr. McCoy was required to exhaust his administrative remedies, the Board of Selectmen did not have authority under the Zoning Ordinance to extend Mr. McCoy's storage container permit, and its illegal "extensions" diverted Mr. McCoy from seeking a zoning variance or appealing its decisions concerning his requests for extensions to the Zoning Board of

Appeals.  The Town's argument that Mr. McCoy failed to exhaust his administrative remedies is premised entirely on the notion that the Board of Selectman's denial of a third extension of his storage container permit was *valid*, and that its prior two "extensions" were also *valid*.  Its singular reliance on that notion is erroneous – and perhaps a bit disingenuous.

"The doctrine of municipal estoppel has been applied to municipalities to prevent unjust enrichment and to accord fairness to those who bargain with the agents of municipalities for the promises of the municipalities."  *Thomas v. Town of Hooksett*, 903 A.2d 963, 966 (2006).  "The elements of estoppel are: first, a false representation or concealment of material facts made with knowledge of those facts; second, the party to whom the representation was made must have been ignorant of the truth of the matter; third, the representation must have been made with the intention of inducing the other party to rely upon it; and fourth, the other party must have been induced to rely upon the representation to his or her injury."  *Id.* at 967.

All four elements are satisfied here.  First, the Town was aware the Ordinance did not apply to Mr. McCoy's trailer, and it had no authority to "grant" or "deny" him any "extension" of a permit for it.  Nevertheless, it required Mr. McCoy to obtain and maintain a permit for his trailer and did not direct him to seek a zoning variance.  Second, while the Board of Selectmen contends it could not have granted a zoning variance, there is no statute or ordinance stating it could not have granted a variance, and there is no way Mr. McCoy could have known the Board's purported "extensions" of his permit were illegal.  Indeed, the Town continues to insist its purported "extensions" were lawful.  Third, there is no question the Town intended to induce Mr. McCoy to rely on these "extensions" because it concocted an entire, unauthorized process based on them and then "denied" him a third request for an extension.  Fourth, Mr. McCoy did, in fact, rely on the Board's "extensions" and did not seek an appeal of those decisions.  The

Board of Selectmen's first "extension" of the permit in November 2016 – which the Town admits was illegal – diverted Mr. McCoy from applying to the Zoning Board of Adjustment for a zoning variance, or seeking an appeal of the Board's decision (and, thus, missing the deadline). The same result occurred when the Town "granted" the second "extension" in 2017, and when it granted him an additional 30-day "extension" in 2018. When Mr. McCoy requested these extensions, the Board of Selectmen should (and could) have easily informed him he needed to apply for a zoning variance or else seek an appeal of its decisions. It obviously failed to do that, and its illegal "extensions" and then "denial" of a third "extension" combined with a 30-day "extension" to remove the trailer diverted Mr. McCoy away from the appellate relief he needed to seek. The Town's argument that Mr. McCoy failed to exhaust his administrative remedies is essentially asking this Court to reward the Board of Selectmen for its deceit.

**F.    The Court Should Grant Summary Judgment on Mr. McCoy's Claims**

"After giving notice and a reasonable time to respond, the court may: (1) grant summary judgment for a nonmovant; (2) grant the motion on grounds not raised by a party; or (3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute." Fed. R. Civ. P. 56(f). Here, although the Town filed a Motion for Summary Judgment, the facts are undisputed and demonstrate the Town's application of the Ordinance to Mr. McCoy was unconstitutionally vague, and it treated Mr. McCoy differently than other similarly-situated property owners with unpermitted trailers. Thus, the Court may – and should – grant summary judgment in favor of Mr. McCoy on Counts I and II. *See Praed v. Kurtz (In re Kurtz)*, No. 18-01072-KHK (Bankr. E.D. Va. Jan. 23, 2019) (granting summary judgment under Rule 56(f)(1) for non-moving plaintiff); *Ganatra v. Land*, CIVIL No. 1:12-cv-

00245-MR-DLH (W.D.N.C. Aug. 12, 2013) (granting summary judgment under Rule 56(f)(1)

for non-moving defendant).

**CONCLUSION**

For the foregoing reasons, Mr. McCoy respectfully requests that the Court (1) deny the

Town's Motion for Summary Judgment; (2) grant summary judgment on Counts I and II in favor

of Mr. McCoy; and (3) grant any other relief deemed just and necessary.

JOSEPH McCOY,

By His Attorneys,

FOJO LAW, P.L.L.C.

Dated:  July 12, 2021                                       _/s/ Robert M. Fojo_
                                                           Robert M. Fojo (#19792)
                                                           264 South River Road, Suite 464
                                                           Bedford, NH 03110
                                                           Direct: (603) 473-4694
                                                           rfojo@fojolaw.com

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing was electronically filed with the Clerk

of Court using CM/ECF on July 12, 2021.  I also certify that this document is being served this

day on all counsel of record via transmission of Electronic Filing generated by CM/ECF.

_/s/ Robert M. Fojo_
Robert M. Fojo

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

**Case No.: 1:20-cv-362-JL**

JOSEPH McCOY,

     Plaintiff,

vs.

TOWN OF PITTSFIELD

     Defendant.

_____

**DECLARATION OF JOSEPH McCOY**

I, Joseph McCoy, declare as follows under penalties of perjury:

1.     I am the Plaintiff in this lawsuit.

2.     I am over 18 years of age and am competent to make this Declaration.

3.     This Declaration is based on my personal knowledge and direct observations.

4.     I make this Declaration in support of Plaintiff's Objection to the Town of Pittsfield's Motion for Summary Judgment.

5.     Attached as Exhibits 1 and 2 are documents containing numerous photographs of several hundred trailers or storage containers located on properties in Pittsfield, New Hampshire. But for a handful of them, these trailers do not have storage container permits. The Town has not directed these property owners to remove these trailers.

6.     For example, Carl Anderson had two trailers hidden on his property at 324 Barnstead Road and did not have permits for them. *See* Ex. 1 at 1.

7.     Another group of trailers is located on a property on Carroll Street on the outskirts of Pittsfield. *See* Ex. 1 at 2-3.

420

8.    The next set of photographs shows trailers I requested that the Town remove after it directed me to remove my trailer.  *See* Ex. 1 at 4.

9.    Another group of approximately 30 unpermitted trailers is located on a property owned by Reese Freese (known as Tommy Trailor) at 16 Clark Street.  Ex. 1 at 5-15.

10.    Gerard Leduc has an unpermitted trailer on his property at 24 Carroll Street.  Ex. 1 at 16.

11.    Carole Dodge has at least two unpermitted trailers on her property at 80 Smith Hill Road.  Ex. 1 at 17-18.

12.    Brendan Guida currently has an unpermitted 40-foot trailer on his property at 187 Barnstead Road.  Ex. 1 at 19.  He had a permit for it from January 29, 2020 to January 29, 2021. The permit expired.  *Id.*

13.    Finally, Ed Trzcinski at 217 Shingle Mill Brook Road has an unpermitted trailer on his property.

14.    The remaining photographs of hundreds of other trailers in Exhibit 2 are photographs taken of trailers I observed on properties in Pittsfield that did not have permits.  *See* Ex. 2.

15.    The Town has not directed any of the trailers above to be removed.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on July 12, 2021

.

*Joseph McCoy*
_____
Joseph McCoy

**EXHIBIT 1**

**Carl Anderson (324 Barnstead Road)**



**Carroll Street**





**Other Trailers I Requested to Be Removed**



**Reese Freese (Tommy Trailor) (16 Clark Street)**























**Gerard Leduc (24 Carroll Street)**



**Carole Dodge (80 Smith Hill Road)**



438



**Brendon Guida (187 Barnstead Road)**



## EXHIBIT 2

**Other Trailers Observed in Pittsfield**

























452









**TOWN OF PITTSFIELD**
**BOARD OF SELECTMEN**
**TOWN HALL, 85 MAIN STREET**
**PITTSFIELD, NH 03263**

**MEETING MINUTES OF Tuesday May 23, 2017**

**CALL TO ORDER**
Call to order at 6:00 p.m. by J.C. Allard, Chairman

**MEMBERS PRESENT**
J.C. Allard, Chairman
Gerard LeDuc, Vice-Chairman
Carole Richardson
Carl Anderson

**MEMBERS ABSENT**
None

**OTHERS PRESENT**
Cara Marston, Town Administrator
Ammy Ramsey, Recording Secretary

**PUBLIC INPUT** – regarding agenda items only
Mary French inquired about the best time to speak about 81 Main Street would be, and J.C. explained that the public hearing would be the time to do so.

**AGENDA REVIEW**
Gerard: Report for Aqueduct under committee reports.
Carole: None.
Carl: None.
J.C.: None.

**PUBLIC HEARING**
6:15 p.m. – Pittsfield Historical Society proposed relocation to 81 Main Street

J.C. opened the public hearing to receive input from the public regarding the proposal by the Historical Society to take possession of town owned property at 81 Main Street which is adjacent to the Town Hall.

Adam Gauthier asked if there are any proposals printed to look at, Cara handed some out.

Mark Riel asked if the proposal is the actual letter, J.C. stated yes, with a copy of the tax card for people to see the property.

Mary French asked which item we are talking about, because under old business it says it's a sale and the proposal states it's a donation. J.C. explained that the public hearing is a discussion for the proposed donation of the property and the item under old business is referring to us trying to sell this property over the last year. This is a relatively new proposal from the Historical Society to take possession of the property. J.C. asked Carl to give a history of the property. Carl explained that we ran into an issue with selling this property with a clear title. In addition to the usual title problems with a property that is taken by tax deed this one had other issues, too. Carl stated that the likelihood of getting a clear title without doing an action to quite title which can cost ten to fifteen thousand dollars is out of the question. There have been several title companies working on it to accomplish this. If we were to take this to auction we still have to convey a clear title. To get a clear title it would easily cost ten to fifteen thousand dollars and have to go through the courts and that can be a lengthy process. Carl stated that they had a person interested in purchasing the property and they would take on the expense of clearing the title themselves, and at the point it would be rehabbed and restored to the tax rolls, at a low purchase price. Then the question would be if that would be in the best interest of the town, because you are rolling the dice when you sell a property as to how much additional burden could be put on the services in town. It's an unknown when you sell the property to know if the tax revenue that the town receives would be of benefit to the town. Or would we be better off donating this property to the Historical Society, so the town would have a nice place to keep the history of the town. It won't bring any revenue, but to Carl's understanding they would clear the title and tear down the existing building and build a new one. Otherwise we would be in for a 10 year wait to see what happens with the title.

Randy Severance stated that at the last meeting there was a non-public session held with the Historical Society and it was later revealed to us during public session that the non-public meeting minutes would be unsealed and put up on the website as agenda minutes. As of noon time today they were not on the website and requested a synopsis of that then private but not private meeting. J.C. stated the reason the minutes are not on the website is because they have not been approved and will be during this meeting. J.C. explained that it was a discussion concerning the desire of the Historical Society to take possession of 81 Main Street property. They would demolish the existing building and replace it with building yet to be designed to accommodate the possessions of the Historical Society. Part of that discussion pertained to the issues that Carl just explained with the title. Currently in the state of New Hampshire we have an advantage concerning titles for non-profit organizations relative to titles verses a private sale.

Adam Gauthier asked if there was a time table for demolition and moving forward, J.C. stated they don't have a formal commitment as they are waiting for approval. The Historical Society shares this board's interest in moving forward with getting the current structure down and construct a new building.

Mary French asked if that will be a stipulation put in the deed, Carl stated that we could. The other properties that have been sold in town for residential rehab have had time frame for improvements so the properties are better to look at. Carl feels that we would be looking for the same thing and thinks they are prepared for something like that, as well.

Justin Clough is in favor of history but considering the fact of serious constraints in regards to tax revenue. With an offer on the table for this property who is willing to work the title process at their expense, he is wondering why we are not taking a closer look at that first. He would like to see something more available for the Historical Society, but looking at this from a tax revenue purpose he finds it a little difficult to hand over a property that would not generate any tax revenue when we have an offer that could generate revenue. Carl stated that we don't exactly have an offer on the table, however one could be generated. Carl stated that there are things we have to consider when looking at it from that perspective. You have to look at how much tax revenue it will be capable of generating. Will it have a house on that small lot that will be taxed for $10,000.00 or $4,500.00. And the other thing would be depending on the buyers and if it is a family that will cost the town more than that in services. It's not an exclusion from someone coming and building but residential development does not usually enhance the tax situation. Justin's other concern is that previously he saw it was going to be rezoned so that it would be a business. His question would be if it is generating just one dollar of tax revenue then wouldn't it be better than generating none. Carl stated that just because you generate a dollar in revenue does not mean you are on the up side.

Mark Riel stated that the intention of the Historical Society is to put their current building back onto the tax rolls and it is assessed twice as much so it would generate tax revenue. Justin asked if it could potentially be a tear down. Mark stated the building is in good condition.

Mary French asked if the current Historical Society building was originally bought or donated, Mr. Berkson stated it was purchased. She also is impressed with Pittsfield's Historical Society and how they handle the history of Pittsfield. Mary asked if the previous residents lived there when the property was taken by tax deed. Cara stated that she had passed away. Mary feels that it would be a benefit to have the Historical Society there and has some possible suggestions for the deed.

Fred Okrent believes that the donation of the property to the Historical Society for the construction of a new building would be a great step forward for the revitalization of the town.

Adam Gauthier stated that he is not against the Historical Society he just would like some more information. He asked if funding is available for this project or are they going to be doing some fundraising. Mark Riel stated that they have some significant pledges for the project, that will get them to a point of clearing the title, demolishing the current structure, some site work, and a new structure up and enclosed. There may be some fundraising later to finish the project.

Doug Martin asked if the rebuild would be period correct, J.C. stated that the town does not have a historic district that has that kind of requirement. Doug commented that we are taking down history to put up a warehouse. J.C. stated that the architectural design has not been done yet. Doug inquired about the building being climate controlled to properly store the Historical Society's items. Mark Riel informed Doug that most historical societies do not have climate controlled atmosphere for the entire facility, they do for some of the paper items. Mark stated that the 3 story building including the full basement that would hold the fire wagons and baggage carts, and stated that they want it to fit the Historical Society's image and benefit the town. J.C. commented that anyone could take possession of the building would most likely tear it down because of the condition it is in. Doug understands that but it would be private sector and not a gift or donation.

Randy Severance asked if the town still has an abandoned piece of property next to the library and if so wouldn't that be a better location for the Historical Society. And has it been considered. Mark Riel stated that they had looked at that and it would be costly in the long run for the upkeep of that building.

Lee Corson asked about a time frame for the new building to be up. Mark Riel stated it is the intention to remove the existing building quickly, but we would need the title cleared before the construction process starts.

Justin Clough asked if the time has been taken to look at existing structures around town. He is in favor of having a good Historical Society, but would it be more price advantageous to purchase and rehab to meet their needs and put this property back on the tax roll. Justin inquired about the building down the street that has been vacant for a while and has a good location. Ray Webber stated that then you would be taking that property off the tax roll.

Larry Berkson stated they have done some research and looked at all (14 currently) available properties in town. Larry explained the building Justin referred to would be a big loss in tax revenue for the town, and they would not be able to afford the maintenance and upkeep that property would need. They currently have a window with some major donors and would need to do something pretty hastily to capture that money and move forward and the project next door is the best option.

Justin Clough stated that he is only asking these questions because there was not much information given to the public. He understands that they have done the research but there is not a lot of information available to know what's going on.

Adam Gauthier asked about parking, Mark Riel stated that it wouldn't be any worse than what they have now because they don't have any now. Ray Webber stated that there will be some available behind the building.

Jim Gamble stated that he was the one with the purchase and sales agreement on this property, he does this for a living and he was prepared to purchase and rehab it. He has been doing this for 42 years and agrees that it needs work but the work is doable. He currently is rehabbing 114 Main Street.

Lee Corson inquired about how long it would take to get a clear title. J.C. stated he is not sure how long it would take but it would be costly. Carl stated it could take 6 months to a year.

Jim Gamble stated it was his attorney that found the problems with that title. They said it was not hard it's just dealing with the lenders, and it would take 6 months to a year just like he explained to Carl.

Justin Clough asked if the Historical Society would be looking at the same time frame. J.C. believes that it would be different because of their non-profit status. Carl stated that the board could convey the property to anyone with a clear title or not, it's whether the buyer accepts the

title the way it is. In the case of Mr. Gamble he can purchase it and rehab it, but when it comes time sell the property it would be in his best interest to clear the title.

Mary French requested clarification of clearing the title if it goes to the Historical Society. J.C. stated that whoever the property is conveyed to would still have to clear the title. And to his understanding the Historical Society would be the terminal holder because they would intend to hold the property in perpetuity, whereas a private citizen would fix it and sell it the title would come into question again. It seems holding onto the title for a time seems to have less questions. Mary feels that it would be important to put something in the deed that states if the Historical Society is not able to continue residing on that property they could not sell it and would return the property to the town. She has examples that she would like to provide to the selectboard for their information.

J.C. closed the public hearing at 6:47 p.m.

Carl asked if we could do a poll to see how many would be in favor and who would not. There was some discussion and a poll was done. The majority was in favor of donating the property to the Historical Society.

**NEW BUSINESS**

**ACTION ITEMS**
1.  Property Tax Warrant – $4,211,170.00
J.C. stated that item number 1 is for the Property Tax Warrant.

Gerard: I make a motion to approve the Property Tax Warrant in the amount of $4,211,170.00.
Carl: Second.
Discussion: None.
Motion carries 4-0

2.  Notice of Intent to Cut Timber – Tax Map R30, Lot 4 – 520 Catamount Road
J.C. stated that item number 2 is for a Notice of Intent to Cut Timber for Tax Map R30, Lot 4 at 520 Catamount Road.

Carl: I make a motion to approve the Notice of Intent to Cut Tax Map R30, Lot 4, 520 Catamount Road.
Gerard: Second.
Discussion: None.
Motion carries 4-0

3.  Application for Current Use – Tax Map R2, Lot 7 – 113 Daroska Road
Gerard inquired if the current use was the 128 acres, Cara stated that it was the same ownership and contiguous. J.C. stated that item number 3 is for an Application for Current Use for Tax Map R2, Lot 7 at 113 Daroska Road. Carl inquired with Cara about the house location (on the abutting parcel) in reference to the 128 acres and the land that is currently in current use.

Carl: I make a motion to approve the Application for Current Use for Tax Map R2, Lot 7, 113 Daroska Road.
Carole: Second.
Discussion: None.
Motion carries 4-0

4. Abatement – 2 & 4 Manchester Street - $1,357.81
J.C. stated that item number 4 is a request for an abatement for 2 & 4 Manchester Street in the amount of $1,357.81.

Gerard: I make a motion to approve the abatement for Tax Map U01, Lot 83 2 & 4 Manchester Street in the amount of $1,357.81.
Carl: Second.
Discussion: None.
Motion carries 3-1 Carole opposes.

5. Conservation Commission Resignation – Owen David
J.C. stated that item number 5 is a resignation letter from Owen David.

Gerard: I make a motion to approve the resignation of Owen David from the Conservation Commission.
Carl: Second.
Discussion: None.
Motion carries 4-0

6. Conservation Commission Appointment – Carl Wallman
J.C. stated that item number 6 is an appointment application for Carl Wallman to the Conservation Commission.

Gerard: I make a motion to approve the appointment of Carl Wallman to the Conservation Commission.
Carl: Second.
Discussion: None.
Motion carries 4-0

7. Committee name change request - Economic Development to Community Development
J.C. stated that item number 7 is a request to change the name of the Economic Development Committee to be the Community Development Committee.

Carl: I make a motion to approve the name change request of the Economic Development Committee to Community Development Committee.
Carole: Second.
Discussion: None.
Motion carries 4-0

8. Economic (Community) Development Committee Appointment – Leroy Corson
J.C. stated that item number 8 is an appointment request of Leroy Corson to the new Community Development Committee.

Gerard: I make a motion to approve the appointment of Leroy Corson to the Economic (Community) Development Committee.
Carl: Second.
Discussion: None
Motion carries 4-0

9. Parks & Recreation Commission Appointment – David Stasiak
Gerard: I make a motion to approve the appointment of David Stasiak to Parks & Recreation Committee.
Carl: Second.
Discussion: None.
Motion carries 4-0

10. BCEP Solid Waste District disposal fee waiver – Josiah Carpenter Library
Carole: I make a motion to waive the fee waive the fee for the library.
Carl: Second.
Discussion: None.
Motion carries 3-1 Gerard abstains.

11. 42 Chestnut Street grant demolition project – easement addition to deed
Cara stated that this is something that FEMA requires with the project to make sure that anyone searching the title on the property that FEMA was involved with the project. It's part of the grant, if for some reason we wanted to sell this property we would have to go back to FEMA and ask their permission because they have an interest in the property, and then there would be a different easement going forward.

Carl: I make a motion to approve the easement addition to the deed to satisfy FEMA.
Carole: Second.
Discussion: None.
Motion carries 4-0

12. Proposed donations of personal property – Police Department
Cara stated that there were some donations dropped off at the police department of coloring books and stuffed animals for the officers to give to children in difficult situations.

Carl: I make a motion to accept the personal property donation for the police department as described.
Carole: Second.
Discussion: Carole asked if we have a person or group to thank. J.C. asked if we should send something to the church. Carl suggested sending a letter of thanks to them.
Motion carries 4-0

13. Proposed donation of personal property – Emergency Management

Cara stated that this would be retroactive because this came forward at the same time the donation policy was being discussed. Rob Freese printed out the entire plan and the big color print outs needed for the hazardous mitigation materials.

Carl: I make a motion to accept the proposed donation of the personal property as described.
Gerard: Second.
Discussion: None.
Motion carries 4-0

14. Draft bid notice – LED street light conversion project

Cara presented the draft bid notice for the board to review. She explained that she used several different examples to create this bid. Carl would like to review this, because we need to make sure there is some kind of accommodation for either a relocation or possible addition of some lighting. Carole confirmed this had to go out to bid with Cara because she thought there was a company that was already set up to do this project. Cara also included the current street light inventory that was done by Sgt. DiGeorge that gave his opinion from a safety aspect if we need the light or not, then gave it to George for his review from a public works perspective.

Carl: I make a motion to table this until our next meeting so we have a chance to look at the bid proposal and the list of lighting.
Gerard: Second.
Discussion: Cara explained that there is 141 lights the town is paying for and when Sgt. DiGeorge went through the list he could not find 6 of them but found and additional 13 that we are not paying for. Carole stated that the LED lights are supposed to be more effective so we may not need as many but who is going to tell us that. Cara stated that part of the bid is going to do an audit and they should be able to tell us what we need and don't need. Then they will bring it to you and you will have the final decision.
Motion carries 4-0 (to table)

Carole asked if we could have a time frame on this so we can get moving with this. Carl stated that the motion to table is for 2 weeks. Carole is hoping we get this done by fall. Cara stated that as long as we can get a good list we can put it out to bid. Cara stated that when looking at other municipalities that have done this there was a time of around 6 months.

15. Storage Container Permit extension concern – 322 Catamount Road

Cara stated that this original permit came to the board in the fall for an extension and now has lapsed, so Cara asked Jesse to go take a peek to see if it was still there. Jesse stated that the gentleman was going to come in and ask to speak to the board, Cara stated she received a letter. J.C. asked for the location and Jesse stated it was on Catamount Road. Jesse explained that the man is disabled and has trouble getting in and out of the trailer so it is taking him longer to clean it out. The other concern he brought forward is that other people in town have trailers and questioned why he has to move his is other people are not required to. Carl asked Jesse if he is aware of other storage trailers in town that are supposed to have a permit. Jesse stated that storage trailers are not allowed unless they are for construction reasons. We don't have anything in our codes that they need a permit, but we have a paper that says if you have a storage container you have to be approved by the BOS. Cara stated that is in the Zoning Ordinance. Carl

asked Jesse if he is aware of any other trailers in town that shouldn't be, and Jesse stated that they are all over the place but are they grandfathered or not would be another question. Carl asked if the trailer is registered, because to his understanding if the trailer was registered and so that it could be moved when needed it was not taxable and would be in a different category then a storage building. Jesse has not seen anything that says that but it does say storage trailers. Whether or not it's registered it is still storage on private properties and Jesse does not believe it was the intent of the ordinance to allow anyone to have the storage containers on their property. Cara stated the ordinance does not say anything about registration. Carl asked about the property next to the town shed and Cara informed him that he is taxed on those and is grandfathered and the other residents are not taxed. Carl stated that could be a way to address the issue and start taxing the trailers. Jesse explained that in other towns where he builds they sometimes are in need of a storage trailer to store stuff while the construction is going on and then when the construction is complete the trailer is removed and he believes that is what our ordinance is addressing. J.C. asked if there is a difference between a trailer and a container. Adam Gauthier stated that trailer is not mentioned in the ordinance and container is. J.C. questioned if they should deal with trailers any differently. Cara stated the definition of storage container on the permit application reads: would be any truck, trailer, box trailer, school bus, mobile home or any other facilities used for storage or other purposes whether registered or not. J.C. asked what we should do about this item, and suggested tabling it because the gentleman requested to come in and speak with the board. Carl stated he does not know how we can justify treating this one resident any different than any other. J.C. stated he did do the right thing and came in and received a permit. Jesse stated it originated from a complaint and the gentleman stated he was using the trailer while he built his garage and got the permit. Cara stated that in order to change the ordinance you would have to go to town meeting. Gerard stated he would like to see him come in front of the board since he did request to. Cara asked about the other properties that are technically in violation, Carl stated they are not on the agenda at the moment. Chief Pszonowsky stated the fire department is currently in violation to store equipment so we would be subject to anything that might come about. Justin Clough stated that he believes it's not the trailer but the ordinance to be reviewed. Carl would like to see this tabled and have Mr. McCoy come in and talk with us.

Carl: I make a motion to table.
Gerard: Second.
Discussion: None.
Motion carries 4-0

**COMMITTEE REPORTS**
Gerard stated at the last Aqueduct meeting the board voted to pay the balance to Mr. Sancoucy. Gerard also stated that the petition was submitted to the selectboard and since there has not been any movement the committee feels the selectboard is in violation of RSA 50. Carl asked what RSA 50 says and Cara was not sure. Cara stated the board's direction to the committee was to give us a vote on their proposal on the boundaries and a boundary list that agreed to the maps. Fred Okrent stated that was voted on and sent. Cara stated this meeting is the next meeting of the selectboard after that and is on the agenda under old business, so unsure of what RSA could be in violation. J.C. inquired what the next step is, and Cara stated to establish the boundaries of the water district and included it in the agenda packet for the board along with the minutes. Carl stated he has seen the boundaries and the list of properties, and personally has an issue with

properties being placed in a village district in which the property owner has no vote or say in what happens. Carl stated to his understanding the only people who have a vote in the village district are those who are domiciled in the village district. So if you own a property in the village district but do not live there you do not get a say. J.C. asked if that meant the landlords would not have a say or vote, and Carl said yes if he understands it correctly. Carl stated that the landlords and the people who own land would not have a vote but would still be subject to the rules made by others and he is opposed.

Carole had no committee reports but would like Ammy to include the list of state paving that Mr. Donovan provided that are proposed for next year.

| Road Route | Length | Limits |
|---|---|---|
| NH 107 | .8 | From Depot St. to NH 107 |
| Loudon Rd. / Concord Hill Rd. Main St. | 1 | From NH 28 to Clark St. |
| Barnstead Rd. | .2 | From NH 28 to NH 28 |
| Barnstead Rd. | .5 | From NH 28 to NH 28 |
| Carrol St. | .2 | From Main St. to Depot St. |
| NH 28 Barnstead Rd. | 3.1 | From Epsom Circle to S. |

Cara asked if these are proposed or slated, Carole stated they are slated. Cara stated they usually receive notification from the state and then it becomes and information item on the Selectboard agenda.

J.C. stated that the new Community Development Committee will meet tomorrow evening at 6:30.

**INFORMATION ITEMS**
April Waste Water Treatment Facility Report was presented to the board.

**OLD BUSINESS**
1. Town hall basement code issues (4/5/16)
Cara stated that until we know that the food pantry is completely moved out we can't move forward. There are some freezers down there and she spoke with one of the board members from the pantry and they are working on distributing those. They did say the move has been successful and they are working on getting some insurance as a non-profit.

3. Joy Street Pump Station concern (8/16/16, building/health to follow up)
Cara sent the letter and has not heard anything back, but it's only been a week.

4. Consulting Services Contract for Municipalization of Pittsfield Aqueduct Co. (9/27/16)
Cara stated that Gerard stated the Aqueduct Committee voted to pay the balance, so asked if there is going to be a contract. Fred Okrent stated the motion on that was to have the selectman approve the contract for the remaining balance, whether we use it or not is up in the air. But it has to be an approved contract before we use it if we need to. It has been voted on in the past and the money was set aside and it was a matter of book keeping. Fred stated they approved it. J.C. asked now that they approved if we need to approve it. Cara stated yes, that as long as

Sansoucy amended the contract amount because that was the problem. The contract amount that was given was above the encumbered amount so we wanted the amendment to reflect the encumbered amount so we could approve that. Fred stated he believed he sent it and will check on that.

5. Library sewer line repair (4/4/17)
Cara stated that Bill Gilpatrick was over at Sanels who needed some sewer work done and he spoke with the company doing that work and asked them if they would put in a bid for the work needed at the library. Cara stated they did and she forwarded that to the board and was not sure if the library trustee was aware they need to act on this or if they are going to refer to the selectboard. J.C. stated he will contact them.

6. Voter petition for formation of a Village Water District (4/4/17)
Cara stated that now that the board has seen what the committee voted on as a proposed list and map. Cara feels that the map should be marked for the public to easily see. The question would be if the board is ready to go forward with scheduling a public hearing on the proposed boundaries for the proposed water district. Town counsel suggested not lumping everything into one public hearing and to first establish the boundaries. The public hearing will be scheduled for June 27, 2017 during our regular scheduled meeting.

7. 2017 Balloon Rally fireworks proposal (5/2/17)
Cara stated that the contracts are ready to sign. The Rotary Club will be paying Atlas Fireworks directly.

Carl: I make a motion to approve the fireworks contract for the 2017 Balloon Rally and have the chairman sign the contract.
Carole: Second.
Discussion: None.
Motion carries 4-0

Gerard asked if they will be doing anything for 81 Main St. tonight. J.C. stated they should think about that before making a decision. Gerard stated the proposal consisted of a 3 story building and there may be a restriction in our zoning for that. Carl suggested putting a time frame for the existing building to come down and the lot cleaned up if it is approved, and requesting a drawing of what the new building will look like. The board discussed those items and decided to have Cara contact the Historical Society and request a proposed architectural design and a time frame for the next selectboard meeting so they can make a decision.

**CHECK MANIFESTS**
1. Accounts Payable
Gerard: I make a motion to approve Accounts Payable.
Carl: Second.
Discussion: None.
Motion carries 4-0

2. Payroll
Gerard: I make a motion to approve Payroll and Direct Deposit.

Carl: Second.
Discussion: None.
Motion carries 4-0

**MINUTES**
1.  May 9, 2017 – Public Meeting Minutes
Gerard: I make a motion to approve the May 9, 2017 Public Meeting Minutes.
Carl: Second.
Discussion: None.
Motion carries 4-0

Cara stated that an amendment for the Purchase and Sales Agreement is needed for the property that Sanel's is purchasing (Map U3, Lot 7).

Carl: I make a motion to extend the Purchase and Sales Agreement for 30 days till June 3, 2017.
Gerard: Second.
Discussion: None.
Motion 4-0

**PUBLIC INPUT**
Paul Nickerson would like the board to think about considering a hotel being put in town, he has two locations in mind and is working on putting something into motion.

Randy Severance stated you can put a stipulation in a deed when donating a property to also approve the architectural design of a building at a later time.  So the gifting can be done immediately and the design can be addressed later.  Carl stated the Historical Society would have to agree to making that stipulation.

Adam Gauthier asked about the roads that are slated to be paved, and he was given the list.

Paul Nickerson stated that we are not just giving a piece of land and inquired about the current property.  J.C. stated that they will be selling the current property and then it will return to the tax rolls.

J.C. stated they are going to go into non-public.

Carl:  I make a motion to go into non-public for RSA 91A:3-2 a,b,c,e.
Gerard: Second.
Discussion: None.
Roll call was done and all approved.

Gerard: I make a motion to seal.
Carl: Second.
Discussion: None.
Roll call was done and all approved.

J.C. called meeting back into public.

Board of Selectmen                                    12                                    May 23, 2017

Cara stated that the applications for the vacant selectboard position are in with a few more days to have some more come in, and asked how the board would like to proceed.  The board had some discussion and decided to have them all contacted to come into the next meeting and be prepared for questions during the public session.  They will consider a decision at the following meeting.

Carole:  I make a motion to adjourn.
Gerard: Second.
Discussion: None.
Motion carries 4-0

Meeting adjourned at 9:40 p.m.

Approved:

_____          27 June 2017
J.C. Allard, Chairman                      Date



**MEETING AGENDA**
TOWN OF PITTSFIELD
BOARD OF SELECTMEN
TOWN OFFICE, 85 MAIN STREET
PITTSFIELD, NEW HAMPSHIRE 03263

---

### TUESDAY, MAY 23, 2017

**6:00 p.m. –**Call to order – Regular Session

*Please note: The meetings of the Board of Selectmen are recorded, audio and video.*

Public Input standards: The Board of Selectmen may accept the public's input that is addressed directly to the Chair in a courteous and respectful manner in a time frame of three minutes or less.

**PUBLIC INPUT** – regarding agenda items only

### AGENDA REVIEW

### PUBLIC HEARING
    **6:15 p.m.** – Pittsfield Historical Society proposed relocation to 81 Main Street

### NEW BUSINESS

#### ACTION ITEMS
1. Property Tax Warrant – $4,211,170.00
2. Notice of Intent to Cut Timber – Tax Map R30, Lot 4 – 520 Catamount Road
3. Application for Current Use – Tax Map R2, Lot 7 – 113 Daroska Road
4. Abatement – 2 & 4 Manchester Street - $1,357.81
5. Conservation Commission Resignation – Owen David
6. Conservation Commission Appointment – Carl Wallman
7. Committee name change request - Economic Development to Community Development
8. Economic (Community) Development Committee Appointment – Leroy Corson
9. Parks & Recreation Commission Appointment – David Stasiak
10. BCEP Solid Waste District disposal fee waiver – Josiah Carpenter Library
11. 42 Chestnut Street grant demolition project – easement addition to deed
12. Proposed donations of personal property – Police Department
13. Proposed donation of personal property – Emergency Management
14. Draft bid notice – LED street light conversion project
15. Storage Container Permit extension concern – 322 Catamount Road

#### COMMITTEE REPORTS

#### INFORMATION ITEMS
1. April Waste Water Treatment Facility report

### OLD BUSINESS
1. Town hall basement code issues (4/5/16)
2. Sale of town owned/tax-deeded property (7/26/16)
   a. 81 Main Street
   b. 37 Main Street – (deeded "back" to town, discussed 1/3/17)
3. Joy Street Pump Station concern (8/16/16, building/health to follow up)

    4. Consulting Services Contract for Municipalization of Pittsfield Aqueduct Co. (9/27/16)
    5. Library sewer line repair (4/4/17)
    6. Voter petition for formation of a Village Water District (4/4/17)
    7. 2017 Balloon Rally fireworks proposal (5/2/17)

## CHECK MANIFESTS
    1. Accounts Payable
    2. Payroll

## MINUTES
    1. May 9, 2017 – Public Meeting Minutes

## PUBLIC INPUT

Hello Joe,

I'm writing to try to correct some incorrect information that is being spread verbally and through social media by you.

Before becoming a selectman in 2016, I frankly knew zero about the storage container article in the zoning ordinance. My *first* exposure to it was when you came to the board with your expired permit and literally begged the board to give you a one-year extension due to your disability and how long it would take to empty the trailer out. I'm sure you remember it, as does everyone else in the room at the time. Hopefully you remember that I was the one that made the motion to give you a *yearlong extension*. I remember you thanking us profusely and *swearing you'd have the trailer empty and gone by the end of the year!*

Over the course of that next year, in addition to a workload you can't even imagine, that the select board has to find a way to deal with, we received several complaints about storage containers. One of those complaints was about your trailer, and in addition, that you were operating a second hand store in the rural district without a variance (which as you know, we never pursued). We were never given a name*. Nothing was said about Trump being on the trailer-* not then, not ever- not from the - complainant and not from any member of the board. Let me assure you that none of this is related to Trump's name on the trailer (and which if you recall was no longer even on the trailer when you got a notice that your extension was nearly up). We happen to all be Republicans, and not one of us has ever bad-mouthed Trump at all that I know of. Personally, I liked Trump on your trailer better than I liked the balloons, but at the end of the day none of us gave a damn what you painted on it. Most of the time I still wear a Make America Great Again hat.

Anyway, what was obvious was that there were illegal storage containers all over the place (that's about the only *truth* I can find in your rants). So, what should we do about it? None of us had any idea when they were put in- before or after the zoning article. Many select boards had apparently just ignored the ordinance, thus creating a nearly impossible situation for *this* board. Most of us actually work-full time and it is hard to work 70 hours a week, keep up with everything else a select board has to do *AND* start going house by house figuring out what the story is with every existing storage container would be an almost impossible task. However, the rule is on the books and the select board is elected to enforce the rules whether we agree with them or not. So, as a board, we decided the best we could do is enforce the rule as storage trailers were added and that we knew about coming in during our term in office. We didn't make the rule. We weren't the ones that ignored the rule. We decided to not make the situation worse by ignoring it on our watch.

Fast forward to 11 months into your year long extension. It was obvious you had made zero progress emptying your trailer and we didn't want you to get to the end of year and have us on your ass about an expired permit. You keep claiming we demanded you get rid of the trailer a month early. *That was simply a courtesy to remind you that time was approaching when we would have to deal with it again!*

You say I was in your yard leaving a sign and told you I didn't know "what happened to your trailer". That is not what I said. I told you I didn't know who *complained* about your trailer. I didn't know then, and I don't know now. We were never given a name. But I do know that we gave you a year-long extension to keep it, you used up the year and we reminded you that you'd have to remove it. You

470

know what happened and I know what happened. Did I make the motion to send you the letter? Yes, I did. And I would have done the same thing no matter who it was and no matter what they had painted on their trailer- I couldn't care less what the trailer looked like. You made us a promise and we were not prepared to let that promise be broken. Those are the rules and the only ones we are capable of enforcing are the ones that come in under our tenure. You're being told by your neighbors and people who you think are friends that *you* have been picked on. ***The truth is you've been treated just like everyone else that has brought in a storage container or a permit has expired since we took office!***

These people who are advising you are convincing you that the board of selectmen is only interested in taking care of their friends, that we treat newcomers differently. ***THAT IS THE BIGGEST UNTRUTH THAT IS BEING TOLD!***

You are claiming I voted not to recommend Pritchard's article because "we need it to make the town pretty". ***Once again, absolutely NOT what I said, and I have the audio to prove it!*** Frankly, I don't give a damn whether we have the storage container rule or not. The voters decided to pass it long ago *"to promote the general welfare by protecting the aesthetics of the town".* That's verbatim from the zoning ordinance. My comment was that if that's what the voters want, so be it. My biggest problem with the proposed change is that it is not town wide. Separating the rules by district will just add one more layer of confusion for the public.

In closing I wanted to send you this letter to set the record straight and remind you of what you agreed to. This letter contains the truth and as with anyone who makes claims that are untrue in my presence, I will correct them with the truth. I think that you should stick to what actually happened and not get personal because you are being instigated by others. Being a selectman means a heavy work load for literally no compensation and at times includes tirades from people who, if they are honest with themselves, have no real justification.

Carl Anderson

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

JOSEPH McCOY                          )
                                     )
Plaintiff                            )
                                     )
v.                                   )          Civil Action No.:1:20-cv-00362-JL
                                     )
TOWN OF PITTSFIELD                   )
                                     )
Defendant                            )

## REPLY TO PLAINTIFF'S OBJECTION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant Town of Pittsfield ("Town") replies to Plaintiff's Objection to Defendant's

Motion for Summary Judgment ("Objection") and says as follows:

INTRODUCTION

The arguments contained in Plaintiff's Objection are perplexing at points, and in whole,

are incorrect. There are no genuine disputes as to any material fact, and the Town is entitled to

judgment as a matter of law. Plaintiff has failed to meet his burden to demonstrate on Count I or

Count II that a trier of fact could reasonably resolve those claims in his favor. In particular,

Plaintiff's Objection is devoid of  any specific allegations or evidence of intentional

discrimination or disparate treatment, and Plaintiff fails to provide evidence of similarly situated

comparators sufficient to sustain a class-of-one equal protection claim. Likewise, Plaintiff fails to

provide an affidavit or declaration representing that he did not know or understand the basis for

the Town's decision in 2018 denying his permit request. In responding to the Town's Motion,

Plaintiff bears the burden of supporting each issue with significantly probative materials of

evidentiary quality. *See Flovac, Inc. v. Airvac, Inc.*, 817 F.3d 849, 853 (1st Circ. 2016). He has

not done so. Summary judgment should enter for the Town.

472

ANALYSIS

I.  *Plaintiff fails to identify any genuine disputes of material fact, and summary judgment should enter for the Town.*

In opposing summary judgment, Plaintiff bears the burden of demonstrating the existence of genuine disputes of material fact. This standard requires that his objection "point to definite and competent evidence showing the existence of a genuine issue of material fact." *See Perez v. Lorraine Enterprises, Inc.*, 769 F.3d 23, 30 (1st Cir. 2014). "Definite, competent evidence is evidence that is sufficiently probative of an issue that a factfinder could resolve that issue in favor of the nonmoving party based on that evidence." *Id.* Thus, "[t]he key…to defeating a properly supported motion for summary judgment is the non-movant's ability to support his or her claims concerning disputed material facts with evidence that conflicts with that proffered by the moving party." *See Cam-Sam Real Est. Holding, LLC v. Merchants Mut. Ins. Co.*, No. 18-CV-433-SM, 2019 WL 2913689, at *2 (D.N.H. July 8, 2019). Plaintiff's objection falls far short of the above standards.

In its Memorandum of Law in Support of Motion for Summary Judgment ("MOL") (capitalized terms not defined herein shall have the meaning ascribed to them in the MOL), the Town has presented affidavits and evidence, which support the following material facts, among others:

- Plaintiff was not intentionally harassed or discriminated against. *See e.g.*, MOL at 6-8 (describing circumstances of 2016 and 2017 permit approvals).

  Plaintiff was not ordered to remove the Storage Container because it said "TRUMP" but rather based on the requirements of the Zoning Ordinance ("Ordinance"), and in particular, in consideration of the prior extensions granted. *See e.g.*, MOL at 10 (describing 2018 denial).

- Plaintiff was given permit extensions when the Storage Container displayed "TRUMP" and only denied one after that image was replaced. *See e.g.*, MOL at 6

2

(describing 2016 permit approval) and *compare* MOL at 10 (describing 2018 permit denial).

- Plaintiff was notified of the basis of the Town's decision by letter and through prior notices of violation and reminders. *See e.g.*, MOL at 5-6 (describing 2016 notice of violation) and MOL at 10 (describing 2018 denial).

- The Town enforced its Ordinance with respect to other storage containers that were not used for expressive purposes in substantially the same manner as with respect to Plaintiff, including with respect to Plaintiff's own Rental Container in 2016 and the Tilton Hill Trailers in 2018. *See e.g.*, MOL at 11.

- Plaintiff knew the Ordinance was available on the Town's website, and knew how to arrange to meet with the Board of Selectmen if he had questions regarding its requirements. *See* MOL at 21.

- Plaintiff did not appeal the Board's decision denying his third permit extension in 2018. *See* MOL at 11.

- The Board of Selectmen are the Zoning Ordinance Administrators and vested with authority over Storage Container permitting. *See* MOL at 21.

- Plaintiff represented on multiple occasions that he was using the Storage Container for storage and the Board of Selectmen relied on those representations in granting additional permit approvals in 2016 and 2017. *See* MOL at 6.

- Plaintiff's use of the Storage Container to support President Trump never factored into the Board of Selectmen's deliberations, nor was it ever mentioned by Plaintiff in seeking extensions. *See* MOL at 7.

- The Town initially required Plaintiff to obtain a storage container permit in 2015 - prior to the Storage Container being painted "TRUMP" - because it gained actual knowledge that the Storage Container was unpermitted during a visit to Plaintiff's property with respect to a building permit, and thereafter, knew that the Storage Container needed a permit to be in compliance. *See* MOL at 3.

- The Town was aware of at least one complaint with respect to Plaintiff's Storage Container. *See* MOL at 7.

- The Town has taken enforcement measures against other storage containers when it becomes aware that they need to be permitted, but it does not routinely investigate permit status absent such knowledge. *See* MOL at 11.

474

Despite the significance of the above facts, Plaintiff has not disputed their accuracy in his Objection, nor has he provided any evidence or affidavits that would raise a genuine dispute regarding these facts. Of particular note, Plaintiff does not identify any instances of harassment or discrimination, and provides nothing on which to base his claim that the Ordinance was applied to him because of his support for Donald Trump, as opposed to the reasons cited by the Town. Accordingly, he has no factual basis for an equal protection claim.

Additionally, in order to sustain his claim that the application of the Ordinance to him was unconstitutionally vague, Plaintiff needs to have included, as a baseline, an affidavit or declaration that he did not understand why the Ordinance was applied to him and some evidence to support that claim. Yet, he does not do so.

In fact, the only evidence provided in support of his claims is a declaration (the "Declaration") in which Plaintiff identifies various storage containers and trailers in Town that he asserts are not permitted. This Declaration is provided for the apparent purpose of identifying similarly situated comparators as is necessary to sustain his class-of-one equal protection claim. The Declaration, however, fails to meet Plaintiff's burden on summary judgment. In particular, the mere fact that there are some unpermitted trailers in Town does not provide evidence of discrimination or an equal protection violation. The mere absence of a permit is not evidence of illegality or that a storage container is similarly situated.

In sum, Plaintiff's Objection contains nothing more than "'a conglomeration of conclusory allegations, improbable inferences, and unsupported speculation…'" which is "…insufficient to ward off summary judgment." *See Irobe v. United States Dep't of Agric.*, 890 F.3d 371, 381 (1st Cir. 2018) (*quoting Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990)).

II.    *The existence of unpermitted trailers in Town, standing alone, is insufficient to sustain a class-of-one equal protection claim.*

In his Declaration, Plaintiff identifies various storage containers and trailers in the Town that he represents are not permitted. The only information provided with respect to each container and trailer is an image and, in some instances, an address and owner information. No other information is provided to explain how or why the containers and trailers are similarly situated to Plaintiff's own Storage Container.

For reasons more fully set forth in a corresponding Motion to Strike (to be filed), Plaintiff's declaration should not be considered by the Court.[1] However, even if it is considered, it would not defeat summary judgment because the existence of unpermitted containers and trailers, absent more, is insufficient to sustain a class-of-one theory of liability.

As set forth in the Town's MOL, Plaintiff's class-of-one equal protection claim requires Plaintiff to identify specific instances where persons similarly situated in all relevant respects were treated differently without rational basis. *See* MOL at 16. Plaintiff's Declaration fails this requirement. For example, Plaintiff's Storage Container was the subject of at least one complaint, had been on his property for multiple years when it was denied a permit in 2018, and had received multiple prior approvals. It follows that to identify a similarly situated comparator in all relevant respects, Plaintiff is required to at least identify some storage container or trailer that has similar shared characteristics and during a similar time period as Plaintiff.[2] Yet, the

---

[1] The information and images provided in Plaintiff's Declaration were not previously produced to the Town as part of Plaintiff's initial disclosures or in supplement thereto, despite prior representations that Plaintiff has had such information since prior to bringing suit in this matter. Further, Plaintiff has not responded to interrogatories and requests for production that explicitly sought such information and images, which were propounded on April 12, 2021. Additionally, discovery in this matter has been closed since June 1, 2021. Accordingly, the Town will be submitting a motion to strike Plaintiff's declaration within the week, which should render Plaintiff's objection entirely devoid of any evidentiary support of any kind, and provides an additional basis to enter summary judgment for the Town.

[2] As outlined in the Town's MOL, there are many other relevant characteristics that would need to be addressed to identify similarly situated comparators. *See* MOL at 18.

information provided by Plaintiff in his Declaration is devoid of any detail necessary to evaluate if the storage containers listed are in fact similarly situated.

III.    *The Town's Ordinance was applicable to Plaintiff, and the Selectmen had authority to grant permit extensions.*

Plaintiff attempts to avoid summary judgment by arguing that the Ordinance was not applicable to his Storage Container because his Storage Container was not used principally for storage. *See* Objection at 11. He further contends that the Board of Selectmen lacked authority to grant permit extensions in 2016 and 2017 because the Ordinance did not include a specific process for extensions. *Id*. at 12. Additionally, Plaintiff asserts that "the Ordinance should not be at issue in this case" (Objection at 14), and that "[h]e has not made any allegations concerning whether the Town should have granted him a storage container permit, or whether the Town should have granted him a third extension of that permit." *See* Objection at 19. In sum, these arguments appear to be an attempt to allege that the Board of Selectmen acted without legal authority when it ordered Plaintiff to remove his Storage Container. These arguments, however, are misplaced.

There is, in fact, no genuine dispute that the Ordinance was applicable to Plaintiff's Storage Container. On its face, the Ordinance applies to storage containers, and Plaintiff represented on multiple occasions that the Storage Container was used for storage. Yet, even if it was not applicable, it is unclear how that helps Plaintiff's arguments. To the contrary, if Plaintiff did not have a right to have the Storage Container on his property, then he has no basis to allege that the Town violated a law or ordinance - i.e., engaged in unequal protection of the law - in making him remove it. To allege unequal application of law, it is axiomatic that Plaintiff must identify a law that was unequally applied.

Additionally, as outlined in the Town's Memorandum of Law, the Town's Selectmen are in fact the zoning ordinance administrators and vested with authority to grant storage container permits. *See* MOL at 21. Yet, even if they exceeded their authority in granting multiple permit approvals to Plaintiff, that would not give rise to a constitutional injury to Plaintiff. To the contrary, Plaintiff's argument would tend to prove that the Town exercised its discretion in a manner that favored Plaintiff, not the opposite.

More fundamentally, Plaintiff's arguments lose sight of the narrative thread of his claims. At its core, Plaintiff's Complaint alleges that he should not have been required to remove his Storage Container because there are allegedly other unpermitted storage containers in Town. But, by arguing that the Ordinance does not apply, and that the Selectmen had no authority to grant extensions, Plaintiff asserts that he had no right to maintain the Storage Container. And, if the Storage Container was instead principally used as a sign, then a permit still would have been required. The notion that the Ordinance did not apply and is not at issue is puzzling given the claims in this case, but highlights the inconsistencies in Plaintiff's arguments and factual representations.

Further, to the extent Plaintiff now seeks to ground his claims on the notion that the Town somehow acted ultra vires in its application of the Ordinance, Plaintiff should be precluded from doing so given that such claim is a distinct allegation of harm, and not set forth in his Complaint, nor would it change the outcome on summary judgment.

IV. *Plaintiff was required to bring an appeal of the 2018 permit decision to the Town's ZBA to the extent he seeks to hold the* Town *liable for constitutional injuries.*

Plaintiff contends that no appeal to the Pittsfield ZBA was needed because his "claims are not issues that are routinely resolve[d] by local zoning boards, nor are they within the power of local zoning boards to correct." *See* Obj. at 19. This argument misses the mark. On appeal, the

ZBA would not have been asked to examine the constitutional claims asserted in Plaintiff's

Complaint, rather they would have been tasked with the routine job of determining whether the

denial of Plaintiff's 2018 permit request was unlawful or unreasonable under the terms of the

Town's Zoning Ordinance based on the facts and circumstances set forth in the record at that

time. As set forth in the Town's MOL, this step is important because with respect to permitting

decisions, the ZBA is the final decision maker. Accordingly, if the ZBA had found that the

Board's decision was unlawful or unreasonable, it would have been required to overturn that

decision and obviate the need for federal litigation.

V.     *Plaintiff incorrectly contends that the doctrine of municipal estoppel should preclude the Town from raising a ripeness argument.*

Plaintiff's arguments regarding municipal estoppel warrant little response. They are

unsupported and conclusory. There is nothing in the record to suggest that the Town engaged in

a false representation, concealed facts, or acted with any intent to induce reliance.

VI.    *Plaintiff incorrectly contends that the Court should enter summary judgment for Plaintiff.*

For the reasons set forth above, and in the Town's Motion and MOL, Plaintiff's request

for summary judgment should be denied. Of note, the only evidence provided by Plaintiff in his

Objection is a Declaration limited to generic information regarding allegedly unpermitted

trailers. This record cannot sustain a motion for summary judgment against the Town given the

requirements of Rule 56. Further, the deadline for filing motions for summary judgment closed

on June 1, 2021.

VII.   *Plaintiff's Objection is rife with inaccurate statements and representations regarding the Town's positions and alleged admissions.*

Plaintiff's objection contains numerous incorrect and unsubstantiated representations

regarding alleged admissions and concessions by the Town, some of which are directly

contradicted by the evidence cited by Plaintiff. For example, Plaintiff alleges that the Town admitted the Board had no authority to grant permit extensions. *See* Objection at 3. In fact, the portion of transcript relied on by Plaintiff explicitly states otherwise. When the Town's Administrator was asked if there was no provision or process to request an extension of a storage container permit, she stated "…they can ask for an extension. There just no defined process for that extension." *See* Objection at 3. This is a far cry from Plaintiff's allegation that the Board allegedly admitted that it had no authority to grant extensions.

The Objection contains numerous other representations, which are not properly supported, are disputed, and are contradicted by the facts and evidence provided in support of the Town's Motion for Summary Judgment and MOL. In particular:

- Plaintiff incorrectly contends the Selectmen ignored restrictions in the Zoning Ordinance that would have prevented issuing a permit to Plaintiff. *See* Obj. at 4.
- Plaintiff incorrectly contends the Board had an obligation to instruct Plaintiff that he could pursue a variance and failed to do so. *See* Obj. at 5.
- Plaintiff incorrectly contends that the Board conceded it had no authority to grant his 2017 permit. *See* Obj. at 6.
- Plaintiff incorrectly contends that the Board acknowledged it had no authority to grant his 2018 permit. *See* Obj. at 7.
- Plaintiff incorrectly contends that the Board cannot identify any reasoning for denying his permit in 2018. *See* Obj. at 7 and 12.
- Plaintiff incorrectly contends that the Board conceded that there was "nothing different" between Plaintiff's first two permit extension requests and his third. *See* Obj. at 7.
- Plaintiff incorrectly contends that various trailers in Town are "unpermitted" and implies that they therefore should have been subjected to enforcement. *See* Obj. at 9-11.
- Plaintiff incorrectly contends that the Town acknowledged that Plaintiff did not use the Storage Container principally for storage. *See* Obj. at 14.
- Plaintiff incorrectly contends that the Town conceded it lacked any reasoning or basis for requiring him to remove his Storage Container. *See* Obj. at 17.

Plaintiff provides no affidavit or specific evidence to support the above allegations of admissions, concessions, and representations by the Town, and they are contradicted by the record attached in support of the Town's Motion for Summary Judgment and MOL.

CONCLUSION

Plaintiff's assertions that the Zoning Ordinance was applied in an unconstitutionally vague manner, and that he was subjected to unequal protection of the law because he used his Storage Container for political speech, are not credible and are missing any supporting evidence. In contrast, the record in support of the Town's Motion for Summary Judgment and MOL is overwhelming. Plaintiff knew or should have known why his permit request was denied in 2018. And, more importantly, he was not discriminated against in anyway. Rather, the record shows he was afforded numerous opportunities to come into compliance with the Zoning Ordinance, and after multiple approvals, the Selectmen finally concluded they could not grant another approval. This is precisely the type of balanced, fair, and reasonable conduct that should be encouraged of local officials. The Town is entitled to summary judgment.

WHEREFORE, the Town of Pittsfield respectfully requests that the Court:

A.  Grant the Town's Motion for Summary Judgment; and

B.  Grant such other relief the Court deems just.

Respectfully submitted,
**TOWN OF PITTSFIELD**

By Its Attorneys,
GALLAGHER, CALLAHAN & GARTRELL, P.C.

Dated:  July 19, 2021          By:___/s/ Robert J. Dietel_____
Robert J. Dietel (#19540)
214 North Main Street
Concord, NH  03301
603-228-1181
dietel@gcglaw.com

**CERTIFICATE OF SERVICE**

I, Robert J. Dietel, hereby certify that a copy of the foregoing was sent to all counsel of record via ECF.

Dated:  July 19, 2021          By:___/s/ Robert J. Dietel_____
Robert J. Dietel

10

481

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Joseph McCoy

     v.                         Civil No. 1:20-cv-362-JL
                                      Opinion No. 2021 DNH 158
Town of Pittsfield

## **MEMORANDUM ORDER**

After the court's denial of Defendant Town of Pittsfield's motion for judgment on the pleadings regarding certain counts of this civil rights lawsuit involving a political message on a trailer in a residential yard, two of Plaintiff Joseph McCoy's claims remain:  Count 1 for violation of his free speech rights, and Count 2 for violation of his equal protection rights. [1]  The Town now moves for summary judgment on these claims, arguing that the undisputed factual record demonstrates that the Town did not apply its zoning ordinance against him in an unconstitutionally vague manner or in any other way that violated his First Amendment rights, and did not selectively enforce the ordinance against him in violation of his equal protection rights.[2]  The Town also moves to strike a declaration and attachments to the declaration McCoy submitted as part of his objection to the summary judgment motion.[3]  This court has jurisdiction over McCoy's claims under 28 U.S.C. §§ 1331 and 1343 because the claims present federal questions and arise from federal civil rights statutes.

After consideration of the parties' submissions and hearing oral argument, the court grants the Town's motion for summary judgment and denies its motion to strike.  As for the

---

[1] Doc. no. 13.

[2] See Motion for Summary Judgment (doc. no. 17).

[3] See Motion to Strike (doc. no. 23).

content or viewpoint discrimination aspects of McCoy's First Amendment claim, summary

judgment is appropriate because McCoy cannot "point to specific, competent evidence" that

Town officials discriminated against him based on the expressive content on his trailer.

Sanchez-Rodriguez v. AT&T Mobility P.R., Inc., 673 F.3d 1, 9 (1st Cir. 2012).  McCoy's

vagueness claim suffers the same fate because no reasonable fact finder could conclude that the

Town's application of the storage container ordinance failed to provide a person of ordinary

intelligence fair notice of what was prohibited, was so standardless that it authorized or

encouraged seriously discriminatory enforcement, or even led to discriminatory enforcement in

McCoy's case.  Finally, the Town is entitled to summary judgment on McCoy's "class of one"

equal protection claim because he has not met his burdens of production and persuasion to

identify similarly situated landowners, demonstrated that the Town treated him differently than

these alleged comparators, or proven that the Town did not have a rational basis for its

enforcement of the ordinance against him.

## I.    <u>Applicable legal standard</u>

Summary judgment is appropriate where "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  A dispute is "genuine" if it could reasonably be resolved in either party's favor

at trial by a rational fact-finder, and "material" if it could sway the outcome under applicable

law.  Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010).  In analyzing a summary

judgment motion, the court "views all facts and draws all reasonable inferences in the light most

favorable to the non-moving party."  Id.

The Town also moves to strike the entire McCoy declaration and attachments thereto

under Fed. R. Civ. P. 37(c)(1).  "If a party fails to provide information or identify a witness as

required by Rule 26(a) . . . the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c). Thus, "the baseline rule is that the required sanction in the ordinary case is mandatory preclusion of late-disclosed information." Harriman v. Hancock County, 627 F.3d 22, 29 (1st Cir. 2010) (quotation marks and bracketing omitted). The court considers several factors in determining whether preclusion is appropriate, including "the sanctioned party's justification for the late disclosure; the opponent-party's ability to overcome its adverse effects (i.e., harmlessness); the history of the litigation; the late disclosure's impact on the district court's docket, and the sanctioned party's need for the precluded evidence." Id. at 30 (citing Esposito v. Home Depot U.S.A., Inc., 590 F.3d 72, 76 (1st Cir. 2009)).

Moreover, under Rule 56, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "[P]ersonal knowledge is the touchstone" of the admissibility analysis. Perez v. Volvo Car Corp., 247 F.3d 303, 315–16 (1st Cir. 2001). In addition, an affidavit's statements "must concern facts as opposed to conclusions, assumptions, or surmise" to be admissible. Id. at 316. Finally, because Rule 56 "requires a scalpel not a butcher knife," a court must only strike the portions of an affidavit that are inadmissible, while crediting the remaining portions. HMC Assets, LLC v. Conley, No. CV 14-10321-MBB, 2016 WL 4443152, at *2 (D. Mass. Aug. 22, 2016) (Bowler, M.J.) (quoting Perez, 247 F.3d at 315).

II.    **Background**

The following facts are undisputed, unless otherwise noted.  See L.R. 56.1(b) ("All

properly supported material facts set forth in the moving party's factual statement may be

deemed admitted unless properly opposed by the adverse party.").

In early 2014, McCoy and his wife moved to Catamount Road in Pittsfield.  Shortly after

moving to Pittsfield, McCoy purchased a 52-foot trailer and had it delivered to his property.

McCoy used the trailer to store items from his prior residence, as well as items from storage units

he had purchased.[4]  He also kept tools and other items in the trailer so that he could perform

maintenance or other renovation work on his property.[5]  In August 2015, the Town's then

building inspector, Jesse Pacheco, visited McCoy's property to conduct an inspection relating to

a building permit that McCoy had obtained for work on his home.  During the inspection,

Pacheco noticed the trailer and told McCoy that he needed to obtain a storage container permit[6]

from the Town to keep the trailer on his property.

---

[4] McCoy Depo. (doc. no. 17-2), at 25:1-13.

[5] Id.

[6] From 1997 to 2015, the Town's Zoning Ordinance defined "storage container" as "any truck trailer, box trailer, school bus, mobile home or other similar facility used for storage or other purposes."  In 2016, the Town amended this definition in its ordinance to define a "storage container" as "a truck trailer, box trailer, school bus, MANUFACTURED HOUSING unit, or similar mobile container parked continuously for 31 days or more and used principally for storage and not used for any person's residential occupancy or transient lodging."  Ordinance, Article 3.

McCoy then applied for and obtained a storage container permit from the Town for the trailer,[7] effective September 1, 2015 (the "2015 Permit").[8]  Article 14 of the Town's Zoning Ordinance, applicable to storage containers, now provides (as it did when McCoy applied for his permit) that regulating and permitting conditions for storage containers are intended "to promote the general welfare by protecting the aesthetics of the town."  Under the ordinance, storage containers must be used only for storage, must meet certain setback requirements, and must not be kept on a lot for longer than 12-months during any 15-month period.  Consistent with this section of the ordinance, the 2015 Permit stated that the trailer was permitted for storage purposes only for a period of one year, must be removed by September 1, 2016, and was not allowed to be kept permanently.

Later in 2015, McCoy rented another storage container to keep on his property, but did not obtain a storage container permit for the rental container.  In January 2016, McCoy allowed his son to paint the side of his trailer with an image that reads "TRUMP! USA" with "2016" in smaller, red paint.  As of January 29, 2016, the trailer appeared as follows in a social media posting:

---

[7] The permit lists the serial number, make, and manufacturer of McCoy's trailer and McCoy does not dispute that these numbers are associated with some other trailer or container.

[8] See 2015 Permit, Exhibit 2 to Marston Affidavit (doc. no. 17-3).



McCoy Depo., Ex. D (doc. no. 17-2).

     McCoy continued to use the trailer for storage but also used it to express his support for then-candidate Trump's bid to become President of the United States.  In August 2016, the Concord Monitor published an article about the trailer and McCoy's support for candidate

6

Trump, which attracted more attention to the trailer and McCoy's property.  A staff photographer

from the Concord Monitor photographed the trailer as part of the article, as shown in the

following image:



Ex. A to McCoy Depo. (doc. no. 17-2), at 112.  This photograph depicts the expressive content at

issue in this lawsuit.

On September 1, 2016, McCoy's storage container permit for the trailer expired.

Pacheco wrote to McCoy sometime in September or October 2016 and informed him that the

2015 Permit had expired and that the trailer needed to be removed pursuant to Article 14, Section

3 of the ordinance.[9]  The Town also notified McCoy that he needed to remove the unpermitted

rental container, which did not feature any expressive content.  By handwritten letter dated

---

[9] 2016 Notice of Violation, Ex. 3 to Marston Affidavit (doc. no. 17-3).

November 3, 2016, McCoy wrote to Pacheco and requested a six-month extension of the 2015 Permit.[10]  In his letter, McCoy wrote that he was seeking a six-month extension "to keep [his] tools and materials inside this trailer while [he] deal[t] with [an] emergency construction situation."  McCoy also cited the fact that he was handling the construction work himself and was "physically handicapped," but would "complete this task [of removing the trailer in six months] in order to remain with good standards for this town and it's [sic] rules as a Pittsfield home owner."

On November 15, 2016, the Town's select board met and considered McCoy's request to keep his trailer for an additional six months.  On a motion by Selectman Carl Anderson, which passed by unanimous vote, the board granted McCoy's request.  At this time, Anderson and other board members were well aware that McCoy was also using the trailer to express his support for President Trump.  The board granted McCoy's extension request despite having received at least one anonymous complaint[11] about the trailer and despite the fact that the applicable section of the ordinance prohibits storage containers from remaining on a lot for more than 12 months in any 15-month period.

McCoy continued to keep the trailer on his property into 2017 and in May 2017, Pacheco visited McCoy's property.  After this visit, McCoy requested a meeting with the select board. The board discussed McCoy's trailer during its May 23, 2017 meeting, but tabled any decisions about the trailer until McCoy could appear before the board.  In the board's minutes from the

---

[10] Nov. 2016 Letter, Ex. F to McCoy Depo. (doc. no. 17-2), at 117.

[11] The Town has no record of who submitted the complaint or the basis for the complaint, and Town witnesses similarly have no recollection of the complainant's identity or complaint's basis.

May 23 meeting, there is no discussion of McCoy's trailer being used to express support for President Trump or any other expressive purposes.

The board met with McCoy during its June 13, 2017 meeting. McCoy explained that it was taking him longer than expected to finish the repairs on his home because he was handicapped and doing the work himself. He then requested another extension of the storage container permit for the trailer, this time for one year, and that he planned to "get rid" of the trailer after that. McCoy did not mention the trailer being used as a sign or indicate any interest in applying for a sign permit (a separate Town process) during this meeting. According to minutes from this meeting, the board agreed to "extend the permit for one year." On June 13, 2017, the board approved a new storage container permit for McCoy's trailer.[12]

By the end of July 2017, the side of the trailer that showed support for President Trump had been painted over with a scene of hot air balloons and a waving American flag. The following image from social media shows the side of the trailer at issue as of July 30, 2017:

---

[12] At oral argument, counsel for both parties suggested that the distinction between granting a permit extension or a new permit was one of terminology, not of substance. The court accepts this premise for purposes of this order.



Ex. H to McCoy Depo (doc. no. 17-2), at 119.

For the remainder of 2017 and well into 2018, the trailer continued to display the balloon

scene. On May 22, 2018, the select board wrote to McCoy to remind him that his storage

container permit for the trailer was expiring in June 2018. The board also reminded McCoy that

the trailer needed to be removed from his property for at least three months before he could

apply for another permit to "bring it back."[13]  McCoy responded by letter dated May 29, 2018.

In his letter, McCoy referenced the fact that he had two trailers to unload and that he had emptied

one, but because he was disabled, the task of emptying the other one was taking longer.  McCoy

then requested "another permit in order to accomplish this huge task."[14]

The select board met on June 12, 2018 and considered McCoy's request.  After some

deliberation, the board voted to deny the request.  The following day, Town Administrator Cara

Marston (then Cara Hayes) wrote McCoy to inform him of the board's decision.  In her letter,

Marston noted that while the board understood the "personal circumstances that have caused

delay, [it] ha[d] to balance the terms of the zoning ordinance with [his] request," and voted to

deny it.[15]  The board allowed McCoy an additional 30 days to remove the trailer from his

property.  Thereafter, McCoy sold the trailer to a local business and removed it from his

property.  The Town did not impose any penalties or take any other enforcement actions against

McCoy relating to his trailer, other than to confirm that the trailer was removed following the

board's June 2018 decision.

McCoy and the Town had no further engagement regarding the trailer until almost two

years later when McCoy sued, alleging that the Town's actions regarding his trailer were

discriminatory and motivated by political animus.[16]  After answering the complaint, the Town

moved for judgment on the pleadings[17] and the court granted the motion in part and denied it in

---

[13] May 2018 Letter, Ex. 8 to Marston Affidavit (doc. no. 17-8), at 32.

[14] McCoy 2018 Letter, Ex. 9 to Marston Affidavit (doc. no. 17-8), at 33.

[15] Marston 2018 Letter, Ex. 12 to Marston Affidavit (doc. no. 17-8), at 47.

[16] See Doc. no. 1.

[17] See Doc. no. 10.

part.[18]  The parties exchanged some written discovery, although it appears McCoy has not responded to the Town's interrogatories or requests for production of documents, and deposed some witnesses.  The Town filed its motion for summary judgment on the agreed-upon deadline for such motions.

McCoy appears to argue that disputes of material fact preclude summary judgment for the Town.  First, McCoy alleges that beginning in mid-2016, he did not use the trailer principally for storage; he instead used it principally to display his support for President Trump and secondarily for storage.  McCoy contends that this fact is material because it shows that the Town should not have applied the storage container section of the ordinance against him at all, and that once it did apply that section, its application was unconstitutionally vague.  McCoy next alleges that there are numerous other unpermitted storage containers in Pittsfield that the Town has not taken enforcement action against.  As explained below, neither of these alleged factual disputes, if they can even be characterized as such, are sufficiently genuine or material to warrant denial of the Town's motion.

III.    **Analysis**

Counts 1 and 2 of McCoy's complaint arise from 42 U.S.C. § 1983.  To prevail on his § 1983 claims, McCoy establish two elements:  "(i) that the conduct complained of has been committed under color of state law, and (ii) that this conduct worked a denial of rights secured by the Constitution or laws of the United States."  Rodríguez-Reyes v. Molina-Rodríguez, 711 F.3d 49, 55 (1st Cir. 2013).  The Town argues that even viewing the undisputed factual record in

_____

[18] See Doc. no. 13.

12

McCoy's favor, McCoy cannot establish, as a matter of law, that the Town's conduct violated his constitutional rights. The court addresses each count in turn.

### A.    Count 1 - First Amendment

#### 1.    As-applied content or viewpoint discrimination

Because there was some confusion at oral argument about the nature of the claims McCoy is asserting in Count 1, the court summarizes the status of those claims here. In his complaint, McCoy consolidated three types of First Amendment claims into Count 1: content or viewpoint discrimination, overbreadth, and vagueness. After the court's order on the Town's motion for judgment on the pleadings, only the content or viewpoint discrimination and vagueness claims remained. Indeed, the court's order was clear that the content or viewpoint discrimination aspects of Count 1 survived the Town's motion for judgment on the pleadings.[19] Notwithstanding this clarity, neither party separately briefed the content and viewpoint discrimination claim and counsel for the parties admitted at oral argument that they mistakenly believed that the court had dismissed this claim.[20]

---

[19] Doc. no. 13, at 8; 18 ("For the reasons set forth above, Pittsfield's motion for judgment on the pleadings is GRANTED as to Counts 3, 4, and the overbreadth portion of Count 1, and DENIED as to the remainder of Count 1 and all of Count 2. Counts 3 and 4 and the overbreadth portion of Count 1 are dismissed with prejudice.").

[20] McCoy's counsel initially conceded at oral argument that he was no longer pursuing the content or viewpoint discrimination claim and acknowledged that the direct evidence of discrimination, if any, was thin at best. He later argued that he misunderstood the court's judgment on the pleadings order and did not raise content or viewpoint discrimination in his summary judgment briefing because the Town's motion did not explicitly address this claim. This explanation is difficult for the court to accept. McCoy was on notice that the Town was seeking summary judgment on all remaining claims and the Town was clear that part of its argument was that there "is no evidence of discrimination." Doc. 17-1, at 2, 15. Since the beginning, this case has been about McCoy's allegation that the Town ordered him to remove his trailer because the trailer depicted the word "TRUMP" and that this decision was a "content-based and viewpoint-based restriction on speech." Complaint (doc. no. 20) at ¶¶ 20, 29. If, in the face of a summary judgment motion seeking complete dismissal of his lawsuit, McCoy had

The Town nevertheless argues that the undisputed facts show that it did not discriminate against McCoy based on the expressive content or political speech on his trailer. The court agrees.

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'" Reed v. Town of Gilbert, 135 S. Ct. 2218, 2226 (2015) (quoting U.S. Const. amend. I). "As a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." United States v. Stevens, 559 U.S. 460, 468 (2010) (citing Ashcroft v. American Civil Liberties Union, 535 U.S. 564, 573 (2002)).

The government may restrict speech in nonpublic fora "as long as the restrictions are 'reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.'" Cornelius v. NAACP Legal Defense and Education Fund, Inc., 473 U.S. 788, 800 (1985) (quoting Perry Educational Assn. v. Perry Local Educators' Assn., 460 U.S. 37, 46 (1983)). "The existence of reasonable grounds for limiting access to a nonpublic forum, however, will not save a regulation that is in reality a facade for viewpoint-based discrimination." Id. at 811.

First Amendment jurisprudence recognizes varying levels of discrimination. Content discrimination occurs whenever a government regulates "particular speech because of the topic discussed or the idea or message expressed." Reed, 135 S.Ct. at 2226-27. Content-based restrictions "are subject to strict scrutiny, which requires the government to demonstrate that the restriction advances a 'compelling interest' and is 'narrowly tailored to achieve that interest.'"

---

evidence to support this aspect of Count 1, he had ample opportunity to present it and failed to do so.

Signs for Jesus v. Town of Pembroke, NH, 977 F.3d 93, 101 (1st Cir. 2020) (quoting Reed, 135 S.Ct. at 2218).  Viewpoint discrimination is "an egregious form of content discrimination" in which "the government targets not subject matter, but particular views taken by speakers on a subject."  Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819, 829 (1995).

In cases like this one involving political speech, the "First Amendment's guarantee of free speech applies with special vigor" and "affords the broadest protection to such political expression in order to ensure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people."  See Nat'l Org. for Marriage v. McKee, 649 F.3d 34, 51 (1st Cir. 2011) (quotations omitted).

McCoy neither provides nor points to any evidence to support his claims that the Town enforced the ordinance against him in a discriminatory manner based on its content, or targeted McCoy because the trailer expressed a viewpoint supporting President Trump.  In fact, the record evidence suggests the opposite.  During the time that the trailer contained the expressive content at issue, the select board granted McCoy two extensions of storage container permit and allowed him to keep the trailer on his property far longer than the express terms of the ordinance contemplated.  It was only in June 2018, well after the expressive content was removed from the trailer, that the Town ordered McCoy to remove it and refused to grant him any more permit extensions.[21]

_____

[21] McCoy's counsel asserted at oral argument that the back side of the trailer continued to say "Trump," even after the main section facing the road was painted over with the balloon scene, implying that this somehow showed the Town's discriminatory animus.  McCoy's claims have never been about the alleged expressive content on the back side of the trailer.  Instead, starting with the complaint, McCoy has focused on the larger, 52-foot length, part of the trailer that faced the road and caught the Town's and public's attention.  See doc. no. 1, at ¶ 10 ("In July 2016, Mr. and Mrs. McCoy's son, Brian Bales, painted the word 'TRUMP' on the trailer in large white letters (against a green background).").  McCoy has also presented no evidence that anyone from

There is no evidence in the record from which a reasonable jury could conclude that members of the select board or other Town officials at any time held discriminatory animus against McCoy resulting from his use of the trailer to express support for President Trump. Similarly, there is no evidence that Town officials held animus but did not act on it during the time the trailer expressed support for Trump, waited until the trailer no longer showed support for Trump, and *only then* decided to punish McCoy for his prior support for Trump by requiring him to remove the trailer. Nor is there evidence that Town officials harassed McCoy because of the expressive content on his trailer, as he alleged in his complaint.

When pressed about this at his deposition, McCoy answered that Town officials informed him that they had received complaints about his trailer and enforced the ordinance against him as a result of those complaints.[22] Even if the court accepted as true McCoy's allegation that the select board ordered him to remove the trailer in response to anonymous, non-specific complaints, no rational factfinder could conclude that this demonstrates the Town's discriminatory animus. Nor does the Town's decision to enforce its own ordinance in 2018 (when he was plainly in violation of the ordinance) show that it discriminated against McCoy based on the content or viewpoint expressed on the trailer in 2016 and 2017. The Town is entitled to judgment as a matter of law on this aspect of McCoy's First Amendment claim.

---

the Town knew that the back side of the trailer allegedly continued to display his support for President Trump.

[22] McCoy Depo. (doc. no. 17-2), at 98:2-99:19-20, 100:20-101:5.

2.    <u>As-applied vagueness</u>

McCoy also argues that the Town violated his free speech rights because the "Ordinance, as applied by the Town, is an unconstitutionally vague restriction on expressive activity."[23]  The vagueness doctrine implicates the Due Process Clause of the Fourteenth Amendment, not purely the First Amendment.  See United States v. Williams, 553 U.S. 285, 304 (2008); Kolender v. Lawson, 461 U.S. 352, 353-54 (1983).  A law is unconstitutionally vague when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  Id.  "The degree of vagueness that the Constitution tolerates – as well as the relative importance of fair notice and fair enforcement – depends in part on the nature of the enactment."  Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498 (1982).  "Even when expressive rights are involved," however, "perfect clarity and precise guidance have never been required."  Butler v. O'Brien, 663 F.3d 514, 520 (1st Cir. 2011) (quoting Williams, 553 U.S. at 304).

The Town contends that McCoy's vagueness claim is factually unsupportable because he had ample notice of what was required under the ordinance and the Town adequately explained its decisions to him.  McCoy responds by first arguing that the storage container section of the ordinance did not apply to his trailer at all, which shows that the Town's use of that part of the ordinance was standardless to the point of authorizing or encouraging discriminatory enforcement.  He next argues that even if the storage container section applied, the Town's application was vague because the ordinance does not provide a process for seeking permit extensions or explain the grounds for granting an extension.  Lastly, McCoy argues that the Town applied the ordinance so inconsistently that a person of ordinary intelligence would not

---

[23] Doc. no. 1, at ¶ 28.

have fair notice of what is prohibited.  The court is not persuaded by any of McCoy's arguments and addresses each one in turn.

Even if the court accepted McCoy's argument that the storage container ordinance did not apply to his trailer (an assertion belied by McCoy's own behavior and other record evidence), it is unclear how that would affect McCoy's vagueness claim.  For example, if, as McCoy says, his trailer was not a "storage container" as defined in the ordinance, the select board should have denied his initial application for a storage container permit.  Had the board done that, McCoy would have no vagueness claim.  McCoy's vagueness claim instead depends on the Town applying the storage container section of the ordinance to his trailer, so his puzzling argument that the "Ordinance should not be at issue in this case" (doc. no. 21, at 12) does not help his cause.

Next, the court rejects McCoy's conclusory argument that the ordinance's lack of language regarding permit extensions somehow proves that the Town applied it in a vague manner.  This argument is neither legally nor factually supportable.[24]  On the facts, the Town has not conceded, as alleged by McCoy, that it had no authority to grant a permit extension.  And legally, the ordinance's silence on this issue does not equate to a prohibition.  See Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65, 93 (1st Cir.2004)  ("The mere fact that a regulation requires interpretation does not make it vague.").  Instead, the ordinance is clear that the select

---

[24] McCoy also raises this "exceeding authority" argument for the first time in his opposition to the Town's summary judgment motion.  It was not plead in his complaint or raised during the parties' briefing of the Town's motion for judgment on the pleadings.  In fact, McCoy relied on an entirely different theory to support his vagueness claim at the pleadings stage, and appears to have abandoned this theory now.  See doc. no. 12, at 4 ("That application [of the ordinance] is also vague: the Town's action fails to make clear whether all political speech may be prohibited, or only some types of speech or expression. These allegations adequately assert a valid claim for relief.").

board "shall have charge of administering and enforcing the zoning ordinance."[25]  See also N.H.

RSA 41:8 ("The selectmen shall manage the prudential affairs of the town and perform duties by

law prescribed."); Segre v. Ring, 103 N.H. 278, 280 (1961) (noting that "wide discretion should

be given as to the methods" select boards employ to manage towns).  The authority to administer

and enforce the ordinance includes the authority and discretion to decide whether to grant storage

container permits and extensions of existing permits.  While the ordinance does not include

specific provisions stating so, the select board's general authority encompasses the power to

grant or deny permit extensions.  McCoy provides no authority stating otherwise.

Finally, while McCoy's inconsistent application argument has some superficial appeal, it

does not create a trial worthy issue over whether the application was unconstitutionally vague.  It

is true that the select board allowed McCoy to twice extend his permit, but denied him a third

extension.  McCoy is incorrect, however, that "[t]here is nothing different about [his] third

extension request."[26]  At least two key factors differentiate McCoy's third extension request from

his prior requests.  First, significant time had passed from when McCoy initially received his

permit in 2015 to when he made the third extension request in 2018.  That passage of time was

undoubtedly a factor in the board's decision not to grant McCoy another permit extension.

Second, at the time the board denied McCoy a third extension, the expressive content on the

trailer had been painted over.  This change in circumstances is material because McCoy is

alleging that the board's decision was an "unconstitutionally vague restriction on expressive

activity" and was so arbitrary or "standardless that it authorizes or encourages seriously

---

[25] Ordinance, Section 7, available at
https://www.pittsfieldnh.gov/sites/g/files/vyhlif3681/f/pages/zoning_ordinance_2021_2.pdf.

[26] Doc. no. 21, at 14.

19

discriminatory enforcement." Without expressive content on the trailer at the time of the board's 2018 denial, the "vague restriction on expressive activity" and discriminatory enforcement aspects of McCoy's vagueness claim are unsupportable, and McCoy has proffered no other evidence suggesting that the board's 2018 decision restricted his expressive activity.[27]

The ordinance clearly provides that storage containers must be kept on a lot for no more than 12 months during any 15-month period. McCoy's initial storage container permit stated that it could not remain on his property permanently and had to be removed one year from the approved date. After McCoy's initial permit expired after one year and the Town notified him that his trailer could not remain in his yard, McCoy wrote to the select board requesting a six-month extension of his permit. In his letter, McCoy told the board that he needed to keep the trailer longer to store items for emergency construction work that he (a disabled individual) was performing himself, but that he would "have it emptied and removed by the end of April 2017." He also indicated that he wished "to remain with good standards for this town and it's rules as a Pittsfield homeowner." The board granted McCoy's extension request.

In May 2017, McCoy again petitioned the board for a one-year extension of the permit due to unforeseen home repairs and the added time it would take for him to perform the repairs as a disabled person. McCoy also appeared before the board to state his case for an additional extension. At this meeting, when asked by a board member whether the trailer would be gone after another year, McCoy stated that he wanted to get rid of it, but just needed more time. The board granted McCoy's second extension request, this time providing him another year to keep

---

[27] Indeed, in the main case that McCoy relies on in his summary judgment briefing to support his vagueness claim, Buckle Up Festival, LLC v. City of Cincinnati, the city ordinance in question did not affect the plaintiff's First Amendment rights in any way. See Buckle Up Festival, LLC, 336 F. Supp. 3d 882, 886 (S.D. Ohio 2018).

the trailer on his property.  A jury could infer from this evidence that McCoy understood his obligations under the ordinance and further understood or believed that the select board had the power to grant exceptions to the rules in the ordinance.  It certainly does not suggest that McCoy "had no choice but to guess at [the ordinance's] meaning and modes of application."  United States v. Hussein, 351 F.3d 9, 14 (1st Cir. 2003).

After the Town notified McCoy in May 2018 that his permit was set to expire, he again requested more time to keep the storage container on his property.  At that point, the trailer had been on McCoy's property since 2014, and nearly three years had passed since the Town first issued a storage container permit for the trailer in September 2015.  The select board considered McCoy's request and denied it by unanimous vote.  Following the vote, the board notified McCoy of its decision in writing and explained its reasoning, noting his "personal circumstances that have caused the delay," but "balanc[ing] the terms of the zoning ordinance with [his] request."  Importantly, the decision letter stated that "as you have already been granted a year's extension beyond the 12 months permitted, they voted not to grant this second extension."  McCoy does not dispute any of these facts.  Under these circumstances, a person of ordinary intelligence would have understood how the storage container permitting and board deliberation process worked and, most importantly, would have had fair notice that he had run out of extensions.  It is unreasonable for McCoy to expect the select board to grant him permit extensions in perpetuity, which, under his theory, would be the only application of the ordinance that was not vague.

On this record, no rational fact finder could conclude that the Town's application of the ordinance was so inconsistent or "shifting" to the point that it was unconstitutionally vague.  Instead, it was a proper exercise of the board's authority and discretion after material changes in

21

circumstances.  While the court does not suggest that, as a matter of law, laws applied in this manner can never be unconstitutionally vague, the Town's application of the ordinance under the facts and circumstances here does not constitute an unconstitutionally vague restriction on McCoy's expressive activity.  The Town's motion for summary judgment is granted as to Count 1.

### B.    Count 2 - Equal Protection – Class of One Theory

In Count 2, McCoy asserts that the ordinance, as applied by Pittsfield, impermissibly creates two classes of residents – persons with unpermitted storage containers expressing political speech and persons with unpermitted storage containers not expressing political speech – and argues that the Town treats these classes differently in violation of the Constitution.  To prove this "class of one" theory of equal protection liability, McCoy must establish that he has "been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Donovan v. City of Haverhill, 311 F.3d 74, 77 (1st Cir. 2002) (quoting Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam)).  The Town contends that McCoy cannot prove any of these elements, and the court agrees.

**Similarly situated.**  "An individual is 'similarly situated' to others for equal protection purposes when 'a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated.'" Davis v. Coakley, 802 F.3d 128, 133 (1st Cir. 2015) (quoting Barrington Cove Ltd. P'ship v. Rhode Island Hous. & Mortgage Fin. Corp., 246 F.3d 1, 8 (1st Cir. 2001)).  At the summary judgment stage, McCoy has both the "burdens of production and persuasion" to identify – "backed by competent evidence" – "instances where persons similarly situated in all relevant respects were treated differently." Cordi-Allen v. Conlon, 494 F.3d 245, 250-51 (1st Cir. 2007) (quoting Buchanan v. Maine, 469 F.3d 158, 178

503

(1st Cir. 2006)); see also Gianfrancesco v. Town of Wrentham, 712 F.3d 634, 640 (1st Cir. 2013)

("[A] class-of-one plaintiff bears the burden of showing that his comparators are similarly

situated in all respects relevant to the challenged government action.").

These are "significant" burdens that are "enforced with particular rigor in the land-use

context." Cordi-Allen, 494 F.3d at 251.  Although "[e]xact correlation" with comparators is

neither likely nor necessary, McCoy "must show an extremely high degree of similarity between

[himself] and the persons to whom [he] compare[s]" himself.  Id. (quoting Clubside, Inc. v.

Valentin, 468 F.3d 144, 159 (2d Cir. 2006)).  Said differently, McCoy "must show that the

parties with whom he seeks to be compared have engaged in the same activity vis-à-vis the

government entity without such distinguishing or mitigating circumstances as would render the

comparison" inapt.  Id. (citing Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751 (1st Cir.

1996)).  Summary judgment is therefore appropriate on class of one claims "where it is clear that

no reasonable jury could find the similarly situated" element met, even in cases where, as here,

"the plaintiffs have presented copious evidence concerning a multiplicity of possible

comparisons." Id. at 252.

The parties disagree on the relevant comparison points.  McCoy relies on the court's

order on the Town's motion for judgment on the pleadings, where it stated that "the relevant

comparison points are property owners in Pittsfield with unpermitted storage containers on their

properties, including trailers, that do not express political speech."[28]  The Town argues that there

are several additional comparison points that the court must consider and that McCoy cannot

---

[28] McCoy's identification of comparators for his equal protection claim again demonstrates the
illogicality of his argument that the storage container ordinance does not apply at all to his
trailer.  Because if the storage container ordinance does not apply, the relevant comparators
change and McCoy's declaration and the accompanying photographs of unpermitted trailers are
irrelevant.

establish.  Even assuming that McCoy's characterization of the relevant comparators is correct, he has not met his burden of providing competent evidence of such comparators or proving that they were similarly situated to him in all relevant respects.

As evidence of the alleged comparators, McCoy submitted a declaration with his objection to the Town's summary judgment motion that attached several exhibits containing photographs of alleged unpermitted storage containers.  The Town moves to strike this evidence because McCoy did not disclose this information as part of his Rule 26 initial disclosures or in response to repeated formal and informal requests made by Town counsel during discovery.  To ensure the court is ruling on a complete summary judgment record, the court will consider McCoy's declaration and attachments as part of this motion.  The Town's concerns about McCoy's belated disclosure of this information and continued, unexplained failure to respond to interrogatories and document requests are valid and well taken, however, and nothing in this ruling should be construed as endorsing this type of discovery conduct.[29]

The Town argues that the relevant comparators are persons with permitted storage containers that expired, received extensions of the permit, and then were asked to remove the containers, similar to McCoy's experience with the Town.  It also asserts that several other factors make up the relevant comparison points.  McCoy rejoins that he has identified numerous other residents with unpermitted storage containers that have escaped enforcement action from

---

[29] At oral argument, McCoy's counsel tried to justify this discovery conduct by arguing that there was no real harm from his belated disclosures because the Town knew all along that these other unpermitted storage containers existed.  Whether a litigant knew or should have known about a certain witness or item of evidence (absent timely, complete disclosures of the information during the litigation) does not excuse its opponent from meeting his fundamental discovery obligations under Rule 26.  And even if the court accepted McCoy's premise about lack of harm, McCoy has not shown that the prior information the Town allegedly had about unpermitted storage containers was the same information contained in his declaration and the attached photographs.

the Town and that is sufficient to meet his burden of showing similarly situated landowners. The court disagrees.

McCoy's evidentiary proffer is too conclusory or speculative to satisfy his burden of producing "competent evidence" of relevant comparators at the summary judgment stage. See DePoutot v. Raffaelly, 424 F.3d 112, 117 (1st Cir. 2005) (the nonmoving party "must demonstrate, through submissions of evidentiary quality, that a trialworthy issue persists. Factual specificity is required; a conglomeration of conclusory allegations, improbable inferences, and unsupported speculation is insufficient to discharge the nonmovant's burden") (quotations omitted). In general, McCoy's declaration and photographs provide incomplete or inadequate information to show that these other trailers were similarly situated to McCoy. McCoy has provided photographs, addresses, and conclusory allegations that these property owners did not have permits[30] for the trailers and the Town did not require them to remove them. This "oversimplifies the analysis and fails to account for the fact that '[v]arious factual traits, circumstantial nuances, and peculiarities can set entities apart, rendering them, by virtue of their differences, amenable to disparate treatment.'" Cordi-Allen, 494 F.3d at 252 (quoting Racine Charter One, Inc. v. Racine Unified Sch. Dist., 424 F.3d 677, 681 (7th Cir. 2005)). McCoy's evidence is also deficient in several specific, material respects.

First, the court cannot decipher from this evidence which of the alleged comparators may be "grandfathered" in; that is, they installed the storage containers before there was an ordinance requiring a storage container permit. In fact, the ordinance was not adopted until 1988, the storage container article was not added until 1997, and the storage container was amended in

---

[30] In some instances, the property owners did have permits and received those permits after the events at issue in this case, weakening their status as potential comparators.

2016.  Without this information, a reasonable jury cannot determine whether the alleged

comparators are similar in relevant respects.  See Cordi-Allen, 494 F.3d at 253 ("In the land-use

context, timing is critical and, thus, can supply an important basis for differential treatment.

Since zoning bylaws, environmental standards, and licensing criteria may change over time,

courts must be sensitive to the possibility that differential treatment — especially differential

treatment following a time lag — may indicate a change in policy rather than an intent to

discriminate").

Second, McCoy's declaration is missing other information about the trailers that would

help a fact finder determine whether they are truly similarly situated.  For example, McCoy does

not explain:  (1) whether the trailers have been parked in the same location continuously for

more than 31 days (many have wheels or appear mobile); (2) whether the trailers were being

used for residential occupancy or transient lodging (which would exclude them from the

definition of "storage container" in the ordinance); (3) whether the storage containers were

unpermitted during the same period that McCoy kept the trailer on his property; (4) whether any

of these landowners received permit extensions from the select board; or (5) whether the Town

took any enforcement action against these other landowners.[31]

McCoy must do "more than 'point to nearby parcels in a vacuum and leav[e] it to the

municipality to disprove conclusory allegations that the owners of those parcels are similarly

situated,'" albeit by the slimmest of margins.  Freeman v. Town of Hudson, 714 F.3d 29, 38 (1st

---

[31] It is undisputed that the Town has taken similar enforcement action against other landowners with unpermitted storage containers on their property.  That alone may be enough to defeat a "class of one" equal protection claim because, "[b]y definition, a class of one is not a class of many."  Cordi-Allen, 494 F.3d at 254; see also Campbell v. Rainbow City, Ala., 434 F.3d 1306, 1317 (11th Cir. 2006) (explaining that a class of one suit cannot be maintained when similar burdens have been imposed on other individuals).

Cir. 2013) (quoting Cordi-Allen, 494 F.3d at 251).  Simply put, he has failed to marshal evidence in support of his equal protection claim that is "sufficient to establish factual as well as regulatory similarity."  Cordi-Allen, 494 F.3d at 251.  For this reason alone, the Town is entitled to summary judgment on McCoy's equal protection claim.

**Discriminatory enforcement against McCoy**.  Even assuming for purposes of this order that McCoy has identified a group of similarly situated comparators, the summary judgment record is devoid of any evidence that the Town selectively enforced the ordinance against McCoy because of his trailer's expressive content.

To maintain his equal protection claim, McCoy must also show that there is a trial worthy issue as to whether the Town intentionally treated him differently than other similarly situated landowners.  See Vill. of Willowbrook, 528 U.S. at 564 ("The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.") (emphasis added) (quoting Sioux City Bridge Co. v. Dakota County, 260 U.S. 441, 445 (1923)); see also Barrington Cove, 246 F.3d at 7 ("In order to establish its [equal protection] claim, however, Barrington needed to allege facts indicating that, 'compared with others similarly situated, [it] was selectively treated . . . based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'") (quoting Rubinovitz v. Rogato, 60 F.3d 906, 909-10 (1st Cir.1995)).

While McCoy is correct that direct evidence of discriminatory intent is rare, here, even the circumstantial evidence suggests that the Town acted with no discriminatory intent.  For example, during the time period when McCoy used the trailer to express his support for President

Trump, the select board allowed him to keep the trailer on his property for far longer than what the ordinance allowed.  In fact, the undisputed evidence shows that the board went out of its way to accommodate McCoy during this time.  By the time the Town ordered McCoy to remove the trailer in June 2018, the expressive content at issue had been removed for almost a year.  The Town also presented evidence with its summary judgment motion – which McCoy does not meaningfully contest – that it took similar enforcement action against other landowners with unpermitted storage containers.  This further refutes the notion that McCoy was singled out for enforcement.

To show discriminatory enforcement, McCoy resorts back to his argument that the select board had no authority under the ordinance to grant extensions to storage container permits.  Even if the court accepted McCoy's argument that the board lacked authority or acted unlawfully in granting permit extensions, this does not change the result.  "[T]he mere fact that [the Town] may have violated or abused federal or state regulatory regimes" in administering the ordinance "has no direct bearing on whether [the Town] violated [McCoy's] equal protection rights." Barrington Cove, 246 F.3d at 10-11.

**Rational basis.**  Finally, McCoy offers no evidence to show that the Town did not have a rational basis for ordering him to remove the trailer in June 2018.  By that time, the Town had allowed McCoy to keep the trailer on his property unpermitted from early 2014 to September 2015, afforded McCoy an extension of his original storage container permit, and granted him a new permit.  The trailer remained on McCoy's property for over four years when the ordinance only allowed storage containers for 12 months.  McCoy had promised the select board multiple times that he was in the process of removing items from his trailer and would have the trailer removed from his property.  Yet he continued to keep the trailer and store items inside the trailer

and continued to ask for extensions from the select board, all in recognition that he had no right to continue keeping the trailer on his property indefinitely. By June 2018, the select board had run out of patience with McCoy and declined to allow him to keep the trailer on his property. This was a wholly rational decision.

More importantly, McCoy has failed to adduce evidence of an arbitrary or irrational motive for Town's order to remove the trailer. And for good reason. By the time the Town ordered him to remove the trailer, it no longer contained expressive content and there is no evidence that Town officials held arbitrary or irrational motives prior to its June 2018 removal order, so no rational fact finder could infer that the Town's actions were motivated by political animus against McCoy. See Wojcik v. Massachusetts State Lottery Com'n., 300 F.3d 92, 104 (1st Cir. 2002) ("An equal protection claim will only succeed if the decision to treat an individual differently than those similarly situated is wholly 'arbitrary or irrational.'") (quoting Me. Cent. R.R. Co. v. Bhd. of Maint. Way Employees, 813 F.2d 484, 492 (1st Cir. 1987)).

### C.    Ripeness or failure to exhaust administrative remedies

The Town also argues that it is entitled to summary judgment on McCoy's claims because he failed to exhaust his remedies at the Town level before filing suit. Specifically, the Town contends that McCoy should have sought a variance before the Town's Zoning Board of Adjustment or appealed the select board's 2018 decision ordering him to remove the trailer, and because he failed to do so, his claims in this case are not ripe. McCoy responds, in part, that the Town should be municipally estopped from arguing that McCoy failed to exhaust his administrative remedies because the Town's own conduct dissuaded him from doing so. The court need not reach these questions as a result of the above rulings in the Town's favor on the merits.

## IV.    **Conclusion**

For the reasons set forth above, the Town's motion for summary judgment[32] is

GRANTED and its motion to strike[33] is DENIED.  The clerk shall enter judgment accordingly

and close the case.

        **SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated: October 6, 2021
cc:    Robert M. Fojo, Esq.
       Robert Joseph Dietel, Esq.

---

[32] Doc. no. 17.

[33] Doc. no. 23.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * * *
                                    *
        JOSEPH MCCOY              *
                                    *   20-cv-362-JL
            v.                      *   September 17, 2021
                                    *   10:15 a.m.
     TOWN OF PITTSFIELD            *
                                    *
* * * * * * * * * * * * * * * * * * *
```

<u>TRANSCRIPT OF MOTION HEARING</u>
<u>BEFORE THE HONORABLE JOSEPH N. LAPLANTE</u>

<u>APPEARANCES</u>:


<u>For the Plaintiff</u>:          Robert M. Fojo, Esq.
                                 Fojo Law, PLLC




<u>For the Defendant</u>:         Robert Joseph Dietel, Esq.
                                 Gallagher Callahan & Gartrell PC




<u>Court Reporter</u>:           Susan M. Bateman, RPR, CRR
                                 Official Court Reporter
                                 United States District Court
                                 55 Pleasant Street
                                 Concord, NH 03301
                                 (603) 225-1453

```
 1                    P R O C E E D I N G S

 2          THE CLERK:  Court is in session and has for

 3   consideration a motion hearing in Joseph McCoy versus the Town

 4   of Pittsfield, New Hampshire, civil case 20-cv-362-JL.

 5          Will counsel identify themselves for the record

 6   beginning with counsel for the plaintiff?

 7          MR. FOJO:  Good morning, your Honor.

 8          Robert Fojo for Joseph McCoy, the plaintiff, and

 9   Mr. McCoy is signed on as well.

10          THE COURT:  Good morning, Mr. Fojo.

11          Good morning, Mr. McCoy.

12          MR. DIETEL:  Good morning, your Honor.

13          Robert Dietel for the Town of Pittsfield.

14          And through Cara Marston I believe we have the town

15   administrator and also Carl Anderson watching and one of the

16   board of selectmen.

17          THE COURT:  Yeah, I can see Administrator Marston

18   on the screen here.  I can see her square, yeah.

19          Okay.  Look, I've read your submissions.  This is a

20   difficult situation.  There's just a lot of talking past each

21   other going on and a lot of real confusion over what the

22   claims even are.  I'm struggling with it, to be honest, so I'm

23   asking questions today, but I'll do my best to kind of hack

24   through it.

25          Let me get some preliminaries out.  This is a --
```

```
 1   first, it's a factual question.  June 2017 the minutes say he
 2   got an extension on the trailer, but he got an actual permit.
 3   He got a new permit.
 4           So was he granted a new permit or was he granted an
 5   extension?
 6           MR. DIETEL:  Your Honor, I think it's a distinction
 7   without much meaning.
 8           THE COURT:  You're probably right, yeah.
 9           MR. DIETEL:  He got approved to continue to keep
10   the trailer on the property.  He got that two times.  One in
11   2016 he got it, and he got it again in 2017, and then he gets
12   denied in 2018 on another third request.
13           THE COURT:  So your view is it doesn't really
14   matter?
15           MR. DIETEL:  Yeah.  I mean, we don't run away from
16   the fact, your Honor, that the ordinance which Attorney Fojo
17   makes much of says that it's for a 12-month period of time.
18           THE COURT:  Yep.
19           MR. DIETEL:  We think that that argument actually
20   totally undercuts Mr. McCoy's claims.
21           THE COURT:  Yeah, I'm not getting into your
22   argument yet.  I'm just trying to understand what happened.
23           Mr. Fojo, do you agree with that?  The minutes say
24   there is a new permit.  Do you agree with Mr. Dietel that this
25   doesn't make much difference?  In the scheme of things, it
```

```
 1   doesn't make a difference?
 2          MR. FOJO:  I don't think it makes much of a
 3   difference for a variety of reasons which we've articulated.
 4   So I'll leave it at that.
 5          THE COURT:  Okay.  Fair enough.
 6          Now, neither of you spent any time -- you know,
 7   this is a suit against the town.  It's not against Ms.
 8   Marston.  It's not against the board.  It's against the town.
 9   And so -- it's a Monell claim.
10          Do you concede, Mr. Dietel, that since it's a vote,
11   since it's an official town action that there's no reason to
12   dispute that?
13          MR. DIETEL:  Yeah, your Honor.
14          You know, I had thought about raising that.  We've
15   got a vote from the board of selectmen that makes the
16   determination.  I think the case law is clear that's a town
17   decision.
18          THE COURT:  I think you're right.
19          MR. DIETEL:  But it dovetails into my ripeness
20   arguments to some extent, and, you know, we'll touch on that
21   later I suppose.
22          THE COURT:  Sure.  You mean like your exhaustion?
23          MR. DIETEL:  Yeah.  I mean, we've got an argument
24   that the town has discriminated, and the town makes a final
25   decision here when there's an appeal to the ZBA of the
```

 1   determination.

 2          THE COURT:  Okay.

 3          MR. DIETEL:  But that never happened.  We don't

 4   have allegations -- the individual board of selectmen are not

 5   named.  Even the individual board itself is not named.  It's

 6   the town that's named.

 7          THE COURT:  Okay.  Now, this one might help me

 8   narrow things a bit.  Count 1 appears to argue by the

 9   complaint that the ordinance as applied by the town is

10   content-based and viewpoint-based restriction.

11          Neither of you really engaged that in the summary

12   judgment papers and I think that's because -- if I understand

13   Mr. Fojo's argument correctly now, it's not that the ordinance

14   is content-based or viewpoint-based.  Instead, the ordinance

15   -- which Mr. Fojo says shouldn't apply to his trailer anyway,

16   right, but instead -- it's impermissibly applied as a matter

17   of vagueness, not as a matter of content-based discrimination.

18          Do I have that right, Mr. Fojo?

19          MR. FOJO:  That's correct.  The way it's applied --

20   we obviously contend it shouldn't even matter here, but the

21   way the town exercised its discretion under the ordinance,

22   they did so in an arbitrary fashion and in a discriminatory

23   fashion.

24          Yes, nothing in the ordinance on its face is

25   content-based.  We concede that.  There's obviously no --

1    there are no -- there's never a smoking gun like that in these

2    instances in which the town intended to apply it in a

3    content-based way, but the way it was applied was vague and --

4              THE COURT:  Void for vagueness.

5              MR. FOJO:  Void for vagueness.  That's correct.

6    That is the correct claim.

7              THE COURT:  Okay.  Got you.  Okay.

8              And I guess that's why nobody really got into the

9    whole content-based aspect of the ordinance as applied or

10   basically whatever.  The point is Mr. Fojo's argument is it's

11   void for vagueness as applied.

12             Right, Mr. Fojo?

13             MR. FOJO:  Right.  That's correct.

14             I mean, the same facts existed each time Mr. McCoy

15   approached the board and requests an extension.  There's

16   nothing different.  The town has conceded, and Ms. Marston

17   conceded at her deposition, there's nothing different about

18   either request, and the town purportedly granted an extension.

19             In one instance the following year they denied it,

20   but then they go in and grant him another 30-day extension

21   when again nothing is different about those circumstances.  So

22   they're acting in a very contradictory and arbitrary fashion.

23             THE COURT:  Okay.  Let's stay with this then for a

24   minute because it really might help us streamline some of

25   this.

```
 1              One of the interesting points of your argument, Mr.

 2   Fojo, is that -- your point is this ordinance doesn't even

 3   apply to my client's trailer, it shouldn't apply at all,

 4   right?

 5              Now, I'm trying to figure out, can you make an

 6   argument that an ordinance that doesn't apply to your client's

 7   trailer is void for vagueness?  Do you follow what I'm saying?

 8   I mean, can you have it both ways?  Can you say it doesn't

 9   apply on the one hand and it's void for vagueness?

10              MR. FOJO:  The town contends that it applies

11   because that's what they were operating under.

12              THE COURT:  Yeah.

13              MR. FOJO:  So that's what I had to challenge.  I

14   had to challenge the town's application of the ordinance.  So

15   that is our claim.

16              I do believe -- I think I can maintain that the

17   ordinance never should have been applied to him, but that is

18   the action that the town took so that is the action I am

19   challenging.

20              And I think that the town for whatever reason

21   relied on this ordinance to exercise some authority to act

22   here, and I think it's perfectly consistent to argue on the

23   one hand that they applied it in a vague manner, but at the

24   same time they never should have used that ordinance in the

25   first place.
```

1          THE COURT:  Do you have any thought about that at
2   all, Mr. Dietel?
3          MR. DIETEL:  Yes.
4          Your Honor, you're picking up on points that I've
5   been struggling with.
6          I think the arguments made by plaintiff are
7   entirely inconsistent and factually just do not hold any
8   water.
9          You know, we've got an ordinance that on its face
10  applies to storage containers, right?  There's no dispute on
11  that.  He's got a storage container on his property.
12         He applies on three occasions saying that he's
13  using the storage container for storage purposes and that he
14  wants it approved under the storage container ordinance, and
15  he gets permits and signs applications under that ordinance.
16         And then he comes back and he says to the Court,
17  well, that ordinance really shouldn't have applied to me.
18  Disregard all my representations that I made to the planning
19  board.  I really wanted to use this as a sign.  And so, town,
20  you shouldn't have applied this.  Even though I asked you to
21  apply it, you shouldn't have applied it.
22         And then it just totally ignores the fact, okay,
23  well, even if that makes some sense logically, which it
24  doesn't, you have an ordinance that provides for signs to be
25  permitted, and he never applied for a sign permit.

1           I mean, I am perplexed.  I noted that in my reply

2    that logically these arguments do not make sense.

3           THE COURT:  Well, but isn't Mr. Fojo's argument --

4    okay, he's saying, look, I don't think this applies to my

5    client.  It should have been a sign.  However, it was -- Mr.

6    Fojo just said it was applied as a storage container ordinance

7    but they did so in a way -- he's not saying it's

8    viewpoint-based discrimination anymore because neither party

9    briefed it.  What he's saying though is that the way it was

10   applied was unconstitutionally -- rendered it

11   unconstitutionally void for vagueness.  That's Mr. Fojo's

12   argument as far as I can tell.

13          So what's hard to -- what's not to understand?

14          MR. DIETEL:  Well, your Honor, fundamentally -- I

15   mean, what Attorney Fojo is doing is he's coming in here and

16   he's saying, your Honor, I would now like to make an argument

17   but really I don't understand -- my clients did not understand

18   what this permit was all about, because I would like to

19   contend it was really a sign and I can't understand factually

20   how the town applied this to me.

21          Because the question is on a void for vagueness

22   as-applied challenge, would a person of reasonable

23   intelligence have understood how and why it was applied to

24   them.  For the Court to even go down that avenue requiring --

25   I'm not saying the Court is, and I understand the Court is

```
 1    trying to understand the arguments, but it would require you
 2    to look past the handwritten representations of Mr. McCoy that
 3    he wanted a permit for storage container purposes.  Multiple
 4    letters to the town.
 5           So how do you now come before the Court and say,
 6    yes, I wrote to the town on three occasions and said I wanted
 7    this explicitly for storage container purposes, but I didn't
 8    understand how it was applied.  I really -- you know, this was
 9    confusing to me.  This should have been a sign permit
10    application.
11           That doesn't hold water.  It just doesn't make
12    sense.
13           THE COURT:  All right.  But it doesn't make -- it's
14    not that I dispute that assertion, Mr. Dietel.  It doesn't
15    make sort of sense based on -- I think you're probably right
16    about the fact that it doesn't make a lot of sense based on
17    the facts as we understand them to be or the complaint
18    actually in the case, but I'm going to try to -- I'm trying to
19    analyze Mr. Fojo's approach from a legal perspective.
20           MR. DIETEL:  I understand.  I understand.
21           THE COURT:  I guess your argument on the law is,
22    look, if the test is whether a person would -- you know, would
23    a person be -- would the average reasonable person be able to
24    understand how it was applied to him, I guess your point is,
25    right, that the facts just don't bear that out.  It didn't
```

1    seem like there was any --

2              MR. DIETEL:  I fully understand, your Honor, why

3    you're going down this path, and I have struggled with it

4    because I don't understand how you can come to the Court and

5    say I'm going to bring an as-applied vagueness challenge under

6    this ordinance which I don't think applies to me.  I struggle

7    just at a threshold level with that.

8              But then I look at it on the facts and I look at it

9    on the standard of a motion for summary judgment, and could a

10   reasonable jury conclude that a person of reasonable

11   intelligence wouldn't have had fair notice here.

12             And we've got three separate engagements with the

13   board of selectmen with three separate handwritten letters

14   requesting this for storage, and in the final minutes the

15   board says, look, we have to keep this man to his word.  He's

16   represented -- and I'm filling in now the blanks of the

17   minutes, but he's represented twice that he needs this because

18   he's using it for storage.  He's disabled.  He wants to get

19   his stuff out of there.  We cut him slack on two prior

20   occasions.  We need to keep this man at his word is what they

21   say, and they deny him on the third go-around.

22             I mean, this is exactly what we want the town to

23   do, right?  They were flexible in their application of the

24   zoning ordinance based on the representations made to them

25   about a good faith desire to use this for storage and to get

```
 1   it unpacked, and then they turn around after the fact on a
 2   third denial when it doesn't even say Trump on it anymore and
 3   say I don't understand now why it was applied to me in this
 4   way.
 5           I don't think that's credible, your Honor.
 6           THE COURT:  Yeah, but of course the test isn't
 7   whether it's credible.  I understand your point.
 8           MR. DIETEL:  Right.  It's whether a person of
 9   reasonable intelligence would have had fair notice, and I
10   submit he had fair notice at that point.
11           THE COURT:  Tell me, Mr. Fojo --
12           And I promise I will let you guys make your
13   arguments and not just pepper you with questions all the time,
14   but I'm really struggling with this.
15           So, Mr. Fojo, tell me.  If -- let's assume you're
16   right about this and that the storage container ordinance
17   shouldn't apply to Mr. McCoy.  How does that affect your
18   claim?  I mean, if this wasn't a storage container and the
19   board shouldn't have applied the storage container part of the
20   ordinance, what's your theory of liability?  Like, what makes
21   the town's conduct unlawful or unconstitutional?
22           MR. FOJO:  I think it's important to understand
23   that when I'm arguing that the ordinance should not have
24   applied here, I'm not -- it's not like I'm abandoning our
25   claim.  I think -- it supports the notion that the town's
```

 1   application of the ordinance was vague.  You have identical

 2   circumstances in which the town applied the ordinance one way

 3   and then applied it another way.

 4          THE COURT:  To Mr. McCoy?

 5          MR. FOJO:  To Mr. McCoy, yes.

 6          THE COURT:  The point is to grant him extensions

 7   and then not to grant an extension, that's the vagueness?

 8          MR. FOJO:  In the first instance -- to apply the

 9   ordinance in the first instance.  He testified at his

10   deposition that he was not using the trailer principally for

11   storage.  I understand what he stated at the meetings several

12   years ago, but he wasn't using it principally for storage.

13          By the way, in the final go-around it did say

14   Trump.  It wasn't on the front of the trailer anymore.  It was

15   on the back.  He testified about that at his deposition as

16   well.

17          But to answer your question, Judge.  In applying in

18   the first instance and then granting him an extension that the

19   town concedes it had no authority to provide -- Ms.

20   Marston testified at her deposition that they had no process

21   for an extension under the ordinance.  And then doing that a

22   second time and then denying him a third extension in 2018,

23   but then granting him a 30-day extension in literally the same

24   breath, that is the very definition of vagueness.

25          I'm not abandoning the claim.  I'm merely trying to

1    explain the chronology here.  The ordinance should never have

2    been applied to him in the first instance.  They're applying

3    it and then -- applying it in directly contradictory ways.

4         We cited a case from the Southern District of Ohio

5    in our papers that provides a very similar example of such

6    strict discriminatory enforcement.

7         THE COURT:  Talk to me about that.

8         MR. FOJO:  About the case?

9         THE COURT:  Yes, because my next question for you

10   is going to be -- if this is your argument, and I think I

11   really do have a better handle on it now, It's the idea of

12   allowing the extensions and then declining to do so --

13        MR. FOJO:  Correct.

14        THE COURT:  -- amounted to unconstitutional

15   vagueness.  So I was going to ask you about authority for

16   that, and you're about to tell me about an Ohio case.

17        MR. FOJO:  We cited a case <u>Buckle Up Festival</u>

18   <u>versus City of Cincinnati</u>, it's Southern District of Ohio

19   2018.  The district court there held that there's a municipal

20   ordinance that required an admission tax to be paid to the

21   City of Cincinnati based on -- I'll leave it at that.

22        The ordinance defined admission and that definition

23   contained some discretion that could be exercised by the city,

24   and so the plaintiffs alleged that the defendants didn't

25   require them to pay that admission tax in 2012 for this music

```
 1   festival but then required them to pay the tax the following
 2   year for the same music festival, and the Court held that
 3   those allegations supported the claim that it was vague and it
 4   led to arbitrary and discriminatory enforcement.
 5            And I think the way the town acted here, the board
 6   acted here, is nearly -- is precisely the same.
 7            You take an ordinance that they believed applied.
 8   There is some discretion exercised pursuant to the ordinance.
 9   They granted him an extension one year.  They did it a second
10   time.  They denied him a third time.  The circumstances that
11   supported each request were exactly the same.  The town
12   conceded that.  Ms. Marston conceded that at her deposition
13   that nothing was different about any of those requests for
14   extension.
15            So we think that that case squarely applies here
16   and supports the void for vagueness claim.
17            THE COURT:  Well, but -- I see.  I don't know.
18            But, I mean, he made specific requests for those
19   extensions based on a disability and the difficulty he was
20   having removing his materials.
21            MR. FOJO:  Right.
22            THE COURT:  So was the town basically bound to
23   extend the permit for the trailer as long as he kept
24   representing that his disability prevented him from removing
25   the stuff from the trailer?  I mean, that doesn't seem like it
```

```
 1    would make sense.
 2              MR. FOJO:  I don't think -- well, there's nothing
 3    in the ordinance concerning an extension for -- first of all,
 4    there's nothing -- like Ms. Marston said at her deposition,
 5    there's no process in the ordinance for an extension.  I think
 6    we can all agree on that and so --
 7              MR. DIETEL:  We can't, your Honor, all agree to
 8    that.
 9              MR. FOJO:  Okay.  All right.
10              If you take Mr. McCoy at his word in 2016, 2017,
11    2018, and his representations then, then even if you agree
12    that the town was correct in applying the ordinance, there's
13    no process for an extension under the ordinance and they
14    applied it in a discriminatory fashion in each of those years.
15    So the claim still should prevail here in my opinion based on
16    the Buckle Up Festival case that I explained.
17              THE COURT:  Okay.
18              MR. DIETEL:  Your Honor, if I may, you know, I --
19              THE COURT:  So -- but --
20              Go ahead, Mr. Dietel.
21              MR. DIETEL:  Well, I was going to say that case is
22    not on point and -- you know, I say this with all due respect
23    to Attorney Fojo and to give him some credit, I think he's
24    doing a good job of trying to muddy the waters here, but the
25    fact is that -- I think the Court has to first look at the
```

1    statute and conclude -- it's not the statute, it's the

2    ordinance, and conclude that it did apply under the facts and

3    circumstances here.  I mean, on its face it applies.  Further,

4    it applies based on the representations Mr. McCoy made.

5         And it all begs the question, how is the town

6    supposed to know that Mr. McCoy really wanted a sign permit

7    when he's come in on multiple occasions and said give me a

8    storage container permit.

9         THE COURT:  You're trying to talk -- Mr. Dietel,

10   you're trying to talk about reality and I'm up in the clouds

11   talking about theory.

12        MR. DIETEL:  Yeah, you know, and it's the facts

13   here at the end of the day.  And I enjoy this back and forth

14   on this but, you know, we can't go past those points.

15        And, you know, at the end of the day this is not a

16   circumstance where -- you know, as your Honor pointed out,

17   this third denial does not occur in a vacuum.  I mean, this

18   occurred after a series of prior permit approvals based on

19   representations and it's part of a chain.

20        And, you know, as an aside, you know, the

21   concessions that Mr. Fojo claims the town made, I just want to

22   be clear we don't agree that those concessions have been made.

23        THE COURT:  Uh-huh.

24        MR. FOJO:  If the ordinance applied, then they

25   should have just denied the first request.

```
 1              MR. DIETEL:  I mean, this is the funniest thing,
 2    your Honor.  This is what I -- I don't get it.  I mean, the
 3    record if anything -- this whole suit is about an allegation
 4    that the town discriminated against Mr. McCoy because he
 5    painted this sign -- this storage container Trump.
 6              THE COURT:  Which is no longer the suit because --
 7              MR. DIETEL:  It's evolved, right?  The arguments
 8    have been a moving target.
 9              But at the end of the day the record before you, if
10    anything, would support an inference that he was granted
11    preferential treatment under Mr. Fojo's theory.  I mean,
12    Attorney Fojo is coming in and saying the town shouldn't have
13    even granted a single permit extension.  That this was a
14    constitutional injury that it granted permit extensions.
15              THE COURT:  Well, I think his argument is -- I'm
16    not saying I necessarily countenance this.  That's why I spent
17    time trying to understand it.  It's that to grant him this
18    preferential treatment and then withhold it amounts to
19    unconstitutional vagueness.  Not viewpoint discrimination.
20    Unconstitutional vagueness.  There's a difference.
21              MR. DIETEL:  Yes, sir.
22              THE COURT:  Okay.
23              MR. FOJO:  Judge, that was your ruling on the
24    motion for judgment on the pleadings.  That was the portion of
25    the First Amendment claim that survived.  So it's not an
```

```
 1   evolving lawsuit.  I mean, that is what you -- you believed
 2   that that was the only portion of the claim that survived at
 3   that point so that is -- and that's what Attorney Dietel
 4   challenged in his motion for summary judgment and that's what
 5   we responded to.
 6                MR. DIETEL:  I think what the Court's ruling said
 7   was that the only surviving claim was an as-applied vagueness
 8   challenge.
 9                MR. FOJO:  Correct.  I'm not disputing that.
10                THE COURT:  That's what he just said, right?
11                MR. FOJO:  Correct.  But it's not an evolving
12   complaint.  It's that's what survived.
13                MR. DIETEL:  Well, my comment previously about
14   these being evolving arguments is that -- the essential
15   allegation in your complaint, Attorney Fojo, was that the only
16   reason for the town denying a permit extension was because it
17   said Trump on the side, and now we're going down a path of
18   saying, well, what really happened is that on the third denial
19   I incurred a constitutional injury because I didn't understand
20   why it was denied, right, the application of it to me on that
21   third occasion.  I didn't have fair notice as to why I was
22   being denied.
23                MR. FOJO:  Well, my client continues to maintain
24   that it was removed because it said Trump, but the surviving
25   portion of that claim is a void for vagueness challenge -- an
```

1  as-applied vagueness challenge, and that's what we're

2  litigating and disputing right now.

3            THE COURT:  Okay.  Give me a moment here.

4            (Pause)

5       So just articulate for me -- I think you've done

6  this, Mr. Fojo, but just articulate for me.  When we take the

7  expressive content of viewpoint discrimination out of the

8  equation, the vagueness claim is what?  Just in your own

9  words, what is the constitutionally impermissible vagueness of

10  the application of the storage container ordinance?  Is it

11  just that it was allowed and then withheld for reasons that,

12  as Mr. Dietel says, your client couldn't be expected to

13  understand?

14            MR. FOJO:  It's the manner in which they applied

15  it.  They applied it in one way in one year and they applied

16  it in a completely opposite fashion the following year but

17  then granted him a 30-day extension immediately after that.

18       So it's this constantly shifting application of the

19  ordinance based on identical circumstances.  A person of

20  ordinary intelligence could not possibly understand what is

21  driving the town's application of the ordinance in each of

22  those instances, and Ms. Marston conceded at her deposition

23  that they had no reason for why they continued to change their

24  application of the ordinance.  We cited that language in our

25  brief.

```
1              THE COURT:  But isn't --

2              MR. FOJO:  It's still a mystery to me why they

3    continued to -- they're explaining now that they were being --

4    Attorney Dietel is explaining now that they were being

5    flexible because he was disabled and such.  Again, there's no

6    process in the ordinance that allows them to consider any of

7    those factors.

8              Ms. Marston conceded that there was no basis, there

9    was no rationale for why they granted him -- purportedly

10   granted him an extension one year, denied it the following

11   year, and then granted him a brief extension immediately

12   afterwards so he could remove the trailer.  It's still a

13   mystery to me why they were doing this and why they continued

14   to change their position.

15             THE COURT:  It's difficult for me to comprehend why

16   you would say that the 30-day extension is somehow a chink in

17   their armor.  I mean, what were they supposed to do, go there

18   every day and give him a new citation that it was still on the

19   property?  They gave him time to get it off the property.

20   That can't be part of the claim.

21             MR. FOJO:  I suppose so, but I'm principally not

22   relying on that.  I'm principally relying on the granting of

23   the extension the two prior times and then denying it the

24   third time.

25             MR. DIETEL:  Your Honor, this highlights what's the
```

```
 1   constitutional injury here.

 2              THE COURT:  Yeah.  That's the next question.

 3   Right.

 4              What is the -- if I accept your -- if I accept your

 5   rendition, right, that it was just impermissibly vagueness,

 6   vague as applied because of what looks to you like

 7   irreconcilable standards or irreconcilable action, right, what

 8   is the injury to your client, the constitutional injury, Mr.

 9   Fojo?

10              MR. FOJO:  Well, it falls under the First

11   Amendment, is that what you're asking me, or you're asking me

12   what his damages are?

13              THE COURT:  Well, it doesn't fall under the First

14   Amendment.  It's not viewpoint-based.  See, you can't have it

15   both ways.  You can't say it's expressive content and then

16   not.  I mean, so you're saying it's vagueness so that a person

17   wouldn't understand how the law applied to him.  Mr. McCoy in

18   this case.  But let's assume I accept that, that that's a

19   viable argument, even though it would seem to be -- well, I'm

20   not going to go down that path right now.

21              It's an impermissibly vague application of the

22   container ordinance, let's assume you're right about that,

23   what's the constitutional injury to Mr. McCoy?

24              MR. FOJO:  Then it would be a due process claim.

25   You're correct.
```

```
 1              THE COURT:  Okay.  And what's the injury?  What's
 2   been the deprivation that's a constitutional violation?
 3              MR. FOJO:  Well, I mean, it's -- I mean, I'm not
 4   sure I understand the question, your Honor.  Maybe if --
 5              THE COURT:  How was your client --
 6              MR. FOJO:  Go ahead.  I'm sorry.
 7              THE COURT:  No.  You were about to answer it.  He's
 8   been deprived of -- he's been -- I guess the argument is he's
 9   been subject to regulations that he -- subject to regulation
10   regarding the disposition of his property that are too vague
11   to be applied in any way that's not arbitrary and
12   inconsistent.
13              I guess that's the claim, Mr. Dietel.  What do you
14   say about that?
15              MR. DIETEL:  I think, your Honor, that you're
16   giving some generous readings to things in the sense I
17   understand the logic that you're following, but I think it
18   gets us off track here.
19              I think the reason why we're all struggling with
20   this is because it doesn't add up.  I mean, we've got a
21   situation where we have the plaintiff arguing that he was not
22   entitled to permit extensions and the town granted him permit
23   extensions, and because they did it twice he now has an
24   entitlement to a third permit extension.  But we're dealing
25   with an as-applied vagueness challenge, so the real question
```

1  is whether or not he should have reasonably understood why he

2  was denied the third time, and factually -- I keep coming back

3  to the facts here because I think they are controlling.

4         We've got a plain record that explains to him why

5  he was denied and we have a follow-up letter to him explaining

6  to him why he was denied.

7         THE COURT:  Okay.

8         MR. DIETEL:  And we've got this question of, okay,

9  well, if he wasn't entitled to the permit, then what is it

10  that he was -- where's the injury?  I mean, I'm having a hard

11  time articulating it, your Honor, because I just -- maybe it's

12  a shortcoming on my analytical abilities, but I'm not

13  following it.

14         THE COURT:  I get it.

15         All right.  Why don't I just let you make your

16  arguments, and I'll interrupt you when I have questions.

17         MR. DIETEL:  Your Honor, I assume you want me to

18  start as the moving party?

19         THE COURT:  Yep.

20         MR. DIETEL:  Your Honor, I actually don't have a

21  whole lot to say this morning because I think we've briefed

22  this exhaustively.  We've given you a very detailed recitation

23  of the facts, and the summary of the law is better stated in

24  my writings than I can summarize to you orally.

25         However, because I have the opportunity to speak

```
 1    with you about this this morning, I do want to pull back on

 2    some of the points that we have just been touching on, and I

 3    think your Honor has been probing the areas that I wanted to

 4    touch on anyway, and that is fundamentally we're dealing with

 5    a discrimination claim.  We're dealing with an allegation that

 6    Mr. McCoy was subjected to intentional discrimination because

 7    he had a trailer that said Trump on the side of it.  That is

 8    something that I think we all agree is what this case turns

 9    on.

10           But he bears the burden of both production and

11    persuasion on the elements necessary to satisfy those claims,

12    and I don't think a reasonable jury can look at the facts in

13    front of you, your Honor, and determine -- I'll delve into the

14    specifics, but that there was any discrimination here.  In

15    fact, Mr. McCoy's own declaration in support of summary

16    judgment does not set forth any factual elements to support

17    any finding of any sort of discrimination whatsoever.

18           What the record bears out in black and white based

19    on Mr. McCoy's own representations is that he wanted this as a

20    storage container, he applied for it as a storage container,

21    he was granted approvals while it said Trump on the side of

22    it, and when the big 50-foot side that is promoted in the

23    complaint as the subject of all of this was repainted as a

24    balloon scene, it's only then after that point that he's

25    denied.
```

1              So, you know, these points all really hone in on

2    the equal protection claim aspect of this, which is I think --

3    you know, you've heard from me extensively now at this point

4    on the vagueness application, what I think of that, so I'll

5    focus in on the equal protection, but are there any facts that

6    he was intentionally treated differently in some

7    discriminatory manner?  The record in front of you does not

8    contain any facts and he's not provided any in his declaration

9    to support that.

10             Was there no rational basis?  There was a clear

11   rational basis.  You've got three requests.  I mean, Mr.

12   Fojo's whole argument is you can't supposedly grant further

13   extensions after one year.  Well, the board had granted two

14   extensions and gives a third.  He's not followed through on

15   his representations.  There's no disputes on these points.

16   We've got a request for admissions and a deposition in front

17   of the Court that establish all of these things definitively.

18             THE COURT:  What if he's right about this -- I

19   don't think he is, but what if he is right about this.  What

20   if he's right about the idea that given that there's no

21   authority under the ordinance for extensions that that makes a

22   difference here, right?

23             MR. DIETEL:  Yes.

24             THE COURT:  Does it make a difference?  I don't

25   think the lack of any black and white, you know, express

1    authority to provide an extension really means that there

2    can't be an extension.  I don't believe that, but assuming

3    he's right about that, what difference does that make?

4         MR. DIETEL:  I think it supports our arguments that

5    he was not discriminated against.  If the town did not have

6    the authority to grant him extensions and it granted him

7    extensions when the storage container said Trump, how can he

8    establish that he was discriminated against?  And we have to

9    have evidence you have intentional discrimination by the town.

10   He's not pled claims against individual selectmen.  It's

11   against the town.  There's nothing in the record, there's

12   nothing in his declaration on those points, and the rational

13   basis here is that the town granted one permit approval, then

14   it granted an extension, then it granted another extension for

15   an ordinance that says twelve months, and at some point you

16   have to say, I'm sorry, we can't grant further extensions on

17   this.

18        You know, heading more granular -- I mean, across

19   the board I think it fails on all of the prongs of an equal

20   protection claim but, you know, I've cited, and I'm sure the

21   Court will take a look at it, the Cordi-Allen decision from

22   the First Circuit.

23        The only thing that was provided in response to

24   summary judgment that's at all responsive to these issues was

25   a collection of pictures of other storage containers in town

1    with no factual detail as to where they are or what the basis

2    is for those being somehow similarly situated.

3            In that Cordi-Allen decision the First Circuit said

4    that, "It is inadequate merely to point to nearby parcels in a

5    vacuum and leave it to the municipality to disprove conclusory

6    allegations that the owners of those parcels are similarly

7    situated."  And that's precisely what he's putting on the town

8    here.

9            But, you know, setting that aside, we've gone the

10   extra step of putting in front of the Court two trailers that

11   I think it's fair for the Court to look at in evaluating

12   whether there was discrimination or not.

13           One is on Mr. McCoy's own property.  He claims he

14   only had to get the trailer off because it said Trump and that

15   that was the only reason.  Well, perhaps the most similarly

16   situated trailer would be the other trailer that was on his

17   property.  We've defined it in our pleadings as the rental

18   container, I believe, and he had another trailer on his

19   property that did not say Trump and was required to be

20   removed.

21           And in the May 2018 board decision where they

22   decided that it was time to finally deny his third extension

23   request, they brought an enforcement action against another

24   set of trailers in town and they required that they come in

25   and get permitted.  And much like they treated Mr. McCoy, they

```
 1    allowed one of those trailers to be permitted and the other
 2    two had to go because only one trailer is allowed by the town.
 3              I highlight those things because, you know, part of
 4    his claims are these allegations that he was treated
 5    differently from other people.  I mean, the facts that are in
 6    front of the Court don't sustain that in any way.
 7              We've gone over our as-applied vagueness challenge.
 8    I think a person of reasonable intelligence on this record --
 9    the Court has to conclude respectfully that a person of
10    reasonable intelligence would know why it was applied.
11              And I'll touch on our ripeness argument, your
12    Honor, because it was pretty clear.  That's not a throwaway
13    argument on our part and it's not just academic.
14              As we cite in our pleadings, the Second Circuit
15    looked at this question, and it's a different context but I
16    think analogous, in the Murphy case.  They adopted the Supreme
17    Court's Williamson finality standard there, and I think
18    appropriately so.
19              You know, the question with these types of cases
20    is, is the federal district court supposed to sit as basically
21    like a super zoning board.
22              We have a situation where the final decision here
23    resides with the ZBA.  Mr. McCoy could have taken an appeal to
24    the extent he believed he has constitutional injuries and he
25    could have challenged this.
```

```
 1              And in that Murphy decision I think the Second

 2    Circuit touches on two points which I agree with.  Now, maybe

 3    you don't have to do that if you suffer some immediate injury

 4    by bringing an appeal, but bringing an appeal would have just

 5    extended the time that he could have kept the trailer on the

 6    property.

 7              And the next analysis is would bringing that appeal

 8    further define the issues for the Court, and certainly it

 9    would.  A ZBA looks at whether these decisions are unlawful or

10    unreasonable, and Mr. McCoy would have had an opportunity to

11    the extent he felt this was an unreasonable application to

12    argue that there.

13              So I think the Court should look at the ripeness

14    analysis that we have if it doesn't grant summary judgment on

15    the other grounds and should consider that.

16              And then we also have a motion to strike, as the

17    Court's aware, which I touch on because it is tied into this

18    and it goes to my points about the declaration provided in

19    support of summary judgment.  That declaration fails on a

20    couple grounds.

21              Number one, it doesn't recite any harassment.  It

22    doesn't recite any personal knowledge for the notion that

23    these trailers are somehow similarly situated.  It just

24    provides a bunch of pictures of trailers.

25              And then on top of that, it was a late disclosure
```

```
 1    that for the reasons set forth in our motion I think should
 2    not be considered by the Court.
 3            So to sum up, your Honor, at the end of the day
 4    could a reasonable jury find in his favor on these facts?  No.
 5    I don't believe so.
 6            And I think this case is entirely devoid of merit
 7    despite the interesting academic arguments we've had about
 8    these questions, and I would ask that summary judgment enter
 9    for the town.
10            THE COURT:  Yep.  Talk to me first, Mr. Fojo --
11    let's work backwards.  What about the lateness of the
12    disclosure?  Leaving aside whether that affidavit and the
13    photos create genuine issues of material fact, leaving that
14    aside for the moment, what happened here and why should it be
15    allowed to play out the way it did?
16            MR. FOJO:  In the complaint we alleged, and there's
17    no dispute, that two board members acknowledged and conceded
18    that there were trailers -- unpermitted storage container
19    trailers all over town.  Ms. Marston conceded that at her
20    deposition as well.
21            For whatever reason the town has made it seem
22    throughout this litigation like that wasn't true.  Perhaps I'm
23    naive and my client was naive, but we didn't believe that that
24    would be the position.  We believed we would instead
25    acknowledge the fact that there literally are trailers all
```

```
 1    over town and that we would just be engaging in these academic
 2    arguments as to whether there was a constitutional violation.
 3              So my client in April drove around and took
 4    pictures of as many of these trailers as he could find, and
 5    there were many, many trailers.
 6              So it was never -- you know, it was alleged earlier
 7    on in this proceeding that the allegation that there were
 8    trailers all over town was too generic.  It wasn't generic.
 9    It was fatally true.
10              He sent me all these photos and images in April.
11    They make it seem in their motion to strike as if we were
12    sitting on these since the beginning of the case, and that's
13    not true.  I provided the image files, the native files, to
14    Attorney Dietel that contained the metadata which demonstrates
15    when these images came into existence, which was April, and he
16    provided all of these to me in April and May.  There were a
17    lot of images.  It took a while to get through all this and
18    just process them and understand where they came from and
19    where this was, and so we provided them along with our
20    objection to motion for summary judgment.
21              The standard that they are relying on to strike the
22    submission, it doesn't require automatic exclusion and
23    submissions like these are allowed if they're harmless or
24    substantially justified.
25              THE COURT:  I guess I need to understand.
```

```
 1                MR. FOJO:  Sure.

 2                THE COURT:  And I mean this with respect.

 3                MR. FOJO:  Of course.

 4                THE COURT:  But you're saying it took a long time

 5      to go through them.  That's not substantially justified.  My

 6      understanding is you haven't even answered interrogatories or

 7      document requests in this case, you literally didn't do

 8      discovery, and then in response to summary judgment you came

 9      up with an affidavit from your client and some photos.

10                That -- look, the bottom line is I'm going to

11      probably consider them because I don't want to just leave it

12      out of the case and make that a ground for some type of even

13      perception that I'm not hospitable to your claim, but I can't

14      imagine why that is viewed as permissible in litigation.  It's

15      just not.

16                MR. FOJO:  The issue here is that they're harmless.

17      The town knew all along based on admissions by their own board

18      members that these trailers were in existence.  We provided

19      every document that was responsive and that we had in our

20      possession.  But for the photographs, every other document was

21      provided and right around the close of discovery.  So we did

22      produce documents.

23                There were only six interrogatories that were

24      proffered.  The information called for by those

25      interrogatories was obtained by Attorney Dietel at Mr. McCoy's
```

1    deposition.  So he had -- all of the information requested in

2    discovery they had before the close of discovery.

3            The photographs are the only issue.  Their

4    production is harmless because the town knew all along that

5    these trailers were in existence all over town, and Mr. McCoy

6    testified to the existence of these trailers in his deposition

7    which was again taken before the close of discovery.  He

8    identified some of the trailer owners and property addresses

9    in his deposition, and then he alluded to many, many others.

10   Of course he's not going to have the addresses of every one of

11   these trailers off the top of his head or in his memory, and

12   so we followed up with the photographs that he took a little

13   bit before that.

14           THE COURT:  Okay.  All right.  I interrupted you,

15   Mr. Fojo.

16           MR. FOJO:  That's fine.

17           THE COURT:  I want to let you respond to Mr.

18   Dietel's arguments.

19           MR. FOJO:  That's fine.  I appreciate that.

20           Just going back to the -- we talked extensively

21   about the vagueness challenge, and I admittedly got a little

22   confused by your question.

23           A vagueness challenge -- an as-applied vagueness

24   challenge can be made in the context of a First Amendment

25   claim if the allegation is that it infringes or inhibits a

1    freedom of expression, and that's how it was pled here

2    originally.

3              You were asking what is the deprivation.  That

4    would obviously be a due process claim.  We haven't made that

5    here.

6              The claim here is it was applied to him in a vague

7    manner such that he was the only person in town with a trailer

8    with political expression on it who was ordered to remove that

9    trailer.  So that was the end result.  That is the

10   constitutional injury.

11             I'll leave the rest of that claim alone since we

12   spent a lot of time on it earlier.  If you have any other

13   questions, Judge, I would be happy to answer them.

14             As far as the equal protection claim, the relevant

15   comparison points here as per your order on the motion for

16   judgment on the pleadings several months ago are property

17   owners in Pittsfield with unpermitted storage containers on

18   their properties.  We've identified numerous property owners

19   in Pittsfield with unpermitted storage containers on their

20   properties who were treated differently than Mr. McCoy.

21             Again, the town conceded that many of these

22   trailers existed.  Ms. Marston conceded that not only in the

23   2017 -- May 2017 board meeting but at her deposition.  She

24   stated at her deposition she had no reason to dispute what the

25   town's Code Endorsement Officer, Jesse Pacheco, had stated at

1    that same May 2017 meeting.  She conceded that the town never

2    bothered to investigate whether these trailers existed.

3           The town contends that it undertook some

4    enforcement activity concerning three property owners, and it

5    attempts to argue that this constitutes lax enforcement.  That

6    this was essentially -- given the number of trailers -- and

7    they're all over the place.  The photographs demonstrate that.

8    Mr. McCoy's testimony demonstrates that.  The town's own board

9    members' concessions demonstrate that.

10           This was a complete abdication of enforcement.  But

11    for whatever reason, they targeted Mr. McCoy and ordered him

12    to remove his trailer off his property, and his trailer is the

13    only one of all of those trailers that contained any form of

14    political speech on it.

15           Concerning the exhaustion argument, I don't think

16    that applies here.  The rule -- it's clear that the rule on

17    exhaustion of administrative remedies is flexible, but there

18    are exceptions to it.  And one of those is if judicial

19    treatment is more appropriate for the types of claims being

20    alleged, then exhaustion of administrative remedies isn't

21    required.

22           And here this is precisely what the case is.  We've

23    alleged constitutional claims under the cases that we've

24    cited.  For example, Blue Jay Realty Trust versus City of

25    Franklin.  There were constitutional claims alleged.

1    Administrative -- the exhaustion of administrative remedies

2    was not required.

3            The same thing with Olson versus the Town of

4    Litchfield that we cite in our brief.

5            They don't want a local town board to be dealing

6    with constitutional claims.  Those claims are particularly

7    suited for this Court, not a town board.

8            And then even if this exhaustion principle or rule

9    applied here, I think the doctrine of municipal estoppel

10   should prevent the town from asserting that we failed to

11   exhaust those remedies given its conduct in the way it applied

12   the ordinance in many different fashions in many different

13   ways.  We think that that -- and we briefed this extensively

14   in our objection.  I don't think it's necessary to go into

15   every detail and the different elements of how this exception

16   applies, but the bottom line is they deceive Mr. McCoy into

17   acquiescing to these extensions and to accepting these

18   extensions of a storage container permit thinking that that's

19   what he needed, and then at the very end when they gave him 30

20   days to remove the storage container and the trailer from his

21   property, by the time that that extension expired his

22   appellate rights had expired.

23           So we don't believe that -- we believe that the

24   town should be estopped from asserting that he failed to

25   exhaust his administrative remedies even if that doctrine

```
 1    would apply, which again it shouldn't because these are
 2    constitutional claims that a court, not a town board, should
 3    be dealing with.
 4              THE COURT:  Well, I'm not saying the town board
 5    should be adjudicating the constitutionality of the ordinance
 6    or its application, I'm with you, but you could have certainly
 7    done the normal appeals by arguing that, look, these
 8    ordinances do not permit the permitting or denial of
 9    permitting, whether it's storage containers or signage, based
10    on political viewpoints.  That's an argument that you can
11    clearly say the law doesn't permit that, the town law, right?
12    I mean, there's nothing stopping you from doing that, right?
13              MR. FOJO:  No, but -- well, that's not what we're
14    arguing here.  Again, it's the claim that needs to be
15    exhausted.  That's the point.  We're not alleging he should
16    have been granted another extension or he shouldn't have.
17    That's not what we're alleging.
18              Our allegations here -- it was applied -- it's an
19    applied vagueness challenge and his equal protection rights
20    were violated.  Those aren't the claims he would have been
21    asserting in an appeal at the town level.
22              THE COURT:  Yeah, but what you would be able to say
23    was we -- you know, we appealed these decisions that we say
24    are unlawful and they were resolved in a way that violates my
25    client's, you know, constitutional rights to avoid
```

```
 1    impermissibly vague laws and equal protection violations,

 2    right?  I mean -- I don't know.

 3              What about that, Mr. Dietel?

 4              MR. DIETEL:  I was going to say the standard of

 5    review for the ZBA under New Hampshire law is whether the

 6    decision was unlawful or unreasonable.  Attorney Fojo could

 7    have come in for Mr. McCoy and said this was an unlawful

 8    application of the zoning ordinance or unreasonable because it

 9    was being applied solely based on his support of President

10    Trump, and those are precisely the types of things that the

11    ZBA is supposed to adjudicate.

12              But beyond that why I just get fundamentally

13    perplexed is at the time of this denial it doesn't even say

14    Trump so --

15              THE COURT:  But it used to.

16              MR. DIETEL:  The back of it did.

17              THE COURT:  The back of it doesn't matter.  It's

18    not facing the road so I'm not worried about the back of it,

19    but it used to say Trump.  You're making it sound like that

20    couldn't be the basis for the town action, and it certainly

21    could be.

22              MR. DIETEL:  I respectfully disagree, your Honor.

23              He says in paragraph 20 of his complaint, "The

24    court order was based solely on the fact that the trailer

25    depicted Trump in large letters."  So I'll concede he doesn't
```

```
 1    define a time period, but how do you reconcile that when it

 2    gets two approvals when it says Trump and then a denial when

 3    it doesn't say Trump?

 4             THE COURT:  Well, I mean -- let me make the

 5    argument.  We don't like this big sign that says Trump, but

 6    he's disabled and he says he's having difficulty.  Let's face

 7    it.  Mr. McCoy's course of conduct here didn't appear to be

 8    square dealing with the town.  That's a fact, right, you know,

 9    extension, extension.  And they might have had it in their

10    thinking that they don't want this big Trump sign.  Okay.  I

11    have no idea if this is true and there's no evidence of it, by

12    the way, none whatsoever, but I want to give him the benefit

13    of his argument that that's what was happening.  So take him

14    at his word.  They didn't want it there because it said Trump,

15    but they gave him an extension because he had a sympathetic

16    reason and they listened to it a couple times.  But finally

17    they stopped believing this sympathetic reason and they said,

18    well, enough with the Trump sign.  Now, it doesn't say Trump

19    anymore, but he put us through that so get rid of your

20    trailer.  I mean, wouldn't that be impermissible?

21             MR. DIETEL:  If their decision was motivated by his

22    expression of political speech and there was something in the

23    record to evidence that, but that's the central point, your

24    Honor.  There's nothing in the record to evidence that and

25    it's contradicted by that sequence of events, right?
```

```
 1              THE COURT:  Okay.
 2              MR. DIETEL:  I mean, at the end of the day here
 3     we're dealing with a circumstance where Attorney Fojo is
 4     arguing we don't have a right to grant extensions under this,
 5     but the town grants him a series of extensions.  Where's the
 6     discrimination?
 7              And setting that aside, where's the evidence of any
 8     intentional discrimination?  I mean, we have an ordinance that
 9     says twelve months.  They state in their denial the reasons
10     for why they're denying it, and that's a rational basis right
11     there.
12              And if it fails on any one of the prongs for the
13     equal protection claim, it fails on all of them in the sense
14     that he has to satisfy -- it's his burden to satisfy all of
15     those prongs.
16              THE COURT:  Yep.
17              MR. FOJO:  I think the bottom line on the
18     administrative exhaustion point is that it's a flexible rule.
19     It's not absolute.  He's not required in every instance to
20     appeal it to the town ZBA.  When it involves purely legal
21     issues or constitutional issues, such as the cases that we
22     cited, he has the discretion to pursue those claims, those
23     specific claims in a court of law as opposed to appealing it
24     to the town ZBA.
25              THE COURT:  I've spent too much time on it.  I
```

1    don't think I'm going to spend a lot of time on the

2    exhaustion, to be honest.

3            Mr. Dietel, one thing I'm surprised at here is that

4    when Mr. Fojo said, well, we're only arguing vagueness only

5    because on a motion for judgment of the pleadings you took

6    away viewpoint-based discrimination, and I thought to myself,

7    no, and then you agreed with him.

8            I'm looking at page 8 of my order, "These

9    allegations, taken as true for the purposes of this motion,

10   support a claim for unconstitutional content (banning

11   unpermitted storage containers with political messages) or

12   viewpoint (banning unpermitted storage containers expressing

13   support for then political candidate Trump) discrimination."

14   I didn't foreclose any -- I didn't foreclose any pursuit of a

15   viewpoint-based claim by Mr. Fojo.

16           Now, I thought he didn't argue it so it was gone,

17   and that's my view of it.  He's arguing vagueness.  But why do

18   you support that reading of the order?

19           MR. DIETEL:  Your Honor, I don't have your order,

20   unfortunately, right in front of me.  I had it in the back of

21   my head that there was specific language that said that the

22   only thing that applied was an as-applied -- the only aspect

23   that survived was an as-applied vagueness challenge.  Maybe

24   I'm wrong on that, your Honor, but it's certainly the only

25   thing that's been argued, and I don't see any basis for

```
 1   viewpoint -- any factual basis for viewpoint discrimination.

 2            I'll concede I could be wrong, your Honor.  If

 3   you've got it in front of you, you've probably got a better

 4   record right now than I --

 5            THE COURT:  Can I get someone in -- like, I don't

 6   know if Vinny is on this.  Can somebody send me that order?

 7   Because I'm lost.

 8            THE CLERK:  I can send it to you, Judge.

 9            MR. FOJO:  I'll send it.

10            You granted the motion on the overbreadth portion.

11   That's Count 1.

12            THE COURT:  Overbreadth, yeah.

13            MR. FOJO:  Overbreadth.

14            The vagueness portion survived.  I'm just reviewing

15   it right now myself.

16            The issue here is the motion targeted the vagueness

17   issue, and so that's what I was responding to.  The motion for

18   summary judgment that is.

19            THE COURT:  Are you saying that if I -- see, that's

20   the problem with these situations.  There's no clarity on what

21   the claims are.  There's no clarity on anything.  So whatever

22   we do is just -- at the next level people just argue whatever

23   they want like none of this happened, and I get frustrated and

24   tired of that.  It's impossible to have these conversations

25   when we're not even having the same argument about the same
```

1    claims.

2              Hold on.  Somebody just sent me that.

3              (Pause)

4              Yeah.  So Mr. Fojo was basically saying since you

5    only moved on vagueness, he's only arguing vagueness.

6              I don't want anyone here saying you're not arguing

7    viewpoint because I foreclosed it because I did not foreclose

8    it.  If that's a problem, that's not something I want a remand

9    on from the First Circuit Court of Appeals, all right?  That's

10   the kind of thing I like to avoid, a Court of Appeals judge

11   saying I didn't really understand my case, all right?  That is

12   irksome.

13             So we're basically having a big argument here about

14   a portion of the case that Mr. Fojo is going to argue -- well,

15   I don't know -- that Mr. Fojo is going to argue was the only

16   portion at issue in this motion, which is vagueness, but this

17   is the whole case we're talking about as far as I'm concerned.

18             MR. DIETEL:  Your Honor, I've got here at the start

19   of my memorandum of law, I say, "With respect to Count 1, the

20   Court ruled that McCoy alleged minimally sufficient facts to

21   support a claim that the town applied its ordinance against

22   him in a vague manner.  The Court has accepted as true the

23   allegation that the town required him to remove his storage

24   container because it depicted Trump and that a person of

25   ordinary intelligence would not have fair notice of what was

```
 1    prohibited under the ordinance of what a trailer must look
 2    like in order to pass muster under the storage container
 3    section of the ordinance."
 4              I suppose, reading it as a whole, it was my
 5    understanding that what you were finding survived was that its
 6    application was -- the only thing that was properly pled was
 7    that its application was impermissibly vague.
 8              THE COURT:  I completely accept that as your
 9    representation, not a correct reading of the order, because,
10    look, the last page of the order says, "For the reasons set
11    forth above, Pittsfield's motion for judgment on the pleadings
12    is granted as to Counts 3, 4, and the overbreadth portion of
13    Count 1, and denied as to the remainder of Count 1 and all of
14    Count 2," right?
15              So the motion was denied as to Count 1, and that
16    included content-based and viewpoint discrimination.
17              Now, the way it was described though in Count 1 is
18    a little bit -- and I think that's -- this probably isn't a
19    problem.  I just want it to be clear for the record, okay?
20    Because the way Count 1 is argued -- I think maybe this is
21    what Mr. Fojo has been saying all along, but he's saying that
22    it is a -- let me pull it up here.  Yeah, he says at paragraph
23    29 of the complaint, "The ordinance as applied by the town is
24    a content-based and viewpoint-based restriction on speech,"
25    okay, "as applied by the town."  He also says -- I think it's
```

```
 1   paragraph 28, yeah, if I can find it here.
 2             MR. FOJO:  I've got 29.
 3             THE COURT:  Yeah.  Hold on a minute.
 4             (Pause)
 5             Okay.  No.  Vinny, that's not what you sent me.
 6   I'm looking for the complaint.
 7             Oh, I'm sorry, Vinny.  You sent me the right thing.
 8   I asked you for the order and that's what you sent.
 9             THE CLERK:  Okay.
10             THE COURT:  Hold on a minute.
11             Here it is.  Paragraph 28, "The ordinance as
12   applied by the town is an unconstitutionally vague restriction
13   on expressive activity."
14             That's kind of a hybrid allegation I admit.  I
15   don't even know if it exists under the law.  Mr. Fojo told me
16   it does exist, by the way, a few minutes ago.  That vagueness
17   can be applied as a way to restrict expression.  He did tell
18   me that but, you know, its vagueness -- and I guess that maybe
19   answers my question of Mr. Fojo.  It's that the
20   unconstitutionality is its vagueness and its application here,
21   which Mr. Fojo described as the irreconcilably inconsistent
22   application.
23             MR. FOJO:  That's right.
24             THE COURT:  The damage I guess would be some type
25   of restriction on his expressive activity, his speech.
```

```
 1                MR. FOJO:  That's correct.

 2                Your Honor, you alluded to this in your order on

 3      the motion for judgment on the pleadings.  When it does

 4      inhibit freedom of expression, the vagueness test is even more

 5      stringent.

 6                MR. DIETEL:  This goes to my point, your Honor.

 7      How is his expression being restricted?

 8                THE COURT:  Yeah, that's true.

 9                And that's true, Mr. Fojo, because by the time you

10      were ordered to remove the trailer there wasn't a Trump sign

11      anymore.  The back of it doesn't make much difference to me

12      because, you know, he can face any sign he wants toward his

13      house, but that's kind of the -- like, where's the restriction

14      of expression when it wasn't a Trump sign by the time it was

15      ordered moved?

16                MR. FOJO:  It still restricts his expressive

17      activity.  I know you're saying that because it was in the

18      back it doesn't make a difference, but I'm not aware of why

19      that location should matter.

20                THE COURT:  Okay.

21                MR. DIETEL:  Well, it matters factually.  I mean,

22      this all -- this is a very -- I'm glad we're going down this

23      path because it helps clarify some of my thinking, your Honor,

24      and I obviously want a very clear record, but it doesn't

25      excuse the fact that there's no evidence in the record of any
```

 1   discriminatory intent.

 2           I mean, where's the discrimination?  There's

 3   nothing in his declaration.  There's nothing in anything that

 4   actually is credible evidence of any discrimination.  You

 5   know, when I asked him, and I provided it in our support, to

 6   identify what was the discriminatory action that was taken by

 7   the town, he could only identify one thing, and he said that

 8   selectmen, three of them, James Allard, Carl Anderson, and a

 9   prior one, Larry Konopka, told him that the town had received

10   word of complaints, and I said, is that it, and he said,

11   complaints, complaints, complaints.

12           Selectmen telling him that they received word of

13   complaints, that cannot be the level for a constitutional

14   injury here.  You know, there would have to be something far

15   more than that.

16           THE COURT:  Was it complaints about the content or

17   just complaints about the trailer?

18           MR. DIETEL:  Just vague general complaints about

19   the trailer.

20           THE COURT:  Yeah.  Okay.  Well, the complaint is

21   going to control that.  Okay.

22           Well, look, I've been running you guys all around

23   the field today with my questions.  I think I'm good,

24   actually.

25           I want to give you each a chance though if there's

1   anything else you want to say to me that you haven't been able

2   to say, to do so.

3          We'll start with you, Mr. Dietel.  It's your

4   motion.  Is there anything else you want to say?

5          MR. DIETEL:  Yes, your Honor.  I apologize.  My

6   neighbor is mowing his lawn.  I hope you can hear me.

7          THE COURT:  I can't hear that at all.

8          MR. DIETEL:  Okay.  Great.

9          I just want to highlight, your Honor, that the

10  standard on an equal protection claim is that he's got to

11  provide specific instances where people are similarly situated

12  in all relevant respects.  Providing pictures of trailers in

13  town does not meet that standard.  There's no case law that

14  suggests that meets that standard.  He's got to provide both

15  temporal similarities, he has to provide regulatory

16  similarities, he has to provide factual similarities, and his

17  central allegation that the only reason he was singled out was

18  because of Trump -- well, he was not the only person that was

19  subjected to enforcement.  We provided the Court with evidence

20  of that.  The town even took an individual to court on a

21  storage container permit violation.

22         So, you know, at the end of the day the facts just

23  do not support his claims in any way, and we ask that the

24  Court grant summary judgment.

25         THE COURT:  Got it.

```
 1              Go ahead, Mr. Fojo.

 2              MR. FOJO:  Thank you.

 3              I'll just -- the only thing I have left to say is

 4    I'll respond to Attorney Dietel's final comment.

 5              This Court laid out what the relevant comparison

 6    points were in its order on the motion for judgment on the

 7    pleadings, and that was, again, property owners in Pittsfield

 8    with unpermitted storage containers on their property,

 9    including trailers.

10              Mr. McCoy identified several such trailers.  The

11    pictures demonstrate many, many such trailers.  It's better to

12    show than tell.  All of those trailers look very similar to

13    Mr. McCoy's trailers, none of them contain expressive activity

14    on them, and the town has conceded that only twelve such

15    trailers were ever granted permits.  Indicating that the

16    remainder of them had no permit.

17              So we've satisfied those comparison points and

18    there's no question here that Mr. McCoy was treated

19    differently than all those other trailer owners.

20              So we are -- I think that there's no dispute really

21    as to any fact here.  The Court has the discretion -- we made

22    this request in our objection.  The Court has the discretion

23    to grant summary judgment for the nonmovant, and I believe,

24    given that there's no dispute of fact as to many of the issues

25    here, that opportunity is available.
```

```
 1              I have nothing further unless the Court has any
 2    questions.
 3              THE COURT:  Under your theory -- I want to be clear
 4    on this, Mr. Fojo -- there's no genuine disputes of material
 5    facts here.  I could grant summary judgment to you.
 6              MR. FOJO:  That's correct.  That's the argument I
 7    made.
 8              THE COURT:  Okay.
 9              MR. DIETEL:  Your Honor, for our record, that would
10    require a -- if you were to grant summary judgment in favor of
11    Mr. Fojo, that would be over our objection that there's some
12    discriminatory intent.  We've proved that there is no
13    discriminatory intent.
14              So for the purposes of his motion for summary
15    judgment, there would be a factual dispute.
16              THE COURT:  Okay.  Okay.
17              Well, thank you, gentlemen.  I appreciate your
18    presentations, and I'll get an order out here shortly.
19              Are we scheduled for trial soon?
20              MR. DIETEL:  We're scheduled for the first trial
21    period in November, your Honor, so we have some deadlines
22    coming up.
23              THE COURT:  You'll have an answer from me well in
24    advance of that so you're not caught like, you know, not
25    knowing if there's going to be a trial.  We'll get you an
```

1    answer well in advance, okay?

2                MR. DIETEL:  Thank you, your Honor.

3                MR. FOJO:  Thank you, your Honor.

4                THE COURT:  Thank you, counsel.

5                And thanks to everyone from the town and to Mr.

6    McCoy for participating.

7                We're adjourned.

8                (Conclusion of hearing at 11:25 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3

 4        I, Susan M. Bateman, do hereby certify that the

 5   foregoing transcript is a true and accurate transcription of

 6   the within proceedings, to the best of my knowledge, skill,

 7   ability and belief.

 8

 9

10   Submitted:  1-28-22          /s/   Susan M. Bateman _____
                                  SUSAN M. BATEMAN, RPR, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```